## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**Case No. _____**

FRIENDS OF THE EVERGLADES, INC., a Florida
501(c)(3) not-for-profit corporation, and CENTER
FOR BIOLOGICAL DIVERSITY, a 501(c)(3)
nonprofit organization,

        Plaintiffs,

vs.

KRISTI NOEM, in her official capacity
as Secretary of the UNITED STATES
DEPARTMENT OF HOMELAND SECURITY;
TODD LYONS, in his official capacity as Acting
Director of the UNITED STATES IMMIGRATION
AND CUSTOMS ENFORCEMENT; KEVIN
GUTHRIE, in his official capacity as Executive
Director of the Florida Division of Emergency
Management; and MIAMI-DADE COUNTY, a
political subdivision of the State of Florida,

        Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.    This is an action for declaratory and injunctive relief under the National

Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*; the Administrative Procedure Act

(APA), 5 U.S.C. § 701 *et seq.*; and applicable provisions of Florida law, to halt the unlawful

construction of a mass federal detention facility for up to 5,000 noncitizen detainees, which the

Defendants are calling "Alligator Alcatraz," at the Dade-Collier Training and Transition Airport

("TNT Site"), a limited-use pilot training facility within the Greater Everglades, the Big Cypress National Preserve and Big Cypress Area.

2.    The TNT Site is owned by defendant Miami-Dade County and located within or directly adjacent to the Big Cypress National Preserve and the Big Cypress Area, a nationally and State protected, and ecologically sensitive, area that serves as habitat for endangered and threatened species like the Florida panther, Florida bonneted bat, Everglade Snail kite, wood stork, and numerous other species.

3.    Defendant Florida Division of Emergency Management (the "Division"), through its Executive Director, has entered into an arrangement, the details of which have not been made public, with the Defendants U.S. Department of Homeland Security ("USDHS") and U.S. Immigration and Customs Enforcement ("ICE") to transform the TNT Site into a mass migrant detention and deportation center. The decision to construct a mass migrant detention and deportation center at the TNT Site was made without conducting any environmental reviews as required under NEPA, without public notice or comment, and without compliance with other federal statutes such as the Endangered Species Act, or state or local land-use laws.

4.    Defendant Miami-Dade County is a political subdivision of the State of Florida and is the owner of the TNT Site.

5.    Plaintiffs seek an injunction and declaratory relief to halt pre-construction activities, construction, and related operations at the TNT Site unless and until Defendants comply with NEPA and related state, federal and local environmental laws and regulations. Simultaneous with the filing of this Complaint, Plaintiffs have filed their Expedited Motion for Temporary Restraining Order and Preliminary Injunctive Relief under Rules 65(a) and (b), of the Federal Rules of Civil Procedure, and respectfully request its expedited consideration.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 701–706 (APA), 42 U.S.C. § 4321 *et seq.* (NEPA), and supplemental jurisdiction under 28 U.S.C. § 1367 over related state-law claims.

7.      Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. §§ 1391(b) & 1391(e)(1)(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district, and because the TNT Site is owned by defendant Miami-Dade County, which is located in this district.

## PARTIES

8.      Plaintiff, Friends of the Everglades, Inc., is a Florida non-profit organization with members and directors in Miami-Dade County, Florida. Its mission includes protecting and restoring the Greater Everglades ecosystem, including the Big Cypress National Preserve and Everglades National Park.

9.      Friends' members regularly visit and use the Big Cypress National Preserve for recreational, aesthetic, scientific, and spiritual purposes, and intend to continue using the area in this manner, and will suffer irreparable harm if the detention facility is constructed and operated at the TNT Site. Friends and its members will suffer procedural harm if the detention center is constructed without compliance with the procedural requirements of NEPA.

10.      Friends was founded in 1969 by Marjory Stoneman Douglas, a renowned journalist and environmental activist, to protect the Everglades from development and degradation. In an striking echo, the organization's founding focus was on stopping the construction of the proposed "Everglades Jetport" at the precise spot where the TNT is located. Since that time Friends' mission has expanded to include preserving, protecting, and restoring

the entire Everglades ecosystem.  Now, history is repeating itself as Friends once again must act to prevent destructive development in the heart of the Everglades ecosystem in the same location. Just as Friends did in the 1960s to stop the ill-conceived Jetport, Friends now finds itself in a familiar fight—resisting renewed threats to the Everglades posed by the construction of a mass detention and deportation facility at the TNT Site.

