IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:25-CV-22896-JEM

FRIENDS OF THE EVERGLADES et al.,

    Plaintiffs,

v.

KRISTI NOEM in her official capacity as
Secretary of the UNITED STATES
DEPARTMENT OF HOMELAND SECURITY
et al.,

    Defendants.
_____/

**DEFENDANT MIAMI-DADE COUNTY'S
RESPONSE TO PLAINTIFFS' EXPEDITED MOTION FOR
<u>TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

The State of Florida, using emergency powers and pursuant to express statutory authority, has commandeered Miami-Dade County's Transition and Training Airport to address a declared immigration emergency. Plaintiffs believe that the County could have shielded itself from the State's actions by invoking the Miami-Dade County Code and Comprehensive Development Master Plan (CDMP), but there is no legal basis for Plaintiff's argument—it would be like seeking to constrain the federal government by invoking state law. The argument fails at the initial step, without more. And even if it didn't—if the State's exercise of emergency powers could be subjected to the County Code—private parties like Plaintiffs are not entitled to injunctions forcing the County to act on its own ordinances, and any challenge under the CDMP is unripe.

Plaintiffs cannot establish a substantial likelihood of success on the merits of their claims against the County, and Plaintiffs also fail to establish the other elements necessary for

1

injunctive relief. Moreover, the injunction Plaintiffs request against the County also fails on its own terms: the injunction is impermissibly indefinite and fails to specify the acts the County would have to take to comply. Plaintiffs' Expedited Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion") (DE 5) must therefore be denied as to the County

## BACKGROUND

**I.     The State's Use of Emergency Powers to Commandeer the County's Airport**

On January 6, 2023, State of Florida Governor Ron DeSantis issued Executive Order 23-03 declaring a state of emergency in Florida upon finding "that the migration of unauthorized aliens to the State of Florida is likely to constitute a major disaster." (Cnty. Ex. A at 3). The Governor's order designated the Director of the State's Division of Emergency Management (FDEM) as the State Coordinating Officer for the duration of the emergency, directed him to execute response, recovery, and mitigation plans necessary to cope with the emergency, and authorized him to exercise the State's emergency powers codified in sections 252.36(6)–(12), Florida Statutes. (*Id.*). The Governor renewed Executive Order 23-03 multiple times, most recently on June 2, 2025, via Executive Order 25-120. (Cnty. Ex. B at 1).

On June 21, 2025, Defendant Kevin Guthrie, Executive Director of FDEM, sent a letter of intent to Miami-Dade County Mayor Daniella Levine Cava and Rick LoCastro, Commissioner on the Collier County Board of County Commissioners, advising of FDEM's intent to purchase the Dade-Collier Training and Transition Airport, located at 54575 Tamiami Trail E, Ochopee, Florida 34141 (the "TNT Airport"), and proposing certain terms of sale. (Cnty. Ex. C at 1). The TNT Airport is owned by Defendant Miami-Dade County, and the larger parcel of land on which it is sited (which parcel is also owned by Miami-Dade County) is mostly located within Collier County, with a portion in Miami-Dade County. The letter

explained FDEM "has identified the airport as a critical asset for ongoing and future emergency response, aviation logistics, and staging operations" and, citing Executive Order 23-03, asserted the State's need to acquire the property "by emergency procurement." (*Id.* at 1–2).

On June 23, 2025, the County Mayor responded by letter to FDEM's letter of intent by addressing matters concerning appraisal of the land and public safety and security and seeking additional information and details, "particularly regarding environmental safeguards." (Cnty. Ex. D at 1–2).

The FDEM Executive Director responded by letter that same day, informing the County that, "[w]hile the negotiations to purchase the property are underway, [FDEM] will begin immediate utilization of the improved area of the site, as I now deem it necessary to meet [FDEM]'s current operational demands in coping with the emergency." (Cnty. Ex. E at 1). The letter specified that FDEM's use of the property was "to assist the federal government with immigration enforcement." (*Id.*).

