**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**No. 25-cv-22896-JEM**

FRIENDS OF THE EVERGLADES, INC., et al.,

     Plaintiffs,

v.

KRISTI NOEM, et al.,

     Defendants.

_____/

### DEFENDANT KEVIN GUTHRIE'S OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

Plaintiffs—two political advocacy organizations—challenge a State of Florida decision to establish a temporary detention and deportation facility on an airfield in the Everglades.  But Plaintiffs bring their challenge under an environmental statute—the National Environmental Policy Act—that places obligations on *federal* agencies, not state agencies.  Accordingly, Plaintiffs' motion for a temporary restraining order should be denied.

### BACKGROUND

The federal government simply "does not possess the resources necessary to arrest or remove all of the noncitizens" that are released from prison or subject to a final order of removal. *United States v. Texas*, 599 U.S. 670, 680 (2023) (citing 8 U.S.C. §§ 1226(c), 1231(a)(2)).  That is a problem that affects states like Florida because "deportable criminal aliens who remain[] in the United States often commit[] more crimes before being removed." *Demore v. Kim*, 538 U.S. 510, 518 (2003).  Moreover, overcrowded facilities can pose "an immediate risk to the health and safety of [law enforcement] agents and officers, and to those detained." *Rosa v. McAleenan*, 583 F. Supp. 3d 850, 864 (S.D. Tex. 2019) (quotation marks omitted).  While these harms have long been present, the immigration crisis has considerably worsened in recent years due to the prior federal

administration's open-border policies.  The illegal immigrant population in the United States reached 11 million in 2022.[1]  Encounters at the southern border reached a historic high of nearly 2.5 million in fiscal year 2023.[2]

In light of these unprecedented numbers, in January 2023, Governor Ron DeSantis declared a state of emergency arising from the migration of illegal aliens into Florida.  Fla. Exec. Order No. 23-03 (Jan. 6, 2023).  At that time, hundreds of thousands of illegal aliens were streaming across the Southwest border of the United States and over 8,000 migrants had been interdicted in Florida's territorial waters over the previous six months.  *Id.* at 1.  The state of emergency has repeatedly been extended, most recently on June 2, 2025, and it remains in effect.  *See* Fla. Exec. Order No. 25-120 (June 2, 2025).

The new federal administration has also taken dramatic steps to address the immigration crisis.  President Trump announced a national emergency at the southern border on his first day in office.  *See* Declaring a National Emergency at the Southern Border of the United States, 90 Fed. Reg. 8327 (Jan. 20, 2025).  U.S. Immigrations and Customs Enforcement (ICE) has made more than 100,000 arrests of illegal aliens through the first week of June—an average of 750 arrests per day, which is double the average over the prior decade.[3]  And ICE is trying to increase its pace to 3,000 arrests a day.[4]  As a result of these efforts, unlawful crossings are at historic lows.  Since

---

[1] Jeffrey S. Passel & Jens Manuel Krogstad, *What we know about unauthorized immigrants living in the U.S.*, Pew Research Center (July 22, 2024), https://www.pewresearch.org/short-reads/2024/07/22/what-we-know-about-unauthorized-immigrants-living-in-the-us/.

[2] Muzaffar Chisti et al., *Biden's Mixed Immigration Legacy*, Migration Policy Inst. (Dec. 10, 2024), https://www.migrationpolicy.org/article/biden-immigration-legacy.

[3] Ted Hesson, *Trump's immigration enforcement record so far, by the numbers* (June 17, 2025), https://www.reuters.com/world/us/trumps-early-immigration-enforcement-record-by-numbers-2025-03-04/.

[4] Brittany Gibson, *ICE's cash crisis deepens amid immigration crackdown*, Axios (June 16, 2025), https://www.axios.com/2025/06/16/ice-cash-crisis-immigration-crackdown-trump.

February, U.S. Customs and Border Patrol has reported the lowest monthly levels of arrests at the southern border since those figures began to be tracked in 2000.[5]  Compared to May 2024, May 2025 saw average daily apprehensions decrease by 93% nationwide, border encounters decrease by 88% (93% at the southwest border), encounters of unaccompanied minors decrease by 88%, and fentanyl seizures at the Southwest border decrease by 70%.[6]

But the arrests have resulted in a shortage of housing for detainees.  In February 2025, ICE facilities were at 109% capacity with 42,000 detainees, forcing ICE to release some detainees.[7] ICE had 47,600 detainees in March.[8]  By April, detainees were reportedly sleeping on floors.[9]  And disorder in a Miami immigration facility led to a riot that had to be forcibly suppressed.[10]  As of June 24, ICE was holding around 59,000 detainees, about 140% of budgeted capacity.[11]

States—which often work with federal officials to detain illegal aliens who commit state crimes—are also facing problems with detention capacity.  For example, in just one recent

---

[5] Ted Hesson, *Trump's immigration enforcement record so far, by the numbers*, Reuters (June 17, 2025), https://www.reuters.com/world/us/trumps-early-immigration-enforcement-record-by-numbers-2025-03-04/.

