UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:25-cv-22896-JEM

FRIENDS OF THE EVERGLADES, INC., a Florida not-for-profit corporation, and CENTER FOR BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit organization,

        Plaintiffs,

vs.

KRISTI NOEM, in her official capacity as Secretary of the UNITED STATES DEPARTMENT OF HOMELAND SECURITY; *et al.*

        Defendants.

**REPLY IN SUPPORT OF PLAINTIFFS' EXPEDITED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Alisa Coe, Esq.
Tania Galloni, Esq.
EARTHJUSTICE
4500 Biscayne Boulevard, Suite 201
Miami, Florida 33137
Telephone: (305) 440-5432

*Counsel for Friends of Everglades*

Elise Pautler Bennett, Esq.
Jason Alexander Totoiu, Esq.
CENTER FOR BIOLOGICAL DIVERSITY
Post Office Box 2155
St. Petersburg, FL 33731
Telephone: (727) 755-6950

*Counsel for Center for Biological Diversity*

Paul J. Schwiep, Esq.
Scott Hiaasen, Esq.
COFFEY BURLINGTON, P.L.
2601 South Bayshore Drive, Penthouse One
Miami, Florida 33133
Telephone: (305) 858-2900

*Counsel for All Plaintiffs*

Plaintiffs Friends of the Everglades, Inc., and Center for Biological Diversity, Inc. ("Plaintiffs"), by and through undersigned counsel, hereby Reply in support of their Expedited Motion for Temporary Restraining Order and Preliminary Injunction (D.E. 5) (the "Motion"):

## **INTRODUCTION**

The State and Federal Defendants[1] cannot get their stories straight.  In their responses to the Motion, D.E. 16 and D.E. 21, Defendants portray themselves as passing strangers, and the immigration detention facility (which will also function as an immigration court and deportation airport) being erected at breakneck speed in the heart of the Big Cypress National Preserve as a frolic of State, without any Federal participation. *See, e.g.,* D.E. 21-1 ¶ 5. Because this is the State's lonely endeavor, they argue, NEPA[2] does not apply, and they are not obliged to prepare an Environmental Impact Statement (EIS) to assess the impact of this facility on the Preserve and the Greater Everglades, or consider, as NEPA requires, reasonable alternatives that would achieve the desired result. Outside of court, however, the Defendants have told a different story.

Last week, Gov. DeSantis said the State began building a detention center in the Dade-Collier Training and Transition Airport ("TNT Site") at the "request[] [of] the federal government," and further stated and that it "is fully funded by the federal government."[3] Defendant Noem also stated that the detention center "will expand facilities and bed space in just days, thanks to our ***partnership*** with Florida."[4] While touring the detention center on July 1, Defendant Noem elaborated on her Department's "partnership": "My general counsel … called up the Attorney General and Governor and said, 'Hey, what do you think about partnering with us on a detention facility?"[5] That same day, State officials confirmed that "[t]he timing of detainee arrivals at the detention facility will be determined by the U.S. Department of Homeland Security and U.S.

---

[1] In this Reply, Plaintiffs shall refer to Defendant Guthrie, sued in his official capacity as Executive Director of the Florida Division of Emergency Management, as the "State," and Defendants Noem and Lyons, sued in their official capacities as Secretary of the DHS and Acting Director of ICE, respectively, as the "Federal Defendants."

[2] The National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*,

[3] https://www.youtube.com/watch?v=gJfG7L9reHU&ab_channel=FOX35Orlando, (at 6:01 timemark), last visited June 27, 2025.

[4] Camilo Montoya-Galvez, *Florida to receive federal funds to build immigration detention sites, including "Alligator Alcatraz," Noem says*, CBS News (June 24, 2025), https://www.cbsnews.com/news/alligator-alcatraz-florida-immigration-detention-centers-dhs-secretary-noem/.

[5] Syra Ortiz Blanes and Alex Harris, *Feds move in court to distance Trump administration from Alligator Alcatraz*, Miami Herald (July 3, 2025), https://www.miamiherald.com/news/local/immigration/article309936010.html.

Immigration and Customs Enforcement"[6]–contrary to the declaration filed in this Court by the Federal Defendants a day later. *See* D.E. 21-1.

These representations are consistent with Florida's framework for coordinating and providing state assistance for Federal Defendants in immigration enforcement. Florida's Immigration Enforcement Operations Plan describes an "***integrated*** Federal-Florida State approach" between the State and its "Federal partners" to build new detention facilities. *See* Exhibit A at 5 (emphasis added). The detention center is a federal-state partnership. As a matter of law, it must be because the State cannot detain individuals under immigration law without the supervision and approval of Federal Defendants. Courts hold that where nonfederal entities "have entered into a partnership or joint venture with the Federal Government" they may be enjoined for noncompliance with NEPA. *Biderman v. Morton*, 497 F.2d 1141, 1147 (2d Cir. 1974). The Federal Defendants cannot shirk NEPA responsibilities by passing the buck to the State; the State is bound as a partner. They should all be enjoined as a result of their undisputed failure to comply with NEPA.

