# State of Florida



# Immigration Enforcement Operations Plan

Exhibit A

# Table of Contents

Introduction ...................................................................................................................4

Roles and Responsibilities ..............................................................................................6

    Federal Partners ........................................................................................................6

    Board of Immigration Enforcement ...........................................................................7

    Florida Division of Emergency Management ...............................................................7

    Agency Representatives..............................................................................................8

    Florida Department of Law Enforcement ...................................................................8

    Florida Highway Patrol ..............................................................................................8

    Florida Fish and Wildlife Conservation Commission ...................................................8

    Florida Sheriff's Association .......................................................................................9

    Florida National Guard ..............................................................................................9

Concept of Operations ....................................................................................................9

    Intelligence ...............................................................................................................9

    Federal Enforcement Support ...................................................................................10

    Florida Immigration Enforcement under 287(g) .......................................................11

    Interior Transportation ............................................................................................12

    Detention Facility Operations...................................................................................12

    Judicial Review .......................................................................................................13

    Deportation Transportation .....................................................................................13

Current Operations and Pathways Forward ....................................................................14

    Current Actions ......................................................................................................14

    Preliminary Potential Actions ..................................................................................14

Annex A – Organization Chart to Support Full Plan Activation .........................................17

Annex B – DHS Organization and ICE HSTF Organization ...............................................18

Annex C – HSTF-SE Organizational Chart .......................................................................19

Annex D – RDSTF Map / RLECT Jurisdictions .................................................................20

Annex E – 287(g) Participating Agencies ........................................................................21

Annex F – Federal Facilities............................................................................................26

Annex G – Interior Transportation Cost Estimates ..........................................................28

Annex H – Detention Center Standards ..........................................................................30

Exhibit A

Annex J – Camp Blanding Improvements for Detention Center ....................................................35

Exhibit A

## Introduction

Over the years, a commonality of interests during mass immigration emergency events has shown the Federal and State governments that they work best when they work cooperatively. This is as true today as it was decades ago, and both Florida and the Federal government have a history of working closely and well together. Florida's approximately 47,000 law enforcement officers at all levels have already received, or are in the process of obtaining, training and certification to act as cross-designated immigration officers under the 287g program, thus providing a robust force multiplier throughout the state for Federal immigration enforcement operations. But much more can be done.

### Background

One of the first actions taken by President Donald Trump was to declare a national border and immigration emergency. He directed the military to assist in promptly beginning reconstruction of the long-unfinished border wall, and he named a "border czar" (Senior Advisor to the President Tom Homan, a seasoned former Immigration and Customs Enforcement (ICE) leader who came up from the ranks) to spearhead operations to seal the border, and to remove alien terrorists, gang members and criminals, as well as aliens under unexecuted Final Orders of Removal, from the interior of the U.S.

For perspective, it's estimated that during the four open border years of the Biden administration, nearly 10 million aliens entered the United States, most illegally, but also a significant number under a legally dubious "parole" program that appeared to violate, on its face, the plain language of the parole statute. To cite the New York Post—

> *The US has seen its largest surge in immigration in its history under the Biden Administration — surpassing the Ellis Island-era migration boom that changed the face of the nation forever, according to a shocking new analysis.*
>
> *An average of 2.4 million immigrants per year poured into the US between 2021 and 2024, according to the Congressional Budget Office. About 60% of the migrants crossed into the US illegally, a Goldman Sachs analysis found.*

Florida, too, has been under a state of immigration emergency, first declared by Governor Ron DeSantis on January 6, 2023 and extended on December 9, 2024. Florida has about 1,350 miles of coastline (longest of the 48 contiguous states), extending into the Gulf of America and close to the shores of various Caribbean countries such as Cuba and Haiti, realities that have over the years made it vulnerable to mass maritime migration. But it would be a mistake to consider Florida's illegal immigration issues as stemming solely from a maritime perspective. It's geographic position, ambient culture, and the confluence of three major interstate highways (I-10, I-75 and I-95) have made it attractive to criminal organizations smuggling everything from aliens to drugs to guns and money.

A July 2024 Pew Research Center report, using 2022 numbers, estimated Florida's illegal alien population at 1.2 million, adding that—

4

<span style="color:red">Exhibit A</span>

*Most U.S. states' unauthorized immigrant populations stayed steady from 2019 to 2022. However, six states showed significant growth...**Florida (+400,000)**....* (emphasis added)

There can be little doubt that the illegal alien population of Florida increased even further in the two final years of the Biden administration.

## Purpose and Scope

We are proposing an integrated Federal-Florida State approach that encompasses the entire illegal alien identification-apprehension-detention-removal cycle.  We believe that this approach could be leveraged to mitigate many of the bottlenecks that attend to the detention and removal portions of the existing cycle, not just in Florida but nationally.

The type of synergy envisioned is transformational, in that it provides sustainable, consistent and repeatable operations through upward and downward flows in the identification-apprehension-detention-removal cycle and, not least, makes the best possible use of taxpayer dollars.  The key is in scalability, which is where the expertise of Florida's Department of Emergency Management shines through. The Florida National Guard also plays a key role in addressing existing bottlenecks in the identification-apprehension-detention-removal cycle, by providing personnel, matériél, and both ground and air mechanisms that could be leveraged particularly for the detention and removal segments of the cycle.

The purpose of this document is to put forward a road map for the significant role that the State of Florida can play in aiding the Federal government in combating illegal immigration during the present emergencies and going forward into the future. This plan outlines the operational capabilities that the State of Florida possesses as well as the actions that have and will be taken in order to fulfill the current immigration enforcement mission. The plan includes federal, state, and local agency roles and capabilities to ensure successful execution as well as outlines specific concerns that have been identified in regard to partnering with the federal government in this operation and what the State's capabilities could be if Florida were to conduct this mission separate from the federal government.

## Objectives

- Prevent unauthorized maritime border incursions
- Reduce the number of illegal aliens residing in the State of Florida through coordinated enforcement and compliance efforts
- Enhance intelligence collection and analysis by leveraging existing state databases and interagency coordination
- Support federal immigration and border security operations by providing logistical and operational assistance
- Develop a comprehensive plan to maintain state-led border security operations in the absence of federal support
- Develop a course of action that plans for the state of Florida to operate without federal assistance

## State Authorities and References

- Chapter 908, Florida Statutes - Federal Immigration Enforcement

Exhibit A

- Chapter 23, Part I, Florida Statutes - Florida Mutual Aid Act
- Section 943.03, Florida Statutes - Department of Law Enforcement
- State Comprehensive Emergency Management Plan, 2024
- State Comprehensive Emergency Management Plan, Appendix XVI: Emergency Support Function 16 – Law Enforcement and Security
- The Florida Mutual Aid Plan for Law Enforcement; Guidelines for Emergency Response
- Annex to the State Comprehensive Emergency Management Plan: Mass Immigration Emergency Plan

## Roles and Responsibilities

### Federal Partners

*Department of Homeland Security*

The Department of Homeland Security (Annex B) is the head organization tasked with immigration enforcement. The US Coast Guard, Homeland Security Investigations, Customs and Border Patrol, and Enforcement Removal Operations are all supporting agencies within DHS.

*Immigration and Customs Enforcement*

Immigration and Customs Enforcement (ICE) is DHS's premier law enforcement agency, mitigating transnational threats and safeguarding the United States. ICE is the parent agency for Homeland Security Investigations and Enforcement Removal Operations.

*Unites States Coast Guard*

United States Coast Guard (USCG) is an agency within DHS and has been part of the unified command for HSTF-SE since its inception in support of OVS. As the new immigration enforcement mission has been moved within the scope of OVS, USCG will continue to support both missions as a leading agency.

*Homeland Security Investigation*

Homeland Security Investigation (HSI) is a law enforcement agency within US Immigration and Customs Enforcement (ICE) that conducts federal criminal investigations into the illegal movement of people, goods, money, contraband, weapons, and sensitive technology into and out of the United States. In cooperation with their DHS counterparts and Florida state agencies, HIS is supporting the intelligence and data collecting operations based out of the Joint Intelligence Operations Coordination Center (JIOCC) and Field Coordination Center (FCC).

