IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

FRIENDS OF THE EVERGLADES, INC., a Florida 501(c)(3) not-for-profit corporation, and CENTER FOR BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit organization,

    Plaintiffs,

vs.

KRISTI NOEM, in her official capacity as Secretary of the UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, in his official capacity as Acting Director of the UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; KEVIN GUTHRIE, in his official capacity as Executive Director of the FLORIDA DIVISION OF EMERGENCY MANAGEMENT; and MIAMI-DADE COUNTY, a political subdivision of the State of Florida,

    Defendants.

_____/

CIVIL DIVISION

CASE NO. 25-CV-22896-JEM

## **MOTION TO INTERVENE**

Interested Party the Miccosukee Tribe of Indians of Florida (the "Tribe"), hereby moves to intervene[1] as an Intervenor-Plaintiff in the action styled *Friends of the Everglades, Inc., et al. v. Noem, et al.*, Case No. 25-CV-22896-JEM (the "Action") as a matter of right pursuant to Federal Rule of Civil Procedure 24(a) or, in the alternative, as a permissive intervenor pursuant to Federal Rule of Civil Procedure 24(b). The original plaintiffs and defendants seek relief which pose direct and serious impacts to the Tribe's interests.

---

[1] In doing so, the Tribe does not waive its sovereign immunity. *See Oklahoma Tax Com'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 509-10 (1991).

## INTRODUCTION

The Miccosukee people have lived in and cared for the land now known as the Big Cypress National Preserve (the "Preserve") since time immemorial. For generations, the Miccosukee people made pilgrimages from north Florida to the Everglades, including the Preserve, to fish, hunt, trap, and hold sacred ceremonies. Following the First and Second Seminole Wars, the Miccosukee people were relocated to approximately 2.5 million acres of land at the southernmost point of their traditional range that was reserved as Indian Territory in or about 1845. However, the truce was broken and the United States attempted to remove the Miccosukee from these reserved lands, forcing the Miccosukee people deeper into the Everglades. Eventually, under the leadership of Abiaki (Sam Jones), the Miccosukee living within the Everglades retreated to the tree islands and cypress strands inside the contemporary borders of the modern Everglades National Park, Big Cypress National Preserve, Miccosukee Federal Reservation, and Miccosukee Water Conservation Area 3-A (the "MWCA"), where they remain today.

For over a century, the State of Florida has recognized the Tribe's right to use and enjoy these lands, including the Preserve. The Acts of 1917 of the State of Florida created a 99,200-acre reservation for the Miccosukee and Seminole people, known as the State Seminole Indian Reservation, to provide a residence for the Native peoples living in the southern Everglades. However, the reservation was terminated to establish the Everglades National Park, which resulted in the eviction of then-active traditional family camps and villages, many of which moved north onto lands that presently comprise the Preserve.

Disputes regarding the State reservation were settled in 1982, guaranteeing to the Tribe a perpetual lease of State lands along the eastern boundary of the Preserve and TNT Site,[2] known as the MWCA, and preserving individual Miccosukee and Seminole member aboriginal use and occupancy rights throughout the State. *See* P.L. 97-399; 25 U.S.C. § 1741 *et seq*. (Florida Indian Land Claims Settlement Act of 1982) (settling claims, outlining Tribal rights within the WCA 3-A, and preserving tribal rights); FFWCC Regulations Summary and Area Map (July 01, 2025-June 30, 2026)[3] (designating Tribal lands in Water Conservation Area 3-A as "Miccosukee WCA 3-A"); Fla. Stat. §§ 285.17-18 (designating the Tribe as governing authority of a Special Improvement District surrounding these lands; designating Miccosukee Police Department as a "criminal justice agency" of Florida).

After Everglades National Park was established in 1947, several Miccosukee settlements along the Tamiami Trail continued their occupancy in Everglades National Park under special-use permits. Several traditional villages were incorporated into the Miccosukee Reserved Area through the Miccosukee Reserved Area Act of 1998. *See* P.L. 105-313 §§2-3; 16 U.S.C. § 410. Consistent with the Miccosukee people's primordial connection to this land and the Tribe's longstanding stewardship of same, the Tribe has for decades lead efforts to restore the land and revitalize its presence thereon. As a result, the Miccosukee people continue to live in traditional villages within the Preserve and routinely hunt, fish, trap, gather plants, hold sacred rituals, and lay their deceased to rest in the Preserve.

