

July 11, 2025

*Via Electronic and Certified Mail*

The Honorable Kristi Noem
Secretary of Homeland Security
U.S. Department of Homeland Security
MS 0525
2707 Martin Luther King Jr Ave SE
Washington, DC 20528-0525
dhssecretary@hq.dhs.gov

Todd Lyons
Acting Director
U.S. Immigration and Customs Enforcement
500 12th St., SW
Washington, DC 20024
todd.m.lyons@ice.dhs.gov

David Richardson
Acting Administrator
Federal Emergency Management Agency
500 C Street SW
Washington, DC 20024
David.Richardson@fema.dhs.gov
FEMA-R4-Info@fema.dhs.gov

The Honorable Doug Burgum
Secretary of the Interior
U.S. Department of the Interior
1849 C Street NW
Washington, DC 20240
exsec_exsec@ios.doi.gov

Jessica Bowron
Acting Director
National Park Service
1849 C Street NW
Washington, DC 20240
Jessica_Bowron@nps.gov

Lee Zeldin
Office of the Administrator
Environmental Protection Agency,
Mail Code 1101A
1200 Pennsylvania Avenue NW
Washington, DC 20460
Zeldin.Lee@epa.gov

Kevin Guthrie
Executive Director
Florida Division of Emergency Management
2555 Shumard Oak Boulevard
Tallahassee, Florida 32399
Kevin.Guthrie@em.myflorida.com

Kevin J. McOmber
Regional Administrator, Region 4
Environmental Protection Agency
61 Forsyth Street SW
Atlanta, GA 30303
McOmber.Kevin@epa.gov

Alexis A. Lambert
Secretary
Florida Department of Environmental
Protection
3900 Commonwealth Boulevard M.S. 49
Tallahassee, FL 32399
Alexis.Lambert@FloridaDEP.gov

The Honorable Pamela Bondi
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

*Arizona · California · Colorado · Florida · N. Carolina · New York · Oregon · Virginia · Washington, D.C. · La Paz, Mexico*

P.O. Box 2155, St. Petersburg, FL 33731        BiologicalDiversity.org

Exhibit 1

**Re:     Notice of Violations of Endangered Species Act Sections 7 and 9, Clean Water Act Section 404, the National Park Service Organic Act, and Implementing Regulations, Relating to Federal and State Agencies' Actions in Furtherance of the Construction and Operation of a Mass Detention Center in the Everglades and Their Effects on Public Lands, Endangered and Threatened Species, and Clean Water.**

Dear Sirs and Madams,

On behalf of Friends of the Everglades and the Center for Biological Diversity, we provide notice that the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Federal Emergency Management Agency (FEMA), U.S. Department of the Interior (DOI), and National Park Service (NPS) (collectively, Federal Agencies), and Florida Department of Emergency Management (FDEM) are violating federal environmental laws including the Endangered Species Act (ESA), Clean Water Act (CWA), and National Park Service Organic Act. These violations of federal law compound the Federal Agencies' violations of the National Environmental Policy Act.[1]

First, we provide notice pursuant to Section 11(g) of the ESA[2] that DHS, ICE, and FEMA are violating Sections 7 and 9 of the ESA and the ESA's implementing regulations,[3] for failing to consult over their agency actions associated with the ongoing construction and operation of a mass immigration detention center known as "Alligator Alcatraz" and its effects on ESA-listed species including the endangered Florida panther, endangered Florida bonneted bat, threatened crested caracara, threatened eastern black rail, endangered Everglade snail kite, threatened red-cockaded woodpecker, threatened wood stork, threatened eastern indigo snake, proposed threatened monarch butterfly, threatened Everglades bully, threatened Florida pineland crabgrass, endangered Florida prairie-clover, and threatened Garber's spurge. By taking actions in furtherance of building a mass immigration detention center in the Everglades, the Federal Agencies have also made unlawful, irreversible, and irretrievable commitments of resources that foreclose the formulation or implementation of any reasonable and prudent alternative measures, in violation of ESA Section 7(d). Furthermore, because the Federal Agencies have failed to complete consultation, there is no valid take coverage for the construction and operation of the mass immigration detention center, meaning, to the extent the actions of the Federal Agencies, Florida agencies, and/or individuals and businesses working with them take listed species, they may be held liable for unauthorized take under ESA Section 9.

Second, we provide notice pursuant to Section 505(a) of the CWA[4] that DHS, ICE, and FDEM are violating CWA Section 404 for failing to obtain a dredge-and-fill permit for apparent filling and paving of federal jurisdictional waters associated with the construction and operation of the mass detention center.

---

[1] 42 U.S.C. §§ 4321 *et seq.*; *see* Complaint for Declaratory and Injunctive Relief, *Friends of the Everglades & Center for Biological Diversity v. Noem et al.*, No. 1:25-cv-22896-JE (S.D. Fla., June 27, 2025).
[2] 16 U.S.C. § 1540(g).
[3] *Id.* § 1536; 50 C.F.R. Part 402. FWS's violations of the ESA are also arbitrary and capricious, an abuse of discretion, and not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).
[4] 33 U.S.C. § 1365(a).

Notice of Violations of Federal Environmental Law: Everglades Mass Detention Center
Page 2

Exhibit 1

Third, as a courtesy, we provide notice that DOI and NPS are violating the National Park Service Organic Act and Administrative Procedure Act by failing to take affirmative action to regulate impacts to Big Cypress National Preserve from the construction and operation of the mass detention facility.

The Federal Agencies and state agencies have sixty days to remedy the violations identified in this letter. If these violations are not cured within the sixty-day notice period, Friends of the Everglades and the Center for Biological Diversity intend to file suit in federal court.

## ENTITIES GIVING NOTICE

Friends of the Everglades is a Florida non-profit organization with members and directors in Miami-Dade County, Florida. Its mission includes protecting and restoring the Greater Everglades ecosystem, including the Big Cypress National Preserve.

Center for Biological Diversity (Center) is a national, nonprofit conservation organization with an office in Florida and more than 1.7 million members and online activists dedicated to the protection of endangered species and the land, water, and climate they need to survive. The Center and its members are concerned with the conservation of imperiled species, like the Florida panther, Florida bonneted bat, crested caracara, eastern black rail, Everglade snail kite, red-cockaded woodpecker, wood stork, eastern indigo snake, and monarch butterfly, and with effective implementation of federal environmental laws that support all species.

## LEGAL BACKGROUND

### THE ENDANGERED SPECIES ACT

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," with the vital objective to "halt and reverse the trend toward species extinction, whatever the cost."[5] To that end, the purpose of the ESA is "to provide a program for the conservation of . . . endangered species and threatened species" and to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved."[6] The Secretary of the Interior administers the ESA through the U.S. Fish and Wildlife Service (FWS) for terrestrial, non-marine aquatic species, and certain marine species while on land, and the National Marine Fisheries Service (NMFS) for marine species.[7]

The heart of the ESA is the federal consultation requirement. Section 7(a)(2) sets forth a substantive duty for federal agencies to ensure the actions they authorize or carry out are not likely to jeopardize listed species or destroy or adversely modify critical habitat designated for those species.[8] The ESA broadly defines agency action to include "*any* action authorized, funded, or carried out by such agency."[9] Implementing regulations further explain that "action"

---

[5] *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978).
[6] 16 U.S.C. § 1531(b).
[7] 50 C.F.R. § 402.01(b).
[8] 16 U.S.C. § 1536(a)(2).
[9] *Id.* (emphasis added); 50 C.F.R. § 402.03 (stating that section 7 applies "to all actions in which there is discretionary Federal involvement or control."); *see, e.g.*, *Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1141 (11th Cir.

Notice of Violations of Federal Environmental Law: Everglades Mass Detention Center
Page 3

<span style="color:red">Exhibit 1</span>

means "all activities or programs *of any kind* authorized, funded, or carried out, *in whole or in part*, by Federal agencies in the United States," with examples including but not limited to "actions directly or indirectly causing modifications to the land, water, or air."[10] For example, entering into agreements constitutes agency action under the ESA.[11]

"In no uncertain terms, the ESA mandates that every federal agency 'shall' engage in consultation *before* taking 'any action' that could 'jeopardize the continued existence of any endangered species or threatened species.'"[12] And federal agencies must review their actions "at the earliest possible time" to determine whether the actions may affect listed species or critical habitat and thus require consultation.[13] Absent a formal exemption under section 7(h), agencies "may not duck [the] consultation requirement, whether based on limited resources, agency priorities or otherwise."[14]

Federal "action agencies" must fulfill their substantive obligation through a consultation procedure with the "expert agency"—in this case, FWS—using the "best scientific and commercial data available."[15] For each federal action, the agency must ask the FWS whether any listed or proposed species may be present in the area of the agency action.[16] The "action area" includes "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action."[17]

If listed or proposed species may be present in the action area, the agency must prepare a "biological assessment" to determine whether the listed species may be affected by the proposed action.[18] The biological assessment must generally be completed within 180 days.[19]

If an agency determines that its action "may affect" but is "not likely to adversely affect" a listed species or its critical habitat, it may complete "informal consultation," during which FWS must concur in writing with the agency's determination.[20] If the agency determines that its action is "likely to adversely affect" a listed species or critical habitat, or if FWS does not concur with the

---

2008) (holding that the Federal Emergency Management Agency's administration of the National Flood Insurance Program is an agency action requiring ESA consultation).

[10] 50 C.F.R. § 402.02.

[11] *Tinoqui-Chalola Council of Kitanemuk & Yowlumne Tejon Indians v. United States DOE*, 232 F.3d 1300, 2000 (9th Cir. 2000); *Natural Resources Defense Council v. Houston*, 146 F.3d 1118, 1125 (9th Cir. 1998).

[12] *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 188 n. 10 (D.C. Cir. 2017) (quoting 16 U.S.C. § 1536(a)(2)) (emphasis added).

[13] 50 C.F.R. § 402.14(a).

[14] *Ctr. for Biological Diversity*, 861 F.3d at 188 n. 10; *Conner v. Burford*, 848 F.2d 1441, 1455 n.34 (9th Cir. 1988) (explaining that section 7 does not say "that a comprehensive biological opinion is not required before the initiation of agency action so long as there is no irreversible or irretrievable commitment of resources."); *see also Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 173 (1978) (holding, pre-ESA section 7(h) enactment, that section 7(a)(2) "admit[ted] of no exception").

[15] 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.01(b).

[16] 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12.

[17] 50 C.F.R. § 402.02.

[18] 16 U.S.C. § 1536(c); 50 C.F.R. § 402.12 ("A biological assessment shall evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action and is used in determining whether formal consultation or a conference is necessary.").

[19] 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(i).

[20] 50 C.F.R. § 402.14(a)–(b).

Exhibit 1

agency's "not likely to adversely affect" determination, the agency must engage in "formal consultation."[21] An agency is relieved of the obligation to consult on its actions only where the action will have "no effect" on listed species or designated critical habitat.

Effects determinations are based on the direct, indirect, and cumulative effects of the action when added to the environmental baseline and other interrelated and interdependent actions.[22] "Effects of the action" include "all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action but that are not part of the action" and "may occur later in time and . . . include consequences occurring outside the immediate area involved in the action."[23] The environmental baseline "refers to the condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat caused by the proposed action," and "includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area."[24]

To complete formal consultation process, FWS must issue a "biological opinion" that "detail[s] how the agency action affects the species,"[25] and sets forth FWS's opinion as to whether the action is "likely to jeopardize" the continued existence of a listed species.[26] If FWS determines the project is unlikely to cause jeopardy to the species or adverse modification of critical habitat, the agency must provide a statement specifying the impact of the incidental take on the listed species, outlining "reasonable and prudent measures" (RPMs) to minimize the impact from incidental take, and setting forth any conditions the agency and applicant must follow.[27] If FWS determines the agency action is likely to jeopardize the continued existence of a listed species or result in adverse modification of critical habitat, the biological opinion must suggest "reasonable and prudent alternatives" that would reduce action-related impacts such that the agency action may avoid jeopardizing listed species.[28]

If the agency action is expected to cause "take," defined as to "harass, harm, pursue, hunt, shoot, wound kill, trap, capture, or collect, or to attempt to engage in any such conduct,"[29] FWS must also include an incidental take statement (ITS) in its biological opinion.[30] The ITS must, wherever practicable, quantify the amount of take allowed for each species, thereby creating a meaningful "trigger" to reinitiate consultation when an allowable level of take is exceeded.[31]

Compliance with a valid biological opinion and its incidental take statement protects federal agencies, and others acting under the biological opinion from enforcement action under ESA

---

[21] *Id.* §§ 402.02, 402.14(a).
[22] *Id.* § 402.02.
[23] *Id.*
[24] *Id.*
[25] 16 U.S.C. § 1536(b)(3)(A).
[26] 50 C.F.R. § 402.14(h)(1)–(3).
[27] 16 U.S.C. § 1536(b)(4)(A)–(C).
[28] *Id.* § 1536(b)(3)(A).
[29] *Id.* § 1532(19). Harm and harass are further described by regulation at 50 C.F.R. § 17.3.
[30] *Id.* § 402.14(i).
[31] *Id.* § 402.14(i)(1)(i).

