UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:25-cv-22896-KMW

FRIENDS OF THE EVERGLADES, INC., a Florida
not-for-profit corporation, and CENTER FOR
BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit
organization,

   Plaintiffs,

vs.

KRISTI NOEM, in her official capacity as Secretary
of the UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; TODD LYONS, in his
official capacity as Acting Director of the UNITED
STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT; KEVIN GUTHRIE, in his official
capacity as Executive Director of the Florida Division
of Emergency Management; and MIAMI-DADE
COUNTY, a political subdivision of the State of
Florida,

   Defendants.

and

THE MICCOSUKEE TRIBE OF INDIANS,

   Intervenors.

## DECLARATION OF CURT BRADLEY

1.  My name is Curt Bradley, and I make this declaration on personal knowledge.

2.  I am a senior scientist and Geographic Information Systems (GIS) specialist at the

Center for Biological Diversity, where I assist Center matters with GIS analyses and cartography.

I hold a master's in watershed management and a bachelor of science in mechanical engineering

<span style="color:red">Exhibit A</span>

from the University of Arizona. I have training in several GIS software applications and have more than 25 years of experience in GIS analysis and cartography.

3.      I prepared the map attached to this declaration as Exhibit 1. The map depicts the Dade-Collier Training and Transition Airport property (TNT Site) in relation to a map counsel for Defendant Guthrie filed in this case on August 1, 2025, D.E. 79.

4.      To prepare this map, I used ArcGIS Pro version 3.4.4 GIS software from ESRI.

5.      To prepare this map, I created a map layer of the TNT Site boundary by digitizing a map found on page 15 of a report titled "17,339 acres in the BIYC, Collier, and Miami-Dade Counties: A Real Property Appraisal," prepared for the Miami-Dade County Aviation Department on May 25, 2025 (Exhibit 2).  Digitizing is a process of converting geographic features from an image into digital format so that it can be used in a GIS.

6.      I confirmed the TNT Site boundary against a National Park Service Map titled "Big Cypress Wildlife Management Area,"[1] found at https://www.nps.gov/bicy/planyourvisit/upload/-9002373-4_Hunt_map_units.jpg, which depicts the same area and calls it "Jetport Property" (Exhibit 3). I labeled this layer "Dade-Collier Training and Transition Airport." Hereafter, I will call this shape on the map as the "TNT Site."

7.      I then digitized and added a map layer that approximates the map counsel for Defendant Guthrie filed on August 1, 2025, which the defendant characterizes as the "TNT Airport," (D.E. 79). I labeled this layer "Defendant's Exhibit Map (D.E. 79-1)."

8.      I also added a map layer that shows the county boundaries obtained from the National Atlas of the United States.

---

[1] Nat'l Park Serv., Brochures, Maps, Big Cypress Management Units, https://www.nps.gov/bicy/planyourvisit/upload/-9002373-4_Hunt_map_units.jpg (last accessed Aug. 1, 2025).

Exhibit A

9.      According to my map, approximately 27.9% of the TNT Site is in Miami-Dade County

10.      A true and correct copy of this map is attached as Exhibit 1 to this declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 1, 2025.

Curt Bradley

Exhibit A

**Exhibit 1**



Exhibit 2

# 17,339 Acres in the BIYC, Collier and Miami-Dade Counties

## A Real Property Appraisal





URBAN
ECONOMICS INC.

TRANSFORMING COMPLEXITY INTO CLARITY

Exhibit A

APPRAISAL OF

17,339 ACRES IN THE BIG CYPRESS NATIONAL PRESERVE,
COLLIER AND MIAMI-DADE COUNTIES, FLORIDA

Prepared By

Michael McElveen, MAI, CRE
State Certified General Real Estate Appraiser RZ360
Urban Economics, Inc.

Prepared For

Basil Binns, ll
Miami-Dade County Aviation Department
P.O. Box 025504
Miami, FL 33102

Effective Date Value May 2, 2025

Date of Report May 25, 2025

Exhibit A



Urban Economics
813.289.8844
info@urbaneconomics.com
URBANECONOMICS.COM

May 25, 2025

Basil Binns, ll
Miami-Dade County Aviation Department
P.O. Box 025504
Miami, FL 33102

Re: 17,339 Acres in the Big Cypress National Preserve, Collier and Miami-Dade Counties, Florida.

Dear Mr. Binns:

As requested, I made a detailed investigation, analysis and appraisal of the market value of fee simple estate in 7,389 acres and the market value of the surface estate in 9,950 acres which together is the 17,339 acre non-airfield portion of the Dade-Collier Training and Transition Airport.

The purpose of the appraisal is to develop an opinion of market value as of the effective date, May 2, 2025, which is the date of my most recent inspection of the referenced property.

It was not necessary to use either a hypothetical condition or extraordinary assumption to produce a credible opinion of market value.

The attached appraisal report complies with the reporting requirements of Standards Rule 2-2(a) of the *Uniform Standards of Professional Appraisal Practice*, Effective January 1, 2024.

My opinions and conclusions are based on the scope of work described in the report and the expressed definitions, assumptions, limiting conditions, and certifications. Supporting documentation concerning the data, reasoning and my analysis of the data has been retained in my workfile. The depth of discussion contained in the report is specific to the needs of my client and to the intended use of the opinions as stated in the report.

*Exhibit A*

Page 2
Mr. Binns
May 25, 2025


Based on my analysis, my opinion of the market value of the subject property, as set forth, documented, and qualified in the attached report under conditions prevailing on May 2, 2025, was:

THIRTY-FIVE MILLION, TWO HUNDRED SIXTY-EIGHT THOUSAND DOLLARS,
($35,268,000)


Respectively;


Michael A. McElveen, MAI, CRE
State-Certified General Real Estate Appraiser RZ360

Table of Contents

Letter of Transmittal......................................................................................................... -

Appraiser's Certification.................................................................................................... -

Identification of the Appraisal Problem........................................................................1

Scope of Work.................................................................................................................6

Type and Extent of Data Researched ..........................................................................7

    Market Area.................................................................................................................7

Legal Description..........................................................................................................8

Three Year History of Sales, Options and Listing....................................................10

Market Area Location, Description and Trend..........................................................10

Land Description ........................................................................................................ 14

    Physical Characteristics..........................................................................................14

    Legal Characteristics..............................................................................................21

Highest and Best Use as if Vacant........................................................................... 22

Valuation Methodology..............................................................................................24

Sales Comparison Approach ..................................................................................... 25

    Qualitative Analysis............................................................................................... 28

Exposure Time...........................................................................................................33

Assumptions and Limiting Conditions......................................................................-

Michael A. McElveen, MAI, CRE, Curriculum Vitae..............................................-

ADDENDA.....................................................................................................................-

Exhibit A

Appraiser's Certification

I certify that, to the best of my knowledge and belief:

The statements of fact contained in this report are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

- I have not performed an appraisal or other real estate services regarding the property that is the subject of the attached report.

- I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- My engagement in this assignment was not contingent upon developing or reporting predetermined results.

- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice, effective January 1, 2024.

- I made a personal inspection of the property that is the subject of this report on May 2, 2025.

- No one provided significant real property appraisal assistance to the person signing this certification.

- The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

Exhibit A

- As of the date of this report, Michael A. McElveen, MAI, CRE has completed the continuing education program of the Appraisal Institute.

Michael A. McElveen, MAI, CRE
State-Certified General Real Estate Appraiser RZ360

Exhibit A

Identification of the Appraisal Problem

Client

The client of this appraisal assignment and the opinions in this report is the Miami-Dade County Aviation Department, 4200 NW 36th St, Miami, FL 33166.

Intended User

The Intended User of this appraisal assignment and the opinions include the client, Miami-Dade County Aviation Department (MDAD), the Federal Aviation Administration (FAA) and Slack, Johnson & Magenheimer, Inc, as the contracting agent.

Intended Use

The intended use of the opinions in this appraisal report, identified in conversations with my client, is to establish value for planning purposes.

Type of Value

Based on the Service Order I estimated market value which is defined as: "The most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress."[1]

Real Property Rights Appraised

Based on the Service Order from my client, this appraisal is of a total 17,339 acres. This includes a fee simple estate of 7,389 acres and a surface estate of 9,950 acres. Miami-Dade County (MDC) owns mineral rights in this land as follows:

- MDC has an undivided 25% mineral interest in 8,361 acres.
- MDC has no mineral interest (0%) in 1,589 acres.

Within the total acreage, 2,862 acres are in a Tier 3 prospect for oil and gas. MDC's mineral interests within this Tier 3 prospect area are:

- 25% undivided mineral interest in 299 acres.
- 100% mineral interest in 1,272 acres.
- 0% mineral interest in 1,291 acres.

[1] Appraisal Institute. (2022). market value. *The Dictionary of Real Estate Appraisal* (7th ed., p. 118). Appraisal Institute.

Exhibit A

2

An undivided interest in real property is "fractional ownership without physical division. Co-owners share the property rights owned."[2] Fractional ownership can affect marketability and reduce the value buyers are willing to pay, particularly when the ownership stake is 50% or less. In Florida a majority ownership or effective control (over 50%) is required to apply for a drilling permit.

The table below summarizes the distribution of MDC's fee simple ownership, surface estate ownership, and mineral rights (oil, gas, and minerals). Following the table is a map showing the Public Land Survey System (PLSS) sections categorized by MDC's percentage ownership of oil, gas, and mineral rights.

---

[2] Appraisal Institute. (n.d.-i). undivided interest. *The Dictionary of Real Estate Appraisal* (p. 196).

