# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

FRIENDS OF THE EVERGLADES, INC., a Florida 501(c)(3) not-for-profit corporation, and CENTER FOR BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit organization,

CASE NO. 25-CV-22896-KMW

Plaintiffs,

vs.

KRISTI NOEM, in her official capacity as Secretary of the UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, in his official capacity as Acting Director of the UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; KEVIN GUTHRIE, in his official capacity as Executive Director of the FLORIDA DIVISION OF EMERGENCY MANAGEMENT; and MIAMI-DADE COUNTY, a political subdivision of the State of Florida,

Defendants.
_____/

## INTERVENOR COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiff-Intervenor, The Miccosukee Tribe of Indians of Florida (the "Tribe") submits the following intervenor-complaint against Defendants Kristi Noem, in her official capacity as Secretary of the United States Department of Homeland Security ("DHS"), Todd Lyons, in his official capacity as Acting Director of the United States Immigration and Customs Enforcement ("ICE"); Kevin Guthrie, in his official capacity as Executive Director of the Florida Division Of Emergency Management ("FDEM"); and Miami-Dade County (the "County") (together, DHS, ICE, FDEM, and the County are the "Defendants").

1. On July 30, 2025, the Court granted the Tribe's motion to intervene. *See* D.E. 73.

**ADOPTION BY REFERENCE**

2. Pursuant to Rule 10(c), the Tribe incorporates and adopts the following allegations from the Complaint for Declaratory and Injunctive Relief (D.E. 1) ("Complaint") filed by Plaintiffs Friends of the Everglades, Inc. ("Friends") and Center for Biological Diversity (the "Center") (together, Friends and the Center are the "Plaintiffs"):

    a. Introduction: Allegation numbers 1-5.

    b. Jurisdiction and Venue: Allegation numbers 6-7.

    c. Parties: Allegation numbers 8-20.

    d. Common Allegations: Allegation numbers 21-60.

**COUNT I**
**(VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT)**
**(Against the DIVISION, DHS and ICE)**

3. The Tribe realleges the Common Allegations as if fully set forth herein.

4. The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, requires federal agencies to prepare an Environmental Impact Statement (EIS) for any major federal action significantly affecting the quality of the human environment, or an Environmental Assessment (EA) if the agency action does not have reasonably foreseeable significant effects on the human environment, or if the significance of such effect is unknown.

5. Major federal actions include any action that is subject to "substantial Federal control and responsibility." 42 U.S.C. § 4336e(10).

6. The construction of a detention center is an action that is necessarily subject to federal control and responsibility. The State of Florida has no authority or jurisdiction to enforce federal immigration law.

7. In Fla. Stat. § 908.13, the Florida legislature authorized the Division to facilitate the transport of detainees on the condition that ICE "specifically request assistance from the division with the transport of unauthorized aliens pursuant to specific federal legal authority." *Id.* § 908.13(2)(a). Additionally, ICE "must reimburse the state for the actual cost of assisting with the transport of unauthorized aliens." *Id.* § 908.13(2)(b). Any such transport "must occur under the ***direct control and supervision*** of" ICE. *Id.* § 908.13(2)(c) (emphasis added). Because state law requires that the Division's transportation of detainees to and from the detention center occur under the "direct control and supervision" of ICE, the detention center project at the TNT Site is statutorily required to be under "Federal control and responsibility," 42 U.S.C. § 4336e(10), thereby triggering NEPA. In this way, the Division is acting as agent for DHS and ICE.

8. Florida Attorney General Uthmeier has announced that the TNT Site will be used "in support of the Trump administration" in federal law enforcement. The Attorney General has posted on social media that "Alligator Alcatraz [is] the one-stop shop to carry out President Trump's mass deportation agenda." He accompanied the post with a video of the TNT Site runway. Governor DeSantis has been quoted as stating the TNT Site is to "facilitate the federal government in enforcement."