11.    Ironically, the 1968 proposal to build the "Everglades Jetport"—now the TNT Site—contributed to the January 1, 1970 adoption of NEPA, and its requirement to evaluate reasonably anticipated environmental impacts that could result from federal action *before* acting. After construction on the Everglades Jetport commenced, and the environmental outcry— spearheaded by Friends' founder Marjory Stoneman Douglas—ensued, the Department of Interior commissioned a 1969 report led by ecologist Luna Leopold to assess the ecological impacts of the proposal. The report became one of the first *de facto* environmental impact statements assessing impacts of federal action, and illustrated the utility of evaluating environmental impacts *before* acting. Nathaniel "Nat" Reed, who served as then Florida Governor Claude Kirk's senior advisor, used the Leopold report to persuade the Governor, who had initially supported the Jetport plan, to reverse course and oppose the project—a position later adopted by President Richard Nixon. The Jetport plan was ultimately scuttled, and only the runway—which is expressly limited to use for aviation training—remains. The Nathaniel P. Reed Visitor Center at Big Cypress National Preserve now sits nearby the TNT Site.

12.    Friends' member and Executive Director Eve Samples has personally visited the site and is familiar with the area. Friends' members enjoy recreating in the Everglades and Big Cypress area, including in panther habitat. They enjoy hiking, camping, fishing, kayaking, canoeing, birdwatching, and viewing and photographing nature and wildlife. Since the proposal

4

to build a mass detention facility in the Big Cypress National Preserve first surfaced, an astonishing 18,000 supporters of Friends have voiced their opposition to the plan. This opposition springs from a desire to preserve and protect the Everglades, and the Big Cypress National Preserve specifically, among Friends' members who use, fish, recreate, observe wildlife or otherwise enjoy the area.

13.     Plaintiff Center for Biological Diversity (the "Center") is a national, nonprofit conservation organization that works through science, law, and policy to protect all species— great and small—hovering on the brink of extinction. The Center has offices throughout the United States, including in Florida, and more than 93,000 active members across the country.

14.     The Center's members and staff derive ecological, recreational, aesthetic, educational, scientific, professional, and other benefits from visiting Big Cypress National Preserve and observing the ecosystems and species who live there. The Center's members and staff live near or regularly visit Big Cypress National Preserve and the Greater Everglades Ecosystem.

15.     For example, one Center member, Tierra Curry, is a scientist committed to protecting intact ecosystems and preventing biodiversity loss. She plans to visit Big Cypress National Preserve this fall 2025 to hike, paddle, and observe wildlife. Another Center member, Amber Crooks is a conservationist who regularly visits Big Cypress National Preserve to enjoy the quiet peace of nature, to observe wildlife like red-cockaded woodpecker, and to appreciate remarkably dark night skies—among the darkest east of the Mississippi.

16.     Friends of the Everglades' and the Center's members are being injured by Defendants' unlawful actions, which threaten the integrity of Big Cypress National Preserve's waters and pristine night skies, the wellbeing of the plants and wildlife living there, and thus the

Plaintiffs' interests in them. Friends and the Center are also injured by being deprived of critical information and a public process to analyze and address significant environmental impacts associated with the detention center. NEPA is a procedural statute and "[w]hen a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Okeelanta Corp. v. United States Army Corps of Eng'rs*, 132 F.4th 1320, 1332 (11th Cir. 2025) (quoting *Massachusetts v. E.P.A.,* 549 U.S. 497, 517 (2007)).

17. The injuries described are actual, concrete injuries presently suffered by Plaintiffs and their members, and they will continue to occur unless this Court grants immediate relief. The relief sought herein would redress those harms. Plaintiffs have no other adequate remedy at law.

18. Defendant Kevin Guthrie is the Executive Director of the Florida Division of Emergency Management and is sued solely in his official capacity.