FDEM's letter invoked section 252.36(6)(b) of the Florida Statutes, which authorizes the Governor to "utilize all available resources of the state government and of each political subdivision of the state, as reasonably necessary to cope with the emergency." The County's property—that is, the TNT Airport—was and still is subject to the State's use for emergency purposes at the State's prerogative.

The County must also comply with the requirement that local officials "use best efforts to support the enforcement of federal immigration law." § 908.104(1), Fla Stat. This requirement is subject to severe penalties for noncompliance: in addition to declaratory or injunctive relief that may be sought, as well as potential contempt proceedings, "[a]ny executive or administrative state, county, or municipal officer who violates his or her duties

3

under this chapter may be subject to action by the Governor, including potential suspension from office, in the exercise of his or her authority under the State Constitution and state law." *Id.* § 908.107(1). FDEM explained in its letter that the State's use of the TNT Airport was "to assist the federal government with immigration enforcement." The County has thus complied with state law by allowing FDEM to use the TNT Airport for FDEM's stated purposes.

Consistent with FDEM's expressed intent, on or around June 23, 2025, FDEM began occupying the TNT Airport and constructing the immigration detention facility referred to hereinafter as the Detention Facility.

## II.  Procedural History

Plaintiffs are environmental organizations who claim aesthetic, recreational, and related injuries as a result of the State's use of the TNT Airport for the Detention Facility and the federal government's funding of the State's effort. Plaintiffs' Complaint (DE 1) asserts four counts, three of which are not against the County. Count I, asserted against the Secretary of the United States Department of Homeland Security (DHS), the Acting Director of the United States Immigration and Customs Enforcement (ICE), and the Executive Director of FDEM (but not the County), alleges those defendants' failure to comply with the federal National Environmental Policy Act (NEPA) by not conducting certain environmental reviews prior to construction of the Detention Facility. Count II, asserted against DHS and ICE (but not the County or FDEM), alleges those defendants' non-compliance with the federal Administrative Procedure Act (APA) by not providing for notice and comment prior to construction of the Detention Facility. Count III, asserted only against FDEM (but not the County or DHS or ICE), alleges that FDEM's construction of the Detention Facility has not complied with certain provisions of state law. Count IV, asserted against the County alone, alleges that the County's

"agreement or acquiescence in allowing the TNT Site for use as [the Detention Facility]" violates chapter 25 of the Code of Miami-Dade County, Florida (the "County Code") and the County's Comprehensive Development Master Plan (CDMP).

Plaintiffs' concurrently filed Motion seeks a temporary restraining order ("TRO") and preliminary injunction against DHS, ICE, and FDEM to stop those defendants from constructing or operating the Detention Facility. (Mot. 13–14). The proposed TRO against the County is far more vague and nebulous, seeking an order that "Miami-Dade County and any of its officers, agents, servants, employees, attorneys, and any other persons who are in active concert or participation with any of the Defendants are hereby <u>restrained and enjoined from acquiescing in</u> the use of the TNT Site for any purpose other than the limited-use pilot training for which the Site was used prior to June 23, 2025" ([Proposed] Order Granting Temporary Restraining Order (DE 5-4) at 6).

## LEGAL STANDARD

For a temporary restraining order or preliminary injunction to be granted, Plaintiffs must establish "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005). The third and fourth factors "merge when, as here, the Government is the opposing party." *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)) (cleaned up). Plaintiffs have the burden of persuasion and must clearly establish all four prerequisites to obtain the temporary restraining order or preliminary injunction. *See Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016).

Because Plaintiffs fail to establish any of the elements for a TRO or preliminary injunction against the County, the Motion as to the County must be denied.

## ANALYSIS

**I. Plaintiffs Fail to Establish a Substantial Likelihood of Success on the Merits as to the County**

Count IV (the sole count against the County) claims that the County's "agreement or acquiescence in allowing the TNT Site for use as [the Detention Facility]" violates chapter 25 of the County Code and the County's CDMP, but Plaintiffs cannot establish a substantial likelihood of success on the merits of Count IV because Count IV fails for at least four independent reasons.