[6] House Homeland GOP (@HomelandGOP), X (June 28, 2025, 12:35 PM), https://x.com/HomelandGOP/status/1938999585969500205.

[7] Camilo Montoya-Galvez, *ICE releases some migrant detainees as its detention facilities reach 109% capacity*, CBS News (Feb. 5, 2025), https://www.cbsnews.com/news/ice-releases-some-migrant-detainees-detention-facilities-reach-109-percent-capacity/.

[8] Gabe Whisnant & Dan Gooding, *ICE Seeks More Bed Space as Detainee Numbers Hit Maximum Capacity*, Newsweek (Mar. 12, 2025), https://www.newsweek.com/ice-seeks-more-bed-space-detainee-numbers-hit-maximum-capacity-2043662.

[9] Douglas MacMillan, *Immigrants forced to sleep on floors at overwhelmed ICE detention centers*, The Wash. Post (Apr. 20, 2025), https://www.washingtonpost.com/business/2025/04/18/immigrant-detention-overcrowding-trump-crackdown/.

[10] C. J. Ciaramella, *Overcrowding and Dysfunction Produced a Quiet Riot at a Miami Federal Prison Holding ICE Detainees*, Reason (May 27, 2025), https://reason.com/2025/05/27/overcrowding-and-dysfunction-produced-a-quiet-riot-at-a-miami-federal-prison-holding-ice-detainees/.

[11] Camilo Montoya-Galvez, *ICE holding a record 59,000 immigrant detainees, nearly half with no criminal record, internal data show*, CBS News (June 24, 2025), https://www.cbsnews.com/news/ice-record-59000-immigrant-detainees-half-no-criminal-record/.

enforcement operation, ICE and Florida law enforcement arrested more than one hundred illegal aliens, including one who is charged with four counts of assault on law enforcement officers and another who attempted to pull a weapon on officers.[12]  On June 20, Florida Attorney General James Uthmeier stated that "jails are filling up," creating a need for new detention sites.[13]  In a later interview, Attorney General Uthmeier cited the "illegal immigration crisis," explaining that Florida had recently arrested alien MS-13 gang members and human traffickers and that successful arrests were quickly filling up the jails.[14]

Florida is now responding to this crisis by seeking to enable new housing capacity for detainees awaiting deportation, including at the Dade-Collier Training and Transition Airport. Attorney General Uthmeier first publicly discussed the idea of a facility at the airfield on June 18.[15]  On June 19, he announced an "efficient, low-cost opportunity to build a temporary detention facility."[16]  As Attorney General Uthmeier explained, the Dade-Collier location had the advantage of an existing site, an eleven-thousand-foot runway, and the Everglades serving as a natural security perimeter.[17]

---

[12] U.S. Immigr. & Customs Enf't, *ICE arrests 100+ illegal aliens during targeted enforcement operation in Tallahassee* (June 13, 2025), https://www.ice.gov/news/releases/ice-arrests-100-illegal-aliens-during-targeted-enforcement-operation-tallahassee.  According to DHS, attacks on ICE officers have increased by more than 500%.  *See* House Homeland GOP, *supra*.

[13] James Uthmeier (@AGJamesUthmeier), X (June 20, 2025, 11:48 AM), https://x.com/AGJamesUthmeier/status/1936088689257447867.

[14] James Uthmeier (@AGJamesUthmeier), X (June 25, 2025, 5:11 PM), https://x.com/AGJamesUthmeier/status/1937982079276302682.

[15] Ana Ceballos, Romy Ellenbogen, & Alex Harris, *DeSantis used his emergency powers to get 'Alligator Alcatraz' built*, Tampa Bay Times (June 28, 2025), https://www.tampabay.com/news/florida-politics/2025/06/28/desantis-alligator-alcatraz-emergency-powers-immigration-detention-trump/.

[16] James Uthmeier (@AGJamesUthmeier), X (June 19, 2025, 12:49 PM), https://x.com/AGJamesUthmeier/status/1935741644101374271.

[17] James Uthmeier (@AGJamesUthmeier), X (June 20, 2025, 11:48 AM), https://x.com/AGJamesUthmeier/status/1936088689257447867.

By June 23, Florida had begun installation of temporary structures. Attorney General Uthmeier announced plans to have "5,000 beds by early July" across multiple facilities to help with the detainee housing shortage.[18] The Florida Division of Emergency Management (DEM) commandeered the airport under the state emergency authority triggered by Governor DeSantis's executive orders.[19] The detention facility is projected to hold around 3,000 detainees and to be ready for intake by July 1.[20] The State is currently funding the construction and operation of the facility. Decl. of Keith Pruett (Ex. 1) ¶ 2. While Florida plans to seek reimbursement from the federal government, it has not received any reimbursement, and "the precise source and amount of any such reimbursement is unknown." *Id.* ¶ 3.