Indeed, the need for injunctive relief has only grown more urgent since Plaintiffs' Motion was filed. While the State continues to downplay the impacts of the detention center (and describe it as "temporary"), the evidence proves otherwise: Previously unimproved sections of the Site have been filled and paved; roads have been added and expanded; and the night sky over Big Cypress now glows like Yankee Stadium, visible from 15-miles away. *See* Exhibits D & E, attached. As shown in the Motion and below, the environmental impacts will be devastating. Defendants cannot hide from this fact – or from the public – under cover of darkness and avoid their responsibilities under federal law. An injunction should be entered to prevent further damage and maintain the status quo while this action is pending.

## I. ARGUMENT

### A. Construction and Operation of the Detention Center Is a Major Federal Action Subject to NEPA.

In their Responses, Defendants strain to evade the reach of NEPA by claiming that the State alone is responsible for the detention center. D.E. 16 at 7-9; D.E. 21 at 3-6. In the same breath, however, Defendants concede that the facility is intended for the detention and adjudication of

---

[6] CBS Miami Team, *Everglades "Alligator Alcatraz" immigrant detention center to receive first arrivals*, CBS News (July 2, 2025), https://www.cbsnews.com/miami/news/first-group-of-immigrants-set-to-arrive-at-alligator-alcatraz-immigrant-detention-docneter-in-everglades/.

individuals under color of federal immigration law and the authority of DHS. *See* D.E. 16 at 4 (asserting that the facility will house "detainees awaiting deportation" as part of the State's campaign against what it calls the "illegal immigration crisis"); D.E. 21 at 4-5 (asserting that Florida is acting pursuant to a 287(g) agreement with ICE). Defendants ignore the obvious: In performing exclusively federal functions on immigration enforcement, the State must necessarily be acting under federal control and authority at every step to build, maintain, and operate the detention center, because the State otherwise lacks the power to detain and deport individuals under federal immigration law. This project is necessarily a major federal action subject to NEPA, as the State ***cannot*** act in this field without federal approval or control.

Federal actions subject to NEPA include any actions that are subject to "substantial Federal control and responsibility." 42 U.S.C. § 4336e(10)(A). Contrary to the State's argument, "[m]ajor federal action can exist when the primary actors are not federal agencies." *United States v. S. Florida Water Mgmt. Dist.*, 28 F.3d 1563, 1572 (11th Cir. 1994). A "federal agency's authority to influence" nonfederal activity is "the touchstone of major federal activity." *Id.* (internal citation omitted) ("[t]he federal agency must possess actual power to control the nonfederal activity"). Under this standard, "a non-federal project is considered a 'federal action' if it cannot 'begin or continue without prior approval by a federal agency.'" *Maryland Conservation Council, Inc. v. Gilchrist,* 808 F.2d 1039, 1042 (4th Cir. 1986). Courts consider "whether the federal agency must undertake 'affirmative conduct' before the non-federal actor may act." *Indian River Cnty. v. Rogoff*, 201 F. Supp. 3d 1, 15 (D.D.C. 2016). Where a project is "sufficiently federal in character," NEPA applies. *Scottsdale Mall v. Indiana*, 549 F.2d 484, 489 (7th Cir. 1977).

Here, the State is constructing a detention center that is ***entirely*** federal in character. Gov. DeSantis has publicly stated that the TNT Site is to be used for (1) the ***detention*** of suspected illegal immigrants; (2) the ***adjudication*** of the removability of these individuals; and (3) the ***deportation*** of these individuals by utilizing the runway at the Site.[7] These are ***exclusively*** federal functions that the State is legally prohibited from performing without federal control and approval. Where federal approval is a "legal precondition for implementation," the action is federal action for NEPA purposes. *S. Florida Water Mgmt. Dist.*, 28 F.3d at 1572.

---

[7] Romy Ellenbogen and Ana Ceballos, *Trump OKs using National Guard as immigration judges at Florida detention center*, MIAMI HERALD (July 1, 2025), https://www.miamiherald.com/news/local/immigration/article309792865.html.

As the Supreme Court has held, the State has no authority "to decide whether an alien should be detained for being removable" because "the removal process is entrusted to the discretion of the Federal Government." *Arizona v. United States*, 567 U.S. 387, 409 (2012). For these reasons, two district court judges in this district recently held that Florida statutes providing for state and local enforcement of immigration laws were unenforceable and unconstitutional. *Florida Immigrant Coal. v. Uthmeier*, ---F. Supp. 3d---, No. 25-21524-CV, 2025 WL 1423357, at *7-10 (S.D. Fla. Apr. 29, 2025) (Williams, J.); *Farmworker Ass'n of Fla., Inc. v. Moody*, 734 F. Supp. 3d 1311, 1332-37 (S.D. Fla. 2024) (Altman, J.).

Similarly, the State has no legal power to determine the removability of any individual, or to deport any individual following a removability determination. *Arizona*, 567 U.S. at 409-10 ("The authority to control immigration–to admit or exclude alien–is vested solely in the Federal Government") (internal citation omitted). It is well established that "immigration judges alone have the authority to determine whether to deport an alien." *United States v. Romeo*, 122 F.3d 941, 943 (11th Cir. 1997) (interpreting 8 U.S.C. § 1229a). Immigration judges "are creatures of [federal] statute, receiving some of their powers and duties directly from Congress, and some of them by subdelegation from the Attorney General." *Jimenez-Rodriguez v. Garland*, 996 F.3d 190, 193 (4th Cir. 2021); *see also* 8 U.S.C. § 1101(b)(4) ("[a]n immigration judge shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe"). In establishing an immigration court on the TNT Site, *see* n.7, the State is by definition creating a *federal* court under the exclusive control of the U.S. Attorney General. This alone is sufficient to establish federal action. *S. Florida Water Mgmt. Dist.*, 28 F.3d at 1572 ("[t]he federal agency must possess actual power to control the nonfederal activity").