*Customs and Border Patrol*

US Customs and Border patrol (CBP) is the unified border agency within the Department of Homeland Security charged with the management, control and protection of our nation's borders at and between official ports of entry. CBP staffs the JIOCC and FCC as well as assists as needed in the field during detaining and deportation missions.

*Enforcement and Removal Operations*

Enforcement and Removal Operations (ERO) is a law enforcement agency within ICE manages all aspects of the immigration enforcement process, including the identification, arrest, detention, and

6

Exhibit A

removal of all illegal aliens who are subject to removal or are unlawfully present in the United States. ERO is the lead agency at the FCC in coordination with its federal partners.

*Homeland Security Taskforce-Southeast*

Homeland Security Taskforce Southeast (HSTF-SE) (Annex C) was established in 2003 and serves as the DHS lead for operational and tactical planning, command and control, and as a standing organization to deter, mitigate, and response to maritime mass migration in the Caribbean Sea and the Florida Straits. HSTF-SE is bringing its decades long experience in immigration enforcement to assist in the current immigration enforcement operation.

## Board of Immigration Enforcement

Pursuant to section 908.1031, Florida Statutes, the Executive Director of the State Board of Immigration Enforcement shall coordinate and cooperate with the federal government in the enforcement of federal immigration laws and other related matters. The Executive Director shall also assist and coordinate with law enforcement agencies in the enforcement of these laws and monitor compliance by local governments.

*Local Law Enforcement Immigration Grant Program*

The Local Law Enforcement Immigration Grant Program was created within the State Board of Immigration Enforcement to award grants to support local law enforcement agencies, which include chief correctional officers operating county detention facilities, in their cooperation and coordination with federal immigration agencies in the enforcement of federal immigration laws. The board shall award any funds specifically appropriated for the program to reimburse expenses or issue bonus payments as provided in this section.

## Florida Division of Emergency Management

The Florida Division of Emergency Management is the coordinating agency in the State of Florida for the development and implementation of the State Emergency Response Team (SERT) which is comprised of all resources, personnel, and equipment at the state and local levels of government which could conceivably be used to respond and recover from an emergency event. In addition, the SERT has a significant connection with various private non-profit organizations and private sector companies.

*Forward SERT Incident Management Team*

The Forward State Emergency Response Team (FSERT) Incident Management Team (Annex A) serves as the forward coordination element of the SERT under the command of the State Coordinating Officer (SCO). It operates as the State Emergency Operations Center (SEOC) under the coordination of the FSERT IMT IC within the predefined area of operation with fully delegated authority to manage all missions and resources on behalf of the SERT. The FSERT provides resources and technical assistance in support of local tactical operations.

The FSERT IMT is led by an Incident Commander (IC), who is responsible for the overall management of all aspects of the incident, to include ensuring a safe and coordinated response. The FSERT IMT IC determines the necessary general staff positions based on operational needs. The general staff of the IMT will expand and contract based on the scale of operations being coordinated through the

Exhibit A

Regional Law Enforcement Coordination Teams (RLECTs) (Annex D), the number of partner agencies involved, and the amount of logistics support needed.

For Immigration Enforcement Operations, the minimum staffing for the FSERT IMT includes an Incident Commander, Operations Section Chief, Planning Section Chief, Logistics Section Chief, and Finance Section Chief. Additionally, representatives from the Florida National Guard and Florida Department of Law Enforcement will be included to coordinate resource requests through the RLECTs.

Preferred staffing on the FSERT IMT includes agency representatives from key federal agencies to directly coordinate requests for resources and facilitate streamlined information sharing across partners. As operations expand to involve more tactical coordination and additional state agency partners, operational branches will be established and staffed by executing state agency representative partners.

## Agency Representatives
As additional capabilities are identified across state agencies, representation from those agencies will be requested on the FSERT IMT. Each representative should be an Emergency Coordination Officer or a subject matter expert with decision-making authority on behalf of their agency.

## Florida Department of Law Enforcement
Per section 943.03(14), Florida Statutes, the Florida Department of Law Enforcement is responsible for coordinating with and providing assistance to the federal government in the enforcement of federal immigration laws, responses to immigration enforcement incidents within or affecting this State, and other matters related to the domestic security of Florida as it relates to terrorism and immigration enforcement incidents, shall coordinate and direct the law enforcement, initial emergency, and other initial responses.

### *Regional Law Enforcement Coordination Team (RLECT)*
As outlined in the State Comprehensive Emergency Management Plan (CEMP), FDLE will establish Regional Law Enforcement Coordination Teams (RLECTs) to assume tactical management of in-place and deployed state law enforcement and mutual aid resources to assist local law enforcement.

The RLECT will coordinate with the deployed law enforcement resources as needed to execute missions.

## Florida Highway Patrol
Florida Highway Patrol (FHP) assists with vehicle monitoring and traffic stops that, through the 287(g) program, allow troopers to enforce certain aspects of immigration law. Within ESF 16, FHP reports to FDLE in order to coordinate its immigration enforcement activities.

## Florida Fish and Wildlife Conservation Commission
Florida Fish and Wildlife Conservation Commission (FWC) has had a presence in the OVS mission since its inception and has a continued presence in the intelligence operation as well as the field operations. Within ESF 16, FWC reports to FDLE in order to coordinate its immigration enforcement activities.

Exhibit A

## Florida Sheriff's Association

The Florida Sheriff's Association (FSA) provides support as the coordinating body of the state's local law enforcement operations. Through the 287(g) program, the FSA and its members are a force multiplier and a constant local presence that allows for a comprehensive approach to immigration enforcement. Local sheriff offices are supplying equipment and personnel as well as identifying any available space within their detention facilities that could be useful in the immigration enforcement operation.

## Florida National Guard

When directed by Executive Order, the Adjutant General of Florida coordinates, employs and controls trained Florida National Guard (FLNG) forces in order to assist civil authorities with the protection of life and property, and to maintain peace, order, and public safety. The FLNG is currently active under two Florida Executive Orders, providing aviation support to state law enforcement to sight and report migrants approaching the Florida coastline and supporting the Department of Corrections with service members at critically low manned facilities.

FLNG may expand their operations under either of these executive orders to prove a force multiplier to the state to support an increase in immigration enforcement operations. In addition to personnel, FLNG maintains property throughout the State of Florida that can be used for detention facilities, operational bases, or staging as needed to support operations.

# Concept of Operations

In accordance with the Executive Director of the Board of Immigration's mission to find, sort, detain, and deport illegal aliens within the State of Florida, the State of Florida is prepared to execute the following actions to support the federal immigration enforcement operation. Multiple state agencies have combined resources in a joint intelligence operation with the goal of finding illegal aliens and creating target packages for enforcement teams. This enforcement support occurs in the form of targeted operations, integrated patrol operations, and enhancing the ongoing OVS operations.

State and local law enforcement have and will continue to become 287(g) certified in order to increase their immigration enforcement capabilities to detain individuals suspected of entering the country illegally. These law enforcement agencies, in coordination with CBP and ERO have also offered equipment and personnel to transport individuals between ICE detention facilities. The State has also offered to supplement the federal detention facilities capabilities through the use of existing logistics vendors.

The Florida National Guard has offered JAGs to be trained as immigration judges to expedite the legal process at the request of the federal government. The State of Florida also has multiple vendors prepared to support flying individuals out of the country if requested.

## Intelligence

Florida deployed representatives from the Florida Division of Emergency Management, Florida Department of Law Enforcement, Florida Fish and Wildlife Conservation Commission, Florida Highway Patrol, Florida National Guard, Florida Department of Corrections, Florida Department of Agriculture and Consumer Services, and the Florida Department of Health, to support the intelligence sharing operations in regard to illegal aliens conducted by DHS partners.

Exhibit A

Two concurrent intelligence operations are being run out of the same location at the HSI Miami Office, the Field Coordination Center (FCC) and the Joint Intelligence and Operations Coordination Center (JIOCC). State agency representatives are either co-located within the facility or remain on-call to provide data from existing state databases. This support enables federal partners to identify and prioritize individual cases for field action.