---

[2]   The Tribe adopts the usage of "TNT Site" in the Complaint in this action (*See* DE 1, ¶ 1) (defining TNT Site as the Dade-Collier Training and Transition Airport).

[3]   Available at <https://ocean.floridamarine.org/HGMSearch/BrochureDetails.aspx?srctype=pfs&title=everglades%20and%20francis%20s.%20taylor> (last accessed July 14, 2025).

### I. The Tribe's Interests in Big Cypress Preserve.

The area now known as the Preserve is a core piece of the Tribe's homeland. Today, all of the Tribe's active ceremonial sites and a significant majority of the Tribe's traditional villages (sometimes known as "clan camps") are located within the Preserve. Indeed, the Tribe played a significant role in the creation of the Preserve as part of the sustained campaign to prevent the further development of the TNT Site. As a direct result of this campaign, Congress passed the Big Cypress Enabling Act, which created the Preserve and specifically recognized the Tribe's rights to use and occupy the land therein. The Act provides: "members of the Miccosukee Tribe of Indians of Florida . . . shall be permitted . . . to continue their usual and customary use and occupancy of Federal or federally acquired lands and waters within the preserve and the Addition, including hunting, fishing, and trapping on a subsistence basis and traditional tribal ceremonials." P.L. 93-440; 16 U.S.C. § 698j (Big Cypress Enabling Act).

Congress also recognized the Tribe's right to use and occupy the lands surrounding the Preserve when it passed the Everglades National Park Act (the "ENP Act") and the Miccosukee Reserved Area Act (the "MRA Act"). Specifically, the ENP Act provides that "Nothing in this Act shall be construed to lessen any existing rights of the [Miccosukee][4] Indians which are not in conflict with the purposes for which the Everglades National Park is created." 16 U.S.C. §410b. The MRA Act similarly provides: "Nothing in this Act shall affect any rights of the Tribe under Federal law, including the right to use other lands or waters within the [ENP] including any

---

[4] The ENP Act uses the term "Seminole" to describe all of the native peoples living in the area. As confirmed in a 1982 NPS report and other documents, "An Ethnohistory of Big Cypress National Preserve, Florida," the term "Seminole" refers to all of the Native Americans living in ENP then, which included Miccosukee Indians. (*See generally* Paige, J., van Horn, Lawrence, *An Ethnohistory of Big Cypress National Preserve, Florida*, National Park Service, U.S. Dept. of Interior (1982) accessible at <https://www.nps.gov/parkhistory/online_books/bicy/ethnohistory.pdf>

additions to that Park for other purposes, including, fishing, boating, hiking, camping, cultural activities, or religious observances." P.L. 105-313, §5(e).

The State of Florida also has passed legislation to codify the Tribe's protectable rights and interests in the Preserve. Specifically, section 380.055, Florida Statutes (the "FL Big Cypress Conservation Act of 1973"), provides: "[M]embers of the Miccosukee Tribe of Indians of Florida . . . may continue their usual and customary use and occupancy of lands and waters within the Big Cypress Area, including hunting, fishing, and trapping on a subsistence basis and traditional tribal ceremonials." Fla. Stat. § 380.055(8). *See also* Fla. Stat. § 285.09 ("It is lawful for members of the Miccosukee Tribe and members of the Seminole Tribe to take wild game and fish at any time within the boundaries of their respective reservations and in the exercise of hunting, fishing, and trapping rights within the Big Cypress Preserve . . . .").

At all times material, before and after the aforementioned legislation, the Tribe and its members have maintained the usual and customary use and occupancy of the land within the Preserve and continue to exercise and protect these rights and interests today. The aforementioned federal and state legislation clearly recognizes the Tribe's protectable rights to use and occupy the lands within the Preserve and those adjacent thereto, including Everglades National Park, the Miccosukee Reserved Area, and the MWCA. Further, the Tribe has an interest in protecting and preserving the land where its members reside and traditional hunting grounds and ceremonial sites are located.