Exhibit 1

section 9's prohibition against unauthorized take.[32] However, take not in compliance with a valid biological opinion or absent a valid take statement or take permit violates section 9 of the ESA.

Until consultation is complete, federal agencies are prohibited from making any irreversible or irretrievable commitment of resources with respect to the agency action which may foreclose the formulation or implementation of any reasonable and prudent alternative measures.[33] This prohibition exists to maintain the status quo pending the completion of consultation and remains in effect throughout the consultation period and until the action agency has satisfied its obligations under section 7(a)(2) that the action will not result in jeopardy to the species or adverse modification of its critical habitat.

Federal agencies have additional responsibilities under section 7(a)(1) of the ESA, including a requirement that they "utilize their authorities in furtherance of the purposes of [the Act]" and to "carry[ ] out programs for the conservation of" listed species.[34] The ESA defines "conservation" to mean the use of "all methods and procedures" that are necessary to recover a listed species to the point where protections under the act are no longer necessary.[35] Thus, section 7(a)(1) requires each federal agency to ensure that its actions are consistent with the recovery of listed species.[36]

In sum, the substantive and procedural requirements of ESA section 7, and implementing regulations, assure that federal action agencies do not take action until they have ensured the action will not harm a species' survival and recovery or result in destruction or adverse modification of protected critical habitat. This is the only way federal agencies can ensure they will not drive an already endangered species further down the path toward extinction. Lawful compliance with ESA section 7 can also shield federal agencies and private entities from ESA section 9 take liability.

## THE CLEAN WATER ACT

Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."[37] To that end, the Clean Water Act prohibits "any [unpermitted] addition of any pollutant to navigable waters from any point source."[38] "The term 'pollutant' means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water."[39] "Navigable waters" means "the waters of the United States."[40]

---

[32] 16 U.S.C. §§ 1536(o)(2); 1538(a); 50 C.F.R. § 17.31(a).
[33] 16 U.S.C. § 1536(d).
[34] Id. § 1536(a)(1).
[35] Id. § 1532(3).
[36] See 50 C.F.R. § 402.15(a) (explaining that it is each agency's continuing obligation to "determine whether and in what manner to proceed with the action in light of its section 7 obligations" to protect and recover listed species).
[37] 33 U.S.C. § 1251(a).
[38] Id. §§ 1362(12), 1311(a).
[39] Id. § 1362(6).
[40] Id. § 1362(7).

Exhibit 1

Under section 404 of the Act, the Army Corps of Engineers "may" issue a permit, "after notice and opportunity for public hearing[]," for the discharge of dredged or fill material into navigable waters at specified disposal sites."[41]

> The term 'discharge of fill material' means the addition of fill material into waters of the United States. The term generally includes, without limitation, the following activities: Placement of fill that is necessary for the construction of any structure or infrastructure in a water of the United States: the building of any structure, infrastructure, or impoundment requiring rock, sand, dirt, or other material for its construction; site-development fills for recreational, industrial, commercial, residential, or other uses; . . . .[42]

"The Corps and EPA regard the use of mechanized earth-moving equipment to conduct land clearing, ditching, channelization, in-stream mining or other earth-moving activity in waters of the United States as resulting in a discharge of dredged material unless project-specific evidence shows that the activity results in only incidental fallback."[43] The disposal sites for dredged material must be specified for each such permit and permits may be denied or restricted where the Administrator determines, after notice and an opportunity for public hearings, that discharges will have an unacceptable adverse effect on municipal water supplies, fisheries, wildlife, or recreational areas.[44]

Further, CWA section 401(a)(1) requires:

> Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate . . . that any such discharge will comply with the applicable [water quality standards].[45]

Section 505 of the CWA, authorizes citizens to:

> Commence a civil action on his own behalf…against any person…governmental instrumentality or agency…who is alleged to be in violation of (A) an effluent standard or limitation . . . or (B) an order issued by the Administrator or a State with respect to such a standard or limitation . . . .[46]

The meaning of "effluent standard or limitation" includes an unlawful act under section CWA section 301, an effluent limitation or other limitation under CWA sections 301 or 302, certifications under CWA section 401, and permits or conditions issued under CWA sections 402

---

[41] *Id.* § 1344(a).
[42] 33 C.F.R. § 323.2(f).
[43] *Id.* § 323.2(d)(2)(i).
[44] 33 U.S.C. § 1344(b), (c).
[45] *Id.* § 1341(a)(1).
[46] *Id.* § 1365.

Exhibit 1

and 404.[47] The district court has jurisdiction to "enforce such an effluent standard or limitation, or such an order, . . . and to apply any appropriate civil penalties."[48]

## THE NATIONAL PARK SERVICE ORGANIC ACT

The National Park Service Organic Act of 1916[49] states, "The Secretary, acting through the Director of the National Park Service, shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."

This "non-impairment" mandate was reaffirmed by Congress in the 1978 amendments to the Act. The 1978 Reaffirmation states: "Congress reaffirms, declares, and directs that the promotion and regulation of the various System units shall be consistent with and founded in the purpose by subsection (a), to the common benefit of all the people of the United States.  The authorization of activities shall be construed and the protection, management, and administration of the System units shall be conducted in light of the high public value and integrity of the System and shall not be exercised in derogation of the values and purposes for which the System units have been established, except as directly and specifically provided by Congress."[50]

The Big Cypress National Preserve was established in 1974 and has been expanded since its creation.[51] The Preserve was created "in order to assure the preservation, conservation and protection of the natural, scenic, hydrologic, floral and faunal and recreational values in the Big Cypress Watershed."[52] The Preserve is managed as a unit of the National Park System "in a manner which will assure their natural and ecological integrity in perpetuity' in accordance with the provisions of this Act and with the provisions of the Act of August 25, 1916 (39 Stat. 535; 16 U.S.C. 1-4), as amended and supplemented."[53]

---

[47] *See id.* § 1365(f).
[48] *Id.*
[49] 16 U.S.C. § 1, amended and recodified in 54 U.S.C. § 100101(a) (2014).
[50] 54 U.S.C. § 100101(b).
[51] *See* Big Cypress National Preserve Act, Pub. L. No. 93-440, as amended by Pub. L. No. 100-301 (the Big Cypress National Preserve Addition Act of 1988); 16 U.S.C. § 698f.
[52] Pub. L. No. 93-440(a).
[53] Pub. L. No. 100-301 § 4(a), Big Cypress National Preserve Addition Act of 1988.

Exhibit 1

## FACTUAL BACKGROUND

**America's Everglades and Big Cypress National Preserve**

America's Everglades are the largest subtropical wilderness in the United States[54] and internationally renowned as an International Biosphere Reserve, a World Heritage Site, and a Ramsar Wetland of International Importance.[55] The Everglades hold immense value for Americans, providing clean drinking water, reducing flooding, and supporting habitat for an extraordinary diversity of native flora and fauna. This special place also draws visitors from all over the world to fish, boat, and enjoy the wildlife and natural vistas, which in turn supports Florida's tourism industry, bringing in hundreds of millions of dollars to Florida's economy.[56]

While currently a source of great American pride, the Everglades was once the target of one of our Nation's greatest follies. Following decades of draining, ditching, and construction of thousands of miles of canals, levees, and water control structures, the Everglades were significantly reduced in size and health, with half drained by the mid-1900s.[57] Our Nation has been working to repair this massive mistake ever since. Beginning with the passage of landmark American environmental laws like the Clean Water Act in the 1970s and coalescing around the authorization of the Comprehensive Everglades Restoration Plan in 2000, federal, state, and local governments, Tribal governments, nongovernmental organizations, and stakeholders have been working together to restore the Everglades to their former glory.[58]

The Greater Everglades Ecosystem, pictured in Figure 1, below, extends far beyond Everglades National Park, and its health is dependent upon healthy, functioning ecosystems in surrounding areas—particularly areas to the north, which help facilitate the flow of water into the park.

---

[54] Nat'l Park Serv., America's Everglades - The largest subtropical wilderness in the United States, https://www.nps.gov/ever/index.htm (last visited July 8, 2025).
[55] Nat'l Park Serv., Everglades is Internationally Significant, https://www.nps.gov/ever/learn/news/internationaldesignations.htm, (last visited July 8, 2025).
[56] *See* Nat'l Park Serv., National Park Tourism in South Florida Creates $225 Million in Economic Benefit (May 24, 2019), https://www.nps.gov/ever/learn/news/national-park-tourism-in-south-florida-creates-225-million-in-economic-benefit.htm.
[57] Everglades Law Center, Everglades Restoration Timeline, https://evergladeslaw.org/everglades-timeline/ (last visited July 8, 2025).
[58] Kassidy Robinson, Tell Me About: Everglades Restoration, FLORIDA MUSEUM OF NATURAL HISTORY, THOMPSON EARTH SYSTEMS INSTITUTE (Apr. 21, 2022), available at https://www.floridamuseum.ufl.edu/earth-systems/blog/tell-me-about-everglades-restoration/.

Exhibit 1

Figure 1: The Greater Everglades Ecosystem[59]



Big Cypress National Preserve is one of many federal public lands whose ecological health is critical to the health of the Everglades. The Big Cypress National Preserve, America's first

---

[59] National Academies of Sciences, Engineering, and Medicine. 2005. Re-Engineering Water Storage in the Everglades: Risks and Opportunities. Washington, DC: The National Academies Press. https://doi.org/10.17226/11215.

Exhibit 1

national preserve, was established in 1974, and has been expanded since its creation.[60] The Preserve was created "in order to assure the preservation, conservation and protection of the natural, scenic, hydrologic, floral and faunal and recreational values in the Big Cypress Watershed."[61] The Preserve is managed as a unit of the National Park System "in a manner which will assure their natural and ecological integrity in perpetuity' in accordance with the provisions of this Act and with the provisions of the Act of August 25, 1916 (39 Stat. 535; 16 U.S.C. 1-4), as amended and supplemented."[62] Aside from protecting important aquatic, plant, and wildlife resources, Big Cypress protects one of few remaining dark night skies in the eastern United States urban light pollution.[63] Because of this, Big Cypress received an International Dark Sky Park designation.[64]

Like the Greater Everglades Ecosystem, Big Cypress was also the target of noteworthy—but narrowly avoided—American folly: a 1968 proposal to build the "Everglades Jetport," which would have been the largest airport in the world.[65] After construction on the Everglades Jetport commenced, and the subsequent environmental outcry spearheaded by Friends of the Everglades' founder Marjory Stoneman Douglas ensued, the U.S. Department of Interior commissioned a 1969 report led by ecologist Luna Leopold to assess the ecological impacts of the proposal. The report became one of the first *de facto* environmental impact statements assessing impacts of federal action, and illustrated the utility of evaluating environmental impacts before acting. Nathaniel "Nat" Reed, who served as then-Florida Governor Claude Kirk's senior advisor, used the Leopold report to persuade the Governor, who had initially supported the Jetport plan, to reverse course and oppose the project, a position later adopted by President Richard Nixon. The Jetport plan was ultimately abandoned, and only the runway—which is expressly limited to use for aviation training—remains. The Nathaniel P. Reed Visitor Center at Big Cypress National Preserve now sits nearby.

**Mass Immigration Detention Center Development in the Everglades**

More than 50 years later, development threatens the Everglades and Big Cypress yet again. In late June, Florida Attorney General James Uthmeier proposed opening a mass detention center for immigrants at the abandoned Everglades Jetport site, now known as the Dade-Collier Training and Transition Airport (hereinafter, TNT Site).[66] As described above, the TNT Site is

---

[60] *see* Big Cypress National Preserve Act, Pub. L. No. 93-440, as amended by Pub. L. No. 100-301 (the Big Cypress National Preserve Addition Act of 1988); 16 U.S.C. § 698f.

[61] Pub. L. No. 93-440(a).

[62] Pub. L. No. 100-301 § 4(a), Big Cypress National Preserve Addition Act of 1988.

[63] Nat'l Park Serv., Lightscape/Night Sky, https://www.nps.gov/bicy/learn/nature/lightscape.htm (last visited July 8, 2025).

[64] Nat'l Park Serv., Stargazing in Big Cypress, https://www.nps.gov/thingstodo/stargazing-in-big-cypress.htm (last visited July 8, 2025).

[65] Jacopo Prisco, Everglades Jetport: The 'world's greatest airport' that never was, CNN TRAVEL (Oct. 24, 2022), https://www.cnn.com/travel/article/everglades-jetport-florida-cmd.

[66] Juan Carlos Chavez, Florida Attorney General Uthmeier suggests immigration detention center in the Everglades, TAMPA BAY TIMES (June 20, 2025), https://www.tampabay.com/news/2025/06/20/florida-attorney-general-uthmeier-suggests-immigration-detention-center-everglades/. The DHS shared Uthmeier's announcement, rolled out on X, describing it as "a force multiplier in completing the President's mission." *Id.*

Exhibit 1

located in the heart of the Everglades, within Big Cypress National Preserve and adjacent to Everglades National Park and the Everglades and Francis S. Taylor Wildlife Management Area.