Exhibit A

Table 1

### Undivided Mineral Estate Ownership

| | | | | | MDC Ownership | OGM Ownership | | |
|---|---|---|---|---|---|---|---|---|
| TWS | RNG | SEC | Acres | Surface Estate | MDC | CLCC | SPK | MDC Prospect Acres |
| 52S | 34E | 21 | 649 | MDC | 25% | 50% | 25% | 57 |
| 52S | 34E | 22 | 646 | MDC | 25% | 50% | 25% | 3 |
| 52S | 34E | 23 | 644 | MDC | 25% | 50% | 25% | 0 |
| 52S | 34E | 24 | 641 | MDC | 25% | 50% | 25% | 0 |
| 52S | 34E | 25 | 639 | MDC | 25% | 50% | 25% | 0 |
| 52S | 34E | 26 | 642 | MDC | 25% | 50% | 25% | 0 |
| 52S | 34E | 27 | 645 | MDC | 25% | 50% | 25% | 0 |
| 52S | 34E | 28 | 646 | MDC | 25% | 50% | 25% | 0 |
| 52S | 34E | 29 | 324 | MDC | 25% | 50% | 25% | 0 |
| 52S | 34E | 32 | 323 | MDC | 25% | 50% | 25% | 0 |
| 52S | 34E | 33 | 643 | MDC | 25% | 50% | 25% | 88 |
| 52S | 34E | 34 | 642 | MDC | 25% | 50% | 25% | 148 |
| 52S | 34E | 35 | 640 | MDC | 25% | 50% | 25% | 3 |
| 52S | 34E | 36 | 637 | MDC | 25% | 50% | 25% | 0 |
| 53S | 34E | 2 | 635 | MDC | 0% | 100% | 0% | 0 |
| 53S | 34E | 4 | 632 | MDC | 0% | 100% | 0% | 0 |
| 53S | 34E | 8 | 322 | MDC | 0% | 100% | 0% | 0 |
| Total Acres | | | 9,950 | | 8,361 | | | 299 |

### Fee Simple Ownership

| | | | | | MDC Ownership | OGM Ownership | | |
|---|---|---|---|---|---|---|---|---|
| TWS | RNG | SEC | Acres | Surface Estate | MDC | CLCC | SPK | MDC Prospect Acres |
| 53S | 34E | 1 | 640 | MDC | 100% | 0% | 0% | 3 |
| 53S | 34E | 3 | 630 | MDC | 100% | 0% | 0% | 630 |
| 53S | 34E | 5 | 319 | MDC | 100% | 0% | 0% | 0 |
| 52S | 35E | 19 | 636 | MDC | 100% | 0% | 0% | 0 |
| 52S | 35E | 20 | 160 | MDC | 100% | 0% | 0% | 0 |
| 52S | 35E | 29 | 637 | MDC | 100% | 0% | 0% | 0 |
| 52S | 35E | 30 | 632 | MDC | 100% | 0% | 0% | 0 |
| 52S | 35E | 31 | 628 | MDC | 100% | 0% | 0% | 0 |
| 52S | 35E | 32 | 635 | MDC | 100% | 0% | 0% | 0 |
| 53S | 35E | 5 | 642 | MDC | 100% | 0% | 0% | 0 |
| 53S | 35E | 6 | 637 | MDC | 100% | 0% | 0% | 0 |
| 53S | 35E | 8 | 556 | MDC | 100% | 0% | 0% | 2 |
| 53S | 35E | 17 | 637 | MDC | 100% | 0% | 0% | 637 |
| Total Acres | | | 7,389 | | | | | 1,272 |

Exhibit A

Figure 1



Mineral Estate Ownership Distribution

Exhibit A

Following are the definitions of fee simple estate and surface estate that is to be appraised.

Fee simple estate is "Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power and escheat."[3]

Surface estate is "The surface estate encompasses all rights to the land not expressly reserved as part of the mineral estate and is servient to the mineral estate. This means the surface owner must accommodate reasonable use of the land for mineral development."[4]

Mineral rights are "the rights to the use and profits of the underground portion of a designated property; usually refers to the right to extract coal, minerals, oil, gas, or other hydrocarbon substances as designated in the grant."[5] The mineral estate has dominance over the surface estate and the mineral owner or lessee is permitted to use the surface as reasonably necessary to explore for and produce the oil, gas and minerals.

Real Property is "An interest or interests in real estate."[6]

Effective Date of the Opinions of Market Value

The market value estimate is as of May 2, 2025, which is the date of my most recent inspection of the subject property.

Date of Report

The date of this report is May 25, 2025.

Competency

I have significant geographic competency, having appraised the fee simple estate, dominant estate, servient estate, surface estate or mineral estate in more than 550,000 acres across 19 parcels in south Florida, including in the Big Cypress National Preserve, over the last seven years. Additionally, I have more than 42 years of experience appraising real property in Florida and the southeast United States.

Based on my work experience and education I have demonstrated the geographic and property type expertise necessary to perform this assignment competently.

---

[3] Appraisal Institute. (2022). fee simple. *The Dictionary of Real Estate Appraisal* (7th ed., p. 73). Appraisal Institute.
[4] *Texas Natural Resources Code § 91.402*; see also *Getty Oil Co. v. Jones*, 470 S.W.2d 618 (Tex. 1971)
[5] Appraisal Institute. (n.d.-i). mineral rights. *The Dictionary of Real Estate Appraisal* (p. 122).
[6] Appraisal Institute. (2022). real property. *The Dictionary of Real Estate Appraisal* (7th ed., p. 165). The Appraisal Institute.


Exhibit A

Relevant Property Characteristics

The following relevant characteristics of the subject property can affect market value.

- The subject property at 17,339 acres is the largest non-United States of America owned property in the Big Cypress National Preserve (BIYC).
- The property is within an environmentally sensitive freshwater wetland ecosystem and ecologically significant wildlife habitat which impose constraints and burdens on the use of the property.
- 96.6% of the land cover is wetlands.
- The property does not have frontage on a paved public right of way, therefore access to the property is severely restricted.
- The real property rights to be appraised are the fee simple estate in 7,389 acres and the surface estate in 9,950 acres.
- 2,862 Acres are within a Tier 3 oil and gas prospecting zone.

Property Inspections

On April 16, 2024 I inspected the subject from 11-Mile Road which bisects the property in a north/south direction. On April 17, 2024 I further inspected the subject property by aircraft at an altitude between 1,000 feet and 1,500 feet to gain a better understanding of the interplay between water, streams, swamps, uplands, hammocks and bogs, the transportation network, exploration burdens and development types and development intensity in the area.

My most recent inspection of the subject property was on May 2, 2025, when I inspected the property from the public right of way Tamiami Trail, BIYC trailheads, and the adjacent KTNT airfield.

Assignment Conditions

Assignment conditions are assumptions, extraordinary assumptions, hypothetical conditions, laws and regulations, jurisdictional exceptions, and other conditions affecting the scope of work. Neither a hypothetical condition nor an extraordinary assumption was required to provide a credible opinion of market value.

Scope of Work

The scope of work of an appraisal is the type and extent of research and analysis needed to produce a credible opinion of market value. The scope is determined by the appraisal problem to be solved and the assignment conditions.

Based on the seven factors identifying the appraisal problem, I am estimating the market value of the fee simple estate and the surface estate in a single tract of land comprising 17,339 acres within an environmentally sensitive national preserve and the wetlands land cover is extraordinarily high at 96.6% of the total area.


Exhibit A

The direct comparison method of the sales comparison approach will require consideration and analysis of the partial ownership interests, location in a national preserve, the large size of the tract and the high percentage of wetlands.

Type and Extent of Data Researched

Resulting from my analysis of the appraisal problem and the relevant property characteristics, following is the type and extent of data analyzed to produce credible opinions.

Market Area

In addition to my inspection of the subject property and the area around the property I collected and analyzed data to determine the market area boundaries and the social, economic, governmental, and environmental influences within this defined area that affect the supply and demand for real property in the area.

I collected and analyzed data from the following sources:

- Collier and Miami-Dade County government,
- South Florida Water Management District,
- National Park Service, U.S. Department of the Interior, and
- United States Department of the Interior, Geological Survey

Physical Characteristics of the Land

To ascertain the physical characteristics of the land and their effect on value I extracted and analyzed data from the following sources:

- On-site inspection,
- United States Geological Survey, U.S. Department of the Interior,
- National Park Service, U.S. Department of the Interior,
- General Management Plan, Big Cypress Preserve, U.S. Department of the Interior,
- University of Florida GeoPlan Center,
- U.S. Fish and Wildlife Service, U.S. Department of the Interior, and
- Florida Natural Areas Inventory.

Sales Comparison Approach

Land is most commonly valued by the direct comparison method of the sales comparison approach. To gather a sufficient number land sales to estimate market value, I obtained the sales data file of the following elected county property appraisers.

- Collier County,
- Lee County,
- Hendry County,

Exhibit A

- Charlotte County,
- Osceola County,
- Glades County,
- Okeechobee County,
- Miami-Dade County,
- Broward County.

Besides sales data from county property appraisers, I researched transaction data on Acres.com, and CREXI.com and researched land sales and listings on websites and publications of brokers with an emphasis on the sale of large land tracts in Florida.

For each transaction, I gathered all publicly accessible data from the elected county property appraiser, County Clerk of Courts Office, Florida Department of Environmental Protection, and the relevant Regional Water Management District.

## Legal Description

The subject property is legally described as follows.

Sections 19, 29, 30, 31, 32, AND THE SW 1/4 of Section 20, all lying in Township 52 South, Range 35 East, Dade County, Florida.

Sections 5, 6, 8, AND 17, all lying in Township 53 South, Range 35 East, Dade County, Florida.

Sections 21, 22, 23, 24, 25, 26, 27, 28, 33, 34, 35, 36, the South 1/2 of Section 29, and the North 1/2 of Section 32, all lying in Township 52 South, Range 34 East, Collier County, Florida.

Sections 1, 2, 3, 4, the South 1 /2 of Section 5, and the North 1 /2 of Section 8, TWP 53 South Range 34 East, Collier County, Florida.

Less and Except the West 1 /2 of the Southeast Quarter of Section 8, Township 53 South, Range 35 East, Dade County Florida.

Said Lands Containing 17,339.16 Acres, More or Less.

The subject property  is depicted in the exhibit below.