9. On July 1, 2025, President Donald J. Trump visited the facility accompanied by United States Homeland Security Secretary Kristi Noem and Florida Governor Ron DeSantis, among other federal officials, all of whom were given a walking tour of the facility.

10. At a press conference following the tour, President Trump confirmed that federal "FEMA money" was "used [] to build this project[.]" President Trump also confirmed that the Florida government was working in partnership with the federal government on the project: "I want to express my tremendous thanks to the State of Florida for embracing this opportunity and

being a true partner. They have worked so well with the federal government. . . . [I]t's just been a beautiful, beautiful partnership."

11. Governor DeSantis confirmed the state government's cooperation with the federal government: "Now this facility here was really in response to us working with DHS and ICE from the time the president got sworn in . . . and the number one thing they kept coming back to was … we need detention space in order to be able to bring about more deportations. . . That's how you really start to make a difference. And so we're proud to be able to partner . . . with the Trump administration on that."

12. Defendant, Kevin Guthrie, Executive Director of FDEM added, "Make no mistake, this facility would not be standing here without the president, the secretary, and the governor's vision and determination to uphold the rule of law . . . when the president and the secretary asked Florida to help, the Governor empowered our state and private partners to work collaboratively and deliver real results on a rapid timeline."

13. Under 42 U.S.C. § 4336e(10), Congress identified *non*-major federal actions as actions conducted with "no or minimal Federal funding." Conversely, infrastructure projects like this one that are funded and/or approved by the Federal government, require federal agencies to prepare an environmental impact statement, or EIS for actions that significantly affect the quality of the human environment or an EA if the agency action does not have reasonably foreseeable significant effect on the human environment or if the significance of such effect is unknown. The evaluation must address the significant environmental effects of a proposed project and identify feasible alternatives that could mitigate those effects.

14. NEPA is a procedural statute that requires federal agencies to prepare an EIS, identifying significant environmental effects of the projects, as well as feasible alternatives. The

law ensures that the agency and the public are aware of the environmental consequences of proposed projects. Properly applied, NEPA helps agencies to make better decisions and to ensure good project management.

15. Specifically, an EIS must include a "detailed statement" addressing the following: (i) reasonably foreseeable environmental effects of the proposed agency action; (ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented; (iii) a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal; (iv) the relationship between local short term uses of man's environment and the maintenance and enhancement of long-term productivity; and (v) any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented. 42 U.S.C. §§ 4332(C)((i)-(v).

16. Moreover, NEPA requires that "[p]rior to making any detailed statement," the head of the lead agency "shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." *Id.* § 4332(C). Because actions associated with the construction and operation of the detention center at the TNT Site are within a national preserve that includes primary habitat for the Florida panther and critical habitat for the Florida bonneted bat, at a bare minimum federal law requires USDHS to consult with the National Park Service, and the U.S. Fish and Wildlife Service in assessing the environmental impacts of its proposed project.

17. NEPA contains no exceptions for emergency actions, and no emergency exists. NEPA regulations provided that in cases of emergencies such as a hurricane, flood or wildfire, a

federal agency should consult with the Council about alternative arrangements. These arrangements must be limited to actions necessary to control the immediate impacts of the emergency." 40 C.F.R. § 1506.12. These regulations, however, have been withdrawn. In any event, there is no emergency and, even if there was, no alternative arrangements have been implemented.

18. The arrangements between the Division, USDHS and ICE to transform the TNT Site into a mass detention and deportation facility constitute major federal action, as it involves the use of federal authority, approvals, funding and resources, and will have significant environmental impacts on an ecologically sensitive area. Those impacts, which to date have gone unevaluated, could logically include impacts to listed species, impacts to wetlands and surface waters, impacts due to increased activities at the Site, including traffic to and from the Site, hurricane and flooding preparedness, etc.