19. Defendants Secretary Kristi Noem, in her official capacity as Secretary of the United States Department of Homeland Security ("USDHS"), and Director Todd Lyons, in his official capacity as Director of the United States Immigration and Customs Enforcement ("ICE") agency, are federal officials responsible for immigration enforcement and detention and have authority over the arrangements for the use of the TNT Site as a mass detention center.

20. Defendant Miami-Dade County (the "County") owns the TNT Site and, on information and belief, has acquiesced in the other Defendants transformation of the TNT Site into a mass detention center even though County rules do not permit use of the TNT Site for this purpose.

6

## COMMON ALLEGATIONS

21.     The Dade-Collier Training and Transition Airport is a publicly owned airfield located within environmentally sensitive lands at the border of Miami-Dade and Collier counties, within the Big Cypress National Preserve, and within the Big Cypress Area as defined in Fla. Stat. § 380.055. At over 17,000 acres, the TNT Site is the largest parcel of land within the Big Cypress National Preserve not owned by the federal government.

22.     The Big Cypress National Preserve was established in 1974, and has been expanded since its creation. *see* Big Cypress National Preserve Act, Pub. L. No. 93-440, as amended by Pub. L. No. 100-301 (the Big Cypress National Preserve Addition Act of 1988); 16 U.S.C. § 698f.  The Preserve was created "in order to assure the preservation, conservation and protection of the natural, scenic, hydrologic, floral and faunal and recreational values in the Big Cypress Watershed." Pub. L. No. 93-440(a). The Preserve is managed as a unit of the National Park System "in a manner which will assure their natural and ecological integrity in perpetuity' in accordance with the provisions of this Act and with the provisions of the Act of August 25, 1916 (39 Stat. 535; 16 U.S.C. 1-4), as amended and supplemented." Pub. L. No. 100-301 § 4(a), Big Cypress National Preserve Addition Act of 1988.

23.     The Big Cypress National Preserve area where the TNT Site is located is known for its wetlands, critical wildlife habitat, and protected species, including the threatened wood stork, and endangered Florida bonneted bat and the Florida panther. The Site is within an environmentally sensitive freshwater wetland ecosystem of ecological significance for wildlife habitat. The Site is important for drinking water supply and Everglades water quality.

24.     The Big Cypress Preserve is home to various listed threatened or endangered species including the Florida bonneted bat, the Florida panthers, wood stork, Everglade snail

kite, and others, as documented in the Big Cypress National Preserve website. *See*,
https://www.nps.gov/bicy/learn/nature/animals.htm, last visited June 25, 2025. Florida panthers
have been geolocated on the TNT Site on many occasions. The map below shows Florida
panthers geolocated on the TNT Site:



25.     Florida bonneted bats have also been documented in the Big Cypress National
Preserve. *See* 78 Fed. Reg. 61004, 61008, 61011 (Oct. 2, 2013).

26.     In the Big Cypress Conservation Act of 1973, Fla. Stat. § 380.055, the Florida
Legislature determined that "the Big Cypress Area is an area containing and having a significant
impact upon environmental and natural resources of regional and statewide importance and that
designation of the area as an area of critical state concern is desirable and necessary to
accomplish the purposes of 'The Florida Environmental Land and Water Management Act of
1972' and to implement s. 7, Art. II of the State Constitution." Fla. Stat. § 380.055(2).

27.     The TNT Site is within the Big Cypress National Preserve as illustrated below:



28.    The TNT Site's location within the Big Cypress National Preserve is further illustrated by the below GIS map:



29.     The TNT Site is also proximate to Everglades National Park, and part of the historic Everglades. Since the passage of the Comprehensive Everglades Restoration Plan ("CERP") in 2000, the federal government and the State of Florida have jointly committed to one of the most ambitious ecosystem restoration efforts in the world. Authorized by Section 601 of the Water Resources Development Act of 2000 (WRDA 2000), Pub. L. No. 106-541, 114 Stat. 2572, CERP provides a framework for restoring, preserving, and protecting the South Florida ecosystem, including the Everglades, over multiple decades. The Plan encompasses more than 60 projects designed to improve water quality, restore hydrologic flow, and protect critical habitat.