    **A.    <u>Count IV Fails Because the County Code and CDMP Cannot Limit the State's Use of Emergency Powers to Commandeer the TNT Airport</u>**

Count IV argues that "[t]he TNT Site is permitted only for aviation uses including pilot flight training, pilot proficiency checks, and aircraft maintenance flight checks" and that "[t]he Site is not permitted or authorized for use for non-flight purposes." (Compl. ¶¶ 90, 92). Plaintiffs thus claim that the County's "acquiescence" in "allowing" the State to nevertheless use the TNT Airport for the Detention Facility violates chapter 25 of the County Code, which provides the County's Aviation Department rules and regulations.[1] Plaintiffs further claim that such "acquiescence" on the part of the County also violates the County's CDMP, which is a legislative plan adopted by ordinance that guides the use and development of land in the

---

[1] Ordinances are the local government equivalent of statutes. Just as many Congressional statutes are codified in the United States Code, many of Miami-Dade County's ordinances are codified in the County Code, which is available online at: https://library.municode.com/fl/miami_-_dade_county/codes/code_of_ordinances

County.[2] Comprehensive plans are like land use constitutions, and state law mandates that all local governments have one. *See Machado v. Musgrove*, 519 So. 2d 629, 631–32 (Fla. 3d DCA 1987). As further mandated by state law, local government land development regulations and development orders (such as zoning approvals, building permits, and other decisions having the effect of permitting the development of land) must generally be consistent with the CDMP's policies. §§ 163.3202(1), 163.3215, Fla. Stat.

Both of Count IV's claims rest on the fatally mistaken belief that the County Code and CDMP constrain the State of Florida's exercise of its emergency powers. Florida law expressly provides that, upon issuance of an executive order establishing a state of emergency, the Florida Governor is authorized to seize and make use of all non-federal lands within Florida. § 252.36(6)(b), (d), Fla. Stat. The Governor is expressly authorized to "commandeer or utilize any private property if she or he finds this necessary to cope with the emergency." *Id.* § 252.36(6)(d). County property can be seized as well; the Governor is expressly authorized to "utilize all available resources of the state government and of each political subdivision of the state, as reasonably necessary to cope with the emergency." *Id.* § 252.36(6)(b). There are no facial limits on the Governor's exercise of this power other than the general requirement that the use be reasonably necessary to cope with the emergency.[3] And it would obviously be inappropriate to impute limits which the Florida legislature omitted. *See Hawkins v. Ford Motor Co.*, 748 So. 2d 993, 1000 (Fla. 1999) ("[T]his Court may not rewrite statutes contrary to their plain language."). Nothing on the face of the statute requires the consent of a property

---

[2] The CDMP is available online at: https://www.miamidade.gov/planning/cdmp-adopted.asp

[3] The State is required to provide compensation for the use of this property. § 252.43, Fla. Stat. But compensation is a remedy; it applies after property has been seized.

7

owner before its property is commandeered into the emergency effort, nor does anything in the statute require that the commandeered property be used only as allowed by local ordinances or comprehensive plans.[4]

Plaintiffs' Motion makes no attempt to argue any basis for how the County Code or CDMP could limit the State's use of emergency powers to commandeer the TNT Airport. "Municipal ordinances are inferior to laws of the state and must not conflict with any controlling provision of a statute. When a municipal ordinance flies in the face of state law—that is, cannot be reconciled with state law—the ordinance cannot be sustained." *City of Palm Bay v. Wells Fargo Bank N.A.*, 114 So. 3d 924, 928 (Fla. 2013) (cleaned up). An argument that chapter 25 of the County Code or the CDMP precludes the State's use of the TNT Airport for the State's emergency purposes improperly inverts this precedent—it would privilege the County ordinance over the express provisions of section 252.36.

Similarly, Plaintiffs do not contest the State's determination that the seizure of the TNT Airport is reasonably necessary to respond to the emergency. And indeed, under Florida law, courts have little discretion to second-guess state emergency decisions. *See DeSantis v. Florida Educ. Ass'n*, 306 So. 3d 1202, 1218 (Fla. 1st DCA Oct. 9, 2020) ("Appellees have invited the judiciary to second-guess the executive's discretionary actions exercising emergency powers during a public health emergency to address the health, safety, and welfare of students in Florida's public schools. The courts must decline the invitation.").