The construction is taking place on the "existing footprint" of the airfield.[21] Governor DeSantis has stated, "It isn't permanent. This is temporary. There's no sewer being constructed. Environmental impact is zero."[22] Attorney General Uthmeier similarly stated that "there will be zero impact to the Everglades," explaining that the area was already developed in the 1960s and 1970s when the airport was built.[23] That airport has two buildings that are lit 24 hours a day, and

---

[18] James Uthmeier (@AGJamesUthmeier), X (June 23, 2025, 11:59 AM), https://x.com/AGJamesUthmeier/status/1937178826099798155, at 3:24 to 3:26; Dep't of Homeland Security (@DHSgov), X (June 23, 2025, 8:03 PM), https://x.com/DHSgov/status/1937300544575385790.

[19] Elizabeth Crisp, *'Alligator Alcatraz': What to know about Florida Everglades migrant detention site*, The Hill (June 25, 2025, 12:54 PM), https://thehill.com/homenews/state-watch/5368457-florida-alligator-alcatraz-migrant-detention-center/.

[20] Ron DeSantis (@GovRonDeSantis), X (June 27, 9:20 AM), https://x.com/GovRonDeSantis/status/1938588190450872598, at 0:48 to 0:54, 2:20 to 2:25.

[21] *Id.* at 1:25 to 1:28.

[22] Joan Murray, *"Alligator Alcatraz" immigrant detention center sparks outcry as DeSantis claims zero environmental impact*, CBS News (June 25, 2025), https://www.cbsnews.com/miami/news/alligator-alcatraz-migrant-facility-draws-fire-from-environmental-groups-in-the-everglades/.

[23] James Uthmeier (@AGJamesUthmeier), X (June 26, 2025, 5:15 PM), https://x.com/AGJamesUthmeier/status/1938345273115439397.

it continues to be used on a daily basis, including by large aircraft.  Ex. 1 ¶¶ 4-5.  About 28,000 flights have used the airfield in the last six months.  *Id.* ¶ 4.  As a result, DEM Executive Deputy Director Keith Pruett agrees that "any environmental impact" from the facility's construction or operation "is likely to be minimal."  *Id.* ¶ 6.

On June 27, Friends of the Everglades and the Center for Biological Diversity filed a complaint and motion for a temporary restraining order (TRO) against DHS Secretary Kristi Noem, ICE Acting Director Todd Lyons, DEM Executive Director Kevin Guthrie, and Miami-Dade County.  Doc. 1, 5.  The TRO motion relies solely on the National Environmental Policy Act (NEPA).  Doc. 5 at 1, 6-8.

## ARGUMENT

A temporary restraining order requires the plaintiff to establish all four of the following elements:  "(1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest."  *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 779 F.3d 1275, 1280 (11th Cir. 2015).  A temporary restraining order "is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to each of the four prerequisites."  *Wall v. Ctrs. for Disease Control & Prevention*, 543 F. Supp. 3d 1290, 1292 (M.D. Fla. 2021) (alteration and quotation omitted).  If the plaintiff fails to show a substantial likelihood of success on the merits, a court need not address the other three factors.  *S. Dade Land Corp. v. Sullivan*, 853 F. Supp. 404, 410 (S.D. Fla. 1993).

I.      **PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS**

A.      **Plaintiffs Have No NEPA/APA Claim Against DEM**

Plaintiffs allege that state officials "control" the site and are building the detention facility. *See* Doc. 1 ¶ 39. In the TRO Motion, Plaintiffs thus ask the Court to "restrain and enjoin" DEM "from engaging in any pre-construction activities, construction, conversion, or use of the [Training and Transition Airport] Site for purposes of immigration detention unless and until Defendants comply with NEPA and the APA." Doc. 5 at 14. But NEPA and the APA do not apply to state agencies and thus cannot be the source for a federal TRO.

NEPA does not provide a cause of action. *See Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs*, 100 F.4th 1349, 1355 n.2 (11th Cir. 2024); *Noe v. Metro. Atlanta Rapid Transit Auth.*, 644 F.2d 434, 439 (5th Cir. 1981). Instead, "NEPA claims must be brought under the APA." *Karst Envtl. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1297 (D.C. Cir. 2007); *Lowman v. Fed. Aviation Admin.*, 83 F.4th 1345, 1357 n.12 (11th Cir. 2023). That alone merits denial of the TRO because Plaintiffs do not assert an APA claim against the State. Doc. 1 ¶¶ 75-79.

In any event, state agencies are not subject to the APA. The APA permits judicial review for persons "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action," and defines "agency" as "each authority of the Government of the United States[.]" *See* 5 U.S.C. §§ 701(b)(1), 702. By its own terms, then, the APA "clearly does not apply to state agencies." *Doe, 1-13 ex rel. Doe Sr. 1-13 v. Bush*, 261 F.3d 1037, 1055 (11th Cir. 2001); *see also Sw. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater*, 173 F.3d 1033, 1035 (6th Cir. 1999) (collecting cases). And because NEPA follows the APA, "NEPA," too, "applies only when there is federal decision-making, not merely federal involvement in nonfederal decision-making." *United States v. S. Fla. Water Mgmt. Dist.*, 28 F.3d 1563, 1573 (11th Cir. 1994); *cf. Shell Oil Co. v. Train*, 585

F.2d 408, 412-13 (9th Cir. 1978) (rejecting argument that federal agency "'coercion' transformed the actions of the state agency into federal agency action reviewable" as a "novel theory unsupported by any authority" and certain to cause "mischief," even when "qualifications for federal funding combined with the delegation of operational authority to the states have been tied to state compliance with federal policies and to ongoing federal-state consultations").  NEPA thus does not apply to the State's decision to erect a temporary detention facility—even if the federal government is somehow involved in that decision.