Under Florida law, the State could not build and operate the detention center without federal direction and control if it wanted. Florida law expressly provides that "unauthorized aliens" cannot be transported by State officials unless at the request of ICE and "under the direct control and supervision of" ICE. Fla. Stat. § 908.13(2)(c). Thus, any deportations from the TNT Site must be controlled and supervised by ICE under Florida law.[8] This too is major federal action.

---

[8] Moreover, in order for the State or ICE to utilize any large (31-seat or greater) aircraft to transport passengers from the TNT Site, they must first seek and obtain an Airport Operating Certificate from the Federal Aviation Administration ensuring compliance with safety and emergency requirements. *See* 14 C.F.R. § 139.1.

4

For its part, DHS insists that the State will be detaining individuals pursuant to agreements with the federal government under Section 287(g) of the Immigration and Nationality Act (8 U.S.C. § 1357(g))–though the State *itself* has said no such thing, and no agreement has been produced. D.E. 21 at 4-5; D.E. 16. Although Acting Deputy Executive Associate Director of DHS Giles, asserts in his declaration that the "ultimate decision of who to detain at the TNT Detention Facility belongs to Florida," D.E. 21-1 ¶ 6, this is belied by the parade of DHS vehicles photographed entering and exiting the TNT Site on July 3, 2025. *See* Exhibit B. In any case, federal law and the 287(g) agreements themselves say otherwise.

The statute governing federal/local immigration agreements unambiguously states that "[i]n performing a function under this subsection, an officer or employee of a State or political subdivision of a State *shall be subject to the direction and supervision of the Attorney General*." 8 U.S.C. § 1357(g)(3) (emphasis added). Further, the 287(g) agreement between ICE and the Florida National Guard makes clear that State law enforcement officers "are not authorized to perform immigration officer functions except when working under the supervision or direction of ICE." *See* Ex. C. Indeed, when acting under a 287(g) agreement, state officers "will be treated as Federal employees" and "will be considered acting **under color of federal authority**." *Id.* (emphasis added). The reliance on National Guard members deputized as federal immigration officers under 287(g) is further proof that the creation and operation of the facility is federal action.[9]

At bottom, the State's plan for the TNT Site depends entirely on federal participation and control. Detainees may only be transported to or from the facility by ICE or at ICE's request. Fla. Stat. § 908.13(2)(c). They must be detained by the federal government or pursuant to federal authority and supervision. *Arizona*, 567 U.S. at 409; 8 U.S.C. § 1226(a)-(c) (arrest and detention of aliens is within authority of U.S. Attorney General); 8 U.S.C. § 1357(g)(3). Their removability must be determined by a federal immigration judge. 8 U.S.C. § 1229a. DHS and ICE plainly possess the "actual power to control" every aspect of the operation of the TNT Site, and federal approval is legally required for implementation of every aspect of the Site, rendering the detention center a federal action. *S. Florida Water Mgmt. Dist.*, 28 F.3d at 1572; *see also Gilchrist,* 808 F.2d at 1042 (finding federal action based on federal "monitoring role" and "inevitability of the need for at least

---

[9] Notably, the 287(g) agreement with the Florida National Guard does *not* (and *cannot*) allow Guard members to act as immigration judges, as the State has proposed. *See* Ex. C.; *see also* 8 U.S.C. § 1357(g)(1) (allowing state officers to "perform a function of an *immigration officer*") (emphasis added); 8 U.S.C. § 1101(a)(18) (defining "immigration officer").

5

one federal approval"); *Sierra Club v. U.S. Fish & Wildlife Serv.*, 235 F. Supp. 2d 1109, 1121 (D. Or. 2002) (federal action where federal agency retained "monitoring role" and oversight over state agency pursuant to statute). Even if federal authorities abdicate these legal duties to the State, the facility *still* would constitute a federal action under NEPA. *Bunch v. Hodel*, 642 F. Supp. 363, 365 (W.D. Tenn. 1985) (finding federal action where federal government had "a continuing and an ongoing legal duty to act").

The State is constructing a *federal* detention center to house *federal* immigration detainees, conduct *federal* removal hearings, and undertake *federal* removals. *See* Comp. Ex. B. This is a federal action under NEPA, irrespective of whether (or when) the federal government pays for it. *Sw. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater*, 243 F.3d 270, 279 (6th Cir. 2001) ("major federal actions need not be federally funded to invoke NEPA requirements"); *see also Fath v. Texas Dep't of Transp.*, No. 1:16-CV-234-LY, 2016 WL 7442868, at *9 (W.D. Tex. Sept. 6, 2016) (agency decision to segment projects was final and ripe). The Federal Defendants may not wash their hands of NEPA responsibility when the government is operating in concert with the State.