*FCC*

The FCC is a multi-agency coordination center led by ERO and staffed by HSI that is tasked with collecting data on illegal aliens including last known addresses, criminal history, and final order status, vetting said data and tasking it to field teams who execute removal missions. The scope of this coordination center is limited to targeting individuals identified at the federal level as a priority ERO target for removal.

*JIOCC*

The JIOCC in Miami is a multi-agency coordination center staffed with personnel from multiple DHS components including U.S. Customs and Border Patrol, Homeland Security Investigations, and the U.S. Coast Guard and is co-located with the FCC. The JIOCC's primary responsibility is to act as a unified control center between responding agencies. The JIOCC operates in a similar function to the FCC but is primarily focused on supporting the HSTF-SE with the ongoing Operation Vigilant Sentry mission. The JIOCC can be utilized outside of the federal ERO mission to build target packages based on information from any partner.

## Federal Enforcement Support

Federal partners under DHS have been directed to enhance their current immigration enforcement operations. These agencies lack funding and resources in order to meet their target performance measures. The State of Florida has the ability to provide resources in both personnel, equipment, and contracted services to support these missions upon request from federal partners.

Potential for federal support operationally may consist of providing law enforcement personnel to assist in the enforcement of immigration operations conducted by CBP and ERO throughout the state. These missions consist of targeted operations and patrols and could be performed by law enforcement officers who are not 287(g) certified as there would be federal law enforcement with the necessary authority present during the operation.

*Targeted Operations*

ERO, in conjunction with HSI through the FCC, is building target packages for ERO to execute through their field offices. State and local law enforcement agencies can provide additional personnel to these teams regionally through the RLECTs to enhance their capabilities. These operations would be coordinated and managed through ERO.

CBP may also conduct targeted operations. The JIOCC may utilize information from CBP or state agencies in order to develop target packages to drive these operations. Target operations with CBP would be coordinated with ERO upon the arrest of individuals but would fall outside of FCC jurisdiction.

Proposed actions for integrated target operations:

Exhibit A

- Research state and federal database systems to develop criminal alien targets
- Conduct joint enforcement operations to arrest criminal alien targets
- Analyze federal and state license plate reader data to target alien smugglers

*Patrol Operations*

CBP currently conducts patrol operations under the authority of OVS and through their own jurisdictional authority throughout the state. These patrols include monitoring ports of entry, highways, marinas, etc. State and local law enforcement agencies could provide personnel to support these patrol operations to increase coverage throughout the state.

Proposed actions for integrated patrol operations:

- Highway interdiction operations to target the smuggling of illegal aliens on ingress and egress routes throughout the state
- Immigration inspections at the State agricultural checkpoints
- Immigration screenings at/before airport checkpoints to identify illegal aliens and seize proceeds of smuggling organizations

*OVS Enhanced Operations*

The State of Florida is presently operating under Executive Order 23-03 and its subsequent extensions to support OVS in surveillance and apprehension of migrants. If further action should be requested of the State, FDEM would be able to expand its current footprint and responsibilities under authorities outlined in the Operation Vigilant Sentry plan and the Mass Migration Annex of the Florida State CEMP.

Missions currently include air and marine patrols by FWC, FLNG, and FDLE, and the USCG and CBP.

Proposed actions for enhanced OVS operations:

- Coordinate maritime enforcement assets to cover gaps and enhance deterrence
- Supplement air patrols to support maritime enforcement efforts
- Deploy additional technology for enhanced maritime surveillance
- Increase Law Enforcement's beach and marina patrols
- Conduct tactical checkpoints/boardings in inlets and marinas to identify evaders of foreign arrival reporting requirements

FDEM maintains a base camp in Marathon, FL to house law enforcement officers and can be scaled to support additional officers as necessary.

## Florida Immigration Enforcement under 287(g)

Through the 287(g) program, state and local law enforcement officers collaborate with the federal government to enforce federal immigration laws. This allows law enforcement agencies to enforce certain aspects of U.S. immigration by expanding the agencies authority to identify and process removable aliens with pending or active criminal charges, enforce limited immigration authorities with ICE oversight during routine duties, and service and execute administrative warrants on removable aliens in jails. A list of State and Local agencies who have signed Memorandums of Agreements can be found in Annex E.

Exhibit A

The 287(g) program has three models, the Task Force Model, the Jail Enforcement Model, and the Warrant Service Officer Program.

### 287(g) Task Force Model
Many agencies within Florida have established memorandums of agreement with ICE to follow the Task Force Model. This allows officers to enforce limited immigration authority while performing routine police duties, such as identifying an alien at a DUI checkpoint and sharing information directly with ICE. These officers may also exercise limited immigration authority as active participants in ICE-led task forces.

Agencies may be limited in their scope of authority as some 287(g) agreements require an ICE agent be present during many of the operations needed to conduct a comprehensive immigration enforcement operation. If the federal government loosens or clarifies the requirement for supervision or direction, then participating agencies will not be limited in their scope.

### 287(g) Jail Enforcement Model
The Jail Enforcement Model allows state and local law enforcement officers to identify and process removable aliens currently in local jail or detention facilities who have pending or active criminal charges while in custody.

### 287(g) Warrant Service Officer Program
As part of the Warrant Service Officer Program, ICE trains, certifies and authorizes state and local law enforcement officers to serve and execute administrative warrants on aliens currently in custody.

## Interior Transportation
State law enforcement agencies, in coordination with the Florida Sheriff's Association, have organized plans to assist federal immigration agencies transport illegal aliens within the State of Florida. These agencies are able to offer both prison transport vans as well as drivers to support movement from one ERO or CBP facility (Annex F) to another in order to expedite the deportation process.

Each FDLE region has a designated FDLE, FSA, and ICE contact that are ready to coordinate transportation missions that occur within their jurisdiction. There is also a system already in place for reporting data from these missions to FDLE in order to track information such as the number of individuals transported as well as the number of transports run and by which state or local agencies. This operation has the capability to scale up and down as needed depending on requests made by the individual ERO and CBP offices. Cost estimates can be found in Annex G.

## Detention Facility Operations
The State of Florida has identified several brick-and-mortar locations in the northeastern and south-central regions of the state that could serve as detention centers (see Annex J for an example). By leveraging any of the twelve (12) established Emergency Logistics Contract vendors, FDEM can retrofit these sites with wraparound services to ensure compliance with the National Detention Standards set by the United States Immigration and Customs Enforcement. This approach is preferred as the state enters hurricane season, as it helps reduce operational costs and expedites readiness. To support a seamless detention and deportation process, these potential locations are typically located near airstrips.

Exhibit A

**Additionally, upon request, the same 12 vendors have the capacity to establish detention centers capable of housing up to 10,000 undocumented aliens and necessary support staff at locations designated by the State of Florida or the federal government. These facilities can be fully operational within 72 hours and require up to 96 hours to begin setup.** Each detention center would adhere to ICE's National Detention Standards, including ADA compliance, facilities for laundry, screening, showering, food services, waste services, lodging (i.e., bedding, linens, etc.), medical services with periodic health checks & food inspections and a pharmacy, and other requirements. Additionally, if the federal government were to provide locations or expand current facilities capabilities, the State of Florida has that hybrid site approach experience and can replicate it if requested.

To expedite the establishment of additional detention centers in support of federal operations, DHS could issue waivers for certain requirements, as it has done in the past. For example, DHS previously granted the State of Texas exemptions from specific laws and regulations to accelerate the construction of barriers and roads under section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. A similar waiver for select ICE detention standards—such as requirements for barber services or dining facilities that do not meet current federal specifications—would streamline the setup of detention facilities.

*Voluntary Deportation Coordination*
As Florida has done in the past, an available course of action is to offer voluntary self-deportation to induvial currently in Florida illegally. Not only is this avenue the least fiscally demanding course of action available, as this could be carried out using commercial airlines, but it also reduces the burden on the ongoing local, state, and federal law enforcement operations. The Florida Division of Emergency Management is able to supply personnel to assist with purchasing commercial flights for eligible individuals, limited to those that do not have a criminal record.