## II. The Tribe's Use and Occupancy of Big Cypress and the Surrounding Area.

As noted above, the lands comprising Everglades National Park and the Preserve are the traditional home of the Tribe and hold significant cultural and religious value. Today, there are

fifteen active traditional villages in the Preserve.[5] All of these villages are home to Tribal families, and are located along the Miccosukee Indian School's bus route. These villages, and their traditional precursors, have been located in the Preserve for at least a century prior to the Preserve's legislative creation.

Additionally, many of the Tribe's sacred cultural sites, ceremonial grounds, and burial grounds are located within or adjacent to the Preserve. The use and occupancy rights of Tribal members, including village residents, ensure they are able to access these and other sites and perform traditional ceremonies. There also are dozens of Tribal sites and villages located on Tribal lands west of the TNT Site and adjacent to the Preserve.[6] Further, Tribal members and village residents rely on and routinely exercise their rights to hunt, fish, and trap within the Preserve on a subsistence basis.

### III. Tribal Efforts to Protect and Preserve these Lands.

The Tribe is dedicated to preserving its members' rights, including its members who reside on land within the Preserve. For example, the Department of Interior recently proposed a potential wilderness designation which would have limited Tribal use and access to large sections of the Preserve. To combat the potential loss of use and access, on June 27, 2024, Chairman of the Miccosukee Tribe of Indians of Florida, Talbert Cypress testified before the U.S. House of Representatives on behalf of the Tribe in support of H.R. 8206. H.R. 8206 would have prohibited the designation of wilderness for Preserve lands used and occupied by Tribal members for centuries. The past administration subsequently withdrew their wilderness proposal.

---

[5] Attached hereto as Exhibit 1 is a map showing the location of Tribal villages in area.
[6] Attached hereto Exhibit 2 is a map showing the location of Tribal sites and villages in area adjacent to the TNT Site.

Additionally, the Tribe defends its members' statutory interests in, and the safety, subsistence, and community health of the Tribal residences within the Preserve. The Tribal administration conservatively estimates that the Tribe spent at least $2 million over the past decade on infrastructure within the Preserve, including but not limited to installation of water systems, septic systems, bridges, culverts, and support for the construction of traditional chickees and homes. Such investments are designed to improve Tribal member residences and maintain or enhance accessibility to traditional sites, all in a manner that protects the Preserve's fragile environment.

## IV.     Adverse Effects of the Facility's Construction and Operation.

The TNT Site is surrounded on all sides by the Preserve or lands perpetually leased to the Tribe under the Florida Indian Land Claims Settlement Act of 1982. The facility's proximity to the Tribe's villages, sacred and ceremonial sites, traditional hunting grounds, and other lands protected by the Tribe raises significant concerns about environmental degradation and potential impacts to same caused by the construction and operation of a detention facility at the TNT Site. Aside from a 1974 environmental impact study that found additional airstrip infrastructure in the area would have significant negative impacts on the Everglades ecosystem, there have been no environmental impact studies conducted regarding the construction and operation of the detention facility or its effects on the environment generally.

The anticipated 1,000-5,000 occupants at the facility will, at minimum, more than double the residential density in the area. Despite this, there have been *zero studies or analyses* to determine if constructing and operating a detention facility at the TNT Site will have an adverse effect on the residents of nearby tribal villages or community members who live and work on the Miccosukee Reserved Area, including students attending the Miccosukee Indian School, all of

whom are located downstream[7] of the TNT Site. Further, Tribal members' rights to use the Preserve for traditional and ceremonial purposes, including hunting, fishing, and trapping within the immediate vicinity of the TNT Site, likely will be impaired by the operation of a federal detention facility thereon.