Figure 2: The TNT Site Within the Context of Federal Public Lands[67]



Construction activities at the site commenced soon after Uthmeier's announcement, immediately intensifying on-the-ground use of a property that previously was minimally used for flight training.[68] Immediately, vehicle traffic traveling to and from the TNT Site increased, with cars,

---

[67] Curt Bradley, Center for Biological Diversity. Figure based on maps of the TNT site from public records and publicly available public lands shapefiles.
[68] *See* Memorandum from Carlos A. Gimenez, Miami-Dade County Mayor, to Honorable Chairman Jean Monestime and Members, Board of County Commissioners, *Dade-Collier Training and Transition Airport Report – Directive*

Exhibit 1

busses, dump trucks, portable housing units, portable bathrooms, construction equipment, tanker trucks, and more regularly using the site.[69] One news story reports "[a] seemingly nonstop stream of dump trucks and semi rigs entering the grounds."[70] Trucks have transported significant infrastructure and materials for development to the site, including large, heavy-duty generators and lighting (see Figures 3–5, below).[71]

Figure 3: A Truck Transports Heavy Generators onto TNT Site on Monday, June 24, 2025[72]



---

150934 (Mar. 24, 2016), available at https://www.miamidade.gov/mayor/library/memos-and-reports/2016/03/03.24.16-Dade-Collier-Training-and-Transition-Airport-Report-Directive-No-150934.pdf (describing between 7,248–9,111 aircraft operations per year between 2009–2015).
[69] Video posted by WFLA (@WFLA), Instagram, *Unmarked vehicles arrived at Alligator Alcatraz on Wednesday, just hours after officials said hundreds of detainees would be moved in*, WFLA (July 4, 2025), https://www.instagram.com/reel/DLps7Ptt2Bo/?igsh=MWRrdzJlNjRtcmhvMA==; Steve Litz, *Video shows construction underway at 'Alligator Alcatraz' detention center*, NBC6 (June 2, 2025), https://www.nbcmiami.com/news/local/construction-underway-for-temporary-immigrant-detention-center-alligator-alcatraz/3644243/.
[70] Michael Braun & Jennifer Crawford, *Steady stream of trucks enters 'Alligator Alcatraz' Saturday amid hundreds protesting camp*, WGCU (June 28, 2025), https://www.wgcu.org/top-story/2025-06-28/steady-stream-of-trucks-enters-alligator-alcatraz-saturday-amid-hundreds-protesting-camp.
[71] Ana Ceballos, Syra Ortiz Blanes, Alex Harris & Doug Hanks, *Florida seizes Everglades land to house detained migrants in 'Alligator Alcatraz'*, Miami Herald (June 25, 2025), https://www.miamiherald.com/news/local/immigration/article309263990.html.
[72] *Id.* (photo credit: D.A. Varela/Miami Herald)

Notice of Violations of Federal Environmental Law: Everglades Mass Detention Center
Page 13

Exhibit 1

<u>Figure 4</u>: A Truck Transports Lighting onto TNT Site on Monday, June 24, 2025[73]



<u>Figure 5</u>: Large Dump Trucks Entering and Exiting the TNT Site[74]



---

[73] *Id.* (photo credit: D.A. Varela/Miami Herald)
[74] Michael Braun & Jennifer Crawford, *Steady stream of trucks enters 'Alligator Alcatraz' Saturday amid hundreds protesting camp*, WGCU (June 28, 2025), https://www.wgcu.org/top-story/2025-06-28/steady-stream-of-trucks-enters-alligator-alcatraz-saturday-amid-hundreds-protesting-camp.

<span style="color:red">Exhibit 1</span>

<u>Figure 6</u>: Tents, Trailers, Vehicles, and Heavy Machinery on the TNT Site.[75]



The traffic is facilitating massive and intensive development of the TNT Site. Aerial photographs taken July 5, 2025, show most of the taxiway that runs parallel to the on-site runway covered with tents, trailers, generators, vehicles, and equipment (see Figures 7 & 8, below). All of this activity is occurring directly adjacent to waters and wetlands that surround the property (see Figure 9, below). Aerial imagery also shows what appears to be a new expansion of the paved area on the southwest side of the runway within the TNT Site (see Figure 10, below; Appendix A & B). Additionally, approximately 28,000 feet of barbed wire have been used to secure the site.[76]

Although both federal and state officials have claimed the detention center is temporary, those claims are contradicted by permanent construction of new paved areas on the site and by public statements that this detention center could be around "for a long time."[77] Deportation flights from the TNT Site are also anticipated, which would increase air traffic. The facility has been described as "a one stop shop," where there's "a massive runway . . . where any of the federal assets, if they want to fly these people back to their own country, they can do it."[78]

---

[75] Rafael Olmeda, *Donald Trump Set to Visit Opening of 'Alligator Alcatraz'*, SOUTH FLORIDA SUN SENTINEL (June 30, 2025), https://www.sun-sentinel.com/2025/06/30/donald-trump-will-visit-the-opening-of-alligator-alcatraz-desantis-says/. (Photo credit: WSVN)

[76] Image posted by Jason Delgado (@JasonDelgadoX), X, *Some details & a map of Alligator Alcatraz* (July 1, 2025), https://x.com/JasonDelgadoX/status/1940033900782223801.

[77] Sommer Brugal, *Florida says "Alligator Alcatraz" is temporary. Trump isn't so sure.* AXIOS (July 1, 20250, https://www.axios.com/local/miami/2025/07/01/florida-alligator-alcatraz-president-trump-visit.

[78] John MacLauchlan, *Controversial "Alligator Alcatraz" detention facility days away from opening*, DeSantis says, CBS News (July 1, 2025), https://www.cbsnews.com/miami/news/controversial-alligator-alcatraz-detention-facility-days-away-from-opening-desantis-says/; Michelle Stoddardt & Selina Wang, *Trump says he'd like to see facilities like 'Alligator Alcatraz' in 'many states'*, ABC News (July 1, 2025), https://abcnews.go.com/Politics/trump-visit-new-alligator-alcatraz-migrant-detention-center/story?id=123347684 (quoting White House Press Secretary Leavitt stating, "There's only one road leading in, and the only way out is a one-way flight").

Notice of Violations of Federal Environmental Law: Everglades Mass Detention Center
Page 15

<span style="color:red">Exhibit 1</span>



Figure 7: Aerial Photographs of Development at the TNT Site[79]



---

[79] (Photo credit: Ralph Arwood)

Exhibit 1

Figure 8: Aerial Photograph of Development at the TNT Site[80]



---

Exhibit 1

Figure 9: Aerial Photograph of Development at the TNT Site Surrounded by Aquatic Resources (Note sunlight reflecting off standing water)[81]



---

[81] (Photo credit: Ralph Arwood)

Notice of Violations of Federal Environmental Law: Everglades Mass Detention Center
Page 18

Exhibit 1

Figure 10: Aerial Image Apparently Showing New Pavement Southwest of the Runway[82]



No formal planning documents or environmental reviews were released to the public before construction began and none have been produced to date; however, during a July 1, 2025 visit to the TNT Site by President Donald Trump, statements and available materials indicated that the mass detention center would hold up to 3,000 immigration detainees, supported by 1,000 staff and "400+" security personnel.[83]

Activities associated with constructing and operating the detention center are ongoing and impactful. Increased human activity at the site is creating loud noise, bright light, and vibrations

---

[82] (Photo credit: Ralph Arwood)
[83] Image posted by Jason Delgado (@JasonDelgadoX), X, *Some details & a map of Alligator Alcatraz* (July 1, 2025), https://x.com/JasonDelgadoX/status/1940033900782223801; *see also* Defendant Kevin Guthrie's Opposition to Plaintiffs' Motion for a Temporary Restraining Order, *Friends of the Everglades & Center for Biological Diversity v. Noem et al.*, No. 1:25-cv-22896-JE (S.D. Fla., June 30, 2025).

Exhibit 1

that extend beyond the footprint of the TNT Site, affecting the wildlife beyond. For example, light pollution emanating from artificial lighting at the TNT Site can be seen at least 15 miles away from the site, marring what was previously an internationally renowned dark sky (see Figure 11, below). The new lighting is so bright that the change in the historically dark preserve is readily apparent from satellite imagery (see Figure 12, below).

Figure 11: Light Pollution emanating from the TNT Site, Observed from Approximately 15 Miles Away[84]



---

[84] Photograph taken by Betty Osceola on July 7, 2025, near Mile Marker 30.5 on Tamiami Trail, approximately 15 miles from the TNT Site.

Exhibit 1

<u>Figure 12</u>: Satellite images of the TNT Site on May 27, 2025, showing uniform darkness, and June 27, 2025, showing significant light pollution[85]





Creating a new development in the middle of the Everglades where there are no existing utilities means an increased risk of pollution. The thousands of people present at the site will produce solid waste, wastewater, and human refuse, among other pollutants, that risk contaminating

---

[85] Nat'l Aeronautics and Space Admin., NASA Worldview https://worldview.earthdata.nasa.gov/?v=-81.11014719525654,25.75798245300 2136,-80.72464901116744,25.940893310140247&l=Reference_Labels_15m,Reference_Features_15m(hidden),Coastlines_15m(hidden),VIIRS_SNPP_DayNightBand_At_Sensor_Radiance(hidden),VIIRS_SNPP_DayNightBand_AtSensor_M15,VIIRS_NOAA20_CorrectedReflectance_TrueColor(hidden),VIIRS_SNPP_CorrectedReflectance_TrueColor(hidden),MODIS_Aqua_CorrectedReflectance_TrueColor(hidden),MODIS_Terra_CorrectedReflectance_TrueColor&lg=true&t=2025-06-27-T02%3A00%3A00Z (last visited July 8, 2025).

Notice of Violations of Federal Environmental Law: Everglades Mass Detention Center
Page 21

Exhibit 1

sensitive wetlands and waters surrounding the site. A scant, two-page "waste management plan overview" for the construction and operation of the mass detention center acknowledges that "[s]hower, restroom, and laundry units, as well as administrative and billeting trailers produce graywater, blackwater, and lint waste" and proposes that waste will be stored in 22,000-gallon frac tanks.[86]

The overview states that solid waste will be managed in "roll-off dumpsters" with "lids or tarps to prevent littering, wind dispersal, and animal intrusion" that will be "swapped" daily; however, it provides no details about what procedures or particular equipment will be used to ensure the dumpsters stay shut and that they prevent intrusion from resourceful wildlife like raccoons and black bears. The overview also fails to take responsibility for safe and secure transfer of solid waste, instead placing the responsibility on unspecified "[w]aste haulers."

The overview acknowledges that biohazard waste will be present at the site, which presents a serious contamination concern. Notably, the overview does not mention the pollution risk from spilled fuel used to power generators and other equipment on the site.

Regardless of handling strategy—and the proposed strategy available to the public is lacking—there is a risk of contamination associated with producing, storing, and transporting waste. These contamination and pollution risks threaten to impact surrounding aquatic resources and endangered and threatened species in the action area. Aside from the risk of spills and mismanagement, documented flooding at the site increases the risk of unmitigated contamination on and around the TNT Site.[87]

Contamination from pesticide use is also a risk at the site. It is no secret that swarming mosquitoes have become a problem at the TNT Site.[88] Members of the public present at the gate to the TNT Site have observed vans bearing the logo of the pest-control company "Mosquito Joe" enter and leave the site (see Figure 13, below).[89] The use of pesticides can have cascading ecological effects,[90] poisoning not only the target species but also other species who feed on them. For example, species like the Florida bonneted bat require natural habitats conducive to insect diversity which must be protected to support their ability to forage, and the presence of pesticides puts them at risk.[91] Poisoning insects within Big Cypress risks also poisoning nontarget species like bats. It can also contaminate the sensitive waters and wetlands surrounding the TNT Site.

---

[86] Fla. Dep't of Emergency Mgmt., *TDF Waste Management Plan Overview* (June 24, 2025) (Appendix C).
[87] Kate Plummer, *'Alligator Alcatraz' Floods Within Day of Opening*, NEWSWEEK (July 2, 2025), https://www.newsweek.com/alligator-alcatraz-flooded-opening-day-donald-trump-migrant-detention-center-2093581 .
[88] Evan Axelbank, *Mosquitoes become a concern at Alligator Alcatraz*, FOX13 TAMPA BAY (July 5, 2025), https://www.fox13news.com/news/mosquitoes-become-concern-alligator-alcatraz.
[89] *See also* Image posted by 50501southFlorida (@50501southFlorida), Instagram, *Drop the ICE Contract challenge – Day 2* (July 1, 2025), https://www.instagram.com/p/DLpWnOruC6i/.
[90] *See* Lewis, J.L., Agostini, G., Jones, D.K. and Relyea, R.A., 2021. Cascading effects of insecticides and road salt on wetland communities. *Environmental Pollution*, *272*, p.116006 ("Once in aquatic environments, pesticides can cause direct lethal effects on sensitive non-target species as well indirect effects that cascade through freshwater communities.").
[91] 78 Fed. Reg. 61004, 61006, 61032, 61035 (Oct. 2, 2013).