Exhibit A

9

Figure 2

Depiction of the Non-Airfield Property Appraised



Exhibit A

### Three Year History of Sales, Options and Listing

Based on conversation with my client and my research of the Official Records of Collier and Miami-Dade Counties, I am unaware of an agreement of sale, option, or listing agreement of the subject property current as of the appraisal's effective date and I am unaware of a sale or transfer of the subject property within three years prior to the effective date of this appraisal.


### Market Area Location, Description and Trend

The productivity and value of real estate are deeply affected by both its physical and economic location. Economic location goes beyond the physical positioning of properties and involves analyzing economic activities within the area, which is shaped by physical, political, social, and economic factors, as well as travel times to key destinations. The boundaries of a market area depend on the specific property and can be determined using natural or man-made features. Geographic boundaries may include lakes, hills, mountains, terrain patterns, vegetation, or lot sizes, while man-made features can involve highways, roads, bridges, walls, infrastructure, or legal and political jurisdictions. Additionally, topographic elements that obstruct development or travel can also serve as natural boundaries.

The subject property is located in the Big Cypress National Preserve (BICY). This preserve is surrounded by several protected areas, including Fakahatchee Strand Preserve State Park, Florida Panther National Wildlife Refuge, Green Heart of the Everglades, Rookery Bay National Estuarine Research Reserve, Ten Thousand Islands National Wildlife Refuge, Picayune Strand State Forest, and Francis S. Taylor Wildlife Management Area.

Together, these parks, preserves, and wildlife management areas cover approximately 3.2 million acres (about 5,066 square miles). This extensive region stretches from Naples on Florida's west coast to Miami on the east coast. The area is largely undeveloped, and both the State of Florida and the United States intend to keep it that way. Their goal is to preserve the region's natural habitats, wetlands, water flow systems, and estuarine ecosystems.

I believe the market area is defined as the 5,066 square mile region bounded by San Marco Road to the west, the Miami-Dade County Urban Development Boundary to the east, the northern limits of the BIYC and Francis S. Taylor Wildlife Management Area, and the southern boundary of the Everglades National Park, due to the shared environmental characteristics and protected status of these lands.

Refer to the Market Area map below for reference.

Exhibit A

Figure 3

Market Area Location Map



Exhibit A

## Social Considerations

In a market area analysis, social factors examine why people choose to live and work there. Reasons may include the area's reputation, environment, public services, recreational opportunities, affordable housing and land, and proximity to businesses.

## Economic Considerations

On a local level, economic considerations relate to the financial capacity of a market area's occupants and their ability to rent or own property, maintain it attractively, and renovate or rehabilitate it when needed.

Southwest Florida's major protected areas serve as powerful economic engines for the region. These lands collectively attract millions of visitors each year, fueling substantial spending on lodging, dining, outdoor recreation, and related services. For instance, Big Cypress National Preserve alone generates nearly $92 million in annual economic output and supports over 800 local jobs. Similarly, Rookery Bay National Estuarine Research Reserve contributes $55 million per year and sustains more than 500 jobs.

These protected areas provide significant indirect and long-term economic benefits beyond direct visitor spending. Additionally, the preservation of these lands ensures the continued provision of vital ecosystem services—including clean water, flood protection, storm surge mitigation, and wildlife habitat—which are essential for the region's resilience and would be costly to replace through engineered solutions.

When accounting for the combined effects of tourism, recreation, property value enhancement, and ecosystem services, the total annual economic impact of Southwest Florida's protected areas reaches several billion dollars. These lands not only safeguard the region's unique environmental heritage but also underpin its economic vitality and long-term prosperity.

## Governmental

Florida manages land use and development through an integrated framework of state, regional, and local laws. All local governments must adopt comprehensive plans to guide future growth and enforce them through specific land development regulations, covering zoning, environmental protections, stormwater management, and traffic requirements. Zoning divides land into categories—residential, commercial, industrial, or agricultural—each with rules on uses, building heights, lot sizes, and setbacks. Zoning must align with comprehensive plans to ensure consistent land use decisions.

In Collier County, about two-thirds of the land is designated for conservation under the Future Land Use Plan. Key protected areas include the Florida Panther National Wildlife Refuge, Big Cypress National Preserve, and Corkscrew Swamp Sanctuary. The county's Rural Land Stewardship Area (RLSA) program sets aside nearly 200,000 acres in eastern Collier County for conservation and agriculture.


Exhibit A

13

Miami-Dade uses the Future Land Use Plan to guide growth while preserving critical natural resources. The Future Land Use Plan designates significant tracts of land for conservation, including wetlands, environmentally sensitive lands, and agricultural areas. The county land use policies specifically aim to protect and preserve these areas through a combination of regulatory measures, such as limiting development in critical zones like the Big Cypress Area of Critical State Concern and the East Everglades, and proactive programs like the transfer and purchase of development rights for agricultural and environmentally sensitive property. The county's conservation efforts are further supported by zoning regulations and periodic reviews of the Urban Development Boundary, which currently encompasses about 269,000 acres (420 square miles).

Environmental

Water is the most important natural resource in the South Florida region. Approximately 90% of the area becomes flooded during the rainy season, which lasts from May through October. The region receives about 53 inches of rainfall annually, with 75% occurring during this rainy period.

Figure 4



The flat limestone terrain causes floodwaters to remain for several months after the rains end, allowing the region to function as a natural reservoir and nutrient filter. Throughout the rainy season, water flows slowly southwest, eventually passing through the estuaries of Everglades National Park.

Exhibit A

The landscape includes extensive prairies, marshes, forested swamps, shallow sloughs, coastal marshes, prairie marshes, and freshwater marl prairies. The large amount of wetlands and regular flooding strongly influence how land in this region can be used.

This area also supports significant wildlife populations. Ten species found here are federally listed as threatened or endangered, and an additional fourteen species are listed by the state of Florida as threatened, endangered, or of special concern. Both the state of Florida and the U.S. government aim to protect these endangered species and preserve their natural habitats. To achieve this, strict regulations have been put in place to prevent destruction of native habitats and changes to the natural water flow.

In an effort to preserve the native habitat, linkages in the area are very limited. Interstate 75, a limited access expressway, bisects the area in an east/west direction and generally runs from the city of Naples on the west coast to Ft. Lauderdale on the east coast. This expressway has four interchanges along its 80 mile length. The interchanges are at County Road 951, State Road 29, Snake Road and US Highway 27.

The Tamiami Trail (U.S. Highway 41) bisects the market area in an east/west direction and runs parallel to Interstate 75. This roadway, which was completed in 1928, is two lanes.

Conclusion

By design, this region is largely undeveloped, with federal, state, and local governments working in concert to preserve its natural ecosystems, wildlife habitats, and hydrologic functions. These efforts are enforced through strict zoning regulations, comprehensive land use plans, and conservation programs that limit development and maintain the ecological integrity of the area. Socially, the area appeals to those who value environmental quality and recreational opportunities, though traditional residential and commercial drivers are absent due to land use restrictions.

The region thrives economically not through development, but through the preservation of its natural assets. Ecotourism and outdoor recreation generate significant revenue and support thousands of jobs, while ecosystem services like flood protection, clean water, and storm surge mitigation provide critical long-term value. Infrastructure is intentionally minimal to limit ecological disruption, with limited access roads and carefully placed interchanges. Altogether, the market area's significance lies in its role as a natural preserve—offering environmental, recreational, and economic benefits that are essential to the sustainability and resilience of South Florida.

Land Description

Physical Characteristics

The subject property is on the north, east and west sides of the Dade-Collier Training and Transition Airfield and is bisected by the Collier County Miami-Dade County boundary. The property does not have a connection with a public road being 1.5 miles north of the nearest public right of way, Tamiami Trail (U.S. Highway 41). Within the vicinity of the subject property.


Exhibit A

Tamiami Trail is a two lane asphalt paved arterial running in a general east/west direction from the city of Naples on the west coast of Florida to Miami on the east coast. In the figure below is an aerial depiction of the subject property.

Figure 5



The National Park Services classifies the subject property as "back county" meaning it does not receive public utility service, is not accessible via a state, county, or privately maintained road, and must be accessed by foot, aircraft, or off road vehicle (ORV). Access to a back country property is allowed only at designated trailheads and on designated trails. An owner of back country property has to request a permit to cross closed or restricted Federal lands through the office of the Chief Ranger at the Big Cypress Preserve. The Chief Ranger's office will issue a Special Use Permit to access the property by a designated route using a swamp buggy, airboat, or ATV.

The subject property comprises 17,339 acres and dimensionally at its widest is seven miles laterally and six miles vertically. Of the total acreage 11,556 acres are in Collier County and 5,784 acres are in Miami-Dade County.

Exhibit A

Land Cover Description

Water is the unifying force of the surface, connecting the five predominant surface habitats: hardwood hammocks, pinelands, prairies, cypress swamps, and estuaries.

The almost imperceptible slope of the land, about 1 inch per mile, creates an overland sheet flow of water to the southwest to Tamiami Trail.

The Level 1 Florida Land Use, Cover and Forms Classification System (FLUCCS) classifies 96.6% of the surface as wetlands. Wetlands are areas where the water table is at, near, or above the land surface for most of the year. The hydrologic regime supports aquatic or hydrophytic vegetation, although alluvial and tidal flats may be non-vegetated. Wetlands are often in low-lying areas. Examples include marshes, mudflats, emergent vegetation areas, and swamps.

Rangeland and upland forests, which make up 3.2% of the land cover, are mainly clustered in the northeast and east areas of the property in Miami-Dade County.

The L-28 canal bisects the southeast corner of the property in a general north/south direction. This canal acts as a dam blocking water flow from the east and is represented as the 15 acres of water on the FLUCCS Land Cover map.

See Figure 6 below for a depiction of the land cover.

Exhibit A

Figure 6

FLUCCS Land Cover Map



Exhibit A

The utility of the subject property is severely limited as a result of back country access, lack of utilities and 96.6% of the property that is wetlands. In the area, land with these characteristics are commonly used as open space and/or recreation.