19. To Plaintiffs' knowledge, no EA or EIS has been prepared by DHS, ICE, the Division, or any cooperating agency.

## COUNT II
### (VIOLATION OF ADMINISTRATIVE PROCEDURE ACT)
### (Against DHS and ICE)

20. Plaintiffs reallege the Common Allegations as if fully set forth herein.

21. The Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, permits judicial review of final agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

22. USDHS and ICE have approved or are implementing the use of the TNT Site without providing Plaintiffs and the public with an opportunity for notice and comment, and without adhering to required environmental review procedures under NEPA and other federal laws,

including the Endangered Species Act, and the National Park Service Organic Act of 1916, (16 U.S.C. § 1, amended and recodified in 54 U.S.C. § 100101(a) (2014)).

23. The decision to proceed without notice, comment and without an EA or EIS constitutes final agency action and is subject to judicial review.

24. Plaintiffs are entitled to a declaration that the agency's conduct is unlawful, directing vacatur of the agency action, as well as an injunction preventing further activity until NEPA compliance is achieved.

**COUNT III**
**(VIOLATION OF NATIONAL HISTORIC PRESERVATION ACT)**
**(Against DHS and ICE)**

25. Plaintiffs reallege the Common Allegations as if fully set forth herein.

26. NHPA obligates federal agencies to "assume responsibility for the preservation of historic properties" under their control and requires that federal agencies having authority to license any undertaking, prior to the issuance of any license, shall take into account the effect of the undertaking on historic properties. 54 U.S.C. § 306108; 36 CFR § 800.1.

27. The timing requirement ensures the agency considers a broad range of alternatives, including no action, and to avoid, minimize or mitigate the undertaking's adverse effects to historic properties. *See* 36 CFR § 800.1(c); *Pueblo of Sandia v. United States*, 50 F.3d 856, 859-62 (10th Cir. 1995).

28. An undertaking includes "a project . . . under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license or approval." 36 CFR § 800.16 (y).

29. NHPA consultation is necessary "as long as a Federal agency has opportunity to exercise authority at any stage of an undertaking where alterations might be made to modify its impact on historic preservation goals." *Vieux Carre Prop. Owners Residents & Assoc. v. Brown*, 948 F.2d 1436, 1445 (5th Cir. 1991).

30. NHPA regulations carve out a detailed consultation process for Native American Tribes. 36 CFR § 800.2(c)(2)(ii).

31. This requirement applies, even if the location of the historic property is off tribal lands. 36 CFR § 800.2 (c)(2)(ii)(D).

32. Agencies, like DHS and ICE, shall ensure the consultation process provides a tribe with a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, articulate its views on the undertaking's effects on such properties and participate in the resolution of adverse effects. 36 CFR § 800.2 (c)(2)(ii)(A).

33. The Tribe attaches historic, cultural and spiritual significance to the areas affected by the construction and operation of the TNT Site.

34. The Miccosukee people have lived in and cared for the land now known as the Big Cypress National Preserve (the "Preserve") since time immemorial. The Tribe and its ancestors occupied, traveled, and utilized resources within its ancestral lands, including what is now the Preserve.

35. The Tribe's cultural resources and sites are historically and culturally interrelated and interconnected throughout its ancestral lands generally, including the Preserve, Everglades National Park, Water Conservation Area 3-South, the Miccosukee Reserved Area, and the Miccosukee Reservation.

36. Both the state and federal governments are well aware that of the numerosity and significance of historic Tribal properties throughout Big Cypress. Attached hereto as Exhibit A is a true and correct copy of that certain "PROGRAMMATIC AGREEMENT AMONG THE NATIONAL PARK SERVICE BIG CYPRESS NATIONAL PRESERVE, THE FLORIDA STATE HISTORIC PRESERVATION OFFICER, AND THE SEMINOLE TRIBE OF FLORIDA REGARDING THE IMPLEMENTATION OF THE BIG CYPRESS NATIONAL PRESERVE FINAL BACKCOUNTRY ACCESS PLAN/WILDERNESS STUDY/ENVIRONMENTAL IMPACT STATEMENT, AND THE BIG CYPRESS NATIONAL PRESERVE – ADDITION FINAL GENERAL MANAGEMENT PLAN/WILDERNESS STUDY/OFF-ROAD VEHICLE MANAGEMENT PLAN/ENVIRONMENTAL IMPACT STATEMENT, COLLIER, MIAMI-DADE, AND MONROE COUNTIES, FLORIDA" (the "NPS Agreement").