30.     Under CERP, the federal government, through the U.S. Army Corps and Engineers ("USACE") and the Department of the Interior ("DOI"), fund half the costs of restoration. The State of Florida contributes the other half, with each partner committing billions

of dollars to implementation. As of 2024, total appropriations for Everglades restoration from both federal and state sources exceed $20 billion—much of which has been allocated since 2019—reflecting a sustained, bipartisan commitment to safeguarding the ecological integrity of the Everglades and adjacent areas like Big Cypress National Preserve.

31.     These investments are reinforced by successive authorizations and appropriations through subsequent federal legislation, including the Water Resources Development Acts of 2007, 2014, 2016, 2018, 2020, 2022, and 2024 each of which reauthorized and expanded CERP components. The State of Florida has likewise demonstrated its ongoing commitment to Everglades restoration through substantial state funding, including over $3.5 billion committed between 2019 and 2024 alone under Florida's "Everglades Restoration Strategy." These efforts support not only environmental protection, but also flood control, drinking water supply, and biodiversity, and endangered species habitat preservation and conservation across South Florida.

32.     One recent component of CERP is the Western Everglades Restoration Plan ("WERP"), which will use a series of active and passive water management features, water quality features, and alterations to existing canals and levees with a goal of improving the quantity, quality, timing and distribution of water in the Western Everglades in the effort to re-establish ecological connectivity, reduce the severity and frequency of wildfires, and restore low nutrient conditions.  The TNT sits within the WERP footprint as illustrated below:



33.     The Dade-Collier Training and Transition Airport site, which is within and/or borders the Big Cypress National Preserve, lies within the broader Everglades ecosystem restoration footprint, and any development at that site that disrupts hydrologic connectivity or degrades environmental conditions threatens to undermine the very objectives that these federal and state investments were intended to achieve.

34.     The Division has recently entered into an arrangement with DHS to allow the use of the TNT Site as a mass detention facility for ICE.  DHS has advised that it intends to detain up to 5,000  for federal immigration purposes. In a statement, DHS advised that Federal Emergency Management Agency ("FEMA") shelter program funds would be used to pay the Division approximately $450 million a year to operate the detention centers, which the Division has dubbed "Alligator Alcatraz."

35.     During a press conference on June 25, 2025, Governor DeSantis noted that federal agencies would fully fund the detention center, stating: "This is fully funded by the federal government"; "This is something that was requested by the federal government, and this is something that the federal government is going to fully fund"; "From a state taxpayer perspective, we are implementing it ... but that will be fully reimbursed by the federal government."   https://www.youtube.com/watch?v=gJfG7L9reHU&ab_channel=FOX35Orlando, (at 6:01 timemark), last visited June 27, 2025.

36.     As these public statements confirm, the Division is acting as the agent of federal immigration enforcement agencies in transporting and detaining noncitizens to the TNT Site, and facilitating the deportation of noncitizens from the Site.

37.     In correspondence with Miami-Dade County, Mr. Guthrie stated that the Division intends to use the Site "to assist the federal government with immigration enforcement." Florida

Attorney General James Uthemeier has been quoted that the TNT Site, with its runway, is intended to be used to "detain, deport and get people out of this country." In correspondence to the County, Division Executive Director Guthrie states that the Division, "has identified the [Site] as a critical asset for ongoing and future emergency response, aviation logistics, and staging operations," suggesting that the TNT Site will be used for deportation flights.

38.    The planned use of the TNT Site includes the installation of prefabricated housing, water and sewage infrastructure, security fencing, high-intensity security lighting, and other structures. In addition, numerous fill laden dump trucks have been observed entering the Site. As noted, the Division has also expressed a desire to utilize the runway in connection with receiving and deporting detainees from the Site.

39.    Construction on the detention center has unfolded at a breakneck pace, and is ongoing. The Division took control of the Site only on June 23, 2025. Since then kitchen facilities, restrooms, housing facilities, portable industrial lighting, and other infrastructure have been positioned on site, and heavy vehicular traffic on and out of the site has been observed, and is ongoing. A steady stream of fill-laden dump trucks have been observed entering and exiting the Site in recent days. State officials have publicly stated that they expect to begin housing detainees at the TNT Site by July 1, 2025.