---

[4] And this, generally speaking, makes sense. If the State needed to demolish a home to create a firebreak to prevent a wildfire from spreading into a densely populated area, the State's emergency response cannot be held in abeyance pending consent of the property owner. Similarly, it would be deeply strange if staging of hurricane relief on a particular piece of property could be prevented by the local zoning code. A local noise ordinance likewise could not preempt 24-hour use of a piece of seized property to supply generator power to a hospital in an emergency.

In short, section 252.36 grants the Governor and FDEM broad power to seize and commandeer property to respond to an emergency. Plaintiffs provide no argument or theory as to why or how the County Code or CDMP could limit the State's use of emergency powers to commander the TNT Airport. Plaintiffs are entirely unlikely to succeed on the merits, and the Motion must therefore be denied.

> B. Count IV Fails Because Florida Law Prohibits Courts From Mandating How Local Governments Exercise Their Enforcement Discretion

A second, independent reason that Count IV fails is that, even if the County could exercise regulatory authority vis-à-vis the State under these circumstances, Florida law prohibits courts from mandating how local governments exercise their enforcement discretion. Count IV's request for declaratory and injunctive relief effectively asks the Court to order the County to enforce the County Code and the CDMP against the State of Florida, but it is well-settled Florida law that courts cannot issue such relief. In *Detournay v. City of Coral Gables*, 127 So. 3d 869 (Fla. 3d DCA 2013), a homeowners association sought declaratory and injunctive relief against the City of Coral Gables to force it to pursue enforcement action under the building and zoning code against a nearby third-party property owner. The Third District held that dismissal of the lawsuit was required because, under the separation of powers doctrine, "courts cannot generally supervise the executive when it is deciding when and how to enforce specific laws," and such "pure executive function[s] … cannot be supervised by the courts, absent the violation of a specific constitutional provision or law." *Id.* at 872–73.

The Third District's reasoning came from *Trianon Park Condominium Association, Inc. v. City of Hialeah*, 468 So. 2d 912 (Fla. 1985), in which the Florida Supreme Court explained how the separation of powers prevents judicial interference not only in enforcement decisions, but also permitting and other executive officer functions:

9

> Clearly, the legislature, commissions, boards, city councils, and executive officers, by their enactment of, or failure to enact, laws or regulations, or by their issuance of, or refusal to issue, licenses, permits, variances, or directives, are acting pursuant to basic governmental functions performed by the legislative or executive branches of government. The judicial branch has no authority to interfere with the conduct of those functions unless they violate a constitutional or statutory provision. There has never been a common law duty establishing a duty of care with regard to how these various governmental bodies or officials should carry out these functions. These actions are inherent in the act of governing.

*Id.* at 919. The Court reasoned that "the judicial branch must not interfere with the discretionary functions of the legislative or executive branches of government absent a violation of constitutional or statutory rights"; to hold otherwise "would require the judicial branch to second guess the political and police power decisions of the other branches of government and would violate the separation of powers doctrine." *Id.* at 918.

Plaintiffs ask the Court to order the County to enforce the County Code and CDMP against the State, but this is exactly what Florida law prohibits the Court from doing. *See id.* A local government's decision as to what kind of enforcement action to take, including the threshold decision whether to take any enforcement action at all, is entirely within a local government's prerogative and cannot be dictated by a court. Plaintiffs cannot establish a likelihood of success on the merits of Count IV for this reason as well.