Plaintiffs ignore this fatal defect in their requested relief.  Instead, they generically note that "[f]or certain infrastructure projects that are built, funded, or approved by the Federal Government, NEPA requires federal agencies to prepare an environmental impact statement."  Doc. 5 at 7.  Plaintiffs thus fail to show—other than by ipse dixit—that this project is a major federal action to which NEPA applies; they offer no specific argument or facts on the point.  Indeed, Plaintiffs' motion says nothing about NEPA's application to *this* project, which was approved by the *State* and is being built by the *State*.  When "as here, state and local agencies are solely responsible for the contents of the plan, the projects proposed, and the improvements recommended, and the adoption of the plan in no way obligates the federal government, the plan cannot be said to be 'federal' for the purposes of NEPA."  *Atlanta Coal. on Transp. Crisis, Inc. v. Atlanta Reg'l Comm'n*, 599 F.2d 1333, 1347 (5th Cir. 1979); *see also Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001).  Instead, for NEPA to apply, the federal government "must possess actual power to control the nonfederal activity."  *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1572 (citation omitted).

Plaintiffs offer no evidence that the federal government is controlling the State's construction on State land.  Nor does the chance of future federal funding invoke NEPA: "The

possibility that federal funding will be provided in the future is not sufficient to federalize a state project, even when such funding is likely." *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1573; *see also Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 197 (D.C. Cir. 2003); *Atlanta Coal.*, 599 F.2d at 1347; *City of Highland Park v. Train*, 519 F.2d 681, 695 (7th Cir. 1975).

    **B.**    **Plaintiffs' NEPA/APA Claim Against the Federal Government Is Likely to Fail**

        **1.**    *Any Claim Based on Funding Is Not Ripe*

Even if the potential for federal funding alone were enough to raise a NEPA/APA claim, that claim would fail here because it is not ripe. Any such claim would turn on unknown contingencies that will drive the legal analysis. *See Core Const. Servs. Se., Inc. v. Crum & Forster Specialty Ins. Co.*, 2015 WL 3929696, at *1 (M.D. Fla. June 25, 2015) (a claim is not ripe when "contingent upon facts that have not yet materialized"); *Digit. Props., Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997) ("The ripeness doctrine protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes."). For example, Plaintiffs' claim is contingent on funding decisions that have yet to be made. *See* Ex. 1 ¶ 3 (stating that the source and amount of federal reimbursement is unknown). To be sure, the federal government has suggested that it will use FEMA funds to reimburse Florida for construction.[24] But much of FEMA's work—including work funded under the Stafford Act—is exempt from NEPA. *See* 42 U.S.C. § 5159; *see also San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 647 (9th Cir. 2014); *Hayne Blvd. Camps Pres. Ass'n, Inc. v. Julich*, 143 F. Supp. 2d 628, 635 (E.D. La. 2001). Until the federal government identifies which specific funds

---

[24] *See, e.g.*, Camilio Montoya-Galvez, *Florida to receive federal funds to build immigration detention sites, including "Alligator Alcatraz," Noem says*, CBS News (June 24, 2025), https://www.cbsnews.com/news/alligator-alcatraz-florida-immigration-detention-centers-dhs-secretary-noem/.

(if any) it will use to reimburse Florida, and the mechanism by which those funds will be used, there is no practical way to determine whether NEPA even applies to the federal government's hypothetical funding decision.

Moreover, under section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, the DHS Secretary can "waive all legal requirements," including NEPA, when the waiver is "necessary to ensure expeditious construction of the barriers and roads." 8 U.S.C. § 1103, statutory note; *see also Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 36 (D.D.C. 2020) (emphasizing § 1103's text "commit[s] the decision fully to the Secretary's ... subjective discretion").  Thus, if DHS funds were used to construct walls or roads, DHS could waive NEPA.  Because adjudicating Plaintiffs' claim turns on that down-the-line contingency, the claim is not ripe.

### 2. *Any Claim Based on Funding Is Not Final Agency Action*

The APA applies only to "final agency action."  5 U.S.C. § 704.  Until there is final action, courts have no power of review.  *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236 (11th Cir. 2003).  That rule applies equally to NEPA-based claims.  *E.g.*, *Lakes & Parks All. of Minneapolis v. Fed. Transit Admin.*, 928 F.3d 759, 762 (8th Cir. 2019); *BRRAM, Inc. v. FAA*, 670 F. App'x 50, 52 (3d Cir. 2016).