### B. The Construction and Operation of the Mass Detention Center is APA Final Action.

The Federal Defendants assert that no federal final action has occurred to trigger NEPA obligations, which are reviewable under the APA. The argument reflects a fundamental misunderstanding of APA "final action" in a NEPA context, and, if accepted, would allow any project to be constructed so long as no authorization is given, no review occurs, no permits are granted, or no decisions announced. Neither NEPA nor the APA are so artificially narrow.

Under the APA, agency action is "final" for purposes of review when "(1) the action … "mark[s] the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature"; and (2) is "one by which rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear,* 520 U.S. 154, 177–78 (1997), *cited in Alabama v. Centers for Medicare & Medicaid Servs.*, 780 F. Supp. 2d 1219, 1226 (M.D. Ala. 2011), *aff'd,* 674 F.3d 1241 (11th Cir. 2012). As the Federal Defendants concede, the "core question" is whether the decision-making process has advanced to the point that it "will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). Decisions that are "tentative" or preliminary are not final, while decisions that have a "direct effect on ... day-to-day business" are reviewable. *Id.* at 797; *see also Abbott Labs. v. Gardner,* 387 U.S. 136, 152 (1967).

To be sure, the issuance of a "final EIS or … record of decision … constitute[s] final agency action" for purposes of a NEPA claim. *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1173 (11th

Cir. 2006). This, of course, does not mean that final action may be found **only** where the agency issues a record of decision or an EIS. For instance, in *McClash v. Fla. Dep't of Transp.*, 619 F. Supp. 3d 1167, 1190 (M.D. Fla. 2022), the plaintiffs challenged an agency decision to replace a drawbridge with a fixed span structure. The agency did not create an EIS or EA, which the plaintiffs alleged violated NEPA. The court had no difficulty finding final action where the action "affects the parties' legal rights … and immediately impacts … daily operations." *Id.* at 1190-91.

Here, there is nothing provisional or tentative in the "action" to construct a mass detention center at the TNT Site, and detain and deport noncitizens there. Plaintiffs' protected interests that support NEPA standing include aesthetic, conservational, recreational, and economic values, *see Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 154 (1970), and these interests are right now implicated by the construction and operation of a mass detention center. The action "directly affect[s]" Plaintiffs and their protectable interests now. *Franklin*, 505 U.S. at 797. The action is sufficiently final for APA review. A decision has been rendered—its consequences are visible for all to see—*see* Exs. D & E; Plaintiffs have been directly affected. *Bennett* has been satisfied.[10]

### C. Plaintiffs Will Likely Suffer Irreparable Harm Absent Injunctive Relief.

The key inquiry is whether irreparable harm is ***likely***. *See* D.E. 16 at 15 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Where, as here, "the immediate irreparable injury is not only possible, it is imminent," Plaintiffs have carried their burden and then some. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1241 (11th Cir. 2005); D.E. 5 at 8–11. Moreover, contrary to the State's claims, D.E. 16 at 15, in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), the Supreme Court "never rejected [a sliding scale] formulation" whereby a strong showing of likelihood of success on the merits created a strong presumption that a preliminary injunction is appropriate. *All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011). Thus, while Plaintiffs do not dispute that they must demonstrate each preliminary injunction factor; they maintain that a presumption of "[i]rreparable harm results where environmental concerns have not been addressed by the NEPA

---

[10] By contrast, in *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229 (11th Cir. 2003), *cited in* D.E. 21, at 3, the court concluded the agency had not engaged in final action as it had "done nothing beyond establishing a committee to review alternatives for the future use and management" of a federal resource. *Id.* at 1238. The court relied on the fact that "no rights or obligations have been fixed by [the agencies] behavior, nor [has it] impose[d] any legal consequences on any party." *Id.* Here, Plaintiffs have alleged, and demonstrated by tangible changes on the ground, agency actions that have adversely impacted Plaintiffs. This is reviewable agency action by any measure.

process." *Miccosukee Tribe of Indians of Fla. v. United States*, No. 08-21747-CIV-UNGARO, 2008 U.S. Dist. LEXIS 141936, at *33 (S.D. Fla. Nov. 13, 2008).

Plaintiffs demonstrated that Defendants' actions are likely to cause concrete environmental harm to the ecosystems within Big Cypress National Preserve, and endangered species. *See* D.E. 5 at 8–11. For example, Plaintiffs' declarants described concrete and irreparable harm to the Florida panther, which historically used the site, and is now precluded from continuing to do so by construction and intensified human activity, which contributes to the threat of intraspecific aggression. Likewise, they describe significant increases in traffic to and from the TNT Site, which increases the likelihood of panther-vehicle mortalities, which would significantly reduce a panther population that is only 120–230 adults, and in turn reduce the chances that the Plaintiffs' members could observe them. *See generally* D.E. 5-1 ¶¶ 11, 14; D.E. 5-2 ¶¶ 11, 14, 15; & D.E. 5-3 ¶¶ 15, 25.