Considerations for this course of action include a legal review for all necessary documentation for this process, ensuring individuals who are participating understand the perimeters of this program, as well as how to ensure that individuals that volunteer for this program do not return to the United States. However, the United States Immigration and Customs Enforcement (ICE) must specifically request assistance and must reimburse the State for actual costs.

## Judicial Review
*FLNG*
The Florida National Guard has 9 field-grade Judge Advocate General's Corps officers (JAGs) suitable for training as Immigration Judges. Training and investiture fall under the Department of Justice (DOJ, not DHS) Executive Office for Immigration Review (EOIR), and takes 6 weeks inclusive of a written test from the date of attachment to DOJ. To serve as Immigration Judges, JAGs must be federally activated (Title 10) to exercise immigration authority; JAGs could not support in State Active Duty under the command of the Governor and would be directed/stationed at the needs of the federal government.

## Deportation Transportation
The State of Florida has multiple vendors on standby and are ready to support transportation of undocumented aliens. FDEM vendors have the ability to transport small to large quantities of

Exhibit A

individuals and have the ability to fly from Florida to a detention center or their nation of origin. Pursuant to section 908.13, Florida Statutes, FDEM is authorized to facilitate the transport of undocumented aliens, consistent with federal law. However, the United States Immigration and Customs Enforcement (ICE) must specifically request assistance and must reimburse the State for actual costs.

## Current Operations and Pathways Forward

Due to the previously mentioned limitations that have been exhibited by the federal government's response as part of the immigration enforcement operations, there may be a need to act independently of DHS and create a Florida led operation. Below are the concerns that have been observed that will potentially inhibit a successful federal and state joint operation.

### Current Actions

As mentioned through this plan, the State of Florida is currently involved in the following immigration enforcement activities:

- Supporting state and local law enforcement officers becoming 287(g) certified
- Leveraging state and local resources to assist in the transportation of illegal aliens between detention facilities
- Offering judicial assistance in the form of FLNG JAGs suitable for training as immigration judges
- Coordinating with vendors to transport individuals out of the United States at the request of ICE
- Utilizing the limited existing state facilities that are up to federal regulation standards to work as detention centers to supplement the existing ICE detention capacity
- Utilizing existing state agency databases to assist ICE in vetting and developing criminal alien targets
- Staffing the FCC and JIOCC in order to maintain situational awareness and information-sharing between state and federal partners

### Preliminary Potential Actions

In support of President Trump's fight against the "deep state" within federal agencies, the State of Florida with a waiver of certain federal regulations could circumvent federal agency bureaucracy, and these are some of the additional actions that could be operationalized:

- Authorize all 287(g) certified officers to function as fully empowered immigration officers. This would enable the State to bypass the operational bottleneck caused by the limited availability of ICE personnel.
- Waive federal detention facility requirements to expand housing capacity for arrested individuals. Current standards, as outlined in Annex H and Annex I, limit detention space. Waiving select requirements would significantly increase the State's capacity to detain individuals.
- Utilize existing logistics vendors to establish additional detention space. If the State chooses to forgo the federal detention sites as well as the federal detention standards, logistics vendors are prepared to rapidly deploy detention facilities statewide.

Exhibit A

- Create a command structure led by the state that empowers coordinating officers to act without prior federal authorization. Due to the limitations of the current Federal Executive Order, there has been a lack of leadership coming from the federal government that could be supplemented if the state of Florida were to assume operational control and enabling timely decision-making.

*Detention Facility Capabilities*

We believe that the nature and vast scope of the illegal alien presence deserves a rethinking of detention processes and standards. Recently, Secretary of State Rubio publicly announced that the Administration was amenable to waiving the usual rules for publication, and public comment waiting times needed to post regulatory and procedural changes in the Federal Register, thus allowing changes to be effected immediately.

To this end, we encourage suspension of the National Detention Standards (NDS) presently in use by ICE's Enforcement Removal Operations (ERO) division. The NDS is used to determine which state or local facilities can be used to temporarily house detainees. The standards are so limiting that many county jails cannot meet the standard even though they are otherwise accredited by the American Correctional Association. It is anomalous that facilities adequate to confine U.S. citizens are not deemed adequate to house illegal aliens. This self-limiting proposition works against achieving the President's goals. It also drives up detention costs by making transportation and logistics more complex and cumbersome, and the daily bedspace capacity minimal for lack of a sufficient number of approved facilities.

To obviate the existing choke-point, DHS could post an announcement in the Federal Register stating that, effectively immediately and for the duration of the President's emergency declaration, the NDS will be suspended. The announcement could also state explicitly that despite suspension, aliens will be treated humanely; that their health needs will be attended to; and that detention facilities will still strive to ensure officer and detainee security, while maintaining public safety.

NDS suspension would not only open up bedspace in innumerable county jails to house arrested aliens but also pave the way to set up soft-side detention as needed and desirable, for instance to provide for detention colocation next to Federal- or State-owned landing/takeoff runways that could be used to establish routine air corridors to those nations routinely receiving repatriated illegal aliens. This would be especially useful in prompt removal of aliens under unexecuted Final Orders of Removal.

The State of Florida has demonstrated that is has the ability to quickly increase state assets to facilitate and streamline the process of identifying and arresting illegal aliens. There is, however, a major chokepoint in terms of detention. At its current state, ICE is overwhelmed with the number of detainees that have been arrested prior to the state assisting with the process. With the state's assistance, this number will grow by multitudes, which will likely become unsustainable if ICE were to remain operating at its current state. Many of the individuals arrested by state and local law enforcement will be forced to be released due to the lack of space in ICE detention facilities.

*287(g) Shortcomings*

While the 287(g) program is a valuable tool for empowering state and local law enforcement to support immigration enforcement, it imposes limitations on their authority. Although certified

15

<span style="color:red">Exhibit A</span>

officers are permitted to arrest individuals and investigate their immigration status, those individuals must ultimately be transferred to ICE for processing. This requirement creates yet another bottleneck. As a result, the volume of transfers may quickly exceed ICE's operational capacity.

A more robust and diversified authority also exists. Leveraging off of the President's Executive Order, the DHS Secretary could invoke Section 103(a)(10) of the INA, 8 U.S.C. Section 1103(a)(10), which permits—

*any State or local law enforcement officer…to perform or exercise any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon officers or employees of the [Department]…*

One of the stumbling blocks that we perceive exists in the detention section of the overall removal cycle. At present, the Federal government does not possess adequate bedspace capacity for its ambitious, and long overdue, enforcement strategy. While this can be mitigated by better, quicker through-put in physical repatriation—an important factor—it still poses a choke-point to be addressed.

### *Reimbursement*
Florida has invested significant resources deploying law enforcement and the National Guard to secure the southern coastline of Florida as well as the Texas/Mexico border. The federal government has shown itself to be very hesitant to commit to any form of reimbursement to past or future immigration operations. There may come a time when, without federal assistance, a long-term immigration support mission may become fiscally untenable.