There are ten Tribal villages within a three-mile radius of the TNT Site. One of which, a Panther Clan village known by distinction as the Panther-Osceola Camp, is located approximately 1,000 feet from the boundary of the detention facility. (*See* Ex. 1.) Residents of the Panther-Osceola Village have lived within the Preserve and at their traditional village site since before the Preserve's creation in 1974. This village and its residents routinely uses the land immediately adjacent to and surrounding the TNT Site to hunt, fish, and trap and to perform traditional and religious ceremonies. At present, residents report that ingress and egress to their village have been impacted by increased traffic flow along US-41. Further, given the village's proximity to the facility, residents are concerned about impacts to their freedom to hunt and fish in the immediate area adjacent to a securitized federal detention and immigration facility, as well as the possibility of a facility escape posing a security risk for their community.

Additionally, the residents of the P.O. Village, (*see* Ex. 1), located southeast of the Panther-Osceola Camp, have lived within the National Preserve for generations and well before its creation in 1974. This traditional village is approximately two miles from the facility's entrance and roughly one mile from its closest boundary. The residents of this village host many cultural

---

[7] Attached hereto as Exhibit 3 is a true and correct copy of a map depicting the average monthly flow vectors during the wet and dry seasons for the relevant area. The Exhibit is taken from a South Florida Water Management District, Hydrologic and Environment Systems Modeling Section Report that is accessible at the following link: < https://www.sfwmd.gov/sites/default/files/documents/nsrsm_v3_5_2_documentation.pdf> (last accessed on July 14, 2025).

activities that are unique to the Tribe and which involve persons from all clans. There is a bona fide doubt and concern that such cultural activities will not be allowed to proceed due to the environmental effects of the facility's operation and construction, as well as attendant concerns related to the health, safety, and security of residents and community members. Additionally, the facility is located immediately upstream from several Tribal villages such that potential contamination or pollution from the facility will have a direct and adverse effect on potable water quality for residents and the surrounding environment.

To the immediate southeast of the P.O. Village is another village, designated as the B.L. Village, (*see* Ex. 1), whose residents have lived in the Preserve for generations and well before its creation in 1974. This traditional Panther Clan village is approximately 2.3 miles from the boundary of the TNT Site. Residents here also worry about downstream impacts from construction, interruption to endangered Florida panther and Florida bonneted bat habitat, increased traffic, and the resulting water quality, health and safety, and subsistence impacts which are unknown due to the failure to initiate environmental studies and/or assessments prior to the facility's construction and the failure to obtain permitting for such construction.

Environmental impact studies or evaluations are needed to determine the potential impacts to the residents of nearby Tribal villages in close proximity to the TNT Site. Further, there are multiple Tribal villages and the Miccosukee Reserved Area community and infrastructure, including the Miccosukee Indian School, Miccosukee Health Department, Miccosukee Tribal Court, Miccosukee Water & Fire Departments, are located downstream of the TNT Site. The construction and operation of a detention facility without necessary environmental studies potentially poses a substantial threat to the rights and interests of the Tribe and the livelihood of Tribal members who live adjacent thereto. Additionally, the unknown environmental impacts of

the detention facility's construction and operation may affect the number and quality of game and/or fish stocks such that Tribe's traditional rights – guaranteed by federal and state law – are rendered meaningless. Finally, residents of Tribal villages depend on the two-lane Tamiami Trail as the sole means of ingress and egress from their homes, which also serves as the sole evacuation route during inclement weather or wildfires.

For these reasons, the Tribe seeks to intervene in this action to protect the aforementioned rights by seeking a declaration that Defendants are required to obtain environmental impact studies and/or environmental assessments, including studies or assessments of potential impacts on residents of Tribal villages and Miccosukee Reserved Area community members, as required under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.* The Tribe also moves to intervene in this action to seek a declaration that allowing the construction and operation of the detention facility to proceed without first obtaining environmental impact studies and/or environmental assessments is violative of the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.* and, in turn, is determinantal to the rights and interests of the Tribe and its members.

## ARGUMENT

The Tribe is entitled to intervene pursuant to Rule 24, which sets forth two alternative bases for intervention. Rule 24(a) provides for intervention of right while Rule 24(b) provides for permissive intervention. Under either alternative, an order granting intervention is proper.