Exhibit 1

Figure 13: Photograph of a van with a "Mosquito Joe" exterminator and pest control services logo entering the TNT Site



The construction and operation of the mass detention center at the TNT site is likely also affecting air quality through the use of heavy machinery, vehicles, and generators that burn gasoline, diesel, propane, and/or other fuels. These fuels can also spill and contaminate surrounding ecosystems.

Figure 14: Large Diesel Generator Entering the TNT Site.[92]



---

[92] Devoun Cetoute, 'Alligator Alcatraz' rises in the Everglades. See new immigration detention camp, Miami Herald (June 24, 2025), https://www.miamiherald.com/news/local/immigration/article309318055.html.

Notice of Violations of Federal Environmental Law: Everglades Mass Detention Center
Page 23

Exhibit 1

According to FWS's Information for Planning and Consultation (IPAC) system, the following list of species could potentially be affected by the construction and operation of the mass detention center at the TNT Site:

| Table 1: Species Identified by the Information for Planning and Consultation System | | |
|---|---|---|
| Common Name | Scientific Name | Status |
| Florida panther | *Puma concolor coryi* | Endangered |
| Florida bonneted bat | *Eumops floridanus* | Endangered |
| Eastern black rail | *Laterallus jamaicensis jamaicensis* | Threatened |
| Everglade snail kite | *Rostramus sociabilis plumbeus* | Endangered |
| Red-cockaded woodpecker | *Dryobates borealis* | Threatened |
| Wood stork | *Mycteria americana* | Threatened |
| Eastern indigo snake | *Drymarchon couperi* | Threatened |
| Gulf sturgeon | *Acipenser oxyrinchus desotoi* | Threatened |
| Monarch butterfly | *Danaus plexippus* | Proposed Threatened |
| Beach jacquemontia | *Jacquemontia reclinata* | Endangered |
| Blodgett's Silverbush | *Argythamnia blodgetti* | Threatened |
| Cape Sable thoroughwort | *Chromolaena frustrata* | Endangered |
| Carter's mustard | *Warea carteri* | Endangered |
| Carter's small-flowered flax | *Linum carteri carteri* | Endangered |
| Crenulate lead-plant | *Amorpha crenulate* | Endangered |
| Deltoid spurge | *Chamaesyce deltoidei deltoidei* | Endangered |
| Everglades bully | *Sideroxylon reclinatum austrofloridense* | Threatened |
| Florida brickell-bush | *Brickellia mosieri* | Endangered |
| Florida pineland crabgrass | *Digitaria pauciflorida* | Threatened |
| Florida prairie-clover | *Dalea carthagenensis floridana* | Endangered |
| Florida semaphore cactus | *Consolea coralicola* | Endangered |
| Garber's spurge | *Chamaesyce garberi* | Threatened |
| Pineland sandmat | *Chamaesyce deltoidei pinetorum* | Threatened |
| Sand flax | *Linum Arenicola* | Endangered |
| Small's milkpea | *Galactia smallii* | Endangered |
| Tiny polygala | *Polygala smallii* | Endangered |

Additionally, the TNT Site appears to be within or directly adjacent to final or proposed critical habitat for the federally endangered Florida bonneted bat,[93] and proposed critical habitat for

---

[93] 89 Fed. Reg. 16624, 16670, 16676 (Mar. 7, 2024).

Exhibit 1

endangered Florida prairie-clover,[94] threatened Florida pineland crabgrass,[95] and threatened Everglades bully[96] (see Figure 15, below).

Figure 15: TNT Site in the Context of Proposed and Final Critical Habitat for Listed Species[97]



Available information indicates that the construction and operation of the mass immigration detention center not only may affect but is likely to affect federally listed species and their critical habitat on and adjacent to the site, even if the species do not occupy or use the actual footprint of the project.  It is fragmenting habitat for species populations in the area. It is risking pollution and contamination of sensitive aquatic ecosystems and prey sources. Light, sound, human activity and physical barriers like fences and barbed wire will effectively evict wildlife from the area around the TNT Site. Increased traffic is contributing to a greater risk of road mortality.

---

[94] 87 Fed. Reg. 62564, 62597 (Oct. 14, 2022) (map of proposed critical habitat for Florida prairie clover).
[95] 87 Fed. Reg. 62564, 62602-03 (Oct. 14, 2022) (map of proposed critical habitat for Florida pineland crabgrass).
[96] 87 Fed. Reg. 62564, 62605, 62607 (Oct. 14, 2022) (map of proposed critical habitat for Everglades bully).
[97] Curt Bradley, Center for Biological Diversity. Figure based on maps of the TNT site from public records and critical habitat shapefiles from FWS's Environmental Conservation Online System.

Exhibit 1

All listed species present within or adjacent to the TNT Site are likely to be impacted by the development, including the Florida panther, Florida bonneted bat, crested caracara, eastern black rail, Everglade snail kite, red-cockaded woodpecker, wood stork, eastern indigo snake, monarch butterfly, and several federally listed plants, described in detail below.

*Florida Panther*

The Florida panther (*Puma concolor coryi*) has been listed as an endangered species since 1967.[98] To this day, it is one of the most endangered mammals in the eastern United States, with only an estimated 120–230 adult or subadult panthers living in the wild.[99] Florida panthers are threatened by habitat destruction associated with human development, along with increased vehicle mortality driven by associated roads and traffic. They are also vulnerable to disease, including a disorder called feline leukomyelopathy (FLM), which causes rear-leg weakness in affected individuals that makes it difficult to walk.[100] Additionally, because of historical and current low population numbers, Florida panthers have experienced inbreeding and associated decreased genetic health, which requires periodic human intervention in the form of genetic introgression.[101]

Vehicle collisions are the leading documented cause of direct Florida panther mortalities. Last year, the species experienced the highest number of vehicle mortalities in nearly ten (10) years, with 29 panthers killed.[102] Habitat destruction and fragmentation also contribute to the second leading cause of panther mortality, intraspecific aggression, when panthers fight and kill one another over territory.[103]

The construction and operation of the mass detention facility at the TNT Site will affect and is likely to adversely affect the Florida panther (see generally, Appendix D–G).

The project site is within the Primary Zone of the Panther Focus Area (PFA), which is an area identified by FWS as habitat used by the panther. The PFA defines the geographic limits of the Service's consultation area for projects that potentially affect panthers and their habitats. The Primary Zone is a region of suitable habitats occupied by Florida panthers, and it supports the only known breeding population of panthers in the world. Lands within the Primary Zone are important to the long-term viability and persistence of panthers in the wild.[104] FWS's Panther

[98] U.S. Fish & Wildlife Service, *ECOS: Environmental Conservation online System, Florida panther* (Puma(=felis) concolor coryi), https://ecos.fws.gov/ecp/species/1763; 32 Fed. Reg. 4001 (Mar. 11, 1967).
[99] Florida Fish & Wildlife Conservation Commission, Florida Panther Program, at https://myfwc.com/wildlifehabitats/wildlife/panther/.
[100] Fla. Fish and Wildlife Conserv. Comm'n, Disorder Impacting Panthers and Bobcats, https://myfwc.com/wildlifehabitats/wildlife/panther/disorder/ (last accessed July 5, 2025).
[101] U.S. Fish and Wildlife Service. 2008. Florida Panther Recovery Plan (*Puma concolor coryi*), Third Revision. U.S. Fish and Wildlife Service. Atlanta, Georgia. 217pp, at p. 91, 108 https://www.fws.gov/sites/default/files/documents/Florida_Panther_Genetic_Factsheet_98A5BCF.pdf
[102] Fla. Fish & Wildlife Conserv. C'mmn, *New Litters, Deaths, Depredations*, https://myfwc.com/media/bczhyn24/2024pantherpulse.pdf.
[103] Florida Fish & Wildlife Conservation Comm'n, *Panther Biology* (accessed June 26, 2025), https://myfwc.com/wildlifehabitats/wildlife/panther/biology/.
[104] Randy Kautz, Impacts of the Big Cypress Detention Center on the Florida Panther and Its Habitat 1, 4 (July 10, 2025), attached as Appendix D (explaining that "Kautz et al. (2006) recommended that assessments of potential impacts of proposed developments within the Primary Zone should strive to achieve no net loss of

Exhibit 1

Recovery Plan defines the Primary Zone as "lands essential to the long-term viability and persistence of the panther in the wild."[105] Therefore, the detention facility is within an area long considered essential habitat for the panther.[106]

Panthers frequently use and occupy the site and the surrounding area.  Based on an analysis of the site and a 6701-meter buffer (i.e. the mean daily distance traveled by male panthers during the dry season) telemetry records include 1164 points representing 12 male panthers, 10 females, and 1 Texas female introduced into the southwest Florida population as part of the effort to restore genetic diversity to the population in the 1990s.[107] In addition, there are records of 4 panther dens within 12 km to the northwest, west, and southwest of the site.[108] Data collected from 1982–2014 shows that panthers of all age classes consistently use the landscape immediately surrounding the site.[109] In fact, three individuals have occurred within 70–300 meters of the site and the home ranges of 8 of 11 males and 4 of 10 females overlap the jetport site.[110] Further, a 2015 study indicated that between 2004-2008 the home ranges of four radio-collared adult panthers (3 males and 1 female) were detected  in the location of the facility.[111] The actual number affected may be higher today because not all panthers were radio-collared during the time frame of the study.[112] This data suggests that it is very likely that panthers traverse the paved areas during periods of movement.[113] The data demonstrates that the area has supported a stable and reproducing panther population over many years.[114]

The project is likely to adversely affect panthers in several ways. First, there will be increased human presence in a part of the range that is relatively wild.[115] Studies show that the presence of pumas decrease with increasing human presence.[116] This disturbance will likely reduce the value of the natural areas surrounding the site as panther habitat.[117] More than 1,000 acres may receive less use by panthers with the presence of the detention facility.[118] This increased disturbance may also result in changes in the size or shape of several panther home ranges as panthers are

---

landscape function or carrying capacity for panthers within the Primary Zone and that the total
areal extent of the Primary Zone should be maintained"); *see* Curriculum Vitae of Randy Kautz, attached as Appendix E.
[105] Letter from Robert A. Frakes, Ph.D., to Jason Totoiu, Center for Biological Diversity, Re: opinion on impacts of construction and operation of migrant detention facility on the endangered Florida panther (July 8, 2025), attached as Appendix F (quoting U.S. Fish and Wildlife Service. 2008. Florida Panther Recovery Plan (Puma concolor coryi), Third Revision. U.S. Fish and Wildlife Service. Atlanta, Georgia. 217pp); *see* Curriculum Vitae of Robert A. Frakes, Ph.D., attached as Appendix G.
[106] Frakes 2025 at 1.
[107] Kautz 2025 at 8–9.
[108] *Id.*
[109] The lack of records since 2014 is due to the fact that no panthers have been monitored with radiotelemetry or GPS collars in Big Cypress National Preserve since 2019. *Id.* at 9 (citing Florida Fish and Wildlife Conservation Commission. 2020. Annual report on the research and management of Florida panthers: 2019–2020. Fish and Wildlife Research Institute and Division of Habitat and Species Conservation, Naples, Florida).
[110] Kautz 2025 at 9.
[111] Frakes 2025 at 1–2.
[112] *Id.* at 2.
[113] Kautz 2025 at 9.
[114] *Id.*
[115] *Id.*
[116] *Id.*
[117] *Id.*
[118] *Id.*

Notice of Violations of Federal Environmental Law: Everglades Mass Detention Center
Page 27

Exhibit 1

expected to avoid approaching close to the site.[119] In 2021, researchers published a panther habitat suitability map based on habitat modeling for the purposes of guiding panther recovery planning.[120] A sensitivity analysis of model predictions showed that the presence of human populations, roads, and agriculture (other than pasture) had strong negative effects on the probability of panther presence.[121]

Second, fencing 6 feet and higher precludes the use of bounded areas by panthers and deer, and thus all areas enclosed by panthers will become unusable by panthers and their prey.[122] Although paved areas are no normally considered as panther habitats, panthers nevertheless cross the paved areas of the site in search of prey.[123] Panther biologists have considered all areas surrounded by 6-foot chain link fencing as complete loss of habitat.[124]

Third, studies suggest that panthers will avoid areas with bright, artificial lighting and may not venture within 500 meters of the site during the periods when they are most actively searching for prey.[125] The total affected area (included the buffer area) may include nearly 2,000 acres of panther habitat.[126] Changes to panther home ranges and decreases in prey abundance near the site may also have harmful effects of increasing intraspecific aggression, a leading source of panther mortality.[127]

Fourth, increased highway traffic associated with guards, administrative staff, detainees, food service personnel, maintenance workers, portable toilet services, waste management, etc. traveling to and from the site will likely lead to an increase in the number of panthers killed in collisions with motor vehicles.[128] US 41 lacks dedicated wildlife crossings to reduce these risks and collisions with motor vehicles are the most significant factor affecting the survival of individual panthers.[129] Increased traffic on the access road may also cause panthers to avoid crossing the road, thus fragmenting any existing panther home ranges which may lie on both sides of the road.[130]

Fifth, when viewed in conjunction with the loss of panther habitat from sea level rise, the loss of approximately 1,000–2,000 acres of panther habitat from this project will contribute to the cumulative loss and degradation of habitat in the future.[131]

As explained by two leading panther experts who FWS has long cited in previous ESA consultations, the data clearly demonstrates that panthers frequently use the project site and surrounding area. Moreover, it is the opinions of Dr. Frakes and Mr. Kautz, drawn from decades

---

[119] Frakes 2025 at 2.
[120] *Id.*
[121] Frakes 2025 at 2.
[122] Kautz 2025 at 9.
[123] *Id.*
[124] *Id.*
[125] *Id.* at 10.
[126] *Id.*
[127] Frakes 2025 at 2.
[128] Kautz 2025 at 10.
[129] *Id.*
[130] Frakes 2025 at 2.
[131] Kautz 2025 at 10.