Oil and Gas Characteristics

Almost all of the subject property is within the Sunniland Trend formation, which is characterized by oil reservoirs located more than two miles below the surface. Refer to the figure below for a depiction of the Sunniland Trend coverage of the subject property. Over its history, the Sunniland Trend has yielded more than 120 million barrels of oil (MMBO) from eight major commercial fields, making it a significant contributor to Florida's oil output. The Sunniland Trend continues to draw interest, as evidenced by ongoing exploration and investment in seismic data from Calumet, Burnett Oil Company, and Maverick Natural Resources.

Exhibit A

Figure 7

Map of the Sunniland Trend, Prospect and Subject Property



<span style="color:red">Exhibit A</span>

There have been 14 oil fields in South Florida, all of which are within the Sunniland Trend. Together, these fields have produced over 100 million barrels of oil (MMBO). Two of these fields, Raccoon Point and Bear Island, are within the Sunniland Trend and within the BIYC. Raccoon Point is approximately three miles north of the subject property. Combined, Raccoon Point and Bear Island are the only two developed wellfields in the BIYC and have produced over 32 MMBO.

In the 12 months ending September 2024, Raccoon Point produced an average of 234 barrels of oil per day, more than twice the production of any wellfield in the Sunniland Trend.

In 2018, Burnett Oil Company invested $30 million to acquire new 3D seismic data near Raccoon Point. Based on this data, they identified two promising areas for potential oil production: the Nobles Grade and Tamiami prospects. The Tamiami prospect is located close to the subject property, approximately three miles north of the subject property and 1.25 miles east of 11 Mile Road, which runs through the subject property.

Burnett Oil Company has applied for permits to drill and produce oil at both the Nobles Grade and Tamiami prospects. These permit applications demonstrate that Burnett Oil considers these areas to have significant commercial potential.

Older 2D seismic data, along with newer 3D seismic data, have revealed several additional potential drilling sites ("prospects") within or near the Sunniland Trend. A "prospect" is an area identified through geological or geophysical data as likely containing sufficient oil to justify exploratory drilling.

A Tier 3 prospect of 2,862 acres has been identified on the subject property, as illustrated in Figure 7. Prospects are ranked from Tier 1 to Tier 4 based on their potential for successful oil exploration and development. Tier 1 prospects have the highest potential and lowest risk, while Tier 4 prospects are highly speculative and have the highest risk. Tier 3 prospects, such as the one on the subject property, are considered moderately speculative—less promising than Tier 1 or Tier 2, but more promising than Tier 4.

In 2013, Burnett Oil Company signed a seismic option and exploration agreement covering 150,000 mineral acres, mostly within the BIYC, to further illustrate local demand and interest in oil exploration. In 2019, they exercised a portion of this option, acquiring two oil and gas leases totaling 2,950 acres. Both leases remain active as of the date of this report. The original agreement included lease bonus payments of $300 per net mineral acre, although Burnett Oil noted paying approximately $500 per net mineral acre when the leases were executed.

The market value of the subject property's mineral estate is influenced by the long history of oil production in the Sunniland Trend, ongoing identification of new prospects, and continued industry interest in eastern Collier County.

Exhibit A

Legal Characteristics

    Future Land Use

The subject property lies within two counties, Collier and Miami-Dade. Therefore, the 11,556 acres in Collier County are governed by the Collier County Growth Management Plan, Future Land Use Element adopted April 23, 2024 and the 5,784 acres in Miami-Dade County are governed by the Comprehensive Master Plan for Miami-Dade County as adopted July 22, 2020 and amended through January 19, 2023.

The Future Land Use designation of Conservation applies to the 11,556 acres in Collier County. The Conservation designation protects environmentally unique or sensitive areas by enforcing strict reviews of development proposals to minimize environmental impacts. Key sites like Big Cypress National Preserve and Florida Panther National Wildlife Refuge are vital for biodiversity, recreation, tourism, and economic stability. In Conservation-designated areas of Collier County, oil extraction and processing are allowed.

The 5,784 acres in Miami-Dade County are designated Environmentally Protected Parks, a designation comprising environmentally sensitive land and water areas within the Big Cypress National Preserve.


Zoning

Collier and Miami-Dade Counties use zoning designations and overlay districts to manage development more effectively. This approach allows for greater flexibility and specificity in land use regulations.

Zoning designations provide the framework for land use, determining permitted uses, densities, and development standards. Overlay districts supplement these base zoning regulations to address unique characteristics or goals for particular areas.

The 11,556 acres in Collier County are zoned Rural Agricultural District (A) and have a Big Cypress Area of State Critical Concern/Special Treatment Overlay (ACSC/ST). The Rural Agricultural district preserves and supports agricultural, pastoral, and rural land uses while accommodating related activities and conservation efforts. This zoning district allows agricultural operations and compatible land uses that do not compromise environmental integrity, potable water resources, or wildlife habitats. Oil and gas exploration subject to state drilling permits and Collier County site development plan review is a permitted use in Rural Agricultural District.

The ACSC overlay is an area designated by Florida with a significant impact on regional or statewide environmental or natural resources. After the State designates an area as an ACSC, the local government, Collier County, submits its land use regulations for guiding development in the area, complying with the principles of the ACSC as defined by the State.
The principles of the Big Cypress Area of Critical State Concern are to conserve and protect its natural, environmental, and economic resources. These regulations aim to provide a land and water management system that preserves water quality and optimizes the limited water resources of the area.


Exhibit A

The Special Treatment Overlay are areas that require special regulations. These areas are significant due to their unique flora and fauna, aesthetic appeal, historical or archaeological significance, rarity in the County, or contribution to their own and adjacent ecosystems.
The land in Miami-Dade is unzoned and is designated Environmentally Protected Park land by the Comprehensive Master Plan for Miami-Dade County.

### Other Encumbrances

The U.S. Army Corps of Engineers (ACOE) issues dredge and fill permits for activities in wetland areas. The U.S. Fish and Wildlife Service (FWS) reviews impacts to fish and wildlife as part of the ACOE process; other governmental and non-governmental organizations also review and comment on applications made to the ACOE.

The Florida Department of Environmental Protection issues Environmental Resource Permits for activities within environmentally sensitive areas and individual permits for activities related to exploration and production of oil and natural gas and mining, which is germane because of the proximity to such operations. Separately, the Big Cypress Swamp Advisory Committee reviews applications for activities associated with oil exploration, production, and transportation within the Big Cypress area. The South Florida Water Management District oversees permitting for consumptive use of water for oil and gas operations. The National Park Service, other federal and state agencies, and nongovernmental organizations are asked to comment on applications for Florida seismic or drilling permits within the Big Cypress National Preserve.

### Highest and Best Use as if Vacant

The concept of "highest and best use" reflects a fundamental principle in real estate and market behavior: a property's value is determined by the most profitable use a buyer envisions for it. As a result, land and partial real property estates are typically utilized in ways that maximize their profit potential for the owner. This ideal use may not align with the property's current use, as legal restrictions or physical characteristics of the real estate can impose limitations.

Highest and best use of real property is "The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity."[7]

In essence, value is derived from the potential use of real property. Without a current or foreseeable use, land's value is limited. According to the principle of surplus productivity, the highest and best use is the option, among reasonable alternatives, that generates the greatest present real property value after accounting for labor, capital, and coordination costs.

---

[7] Appraisal Institute. (n.d.-h). highest and best use. *The Dictionary of Real Estate Appraisal* (pp. 88–89).

Exhibit A

Legally Permissable

In Collier County, the 11,556 acres have a Future Land Use designation of Conservation, while the 5,784 acres in Miami-Dade County is designated Environmentally Protected Parks. Both designations share a common and explicit goal: the preservation of environmentally sensitive areas, protection of critical habitats for endangered and threatened species, and maintenance of ecological integrity. These designations clearly demonstrate a commitment to preventing activities that would degrade or compromise fragile ecosystems such as the construction of roads or structures.

Although the land in Collier County is zoned Rural Agricultural District, the controlling overlay is Big Cypress Area of Critical State Concern/Special Treatment. This overlay imposes strict controls on land use to safeguard the area's unique hydrology, preserve water quality and quantity, and protect rare flora and fauna. The overlay specifically aims to limit and regulate development in order to prevent ecological degradation and preserve the natural character of the region.

The National Park Service assigned the subject property a backcountry designation that significantly restricts access to the property. Under the backcountry designation, access to the property is permitted only by foot, aircraft, or ATV along designated trails when crossing federally protected lands. Such stringent access limitations inherently restrict potential uses of the property to activities compatible with minimal environmental impact and access, such as camping, hunting, or passive outdoor recreation.

Miami-Dade County has a 25% undivided interest in the mineral estate in 8,361 acres and no mineral interest in 1,589 acres. Florida Statute 377.2411 requires that to obtain a drilling permit the operator must have a majority of the mineral interests within a drilling unit. Thus, Miami-Dade County has an insufficient ownership interest to apply for a drilling permit without purchasing or leasing additional mineral rights.

The subject property is within the BIYC, a critical component of the hydrological system supporting the greater Everglades ecosystem. The BIYC was established largely in response to intense public opposition and concern over the ecological damage caused by the nearby Jetport. Given this historical context and heightened public sensitivity, any proposed land use—particularly activities like oil exploration or drilling—would inevitably face substantial public scrutiny, widespread criticism, and potential legal challenges.


Physically Possible

The subject property consists of 17,339 acres, of which 96.6% is wetlands. The remaining upland areas are irregularly shaped and scattered throughout the northeastern quadrant of the property, which is farthest from public road access. From May through October (the rainy season), the land experiences flooding, with water depths ranging from several inches to several feet. This seasonal flooding significantly limits practical use of the property, making most conventional activities impractical for roughly half of each year.

The property remains suitable for outdoor recreational uses, despite its irregular shape and flooding limitations.