37. The Miccosukee Tribe is a non-signatory, Consulting Party to the NPS Agreement. (*See* Ex. A, at 21/G-22.)

38. The NPS Agreement arose in connection with NPS's preparation of a "Backcountry Access Plan/Wilderness Study/Final Environmental Impact Statement (Final Plan/FEIS) with respect to the environmental impact of proposed re-opening of off-road-vehicle trails within the Preserve, among others things. (*See* Ex. A, at ix.) Notably, NPS's decision on whether to allow off-road-vehicles on certain trails within the Preserve was sufficient to trigger an almost four-hundred page environmental impact study and consultation process with the Tribe and other Tribes in the area. (*See* Ex. A, at 1/G-2 (defining the reopening of off-road-vehicle trails as a federal undertaking under 36 C.F.R. § 800.16(y).)

39. Considering that the Tribe's ancestral homelands include the Preserve, the NPS found that *the entire Preserve* was an Area of Potential Effect. (Ex. A, at 2/G-3.) Indeed, the NPS

-9-

Agreement provides: "NPS-administered lands in the [Preserve] **contain numerous historic properties**, and these **properties are archeological, historical, of traditional and/or cultural importance to Native American Tribes in the region** and by their very nature, are non-renewable resources and of great worth to the American public." To that end, NPS acknowledged and reaffirmed its obligation to consult with the Tribe and other Tribes during its decision making process. (*See, e.g.,* Ex. A, §§ IIA ("[T]he NPS will consult with . . . the Miccosukee Tribe . . . to identify culturally sensitive areas to be avoided by trails.").)

40. As a whole, the NPS Agreement reflects the level of respect and government-to-government discussions required under law when implementing agency action in areas with known cultural significance, such as Big Cypress.

41. No such efforts were made here.

42. To date, the Tribe has not been consulted with respect to the ongoing construction and operation of the detention facility. The detention facility is located in the heart of the Tribe's ancestral homelands where hundreds, if not thousands, of protected ceremonial and religious sites are located.

43. Upon information and belief, operating a detention center will have an adverse effect on the Tribe and its members' rights to use and access these historic and culturally significant sites.

**PRAYER FOR RELIEF**

WHEREFORE, Friends of the Everglades respectfully requests that the Court:

A. Declare that Defendants' actions violate NEPA, NHPA, and the APA;

B. Enjoin any further activity at the TNT Site unless and until Defendants comply with NEPA, NHPA, and the APA;

C. Award Plaintiffs their attorneys' fees and costs as allowed by law;

D. Grant such other relief as the Court deems just and proper.

Dated: August 1, 2025

Respectfully submitted,

**CHRISTOPHER AJIZIAN, P.A.**

By: /s/ *Christopher Ajizian*
Christopher Ajizian, Esq.
Florida Bar No. 1010170
chris@ajizianlaw.com
1101 Brickell Avenue
Suite S-700
Miami, FL 33131
Tel: (305) 699-5001

-and-

**TODD R. FRIEDMAN, P.A.**
Todd R. Friedman, Esq.
Fla. Bar No. 97919
1101 Brickell Avenue
Suite S-700
Miami, Florida 33131
786-536-7190
todd@toddfriedmanpa.com

*Counsel for The Miccosukee Tribe of Indians of Florida*

## CERTIFICATE OF SERVICE

    I certify that on August 1, 2025 a true and correct copy of the foregoing was filed via the Court's CM/ECF filing system and thereby served on counsel of record.

By: <u>/s/ <i>Todd Friedman</i></u>