40.    The photo below shows dump trucks with covered cargo entering the TNT Site earlier this week:



41.     Below is an image published in the *Miami Herald* and taken on or about June 24, 2025, of industrial, high intensity lighting units being delivered to the TNT site:



42.     Below are images of portable generators, also published in the *Miami Herald*, depicting industrial generators being delivered to the site:



43.     To Plaintiffs' knowledge, no environmental assessment or environmental impact statement has been prepared under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321, *et seq.*, nor has the Division conducted any environmental review under Florida law.

44.     Defendant Miami-Dade County, while unlawfully allowing its TNT Site to be occupied by agencies seeking to enforce federal immigration laws, has questioned the lack of any environmental analyses regarding the project. On June 23, 2025, Miami-Dade County Mayor Daniella Levine Cava wrote to the Division and stated: "With the federal and state government investing well over $10 billion since 2019 in Everglades restoration and protection, we would appreciate a detailed analysis and report on environmental impacts of this facility to the

Everglades. We would also value input from the appropriate federal agencies on their environmental reviews and analyses prior to proceeding."

45.     To Plaintiffs' knowledge, Defendants have not conferred with the USACE, DOI, U.S. Fish and Wildlife Service, or any other federal or local agency regarding potential impacts from the construction of a detention center for 5,000 individuals at the TNT Site.

46.     To Plaintiffs' knowledge, no categorical exclusion from NEPA has been invoked by the Defendants, nor does any apply.

47.     To Plaintiffs' knowledge, no exemption or waiver of NEPA requirements has been invoked by Defendants, and none exist.

48.     There is no emergency that would warrant departure from NEPA's requirements, as NEPA contains no exception for emergencies. Even if an emergency existed, none of the Defendants have made alternative arrangements as was required under NEPA regulations, which, in any event, have recently been withdrawn.

49.     No public notice or hearing has been conducted in connection with the use of the TNT Site for migrant detention.

50.     The property is subject to intergovernmental agreements and historical land use restrictions related to its location within the footprint of the Big Cypress National Preserve and State Big Cypress Area.

51.     The hasty transformation of the Site into a mass detention facility, which includes the installation of housing units, construction of sanitation and food services systems, industrial high-intensity lighting infrastructure, diesel power generators, substantial fill material altering the natural terrain, and provision of transportation logistics (including apparent planned use of the runway to receive and deport detainees) poses clear environmental impacts. The Defendants,

17

in their rush to build the center, have unlawfully bypassed the required environmental reviews. The direct and indirect harm to nearby wetlands, wildlife, and air and water quality, and feasible alternatives to the action, *must* be considered under NEPA *before* acting.

52.     The TNT Site is highly susceptible to flooding and no feasible plan has been studied to evacuate center detainees and personnel in the event of a hurricane or major flooding event.

53.     DHS also violated the Endangered Species Act by, among other things, failing to consult with USFWS.  Plaintiffs intend to amend this Complaint to add the ESA claims after the required 60-day pre-suit notice, 16 U.S.C. § 1540(g)(2)(A)(i), period has expired.

54.     Additionally, to Plaintiffs' knowledge, the Secretary of the Interior, acting through the Director of the National Park Service, has taken no action to regulate the use of the Big Cypress National Preserve in such manner and by such means that will leave the Preserve unimpaired by the environmental impacts of the TNT Site and associated operations.

55.     The National Park Service Organic Act of 1916, (16 U.S.C. § 1, amended and recodified in 54 U.S.C. § 100101(a) (2014)), states, "The Secretary, acting through the Director of the National Park Service, shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."

56.     This "non-impairment" mandate was reaffirmed by Congress in the 1978 amendments to the Act. The 1978 Reaffirmation states: "Congress reaffirms, declares, and

directs that the promotion and regulation of the various System units shall be consistent with and founded in the purpose by subsection (a), to the common benefit of all the people of the United States.  The authorization of activities shall be construed and the protection, management, and administration of the System units shall be conducted in light of the high public value and integrity of the System and shall not be exercised in derogation of the values and purposes for which the System units have been established, except as directly and specifically provided by Congress."  54 U.S.C. § 100101(b).