   C.  <u>Count IV Fails Because, in the Absence of a Development Order, Plaintiffs' Claim of Inconsistency with the CDMP Must Be Dismissed as Unripe and for Lack of Standing</u>

The third reason Count IV fails on the merits is that, under Florida law, a plaintiff cannot simply claim that a project is inconsistent with a local government's comprehensive plan (such as the County's CDMP). Instead, such a "consistency challenge" must be asserted under section 163.3215, Florida Statutes, and must allege that a specific "development order" is inconsistent with the comprehensive plan:

10

> Any aggrieved or adversely affected party may maintain a de novo action for declaratory, injunctive, or other relief against any local government <u>to challenge any decision of such local government granting or denying an application for, or to prevent such local government from taking any action on, a development order</u>, as defined in s. 163.3164, <u>on the basis that the development order</u> materially alters the use or density or intensity of use on a particular piece of property, rendering it <u>not consistent with the comprehensive plan</u> adopted under this part.

§ 163.3215(3) (emphasis added). This section provides "the exclusive method[] for an aggrieved or adversely affected party to appeal and challenge the consistency of a development order with a comprehensive plan." § 163.3215(1), Fla. Stat.[5] Accordingly, this statute is the <u>only</u> means by which Plaintiffs could press their consistency challenge in this case—Plaintiffs cannot just seek an amorphous declaration of inconsistency that is divorced from the requirements of section 163.3215.

Thus, in the absence of a development order, a consistency challenge must be dismissed as unripe and for lack of standing. *See MDXQ, LLC v. Miami-Dade County*, 271 So. 3d 68, 69 (Fla. 3d DCA 2019) ("The trial court also properly concluded that, in the absence of a development order, a cause of action under section 163.3215(3) was not yet ripe."); *Manny Seafood Corp. v. City of Miami*, No. 3D23-0357, 2023 WL 8101728, at *1 (Fla. 3d DCA Nov. 22, 2023) (affirming dismissal for lack of standing of a "complaint [that] does not suggest, much less allege, that the City's proposed use of the subject property as a public park constitutes a 'development order' so as to implicate section 163.3215").

Count IV contends that the use of the TNT Airport for the Detention Facility is inconsistent with the CDMP, but nowhere does the Complaint allege that it challenges a

---

[5] The statute provides another method in subsection (4), but that method is inapplicable because it applies only where "a local government elects to adopt or has adopted an ordinance establishing, at a minimum, the requirements listed in [section 163.3215(4)]," which the County has elected not to do.

11

"development order." In fact, the Complaint does not even cite section 163.3215(3), the statute under which such a claim must be brought. Plaintiffs cannot establish a substantial likelihood of success on the merits of Count IV when the CDMP claim must be dismissed as unripe and for lack of standing. *See MDXQ*, 271 So. 3d at 69; *Manny Seafood*, 2023 WL 8101728, at *1.

### D. Count IV Fails Because It Is Improperly Pleaded

The fourth reason Count IV fails on the merits is that Plaintiffs have not properly pleaded Count IV. It is axiomatic that, before a plaintiff can demonstrate a substantial likelihood of success on the merits to obtain temporary injunctive relief, a plaintiff must first demonstrate a plausible claim for relief. *See, e.g., Greiser v. Whittier Towers Apartments Ass'n Inc.*, 551 F. App'x 506, 507 (11th Cir. 2014) ("Because Greiser's complaint failed to state a claim, he was not entitled to a preliminary injunction."); *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097–98 (11th Cir. 2004) (holding that for a temporary injunction to be theoretically available, the plaintiff must be able to articulate a basis for relief that would withstand scrutiny under Rule 12(b)(6) of the Federal Rules of Civil Procedure). Here, Plaintiffs come up short as to their claims against the County.

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face," not merely conceivable. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 680–81 (2009). As against the County, the totality of Plaintiff's allegations are that, "on information and belief, [the County] has acquiesced in the other Defendants transformation of the TNT Site into a mass detention center even though County rules do not permit use of the TNT Site for this purpose." (Compl. ¶ 20). And not only have Plaintiffs failed to allege any facts to support the conclusory allegation that the County "acquiesced" in the other Defendants' conduct, but

Plaintiffs have altogether failed to allege which of the dozens upon dozens of provisions of the Code or CDMP the County allegedly violated or what specific actions the County Code or CDMP required the County to take. And the reason for this failure is obvious—neither the County Code nor the CDMP impose upon the County any affirmative requirement to oppose or otherwise attempt to control the exercise of emergency powers by the State. Plaintiffs' threadbare and conclusory allegations in support of Count IV do not satisfy the plausibility pleading standard of *Twombly* and *Iqbal*, and therefore Plaintiffs fail to establish a substantial likelihood of success on the merits as to the County for this final reason.