Generally, there are two requirements for final agency action.  "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotations omitted).  "And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Id.*  Plaintiffs' claim falters on the first requirement.  Plaintiffs have not pointed to any final funding decision.  Nor could they.  Florida, not the federal

government, will initially pay for the construction of the detention facility and "then will submit a reimbursement request to FEMA and DHS."[25]  The reimbursement decision, in other words, has not yet been made.  For that reason, there cannot be final agency action.  *E.g.*, *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103 (9th Cir. 2007) ("[T]he congressional appropriation to the EPA of funds for a particular project does not constitute a final agency action by the EPA until the EPA has reviewed a grant application and decided to disburse the funds."); *Karst Envtl. Educ. & Prot., Inc. v. EPA*, 403 F. Supp. 2d 74, 81 (D.D.C. 2005) (same).

In any event, DHS's decision to allocate reimbursement funds to Florida is committed to agency discretion by law.  An agency's decision to allocate funds in a particular way is an unreviewable exercise of discretion because the agency must be allowed to administer its statutory responsibilities "in what it sees as the most effective or desirable way." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993).  Indeed, courts are not well equipped to review the "complicated balancing of a number of factors which are peculiarly within [the agency's] expertise: whether its resources are best spent on one program or another; whether it is likely to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the agency has enough resources to fund a program at all." *Id*. at 193.  Even when Congress has dictated that funds be spent for a specific purpose, so long as it "left to the [agency's] sole judgment" the determination of the allocation of funds, the APA prohibits judicial review of how

---

[25] Maria Briceño, *Florida's 'Alligator Alcatraz' immigration detention center isn't funded by FEMA hurricane money*, Politifact (June 26, 2025), https://www.politifact.com/article/2025/jun/26/Florida-Alligator-Alcatraz-funding-FEMA-hurricane/; *see also* Ex. 1  ¶ 3 ("Florida plans to seek reimbursement of its expenses from the federal government.  But Florida has yet to receive any such reimbursement and the precise source and amount of any such reimbursement is unknown.").

funds are allocated, *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002), if the allocation "meet[s] permissible statutory objectives," *Lincoln*, 508 U.S. at 193.

That is the case here.  Congress allocated $650 million to FEMA "to support sheltering and related activities provided by non-Federal entities, in support of relieving overcrowding in short-term holding facilities of U.S. Customs and Border Protection."   Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, tit. II, 138 Stat. 460, 598 (March 23, 2024). Congress has allocated hundreds of millions more for additional immigration detention facilities. *See* DHS, *FY2025 Budget in Brief*, https://www.dhs.gov/sites/default/files/2024-04/2024_0311_fy_2025_budget_in_brief.pdf.  Under *Lincoln* and *Milk Train*, DHS's decision on how to spend that money is discretionary and cannot be reviewed under the APA.

### 3.    *Any Claim Based on Detention Decisions Is Foreclosed*

To the extent Plaintiffs stray beyond funding and seek to enjoin the federal government's "use" of the facility for detention—as they do in their requested relief, Doc. 5 at 14—that use decision is not subject to judicial review.  Indeed, state agencies often hold federal detainees.  And yet, Plaintiffs cite no authority subjecting those detention decisions to judicial review.  Nor could they.  Both the APA and the Immigration and Nationality Act make clear that courts cannot review purely discretionary immigration decisions.   *See* 5 U.S.C. § 701(a)(2); 8 U.S.C. § 1252(a)(2)(B)(ii).  Those provisions foreclose review of any decision about where to detain aliens.  After all, Congress vested the DHS Secretary with the power to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal."  8 U.S.C. § 1231(g)(1); *see also* 6 U.S.C. § 557.  That power includes the "discretionary power to transfer aliens from one locale to another, as she deems appropriate." *Van Dinh v. Reno*, 197 F.3d 427, 433 (10th Cir. 1999). Said differently, "Section 1231(g)(1) gives both 'responsibility' and 'broad

discretion' to the Secretary 'to choose the place of detention for deportable aliens.'"  *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 751 (9th Cir. 2022) (quoting *Com. of Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434, 1441 (9th Cir. 1986)); *see also Sinclair v. Att'y Gen. of U.S.*, 198 F. App'x 218, 222 (3d Cir. 2006) ("the place of detention is left to the discretion of the [Secretary]").   And that discretionary power cannot be superintended by the courts.  *See Jane v. Rodriguez*, 2020 WL 10140953, at *1 (D.N.J. May 22, 2020); *Lway Mu v. Whitaker*, 2019 WL 2373883, at *5 (W.D.N.Y. June 4, 2019); *Salazar v. Dubois*, 2017 WL 4045304, at *1 (S.D.N.Y. Sept. 11, 2017); *Tercero v. Holder*, 2012 WL 8667571, at *3 (D.N.M. Oct. 4, 2012).  Absent a case-specific constitutional claim, courts will not supervise the Secretary's "daily exercise of his discretion to select the place of detention of aliens in his custody."  *Com. of Cent. Am. Refugees*, 795 F.2d at 1441; *see also Kapiamba v. Gonzalez*, 2007 WL 3346747, at *1 (W.D. Mich. Nov. 7, 2007).