Impacts to the Florida bonneted bat, and consequently Plaintiffs' interests in seeing them, are likewise concrete. Bats occupy the area. D.E. 5-2 at 7 (demonstrating that the TNT Site is near and within designated critical habitat for the bat); 89 Fed. Reg. 16624, 16651 (Mar. 7, 2024) (stating that the Big Cypress unit of critical habitat is "considered occupied" based on "documented presence of Florida bonneted bats within the unit"). Artificial lights degrade or destroy nighttime aerial foraging habitat in the area, causing bats to avoid it. D.E. 5-2 ¶ 16 (citing 89 Fed. Reg. 16624, 16642 (Mar. 7, 2024) (describing how artificial lights can "reduc[e] the availability of prey . . . and the quality of foraging habitat for Florida bonneted bats")). These impacts to bats' critical habitat threaten the population's viability, thus irreparably harming Plaintiffs' interests in conserving and attempting to see them.[11] *See Sierra Club v. Norton,* 207 F. Supp. 2d 1310 (S.D. Ala. 2002) (finding threatened destruction of optimal habitat of an endangered species is clearly irreparable).

Plaintiffs have also concretely tied the likely irreparable environmental harm to actual, imminent harm to their members' interests with specific facts.[12] *See* D.E. 16 at 8–11. The State unsuccessfully attempts to downplay the irreparable harm by arguing that the TNT Site "is only 4% of [Big Cypress's] size" and that "[n]one of the [declarants] state that they plan to visit the *airport*

---

[11] *Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgt.* is inapposite where the court found no irreparable harm because the "habitat [wa]s described as only '*[p]otential* terrestrial denning habitat,' not actual critical habitat." 516 F. Supp. 3d 943, 957 (D. Alaska 2021). The same is the case for *Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*, 492 F. Supp. 3d 701, 725 (E.D. Tex. 2020) (finding the "[p]laintiff's property contains no ESA-protected species or critical habitats")..

[12] *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000), is inapt because, among other things, it concerned speculative outcomes of a manual ballot recount the plaintiffs sought to enjoin. Here, the irreparable outcome is clear and concrete.

(except to protest)," D.E. 16 at 16–17, but this ignores that the impacts extend far beyond the mere footprint of the TNT Site. As Ms. Crooks explained, light pollution impairs the ability to appreciate the night sky during visits to Shark Valley in Everglades National Park. D.E. 5-3 ¶¶ 7, 27; *see also* D.E. 5-1 ¶13 (Ms. Samples describing harm to aesthetic interest in night sky); Ex. D. The State implies these interests are too geographically attenuated because "the Shark Valley hiking trails are about ten miles away," D.E. 16 at 17, but recent observations of the TNT Site demonstrate that light pollution is visible at least 15 miles away.[13] Ex. D.

Likewise, Ms. Curry's and Ms. Crooks' aesthetic and recreational interests in viewing wildlife like the Florida panther and Florida bonneted bat, D.E. 5-2 ¶ 11; D.E. 5-3 ¶¶ 25, 28, will be directly and irreparably harmed by traffic, light pollution, and other construction and operation activities that will reduce the viability of these species' populations in the Preserve and accordingly reduce their chance of seeing one. Plaintiffs' members need not have "*ever* seen a Florida panther in the Preserve," D.E. 16 at 18, because it is "*the desire* to . . . observe an animal species, even for purely esthetic purposes, [that] is undeniably a cognizable interest for purpose of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562–63 (1992).

Importantly, Defendants do not dispute that Plaintiffs have sustained an irreparable ***procedural*** injury relating to the lack of public process guaranteed by NEPA. *See generally* D.E. 12 at 13; D.E. 16 at 15–20; D.E. 21 at 6–7. Plaintiffs' members would have participated in the NEPA process to "protects [their] concrete interest" in protecting the environment and species in Big Cypress. *Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs*, 100 F.4th 1349, 1353 (11th Cir. 2024); *e.g.,* D.E. 5-1 ¶ 4; D.E. 5-2 ¶¶ 22, 29. And here, "the damage done by DHS' [and ICE's] violation of [NEPA] cannot be fully cured by later remedial action" because once the action is complete, "DHS is far less likely to be receptive to comments" or to consider a less environmentally destructive alternative. *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 18 (D.D.C. 2009) (finding irreparable harm where DHS promulgated a rule without APA notice-and-comment procedure); *Okeelanta Corp. v. United States Army Corps of Eng'rs,* 132 F.4th 1320 (11th Cir. 2025) ("Because of the rather special nature of the injury (that is, the failure to follow NEPA), the issue is ripe at the time the agency fails to comply"*). Los Padres Forestwatch v. U.S. Forest Serv.*,

---

[13] Given these far-reaching impacts, Ms. Curry's "intention to visit Big Cypress generally," D.E. 16 at 17, is sufficient, particularly where Defendants' actions are occurring just off Tamiami Trail, a quiet, two-lane highway and one of two major roads running through the preserve, *see id.* at 17 n.27.