16

Exhibit A

# Annex A – Organization Chart to Support Full Plan Activation



# Annex B – DHS Organization and ICE HSTF Organization



Exhibit A

## Annex C – HSTF-SE Organizational Chart



Exhibit A

**Annex D – RDSTF Map / RLECT Jurisdictions**



Exhibit A

## Annex E – 287(g) Participating Agencies

### State Agencies

| Agency | 287(g) Support Type | Date MOA Signed |
|---|---|---|
| Florida Department of Agriculture and Consumer Services | Task Force Model | 2/14/2025 |
| Florida Department of Corrections | Jail Enforcement Model | 8/21/2020 |
| Florida Department of Financial Services | Task Force Model | 3/25/2025 |
| Florida Department of Highway Safety and Motor Vehicles, Division of Highway Patrol | Task Force Model | 2/7/2025 |
| Florida Department of Law Enforcement | Task Force Model | 2/14/2025 |
| Florida Fish and Wildlife Conservation Commission | Task Force Model | 2/14/2025 |
| Florida National Guard | Task Force Model | 4/2/2025 |
| Florida State Guard | Task Force Model | 3/19/2025 |
| Florida Gaming Control Commission | Task Force Model | 4/24/2025 |
| Florida Department of Business and Professional Regulation | Task Force Model | 4/24/2025 |

### Counties

| Agency | 2879(g) Support Type | Date MOA Signed |
|---|---|---|
| Alachua County Sheriff's Office | Warrant Service Officer | 2/24/2025 |
| | Task Force Model | 2/26/2025 |
| Baker County Sheriff's Office | Warrant Service Officer | 10/15/2019 |
| | Task Force Model | 2/26/2025 |
| Bay County Sheriff's Office | Warrant Service Officer | 10/15/2019 |
| | Task Force Model | 2/26/2025 |
| Bradford County Sheriff's Office | Warrant Service Officer | 10/15/2019 |
| | Task Force Model | 2/26/2025 |
| Brevard County Sheriff's Office | Warrant Service Officer | 5/6/2019 |
| | Task Force Model | 2/24/2025 |
| Broward County Sheriff's Office | Warrant Service Officer | 9/9/2019 |
| | Task Force Model | 2/26/2025 |
| Calhoun County Sheriff's Office | Warrant Service Officer | 9/9/2019 |
| | Task Force Model | 2/26/2025 |
| Charlotte County Sheriff's Office | Warrant Service Officer | 5/6/2019 |
| | Task Force Model | 2/26/2025 |
| Citrus County Sheriff's Office | Warrant Service Officer | 2/26/2025 |
| | Task Force Model | 2/26/2025 |
| Clay County Sheriff's Office | Jail Enforcement Model | 3/11/2020 |
| | Warrant Service Officer | 2/24/2025 |
| | Task Force Model | 2/26/2025 |
| Collier County Sheriff's Office | Jail Enforcement Model | 6/9/2020 |
| | Task Force Model | 2/24/2025 |

Exhibit A

| Columbia County Sheriff's Office | Warrant Service Officer | 5/6/2019 |
| --- | --- | --- |
| | Task Force Model | 2/26/2025 |
| DeSoto County Sheriff's Office | Warrant Service Officer | 10/15/2019 |
| | Task Force Model | 2/26/2025 |
| Dixie County Sheriff's Office | Warrant Service Officer | 2/24/2025 |
| | Task Force Model | 2/26/2025 |
| Escambia County Sheriff's Office | Task Force Model | 2/26/2025 |
| | Warrant Service Officer | 2/26/2025 |
| Flagler County Sheriff's Office | Warrant Service Officer | 9/9/2019 |
| | Task Force Model | 2/26/2025 |
| Franklin County Sheriff's Office | Warrant Service Officer | 10/15/2019 |
| | Task Force Model | 2/26/2025 |
| Gadsden County Sheriff's Office | Warrant Service Officer | 2/26/2025 |
| | Task Force Model | 2/26/2025 |
| Gilchrist County Sheriff's Office | Task Force Model | 2/26/2025 |
| | Warrant Service Officer | 2/26/2025 |
| Glades County Sheriff's Office | Warrant Service Officer | 2/26/2025 |
| | Task Force Model | 2/26/2025 |
| Gulf County Board of County Commissioners | Warrant Service Officer | 2/26/2025 |
| Gulf County Sheriff's Office | Task Force Model | 2/26/2025 |
| Hamilton County Sheriff's Office | Warrant Service Officer | 10/15/2019 |
| | Task Force Model | 2/26/2025 |
| Hardee County Sheriff's Office | Warrant Service Officer | 2/26/2025 |
| | Task Force Model | 2/26/2025 |
| Hendry County Sheriff's Office | Warrant Service Officer | 10/15/2019 |
| | Task Force Model | 2/26/2025 |
| Hernando County Sheriff's Office | Warrant Service Officer | 5/6/2019 |
| | Jail Enforcement Model | 6/9/2020 |
| | Task Force Model | 2/26/2025 |
| Highlands County Sheriff's Office | Warrant Service Officer | 10/15/2019 |
| | Task Force Model | 2/26/2025 |
| Hillsborough County Sheriff's Office | Warrant Service Officer | 2/26/2025 |
| | Task Force Model | 2/26/2025 |
| Holmes County Sheriff's Office | Warrant Service Officer | 10/15/2019 |
| | Task Force Model | 2/26/2025 |
| Indian River County Sheriff's Office | Warrant Service Officer | 10/15/2019 |
| | Task Force Model | 2/26/2025 |
| Jackson County Correctional Facility | Warrant Service Officer | 2/26/2025 |
| Jackson County Sheriff's Office | Task Force Model | 2/26/2025 |
| Jacksonville Sheriff's Office | Jail Enforcement Model | 6/9/2020 |
| | Task Force Model | 2/26/2025 |
| Jefferson County Sheriff's Office | Warrant Service Officer | 10/15/2019 |
| | Task Force Model | 2/26/2025 |
| Lafayette County Sheriff's Office | Warrant Service Officer | 10/15/2019 |
| | Task Force Model | 2/26/2025 |
| Lake County Sheriff's Office | Warrant Service Officer | 10/15/2019 |
| | Task Force Model | 2/26/2025 |
| Lee County Sheriff's Office | Task Force Model | 2/24/2025 |
| | Warrant Service Officer | 2/26/2025 |

Exhibit A

|  | Jail Enforcement Model | 3/3/2025 |
|---|---|---|
| Leon County Sheriff's Office | Warrant Service Officer | 10/15/2019 |
| | Task Force Model | 2/26/2025 |
| Levy County Sheriff's Office | Warrant Service Officer | 5/6/2019 |
| | Task Force Model | 2/26/2025 |
| Liberty County Sheriff's Office | Warrant Service Officer | 9/9/2019 |
| | Task Force Model | 2/26/2025 |
| Madison County Sheriff's Office | Warrant Service Officer | 9/9/2019 |
| | Task Force Model | 2/26/2025 |
| Manatee County Sheriff's Office | Warrant Service Officer | 5/6/2019 |
| | Task Force Model | 2/26/2025 |
| Marion County Sheriff's Office | Warrant Service Officer | 10/15/2019 |
| | Task Force Model | 2/26/2025 |
| Martin County Sheriff's Office | Warrant Service Officer | 1/22/2020 |
| | Task Force Model | 2/26/2025 |
| Miami Dade Corrections and Rehabilitation | Warrant Service Officer | 2/26/2025 |
| Miami Dade Sheriff's Office | Task Force Model | 2/26/2025 |
| Monroe County Sheriff's Office | Warrant Service Officer | 10/15/2019 |
| | Task Force Model | 2/26/2025 |
| Nassau County Sheriff's Office | Warrant Service Officer | 10/15/2019 |
| | Task Force Model | 2/26/2025 |
| Okaloosa County Sheriff's Office | Warrant Service Officer | 2/26/2025 |
| | Task Force Model | 2/26/2025 |
| Okeechobee County Sheriff's Office | Warrant Service Officer | 10/15/2019 |
| | Task Force Model | 2/26/2025 |
| Okeechobee Police Department | Task Force Model | 3/17/2025 |
| Orange County Corrections Department | Warrant Service Officer | 2/26/2025 |
| Orange County Sheriff's Office | Task Force Model | 2/26/2025 |
| Osceola County Corrections Department | Warrant Service Officer | 10/15/2019 |
| Osceola County Sheriff's Office | Task Force Model | 2/26/2025 |
| Palm Beach County Sheriff's Office | Warrant Service Officer | 2/26/2025 |
| | Task Force Model | 2/26/2025 |
| Pasco County Board of County Commissioners | Warrant Service Officer | 2/26/2025 |
| | Task Force Model | 2/26/2025 |
| Pinellas County Sheriff's Office | Warrant Service Officer | 4/24/2019 |
| | Task Force Model | 2/26/2025 |
| Polk County Sheriff's Office | Warrant Service Officer | 5/6/2019 |
| | Task Force Model | 2/26/2025 |
| Putnam County Sheriff's Office | Warrant Service Officer | 10/15/2019 |
| | Task Force Model | 2/26/2025 |
| Santa Rosa County Sheriff's Office | Warrant Service Officer | 10/15/2019 |
| | Task Force Model | 2/26/2025 |
| Sarasota County Sheriff's Office | Warrant Service Officer | 5/6/2019 |
| | Task Force Model | 2/26/2025 |
| Seminole County Sheriff's Office | Warrant Service Officer | 9/4/2019 |
| | Task Force Model | 2/26/2025 |
| St. Johns County Sheriff's Office | Warrant Service Officer | 10/15/2019 |
| | Task Force Model | 2/26/2025 |
| St. Lucie County Sheriff's Office | Warrant Service Officer | 2/19/2025 |