### I.    Rule 24(a) - Intervention of Right

Rule 24(a)(2) allows a third party to intervene as of right when it "claims an interest relating to the property of transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."

The Eleventh Circuit has reconfigured the Rule into four elements:

(1) the movant's application to intervene is timely;
(2) she has an interest relating to the property or transaction which is the subject of the action;
(3) she is so situated that disposition of the action, as a practical matter, may impede or impair her ability to protect that interest; and
(4) her interest is represented inadequately by the existing parties to the suit.

*Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989) (quoting *Athens Lumber Co., Inc. v. Federal Election Comm.*, 690 F.2d 1364, 1366 (11th Cir. 1982)),

The Tribe satisfies all four elements.

### a. The Motion is Timely.

First, this motion is timely. This action commenced on June 27, 2025, and the Tribe filed this motion within a matter of weeks thereafter. (*See* DE 1.) Discovery has not commenced. Defendants have not responded to the operative complaint. And even more, Plaintiffs' complaint alleges that it will seek to amend the complaint to add a claim that requires 60-days' pre-suit notice to ripen. (*See* DE 1, at ¶53.) Given the infancy of this case, and the lack of any discovery or responses, there can be no dispute that the Tribe's motion is timely.

"In determining whether a motion to intervene was timely, we consider (1) the length of time during which the proposed intervenor knew or reasonably should have known of the interest in the case before moving to intervene; (2) the extent of prejudice to the existing parties as a result of the proposed intervenor's failure to move for intervention as soon as it knew or reasonably should have known of its interest; (3) the extent of prejudice to the proposed intervenor if the motion is denied; and (4) the existence of unusual circumstances militating either for or against a determination that their motion was timely." *In re Martinez*, 736 F. Supp. 3d 1189, 1200 (S.D. Fla. 2024) (quoting *Georgia v. U.S. Army Corps of Eng'rs*, 302 F.3d 1242, 1259 (11th Cir. 2002)). "[W]e must also keep in mind that timeliness is not a word of exactitude or of precisely measurable

dimensions. The requirement of timeliness must have accommodating flexibility toward both the court and the litigants if it is to be successfully employed to regulate intervention in the interest of justice." *Id.*

Here, the length of time during which the Tribe knew or reasonably should have known of its interest in the case is short by any measure. There is no prejudice to the existing parties; in fact, plaintiffs do not oppose intervention and Defendants have not responded to the operative complaint or conducted any discovery. The Tribe will suffer prejudice if intervention is denied because, as set forth above, it is an adjacent property owner whose rights are infringed by the actions of the Defendants. At bottom, the Tribe seeks access to the Court to have an opportunity to be heard with respect to the subject matter of the federal government's action. Given the swiftness with which the Tribe has sought this relief, there are no unique circumstances militating against a determination that this motion is timely. Ultimately the flexible rule of timeliness and the Tribe's prompt action requires a determination that the Tribe has met its burden on this element. *In re Pons*, No. Case No. 1:19-MC-23236, 2020 WL 5355967, at *5 (S.D. Fla. Sept. 7, 2020) ("The motion to intervene regarding the applicant's motion for leave to issue additional subpoenas is timely because it was filed within two weeks of the applicant's filing of the motion for leave."); *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989) ("We believe that the detainees' motion to intervene was timely. It was filed only seven months after Senator Chiles filed his original complaint, three months after the government filed its motion to dismiss, and before any discovery had begun.").

### b. The Tribe has an Interest Relating to the Property and Transaction at Issue.

Second, the Tribe has an interest relating to the property or transaction at issue. The Eleventh Circuit explained that this element must "be supported by a 'direct, substantial, legally protectible interest in the proceeding.'" *Chiles*, 865 F.2d at 1213-14. (quoting *Athens Lumber*, 690

F.2d at 1366). The movant's interest need not "be of a legal nature identical to that of the claims asserted in the main action." *Id*. (quoting *Diaz v. Southern Drilling Corp.*, 427 F.2d 1118, 1124 (5th Cir. 1970)). The court's inquiry on a motion for intervention of right is "a flexible one, which focuses on the particular facts and circumstances" of each such motion. *Id*. at 1214 (citing *United States v. Perry Cnty. Board of Educ.*, 567 F.2d 277, 279 (5th Cir. 1978)). Accordingly, "[w]here a party seeking to intervene in an action claims an interest in the very property and very transaction that is the subject of the main action, the potential *stare decisis* effect may supply that practical disadvantage which warrants intervention as of right." *Id*. (citing *Atlantis Dev. Corp. v. United States*, 379 F.2d 818, 829 (5th Cir. 1967)).