Notice of Violations of Federal Environmental Law: Everglades Mass Detention Center
Page 28

Exhibit 1

of professional experience and scientific literature, that this project will likely adversely affect panthers due to a variety of human-caused disturbances. Many of the impacts described rise to the level of take as defined under the ESA, which is prohibited without a lawful incidental take statement or incidental take permit.

### Florida Bonneted Bat

The Florida bonneted bat (*Eumops floridanus*) is a federally endangered species native to southern Florida.[132] The species has one of the smallest range distributions of any bat species in the United States, increasing its susceptibility to climate change, particularly the impacts of major storms.[133] In natural areas, the species roost primarily in the cavities of old pine trees. In contrast, they use different structures in urban areas, including Spanish tiles roofs and bat houses.[134] Currently, the roosting and foraging habitat for Florida bonneted bat populations is under threat from land use conversion as part of development (renovation and urban sprawl) and expansion of agricultural areas.[135] FWS anticipates that climate change and sea level rise will both negatively impact the species, which is already suffering from destruction and degradation of suitable habitat.[136] Specifically, FWS anticipates "significant losses of occupied and potential occupied habitat in coastal areas due to climate change."[137]

Fine-scale genetic analysis of Florida bonneted bats has shown that four populations studied (Polk County, Babcock-Webb, Collier county, and Miami-Dade County) are so genetically distinct that they should be managed as distinct population segments.[138] Furthermore, bats in southwestern Florida, including in Big Cypress, are on an independent evolutionary trajectory from bats in Miami-Dade County.[139] These findings provide even more reason to carefully analyze and manage impacts to bonneted bats in Big Cypress (part of the Collier County population), as a loss or decline of a population would mark a loss of genetic diversity for the species as a whole.

Although, to our knowledge, formal surveys of the TNT Site have not occurred in connection with the construction and operation of the mass detention facility, the site is recognized as occupied critical habitat, indicating bats use the area. Furthermore, Florida bonneted bats have been documented through acoustic monitoring at Raccoon Point (approximately 8 miles away from the TNT Site), Buckskin Trail (approximately 15 miles away from the TNT Site), and Annette's Pond (approximately 20 miles away) (see Figures 16 & 17, below).[140] Because Florida bonneted bats have significant spatial needs for foraging, they "may need to travel far distances

---

[132] 78 Fed. Reg. 61004 (Oct. 2, 2013).

[133] *Id.* at 61,004, 61,016.

[134] 77 Fed. Reg. 60750, 60,754–56 (Oct 4, 2012).

[135] Everglades Nat'l Park, *Florida Bonneted Bat*, http://www.nps.gov/ever/learn/nature/flbonnetedbat.htm (last visited July 8, 2025).

[136] *Id*.

[137] 78 Fed. Reg. at 61022.

[138] Austin, J.D., Gore, J.A., Hargrove, J.S. *et al.* 2022. Strong population genetic structure and cryptic diversity in the Florida bonneted bat (*Eumops floridanus*). *Conserv Genet* 23, 495–512. https://doi.org/10.1007/s10592-022-01432-y.

[139] *Id.*

[140] *See* Mylea Bayless, Report: Strategic searches for Florida bonneted bat (*Eumops floridanus*) roosts in Big Cypress National Preserve (BCNP) (March 19, 2019) (Appendix H).

Exhibit 1

and feed over large areas to satisfy dietary needs," and have been known to travel, on average, 9.5 miles from their roosts and 24 miles total per night, and a maximum of 24 miles from their roosts and more than 56 miles total in one night.[141] Accordingly, these areas where Florida bonneted bats were surveyed are within traveling distance of the TNT Site.

Figures 16 & 17: Bat Survey Data in Big Cypress National Preserve from 2017.[142]





[141] 89 Fed. Reg. 16624, 16639 (Mar. 7, 2024).
[142] Bayless 2019.

Exhibit 1

Construction and operation of the mass detention facility at the TNT Site may affect and indeed is likely to affect Florida bonneted bats in a number of ways. Light pollution is likely to adversely affect the Florida bonneted bat. As explained by FWS:

> Artificial light aversion has been documented in other species closely related to Florida bonneted bat (i.e., within Molossidae and/or Eumops) (Jung and Kalko 2010, pp. 147–148; Mena et al. 2022, pp. 568–571). Despite increases in research of Florida bonneted bat ecology since the species' listing in 2013, there has been no evidence that Florida bonneted bats exploit artificial light sources, and the highest Florida bonneted bat activity within an urban matrix has been associated with large, dark, open areas with tree cover (Bat Conservation International 2022, p. 18; Ridgley 2023, unpublished data; Ridgley and GambaRios 2023, unpublished data). Artificial lighting has been demonstrated to also have broadscale negative effects on insects and insect populations (e.g., reduced abundance; altered larval development, reproduction, and other behaviors) (van Grunsven et al. 2020, entire; Boyes et al. 2021, entire; Pennisi 2021, entire), potentially reducing the availability of prey (Mariton et al. 2022, pp. 2, 7) and the quality of foraging habitat for Florida bonneted bats. In addition to effects on foraging habitat, artificial lighting can impact roosting habitat quality because light at emergence is thought to disrupt emergence cues and increase predation risk (or perceived predation risk) at emergence for other open-space-foraging and insectivorous bats (Rydell et al. 1996, pp. 249, 251; Mariton et al. 2022, p. 8). Therefore, areas where roosting, foraging, and other natural behaviors, such as commuting, can occur with limited or no impacts from artificial light are important in considering the conservation of the species.[143]

Use of pesticides like mosquito spraying may also adversely affect the Florida bonneted bat. According to FWS:

> The life history of the Florida bonneted bat may make it susceptible to pesticide exposure from a variety of sources. Mosquito control spraying activities commonly begin at dusk when mosquitoes are most active . . . . Because the Florida bonneted bat forages at dusk and after dark, the possibility exists for individuals to be directly exposed to airborne mosquito control chemicals or to consume invertebrates containing pesticide residues from recent applications.
>
> .   .   .
>
> Currently, [Organochlorine (OC)] pesticides have largely been replaced with [organophosphate (OP)], carbamate, and pyrethroid pesticides. Carbamate and OP pesticides act as cholinesterase inhibitors and are generally more toxic to mammals than OC pesticides. However, they are not as persistent in the environment and do not tend to bioaccumulate in

---

[143] *Id.* at 16642.

Exhibit 1

organisms. Despite this lack of persistence, Sparks (2006, pp. 3–4, 6–7) still found OP residues in both bats and guano in Indiana and suspected that the residues originated from consuming contaminated insects. Pyrethroids, one of which is permethrin, are commonly used mosquito control pesticides in south Florida that display greater persistence than OP and carbamate pesticides, but still degrade much more rapidly than OC pesticides and are believed to exhibit low toxicity to mammals. Grue et al. (1997, pp. 369–388) reviewed the sublethal effects of OPs and carbamates on captive small mammals and birds and found impaired thermoregulation, reduced food consumption, and reproductive alterations. Clark (1986, p. 193) observed a depression in cholinesterase activity in little brown bats following both oral and dermal application of the OP pesticide methyl parathion. Bats with reduced cholinesterase activity may suffer loss of coordination, impaired echolocation, and elongated response time. Alteration of thermoregulation could have serious ramifications to bats, given their high metabolic and energy demands (Sparks 2006, pp. 1–2). Reduced reproductive success would be of concern because the Florida bonneted bat already displays a low reproductive rate (Sparks 2006, p. 2).[144]

Furthermore, "[a] reduction in the number of flying insects is a potential secondary effect to consider when evaluating the impact of pesticides on the Florida bonneted bat," with research suggesting "that mosquito control programs are contributing to reduced food supplies for bats."[145] Notably,

Timm and Genoways (2004, p. 861) indicated that the extant, although small, population of the bat in the Fakahatchee-Big Cypress area of southwest Florida is located in one of the few areas of south Florida that has not been sprayed with pesticides. Marks and Marks (2008a, p. 15) contended that if the species' rarity and vulnerability are due to a dependence on a limited food source or habitat, then the protection of that food source or habitat is critical. Marks (2013, p. 2) also recommended that natural habitats conducive to insect diversity be protected and that any pesticides be used with caution.[146]

Given the small and vulnerable nature of the Florida bonneted bat population in Big Cypress, a thorough consultation with FWS regarding the mass detention center's effects on the species is critical and required to ensure its survival and recovery.

### Crested Caracara

FWS listed the Florida distinct population segment of crested caracara (*Caracara plancus audubonii*) as threatened in 1987.[147] Historically, the caracara lived throughout peninsular south

---

[144] 78 Fed. Reg. at 61035.
[145] *Id.*
[146] *Id.*
[147] U.S. Fish & Wildlife Service, *ECOS: Environmental Conservation online System, Crested caracara (Audubon's) [FL DPS]* (Caracara plancus audubonii*), https://ecos.fws.gov/ecp/species/8250 (last visited July 8, 2025).

Exhibit 1

Florida in wet and dry prairie habitats featuring interspersed cabbage palm trees.[148] Caracaras nest almost exclusively in cabbage palms, and ideal habitat conditions for the species consists of these palms "surrounded by open habitats with low ground cover and low density of tall or shrubby vegetation."[149] The species is an opportunistic hunter, seeking out prey "on the wing, from perches, and on the ground."[150]

The primary threat to the species is habitat loss.[151] The majority of the caracara's habitat loss is attributable to agricultural and residential development.[152] In addition to habitat destruction, the species has suffered from direct human impacts, including mortalities from vehicular collisions, traps, and intentional killings resulting from misplaced fear that the species preys on livestock.[153] The Service's recovery plan for the crested caracara outlines specific measures that should be taken to protect the caracara including, efforts to "create, restore, or expand occupied habitat wherever possible."[154] The plan further states that conservation goals may be met through the expansion of habitat in areas with individuals present, as well as restoration of habitat in vacant areas.

The TNT Site is within FWS's consultation area for the caracara (see Figure 18, below).

Figure 18: Crested Caracara FWS Consultation Area[155]



[148] U.S. Fish & Wildlife Serv., *Multiple Species Recovery Plan for South Florida: Audubon's Crested Caracara: Polyborus plancus audubonii*, U.S. DEPT. OF INTERIOR, 4-221–4-222, available at https://www.saj.usace.army.mil/Portals/44/docs/regulatory/SW/acca.pdf.
[149] *Id*. at 4-222.
[150] *Id*. at 4-223.
[151] *Id*. at 4-225.
[152] *Id*.
[153] *Id*.
[154] *Id*. at 4-234.
[155] St. Johns River Water Mgmt. Dist., Geospatial Open Data, Crested Caracara Consultation Area, https://data-floridaswater.opendata.arcgis.com/datasets/506e0c45dded4b87bf66b41ef4c6a83b_1/explore?location=25.981408%2C-80.994184%2C10.20 (last accessed July 10, 2025).

Notice of Violations of Federal Environmental Law: Everglades Mass Detention Center
Page 33

Exhibit 1

The construction and operation of the mass detention center at the TNT Site may affect crested caracaras by disrupting essential feeding and breeding behaviors with noise, light, and sound. Increased traffic may also increase the risk of road mortality for crested caracaras.

***Eastern Black Rail***

FWS listed the eastern black rail (*Laterallus jamaicensis jamaicensis*) as a threatened species in 2020.[156] The eastern black rail is a small, cryptic marsh bird that occurs in salt, brackish, and freshwater wetlands in the eastern United States. In listing the rail, FWS found that habitat loss and destruction, sea level rise and tidal flooding, incompatible land management, and increasing storm intensity and frequency are the primary threats to the subspecies.[157] The TNT Site is located within an area where eastern black rail presence is possible (see Figure 19, below). Eastern black rails are sensitive to human disturbance,[158] and consequently the construction and operation of the mass detention center may affect any eastern black rails in the area.