Exhibit A

Seismic investigations indicate that 2,862 acres of the property fall within a Tier 3 prospect area, meaning this area has moderate potential for finding commercially viable deposits of oil and gas. Active oil and gas exploration and extraction are currently occurring near the property. For example, Burnett Oil Company has optioned 150,000 mineral acres nearby and has exercised a part of the option to lease 2,950 acres specifically for oil and gas extraction in Raccoon Point, Bear Island, Nobles Grade, and Tamiami prospects.

Miami-Dade County has a 25% mineral interest in 299 acres and a 100% mineral interest in 1,272 acres in this prospect, of the 2,862 acres within the prospect.

The Raccoon Point wellfield, currently the most productive wellfield in South Florida, producing more than twice the oil than all other wellfields in South Florida, is located just three miles north of the subject property. Using updated 3D seismic data, Burnett Oil Company has applied for permits to establish a second wellfield (Tamiami), also located three miles north of the property. Burnett Oil's substantial investment in exploration and development in the immediate area strongly supports the potential value of oil, gas, and mineral rights associated with the subject property.

Oil and gas exploration and extraction are permitted within the BIYC. This is evidenced by the existing wellfields at Raccoon Point and Bear Island, as well as the permitted sites at Tamiami and Nobles Grade, all located within the BIYC.


Financially Feasible

The uses of the property remaining after considering the legal encumbrances and restrictions on access and use by the National Park Service are open space, outdoor recreation, and hunting.

The exploration and extraction of oil are permitted on property in the BIYC, and the exploration and wellfields in the immediate area are indications of financial feasibility outweighing the passive recreation uses of a small portion of the property.

The current wellfields in the BIYC are evidence that the exploration and extraction of oil and gas can coexist with the passive outdoor recreational uses on the property.


Maximally Productive
After considering the legally permissible, physically possible and financially feasible uses of the property, I am of the opinion that the maximally productive use is outdoor recreation and hunting. On the 2,862 acres comprising the Tier 3 prospect, the additional aspect of oil and gas exploration.

Exhibit A

25

Valuation Methodology

Buyers and sellers most commonly price land by the direct comparison method of the sales comparison approach. There is a sufficient number of timely sales of land in South Florida with a highest and best use that is similar to the subject property. Therefore, I used the direct comparison method of the sales comparison approach to estimate the market value of the subject fee simple estate.

I did not use the income approach because buyers and sellers do not rely on this method for pricing open space or outdoor recreational land. As a result, there is insufficient data on land leases and capitalization rates to support this method.

The cost approach does not apply here because the subject property is unimproved land. It estimates value based on the depreciated cost of improvements.

Exhibit A

### Sales Comparison Approach

I analyzed the comparable land sales on a relative qualitative basis. A relative qualitative comparison studies the market data relationships. This technique reflects the nature of real estate markets. To apply this technique, I analyzed comparable sales to determine whether their value-influencing characteristics are inferior, superior or equal to those of the subject property.

The appropriate unit of comparison to estimate the value of open space/recreation land is the overall sale price per gross acre. In the qualitative comparison analysis of the comparable sales, each sale is analyzed for real property rights, financing, conditions of sale, market conditions, location, and physical characteristics.

The table below summarizes the comparable sales details. A detailed description of the comparable land sales is in the Addenda.

Exhibit A

Table 2

Comparable Land Sales Summary Table

| Sale No. | Name | County | Real Property Rights Sold | Date of Sale | Nominal Sale Price | Adjusted Sale Price | Parcel Size | Sale Price / Acre | Upland Acres | Wetland Acres | Percent Wetlands |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Tarpon Blue | Collier, Hendry | Fee simple, surface estate | Nov 2024 | $ 122,400,000 | $ 122,400,000 | 25,039 | $ 4,888 | 12,085 | 12,954 | 51.7% |
| 2 | Devil's Garden | Hendry | Fee simple | Dec 2023 | $ 77,630,500 | $ 77,630,500 | 17,229 | $ 4,506 | 13,885 | 3,344 | 19.4% |
| 3 | Green Heart of the Everglades | Collier | Fee simple | Jun 2023 | $ 29,850,000 | $ 29,850,000 | 11,053 | $ 2,701 | 52 | 11,001 | 99.5% |
| 4 | Everglades Headwaters Preserve | Okeechobee | Fee simple | Dec 2021 | $ 45,842,300 | $ 45,842,300 | 11,220 | $ 4,086 | 8,602 | 2,619 | 23.3% |
| 5 | Deer Creek Ranch | Charlotte | 92% Servient estate, 18% fee simple | Dec 2024 | $ 7,000,000 | $ 7,000,000 | 3,745 | $ 1,869 | 768 | 2,977 | 79.5% |

Exhibit A

Figure 8

Comparable Land Sales Location Map



Qualitative Analysis

Property Rights Conveyed

The discussion of real property rights conveyed is organized into three groups:

- Group 1: 7,389 acres owned in fee simple.
- Group 2: 8,361 acres with an undivided 25% mineral estate interest.
- Group 3: 1,589 acres with no mineral estate interest (surface rights only).

Comparable Sales 2, 3, and 4 are the sale of the fee simple bundle of real property rights. These sales therefore have a bundle of property rights that are similar to Group 1 property rights, and superior to Groups 2 and 3 real property rights.

Comparable Sale 1 involved primarily surface rights, as the seller retained ownership of oil, gas, and mineral (OGM) rights. Therefore, this sale is inferior to Groups 1 and 2, but similar to Group 3 real property rights.

Comparable Sale 5 involved the sale of the servient estate in an Agricultural Conservation Easement (WRP easement). This easement severely restricts the property rights, making it inferior to the rights in Groups 1, 2, and 3. The Comparable Sale 5 dominant estate rights of this easement were purchased by the United States in December 2020 for $11,669,492, or $3,119 per acre. When this dominant estate sale price is combined with the sale price of the servient estate, the summed prices of the dominant easement and servient estate indicate a total fee simple equivalent price of $4,985 per acre. Thus, an upward adjustment of $3,119 per acre is applied to account for the inferior rights.

After this adjustment, Comparable Sale 5 becomes similar to Group 1 property rights and superior to Groups 2 and 3 real property rights.

I performed a paired sales analysis to estimate the price effect of an undivided partial interest in a mineral estate compared to the price of a 100% ownership interest. I found two sales of an undivided 25% ownership in Collier County which were then compared to a similar sale of a 100% mineral estate interest. To ensure accuracy of the analysis, I adjusted the sale price of the partial interest sale to account for the Consumer Price Index (CPI) and variations in market conditions between the sale dates of the partial interest sales and the 100% ownership sales. This adjustment provides a more accurate comparison by normalizing the data for economic fluctuations over time. Following is the paired sales analysis. Refer to the table below for this comparison.

Exhibit A

Table 3

Partial Ownership Interest Paired Sales Analysis

|  | Pair 1 | Pair 2 | Pair 3 | Pair 4 |
|---|---|---|---|---|
| Sale Price / SF |  |  |  |  |
| Sale Date | Dec- 10 | Dec- 10 | Dec- 10 | Dec- 10 |
| Sale Price | $ 25.63 | $ 25.63 | $ 25.63 | $ 25.63 |
| CPI | 0.0% | 0.01% | 0.01% | 0.0% |
| Market Conditions | 0.0% | 0.0% | 0.0% | 0.0% |
| Adjusted Price | $ 25.63 | $ 25.63 | $ 25.63 | $ 25.63 |
| / Ownership % | 25.0% | 25.0% | 25.0% | 25.0% |
| Adjusted 100% Ownership Price | $ 102.50 | $ 102.51 | $ 102.51 | $ 102.50 |
| Comparable | A | B | C | D |
| Sale Date | Dec- 10 | Feb- 11 | Feb- 11 | Jan- 11 |
| Sale Price | $ 112.50 | $ 107.50 | $ 102.50 | $ 114.50 |
| Partial Ownership Discount | -8.9% | -4.6% | 0.0% | -10.5% |

|  | Pair 5 | Pair 6 | Pair 7 | Pair 8 |
|---|---|---|---|---|
| Sale Price / SF |  |  |  |  |
| Sale Date | Oct- 10 | Oct- 10 | Oct- 10 | Oct- 10 |
| Sale Price | $ 22.75 | $ 22.75 | $ 22.75 | $ 22.75 |
| CPI | 0.0% | 0.01% | 0.01% | 0.0% |
| Market Conditions | 0.0% | 0.0% | 0.0% | 0.0% |
| Adjusted Price | $ 22.75 | $ 22.75 | $ 22.75 | $ 22.75 |
| / Ownership % | 25.0% | 25.0% | 25.0% | 25.0% |
| Adjusted 100% Ownership Price | $ 91.00 | $ 91.01 | $ 91.01 | $ 91.00 |
| Comparable | A | B | C | D |
| Sale Date | Dec- 10 | Feb- 11 | Feb- 11 | Jan- 11 |
| Sale Price | $ 112.50 | $ 107.50 | $ 102.50 | $ 114.50 |
| Partial Ownership Discount | -19.1% | -15.3% | -11.2% | -20.5% |

Seven of the eight comparisons indicate a slight discount in the price of a partial ownership interest in a mineral estate. Specifically, seven of these comparisons demonstrate that the price of an undivided minority partial interest in a mineral estate is discounted between -4.6% and -20.5% when compared to 100% ownership. The average price discount of an undivided minority interest in a mineral estate is -11.3%. Based on this analysis I am of the opinion that an undivided minority interest in a mineral estate is priced at a discount of -10.0% of the value of a 100% ownership interest in a mineral estate, assuming all other factors remain constant. This discount equates to $9.00 per mineral estate acre in which there is less than a majority ownership.

Exhibit A

Financing Terms

The sale price of each comparable was in cash or a cash equivalent, therefore the sale price is similar to the cash or cash equivalent tenet of market value.

Conditions of Sale

The sale price of each comparable sale is the result of typical conditions of sale with neither party under undue duress to complete the transaction.

Market Conditions

Florida agricultural land prices rose 35.5% from $5,240 per acre in 2017 to $7,100 per acre in 2024 with the biggest increases occurring between 2023 and 2024 and a one year increase of 11.3%. Refer to the chart for the change in market conditions over time.