57.    The Big Cypress National Preserve was established to "assure the preservation, conservation, and protection of the natural, scenic, hydrologic, floral, and faunal, and recreational values of the Big Cypress Watershed in the State of Florida and to provide for the enhancement and public enjoyment thereof." Pub. L. No. 93-440(a).

58.    The TNT facility and associated operations will use and impair the Big Cypress National Preserve by causing direct and indirect harm to its wetlands, wildlife, and air and water quality. These impacts will result in the degradation of the natural, scenic, hydrologic, floral, and faunal, and recreational values for which the Preserve was created.

59.    The Secretary of the Interior and the National Park Service's apparent acquiescence in DHS and ICE's funding and operating the TNT facility in a manner that will result in significant environmental harm to the Preserve, does not comport with the Act's non-impairment mandate, is in derogation of the values and purposes for which the Preserve was established, and is not otherwise directly and specifically allowed by Congress. Plaintiffs reserve the right to amend this Complaint to add the Secretary of Interior.

60.    All conditions precedent to the maintenance of this action have occurred, been waived, or both.

## COUNT I
### (VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT (NEPA))
### (Against the DIVISION, DHS and ICE)

61.     Plaintiffs reallege the Common Allegations as if fully set forth herein.

62.     The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, requires federal agencies to prepare an Environmental Impact Statement (EIS) for any major federal action significantly affecting the quality of the human environment, or an Environmental Assessment (EA) if the agency action does not have reasonably foreseeable significant effects on the human environment, or if the significance of such effect is unknown.

63.     Major federal actions include any action that is subject to "substantial Federal control and responsibility." 42 U.S.C. § 4336e(10).

64.     The construction of an immigration detention center is an action that is necessarily subject to federal control and responsibility. The State of Florida has no authority or jurisdiction to enforce federal immigration law. *See Arizona v. United States*, 567 U.S. 387 (2012) (holding federal law preempts state immigration law enforcement). In *Arizona*, the Supreme Court reaffirmed "the principle that the removal process is entrusted to the discretion of the Federal Government." *Id.* at 409. The Court explained that "decision[s] on removability [of noncitizens] requires a determination whether it is appropriate to allow a foreign national to continue living in the United States. Decisions of this nature touch on foreign relations and must be made with one voice." *Id.* (quoting *Galvan v. Press,* 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are ... entrusted exclusively to Congress ...")).

65.     In Fla. Stat. § 908.13, the Florida legislature authorized the Division to facilitate the transport of detainees on the condition that ICE "specifically request assistance from the

division with the transport of unauthorized aliens pursuant to specific federal legal authority." *Id.* § 908.13(2)(a). Additionally, ICE "must reimburse the state for the actual cost of assisting with the transport of unauthorized aliens." *Id.* § 908.13(2)(b). Any such transport "must occur under the ***direct control and supervision*** of" ICE. *Id.* § 908.13(2)(c) (emphasis added). Because state law requires that the Division's transportation of detainees to and from the detention center occur under the "direct control and supervision" of ICE, the TNT detention center project is statutorily required to be under "Federal control and responsibility," 42 U.S.C. § 4336e(10), thereby triggering NEPA. In this way, the Division is acting as agent for DHS and ICE.

66. Florida Attorney General Uthmeier has announced that the TNT Site will be used "in support of the Trump administration" in federal immigration law enforcement. The Attorney General has posted on social media that "Alligator Alcatraz [is] the one-stop shop to carry out President Trump's mass deportation agenda." He accompanied the post with a video of the TNT Site runway. Governor DeSantis has been quoted as stating the TNT Site is to "facilitate the federal government in immigration enforcement."

67. Under 42 U.S.C. § 4336e(10), Congress identified *non*-major federal actions as actions conducted with "no or minimal Federal funding." Conversely, infrastructure projects like this one that are funded and/or approved by the Federal government, require federal agencies to prepare an EIS for actions that significantly affect the quality of the human environment or an EA if the agency action does not have reasonably foreseeable significant effect on the human environment or if the significance of such effect is unknown. The evaluation must address the significant environmental effects of a proposed project and identify feasible alternatives that could mitigate those effects. NEPA is a procedural statute that requires federal agencies to prepare an environmental impact statement, or EIS, identifying significant environmental effects

of the projects, as well as feasible alternatives. The law ensures that the agency and the public are aware of the environmental consequences of proposed projects. Properly applied, NEPA helps agencies to make better decisions and to ensure good project management.