## II. Plaintiffs Fail to Establish an Irreparable Injury Caused by Miami-Dade County

To obtain a TRO or preliminary injunction, Plaintiffs must also establish that irreparable injury will be suffered if their requested relief against the County is not granted, but they have not made the required showing as to the County. Plaintiffs argue they "will at a minimum suffer aesthetic and recreational injuries as a result of the construction of the detention center, and they have suffered a [sic] procedural injuries, because there has been no opportunity for public notice, comment or environmental review as Congress intended." (Mot. 9). But even if these are irreparable injuries, none of the submitted evidence shows—and none of the assertions in the Complaint allege—that such injuries are being caused by the County. It's not the County that is constructing the Detention Facility, but DHS, ICE, and FDEM. Similarly, as Plaintiffs' own filings reflect, the County has had nothing to do with the alleged failure on the part of DHS, ICE, or FDEM to comply with NEPA or the APA. As Plaintiffs cannot establish that Miami-Dade County is causing them irreparable injury, the Motion should be denied as to the County.

III. **Plaintiffs Fail to Establish That Any Threatened Injury Outweighs the Harm Their Requested Relief Would Inflict Upon Miami-Dade County; Indeed, the Requested Injunction Against the County Would Disserve the Public Interest**

The third factor for preliminary injunctive relief (that the threatened injury outweighs the harm the relief would inflict on the non-movant) and the fourth factor (that entry of the relief would serve the public interest) "merge when, as here, the Government is the opposing party." *Swain*, 961 F.3d at 1293. But here as well, Plaintiffs fail to show how they have established these factors as to the County. Nor could Plaintiffs make such a showing: entering Plaintiffs' requested TRO and preliminary injunction against the County would effectively force the County to violate state law—a dramatic, radical, and ultimately untenable affront to the public interest.

Plaintiffs ask the Court to "[t]emporarily restrain and enjoin Miami-Dade County . . . from authorizing or otherwise allowing the use of the TNT Site limited to aviation activities as a detainment center for noncitizens or related activities." (Mot. 14). In other words, Plaintiffs ask this Court to force the County to take enforcement action with respect to FDEM's construction and operation of the Detention Facility. The County, however, cannot do so because, as explained in section I.B. *supra*, the Court cannot force the County to take enforcement action against the State.

In addition, any such TRO and injunction, if granted by this Court, could place the County in an untenable position with respect to other state laws that carry severe penalties for non-compliance. State law affirmatively requires the County to use best efforts to support the enforcement of federal immigration law, and the County's failure to comply with that statutory duty could have dramatically adverse consequences for the public interest, including but not limited to the suspension from office of County officials elected by the voters of Miami-Dade

14

County. State law imposes several requirements on local governments regarding federal immigration enforcement, including complying with immigration detainers issued by a federal immigration agency, *see* § 908.105, Fla. Stat., and entering into 287(g) agreements with ICE, *see id.* § 908.11.

Among these provisions is the mandate that local officials "use best efforts to support the enforcement of federal immigration law." *Id.* § 908.104(1). This requirement is subject to severe penalties for noncompliance: in addition to declaratory or injunctive relief that may be sought, as well as potential contempt proceedings, "[a]ny executive or administrative state, county, or municipal officer who violates his or her duties under this chapter may be subject to action by the Governor, including potential suspension from office, in the exercise of his or her authority under the State Constitution and state law." *Id.* § 908.107(1).

As Plaintiffs' Motion itself recognizes, the State's actions are aimed at supporting the enforcement of federal immigration law—the very construction at issue here is for an "immigrant detention center . . . to detain immigrants for [ICE]." (Mot. 2). The Motion further characterizes this action as "federal action . . . since the State of Florida has no authority or jurisdiction to enforce federal immigration law." (*Id.* at 3–4). And finally, as the Motion concedes, the State has taken control of the TNT Airport by invoking emergency powers authorized under a state of emergency declared by the Governor. (*Id.* at 12).