### C.      Plaintiffs Are Unlikely to Receive the Injunction They Request

Plaintiffs request a broad injunction barring "any pre-construction activities, construction, conversion, or use of the TNT Site for purposes of immigration detention unless and until Defendants comply with NEPA and the APA."  Plaintiffs are unlikely to get that remedy because technical NEPA violations often call for remand without vacatur—a remedy that leaves the agency's policy in place while it fixes any NEPA violations.  *Ctr. for Sustainable Coast v. U.S. Army Corps of Eng'rs*, 100 F.4th 1349, 1357 n.8 (11th Cir. 2024); *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015).

In deciding whether to vacate an agency action, courts balance two factors, "(1) the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly), and (2) the disruptive consequences of vacatur."  *City of Port Isabel v. FERC*, 130 F.4th

1034, 1036 (D.C. Cir. 2025).  Here, even if a NEPA/APA violation could be found, both factors would strongly support remand without vacatur.

First, any deficiency in DHS's decisionmaking was minor.  After all, the State—not DHS— is the primary driver of the project.  To the extent DHS failed to do a NEPA review, it relates to only a small piece of the broader state project.  "[W]e are not," in other words, "confronted with a total and unjustifiable failure to follow NEPA's core procedures as to an entire project."  *City of Port Isabel v. FERC*, 130 F.4th 1034, 1037 (D.C. Cir. 2025).  More than that, it is likely that on remand DHS could "offer better reasoning and adopt the same rule."  *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 2025 WL 1669344, at *24 (9th Cir. June 13, 2025).  Indeed, the detention facility will be a temporary facility on land that is still used for airfield and training activities.  The specific site is not environmentally pristine land but is instead a working airfield, with around 28,000 flights in the last six months.  Ex. 1 ¶ 4.  There is thus no reason to think that any additional NEPA process will change the outcome, especially given that "NEPA imposes only procedural requirements and does not dictate a substantive environmental result."  *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1468 n.21 (9th Cir. 1996).

Second, vacatur now would be deeply disruptive.  The project "is now either mid-construction or operational.  In either case, vacating the … orders would be quite disruptive."  *Food & Water Watch v. FERC*, 28 F.4th 277, 292 (D.C. Cir. 2022).  And that disruption is compounded by the emergency the State and federal government are facing.  Quite simply, and as explained above, detention facilities are over capacity.  Halting construction now would put DHS to an impossible choice: either release detainable aliens and take on the associated risk of flight and crime, *see Demore*, 538 U.S. at 518 ("[D]eportable criminal aliens who remain[] in the United States often commit[] more crimes before being removed."), or detain aliens in overcrowded

14

facilities, which poses "an immediate risk to the health and safety of DHS agents and officers, and to those detained," *Rosa*, 583 F. Supp. 3d at 864.  The APA does not require that impossible choice. Remand without vacatur would be the far more appropriate remedy.  *See Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012) (remanding without vacatur when the alternative would have stopped construction on a vital project).

## II.   PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM

Irreparable harm requires a showing that "irreparable injury is *likely* in the absence of an injunction"—a mere "possibility" of harm is inconsistent with the extraordinary remedy of injunctive relief.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  Even if a plaintiff has a strong likelihood of successfully showing a NEPA violation, he still must separately show a *likelihood* of irreparable harm.  *See id.* at 21-24.  Thus, the Supreme Court explicitly rejected the idea that a NEPA violation should create a presumption of injunctive relief.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010).  Instead, the court must independently find an irreparable injury to justify an extraordinary injunction.  *See id.* at 156, 158.

Plaintiffs' contrary argument is incorrect.  They cite *Miccosukee Tribe of Indians of Florida v. United States*, 2008 WL 11332080, at *11 (S.D. Fla. Nov. 14, 2008), for the proposition that "[i]rreparable harm results where environmental concerns have not been addressed by the NEPA process."  Doc. 5 at 10 (alteration in original).  But *Miccosukee Tribe*, which was decided within days of *Winter*, contradicts its holding.  The same is true for Plaintiffs' remaining pre-*Winter* case, *Sierra Club v. Marsh*, which held that an agency necessarily causes harm when it makes a decision without the proper NEPA analysis.  872 F.2d 497, 500 (1st Cir. 1989).  None of that is consistent with current caselaw.  A NEPA violation does not prove irreparable harm—a plaintiff must still show a likelihood that environmental harm will result.  *See Winter*, 555 U.S. at 22-23.

Without a thumb on the scale for injury, Plaintiffs' irreparable injury theories fail for two reasons. <u>First</u>, Plaintiffs point to harm that is too late to prevent. They worry that once the bureaucracy has "committed to a course of action," it will be "difficult to change that course … it is this type of harm that plaintiffs seek to avoid." Doc. 5 at 10 (citation omitted). But Florida has *already* committed to creating a facility at the Dade-Collier airport and construction is underway. That past harm is irrelevant to the irreparable harm analysis. *See Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1134 (11th Cir. 2005). Given the already-existing construction, "the principal relief available to plaintiffs would be further environmental mitigation, which could take place just as effectively in the future." *Pogliana v. U.S. Army Corps of Eng'rs*, 49 F. App'x 327, 329 (2d Cir. 2002); *see also Save the Wekiva River & Headwaters, Inc. v. U.S. Army Corps of Eng'rs*, 2017 WL 10086128 (M.D. Fla. Dec. 29, 2017). Plaintiffs' alleged harm is not irreparable.