9

776 F. Supp. 2d 1042, 1051–52 (N.D. Cal. 2011) (finding irreparable harm based on procedural injury from thwarted opportunity to participate in NEPA process in addition to threatened environmental harm to species and critical habitat). As in *Miccosukee Tribe of Indians of Florida v. United States*, Defendants' actions here "will adversely affect the vegetation and wildlife"; "these as yet unexamined . . . effects could begin to take place, and no amount of subsequent environmental analysis would undo them." No. 08-21747-CIV-UNGARO, 2008 U.S. Dist. LEXIS 141936, at *34, *36 (S.D. Fla., Nov. 14, 2008)

That there is "already-existing construction" does not mean that it is "too late" to prevent the harm such that preliminary relief is precluded. *See* D.E. 16 at 16. As a preliminary matter, Defendants' activities at the TNT Site are not yet complete. Defendants are installing new concrete pads beyond the air strip footprint, Ex. E, and they only just began moving detainees onto the TNT Site less than 24 hours ago.[14] Moreover, ongoing construction and operations at the detention center are likely to cause more and new impacts such as spills that pollute the surrounding wetlands and other ecosystems, *see* D.E. 5-2 at ¶¶ 18, 21; increased daily vehicle trips to transport food, water, and waste are likely to increase panther vehicle mortalities, *id.* at ¶ 15; and the artificial lighting is continues to defile the night sky, harming the public's enjoyment of it and degrading habitat for the Florida bonneted bat and Florida panther, *id.* at ¶¶ 6, 15; *see also* Ex. D. Threatened irreparable harm caused by these ongoing, incomplete actions would be remedied by a preliminary injunction. *See Lutrario v. City of Hollywood*, 683 F. Supp. 3d 1361, 1371 (S.D. Fla. 2023) (entering preliminary injunction based on alleged "ongoing injury" to plaintiff's free speech).

Furthermore, the abstract possibility of after-the-fact mitigation does not obviate the irreparable nature of the harm.[15] D.E. 16 at 16. The Supreme Court has explained that "environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e. irreparable." *Fla. Key Deer v. Brown*, 386 F. Supp. 2d 1281, 1285 (S.D. Fla. 2005) (quoting *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 545 (1987)). Indeed, no amount of money can effectively "unpollute" wetlands surrounding the TNT Site or "unkill" a panther that has been hit by a truck heading to the TNT Site.[16] For this reason, the

---

[14] Curt Anderson & Kate Payne, *First immigration detainees arrive at Florida center in the Everglades*, Associated Press (July 3, 2025), https://apnews.com/article/alligator-alcatraz-immigration-detainees-florida-56670910db4c88800d9df42ac3ce7f91.

[15] Notably, the State has not proffered or provided evidence of *any* proposed mitigation.

[16] *Pogliana v. U.S. Army Corps of Engineers* is factually distinguishable and thus not persuasive where the district court found that Plaintiffs failed to present *relevant* evidence of irreparable harm

10

purported "temporary" nature of the mass detention center,[17] D.E. 16 at 19, does not change the permanent and irreparable harm to the environment and Plaintiffs' concrete interests, and thus is irrelevant to the Court's analysis here.[18] *See* D.E. 16 at 19.

### D. **Injunctive Relief Is Available Without Resolving Vacatur.**

The State prematurely injects arguments regarding *remedy* to claim that Plaintiffs are not likely to succeed on the *merits*, Fla. Resp. at 13–15,[19] but cites no authority where a court considered remedy in this context. Indeed, to rule on vacatur, the court must weigh the seriousness of the violations and potential disruptive consequences with the benefit of "fine-grained and fact-intensive determinations." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015).[20]

Florida's vacatur arguments fail as a matter of law and fact anyway. "[V]acatur … is the ordinary APA remedy." *Id.* (internal citation omitted). Here, the seriousness of the violation and the disruptive consequences of vacatur both weigh in favor of vacatur. *See id.*; *Allied-Signal, Inc. v. USNRC*, 988 F.2d 146, 150–51 (D.C. Cir. 1993).

First, DHS' NEPA violation is serious because no explanation from DHS would justify its failure to comply with NEPA here. D.E. 5 at 6–8. An agency's decision to "authorize construction ... without issuing any environmental impact statement whatsoever" is one of fundamental errors that weighs in favor of vacatur. *City of Port Isabel v. FERC*, 130 F.4th 1034,

---

to the environment, 166 F. Supp. 2d 673, 695 (N.D.N.Y. 2001), and the appellate court found the "principal relief available to plaintiffs would be in the form of further environmental mitigation" where the Corps had already completed a required Environmental Assessment under NEPA, 49 F. App'x 327, 329 (2d Cir. 2002). Here, the federal agencies have produced no NEPA analysis, and Plaintiffs have presented relevant evidence. In *Save the Wekiva River & Headwaters, Inc. v. U.S. Army Corps of Eng'rs*, the court found that plaintiffs requested mitigation, which Plaintiffs do not do here. No: 6:17-cv-1902-Orl-DCI, 2017 U.S. Dist. LEXIS 225367, *11 (M.D. Fla. Dec. 29, 2017).

[17] Defendants' claims that the detention center is temporary are belied by permanent construction of new paved areas on the site, Ex. E, and by public statements from President Trump that this detention center could be around "for a long time." Sommer Brugal, *Florida says "Alligator Alcatraz" is temporary. Trump isn't so sure.* AXIOS (July 1, 20250, https://www.axios.com/local/miami/2025/07/01/florida-alligator-alcatraz-president-trump-visit.