Exhibit A

| | Task Force Model | 2/26/2025 |
|---|---|---|
| Sumter County Sheriff's Office | Warrant Service Officer | 10/15/2019 |
| | Task Force Model | 2/26/2025 |
| Suwannee County Sheriff's Office | Warrant Service Officer | 10/15/2019 |
| | Task Force Model | 2/26/2025 |
| Taylor County Sheriff's Office | Warrant Service Officer | 10/15/2019 |
| | Task Force Model | 2/26/2025 |
| Union County Sheriff's Office | Warrant Service Officer | 2/26/2025 |
| | Task Force Model | 2/26/2025 |
| Volusia County Division of Corrections | Warrant Service Officer | 2/26/2025 |
| | Task Force Model | 2/26/2025 |
| Wakulla County Sheriff's Office | Warrant Service Officer | 10/15/2019 |
| | Task Force Model | 2/26/2025 |
| Walton County Sheriff's Office | Warrant Service Officer | 5/6/2019 |
| | Task Force Model | 2/26/2025 |
| Washington County Sheriff's Office | Warrant Service Officer | 2/26/2025 |
| | Task Force Model | 2/26/2025 |

## Municipalities

| Agency | 2879(g) Support Type | Date MOA Signed |
|---|---|---|
| Arcadia Police Department | Task Force Model | 3/5/2025 |
| Belleair Police Department | Task Force Model | 2/28/2025 |
| Blountstown Police Department | Task Force Model | 3/5/2025 |
| Boca Raton Police Department | Task Force Model | 3/25/2025 |
| Bradenton Police Department | Task Force Model | 3/25/2025 |
| Chattahoochee Police Department | Task Force Model | 2/28/2025 |
| Clearwater Police Department | Task Force Model | 2/28/2025 |
| Clermont Police Department | Task Force Model | 3/5/2025 |
| Cocoa Beach Police Department | Task Force Model | 3/25/2025 |
| Coral Gables Police Department | Task Force Model | 3/7/2025 |
| Davie Police Department | Task Force Model | 3/7/2025 |
| Daytona Beach Shores Public Safety | Task Force Model | 3/10/2025 |
| Deland Police Department | Task Force Model | 3/5/2025 |
| Edgewood Police Department | Task Force Model | 4/14/2025 |
| Eustis Police Department | Task Force Model | 4/2/2025 |
| Fort Walton Beach Police Department | Task Force Model | 2/28/2025 |
| Green Cove Springs Police Department | Task Force Model | 4/10/2025 |
| Gulfport Police Department | Task Force Model | 2/28/2025 |
| Havana Police Department | Task Force Model | 4/10/2025 |
| Highland Beach Police Department | Task Force Model | 4/10/2025 |
| High Springs Police Department | Task Force Model | 3/25/2025 |
| Holmes Beach Police Department | Task Force Model | 4/10/2025 |
| Indian Harbour Beach Police Department | Task Force Model | 4/10/2025 |
| Indian River Shores Department of Public Safety | Task Force Model | 3/5/2025 |
| Indian Shores Police Department | Task Force Model | 2/28/2025 |
| Juno Beach Police Department | Task Force Model | 3/7/2025 |
| Jupiter Inlet Colony Police Department | Task Force Model | 3/10/2025 |

Exhibit A

| | | |
|---|---|---|
| Jupiter Island Department of Public Safety | Task Force Model | 3/25/2025 |
| Jupiter Police Department | Task Force Model | 3/26/2025 |
| Kenneth City Police Department | Task Force Model | 2/28/2025 |
| Key Colony Beach Police Department | Task Force Model | 4/10/2025 |
| Key West Police Department | Task Force Model | 3/5/2025 |
| Lady Lake Police Department | Task Force Model | 4/10/2025 |
| Lake Placid Police Department | Task Force Model | 2/28/2025 |
| Lighthouse Point Police Department | Task Force Model | 4/2/2025 |
| Lynn Haven Police Department | Task Force Model | 2/24/2025 |
| Marianna Police Department | Task Force Model | 3/5/2025 |
| City of Miami Springs Police Department | Task Force Model | 4/2/2025 |
| Naples Police Department | Task Force Model | 3/3/2025 |
| Orlando Police Department | Task Force Model | 3/26/2025 |
| Oviedo Police Department | Task Force Model | 3/26/2025 |
| Palm Beach Gardens Police Department | Task Force Model | 3/5/2025 |
| Panama City Beach Police Department | Task Force Model | 2/26/2025 |
| Panama City Police Department | Task Force Model | 2/28/2025 |
| Pinellas Park Police Department | Task Force Model | 2/28/2025 |
| Sanibel Police Department | Task Force Model | 4/2/2025 |
| Springfield Police Department | Task Force Model | 2/28/2025 |
| St. Augustine Beach Police Department | Task Force Model | 3/3/2025 |
| St. Augustine Police Department | Task Force Model | 2/28/2025 |
| St. Petersburg Police Department | Task Force Model | 2/28/2025 |
| Sunny Isles Police Department | Task Force Model | 3/10/2025 |
| Sweetwater Police Department | Task Force Model | 3/26/2025 |
| Tallahassee Police Department | Task Force Model | 3/10/2025 |
| Tampa Police Department | Task Force Model | 2/28/2025 |
| Tarpon Springs Police Department | Task Force Model | 2/28/2025 |
| Tavares Police Department | Task Force Model | 3/17/2025 |
| Tequesta Police Department | Task Force Model | 3/7/2025 |
| Town of Palm Beach Police Department | Task Force Model | 3/7/2025 |
| Treasure Island Police Department | Task Force Model | 3/7/2025 |
| Venice Police Department | Task Force Model | 3/17/2025 |
| Vero Beach Police Department | Task Force Model | 3/26/2025 |
| West Miami Police Department | Task Force Model | 3/26/2025 |
| Winter Garden Police Department | Task Force Model | 4/2/2025 |

Exhibit A

## Annex F – Federal Facilities

### Custom and Border Patrol Stations

| Location | Address | RDSTF Region |
|---|---|---|
| Jacksonville Station | Redacted pursuant to section 119.071(2)(d), Florida Statutes. | 3 |
| Orlando Station | | 5 |
| Tampa Station | | 4 |
| West Palm Station | | 7 |
| Dania Beach Station | | 7 |
| Marathon Station | | 7 |

*CBP Common Operating Picture*



Exhibit A

## Enforcement and Removal Operations Facilities

### *ERO Offices*

| Location | Address | RDSTF Region |
|---|---|---|
| ERO Stuart | Redacted pursuant to section 119.071(2)(d), Florida Statutes. | 7 |
| ERO Tampa | | 4 |
| ERO Miramar | | 7 |
| ERO Fort Myers | | 6 |
| ERO Orlando | | 5 |
| ERO Tallahassee | | 2 |
| ERO Jacksonville | | 3 |

### *ERO Detention Facilities*

| Location | Address | RDSTF Region |
|---|---|---|
| Baker County Detention Center | Redacted pursuant to section 119.071(2)(d), Florida Statutes. | 3 |
| Broward Transitional Center | | 7 |
| FDC Miami | | 7 |
| Glades County Detention Center | | 6 |
| Krome North Service Processing Center | | 7 |

Exhibit A

# Annex G – Interior Transportation Cost Estimates

These cost estimates use the following scenario with operations at 7 ICE facilities within the state of Florida. ███ Redacted pursuant to section 119.071(2)(d), Florida Statutes. ███ Each vehicle requires 1 driver and 2 law enforcement officers or contracted inmate transport personnel.