Here, the Tribe has a "direct, substantial, legally protectible interest in the proceeding" because both federal and Florida legislation recognize continuing Miccosukee rights to use and occupy the Preserve. *See Chiles*, 865 F.2d at 1213-14. As some of the only residents on the land surrounding the detention facility, the Tribe and its members have direct, substantial, and legally protectible interests in the outcome of this action, *i.e.*, the determination of environmental impacts caused by the facility's construction and/or operation, which necessarily will affect the Tribe's rights to use and occupy the traditional villages and Preserve lands in close proximity to the detention facility, as well as those villages and the Miccosukee Reserved Area located farther downstream. Because the Tribe's interest relates to the "very property and very transaction that is the subject of the main action" – *i.e.*, the Preserve and the detention facility's operation in an enclave thereof – the *stare decisis* effect of this Court's rulings in this action can and likely will impair or impede the Tribe's rights as a practical matter.

### c. The Tribe is so Situated that Disposition of the Action, as a Practical Matter, May Impede or Impair its Ability to Protect that Interest.

Third, the Tribe is so situated that disposition of the action, as a practical matter, may impede or impair its ability to protect that interest. "If an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene." *Cascade Nat. Gas Corp. v. El Paso Nat. Gas Co.*, 386 U.S. 129, 134 n.3 (1967). "All that is required under Rule 24(a)(2) is that the would-be intervener be practically disadvantaged by his exclusion from the proceedings." *Huff v. Comm'r of IRS*, 743 F.3d 790, 800 (11th Cir. 2014) (citing *Chiles,* 865 F.2d at 1214). The Eleventh Circuit "has found that the potential for a negative stare decisis effect "*may* supply that practical disadvantage which warrants intervention of right." *Stone v. First Union Corp.*, 371 F.3d 1305, 1309–10 (11th Cir. 2004) (quoting *Chiles,* 865 F.2d at 1214).

Here, the Tribe will face practical impairment if it is not afforded an adequate opportunity to protect its interests in this action. The Tribe and its members are adjacent land holders and the subject-matter of this action concerns questions of environmental health and safety and land use within Big Cypress, where the Tribe and its members live and conduct a broad range of activities. If the Tribe is not permitted an opportunity to protect its members' interests, then the Court may adjudicate issues that impact the Tribe and its members, at which time, the parties may claim that the Tribe is estopped from seeking relief under a *res judicata* theory or some other similar legal doctrine of estoppel. The Tribe must have an opportunity to be heard at this juncture, before any issues are adjudicated.

### d. The Tribe's Interest is Inadequately Represented by the Existing Parties.

Finally, the Tribe's interests are inadequately represented by the existing parties to the suit. The Court's decision in this action concerns a property surrounded by or in close proximity to

traditional villages inhabited by Tribal members who live in the Preserve, Miccosukee ceremonial grounds in the Preserve, Miccosukee lease lands in the MWCA, and the community who live and work on the Miccosukee Reserved Area, including the Miccosukee Indian School, Miccosukee Health Department, Miccosukee Tribal Court, Miccosukee Water & Fire Departments, among many other departments of the Tribal government's administration and community infrastructure. In addition, the Tribe is unique from the Plaintiffs in that the Tribe has been expressly bestowed certain rights, interests, and privileges in various federal and Florida laws, discussed above, whereas the Plaintiffs do not share those same unique rights, interests, or privileges.