<u>Figure 19</u>: Range of the Eastern Black Rail in the Contiguous United States Based on Present Understanding of the Subspecies' Distribution.[159]



---

[156] 85 Fed. Reg. 63764 (Oct. 8, 2020).

[157] *Id.*

[158] U.S. Fish and Wildlife Service. 2019. Species status assessment report for the eastern black rail (Laterallus jamaicensis jamaicensis), Version 1.3. August 2019. Atlanta, GA, at 72–73

[159] *Id.* at 24.

Exhibit 1

*Everglade Snail Kite*

The Everglade snail kite (*Rostramus sociabilis plumbeus*) is listed as an endangered species. It is a medium-sized raptor that feeds almost exclusively on freshwater Florida apple snails. In Florida, the kite faces threats to its native food source, including changes in water levels, hydroperiods, and vegetation structure; non-native apple snails; and the presence of contaminants.[160] Many of these factors also make snail kite habitat unsuitable, in addition to changes in precipitation and sea level rise driven by climate change, increased water consumption, and urbanization.[161] Non-native and invasive plants also degrade nesting and foraging habitat for the snail kite.[162] Snail kites are also vulnerable to human disturbance, which can disrupt nesting activities, as well as predation, which can cause nest failure.[163]

In the Big Cypress basin, snail kites use the Lostman's and Okaloacoochee sloughs, Hinson Marsh, and the East Loop and Corn Dance units of Big Cypress National Preserve.[164] The TNT site is within the Corn Dance Unit. The construction and operation of the mass detention center may affect the Everglade snail kite through changes in hydrology or contamination events that affect the snail kite's prey base, human disturbance that impacts nesting or feeding, and subsidization of predators through the presence of large amounts of human-created waste.

Figure 20: Map Depicting TNT Site (labeled "Jetport") within the Corn Dance Unit



*Red-cockaded Woodpecker*

The red-cockaded woodpecker (*Dryobates borealis*) is listed as a threatened species.[165] It is among the southeast's most charismatic, visible, and imperiled species. It makes its home in

---

[160] U.S. Fish & Wildlife Serv., Everglade Snail Kite (*Rostrhamus sociabilis plumbeus*) 5-Year Review: Summary and Evaluation. June 2023. Florida Ecological Services Office, at 7.
[161] *Id.* at 8.
[162] *Id.* at 7.
[163] *Id.* at 8.
[164] U.S. Fish & Wildlife Service. 1999. Multi-Species Recovery Plan for South Florida: Everglade Snail Kite *Rostrhamus sociabilis plumbeus* 4-291–4-292, *available at* https://www.saj.usace.army.mil/Portals/44/docs/regulatory/SW/snki.pdf.
[165] 89 Fed. Reg. 85294 (Oct. 25, 2024).

Exhibit 1

mature pine forests, generally more 80 years old, where it plays a vital role in the intricate web of life by providing shelter in the nesting cavities it excavates in living pine trees.[166] The red-cockaded woodpecker is the only woodpecker that excavates cavities exclusively in living pine trees.[167] At least 27 vertebrate species have been documented using their cavities, either for roosting or nesting.[168] Though RCWs were once found throughout the greater Southeast, from New Jersey to Florida and west to Texas, historical logging operations resulted in the loss of nearly 90 million acres of longleaf pine.[169] Because the species uniquely depends upon mature pine forest—trees that are at least 60–80 years old—as few as 7,800 active clusters exist today across the species' range, down from a historical, pre-European settlement estimate of 1–1.6 million family groups.[170]

The TNT Site is within the occupied range of the red-cockaded woodpecker (see Figure 21, below). There have been recent observations of the red-cockaded woodpecker not far (5–10 miles away) from the TNT Site.[171] As displayed below (Figures 22–25), the TNT Site is surrounded by observations to the northeast, southeast, southwest, and northwest.

<u>Figure 21</u>: FWS Map of the Red-cockaded Woodpecker's Occupied Range (TNT Site Denoted by Airplane Symbol)[172]



[166] U.S. Fish & Wildlife Serv., Red-cockaded woodpecker, https://www.fws.gov/species/red-cockaded-woodpecker-dryobates-borealis (last visited July 10, 2025).
[167] *Id.*
[168] *Id.*
[169] Mark Davis, *Georgia landowner Charley Tarver committed to helping the endangered red-cockaded woodpecker*, U.S. Fish & Wildlife Serv. (Jan. 29, 2018) https://www.fws.gov/story/2018-01/safe-harbor-woodpeckers.
[170] U.S. Fish and Wildlife Service. 2018. Draft Species Status Assessment Report for the Red-Cockaded Woodpecker (Picoides borealis). Version 1.1, at 1, 5.
[171] Red-cockaded Woodpecker (*Dryobates borealis*), iNaturalist, https://www.inaturalist.org/taxa/792993-Dryobates-borealis (last visited July 8, 2025).
[172] U.S. Fish and Wildlife Serv. Undated. Red-cockaded woodpecker (*Picoides borealis*) https://www.fws.gov/species/red-cockaded-woodpecker-dryobates-borealis/map (last visited July 8, 2025).

<span style="color:red">Exhibit 1</span>

Figure 22: Map of Red-cockaded Woodpecker Observations on iNaturalist Around the TNT Site



For example, there is a 2023 observation of a nesting cavity logged roughly 5 miles from the TNT Site (See Figure 23, below).[173] There are also recent observations northwest[174] and southwest[175] of the TNT Site (see Figures 24 & 25, below).

Figure 23: Record of Red-cockaded Woodpecker Sighting Southeast of the TNT Site



---

[173] avid275, Red-Cockaded Woodpecker (*Dryobates borealis*), iNaturalist, https://www.inaturalist.org/observations/150028509 (last visited July 5, 2025).
[174] kacey_aralia, Red-Cockaded Woodpecker (*Dryobates borealis*), iNaturalist, https://www.inaturalist.org/observations/260827541 (last visited July 5, 2025).
[175] rmangione, Red-Cockaded Woodpecker (*Dryobates borealis*), iNaturalist, https://www.inaturalist.org/observations/19020485 (last visited July 5, 2025).

Exhibit 1

<u>Figure 24</u>: Record of Red-cockaded Woodpecker Sighting Northwest of the TNT Site



<u>Figure 25</u>: Record of Red-cockaded Woodpecker Sighting Southwest of the TNT Site



Federal Actions at the TNT Site will undoubtedly have impacts within the action area and may affect the red-cockaded woodpecker through sound, light, air, and water pollution, and other disruptions associated with human activity. The installation of heavy machinery and the erection of facilities, road paving, and night-time lighting may affect the nesting and foraging patterns of woodpeckers in the action area.

***Wood stork***

FWS listed the wood stork (*Mycteria americana*) as an endangered species in 1984, and it is the only species of stork "regularly occurring in the United States."[176] In 2014, the Service

---

[176] U.S. Fish & Wildlife Serv., *Wood Stork Recovery Plan: Revised Recovery Plan for the U.S. Breeding Population of the Wood Stork*, http://ecos.fws.gov/docs/recovery_plan/970127.pdf, at 1 (Jan. 27, 1997) [hereinafter *Wood Stork Recovery Plan*].

Exhibit 1

downlisted the species to "threatened," largely due to successful recovery efforts in Georgia.[177] The species was recently proposed for delisting, despite precipitous declines in south Florida.[178]

Although wood storks have seen some improvements in their numbers overall, the species is still in decline in south Florida, as evidenced by its numbers in Corkscrew Swamp, which until recently was considered the most productive colony in the nation. Wood storks are found primarily in Florida, Georgia, and parts of South Carolina; however, there have been occasional sightings in North Carolina and as far west as Mississippi.[179] It is suspected that the species migrates and spends its winters in south Florida, as there is an influx of storks during winter months.[180] Historically, the central and northern Everglades are among the areas where this population surge is most evident. Some years, the Everglades system has been documented to support approximately 55% of the entire U.S. population of the species.[181] Unfortunately, south Florida colonies have been plagued with multi-year nest failures in recent years.

In Southwest Florida, Lauritsen (2010) examined the importance of seasonal, short-hydroperiod wetlands to foraging federally threatened wood storks, which supply most of the food energy for initiating reproduction and suggested that the loss of these wetlands are not being appropriately mitigated for under State wetlands permitting law. The impacts of the loss of these wetlands may result in no nesting or abandonment of nesting attempts by wood storks at sites such as Corkscrew Swamp Sanctuary.

Both freshwater and estuarine wetland ecosystems may serve as suitable wood stork habitat.[182] Storks tend to nest in a variety of different trees depending on what is available within the habitat, including: cypress, black gum, southern willow, red mangroves, prickly pear cactus, Brazilian pepper, and Australian pine.[183] Wood storks require nesting sites located in standing water throughout the nesting season to protect the nest from predators.[184]

For foraging, it is critical that the storks have access to shallow, open water.[185] The species forages using tactilocation, a process where it wades through the water with its beak submerged and clamps down on prey, usually small fish, when they come in contact with its beak.[186] Storks require shallow waters to wade in and fairly dense stocks of fish to support a colony's feeding habits.[187] Storks' needs are somewhat less specific when it comes to roosting trees; although they look for similar sites as those used for nesting, they will roost in a greater variety of trees depending on the availability of food.[188]

---

[177] 79 Fed. Reg. 37078 (June 30, 2014).
[178] 88 Fed. Reg. 9,830 (Feb. 15, 2023).
[179] *Wood Stork Recovery Plan* at 2.
[180] *Id.*
[181] *Id.*
[182] *Id.* at 3.
[183] *Id.*
[184] *Id.*
[185] *Id.* at 4.
[186] *Id.*
[187] *Id.*
[188] *Id.*

Exhibit 1

The greatest threats to the wood stork's existence are the loss of adequate habitat for feeding, changes in water levels and hydrology (habitat modification), lack of nesting habitat, "human disturbance," and loss resulting from the adverse effects of pesticide and chemical contamination.[189] As wetlands are drained and filled—primarily for development and agriculture—the stork's habitat is irreversibly destroyed. Because of the stork's specific foraging and nesting needs, changes in hydrology resulting from developmental impacts, both direct and indirect, can have a major effect on the species' ability to survive in a given area.

The TNT Site is within wood stork core foraging areas for active nesting colonies, as illustrated below (see Figures 26 & 27, below). Human disturbances including light, noise, and vibrations may affect wood storks using the area. Furthermore, impacts to hydrology from altered use of the site could impact water levels in waters used by wood storks for foraging. Pollution running off the site could also injure or kill wood storks or prevent them from using foraging habitat in the area. For these reasons, the Federal Actions at the TNT Site may affect the wood stork.

<u>Figure 26</u>: Florida Department of Environmental Protection Mapping of Wood Stork Core Foraging Areas[190]



---

189 *Id.* at 10–12.
190 https://geodata.dep.state.fl.us/datasets/FDEP::florida-wood-stork-foraging-areas/explore?location=25.964095%2C-80.810364%2C7.71

Notice of Violations of Federal Environmental Law: Everglades Mass Detention Center
Page 40

<span style="color:red">Exhibit 1</span>

Figure 27: Map Depicting Wood Stork Core Foraging Areas in Relation to the TNT Site[191]



### Eastern Indigo Snake

FWS listed the eastern indigo snake (*Drymarchon couperi*) as threatened under the ESA in 1978 due to threats from habitat modification, collection for the pet trade, and gassing of gopher tortoise burrows where the snake takes shelter.[192] The eastern indigo snake's habitat consists of a wide range of upland and lowland habitats, and the most important factors limiting habitat suitability are their quantity and quality (i.e., low fragmentation, road density and urban land cover).[193] Since listing, the snake's range has continuously contracted—particularly in the Florida panhandle because of declines in gopher tortoise populations and in the Florida peninsula because of habitat loss and degradation.[194] In addition to habitat loss, degradation, and fragmentation, direct mortality by people and their domestic pets and from vehicle strikes on roads is an increasing risk.[195]

---

[191] Curt Bradley, Center for Biological Diversity. Figure based on maps of the TNT site from public records and wood stork core foraging areas from Florida Department of Environmental Protection.
[192] U.S. Fish & Wildlife Serv., Recovery Plan for the Eastern Indigo Snake, First Revision 3 (Sept. 26, 2019), available at
https://ecos.fws.gov/docs/recovery_plan/Eastern%20Indigo%20Snake%20Recovery%20Plan%20Revision.pdf
[hereinafter USFWS 2019].
[193] *Id.* at 3–4.
[194] *Id.* at 3.
[195] *Id.*

Exhibit 1

Despite their cryptic nature, which makes them more difficult to observe and survey, eastern indigo snakes have been observed in Big Cypress National Preserve.[196] Construction and operation of the mass immigration detention facility may affect and indeed is likely to affect the eastern indigo snake by precluding use of the site and fragmenting otherwise extensive habitat for the species.