Figure 9



According to the Lay of the Land, Florida 2024 Market Report, ranch and recreation land in Florida increased 7.7% per year on a simple basis between 2020-2024. As the state population grows and wealth relocates to Florida, ranch and recreation continues to be in high demand.

Data analysis clearly shows that there has been a positive change in market conditions between 2020 and the date of value. Thus, the market conditions existing on the date of the


Exhibit A

comparable sales is inferior to the market conditions existing on the valuation date. The degree of inferiority is in proportion to the magnitude of change between the comparable sale date and the valuation date.


Location

It is best to analyze the macro location of the property and the micro location separately because of the unique locational aspects of the subject property.

The subject property is in one of the most remote areas of Florida, surrounded by 5,066 square miles of conservation land, swamps, marshes, estuaries and hammocks. Land value is mostly derived from the use that land can be put by land users. To have land users there needs to be people. There is an inverse relationship between distance (friction) between the users and the land. Given the long distance between the subject property and the nearest population centers of Naples and Miami the location of the subject property is very remote.

Comparable Sales 1, 2, 4 and 5 are in areas with a higher population density and they are nearer to population centers, thus more users and higher demand. Therefore, these comparable land sales have a macro location that is superior to the subject property macro location.

Comparable Sale 3, Green Heart of the Everglades, is 28 miles west of the subject property within the 5,066 square mile defined market area. However, this sale is near the western boundary of the market area, near the populations of Marco Island, Everglades City and Naples. The location of this comparable is slightly superior to the subject property location.
The National Park Service classifies the subject property as "backcountry", meaning it does not receive public utility service, is not accessible via a state, county, or privately maintained road, and must be accessed by foot, aircraft, or off-road vehicle (ORV). This severe access control significantly restricts the use of the land.

Comparable Sales 1, 2, 3 and 4 have extensive frontage and access from a paved public road, which is superior to the subject property access. The access to Comparable Sale 5 is via a 33 foot wide non-exclusive 0.56 mile long ingress/egress easement, which is slightly superior to the subject property access.


Physical Characteristics

The subject property is 96.6% wetlands, which is a significant determinant on use. Generally, the price of recreation or agricultural land is inversely related to the percentage of wetland coverage. The higher the wetland percentage, the lower the average price per gross acre.
Comparable Sales 3 and 5 have a wetland ratio that is very similar to the subject property at 99.5% and 79.5%. The sales price per gross acre of these two land sales are the lowest of the five sales, obviously reflecting the high wetland ratio. Comparable Sale 1 has a wetland ratio of 51.7%, which is moderately superior to the subject property. Comparable Sales 2 and 4 have low wetland ratios of 19.4% and 23.3% and are therefore superior to the subject property for wetland ratio.
Tier 3 Prospect

Exhibit A

The property has 1,571 acres within a Tier 3 prospect, which suggests moderate potential for discovering commercially viable oil and gas deposits. Active oil exploration and extraction operations are occurring within three miles of the property. The nearby Raccoon Point wellfield is the most productive wellfield in the Sunniland Trend, further indicating that a mineral estate within a Tier 3 prospect holds value.

Legal Characteristics

Although Agricultural (A) zoning allows residential development of one dwelling unit per five acres, the Big Cypress Area of Critical State Concern and Special Treatment Overlays significantly restrict development density allowed by the Agricultural zoning. These overlays prohibit a negative impact on the flow of water and since 96.6% of the subject property is wetlands, residential development is almost impossible.

Comparable Sale 3 is therefore most similar to the subject for these legal characteristics, as it is mostly under the same land use, zoning, and overlay districts as the subject property.

The WRP easement removes development within the 3,462 encumbered acres on Comparable Sale 5, which is similar to the effect of the subject future land use, zoning, and overlay districts. 283 acres are unencumbered and are therefore developable. Overall, the legal characteristics of this comparable sale are slightly superior to the subject property.

The legal characteristics of Comparable Sales 1, 2, and 4 are superior to the future land use, zoning, and overlay districts encumbering the subject property.

Comparable Sale 3 is most similar to the subject property but slightly superior in public right of way, paved road frontage, and macro location, given the number and magnitude of adjustments. Comparable Sale 5 is accorded secondary consideration due to the WRP easement effect and its similarity with the future land use, zoning, and overlay districts encumbering the subject property.

The remaining comparable sales are given tertiary weight in the estimation of market value.

Reconciliation

Based on my analysis, I am of the opinion that the market value of the fee simple estate of the 7,389 acres is $2,100 per gross acre and the market value of the servient of the 9,950 acres is $1,950 per gross acre. Thus, the market value of the subject property is:

Exhibit A

Table 4

### Market Value Fee Simple Estate

| Gross Acres | 7,389 |
|---|---|
| * Market Value Acre | $ 2,100 |
| Market Value | $ 15,516,900 |

### Market Value of the Servient Estate

| Gross Acres | 9,950 |
|---|---|
| * Market Value Acre | $ 1,985 |
| Market Value | $ 19,750,750 |
| | |
| Total Market Value | $ 35,267,650 |
| Rounded | $ 35,268,000 |

### Exposure Time

Comparable Sale 3 was exposed to the market for about 18 months. Analysis of other large tract sales in south Florida were exposed to the market of buyers from 4 months to 12 months. In consultation with land brokers if appropriately priced and marketed the exposure time for a large recreation tract should be less than 12 months. Based on my analysis of this data I am of the opinion that the exposure time for the subject property at the estimated market value is less than 12 months.

Exhibit A

ASSUMPTIONS AND LIMITING CONDITIONS

1.  No responsibility is assumed for the legal description or for matters including legal or title considerations.  Title to the property is assumed to be good and marketable unless otherwise stated.

2.  The property is appraised free and clear of all encumbrances, unless otherwise noted.

3.  It is assumed that there are no hidden or unapparent conditions of the property's subsoil or structure that render it more or less valuable.  No responsibility is assumed for such conditions or for arranging for engineering studies that may be required to discover them.

4.  All value estimates have been made contingent on information provided by governmental authorities and employees.

5.  It is assumed that there is full compliance with all applicable federal, state, and local environmental laws and regulations, unless noncompliance is stated, defined, and considered in the appraisal report.

6.  This appraisal report covers only the premises herein; and no figures provided, analysis thereof, or any unit values derived therefrom are to be construed as applicable to any other property, however similar they may be.

7.  The appraiser, by reason of this report, is not required to give testimony in court with reference to the property herein, nor obligated to appear before any governmental body, board, or agent, unless arrangements have been previously made therefor.

8.  This appraisal has been prepared solely for the private use of the client who is listed above as the addressee.   No other party is entitled to rely on the information, conclusions, or opinions contained herein.

9.  Neither all nor any portion of the contents of this appraisal shall be conveyed to the public through advertising, public relations, news, sales, or other media without the written consent and approval of the appraiser, particularly as to valuation conclusions, identity of the appraiser or firm with which he is connected, or any reference to the Appraisal Institute or to the MAI designation. Furthermore, neither all nor any portion of the contents of this appraisal shall be used in connection with any offer, sale, or purchase of a security (as that term is defined in Section 2(l) of the Securities Act of 1933) without the prior express written consent of the appraiser.

10. Unless stated otherwise, the possibility of hazardous material, which may or may not be present on the property, was not observed by the appraiser during the course of the normal inspection and research conducted during the appraisal assignment.   The appraiser, however, is not professionally qualified to detect such substances, and inspection by a professional in the field is recommended for any property. The presence of substances such as asbestos, urea-formaldehyde foam insulation, or other potentially hazardous materials could affect the value of the property, if found.  The value estimate is predicated on the assumption that there is no such material on or in the property that



would cause a loss in value. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required to discover them. This appraisal report is subject to receipt of an environmental audit confirming that no hazardous or toxic material is located on the premises. Should such material be discovered, final value estimates herein would be reduced by the cost to remove such substances and to restore the premises to serviceable condition, and would further be reduced by indirect expenses and income losses incurred by the owner during abatement. Such adjustments to the value estimate contained herein may be made only by the appraiser and only upon receipt of the environmental audit, construction cost estimates and other data satisfactory to the appraiser at his sole discretion.

Exhibit A

MICHAEL A. MCELVEEN, MAI, CRE
President
Urban Economics, Inc.

Michael A. McElveen serves as President of Urban Economics, Inc., a Tampa-based real estate consulting firm specializing in econometrics, valuation, spatial analytics, economic impact studies, and stigma-effect analysis. With over 42 years of professional experience, Mr. McElveen is particularly recognized for his extensive expertise as an expert witness, having provided testimony in numerous jury trials, hearings, and depositions.

Areas of Expertise Include:

- Real Estate Valuation & Expert Testimony: Mr. McElveen has completed valuations, evaluations, consulting, and expert testimony across diverse real estate sectors including:
  - Office Properties
  - Aviation and Port-Related Real Estate
  - Manufacturing Facilities
  - Hospitality and Hotel Properties
  - Golf Courses and Recreational Facilities
  - Regional Retail Centers and Big-Box Stores
  - Master-Planned Residential Communities
  - Developments of Regional Impact (DRIs)
  - Condominiums and Apartment Complexes
  - Convenience Stores and Gas Stations
  - Entitled and Unentitled Land Parcels

- Environmental Impairment and Stigma Analysis: Recognized by his peers and Florida courts as an expert on valuation impacts due to environmental impairment and associated stigma, Mr. McElveen has extensively studied and lectured on property marketability within environmentally impaired contexts, including Brownfields redevelopment. Representative environmental impairment assignments include:
  - Jacksonville, FL: Groundwater contamination (cleaning solvents, VOCs, heavy metals) affecting 86 single-family residences.
  - St. Thomas, USVI: Petroleum groundwater contamination analysis.
  - Orlando, FL: Impact of unexploded World War II ordnance on residential property values.
  - Tallevast, FL: Groundwater contamination and proximity to a Superfund site affecting 150 residential and commercial properties.
  - Tampa, FL: Arsenic-based solvents in groundwater at commercial development sites.
  - Tampa, FL: Valuation impacts from Mulberry Phosphate acidic wastewater slurry spill into Alafia River.
  - Clearwater, FL: Asbestos contamination within a regional shopping mall.
  - Port St. Joe, FL: Impaired fill material impacts on single-family residential development.
  - Largo, FL: Groundwater contamination impacts on retail and business park sites from off-site sources.
  - Sarasota, FL: Petroleum groundwater contamination of residential property.
  - Tavernier, FL: Sewage contamination impact on single-family home.
  - Florida (multiple sites): Numerous valuation analyses involving dry cleaning solvent contamination, landfill proximity, and Brownfield redevelopment sites.