68.     Specifically, an EIS must include a "detailed statement" addressing the following: (i) reasonably foreseeable environmental effects of the proposed agency action; (ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented; (iii) a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal; (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (v) any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented. 42 U.S.C. §§ 4332(C)((i)-(v).

69.     Moreover, NEPA requires that "[p]rior to making any detailed statement," the head of the lead agency "shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." *Id.* § 4332(C). Because actions associated with the construction and operation of the detention center at the TNT Site are within a national preserve that includes primary habitat for the Florida panther and critical habitat for the Florida bonneted bat, at a bare minimum federal law requires USDHS to consult with the National Park Service, and the U.S. Fish and Wildlife Service in assessing the environmental impacts of its proposed project.

70.     NEPA contains no exceptions for emergency actions, and no emergency exists. NEPA regulations provided that in cases of emergencies such as a hurricane, flood or wildfire, a federal agency should consult with the Council about alternative arrangements. These arrangements must be limited to actions necessary to control the immediate impacts of the emergency." 40 C.F.R. § 1506.12. These regulations, however, have been withdrawn. In any event, there is no emergency and, even if there was, no alternative arrangements have been implemented.

71.     The arrangements between the Division, USDHS and ICE to transform the TNT Site into a mass detention and deportation facility constitute major federal action, as it involves the use of federal authority, approvals, funding and resources, and will have significant environmental impacts on an ecologically sensitive area. Those impacts, which to date have gone unevaluated, could logically include impacts to listed species, impacts to wetlands and surface waters, impacts due to increased activities at the Site, including traffic to and from the Site, hurricane and flooding preparedness, etc.

72.     To Plaintiffs' knowledge, no EA or EIS has been prepared by DHS, ICE, the Division, or any cooperating agency.

73.     The failure to conduct the required environmental review under NEPA violates federal law and deprives the public and affected stakeholders, including Plaintiffs, of required procedures and procedural environmental protections.

74.     Plaintiffs are entitled to injunctive and declaratory relief requiring compliance with NEPA before any further activity occurs at the TNT Site.

## COUNT II
### (VIOLATION OF ADMINISTRATIVE PROCEDURE ACT (APA)
### (Against DHS and ICE))

75.     Plaintiffs reallege the Common Allegations as if fully set forth herein.

76.     The Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, permits judicial review of final agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

77.     USDHS and ICE have approved or are implementing the use of the TNT Site without providing Plaintiffs and the public with an opportunity for notice and comment, and without adhering to required environmental review procedures under NEPA and other federal laws, including the Endangered Species Act, and the National Park Service Organic Act of 1916, (16 U.S.C. § 1, amended and recodified in 54 U.S.C. § 100101(a) (2014)).

78.     The decision to proceed without notice, comment and without an EA or EIS constitutes final agency action and is subject to judicial review.

79.     Plaintiffs are entitled to a declaration that the agency's conduct is unlawful, directing vacatur of the agency action, as well as an injunction preventing further activity until NEPA compliance is achieved.

## COUNT III
### (ULTRA VIRES ACTION (Against the Division))

80.     Plaintiffs reallege the Common Allegations as if fully set forth herein.

81.     The Division of Emergency Management is governed by Chapter 252, Florida Statutes.

82.     Nothing in Chapter 252 authorizes the Division to convert county-owned property into a federal detention center without legislative authority, environmental review, or compliance with local land use requirements.

24

83.     Moreover, Florida law requires that, before the State of Florida may construct a correctional facility, it must consult with local governments with jurisdiction over the proposed site to determine if the proposed facility would comply with applicable local land use laws.  Fla. Stat. § 944.095(2). Florida law further provides that local governments have 90 days to review any proposed correctional facility to determine if it complies with the applicable land use laws. The Division has not complied with these legal requirements.