Given this landscape, it is entirely unclear how Plaintiffs' sought relief as to the County—that this Court enjoin Miami-Dade County "from authorizing or otherwise allowing the use of the TNT Site limited to aviation activities as a detainment center for noncitizens or related activities" (*id.* at 14)—can be squared with the County's obligations under chapter 908 of the Florida Statutes. Because the County is statutorily mandated to use best efforts to support

15

the enforcement of federal immigration law, the Court cannot require the County to take any action that would expressly or implicitly obstruct the State's work to support the enforcement of federal immigration law. But Plaintiffs' requested injunction would force the County into the impossible situation of having to choose between obeying a federal injunction and complying with state law, the non-compliance with which could result in penalties as dramatic as the suspension from office of County elected officials or other officers.

A district court cannot fashion an injunction that would require a party to violate a statute.[6] *See United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001) ("[A] court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation. A district court cannot, for example, override Congress' policy choice, articulated in a statute, as to what behavior should be prohibited." (citations omitted)). But Plaintiffs' requested TRO and preliminary injunction against the County would do just that. Forcing the County to defy state law, disrupt the State's emergency management initiatives, and open the County up to the above-mentioned severe penalties would greatly disserve the public interest and, moreover, inflict a harm on Miami-Dade County that greatly outweighs the threatened aesthetic, recreational, and other related injuries that Plaintiffs allege. Plaintiffs fail to establish the third and fourth factors for temporary injunctive relief, and therefore the Court should deny the Motion as to the County for these reasons as well.

---

[6] It bears noting that Plaintiffs do not claim that these statutes are unconstitutional. *Contrast Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1283 (11th Cir. 2024) ("this injury is not outweighed by any threatened harm to Florida because the government has 'no legitimate interest' in enforcing an unconstitutional law").

IV. **The Injunction Requested Against the County Is Unenforceable Because It Is Impermissibly Indefinite and Fails to Specify the Acts the County Would Have to Take to Comply With the Injunction**

Rather than seeking to enjoin the County from a defined set of actions, Plaintiffs would have the Court overseeing and enforcing whether the County and its agents are "<u>acquiescing in the use of</u> the TNT Site for any purpose other than the limited-use pilot training for which the Site was used prior to June 23, 2025." (Proposed Order at 6 (emphasis added)). This proposed relief should be denied because it would violate the Federal Rules of Civil Procedure and related precedent requiring that injunctive relief be set forth with requisite specificity.

An injunction or TRO must, among other things, "state its terms specifically; and [] describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(B)–(C). In effect, "[t]he drafting standard established by Rule 65(d) is that an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed." *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1531 (11th Cir. 1996) (quoting 11A Wright, Miller & Mary Kay Kane, Fed. Prac. & Proced.: Civil 2D § 2955 (1995) (footnotes omitted)).[7]

---

[7] The clarity required by Rule 65 serves two fundamental purposes. First, that persons subject to an injunction have sufficient notice of the prescribed or proscribed conduct to satisfy due process considerations. *See LabMD, Inc. v. Fed. Trade Comm'n*, 894 F.3d 1221, 1235–36 (11th Cir. 2018) (noting that "[t]he most fundamental postulates of our legal order forbid the imposition of a penalty for disobeying a command that defies comprehension" and that "[b]eing held in contempt and sanctioned pursuant to an insufficiently specific injunction is therefore a denial of due process" (citation omitted)). And second, to facilitate effective appellate review. *See Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) ("In the absence of specific injunctive relief, informed and intelligent appellate review is greatly complicated, if not made impossible").