<u>Second</u>, Plaintiffs have not sufficiently tied their claimed harm to their members. To show irreparable harm, it is not enough to point to a procedural defect or to general harm to the environment. Instead, plaintiffs must show environmental injury that affects the plaintiffs. *Nevada v. United States*, 364 F. Supp. 3d 1146, 1153 (D. Nev. 2019). And the irreparable harm must be "neither remote nor speculative, but actual and imminent." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citation omitted). Plaintiffs offer only mere speculation that harm to species would occur, let alone that it would affect them specifically. Plaintiffs' members are not likely to suffer an irreparable loss of enjoyment of Big Cypress National Preserve. The Preserve is massive, covering over 729,000 acres of the Everglades—"roughly the size of Rhode Island."[26] The planned detention center will not occupy the Preserve itself, but a small property less than 4% of

---

[26] Nat'l Park Serv., *Big Cypress*, https://www.nps.gov/bicy/learn/management/statistics.htm (last accessed June 30, 2025).

its size toward the eastern border of the Preserve—and the facility will occupy the existing airport footprint.  None of the visitors state that they plan to visit the *airport* (except to protest).  Tierra Curry states her intention to visit Big Cypress generally.  Doc. 5-2 ¶ 11.  Amber Crooks plans to visit Shark Valley, which she calls "close to the location of the detention center."  Doc. 5-3 ¶ 7.  But the Shark Valley hiking trails are about ten miles away from the airport.[27]  And Eve Samples offers only the conclusory statement that construction will harm her aesthetic interests, which is especially suspect because there is already **an airfield** on the site.  Doc. 5-1 ¶ 13.  Such speculation does not establish a likelihood of irreparable harm.  *See Sierra Club v. U.S. Army Corps of Eng'rs*, 2020 WL 3268228, at *4 (M.D. Fla. Mar. 16, 2020).

Any harm to the cited animal populations is also highly speculative and unlikely.  For example, Curry raises concerns that panthers could avoid the airport, leading to panther infighting in other areas.  Doc. 5-2 ¶ 15.  Florida panthers apparently have been seen around the airport.  But the Florida Panther Telemetry map shows panthers frequent many parts of the large Preserve, and similarly dense panther visits have been seen in populated areas.[28]  It is unclear that a detention facility would in fact deter panthers more than the thousands of airplanes already using the facility.  *See* Ex. 1 ¶ 4. And even if panthers did avoid the area, they would still have much of the massive Preserve left to them.  Curry and Crooks also worry about more panthers being hit by cars.  Doc. 5-2 ¶ 15; Doc. 5-3 ¶¶ 15, 28.  But the objection is simply speculation; Plaintiffs make no effort to quantify the effect this would have on their enjoyment of the panther population.  Even under the

---

[27] *See* Google Maps, https://www.google.com/maps/@25.8221208,-80.8622897,24908m (last accessed June 30, 2025).

[28] Fla. Fish & Wildlife Conservation Comm'n, *Florida Panther Telemetry* (updated Aug. 19, 2024) https://geodata.myfwc.com/datasets/myfwc::florida-panther-telemetry/explore?location=26.186627%2C-81.639535%2C14.46; *compare id.*, https://geodata.myfwc.com/datasets/myfwc::florida-panther-telemetry/explore?location=25.850877%2C-80.898046%2C14.00.

status quo, Florida panthers are "reclusive" and "rarely seen by people,"[29] and the declarations do not claim that Curry or Crooks have *ever* seen a Florida panther in the Preserve.

Still more speculative are concerns about other animals, such as the bonneted bat.  The bat's critical habitat covers 1.2 million acres in Florida, a much larger area than just the Preserve.[30] In addition, almost the entire Preserve was designated critical habitat (except for tribal land) with seemingly little effort to determine precisely where the bats were living.  *See* Designation of Critical Habitat for Endangered Florida Bonneted Bat, 89 Fed. Reg. 16624, 16651 (Mar. 7, 2024). A previous survey found the "vast majority" of bonneted bat calls were at one remote pond. Endangered Species Status for the Florida Bonneted Bat, Fed. Reg. 61004, 61011 (Oct. 2, 2013). So it is unclear whether there are *any* bonneted bats within miles of the facility.

The declarations contain even fewer facts about the habitats of other supposedly threatened species.  Curry states that the snail kite and wood stork live in the Big Cypress National Preserve, but she does not show that they live near the airport.  Doc. 5-2 ¶¶ 18-19.  Curry does not even confirm that the eastern indigo snake lives in the Preserve.  *Id.* ¶ 20.  The declaration thus fails to establish that the detention facility is likely to harm the survival or enjoyment of these species. *See Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgt.*, 516 F. Supp. 3d 943, 957 (D. Alaska 2021) ("The fact that some … construction is scheduled to occur partially within potential denning habitat falls short of establishing likely irreparable harm to the protected species.").