[18] In *United States v. Lambert*, the court found no irreparable harm because the expert testifying to harm stated that the harms would merely make restoration "more difficult, more expensive, and more uncertain," not irreparable. 695 F.2d 536, 540 (11th Cir. 1983). No such evidence exists here.

[19] Notably, DHS has not joined this argument.

[20] Plaintiffs also intend to add ESA claims after the required 60-day notice period has expired, Compl. ¶ 53, which would further support vacatur.

11

1036–37 (D.C. Cir. 2025). DHS would have to be able to "rehabilitate its decision to skip [that] procedural step," *id.*, and Florida has not even attempted to argue that DHS could do so. Instead, Florida contends that DHS could still decide to construct and fund the TNT site. D.E. 16 at 14.[21] But, vacatur is warranted when an agency skips a procedural step "even if the additional procedure is unlikely to change the agency's bottom line." *Port Isabel*, 130 F.4th at 1036–37.

Second, Florida claims that vacatur would force DHS to either release the people being detained or keep them in overcrowded facilities–though the Federal Defendants do not. D.E. 16 at 14. But neither Florida nor DHS have shown that the TNT Site is the *only* possible location for this detention center. Indeed, one of the requirements of NEPA review is a consideration of all reasonable alternatives, 42 U.S.C. § 4332(C), which would likely include alternative locations.

Florida also contends that vacatur would be disruptive because this site is "either mid-construction or operational." D.E. 16 at 14. But "only in rare instances do the disruptive consequences alone determine whether the order is vacated." *New Jersey Conservation Found. v. FERC*, 111 F.4th 42, 64 (D.C. Cir. 2024) (agency could not justify its decision on remand). *Accord Env't Def. Fund v. FERC*, 2 F.4th 953, 976 (D.C. Cir. 2021) (vacating FERC decision when the pipeline was partially operational). Florida's cases, Fl. Resp. at 14, are inapplicable because the court found the first *Allied-Signal* factor weighed against vacatur. *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 993–94 (9th Cir. 2012) (EPA offered new reasoning to support rule); *Food & Water Watch v. FERC*, 28 F.4th 277, 292 (D.C. Cir. 2022) (FERC could review information missing from NEPA review and still find no significant impact).

The Federal Defendants' reliance on 8 U.S.C. § 1252(f)(1) (D.E. 21 at 5) is also unavailing. It is well established that § 1252(f)(1) applies only to injunctions against enforcement of specific provisions of the INA, and does not preclude relief under the APA. *Texas v. United States Dep't of Homeland Security*, 123 F.4th 186, 209 (5th Cir. 2024); *Immigrant Defs. Law Ctr. v. Noem*, No. CV 20-9893 JGB (SHKX), 2025 WL 1172442, at *14 (C.D. Cal. Apr. 16, 2025) (§ 1252(f)(1) does not bar vacatur) (collecting cases). Plaintiffs are not seeking to enjoin the Federal Defendants from enforcing immigration laws; they merely seek an injunction to prevent the operation of this newly constructed facility until the Defendants comply with NEPA and the APA. In any case, § 1252(f)(1) cannot preclude an injunction against the State based on its own arguments.

---

[21] The State also raises arguments about DHS' involvement and the impact of the TNT Site to argue DHS' NEPA violation is not serious, D.E. 16 at 14, but Plaintiffs have already shown that DHS is heavily involved in this action and that the site will cause significant irreparable harm.

12

### E. Plaintiffs' Claims Are Ripe for Adjudication.

Federal Defendants' arguments regarding ripeness and the State's arguments regarding final agency action all fail because they are based on the false premise that funding is the federal nexus to the construction and operation of the detention center. As noted above, the mass detention center necessarily requires federal involvement beyond funding since the State is not otherwise empowered to enforce federal immigration laws. *See Arizona*, 567 U.S. at 409. The federal government's control and responsibility over the construction and operation of the detention center—is therefore ripe, final, and sufficient to trigger NEPA even without the commitment of federal funds. *See Fath*, 2016 WL 7442868, at *9.

As to ripeness, the State's claims that the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) and the Stafford Act may apply and therefore waive NEPA review are without merit. D.E. 16 at 10. First, IIRIRA only applies to actions "necessary" to install barriers and roads or remove obstacles near the "United States border to deter illegal crossings." 8 U.S.C. § 1103, note. That Congress granted DHS's Secretary discretion to waive NEPA compliance only in order to construct barriers at the border, demonstrates that no such discretion exists here. Likewise, the Stafford Act does apply here because it only exempts funding relating to *restoring* facilities "substantially to [their] condition prior to the disaster or emergency," which is not at issue here.[22] 42. U.S.C. § 5159.

### F. The Balance of the Equities Support a TRO and Preliminary Injunction.

The balance of equities strongly supports a TRO and preliminary injunction. Plaintiffs have clearly shown that the project will likely have specific and far-reaching environmental impacts. Moreover, the alleged risks of delaying the detention center are self-imposed. Gov. DeSantis declared a state of emergency on January 6, 2023, followed by multiple extensions of that state of emergency since then. D.E. 16 at 2. However, it was not until June 19, 2025, years later, that the State announced the construction and operation of the TNT site. D.E. 16 at 4.