The State could contract with vendors for transportation including labor, lease vehicles or purchase vehicles and utilize state resources for labor through FLNG and/or regional state law enforcement or utilize SMAA law enforcement teams.

Purchasing or leasing vans and utilizing Florida National Guard and State law enforcement officers as labor is the most cost-effective solution but may need to be supported by SMAA or contracted personnel.

## Vehicle Options

### *Purchase Vehicles*

Vendors and the Florida Department of Corrections have indicated a significant lead time on the purchase on buses outfitted for inmate transport. Additionally, CDL buses requirement would limit the availability of drivers. This option would most likely need to 12-passenger vans.

The cost to purchase a 12-passenger van is around $80,000 to $90,000; each van would need to upfitted costing approximately $34,000 per vehicle. Redaced pusuant to section 119.071(2)(d), Florida Statutes.

Upfitting of vehicles includes tinting, securing a 3-comparment box is securely fastened to the frame of the van to securely transport inmates, installing live video equipment and law enforcement communications. These outfitted vans can transport 8-11 inmates at a time.

### *Lease Vehicles*

| Vehicle | Average Daily Rate per Vehicle | Estimate for 21 vehicles for 14 days |
|---------|-------------------------------|--------------------------------------|
| Bus | $5,250 | $1,542,000 |
| Cargo Van | $2,653 | $779,982 |

## State Labor Options

### *Florida National and State Guard*

The Florida National Guard and/or Florida State Guard could be utilized as drivers for this mission. The Florida National Guard is currently actively supporting the Department of Corrections throughout the state of Florida, and their operations could be expanded to support this mission. ███ Redacted pusuant to section 119.071(2)(d), Florida Statutes. The Florida State Guard with the same footprint would be approximately $138,320 for 14 days.

### *State Law Enforcement Agencies*

State Law Enforcement Officers could be utilized as inmate transfer staff to support this mission. The use of State LEOs that operate in the in-region of the ICE facilities being supported would have no

Exhibit A

additional cost to the State as long as they are able to be absorbed into their day-to-day operations and no overtime is incurred from working these activities.

*State-Wide Mutual Aid Teams*

SMAA Law Enforcement Support Teams could be utilized if FLNG or law enforcement is unable to absorb these responsibilities as a part of their day-to-day operations. ████████ Redacted pursuant to section 119.071(2)(d), Florida Statutes. This includes personnel costs, per diem, lodging, equipment, and materials.

*OPS Staff*

The Division could hire 42 OPS Staff to serve as drivers for this effort at $30 an hour. This would take the longest to execute of these options but would allow for longer sustained operations if necessary.

## Transportation Contracted Including Labor

Includes team drivers, services available 24/7 within the State of Florida, fueling & maintenance, fully staffed by qualified inmate transport personnel.

| Vehicle | Daily Cost Estimate | Estimate for 21 vehicles for 14 days |
|---|---|---|
| 49 Passenger Bus retrofit into inmate transport vehicle* | $150,000 | $44,100,000 |
| 49 Passenger Bus | $55,000 | $16,170,000 |
| 12 Passenger Van | $25,000 | $7,350,000 |

*Several weeks lead time on retrofit of bus*

Exhibit A

# Annex H – Detention Center Standards

## Safety

Safety includes environmental health and safety and transportation by land.

Environmental Health and Safety standards at a detention facility maintain the standards for cleanliness and sanitation, safe work practices and control of hazardous substances and equipment. Standards and procedures include hazardous substances, emergency response, significant event notification requirements, fire prevention and control, pests and vermin, facility water supply certification, emergency electrical power generator, specific areas of the facility to include barber operations and medical operations, and general environmental health conditions including facility conditions, housekeeping, and refuse.

Transportation By Land refers to the facility taking all reasonable precautions to protect the lives, safety, and welfare of the detainees, officers, other personnel, and the general public during ground transportations. Detainees being transported from one facility to another institute or jurisdiction will be transported in a safe and humane manner under supervision of trained and experienced personnel. A transportation plan must be in place before departure to include weather and road conditions and any other relevant considerations. Information on the detainees will be transferred to the receiving facility to include name, date of birth, sex, nationality, etc. The transporting officer is responsible and shall comply with all state and federal motor vehicle regulations including, and not limited to, wearing a seat belt when the vehicle is morning, holding a valid Commercial Driver's License (CDL), transporting detainees in a safe and humane manner, etc. The seating of the detainees must have a policy and implementing procedures governing the seating in transportation vehicles. Minors must be separated from unrelated adults at all times and seated in an area of the vehicle near offices and under close supervision.

## Security

Security includes admission and release, custody classification, facility security and control, funds, and personal property, hold rooms, post orders, searches of detainees, use of force and restraints, special management units, staff-detainee communications, and sexually abuse and assault prevention and intervention.

Admission and Release includes the procedures for processing detainees into and out of the facility. During admission process, detainees shall undergo screening for medical, sexual abuse prevention, and suicide risk evaluation purposes, files must be reviewed for classification purposes, submit to a standard body search, and inventory of all personal belongings. During the release of a detainee, they will return all facility issued items (clothing, bedding, etc.), participate in an identification verification procedure, and complete documents in accordance with facility procedures.

Facility Security and Control includes protection of the communities, staff, contractors, volunteers, and detainees form hard by ensuring facility security is maintained. A facility shall ensure it maintains sufficient supervision of detainees through appropriate staffing levels, video monitoring where applicable. Security inspections and perimeter controls are expected to keep the control of contraband, prevent escapes, maintain safety and security, and eliminate fire and safety hazards are expected. Population counts must be implemented to ensure the accountability of all detainees,

Exhibit A

both formal and informal counts. Key and lock controls must be established in compliance with OSHA and National Fire Protection association requirement, including procedures for controlling gun-locker access.

Hold rooms in detention facilities may be used for the temporary detention of individuals awaiting removal, transfer, immigration court hearings, medical treatment, intra-facility movement, or other processing into or out of the facility. They must be located within the secure perimeter and must contain sufficient seating for the maximum room capacity. The facility must be in compliance with the applicable federal and state accessibility standards. A detainee may not be held in a hold room for more than 12 hours. All male and female adults should be separated regardless of if they are married, and minors must be separated from any unrelated adults unless proven that the adult is their guardian or parent. Holding rooms for a single occupant shall contain a minimum of 37 square feet. Multiple occupants hold rooms should provide an additional 7 square feet of unencumbered space for each additional detainee.

## Orders

Orders include the disciplinary system which includes the safe and orderly living environment for detainees by establishing fair and equitable disciplinary system, requiring detainees to comply with facility rules and regulations, and imposing disciplinary sanctions on those who do not comply.

## Care

Care includes the food services, hunger strikes, medical care, personal hygiene, significant self-harm and suicide prevention and intervention, terminal illness and death, and disability identification, assessment, and accommodation.

Food Services includes the detainees shall be provided nutritious, attractively presented meals, and prepared and served in a sanitary and hygienic food service operation. Ordinarily detainees shall be served 3 meals every day, with 2 being hot meals. The facility administrator may approve variations in the food service schedule during religious and civic holidays, provided that basic nutritional goals are met. No more than 14 hours between the evening meal and breakfast may occur. Clean, potable drinking water must be available. Meals shall always be prepared, delivered, and served under staff or contractor supervision. Religious and special diets must be taken into consideration, unless stated otherwise.

Medical Care includes that an adequate space and equipment will be furnished so that all detainees are provided basic health examinations, treatment, and communication in private. Medical records will be kept separate from the detainee records and must be stored in a securely locked area. Dental treatment includes an initial dental screening exam that shall be performed within 14 days of the arrival of the detainee. If a dentist is not on-site, the exam can be performed by a physician, physician assistant, nurse practitioner, or registered nurse.