Any remedies or settlements fashioned in this case must consider the interests of the Tribe and its members' property rights, which are unique to the Tribe and its members. *See e.g. Satellite Dev. Corp. v. Tortoise Island Homeowner's Ass'n, Inc.*, 487 So. 2d 1157, 1158 (Fla. 5th DCA 1986) ("Rezoning, or even replatting, of property does not deprive an owner of his individual property rights."); *Spencer v. Wiegert*, 117 So. 2d 221, 225 (Fla. 2d DCA 1959) ("The right of a purchaser to such easement is a property right of which he cannot be deprived without due process of law.").

Moreover, the Tribe may not share the ultimate goals and objectives as the Plaintiffs. For example, a result other than ceasing further development and operation of the "Alligator Alcatraz" facility would be unacceptable to the Tribe and its members, whereas other remedies might be acceptable to the existing parties. Alternatively, the Court or the existing parties might fashion a remedy that is even more objectionable to the Tribe and its members than the current situation.

The fact that the parties may have good faith disagreements regarding potential methods of resolving issues raised by this action is sufficient to satisfy the requirement that Intervenor show its interests will not be adequately represented by other parties. *Natural Resources Defense*

*Council v. Costle*, 561 F.2d 904, 912 (D.C. Cir. 1977). The Eleventh Circuit has found that "[a]ny doubt concerning the propriety of allowing intervention should be resolved in favor of the proposed intervention because it allows the court to resolve all related disputes in a single action." *Federal Sav. & Loan Ins. Corp. v. Falls Chase Special Taxing Dist.*, 983 F.2d 211, 216 (11th Cir. 1993). Because of the nature of the parties involved, this Court should follow the Eleventh Circuit's liberal treatment of this requirement and find that Intervenor's interests are not adequately represented by other parties.

**II.     Rule 24(b) – Permissible Intervention.**

In the alternative, an order granting permissive intervention is proper.

Rule 24(b)(1) provides, "On timely motion, the court may permit anyone to intervene who: (A) is given a conditional right to intervene by a federal statute; or (B) has a claim or defense that shares with the main action a common question of law or fact.

"The requirements for permissive intervention are less stringent, requiring only: 1) timely application to intervene; and 2) over a claim that has a question of law or fact in common with the main action." *Adana Investing, Inc. v. Forrest Capital Partners, Inc.*, No. 15-24038-CIV, 2016 WL 7438832, at *2 (S.D. Fla. July 12, 2016) (citing *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989)). Here, the Tribe shares with the main action a common question of law or fact. Where permissive intervention "involves adjudication of an additional claim on the merits," it requires the "intervenors to establish an independent basis for jurisdiction." *Aeroplate Corp. v. United States*, 111 Fed. Cl. 298, 300 (2013) (citations omitted).

First, the Tribe has a claim for violation of the National Environmental Policy Act (NEPA) against the Defendants. *See* 42 U.S.C. §4321, *et seq.* In sum, NEPA requires federal agencies to prepare an environmental impact statement for any major federal action significantly affecting the

quality of the human environment, or an environmental assessment if the federal agency does not reasonably foresee significant effects on the human environment and/or if the significance of such effect is unknown, among other substantive and procedural requirements designed to use all practical means and measures to foster and promote the general welfare and maintain conditions under which humankind and the nature can exist in productive harmony, while fulfilling the social and economic goals of present and future generations. *See* 42 U.S.C. ¶4331(a). Yet, here, Defendants did not prepare an environmental impact statement or environmental assessment before constructing and operating the subject facility. (*See* DE 1, ¶¶ 38-59.)

Second, the Tribe has a claim for violation of the Administrative Procedure Act (APA). *See* 5 U.S.C. § 701, *et seq*. In sum the APA permits judicial review of agency actions that are arbitrary, capricious, abusive of discretion, or otherwise contrary to law. Here, Defendants approved and are operating a detention facility without providing the Tribe with any opportunity for notice and comment, among failing to comply with many other substantive and procedural rules before implementing this development.