In particular, increased traffic risks killing eastern indigo snakes on roads. Herpetologists have long recognized the "irreparable landscape alteration from the nation's transportation infrastructure,"[197] and studied the physical and behavioral traits of reptiles and amphibians that make them particularly susceptible to road mortality.[198] The eastern indigo snake's physical characteristics and behavior patterns make it highly susceptible to road mortality.[199] Because eastern indigo snakes are long-lived, have large home ranges, and are large-bodied, they are more likely to succumb to vehicle collisions, and this threat may result in such a significant loss of individuals that it threatens the sustainability of impacted populations.[200] Their natural behaviors also make them more susceptible to road mortality.[201] For instance, the eastern indigo snake is a wide-ranging species that travels as far as 224 hectares, which means this snake is much more likely to encounter roads and the associated risks of direct mortality.[202] Snake species that move frequently over long distances have been observed to experience higher mortality than more sedentary species.[203] The eastern indigo snake's natural behaviors also put it at additional risk for road mortality once it reaches a roadway. While some species of snake avoid crossing roads, larger snakes like the eastern indigo are less likely to exhibit this avoidance behavior, which places them directly in the path of traffic.[204] This readiness to cross may only be exacerbated during mating season, when the willingness of reproductive snakes to cross roads reduces the barrier effect of the roads but also increases the chance of mortality for these classes of snake.[205] Once on the road, the eastern indigo snake's mode of movement, speed, and defensive behaviors make it less likely it will successfully cross without being subject to a vehicle collision.[206] Furthermore, thick-bodied snakes like eastern indigo snakes are more likely

---

[196] Steiner, T.M., O.L. Bass, Jr., and J.A. Kushlan. 1983. Status of the eastern indigo snake in southern Florida National Parks and vicinity. South Florida Research Center Report SFRC-83/01, Everglades National Park; Homestead, Florida, available at https://www.npshistory.com/publications/ever/sfrnc/sfrc-83-01.pdf, at 5, 7–8, 10–11.

[197] Andrews, K.M. and J.W. Gibbons. 2005. How Do Highways Influence Snake Movement? Behavioral Responses to Roads and Vehicles. Copeia 2005(4): 772–782.

[198] Andrews, K. M., J. W. Gibbons, and D. M. Jochimsen. 2006. Literature Synthesis of the Effects of Roads and Vehicles on Amphibians and Reptiles. Federal Highway Administration (FHWA), U.S. Department of Transportation, Report No. FHWA-HEP-08-005. Washington, D.C. 151 pp.

[199] Andrews, K.M., J.W. Gibbons and D.M. Jochimsen. 2008. Ecological effects of roads on amphibians and reptiles: a literature review. In *Urban herpetology. Herpetological Conservation*. Vol. 3. Jung, R.E. & Mitchell, J.C. (Eds). Salt Lake City, UT: Society for the Study of Amphibians and Reptiles.

[200] *Id.*; Row, J.R., G. Blouin-Demers, and P.J. Weatherhead. 2007. Demographic effects of road mortality in black ratsnakes (*Elaphe obsoleta*). Biological Conservation 137:117–124.

[201] Andrews et al. 2006.

[202] U.S. Fish & Wildlife Service. 1999. Multi-Species Recovery Plan for South Florida: Eastern Indigo Snake *Drymarchon corais couperi* 4-567; Andrews et al. 2006.

[203] Andrews et al. 2008.

[204] Andrews and Gibbons 2005.

[205] Row et al. 2007; Andrews et al. 2006.

[206] Andrews et al. 2006.

Exhibit 1

to cross roads at a slower rate of speed, subjecting them to a higher risk of road mortality when they cannot cross quickly enough to avoid collision.[207]

Activities associated with construction and operation of the mass detention center may also injure or kill indigo snakes either inadvertently or as a result of human persecution. Because snakes are a maligned group of animals, humans are more likely to intentionally kill them when they are easily visible on a roadway or cement pad.[208]

### Monarch Butterfly

FWS proposed listing the monarch butterfly (*Danaus Plexippus*) as a threatened species on December 12, 2024.[209] FWS determined that the monarch butterfly is threatened by ongoing impacts from loss and degradation of breeding, migratory, and overwintering habitat, exposure to insecticides, and effects of climate change.[210] Monarch butterflies are extant in Big Cypress,[211] and larval host plants like fewflower milkweed are found within the preserve.[212] Spraying of pesticides and insecticides, contamination risk from spills, and paving and other development activities on the property may affect and are likely negatively affecting the monarch butterfly.

### Federally Listed Plants

FWS listed Everglades bully (*Sideroxylon reclinatum austrofloridense*) as threatened, the Florida pineland crabgrass (*Digitaria pauciflora*) as threatened and the Florida prairie-clover (*Dalea carthagenensis floridana*) as endangered in 2017.[213] FWS listed Garber's spurge (*Chamaesyce garberi*) as threatened in 1985.[214] The construction and operation of the mass detention center at the TNT Site may affect and indeed are likely to affect the following plants because of their known distributions and proposed critical habitats: threatened Everglades bully, threatened Florida pineland crabgrass, endangered Florida prairie-clover, and threatened Garber's spurge.

There are no publicly available surveys associated with the current activities at the TNT Site; however, TNT Site overlaps with proposed critical habitat for endangered Florida prairie-

---

[207] Andrews & Gibbons 2005.

[208] U.S. Fish & Wildlife Service. 1999. Multiple Species Recovery Plan for South Florida: Eastern Indigo Snake *Drymarchon corais couperi* 4-567; Andrews, K. M., J. W. Gibbons, and D. M. Jochimsen. 2006. Literature Synthesis of the Effects of Roads and Vehicles on Amphibians and Reptiles. Federal Highway Administration (FHWA), U.S. Department of Transportation, Report No. FHWA-HEP-08-005. Washington, D.C. 151 pp. Snake researchers in Louisiana have reported that 30% of drivers will change lanes to intentionally kill a snake and 10% will back over the snake again to ensure it is dead. Schlierf, R., R. Hight, S. Payne, J. Shaffer, B. Missimer, and C.G. Willis. Undated. Kennedy Space Center (KSC) Launch Pad Avian Abatement Efforts Including Related KSC Road Kill Reduction Effort. 22 pp.

[209] 89 Fed. Reg. 100662 (Dec. 12, 2024).

[210] *Id.*

[211] Nat'l Park Serv. 2010. Big Cypress Butterflies, available at https://npshistory.com/publications/bicy/brochures/butterflies-2010.pdf.

[212] *See* Florida Wildflower Foundation, Fewflower milkweed, https://www.flawildflowers.org/flower-friday-asclepias-lanceolata/ (last visited July 8, 2025); Kim O'Connell, A Watery Feast at Big Cypress National Preserve, NATIONAL PARKS TRAVELER, https://www.nationalparkstraveler.org/2020/05/watery-feast-big-cypress-national-preserve (last visited July 8, 2025).

[213] 82 Fed. Reg. 46691 (Oct. 6, 2017).

[214] 50 Fed. Reg. 29345, 29349 (July 18, 1985).

Exhibit 1

clover,[215] threatened Florida pineland crabgrass,[216] and threatened Everglades bully[217] (see Figure 13, above). Because this habitat is essential to the conservation—that is, the survival and recovery—of these plants, human impacts on these areas may affect and indeed are likely to affect the plants.

**The Federal Agencies' Actions Facilitating the Mass Detention Center**

Several federal agencies have undertaken federal agency action in furtherance of constructing and operating the mass immigration detention center at the TNT Site.[218] The construction and operation of an immigration detention center at the TNT Site is inherently a federal agency action attributed to DHS and ICE, who are working in concert with the State of Florida to undertake the action.[219] According to federal officials, FEMA is funding, has agreed to fund, or will imminently fund activities undertaken to construct and operate the mass detention center at the TNT Site (see, e.g., Figure 28).

Figure 28: Instagram Post from Secretary Noem Stating, "Alligator Alcatraz will be funded largely by FEMA's Shelter and Service's Program"[220]



---

[215] 87 Fed. Reg. 62564, 62597 (Oct. 14, 2022) (map of proposed critical habitat for Florida prairie clover).
[216] 87 Fed. Reg. 62564, 62602-03 (Oct. 14, 2022) (map of proposed critical habitat for Florida pineland crabgrass).
[217] 87 Fed. Reg. 62564, 62605, 62607 (Oct. 14, 2022) (map of proposed critical habitat for Everglades bully).
[218] Syra Ortiz Blanes and Alex Harris, *Feds move in court to distance Trump administration from Alligator Alcatraz*, Miami Herald (July 3, 2025), https://www.miamiherald.com/news/local/immigration/article309936010.html.
[219] *See also* Fox35 Orlando, 'Alligator Alcatraz': Florida Gov. DeSantis speaks on immigration project, FOX35 ORLANDO, https://www.youtube.com/watch?v=gJfG7L9reHU (June 25, 2025) (describing federal partnership); CBS Miami Team, Everglades "Alligator Alcatraz" immigrant detention center to receive first arrivals, CBS News (July 2, 2025), https://www.cbsnews.com/miami/news/first-group-of-immigrants-set-to-arrive-at-alligator-alcatraz-immigrant-detention-center-in-everglades/ (timing of detainee arrivals at the detention facility will be determined by the U.S. Department of Homeland Security and U.S. Immigration and Customs Enforcement).
[220] *See, e.g.*, Homeland Security Secretary Kristi Noem (@sec_noem), Instagram, *Alligator Alcatraz* (July 1, 2025), https://www.instagram.com/p/DLlexFmvnaC/; Camilo Montoya-Galvez, *Florida to receive federal funds to build immigration detention sites, including "Alligator Alcatraz," Noem says*, CBS News (June 24, 2025), https://www.cbsnews.com/news/alligator-alcatraz-florida-immigration-detention-centers-dhs-secretary-noem/.

Exhibit 1

DOI and NPS are responsible for managing Big Cypress National Preserve consistent with the National Park Service Organic Act's non-impairment mandate but have failed to do so by apparently acquiescing to DHS's and ICE's construction and operation of the mass detention center on the TNT Site located in the middle of the Preserve.

## VIOLATIONS OF FEDERAL ENVIRONMENTAL LAW

### Endangered Species Act Violations

As required by the ESA,[221] this letter provides notice of violations of the ESA that have occurred, and continue to occur, at the TNT Site. The Federal Agencies are hereby placed on formal notice that, after the expiration of sixty (60) days from the date of this notice letter, Friends of the Everglades and the Center intend to file suit in federal court against the agencies under sections 7 and 9 of the ESA for violations of the ESA described below.

Based on our review of publicly available information, the Federal Agencies have failed to initiate and complete formal consultation over their respective agency actions associated with the construction and operation of the mass immigration detention center in the middle of Big Cypress National Preserve, which may affect—and is indeed likely to adversely affect—species listed under the ESA.[222]

These actions have resulted in several violations of ESA section 7. First, the Federal Agencies are committing a procedural violation of ESA section 7(a)(2) by failing to complete consultation before federal action is undertaken.[223] Second, Federal Agencies are committing a substantive violation of ESA section 7(a)(2) because, by failing to complete consultation before embarking on the action, they have failed to ensure the action will not jeopardize the continued existence of species or adversely modify critical habitat.[224]

Third, by undertaking their respective federal agency actions described above at the TNT Site *before* completing consultation and adopting reasonable and prudent measures, Federal Agencies made an "irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures" or alternatives in violation of ESA section 7(d).[225] Section 7(d) is meant to preserve the status quo during consultation,[226] and the Federal Agencies failed to do this when they proceeded with the construction and operation of the mass immigration detention center without first determining and incorporating essential measures and alternatives to prevent

---

[221] 16 U.S.C. § 1540(g).

[222] *See* 16 U.S.C. § 1536(a)(2).

[223] *Id.*

[224] *Id.*

[225] *Id.* § 1536(d); *see Pac. Coast Fed'n of Fishermen's Ass'n v. Gutierrez*, 606 F. Supp. 2d 1122, 1192 (E.D. Cal. 2008) (citing parties' concession "that it would be inappropriate for the Bureau [of Reclamation] to enter into any long-term water delivery contracts until" reinitiated consultation was completed and a biological opinion was issued).

[226] *Conner*, 848 F.2d at 1455 n.34; *Defs. of Wildlife v. Bureau of Ocean Energy Mgmt*, 871 F. Supp. 2d 1312, 1327 (S.D. Ala. 2012) (citing *Conner*).

Exhibit 1

jeopardizing listed species. In short, the Federal Agencies have "commit[ted] resources in a way that ties[their] hands for future actions."[227]

Fourth, in taking actions to further the construction and operation of the mass immigration detention site at the TNT Site, Federal Agencies have also violated ESA section 7(a)(1) for failing to use their authorities in furtherance of the ESA.[228]

The failure to initiate and complete consultation means there is no valid take coverage, jeopardy determination, or adverse modification determination for the federal agency actions associated with the construction and operation of the mass detention center development. Consequently, as construction and operation activities continue at the site absent either an incidental take statement or incidental take permit and cause take of listed species, the Federal Agencies and state agencies, organizations, businesses, and/or individuals engaging in these activities are violating ESA section 9. [229] The only way take can be authorized consistent with the ESA is through an ESA section 10 habitat conservation plan and incidental take permit or an ESA section 7 biological opinion with an incidental take statement.[230]

To remedy the ESA violations, the federal agencies must immediately halt activities at the site and initiate and complete formal consultation *before* carrying out any further action.