- Aviation and Port-Related Real Estate: As an active Instrument-Rated Single-Engine Land (SEL) Private Pilot and a U.S. Merchant Marine Captain (100-ton, near-coastal waters), Mr. McElveen combines practical aviation and maritime knowledge with real estate expertise. His unique

<span style="color:red">**Exhibit A**</span>

qualifications have led to frequent consulting roles with organizations such as the University of South Florida's Center for Transportation Research (CUTR). Recent aviation and port-related engagements include:

- Port Canaveral: Comprehensive land lease rent and terms analysis for properties south of the shipping channel, including the proposed retail development "The Cove at Port Canaveral."
- Clearwater, FL: Aircraft hangar rental and lease term study for U.S. Army Corps of Engineers corporate aviation facilities.
- Orange County, FL: Approved aviation/non-aviation real estate appraiser with Orange County Aviation Authority (OCAA).
- Opa Locka, FL: Ground lease appraisal review and consulting for Miami-Dade Aviation Department.
- Florida Department of Transportation (FDOT) Aviation & Space Ports: Advisory roles in the publication of:
  - "Guidelines for Determining Market Value & Market Rent of Airport Property" (CUTR)
  - "Florida Aviation Facilities Rent Study" (CUTR)
- Florida Aviation Trades Association: Authored and analyzed the "Florida Hangar Rent Survey," published in Spring 2012.

- Economic Analysis: Mr. McElveen employs advanced econometric and meta-analysis methodologies, utilizing the latest IMPLAN economic impact modeling software to quantify real estate development impacts. Representative projects include:
  - Meta-analysis of Home Depot stores' impact on nearby residential property values (Cape Coral and Jacksonville Beach, FL).
  - Economic impact assessment of a 9,400-acre aggregate mine in Levy County, FL.
  - Econometric analysis of aggregate mine impacts on home prices in Hernando County, FL.
  - Economic impact study of a 1-million-square-foot regional shopping mall in Hillsborough County, FL.
  - Economic impact study of urban infill condominium developments in Tampa, FL.
  - Marginal valuation impact analyses for golf courses, equestrian facilities, and community amenities in various Florida locations.
  - Analysis of delay and development plan-change damages in residential condominiums (Jacksonville Beach, FL; St. Johns, USVI).
  - Hedonic regression analyses examining vehicular traffic, roadway elevation, and parking adequacy effects on property values.

- Spatial Analytics and Counseling: Mr. McElveen leverages sophisticated spatial analytics, including GIS mapping with ESRI ArcView software, to visually demonstrate locational impacts on real estate value and marketability. His advisory services have been utilized by major corporations, such as The Home Depot, to educate stakeholders and communities regarding large-scale retail developments and infrastructure projects.

Education:

- Bachelor of Arts in Finance, University of South Florida
- Bachelor of Science, Florida State University

Professional Associations and Certifications:

- Member of the Appraisal Institute (MAI), Certificate No. 7569
- Florida Real Estate Broker, License BK89611
- CCIM Institute Member (CCIM), National Association of Realtors

Exhibit A

- State of Florida Certified General Real Estate Appraiser, License RZ360
- American Real Estate Society (ARES)
- American Real Estate and Urban Economics Association
- National Association of Business Economists (NABE)
- The Counselors of Real Estate (CRE), Member ID 2592

Expert Witness Experience:

- Qualified expert witness in Federal Bankruptcy Courts (Florida Middle and Lower Districts) and multiple Circuit Courts across Florida counties including Miami-Dade, Hillsborough, Pinellas, Lee, Broward, Orange, Polk, Alachua, Hernando, Manatee, Palm Beach, St. Johns, Sumter, Volusia, Pasco, Hardee, and Washington.

Publications and Presentations:
- Published and presented extensively on topics including real estate valuation, environmental impairment impacts, aviation-related real estate, and spatial econometric analyses. Notable journals include the Journal of Housing Research and Assessment Digest.

Professional Service:

- Past President and Board Member, Florida State University Trends Conference
- Regular speaker and contributor at industry conferences and professional forums addressing valuation, environmental impacts, and spatial analytics.

Exhibit A

ADDENDA

Exhibit A

**Comparable Sale 1 - Tarpon Blue**

| TRANSACTION OVERVIEW | |
|---|---|
| Grantor: | CDC Investment Properties, LLC, successor by merger to CDC Land Investments Inc, Collier Land Holdings Ltd, Cow Bone Slough LLLP. |
| Grantee: | Board of the Trustees of the Internal Improvement Trust Fund of the State of Florida (TIITF) |
| Transaction Date: | November 18, 2024 |
| Real Property Interest: | Fee simple & Surface estate |
| Ownership Interest Transferred | 100% |
| Highest & Best Use: | Agriculture & recreation |
| Sale Price: | |
|   Nominal Price | $122,400,000 |
|   Adjusted Price | $122,400,000 |
| Price per Acre: | $4,888 |

| PROPERTY DETAILS | |
|---|---|
| Location: | Northeast corner of Collier County and west side Hendry County. |
| County/State: | Collier & Hendry Counties, FL |
| Parcel ID Number: | 1-31-47-28-A00-0001-0000, et al |
| Parcel Size Acres: | 25,039 |
| Upland Acres: | 12,085 |
| Wetland Acres: | 12,954 |
| Land Use/Zoning: | Low Residential, High Residential, Agriculture, Rural Mixed Use, Mobile Home Overlay and Rural Land Stewardship, Collier & Hendry Counties |
| Topography: | Level |
| Present Use of Surface: | Agriculture, pasture, row crops & recreation |

| TRANSACTION CHARACTERISTICS | |
|---|---|
| Verification: | Tom Jones, Barron Collier Enterprises |
| Market Exposure: | Not exposed to the market. |
| Financing Terms: | All cash |
| Deed Type: | SWD |
| Recording Data: | OR 1089/1191, Hendry County, OR 6417/3647 Collier County |

<span style="color:red">Exhibit A</span>

Encumbrances/Easements:                    Access easements.

Special Conditions:                          Grantor leased the property back at market rate for five-years with one five year option to renew.

**COMMENTS/ANALYSIS**

TIIFT acquired two five-year options to purchase this tract on March 26, 2024 and exercised the option and closed on the property November 18, 2024.

The Grantor obtained from the Grantee two five-year leases on the property. The lease rate is to be at market and adjusted annually by CPI. The Grantor retained oil, gas and mineral rights therefore this is the sale of the surface estate.

This property is a combination of four parcels ranging in size from 2,341 acres to 9,263 acres located in Collier and Hendry Counties. These parcels have extensive frontage on paved arterials, CR 858, SR 29 and CR 846.

Exhibit A

## AERIAL PHOTOGRAPH



<span style="color:red">Exhibit A</span>

## LAND COVER



Land Cover
- AGRICULTURE - 9,595 AC
- RANGELAND - 537 AC
- UPLAND FORESTS - 2,101 AC
- URBAN AND BUILT-UP - 12 AC
- WATER - 67 AC
- WETLANDS - 12,887 AC

Exhibit A

**Comparable Sale 2 - Devil's Garden**

## TRANSACTION OVERVIEW

| | |
|---|---|
| Grantor: | Alico Inc. |
| Grantee: | Board of the Trustees of the Internal Improvement Trust Fund of the State of Florida (TIITF) |
| Transaction Date: | December 21, 2023 |
| Real Property Interest: | Fee simple |
| Ownership Interest Transferred: | 100% |
| Highest & Best Use: | Agriculture |
| Sale Price: | |
|   Nominal Price | $77,630,500 |
|   Adjusted Price | $77,630,500 |
| Price per Acre: | $4,506 |

## PROPERTY DETAILS

| | |
|---|---|
| Location: | N&S sides Hill Grade Rd, east of Sam Jones Rd. |
| County/State: | Hendry County, FL |
| Parcel ID Number: | 1-33-45-31-A00-0001, et al |
| Parcel Size Acres: | 17,229 |
|   Upland Acres: | 13,885 |
|   Wetland Acres: | 3,344 |
| Land Use/Zoning: | Agriculture/A-2 by Hendry County |
| Topography: | Level with elevations of 20 to 28 feet NAVD88 |
| Present Use of Surface: | Agriculture, row crops, pasture |

## TRANSACTION CHARACTERISTICS

| | |
|---|---|
| Verification: | TIITF board minutes |
| Market Exposure: | Not exposed to the market |
| Financing Terms: | All cash |
| Deed Type: | WD |
| Recording Data: | 202326015628 |
| Encumbrances/Easements: | Typical easements for ingress/egress |
| Special Conditions: | None known |

## COMMENTS/ANALYSIS

This land sale is located in east Hendry County approximately 20 miles southeast of LaBelle.

The property is encumbered with typical ingress/egress easements.

Exhibit A

The property is zoned by General Agriculture,A-2 by Hendry County which permits one dwelling per five acres.

The site is improved with typical ranch improvements such as fencing, cross-fencing, gates, ditches, culverts, trails, and water pits. The majority of this land sale is located in flood zone X which is an area of minimal flood risk. The remainder of the property is in zone A and AE which are areas subject to inundation by the one-percent annual chance flood event.