84.     The Division has no independent legislative authority to construct and manage a correctional facility.  Under Florida law, a correctional facility means any "prison, road camp … prison forestry camp … prison farm [whether] temporary or permanent." Section 944.02(8), Fla. Stat. "Prisoner" includes any person "under civil or criminal arrest [and committed] to the custody of the department pursuant to lawful authority." *Id.* § 944.02(6). These provisions apply to the Florida Department of Corrections, however, not the Division which has no authority to detain persons under Florida law.

85.     Defendant's actions exceed the scope of authority granted by Florida law.

86.     Plaintiffs are entitled to declaratory relief under 28 U.S.C. § 2201 that the Division's arrangement with DHS is *ultra vires* and void, and the construction of the TNT Site detention center is being conducted in derogation of state law.

87.     Plaintiffs are further entitled to injunctive relief preventing further construction or operation at the site.

## COUNT IV
### (Violation of Miami-Dade County Code and CDMP (against Miami-Dade County))

88.     Plaintiffs reallege the Common Allegations as if fully set forth herein.

89.     Pursuant to the County's Operational Directive No. 15-02, the TNT Site is governed by Chapter 25 of the Miami-Dade County Code, pertaining to aviation operations.

90.     The TNT Site is permitted only for aviation uses including pilot flight training, pilot proficiency checks, and aircraft maintenance flight checks.

91.     In addition, the Site, or a portion of it, is designated Environmentally Protected Parks under Miami-Dade Counties Comprehensive Development Master Plan due to its environmental sensitivity.

92.     The Site is not permitted or authorized for use for non-flight purposes.

93.     The County's agreement or acquiescence in allowing the TNT Site for use as a mas detention center is in violation of the County code and permitting regimes.

94.     Plaintiffs are entitled to a declaration under 28 U.S.C. § 2201 that the County may not authorize or allow use of the TNT Site for purposes other than that allowed under the County Code and existing permits and authorizations.

## **PRAYER FOR RELIEF**

WHEREFORE, Friends of the Everglades respectfully requests that the Court:

A.      Declare that Defendants' actions violate NEPA and the APA;

B.      Enjoin any further pre-construction activities, construction, conversion, or use of the TNT Site for purposes of immigration detention unless and until Defendants comply with NEPA and the APA;

C.      Declare that Defendant Guthrie's actions exceed lawful authority under Florida law and violate state environmental and land use laws;

D.      Enjoin Defendant Guthrie from authorizing or permitting further development or use of the TNT Site for purposes related to a mass detention center;

E.      Enjoin the County from permitting the use of property limited to aviation activities as a mass detainment center.

F.      Award Plaintiffs their attorneys' fees and costs as allowed by law;

G.      Grant such other relief as the Court deems just and proper.

Dated:   June 27, 2025

Respectfully submitted,

EARTHJUSTICE
4500 Biscayne Boulevard, Suite 201
Miami, Florida  33137
Telephone:  (305) 440-5432

By:_____s/   Tania Galloni_____
    Tania Galloni, Fla. Bar No. 619221
    tgalloni@earthjustice.org
    Dominique Burkhardt, Fla. Bar No. 100309
    dburkhardt@earthjustice.org

*Counsel for Friends of Everglades*


CENTER FOR BIOLOGICAL DIVERSITY
Elise Pautler Bennett, Fla. Bar No. 106573
ebennett@biologicaldiversity.org
Jason Alexander Totoiu, Fla. Bar No. 871931
jtotoiu@biologicaldiversity.org
Post Office Box 2155
St. Petersburg, FL 33731
Telephone:  (727) 755-6950

*Counsel for Center for Biological Diversity*

COFFEY BURLINGTON, P.L.
2601 South Bayshore Drive, Penthouse One
Miami, Florida  33133
Telephone:  (305) 858-2900

By:_____s/   Paul J. Schwiep_____
    Paul J. Schwiep, Fla. Bar No. 823244
    PSchwiep@CoffeyBurlington.com
    Scott Hiaasen, Fla. Bar No. 103318
    SHiaasen@CoffeyBurlington.com
    YVB@CoffeyBurlington.com
    LPerez@CoffeyBurlington.com
    service@CoffeyBurlington.com

*Counsel for All Plaintiffs*