Given these requirements, "courts will not countenance injunctions that merely require someone to 'obey the law.'" *Hughey*, 78 F.3d at 1531; *see S.E.C. v. Goble*, 682 F.3d 934, 949 (11th Cir. 2012) (noting, "[w]e have repeatedly questioned the enforceability of obey-the-law injunctions not only in the context of securities cases but other cases as well" and collecting cases). This is so because "[b]road, non-specific language that merely enjoins a party to obey the law or comply with an agreement . . . does not give the restrained party fair notice of what conduct will risk contempt." *Hughey*, 78 F.3d at 1531 (citations omitted). Stated differently, an injunction "must be tailored to remedy the specific harms shown rather than to enjoin all possible breaches of the law," and must "contain an operative command capable of enforcement." *Id.* (citations omitted). In effect, "[a] person enjoined by court order should only be required to look within the four corners of the injunction to determine what he must do or refrain from doing." *Id.* at 1532 n.12.

Like an "obey the law" injunction, the TRO and preliminary injunction Plaintiffs seek would have the Court impose a broad, unspecific mandate on the County that would be as unenforceable as the cease-and-desist order vacated in *LabMD, Inc. v. Federal Trade Commission*, 894 F.3d 1221 (11th Cir. 2018). In that case, the Eleventh Circuit considered whether "a cease and desist order directing LabMD to create and implement a variety of protective measures" was unenforceable. *Id.* at 1224. The subject order, the court noted, "identifies no specific unfair acts or practices from which LabMD must abstain and instead requires LabMD to implement and maintain a data-security program 'reasonably designed' to the Commission's satisfaction." *Id.* at 1230. The court highlighted the problem with setting forth such an "indeterminable standard of reasonableness" by explaining what would likely occur at a hypothetical show-cause hearing to enforce the cease-and-desist order. *See id.* at

1236. Each side would have a respective expert to testify that a particular act was or was not "a necessary component of a reasonably designed data-security program," and the court would be tasked with determining which expert correctly read an injunctive provision, with nothing in the provision indicating which expert would be correct. *Id.* at 1237. The court thus held that the cease-and-desist order was unenforceable. *Id.*

To comply with Rule 56(d) and related precedent, Plaintiffs' requested TRO would have to set forth in specificity the list of actions the County would have to take to not violate the TRO's prohibition against "acquiescing" to the State or federal government. Without such specificity, the universe of potential actions is impermissibly indefinite. How exactly would the County have to not "acquiesce" in the State's actions? Would the County have to take enforcement action? If so, what laws would the County have to enforce, and what remedies pursue, and what opportunities to cure provide? Would the County have to file a lawsuit? Or, instead of taking enforcement action, would the County have to require the State to submit to a regulatory approval process? If so, which permits or other regulatory approvals would the State have to get, and under what conditions would the County have to grant or instead deny those approvals, and what should the County do if the State does not strictly comply with the requirements of those permits and approvals?

Such a dizzying list of questions and counterfactuals throws into stark relief the utter failure of Plaintiffs' requested injunctive relief to comply with Rule 65(d)'s specificity requirements. *See Wynn Oil Co. v. Purolator Chem. Corp.*, 536 F.2d 84, 86 (5th Cir. 1976) (holding that an injunction restraining defendants from "slandering and disparaging the Wynn Oil Co. and its products" was "impermissively vague" and that a "lack of specific findings in

19

this regard ma[de] it impossible to relate the broad language to specific acts"). Thus, for yet another reason, the Motion must be denied as to the County.

## CONCLUSION

For the multitude of reasons set forth above, Plaintiffs fail to establish any of the elements necessary for a TRO or preliminary injunction to issue against Miami-Dade County. The County therefore respectfully asks the Court to deny the Motion.

Dated June 30, 2025

Respectfully submitted,

GERALDINE BONZON-KEENAN
Miami-Dade County Attorney
Stephen P. Clark Center
111 NW 1st Street, Suite 2810
Miami, Florida 33128

By: /s/ Christopher J. Wahl
    David M. Murray (FBN 291330)
    Christopher J. Wahl (FBN 122453)
    Assistant County Attorneys
    dmmurray@FlyMIA.com
    wahl@miamidade.gov
    kgriffin@FlyMIA.com
    victor.rodriguez3@miamidade.gov
    (305) 375-5151
    Attorneys for Miami-Dade County