Crooks also objects to light pollution because she enjoys the stars.  Doc. 5-3 ¶ 27.  But the airport is already operational, so there is currently light pollution.  *See* Ex. 1 ¶ 5.  And anyway,

---

[29] Fla. State Parks, *Where to See the Florida Panther*, https://www.floridastateparks. org/learn/where-see-florida-panther (last accessed June 30, 2025).

[30] U.S. Fish & Wildlife Serv., *U.S. Fish and Wildlife Service Designates Critical Habitat for the Endangered Florida Bonneted Bat* (Mar. 6, 2024), https://www.fws.gov/press-release/ 2024-03/us-fish-and-wildlife-service-designates-critical-habitat-endangered-florida.

Crooks provides no concrete plan to enjoy the stars near the detention facility. She states that she once took a bicycle ride by moonlight at Shark Valley "a while ago," and that she "would like to do it again." Doc. 5-3 ¶ 27. Samples's declaration similarly does not explain when she intends to enjoy the night sky. Doc. 5-1 ¶ 13. Such uncertain plans also make any potential harm speculative. "The affiants' profession of an 'inten[t]' to return to the places they had visited before—where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species—is simply not enough." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992)

Finally, even if environmental harm is likely, such harm must be *irreparable* to warrant injunctive relief. The Eleventh Circuit has refused to find irreparable harm in the past despite testimony that wetland filling would prevent vegetation growth and impede the flow of food for fish and shrimp, and that a lake "was likely to be polluted unless preventive measures were taken." *United States v. Lambert*, 695 F.2d 536, 540 (11th Cir. 1983). This testimony failed to "support a finding of injury that could not be remedied by relief following a decision on the merits." *Id.* In other words, the plaintiffs must show a likelihood *both* that the detention facility would harm enjoyment of the environment, and that the harm would be irreparable. But any effect on habitat will likely not be permanent. The detention facility will eventually shut down. Governor DeSantis has been clear that the facility is temporary, is being built on an existing airport, and will not require sewer lines.[31] In these circumstances, there are good reasons to expect a successful return of the status quo. *See Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*, 492 F. Supp. 3d 701, 725 (E.D.

---

[31] Joan Murray, *"Alligator Alcatraz" immigrant detention center sparks outcry as DeSantis claims zero environmental impact*, CBS News (June 25, 2025), https://www.cbsnews.com/miami/news/alligator-alcatraz-migrant-facility-draws-fire-from-environmental-groups-in-the-everglades/.

Tex. 2020) ("Plaintiff offers little proof of the type of permanent, devastating impact on the environment that has convinced other courts to enjoin construction projects.").

## III.   THE BALANCE OF THE EQUITIES DOES NOT SUPPORT A TRO

The balance of equities also cuts against a TRO. As explained, any additional NEPA process is unlikely to change the facts on the ground given Plaintiffs failure to show any environmental impact of the temporary detention facility and the pressing need for more detention beds. *See* Part I.C. Quite simply, any agency considering Plaintiffs' claims would not credit them. The risks from delaying the detention facility, which include both imperiling critical immigration enforcement and endangering detainees in current facilities, overwhelm any incidental environmental harm caused by a temporary facility on an existing site. NEPA, in short, does not prevent the states from engaging in critical, timely infrastructure projects. *See, e.g.*, *Nickler v. Cnty. of Clark*, 648 F. App'x 601, 605 (9th Cir. 2016) (denying injunctive relief when "the balance of equities" "favors concerns of public safety"). That should not be a surprise. "NEPA is not a game where project objectors can engage in unjustified obstructionism." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1517 (2025) (citations and quotation marks omitted). Because that is all Plaintiffs offer, the equities tilt strongly against them.[32]

## CONCLUSION

For these reasons, the court should deny Plaintiffs' request for a TRO or an injunction.

---

[32] Plaintiffs also raise a state law claim in their complaint. *See* Doc. 1 ¶¶ 80-87. They rightly do not seek a TRO or preliminary injunction on that claim because federal courts cannot issue injunctions against state officials for violations of state law. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

Dated: June 30, 2025

Respectfully submitted,

s/ Jesse Panuccio
Jesse Panuccio (FBN 31401)
Evan Ezray (FBN 1008228)
**BOIES SCHILLER FLEXNER LLP**
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida 33301
jpannucio@bsfllp.com

James Uthmeier
  *Attorney General of Florida*
Jeffrey Paul DeSousa (FBN 110951)
  *Acting Solicitor General*
Nathan A. Forrester (FBN 1045107)
  *Chief Deputy Solicitor General*
Robert S. Schenck (FBN 1044532)
  *Assistant Solicitor General*
**Office of the Attorney General**
The Capitol, PL-01
Tallahassee, FL 32399
jeffrey.desousa@myfloridalegal.com

*Counsel for Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 30, 2025, the foregoing was filed with the Clerk of Court using

CM/ECF, which will serve a Notice of Electronic Filing on all counsel of record.

<u>s/ *Jesse Panuccio*</u>
Jesse Panuccio