Since the President issued a national state of emergency in January 2025, the State asserts there have been more than 100,000 arrests with detainments exceeding capacity since February 2025. D.E. 16 at 2-3. Realizing that space would be needed to house and process these detainees, potential sites could have been identified once these states of emergency were issued and the federal

---

[22] Unsurprisingly, Federal Defendants do not identify this as a source of funding. *See* D.E. 21-2. Nor did they invoke either the Stafford Act or IIRIRA in opposing the Motion. The State's speculation on federal law should be disregarded.

13

government could have commenced its review of the environmental impacts of constructing and operating this facility or any other proposed facility in Florida, much less in the Everglades. Even if the need for any such facility was not contemplated by Defendants until only recently, federal agencies are not excused from following the requirements of NEPA because it does not fit within their timelines for project construction and operation.[23]

The State also engages in mere speculation and conjecture that issuing a TRO or injunction pending compliance with NEPA would pose a public safety concern by "imperiling critical immigration enforcement."[24] Similarly, Federal Defendants' statements that the "critical national interest will be hindered" if the facility is temporarily restrained (D.E. 21 at 8) are not supported by the Mr. Giles' Declaration. Mr. Giles simply states that the facility "operationally benefits ICE" as it "will maximize detention capacity" and "will serve to decompress other detention facilities." D.E. 21-1 at ¶ 11. The State offers no support for the assertion that any delays would endanger detainees in current facilities. In fact, detainees are at more danger at the TNT site, where the facilities have flooded after a brief summer storm.[25] Moving detainees only to be subject to standing water and potentially dangerous and unsanitary conditions, further underscores the importance of reviewing the impacts of the project to the "human environment"[26] before people are brought to the site.

## CONCLUSION

The suggestion that federal action is lacking where a State constructs a facility in partnership with the federal government that, legally, may only serve federal functions does not survive scrutiny. Final action is proven based on the actual facts on the ground—it is patent that a final decision has been made to advance the project, which has caused concrete (literally, *see* Exs. D & E) impacts, and resulted in adverse effects to Plaintiffs. The procedural harm is irremediable absent

---

[23] *See Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1115 (D.C. Cir. 1971) ("Considerations of administrative difficulty, delay or economic cost will not suffice to strip the section of its fundamental importance").

[24] The State's single citation to *Nickler v. Cnty. Of Clark*, 648 Fed. Appx. 601 (9th Cir. 2016) is inapposite. In *Nickler*, the Court upheld a district court's denial of a preliminary injunction to bar the Clark County judges from continuing to require the Appellant to submit to security measures after courthouse personnel determined the appellant to be a security threat based on comments made following the Sandy Hook Elementary School shootings.

[25] Kate Plummer, 'Alligator Alcatraz' Floods Within Day of Opening, NEWSWEEK (July 2, 2025), https://www.newsweek.com/alligator-alcatraz-flooded-opening-day-donald-trump-migrant-detention-center-2093581; Videos posted by Jason Delgado (@JasonDelgadoX), X, *A good lil storm passed over us here at 'Alligator Alcatraz.'* https://x.com/JasonDelgadoX/status/1940133353010745811?.

[26] 42 U.S.C. § 4332(2)(C).

immediate injunctive relief to prevent ongoing harm, and vindicate NEPA. The requested relief is proper to preserve the status quo. For the reasons stated herein and in the Motion (D.E. 5), Plaintiffs respectfully request that the Court enter a temporary restraining order and preliminary injunction as described in the Motion.

Dated:  July 3, 2025.

Respectfully submitted,

| | |
|---|---|
| EARTHJUSTICE<br>4500 Biscayne Boulevard, Suite 201<br>Miami, Florida  33137<br>Telephone:  (305) 440-5432<br><br>By:      s/   Tania Galloni<br>    Tania Galloni, Fla. Bar No. 619221<br>    tgalloni@earthjustice.org<br>    Dominique Burkhardt, Fla. Bar No. 100309<br>    dburkhardt@earthjustice.org<br><br>*Counsel for Friends of Everglades* | COFFEY BURLINGTON, P.L.<br>2601 South Bayshore Drive, Penthouse One<br>Miami, Florida  33133<br>Telephone:  (305) 858-2900<br><br>By:      s/   Paul J. Schwiep<br>    Paul J. Schwiep, Fla. Bar No. 823244<br>    PSchwiep@CoffeyBurlington.com<br>    Scott Hiaasen, Fla. Bar No. 103318<br>    SHiaasen@CoffeyBurlington.com<br>    YVB@CoffeyBurlington.com<br>    LPerez@CoffeyBurlington.com<br>    service@CoffeyBurlington.com<br><br>*Counsel for All Plaintiffs* |

CENTER FOR BIOLOGICAL DIVERSITY
Post Office Box 2155
St. Petersburg, FL 33731
Telephone:  (727) 755-6950

By:      s/   Elise Pautler Bennett
Elise Pautler Bennett, Fla. Bar No. 106573
ebennett@biologicaldiversity.org
Jason Alexander Totoiu, Fla. Bar No. 871931
jtotoiu@biologicaldiversity.org

*Counsel for Center for Biological Diversity*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 3, 2025, I electronically filed the foregoing with the Clerk of the Court using CM/ECF.

/s/  Paul J. Schwiep
Paul J. Schwiep