Personal Hygiene includes the issuance of clothing, bedding, linens, blankets, and towel supply on a regular basis as well as the accountability of the items by the detainees.  Detainees should be provided with clean clothing, linens, and towels on a regular basis to ensure proper hygiene. Socks and undergarments will be exchanged daily, outer garments at least twice weekly, and sheets, towels, and pillowcases at least weekly. Detainees should receive personal hygiene items and the facility shall replenish items at no cost on a needed basis.

Exhibit A

## Activities

Activities include correspondence and other mail, recreation, religious practices, telephone access, visitation, and voluntary work programs.

Recreation shall be provided to the detainees including recreational programs and activities within the constraints of the safety and security of the facility. If an outdoor recreation is available, it shall be offered at a reasonable time of day, weather permitting, access for at least one hour per day, five days a week. If only indoor recreation is available, detainees shall have access for at least one hour each day and shall have access to natural light.

Religious practices shall be accommodated without discrimination with the possibility of including language services if needed. A chaplain or individual designated as the religious services coordinated would be responsible for managing religious activities at the facility. An adequate space for practices shall be designated based on the detainee population.

## Justice

Justice includes detainee handbook, grievance system, law libraries and legal materials, and legal rights group presentations.

Law Libraries and Legal Materials must be accessible to detainees. A law library shall be provided in a designated room or area that will have sufficient space and resources to facilitate detainees' legal research and writing. Hours of access shall be flexible, and detainees must be able to visit the library for a minimum of 5 hours per week during a reasonable time of day.

## Administrations and Management

Administration and Management include detention files and detainee transfers.

Exhibit A

Annex I – Holding Facility informationIn accordance with Standard 2.5 (pages 31-33) of the National Detention Standards (2019)

## Holding Facilities

A holding facility can be used for temporary detention of individuals awaiting removal, transfer, Executive office of immigration review immigration court hearings, medical treatment, intra-facility movement, or other processing into or out of the facility.

## Physical conditions

A holding facility must have the following:

- Has to be located within a secure perimeter
- Single occupant
- A minimum of 37 square feet (7 feet unencumbered square feet, 5 for a combination lavatory/toilet, 25 for wheelchair turnaround)
- Multi- occupant
- Provide an additional 7 square feet of unencumbered space for each individual
- Well ventilated, well lit, and allow for convenient visual checks
- Sufficient seating, for max room capacity (capacity must be posted outside room)
- Bunks, cots, beds, or other are not permitted inside hold rooms by exception of those who are ill, minors, and pregnant women.
- All hold rooms should be equipped with:
- Handwashing and potable water
- Toilets shall allow for an appropriate amount of privacy
- No toilet, shift supervisor should at all times position an officer within sight or earshot of the hold room to provide detainees with regular access to the toilet facilities
- Detainees shall be monitored appropriately while using the restrooms
- In compliance with state and federal standards

## Time Limits and Restrictions

- A holding facility cannot be held for more than 12 hours.
- An unaccompanied minor (under 18), persons over 70, females with children, and family groups will not be placed in hold rooms unless they have shown or threatened violent behavior, have a criminal conviction involving violence, or have given staff articulable ground to expect an escape attempt.
- A person may be exempt from hold rooms due to obvious illness; special medical, physical, and/or psychological needs; or other documented reasons shall be seated in designated area outside the hold room under direct supervision. These individuals can be held in separate rooms under supervision.
- Adult males and females shall be segregated at all times, even if married.
- Minors (under 18) will be held apart from adults, unless the adult is an immediate relative or recognized guardian, and no other adult detainees are present in the hold room and no safety concerns are present.
- Shall be provided basic personal hygiene items such as toilet paper, water, disposable cups, soap, feminine hygiene items, diapers, and sanitary wipes.

Exhibit A

## Basic Operation Procedures

- An officer will visually assess every individual before placing them in the hold room, checking for any disabilities, concerns, or special needs.
- Must maintain a log which records custodial information about all detainees placed in and removed from hold rooms.
- A meal must be provided for any adult in the hold room for more than 6 hours. Juveniles will receive meal services regardless of time in custody. A log should be kept providing a record of when food is provided for everyone.
- Juveniles, babies, pregnant women, and others for whom it is medically necessary shall have regular access to snacks, milk, juice, etc. They should also be provided with access to temperature-appropriate clothing and blankets.
- Staff will ensure sanitation and temperatures in hold rooms are maintained at acceptable levels.
- Closely supervise the hold rooms through direct supervision. Irregular visual monitoring not to exceed 15 minutes between checks. Records of time and name of officer should be kept when checks are made.
- Constant surveillance of any detainee exhibiting signs of hostility, depression, or similar behaviors. Notification to a supervisor in the case this occurs.
- Notify emergency medical providers or services when a detainee appears to be in need of emergency medical treatment.
- When the last detainee has been removed, the room shall be given a thorough cleansing and safety inspection.

## Detainee Search

- Every detainee shall undergo a pat-down, search for weapons or contraband.
- Sharp objects (pens, pencils, knives, nail files, etc.) that could be used as a weapon shall be removed from possession.
- Opposite sex pat-down of male detainees shall not be conducted, unless after reasonable diligence, male staff is not available at the time, or in exigent circumstances.
- Opposite sex pat-down searches of female shall not be conducted unless under exigent circumstances.
- All opposite sex searches must be documented.
- If the pat-down search indicates the need for more thorough search, a strip search shall be conducted. Must be the same sex to perform search or in the presence of another officer of the same sex.

Exhibit A

## Annex J – Camp Blanding Improvements for Detention Center

Camp Blanding has provided the following for areas of improvement in order to use the facility as a detention center in accordance with the National Detention Standards (2019).

### Food Service Support

Food Service Support for approximately 4 meals a day, 2 of which must be served hot, for 1,000 individuals and support staff. The existing dining facilities might work, but facilities most likely will not meet the Federal Standards.

- For a workable facility, each block has a kitchen with a dining area. Conceptually, the detainees would have to cycle through. A schedule would be created on when each block is being fed.

### Safety

Redacted pursuant to section 119.071(3)(a), Florida Statutes.

35

Exhibit A



## Specific Building Facilities

A full medical facility to support up to 1,000 personnel with periodic health checks and food inspections. This medical area must also have a pharmacy.

- The use of existing buildings/structures may be able to be used but would be requesting medical equipment and personnel to be fully functional.

A space for barber operations within the facility or confined area must be available. Depending on how the Camp Blanding is separated for each of the required facilities and areas (such as separating of female and male detainee areas), a building should be provided for barber operations.

- Personnel and equipment would be requested to be fully operational and within compliance of standard.

A behavioral health facility has not been identified with existing buildings. Showers, bathrooms, and all other facilities to support detainees with disabilities are also not existent with current facilities.

- Construction of a building would have to occur due to the given lock in/ lock down requirements.
- Construction or provided facility that adheres to the detainees with disabilities would be requested.

A facility that can house and secure appropriate safes/storage for transfer of funds, valuables, and personal property may be provided depending on how the footprint of buildings/facilities are split up.

- If a building can be provided, personnel and equipment will be requested to be fully operational.

## Contractual Requirements

A facility for laundry has been identified and will be able to use. PAX would be required to wash laundry to include clothing and bedding. A schedule would be created for laundry services of all items including bedding, towels, and uniforms.

- FDEM can request contracting staff for laundry services, but FLNG can require PAX for laundry services.

Detainees are required 1 pillow, 1 blanket, 1 towel, 2 sheets, and 1 pillowcase.

- A linen contract would need to be placed for items.

Canine units may be used for contraband detection but may not be used in the presence of detainees.

Exhibit A

- A contract for support or MOU with local law enforcement for canine units (contraband) would need to be placed.

Garbage and refuse must be collected, stored, and removed from common areas at least daily and as often as necessary to maintain sanitary conditions.

- A contract for garbage and refuse to include medical/biohazard waste will be needed to be fully operational.

Exhibit A