"Permissive intervention only requires an interest sufficient to support a legal claim or defense." *Sargeant v. Maroil Trading Inc.*, 2017 WL 11705183, at *1 (S.D. Fla. Nov. 7, 2017) (quoting *Selective Ins. Co. of the Se. v. William P. White Racing Stable, Inc.*, No. 15-21333-CIV, 2015 WL 11237014, at *5 (S.D. Fla. Dec. 22, 2015)).

Since the Tribe has shown an interest sufficient to support a legal claim, it has met its burden to intervene under Rule 24(b)(1).

### III.     Notice Pursuant to Rule 24(c)

Rule 24(c) provides that a motion to intervene "must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought."

While some "courts of appeals have denied intervention to movants who have failed strictly to heed the requirements of Rule 24(c) . . . the majority of circuits, including [the Eleventh Circuit], has not, choosing instead to disregard nonprejudicial technical defects." *Piambino v. Bailey*, 757 F.2d 1112, 1121 (11th Cir. 1985) (citations omitted). Rather, the "purpose of requiring an intervenor to file a pleading is to place the other parties on notice of the position, claim, and relief sought by the intervenor." *Danner Const. Co., Inc. v. Hillsborough Cnty.*, 2009 WL 2525486, at *2 (M.D. Fla. Aug. 17, 2009) (quoting *WJA Realty Limited Partnership v. Nelson,* 708 F.Supp. 1268 (S.D.Fla.1989)).

Here, the Tribe seeks to intervene to assert two claims against the Defendants: (1) violations of the NEPA and (2) violations of the Administrative Procedure Act. These claims can be found in counts I-II of the operative complaint. Not only do plaintiffs not object to the Tribe's intervention request, in paragraph 53 of the operative complaint, plaintiffs advised that they "intend to amend this Complaint to add the ESA claims after the required 60-day pre-suit notice, 16 U.S.C. §1540(g)(2)(A)(i), period has expired." (*See* DE 1.)

Accordingly, upon obtaining the relief requested herein, the Tribe intends to join the amended complaint as an intervenor-plaintiff. In doing so, the Tribe expressly does not intend to waive its rights or limit itself to joining counts I-II in the forthcoming amended complaint. As a result, the Tribe has provided Defendants with sufficient notice of its position, its claims, and the relief it seeks. Moreover, there is no prejudice to Defendants in light of the forthcoming amendment to the operative complaint. *See Nat. Res. Def. Council v. Serv.*, 2016 WL 5415127, at *5 (M.D. Fla. Sept. 28, 2016) ("the Court finds that the Colliers meet the requirements of Rule 24(c), and orders the Colliers to file a responsive pleading to Plaintiffs' Complaint (Doc. 1) within fifteen (15) days of this Order.")

## CERTIFICATE OF CONFERRAL

I certify that on July 14, 2025 at 10:30 a.m., the undersigned counsel emailed counsel for Defendants regarding the relief requested in this motion. As of the time of the filing of this motion, Defendants have not responded regarding whether they object to the relief requested.

By: /s/ *Christopher Ajizian*
Christopher Ajizian, Esq.

## CONCLUSION

Based upon the foregoing, the Miccosukee Tribe of Indians of Florida requests entry of an order granting intervention, whether by right or by permission, in this action, and allowing the Tribe the opportunity to file its claims for relief at the time the Plaintiffs' amended complaint is due.

Dated: July 14, 2025

Respectfully submitted,

**CHRISTOPHER AJIZIAN, P.A.**

By: /s/ *Christopher Ajizian*
Christopher Ajizian, Esq.
Florida Bar No. 1010170
chris@ajizianlaw.com
1101 Brickell Avenue
Suite S-700
Miami, FL 33131
Tel: (305) 699-5001

-and-

**TODD R. FRIEDMAN, P.A.**
Todd R. Friedman, Esq.
Fla. Bar No. 97919
1101 Brickell Avenue
Suite S-700
Miami, Florida 33131
786-536-7190
todd@toddfriedmanpa.com
*Counsel for Intervenor-Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on July 14, 2025 a true and correct copy of the foregoing was filed on the Court's CM/ECF filing system and thereby served by email on counsel of record.

By: /s/ *Christopher Ajizian*