**Clean Water Act Violations**

As required by the CWA,[231] this letter provides notice of violations of the CWA that have occurred, and continue to occur, at the TNT Site. DHS, ICE, and FDEM are hereby placed on formal notice that, after the expiration of sixty (60) days from the date of this letter, Friends of the Everglades and the Center intend to file suit in federal court against the agencies under section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the CWA as stated below.

It appears based on aerial photos of the site and hundreds of dump trucks full of dirt and asphalt that the footprint of the TNT facility is being expanded, filled, and paved in areas that are historically wetlands. These wetlands appear to have a continuous surface flow and connection with navigable waters of the United States within Big Cypress National Preserve. The placement of dredge and fill material within these waters without a permit from the U.S. Army Corps of Engineers constitutes a violation of 33 U.S.C. § 1311(a).

---

[227] *Pac. Coast Fed'n of Fishermen's Ass'n v. Gutierrez*, 606 F. Supp. 2d 1122, 1192 (E.D. Cal. 2008).

[228] 16 U.S.C. § 1536(a)(1); *Ctr. for Biological Diversity*, 861 F.3d at 188 n. 10; *Conner*, 848 F.2d at 1455 n.34.

[229] *See Strahan v. Coxe*, 127 F.3d 155, 158 (1st Cir. Mass. 1997) (explaining that the ESA "not only prohibits the acts of those parties that directly exact the taking, but also bans those acts of a third party that bring about the acts exacting a taking"); *Sierra Club v. Yeutter*, 926 F.2d 429, 438-39 (5th Cir. 1991) (finding Forest Service's management of timber stands was a taking of the red-cockaded woodpecker in violation of the ESA); *Loggerhead Turtle v. County Council of Volusia County*, 896 F. Supp. 1170, 1180-81 (M.D. Fla. 1995) (holding that county's authorization of vehicular beach access during turtle mating season exacted a taking of the turtles in violation of the ESA).

[230] 16 U.S.C. §§ 1536 (b)(4)(C)(i), 1539(a)(1)(B).

[231] 33 U.S.C. § 1365(b).

Exhibit 1

Moreover, it does not appear that despite modifications being made to the existing footprint of the TNT facility, that DHS, ICE, and FDEM have ever applied for an environmental resource permit from the Florida Department of Environmental Protection or South Florida Water Management District. Such permits are required whenever alterations are being made to stormwater management systems,[232] and are water quality certifications that serve as a condition precedent for receiving a dredge and fill permit from the Corps.[233]

Florida Administrative Code Rule 62-330.020(2) states that unless the activity qualifies for a narrow set of exceptions (not applicable here) "a permit is required prior to the construction, alteration, operation, maintenance, removal, or abandonment of any project that, by itself or in combination with an activity conducted after October 1, 2013, cumulatively results in any of the following:

(a) Any project in, on, or over wetlands or other surface waters;

(b) A total of more than 4,000 square feet of impervious and semi-impervious surface areas subject to vehicular traffic;

(c) A total of more than 9,000 square feet of impervious and semi-impervious surface area;

(d) A total project area of more than five acres;

(e) A capability of impounding more than 40 acre-feet of water;

(f) Any dam having a height of more than 10 feet, as measured from the lowest elevation of the downstream toe to the dam crest;

(g) Any project that is part of a larger common plan of development or sale;

(h) Any dry storage facility storing 10 or more vessels that is functionally associated with a boat launching area;

(i) Any project exceeding the thresholds in section 1.2 (District-specific thresholds) of the applicable Volume II, or

(j) Any modification or alteration of a project previously permitted under Part IV of Chapter 373, F.S.

DHS, ICE, and FDEM have violated and are continuing to violate state law and must obtain a water quality certification in addition to a CWA section 404 permit to assure that discharge of dredge and fill materials would comply with relevant water quality standards.

---

[232] Fla. Stat. §§ 373.413, 373.414.
[233] 33 U.S.C. § 1341(a)(1).

Exhibit 1

DHS, ICE, and FDEM must immediately cease any activities on the site and comply with the process for obtaining a section 404 permit from the Corps.[234] That process, including the requisite review under the National Environmental Policy Act and ESA, must occur before actions are taken. This pre-construction review is essential: while the Corps may grant a permit to discharge fill material into jurisdictional waters, it must first ensure compliance with the procedural and substantive restrictions set forth in the 404(b)(1) Guidelines.[235] The Corps cannot permit any discharges where there is a less-environmentally damaging practicable alternative.[236] Furthermore, the Corps must deny any permit that would result in significant degradation or where the applicant has failed to ensure no net loss of aquatic function.[237] DHS and ICE cannot circumvent this process by unlawfully destroying the jurisdictional waters on the TNT site without first obtaining a section 404 permit.

**National Park Service Organic Act Violations**

As a courtesy, Friends of the Everglades and the Center also notify DOI and NPS of violations of the National Park Service Organic Act. The Secretary of the Interior, acting through the Director of the National Park Service, has taken no action to regulate the use of the Big Cypress National Preserve in such manner and by such means that will leave the Preserve unimpaired by the environmental impacts of the TNT Site and associated operations.

The National Park Service Organic Act of 1916[238] states, "The Secretary, acting through the Director of the National Park Service, shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."

This "non-impairment" mandate was reaffirmed by Congress in the 1978 amendments to the Act. The 1978 Reaffirmation states: "Congress reaffirms, declares, and directs that the promotion and regulation of the various System units shall be consistent with and founded in the purpose by subsection (a), to the common benefit of all the people of the United States.  The authorization of activities shall be construed and the protection, management, and administration of the System units shall be conducted in light of the high public value and integrity of the System and shall not be exercised in derogation of the values and purposes for which the System units have been established, except as directly and specifically provided by Congress."[239]

The Big Cypress National Preserve was established to "assure the preservation, conservation, and protection of the natural, scenic, hydrologic, floral, and faunal, and recreational values of the

---

[234] *See id*. §1344(a).
[235] *See* 40 C.F.R. pt. 230.
[236] *Id.* 230.10(a).
[237] *Id*. 230.10(c),(d).
[238] 16 U.S.C. § 1, amended and recodified in 54 U.S.C. § 100101(a) (2014).
[239] 54 U.S.C. § 100101(b).

Exhibit 1

Big Cypress Watershed in the State of Florida and to provide for the enhancement and public enjoyment thereof."[240]

As detailed above, the construction and operation of a mass immigration detention facility at the TNT Site will use and impair the Big Cypress National Preserve by causing direct and indirect harm to its wetlands, wildlife, and air and water quality. These impacts include but are not limited to increased lighting, noise, vehicle traffic, and disturbance. These activities will result in the degradation of the natural, scenic, hydrologic, floral, and faunal, and recreational values for which the Preserve was created.

The Secretary of the Interior and the National Park Service's apparent acquiescence in DHS and ICE constructing and operating the TNT Site in a manner that will result in significant environmental harm to the Preserve, does not comport with the Act's non-impairment mandate, is in derogation of the values and purposes for which the Preserve was established, and is not otherwise directly and specifically allowed by Congress.

Courts have made clear that the Organic Act requires the Secretary to protect national park system units from impacts that would impair these national treasures, even those arising from activities on nonpark lands within the exterior boundaries of a park unit boundaries.[241] As the Secretary of the Interior acknowledged more than 45 years ago, "The Secretary has an absolute duty, which is not to be compromised, to fulfill the mandate of the 1916 [Park Organic] Act to take whatever actions and seek whatever relief as will safeguard the units of the National Park System."[242]

On several occasions, and throughout different presidential administrations, the National Park Service has exercised its authority to protect parklands from threats arising on inholdings.[243] The ability of the NPS to regulate such activities is deeply rooted in the Property Clause of the Constitution.[244]

The Secretary's failure, through the Director of the National Park Service, to take any action to protect the Big Cypress National Preserve from the impacts of the TNT Site constitutes agency action unlawfully withheld. Further, any decisions to otherwise permit such actions to continue to impair the Preserve are "arbitrary and capricious," and "abuse of discretion" or otherwise not in accordance with the law under the APA.[245]

---

[240] Pub. L. No. 93-440(a).

[241] *See Sierra Club v. Department of the Interior*, 424 F. Supp. 172 (N.D. Cal. 1976); *Sierra Club v. Department of the Interior*, 398 F. Supp. 284 (N.D. Cal. 1975); *Sierra Club v. Department of the Interior*, 376 F. Supp. 90 (N.D. Cal. 1974). *See also High Point, LLP v. United States Nat'l Park Serv.,* 2015 U.S. Dist. LEXIS 24132 (S.D. Ga. Feb. 27, 2015)*; United States v. Stefanski,* 2011 U.S. Dist. LEXIS 24361 (D. Alaska, Mar. 9, 2011); *United States v. Stephenson*, 29 F.3d 162 (4th Cir. 1994).

[242] *Sierra Club v. Andrus*, 487 F. Supp. 443, 448 (D.D.C. 1980), aff'd on other grounds, *Sierra Club v. Watt*, 659 F.2d 203 (D.C. Cir. 1981).

[243] *See Free Enterprise Canoe Renters Association v. Watt*, 711 F.2d 852 (8th Cir. 1983), *United States v. Brown*, 552 F.2d 817 (8th Cir. 1977), *United States v. Moore*, 640 F. Supp. 164 (S.D. W. Va. 1986).

[244] *See Kleppe v. New Mexico*, 426 U.S. 529, 538-41 (1976) ("[T]he power granted by the Property Clause is broad enough to reach beyond territorial limits.").

[245] 5 U.S.C. § 706.

Exhibit 1

## **CONCLUSION**

For the foregoing reasons, the Federal Agencies and state agencies are collectively violating the ESA, CWA, and/or National Park Service Organic Act. Furthermore, to the extent any take occurs in connection with the construction and operation of the mass immigration detention facility at the TNT Site, the Federal Agencies and state agencies, organizations, businesses, and/or individuals engaging in these activities are violating ESA section 9. To remedy the ESA violations and curtail other potential or actual associated violations, Federal Agencies must promptly halt activities at the site and initiate and complete formal consultation. To remedy the CWA violations, DHS, ICE, and FDEM must halt activities at the site and obtain a CWA section 404 permit from the Corps. To remedy the National Park Service Organic Act violations, DOI and NPS must take affirmative action to defend preserve resources from degradation and destruction caused by the construction and operation of the mass detention center on the TNT Site. Finally, the Federal Agencies must also fulfill their environmental review obligations to comply with NEPA.

If you have any questions or wish to discuss the matter, please contact us using the information below.

Sincerely,

Elise Pautler Bennett
Florida Director & Senior Attorney
Jason Totoiu
Florida Director of Policy & Senior Attorney
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, Florida 33731
(727) 755-6950
ebennett@biologicaldiversity.org
jtotoiu@biologicaldiversity.org

Tania Galloni
Managing Attorney
Earthjustice
Florida Regional Office
4500 Biscayne Blvd., Ste 201
Miami, FL  33137
(305) 440-5434
tgalloni@earthjustice.org

Cc:

Paul Souza
Acting Director
U.S. Fish and Wildlife Service
1849 C Street, N.W.
Washington, DC 20240
Paul_Souza@fws.gov

Mike Oetker
Regional Director
Southeast Region
U.S. Fish and Wildlife Service
1875 Century Boulevard
Atlanta, GA 30345
Michael_Oetker@fws.gov

Larry Williams
Florida State Supervisor

Col. Brandon L. Bowman
District Commander

Exhibit 1

U.S. Fish and Wildlife Service
1339 20th Street
Vero Beach, FL 32960
larry_williams@fws.gov

Jacksonville District
U.S. Army Corps of Engineers
701 San Marco Blvd
Jacksonville, FL 32207
brandon.l.bowman@usace.army.mil

**Appendices**

**Appendix A** – Oblique Aerial Photos of Ongoing Construction at Dade Collier T&T Airport

**Appendix B** – Brief Analysis of Assertion of Pre-Existing Cement Pad Underlying Newly Asphalted Area at Jetport Site

**Appendix C** – TDF Waste Management Plan Overview

**Appendix D** – Kautz 2025 - Impacts of the Big Cypress Detention Center on the Florida Panther and Its Habitat

**Appendix E** – Curriculum Vitae of Randy Kautz

**Appendix F** – Letter from Robert A. Frakes, Ph.D., to Jason Totoiu, Center for Biological Diversity, Re: opinion on impacts of construction and operation of migrant detention facility on the endangered Florida panther

**Appendix G** – Curriculum Vitae of Robert A. Frakes, Ph.D.

**Appendix H** – Report: Strategic searches for Florida bonneted bat (*Eumops floridanus*) roosts in Big Cypress National Preserve (BCNP) (March 19, 2019)

Exhibit 1