Access to this property is via two miles frontage on CR 833 and six miles frontage on CR 835, Sam Jones Trail Grade Road and Dooley Grade Road.I

## AERIAL PHOTOGRAPH



Exhibit A

**LAND COVER**



Exhibit A

## Comparable Sale 3 - Green Heart of the Everglades

| TRANSACTION OVERVIEW | |
|---|---|
| Grantor: | Collier Land Holdings LTD, CDC Investment Properties LLC, PHU Properties LLC, Barron Collier Partnership LLLP. |
| Grantee: | South Florida Water Management District |
| Transaction Date: | June 28, 2023 |
| Real Property Interest: | Fee simple |
| Ownership Interest Transferred: | 100% |
| Highest & Best Use: | Open space, recreation |
| Sale Price: | |
|   Nominal Price | $29,850,000 |
|   Adjusted Price | $29,850,000 |
| Price per Acre: | $2,701 |

| PROPERTY DETAILS | |
|---|---|
| Location: | West side SR 29, north & south side of Tamiami Trail (US Hwy 41). |
| County/State: | Collier County, FL |
| Parcel ID Number: | 01136000009, et al |
| Parcel Size Acres: | 11,053 |
| Upland Acres: | 52 |
| Wetland Acres: | 11,001 |
| Land Use/Zoning: | AG, Conservation, Urban Residential Sub-district, Agriculture/Rural, ACSC/ST, Rural Agriculture, Collier County |
| Topography: | Level |
| Present Use of Surface: | Open space, recreation |

| TRANSACTION CHARACTERISTICS | |
|---|---|
| Verification: | Ernie Cox, Esq, for Grantor |
| Market Exposure: | Not exposed to market |
| Financing Terms: | All cash |
| Deed Type: | WD |
| Recording Data: | OR 6268/2017, OR 6268/2006, OR 6268/2020, OR 6268/2023 |
| Encumbrances/Easements: | Typical ingress/egress & utility |
| Special Conditions: | None known |

<span style="color:red">Exhibit A</span>

## COMMENTS/ANALYSIS

This property has frontage on the Barron River which flows into Chokoloskee Bay and is a visual and recreational amenity. This property has extensive frontage on the west side of SR 29 and the north and south sides of Tamiami Trail (US Hwy 41) and is in close proximity to the Interstate 75/State Road 29 interchange. The property is adjacent to the BIYC.

This property is near Marco Island and as such is influenced by land development in Marco Island and nearby city of Naples.

The ACSC and the ST overlay  serve to protect the natural, environmental, and economic resources of the area and thus precludes land development.

526.17 acres of State Sovereign submerged land with a depth of 1 to 3 feet mean low water south of the Barron River in Chokoloskee Bay.

## LAND SALE MAP



<span style="color:red">Exhibit A</span>

**LAND COVER**



Exhibit A

**Comparable Sale 4 - Everglades Headwaters Preserve**

## TRANSACTION OVERVIEW

| | |
|---|---|
| Grantor: | Durando Okeechobee Partners, Shala II, LLC, |
| Grantee: | Everglades Headwaters Preserve LLC |
| Transaction Date: | December 1, 2021 |
| Real Property Interest: | Fee simple |
| Ownership Interest Transferred: | 100% |
| Highest & Best Use: | Agriculture, recreation |
| Sale Price: | |
|   Nominal Price | $45,842,300 |
|   Adjusted Price | $45,842,300 |
| Price per Acre: | $4,086 |

## PROPERTY DETAILS

| | |
|---|---|
| Location: | West of US Hwy 441, between Yeehaw Junction and Ft. Drum. |
| County/State: | Okeechobee County, FL |
| Parcel ID Number: | 1-10-33-34-0A00-00001-0000 |
| Parcel Size Acres: | 11,220 |
| Upland Acres: | 8,602 |
| Wetland Acres: | 2,619 |
| Land Use/Zoning: | Agriculture, Agriculture (A), Okeechobee County |
| Topography: | Level |
| Present Use of Surface: | Ranch land, agriculture, hunting, |

## TRANSACTION CHARACTERISTICS

| | |
|---|---|
| Verification: | Ben Crosby, Broker |
| Market Exposure: | Exposed to market |
| Financing Terms: | All cash to grantor |
| Deed Type: | WD |
| Recording Data: | 2021015280, 2022014685 |
| Encumbrances/Easements: | Typical ingress/egress and drainage easements. |
| Special Conditions: | None known. |

## COMMENTS/ANALYSIS

Agriculture zoning allows one dwelling unit per ten acres on paved roads and one dwelling unit per forty acres on unpaved roads. The property is within the Avon Park Air Force Range "Military Operations Area" which is an overlaying restricted airspace.

<span style="color:red">Exhibit A</span>

The property has 1.2 miles of paved frontage on the west side of U.S. Highway 441 and access to U.S. Highway 44.

All but 3.77 acres are contiguous and lie west of U.S. Highway 441. This ranch has been used for cow/calf ranching, hay production, row crop farming, sod and recreation.

The property slopes negatively from the north and east towards the south and west eventually draining to the Kissimmee River. Elevations are relatively flat being between 67 feet and 72 feet.

**AERIAL PHOTOGRAPH**



Exhibit A

**LAND COVER**



Land Cover
- AGRICULTURE - 8,299 AC
- RANGELAND - 138 AC
- UPLAND FORESTS - 167 AC
- WATER - 0.5 AC
- WETLANDS - 2,618 AC

Exhibit A

**Comparable Sale 5 - Deer Creek Ranch**

## TRANSACTION OVERVIEW

| | |
|---|---|
| Grantor: | Spanish Trail Land and Cattle Company LLC |
| Grantee: | Deer Creek Ranch LLC |
| Transaction Date: | December 1, 2024 |
| Real Property Interest: | 3,462 Acres servient estate of WRP easement, 283 acres fee simple |
| Ownership Interest Transferred: | 100% |
| Highest & Best Use: | Agriculture, recreation |
| Sale Price: | |
|   Nominal Price | $7,000,000 |
|   Adjusted Price | $7,000,000 |
| Price per Acre: | $1,869 |

## PROPERTY DETAILS

| | |
|---|---|
| Location: | 0.56 miles east of Farabee Road, 5 miles east of SR 31, along northern Charlotte County boundary |
| County/State: | Charlotte, FL |
| Parcel ID Number: | 402601300001, et al |
| Parcel Size Acres: | 3,745 |
|   Upland Acres: | 768 |
|   Wetland Acres: | 2,977 |
| Land Use/Zoning: | FLUP Designation: AG, Agriculture, permitting residential development 1 unit per 5 or 10 acres and RC, Resource Conservation permitting residential development of 1 unit per 40 acres. Zoning Agriculture, AG, Charlotte County |
| Topography: | Level |
| Present Use of Surface: | Agriculture, cattle grazing |

## TRANSACTION CHARACTERISTICS

| | |
|---|---|
| Verification: | Patrick Hill, Grantee |
| Market Exposure: | |
| Financing Terms: | All cash |
| Deed Type: | SWD |
| Recording Data: | 3473886 |
| Encumbrances/Easements: | Typical ingress/egress easement, Federal WRP wetland reserve easement, see comments below. |
| Special Conditions: | None known. |

<span style="color:red">Exhibit A</span>

## COMMENTS/ANALYSIS

Physical and legal access is via a 33' wide non-exclusive easement extending 0.56 mile east from the eastern extension of Farabee Road. Farabee Road extends west to paved State Road 31 and is an unpaved Charlotte County maintained right-of-way that transitions into a non-exclusive easement for ingress/egress in proximity to the property.

The underlying residential density provided by zoning was sold to the USDA as part of the WRP conservation easement. Thus this sale is of the servient estate in which there is no residential in the encumbered 2,901 acres.

On the eastern encumbered lands continued use is limited to cattle grazing during the dry season, periodic hay harvesting (with permission from the WRP), and recreational use after implementation of the proposed wetland rehydration plan that will inundate 84% of the encumbered acreage approximately 180 days per year into the future.

Land improvements consist of improved pastures on productive organic and transitional soils served by land improvements for water control including on-site pump station. Land Improvements for water control include perimeter and interior canals along with a 650±-acre diked reservoir for storage and reuse of excess surface water in the northeast. Other typical land improvements include perimeter fencing and gates along with internal all weather ranch roads for movement of vehicles and equipment.

3,462.11 acres is encumbered by a Wetland Reserve Program Conservation Easement No. 232 referenced in Charlotte County Official Records Book 4693, Page 1079

The property is improved with pastures.The USDA and NRCS has made a restoration plan over the eastern 3,462 acres for the restoration and rehydration of historical wetlands. After implementation of this project, the 3,462 acres will have 2,901 acres of wetlands which will be inundated for 180 days per year. The western 283 fee simple acres are upland pasture. After the wetland restoration plan implementation, the property will comprise 2,977 wetland acres, an 80% wetland ratio.

This property is 92% encumbered with the USDA WRP easement which prohibits the construction of roads or buildings and prohibits impacting the wetlands and native uplands. Permitted uses include cattle grazing (5-year compatible use agreement) plus typical recreation uses.

The property was acquired by the adjacent property owner for cattle grazing and recreational opportunities of the property for future paid hunts.

On December 28, 2020, the eastern 3,462.11 acres was voluntarily placed under a USDA WRE conservation easement for $11,669,492 and referenced in Charlotte County Official Records Book 4693, Page 1079.

Exhibit A

**AERIAL PHOTOGRAPH**



Uplands/Usable Wetlands - 2,627.11 AC
Wetlands - 1,136.87 AC
Total - 3,763.98 AC

Exhibit A

**LAND COVER**



Land Cover
- AGRICULTURE - 2,423 AC
- BARREN LAND - 22 AC
- RANGELAND - 121 AC
- UPLAND FORESTS - 16 AC
- WATER - 37 AC
- WETLANDS - 1,145 AC

Exhibit A

Exhibit 3

# BIG CYPRESS

### WILDLIFE MANAGEMENT AREA

711,848 acres

Collier, Miami-Dade and Monroe Counties



Exhibit A