# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 25-CV-23182-RAR

**C.M., MICHAEL BORREGO FERNANDEZ,**
**J.M.C., E.R.**, *on behalf of themselves and*
*all others similarly situated*, *et al.*,

      Plaintiffs,

v.

**KRISTI NOEM**, *Secretary of the*
*United States Department*
*of Homeland Security*, *et al.*,

      Defendants.

_____/

## ORDER DISMISSING IN PART AND TRANSFERRING
## PLAINTIFFS' COMPLAINT FOR IMPROPER VENUE

This case involves the operations of Alligator Alcatraz, a detention facility designed by the State of Florida and located in Collier County, in the Middle District of Florida.[1] Its stated purpose is to help advance the Trump Administration's focus on immigration enforcement by serving as a "force multiplier" to facilitate deportation efforts.[2]

---

[1] The facility goes by several names, but the parties and Court will refer to it as "Alligator Alcatraz." *See* State Defs.' Mot. to Transfer Venue and Resp. in Opp'n to Pls.' Renewed Mot. for Prelim. Inj. ("State Defendants' Response" or "Venue Motion"), [ECF No. 49] at 3 n.3; *see also* Ana Ceballos, Syra Ortiz Blanes, Alex Harris & David Goodhue, *Alligator Alcatraz Receives First Immigrant Detainees Wednesday Night*, Miami Herald (July 2, 2025), https://perma.cc/QPY7-ZF8K.

[2] Kate Payne & Curt Anderson, *Environmental Groups Sue to Block Migrant Detention Center Rising in Florida Everglades*, Associated Press (June 27, 2025), https://perma.cc/47S2-ZVW7 (quoting a government spokesperson explaining that "Governor Ron DeSantis has insisted that Florida will be a force multiplier for federal immigration enforcement, and this facility is a necessary staging operation for mass deportations located at a pre-existing airport that will have no impact on the surrounding environment").

Plaintiffs are those detained at Alligator Alcatraz and the lawyers who seek to represent them. They allege that State[3] and Federal[4] Defendants have violated the First Amendment by precluding confidential attorney-client communications. A subset of those detained at Alligator Alcatraz also allege that two federal Defendants—the Executive Office of Immigration Review ("EOIR") and its Director, Sirce Owen ("EOIR Defendants")—have violated the Fifth Amendment by failing to identify an immigration court with jurisdiction over their claims. Though the scope of Plaintiffs' relief has changed over time, Plaintiffs now seek two narrow forms of injunctive relief—directing Defendants to provide regular access to confidential attorney-client communications and requiring Defendants to identify an immigration court that has jurisdiction over detained individuals at Alligator Alcatraz.

But after numerous hearings, affidavits, status conferences, and supplemental filings[5], it has become readily apparent that Plaintiff's Complaint suffers from two key flaws. For one, Plaintiff's Fifth Amendment claim has been rendered moot. And when it comes to their remaining

---

[3] For purposes of this Order, the "State Defendants" include Governor Ronald DeSantis; the Florida Division of Emergency Management ("FDEM"); and Kevin Guthrie, Director of FDEM. Initially, this civil action included Sherea Green, Director of the Miami-Dade County Corrections and Rehabilitation Department. *See* Summons, [ECF No. 1-8]. On August 12, 2025, Plaintiffs voluntarily dismissed Sherea Green from this action. *See* [ECF No. 66].

[4] For purposes of this Order, the "Federal Defendants" include U.S. Department of Homeland Security ("DHS"); Kristi Noem, Secretary of DHS; U.S. Immigration and Customs Enforcement ("ICE"); Todd Lyons, Acting Director and Senior Official Performing the Duties of the Director of ICE; Garrett Ripa, Field Office Director for ICE's Enforcement and Removal Operation's ("ERO") Miami, Fla. Field Office; Executive Office for Immigration Review ("EOIR"); and Sirce Owen, Acting Director of EOIR.

[5] This matter is ripe for review. The operative pleadings include Plaintiffs' Complaint ("Complaint"), [ECF No. 1]; Pls.' Suppl. Class Action Compl. for Decl. and Inj. Relief ("Supplement"), [ECF No. 28]; Pls.' Renewed Mot. for Prelim. Inj. ("Renewed Motion"), [ECF No. 29]; State Defs.' Resp., [ECF No. 49]; Fed. Defs.' Opp'n to Pls.' Renewed Mot. ("Federal Defendants' Response"), [ECF No. 50]; and Pls.' Reply in Supp. of their Renewed Mot. ("Reply"), [ECF No. 67]. The Court held a hearing on the Renewed Motion on August 18, 2025. [ECF No. 84]. The Court considers both these pleadings and any documents attached to the pleadings, including those pleadings that the Court has denied as moot. *See* Paperless Orders, [ECF Nos. 34, 35].

First Amendment claims, Plaintiffs have failed to make a *prima facie* showing that the alleged events substantially occurred here, in the Southern District of Florida. Consequently, the State and Federal Defendants have moved to dismiss the remaining counts in the Complaint for improper venue. And venue matters. Without it, the Court's ability to reach the merits of Plaintiffs' claims is foreclosed. For that reason, the Court **DISMISSES** Count V, **GRANTS** the State Defendants' Venue Motion, and **TRANSFERS** what remains of the instant Complaint to the Middle District of Florida.

## <u>BACKGROUND</u>

In January 2023, Defendant Governor Ronald DeSantis declared a state of emergency after finding that "the migration of unauthorized aliens to the State of Florida is likely to constitute a major disaster." Fla. Exec. Order No. 23-03 (Jan. 6, 2023), [ECF No. 47-4] at 3. Executive Order 23-03 designated the Director of FDEM—Defendant Kevin Guthrie—as the State Coordinating Officer to handle the emergency. *Id.* The State Coordinating Officer would have the authority to "[s]eek direct assistance and enter into agreements with any and all agencies of the federal government as may be needed to meet this emergency," *id.*, and to "[d]irect all state, regional, and local governmental agencies, including law enforcement agencies, to identify personnel needed from those agencies to assist in meeting the . . . mitigation needs created by this emergency, and to place all such personnel under the direct command and coordination of the State Coordinating Officer to meet this emergency." *Id.*

The Executive Order also enabled political subdivisions within the State of Florida to waive "procedures and formalities" related to "[a]cquisition and distribution, with or without compensation, of supplies, materials, and facilities." *Id.* at 5–6. Governor DeSantis has extended Executive Order 23-03. *See* Fla. Exec. Order 25-120 (June 2, 2025), [ECF No. 47-5]; Fla. Exec.

Order 25-153 (July 31, 2025), [ECF No. 47-6]. Executive Order 25-153, the latest extension, remains in effect.

On June 18, 2025, Florida Attorney General James Uthmeier identified the Dade-Collier Training and Transition Airport ("Airport"), as a "temporary detention facility" that could assist in Governor DeSantis's policy goal and serve as a "one-stop shop to carry out President Trump's mass deportation agenda." *See* Eileen Kelley, *'This Is Sacred Land': Proposal for 'Alligator Alcatraz' Draws Hundreds of Protesters to Everglades*, WLRN (June 23, 2025), https://perma.cc/5AKS-UZN2.

The Airport mostly sits in Collier County, though a small portion of the runway juts into Miami-Dade County. State Defs.' Resp. at 3. One road—the Tamiami Trail—connects the Airport to civilization. The City of Miami is fifty miles to the east. Naples is eighty miles to the west. And Monroe County—in the Southern District of Florida—is only three miles away. The Florida Everglades, a biodiversity hotspot known for its alligator habitat, surrounds the Airport. *See* Curt Anderson & Kate Payne, *First Immigration Detainees Arrive at Florida Center in the Everglades*, ASSOCIATED PRESS (July 3, 2025), https://perma.cc/Y5G8-AXK8. Hence, Attorney General Uthmeier nicknamed the Airport "Alligator Alcatraz." Alyssa Dzikowski, *Florida Attorney General Proposes "Alligator Alcatraz" as Immigration Detention Site in Everglades*, CBS NEWS (June 24, 2025), https://perma.cc/9N8G-X833.

On June 21, 2025, Defendant FDEM sent a Letter of Intent to Miami-Dade County officials, including Mayor Daniella Levine Cava. Letter of Intent to Purchase the Dade-Collier Training and Transition Airport ("Letter of Intent"), [ECF No. 47-2]. The Letter of Intent indicated that the State of Florida, by and through Defendant FDEM, intended to purchase the Airport, because Defendant FDEM had "identified the airport as a critical asset for ongoing and future

emergency response." *Id.* at 1. Mayor Levine Cava expressed some concerns. Resp. to Letter of

Intent [ECF No. 47-3]. Defendant Kevin Guthrie replied to Mayor Levine Cava on June 23, 2025,

informing the Mayor that Defendant FDEM would "begin immediate utilization of the improved

area of the site," as Defendant Guthrie "deem[ed] it necessary to meet [FDEM]'s current

operational demands in coping with the emergency." Notice of Intent, [ECF No. 47-1].

Alligator Alcatraz began accepting detainees on July 3, 2025. State Defs.' Resp. at 2;

Suppl. ¶ 84. This action followed.

**A. The Parties**

This action concerns those detained at Alligator Alcatraz ("Detained Plaintiffs") and the

attorneys who represent or hope to represent those detained at the facility ("Attorney Plaintiffs").

Relevant facts as to these Plaintiffs are expressed below.

### *i. Detained Plaintiffs*

The Detained Plaintiffs have, at various points, been detained at Alligator Alcatraz. Many

live in the Southern District of Florida. *See, e.g.*, *id.* ¶ 16 (C.M.); *id.* ¶ 17 (Michael Borrego

Fernandez ("Borrego")); *id.* ¶ 21 (J.M.C.); *id.* ¶ 22 (E.R.); *id.* ¶ 42 (A.S.); *id.* ¶ 49 (N.M.B.). The

residence for the other Plaintiffs is unknown.

Some of the Detained Plaintiffs do not have pending criminal charges or criminal

convictions. *E.g.*, *id.* ¶ 16 (C.M.); *id.* ¶ 21 (J.M.C.); *id.* ¶ 22 (E.R); *id.* ¶ 29 (Gustavo Adolfo Lopez

Hernandez ("Lopez Hernandez")); *id.* ¶ 33 (G.T.C.); *id.* ¶ 35 (F.B.). Three Detained Plaintiffs have

criminal convictions or traffic violations. *E.g.*, *id.* ¶ 17 (noting that Plaintiff Borrego has "a parole

violation for outstanding traffic violations"); *id.* ¶ 22 (noting that Plaintiff E.R. "does not have a

history of any criminal convictions and has an old traffic violation for driving without a license");

*id.* ¶ 25 (noting that Plaintiff Gonzalo Almanza Valdes ("Almanza Valdes") "is on probation based

on a plea deal for a racketeering charge").  The Complaint does not identify the criminal history of the remaining Detained Plaintiffs.

Many Detained Plaintiffs were initially apprehended by officers with a connection to the Southern District of Florida.  Plaintiff Borrego, for example, was arrested for a parole violation by Miami-Dade County law enforcement.  *Id.* ¶ 17.  Plaintiff G.T.C. was detained in a Customs and Border Patrol ("CBP") facility in Dania Beach.  *Id.* ¶ 33.  And officers took Plaintiff A.S. into custody at his residence in this District.  *Id.* ¶ 42.

That said, many of the Detained Plaintiffs were initially apprehended in the Middle District of Florida.  Police officers arrested Plaintiff E.R. on a federal highway "near Fort Myers."  *Id.* ¶ 22.  Plaintiff Almanza Valdes "was detained at a monthly check-in with his probation officer in Orlando."  *Id.* ¶ 25.  Plaintiff Lopez Hernandez was initially taken into custody and detained at the Pinellas County Jail.  *Id.* ¶ 30.  And Plaintiff R.P. was stopped by law enforcement and taken to the Orange County Jail.  *Id.* ¶ 37.  The Complaint does not detail where the remaining Detained Plaintiffs were initially detained.

All Detained Plaintiffs landed up in Alligator Alcatraz.  Their paths from initial apprehension to detention at Alligator Alcatraz were varied.  Some, like C.M., were taken directly to Alligator Alcatraz from the Southern District of Florida.  *Id.* ¶ 16; *id.* ¶ 43 (A.S.).  Some were moved around from federal immigration facilities in the Southern District of Florida before arriving at Alligator Alcatraz.  *E.g.*, *id.* ¶ 21 (J.M.C.); *id.* ¶ 33 (G.T.C.); *id.* ¶ 35 (F.B.).  Others, like Plaintiff Borrego, were transferred between detention facilities in the Middle District and Southern District prior to their arrival.  *E.g.*, Decl. of Katherine H. Blankenship ("Blankenship Decl."), [ECF No. 5-1] ¶ 9(c) (Borrego); Suppl. ¶ 37 (R.P.)  And still others were moved from state jails in

the Middle District of Florida to Alligator Alcatraz without ever having set foot in the Southern District. *E.g.*, *id.* ¶ 25 (Almanza Valdes); *id.* ¶ 30–31 (Lopez Hernandez).

C.M., Borrego, J.M.C., E.R., Lopez Hernandez, G.T.C., R.P., GM.S.G.,[6] and A.S. are no longer in Alligator Alcatraz and have been transferred to federal facilities. *See* Status Report, [ECF No. 58] at 2–6. Three named Detained Plaintiffs—Almanza Valdes, F.B., and N.M.B.—remain at Alligator Alcatraz.

All the Detained Plaintiffs allege that their access to counsel while at Alligator Alcatraz has been "blocked," because "[n]o protocols exist at the facility for providing standard means of confidential attorney-client communication." Suppl. ¶ 4. The only form of communication that the Detained Plaintiffs have is "via infrequent access to collect pay phone calls, which are monitored and recorded, and last approximately five minutes." *Id*; *see id.* ¶ 19 (describing nonconfidential collect phone calls between Borrego and his family); *id.* ¶ 23 (describing short phone calls between E.R., his wife, and his attorney on a monitored, non-confidential line). Plaintiff E.R. further reports that "the Alligator Alcatraz facility does not post any information about how to reach an attorney, schedule a legal call, or contact ICE." *Id.* At bottom, nearly all Detained Plaintiffs maintain that they have "been unable to communicate confidentially with [their] attorney[s] while at Alligator Alcatraz." *E.g.*, *id.* ¶ 32 (Lopez Hernandez); *id.* ¶ 25 (Almanza Valdes); *id.* ¶ 33 (G.T.C.); *id.* ¶ 36 (F.B.); *id.* ¶ 41 (R.P.); *id.* ¶ 45 (A.S.); *id.* ¶ 48 (G.M.S.G.). And Plaintiff N.M.B. presents a similar allegation, noting that his "attorneys' representations of him, including in protecting his interests in adequate procedures to seek bond redetermination, has been further hindered by limitations on attorney-client communications at the facility." *Id.* ¶ 50.

---

[6] The Status Report indicates that "G.M.S.C." was transferred from Alligator Alcatraz, *see* Status Rep. at 6, but the Court assumes Plaintiffs intended to refer to Named Detained Plaintiff G.M.S.G.

Much has changed since the Complaint's filing. Plaintiffs Borrego, J.M.C., Lopez Hernandez, G.M.S.G., and N.M.B. have met with counsel by videoconference, *see* Status Rep. at 2, 4, 6, though they maintain that "the videoconference calls are not . . . confidential, are not in an enclosed room, and . . . they cannot fully communicate with and answer questions posed by counsel, as staff are in close, listening proximity to detainees." *Id.* at 1; *see also id.* at 2 ("Although detainees are provided with a headset, the call takes place in a public setting, and officers can hear what detainees are saying to counsel.").

A subset of the Detained Plaintiffs—Almanza Valdes, Lopez Hernandez, G.T.C., F.B., R.P., A.S., G.M.S.G., and N.M.B.—allege that they are eligible for bond hearings or have had a bond motion filed on their behalf in immigration court. *E.g.*, Suppl. ¶ 26 (Almanza Valdes); *id.* ¶ 31 (Lopez Hernandez); *id.* ¶ 34 (G.T.C.); *id.* ¶ 36 (F.B.); *id.* ¶ 38 (R.P.); *id.* ¶ 44 (A.S.); *id.* ¶ 48 (G.M.S.G.); *id.* ¶ 50 (N.M.B.). This subset alleges that their attorneys have been unable to access—let alone identify—the proper court for those hearings. Many of these Detained Plaintiffs' attorneys have contacted the Krome North Service Processing Center in Miami ("Krome"), but each have been informed by an immigration judge or court clerk that immigration judges at Krome do not have jurisdiction over cases of detainees held at Alligator Alcatraz. *E.g.*, *id.* ¶ 27 (Almanza Valdes); *id.* ¶ 34 (G.T.C.); *id.* ¶ 36 (F.B.); *id.* ¶ 40 (R.P.); *id.* ¶ 44 (A.S.); *id.* ¶ 48 (G.M.S.G.); *id.* ¶ 50 (N.M.B.); *see also id.* ¶ 32 (noting that the "Broward Immigration Court" informed Plaintiff Lopez Hernandez's attorney that it lacked jurisdiction over detainees at Alligator Alcatraz). Despite contacting various federal and state entities, attorneys for this subset of Detained Plaintiffs have been unable to identify which immigration court has jurisdiction over detainees at Alligator Alcatraz. *See id.* ¶¶ 28, 32, 41, 45, 48.

These facts, too, have changed. On August 16, 2025, the Federal Defendants filed a Notice of Material Development, indicating that the EOIR Defendants had publicly designated Krome as the immigration court with jurisdiction over all detainees held at Alligator Alcatraz. *See* [ECF No. 83].

### ii. Attorney Plaintiffs

Four immigration law firms and legal service organizations—Amanda Velazquez, P.A.,[7] Perez PLLC, Sanctuary of the South, and U.S. Immigration Law Counsel ("Attorney Plaintiffs")— provide immigration counsel to detained individuals but have been allegedly prevented from speaking with clients detained at Alligator Alcatraz. All the Attorney Plaintiffs are based in the Southern District of Florida. *See* Suppl. ¶ 51 (Amanda Velazquez, P.A.); *id.* ¶ 54 (Perez PLLC); *id.* ¶ 57 (Sanctuary of the South); *id.* ¶ 60 (U.S. Immigration Law Counsel). Each Attorney Plaintiff represents a Detained Plaintiff. *See id.* ¶ 16 (noting that Amanda Velazquez, P.A. represents C.M.); *id.* ¶ 18 (noting that Sanctuary of the South represents Borrego); *id.* ¶ 22 (noting that Perez PLLC represents E.R.); *id.* ¶ 21 (noting that U.S. Immigration Law Counsel represents J.M.C.).

When the Complaint was filed, the Attorney Plaintiffs alleged that they had repeatedly contacted state, federal, and local officials by phone and email requesting to communicate with their clients. *See id.* ¶¶ 16, 20, 23, 52; *see also id.* ¶ 55 (noting that Attorney Plaintiff Perez PLLC called the ICE Miami Field Office to speak with her client, but was kept on hold before having the call disconnect). In addition, the Attorney Plaintiffs physically traveled to Alligator Alcatraz to meet with their clients but were turned away by various state and federal officials upon arrival. *Id.* ¶¶ 7, 62; *see also* Reply at 28.

---

[7]  Plaintiff Amanda Velazquez was doing business as "Florida Keys Immigration" when she joined this suit. Her Supplemental Declaration represents that she would prefer to use the firm's "official registered business name," which is Amanda Velazquez, P.A. *See* Suppl. Decl. of Amanda Velazquez, [ECF No. 67-12] ¶ 2.

Many of the Attorney Plaintiffs reported sending an email to "legal@privacy6.com" to contact their clients upon the advice of federal and state officials, only to find out that the email address was—for a period of time—nonfunctional. Suppl., ¶¶ 52, 62–63. The Attorney Plaintiffs who have contacted this email address have received a "Legal Counsel Visitation Request Form" that instructs attorneys to attach any documents that they plan to show or discuss with clients so that individuals at Alligator Alcatraz may review and approve them prior to their meeting. *Id.* ¶ 7. The Attorney Plaintiffs who have filled out the Visitation Request Form have received emails from Alligator Alcatraz supervisors "a few days later," but those emails have not "provided any specific information about how a call with a client might proceed, which client the call might be with, any instructions for connecting to the call, or specific times for the call." *Id.* ¶ 8. In the emails, representatives from Alligator Alcatraz have informed Plaintiffs that they "recognize and respect the critical importance of timely and secure attorney-client access." Decl. of Katherine H. Blankenship ("Blankenship Declaration"), [ECF No. 5-1] at 24; *see also* Decl. of Catherine Perez, [ECF No. 5-2] at 12.

In addition, several Attorney Plaintiffs maintain that Defendants have told them "that they are not obligated to provide basic information about attorney access protocols at the facility to detainees and the public." Reply at 7 (citing Decl. of Z. Zareefa Khan, [ECF No. 21-2] ¶ 4; Suppl. Decl. of Aida Ramirez, [ECF No. 67-10] ¶ 4; Suppl. Decl. of Catherine Perez, [ECF No. 67-6] ¶ 6; Suppl. Decl. of Amanda Velazquez, [ECF No. 67-12] ¶¶ 10, 12; Suppl. Decl. of Johan Gutierrez [ECF No. 67-5] ¶ 7). Given these issues, the Attorney Plaintiffs allege that they have been wholly barred from communicating with present and prospective clients "as a result of the policies and practices at the facility." Suppl. ¶ 61; *see also id.* ¶¶ 53, 55, 59. The Attorney Plaintiffs also allege

that they have incurred time and expenses that would not have been incurred but for these barriers to attorney-client access. *Id.* ¶¶ 56, 64.

As with the Detained Plaintiffs, facts on the ground have overtaken the allegations in the Complaint with respect to the Attorney Plaintiffs. Amanda Velazquez, P.A., was able to communicate with a client on August 1, 2025, via videoconference. Status Rep. at 6. Perez LLC held a videoconference with a client on July 26, 2025. *Id.* at 7. Sanctuary of the South communicated with a client on July 16, 2025 (the day of the Complaint's filing), and communicated with Detained Plaintiffs Borrego and E.R. on July 23, 2025 and August 7, 2025, respectively. *Id.* And U.S. Immigration Law Counsel spoke with Plaintiff J.M.C. via videoconference on July 18, 2025, two days after the Complaint's filing. *Id.* However, the Attorney Plaintiffs maintain that these videoconference calls with their clients are not confidential. *See id.* at 6–7; *see also* Reply at 26–32.

### B. The Claims

Plaintiffs' Complaint rests on five causes of action, none of which challenge the conditions of Detained Plaintiffs' confinement, the legality of that confinement, or the policies and procedures that led to Alligator Alcatraz's creation. These causes of action can be grouped with reference to the Plaintiffs' identities.

The Detained Plaintiffs—C.M., Borrego, J.M.C., E.R., Almanza Valdes, Lopez Hernandez, G.T.C., F.B., R.P., A.S., G.M.S.G., and N.M.B.—contend that all Defendants are violating the First Amendment by unreasonably restricting the Detained Plaintiffs' right to hire, consult, and communicate with an attorney, *see* Suppl. ¶¶ 127–30 (Count I). They have also filed a separate statutory claim against the State Defendants under 42 U.S.C. § 1983 for that constitutional violation. *See id.* ¶¶ 131–34 (Count II). The Detained Plaintiffs have brought these

claims on behalf of themselves and a proposed class. *See* Pls.' Renewed Mot. for Class Certification and Mem. of Law in Supp., [ECF No. 30].

The Attorney Plaintiffs—Amanda Velazquez, P.A., the Law Offices of Catherine Perez PLLC, Sanctuary of the South, and U.S. Immigration Law Counsel—contend that all Defendants are violating the First Amendment by denying them the right of their organizations to speak to clients, prospective clients, and witnesses about their legal rights, *see* Suppl. ¶¶ 135–41 (Count III). They have also filed a separate statutory claim against the State Defendants under 42 U.S.C. § 1983 for that constitutional violation. *See id.* ¶¶ 142–47 (Count IV).

Some Detained Plaintiffs—Almanza Valdez, Lopez Hernandez, G.T.C., F.B., R.P., A.S., G.M.S.G., and N.M.B. (collectively, the "Bond Plaintiffs")—contend that the EOIR Defendants are violating the Fifth Amendment by failing to identify an immigration court with jurisdiction over Plaintiffs' claims.[8]

## C. Procedural History

This case has a tortured procedural history. Nearly every aspect of Plaintiffs' civil action—their causes of action, their facts in support, their theories of venue, their arguments on the merits, and their requests for relief—have changed with each filing. Because Plaintiffs' protean litigation

---

[8] Count V has expanded and contracted with each pleading. Initially, Count V alleged that the EOIR Defendants violated the Fifth Amendment by failing to identify an immigration court with jurisdiction over Plaintiff N.M.B.'s bond determination. Plaintiffs' Supplement then expanded Count V to include *all* Defendants and added several new named Plaintiffs, along with a proposed subclass. The Supplement further added a separate statutory claim against the State Defendants under 42 U.S.C. § 1983 that was distinct from their constitutional claim against all Defendants. Comingling separate theories of liability into a single cause of action, as the Eleventh Circuit has plainly instructed, is procedurally improper. *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1322–23, 1323 n.13 (11th Cir. 2015). Then, in a *footnote* to Plaintiffs' Reply, Plaintiffs apparently conceded that the only proper parties to Count V were the EOIR Defendants. Reply at 36 n.6; *see infra* p.17–18. Plaintiffs are thus back where they started.

strategy has profoundly affected their case, the Court finds it necessary to explain how this case has evolved.

Plaintiffs filed their Complaint on July 16, 2025.  [ECF No. 1].  At the time, the Complaint included four named Plaintiffs, representing themselves and a proposed class.  The next day, Plaintiffs filed a motion for "expedited relief seeking entry of a temporary restraining order ("TRO") by July 21, 2025" pursuant to Southern District of Florida Local Rule 7.1(d)(2). Expedited Mot. at 1 (citation omitted).  The Expedited Motion sought both a temporary restraining order and a preliminary injunction "requiring Defendants to permit attorney-client communication at Alligator Alcatraz" for the four named Plaintiffs and the proposed class.  *Id.* at 3.  In addition, Plaintiffs filed a Motion for Class Certification.  [ECF No. 6].

The Court explained to Plaintiffs that their framing of relief in the Expedited Motion was procedurally improper, because it conflated a distinction between an *emergency* motion and an *expedited* one, and further failed to certify that the matter was an emergency as required by the Local Rules.  *See* Order, [ECF No. 17] at 1.  The Court further noted that the Expedited Motion "at times appear[ed] to seek relief only as to the four named Plaintiffs . . . and at other times appear[ed] to seek relief on behalf of the named Plaintiffs *and* the Proposed Class."  *Id.* at 2.  The Court therefore required the parties to clarify the nature and scope of the Expedited Motion.  The Plaintiffs clarified that the Expedited Motion was made on behalf of themselves and a proposed class and then requested expedited briefing.  *See generally* Status Rep., [ECF No. 20].

Soon after, Plaintiffs filed a Supplement to their Expedited Motion that "add[ed] two requests to the existing TRO Motion."  Suppl. to Expedited Mot., [ECF No. 21] at 2.  First, the Supplement requested that "Defendants [ ] identify an immigration court that has jurisdiction over detainees held at Alligator Alcatraz, and [ ] promptly accept and adjudicate petitions for bond by

proposed class members." *Id.* Second, the Supplement requested that the Court "immediately schedule a Status Conference and order Defendants to clarify which entities have custody over the immigrant detainees held at Alligator Alcatraz, and the legal basis for their custody." *Id.*

The Court set a Status Conference for all parties on July 28, 2025. [ECF No. 22]. At the Status Conference, counsel for State Defendants DeSantis and Guthrie argued that there was "a clear venue issue" for the Court, and the Court noted that Defendants would seek to raise, "first and foremost, a venue argument." Status Conference Tr., [ECF No. 38] at 27:3, 32:21–22. Though the Court asked whether Plaintiffs would seek leave to file an amended complaint as a matter of course, *see id.* at 11:6–9, counsel for Plaintiffs stated that they would prefer to supplement their Complaint pursuant to Rule 15(d) of the Federal Rules of Civil Procedure, "such that [Plaintiffs] don't have to update the initial facts that were pled." *Id.* at 11:15–18. Plaintiffs also agreed to refile their Expedited Motion and Motion for Class Certification, and the Court allowed Plaintiffs to file a Motion for Limited Expedited Discovery on any federal-state agreements pertaining to the operation of Alligator Alcatraz. *Id.* at 74:13–24. The Court memorialized the takeaways from the Status Conference in a subsequent Order filed on July 28, 2025, allowed Plaintiffs to file a Supplement to their Complaint pursuant to Rule 15(d) of the Federal Rules of Civil Procedure, and set an expedited briefing schedule *solely* on Plaintiffs' forthcoming Renewed Motion for Preliminary Injunction.[9] *See* Order, [ECF No. 27].

Plaintiffs filed a Supplement to their Complaint, [ECF No. 28], a Renewed Motion for Preliminary Injunction, [ECF No. 29], and a Renewed Motion for Class Certification, [ECF No.

---

[9]  Despite this clear instruction, Plaintiffs filed a Motion for Clarification on August 4, 2025, [ECF No. 42], that "request[ed] confirmation" that the Court would also consider Plaintiffs' Renewed Motion for Class Certification, [ECF No. 30], at the preliminary injunction hearing. The Court denied that Motion, noting that the parties were made aware at the Status Conference that the Court would hear oral argument solely on Plaintiffs' Renewed Motion for Preliminary Injunction. *See* Paperless Order on Pls.' Mot. for Clarification, [ECF No. 43].

30], on July 29, 2025. The Supplement materially changed Plaintiffs' claims. For one, the Supplement expanded the number of named Detained Plaintiffs from four to twelve, and alleged that all twelve Detained Plaintiffs had been unable to communicate confidentially with counsel. Suppl. ¶ 11. The Supplement also expanded the scope of Count V. *Compare* Compl. ¶¶ 117–22, *with* Suppl. ¶¶ 148–55. The original Complaint alleged that Federal Defendant EOIR had failed to identify which immigration court had jurisdiction to receive and rule on Plaintiff N.M.B.'s bond motion. Compl. ¶¶ 117–22. The Supplement added seven new Plaintiffs to Count V, further alleged that *all* State Defendants were responsible for violating Plaintiffs' rights under both the Fifth Amendment and 42 U.S.C. § 1983 and sought relief on behalf of "all persons who are currently, or in the future, held at the Alligator Alcatraz detention facility, and seek release on bond." Suppl. ¶ 119.

Plaintiffs also filed a Motion for Limited Expedited Discovery on July 29, 2025, [ECF No. 32], and the Court granted in part and denied in part that Motion on August 4, 2025, [ECF No. 41]. The Order required Defendants to "[p]roduce all written agreements . . . that provide the legal authority for any government agency or private contractor to detain people and exercise other immigration officer functions at Alligator Alcatraz," to "[i]dentify all federal, state, and/or local government agencies that have legal custody over people detained at Alligator Alcatraz," and to "[i]dentify all federal, state, and/or local government agencies that have legal custody over people detained at Alligator Alcatraz." Order Granting in Part and Den. in Part Pl.'s Mot. for Limited Expedited Disc., [ECF No. 41] at 5–6.

All Defendants responded to the Court's Order Authorizing Limited Discovery and provided accompanying declarations on August 7, 2025. *See* [ECF Nos. 48, 52, 53]. The State Defendants provided various memoranda of agreements between state entities and Federal

Defendant ICE made pursuant to 8 U.S.C. § 1357(g)(1) ("287(g) Agreements").[10]   The State Defendants also identified all Florida state agencies that "are performing detention duties" at Alligator Alcatraz and noted that several state and federal actors without explicit 287(g) Agreements were "assisting with detention operations" at Alligator Alcatraz.  [ECF No. 52] at 2–3.  The Federal Defendants included the same set of 287(g) Agreements as the State Defendants in their responsive production. *Compare* [ECF No. 53-1], *with* [ECF No. 52] at 5–140; *see also* *supra* n.10.

All Defendants filed Responses in Opposition to Plaintiffs' Renewed Motion on August 7, 2025, *see* [ECF Nos. 47, 49, 50].  In their Response in Opposition, the State Defendants sought to dismiss for improper venue or transfer this case pursuant to Federal Rule of Civil Procedure 12(b)(3).  State Defs.' Resp. at 2.

Defendants' filings suggested that there could be discrepancies between Plaintiffs' filings and the facts on the ground.  One filing, for example, noted that "the first successful videoconference between detainees and legal counsel" occurred one day prior to the Complaint's filing, and that "video conference meetings have been available and have occurred nearly every day, other than Sundays."  Decl. of Mark Saunders ("Saunders Declaration") ¶¶ 22, 23.  The Saunders Declaration also noted that in-person meetings began on July 28, 2025, or the day that

---

[10]   The State Defendants have provided 287(g) Agreements for the following state agencies: Florida Department of Business and Professional Regulation, Division of Alcoholic Beverages and Tobacco, [ECF No. 52] at 5–19 (287(g) Task Force Model); Florida Department of Corrections, *id*. at 20–34 (287(g) Jail Enforcement Model); Florida Department of Law Enforcement, *id.* at 35–49; Florida Department of Financial Services, Criminal Investigations Division, *id.* at 50–64 (287(g) Task Force Model); Florida Department of Highway Safety and Motor Vehicles, Division of Highway Patrol, *id.* at 65–80; Florida Fish & Wildlife Conservation Commission, *id.* at 81–95; Florida Department of Lottery, Division of Security, *id.* at 96–110 (287(g) Task Force Model); Florida National Guard, *id.* at 111–25; and the Florida Department of Environmental Protection, Division of Law Enforcement, *id.* at 126–40 (287(g) Task Force Model).

all parties appeared before the Court for a Status Conference. *Id.* ¶ 37.  The Saunders Declaration further stated that several of the Detained Plaintiffs who raised First Amendment claims met with counsel prior to the July 28 Status Conference, the July 29 Supplement, and the July 29 Renewed Motion. *E.g.*, *id.* ¶ 63(a)–(d).

The Court reviewed the Saunders Declaration, Defendants' Responses, and Defendants' discovery productions.  Soon after, the Court required both Detained and Attorney Plaintiffs to submit a Status Report regarding attorney access at Alligator Alcatraz.  [ECF No. 51].  The Court required Plaintiffs to address if each Detained Plaintiff had accessed counsel; where and through what method those communications occurred; and whether such communications were confidential. *Id.* at 6.  The Court also required the Attorney Plaintiffs to detail whether they had been able to access present or potential clients, the dates on which those communications occurred, and whether such communications were confidential. *Id.*

Plaintiffs submitted a Status Report pursuant to the Court's Order on August 8, 2025.  [ECF No. 58].  In the Status Report, Plaintiffs noted that many of the Detained Plaintiffs and Attorney Plaintiffs had established attorney-client communications, but maintained that such communications were not confidential, contrary to Defendants' assertions. *Id.*  Plaintiffs filed a Notice of Errata regarding the Status Report on August 13, 2025, indicating that they had inadvertently provided incorrect dates of transfer for Plaintiffs Lopez Hernandez and E.R.  [ECF No. 70].

On August 13, 2025, Plaintiffs filed their Reply.  [ECF No. 67].  The Reply narrowed the Complaint's scope of requested relief for the Detained Plaintiffs by seeking "regular access to confidential communications with their attorneys and identification of an immigration court that has jurisdiction over Alligator Alcatraz so that detained people can file petitions for bond or

release." *Id.* at 42. In addition, the Reply appeared to amend Count V as it existed in the Supplement to include only the EOIR Defendants as proper Defendants. In other words, the Reply appeared to drop the State Defendants and the non-EOIR Federal Defendants as proper parties for Count V. *Id.* at 36 n.16. Curiously, Plaintiffs did so in a footnote to the Reply, instead of amending the Complaint outright, as one would expect. *Id.* (noting that because the Federal Defendants' responses "make clear that EOIR Defendants have the authority necessary to provide the relief Plaintiffs seek," Plaintiffs "proceed[ ] only against EOIR Defendants on this claim"). Further, the Reply made no mention of the *Attorney* Plaintiffs' purported First Amendment right to communicate confidentially with their present and prospective clients and instead focused only on the Detained Plaintiffs' claims.

The Court held a Status Conference on August 14, 2025, prior to the preliminary injunction hearing. *See* [ECF No. 71]. At the Status Conference, the Court asked counsel for Plaintiffs to "point [the Court] to any action, act, or omission occurring in the Southern District of Florida by the State Defendants." *Id.* at 10:3–5. Plaintiffs were unable to answer that question at the Status Conference but informed the Court that they would provide an answer at the preliminary injunction hearing. The Court held the preliminary injunction hearing on August 18, 2025. *See* [ECF No. 84].

## LEGAL STANDARD

On a motion to dismiss or transfer for improper venue under Federal Rule of Civil Procedure 12(b)(3), plaintiffs bear the burden of demonstrating that venue in the forum is proper. *BP Prods. N. Am., Inc. v. Super Stop 79, Inc.*, 464 F. Supp. 2d 1253, 1256 (S.D. Fla. 2006). "The facts as alleged in the complaint are taken as true, to the extent they are uncontroverted by defendants' affidavits." *Delong Equip. Co. v. Wash. Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir. 1988). When the two conflict, "the court may examine facts outside of the complaint to

determine whether venue is proper." *Wai v. Rainbow Holdings*, 315 F. Supp. 2d 1261, 1268 (S.D. Fla. 2004). When examining the record, the court must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff. *Id.* If the court finds that venue is improper, it "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). Transfer may also be appropriate "to any district or division to which all parties have consented," both "[f]or the convenience of parties and witnesses" and "in the interest of justice." 28 U.S.C. § 1404(a).

## ANALYSIS

### A. Jurisdiction

First, the Court must consider its own jurisdiction. *See Belleri v. United States,* 712 F.3d 543, 547 (11th Cir. 2013) ("[I]n the federal tandem, jurisdiction takes precedence over the merits. Unless and until jurisdiction is found, both appellate and trial courts should eschew substantive adjudication." (citation modified)). Federal courts are "courts of limited jurisdiction," possessing "only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "The burden for establishing federal subject matter jurisdiction rests with the party bringing the claim." *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1247 (11th Cir. 2005). "[O]nce a federal court determines that it is without subject matter jurisdiction, the court is powerless to continue." *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999).

### i. Mootness

At the outset, the Court considers whether Plaintiffs' claims are moot. Article III of the U.S. Constitution limits the jurisdiction of federal courts to "cases" and "controversies." U.S. Const. art. III, § 2, cl. 1. An action runs afoul of this jurisdictional limitation "when it no

longer presents a live controversy with respect to which the court can give meaningful relief." *Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health and Rehab. Servs.*, 225 F.3d 1208, 1216–17 (11th Cir. 2000) (quoting *Ethredge v. Hail*, 996 F.2d 1173, 1175 (11th Cir. 1993)). "If events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give the plaintiff or appellant meaningful relief, then the case is moot" and "dismissal is required because mootness is jurisdictional." *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001). Unlike standing, mootness requires the Court to "look at the events at the present time, not at the time the complaint was filed." *Dow Jones & Co. v. Kaye*, 256 F.3d 1251, 1254 (11th Cir. 2001).

As the Court has noted, several developments have occurred since Plaintiffs filed this case, requiring the Court to consider whether some or all of Plaintiffs' claims may be moot. First, many of the Detained Plaintiffs have been transferred out of Alligator Alcatraz. Second, many of the Detained Plaintiffs (including those who have since been transferred out of Alligator Alcatraz) have received access to counsel, and all the Attorney Plaintiffs have received access to Alligator Alcatraz detainees. *See* [ECF Nos. 58, 70] (detailing dates on which individual Detained Plaintiffs accessed counsel and Attorney Plaintiff accessed present or potential clients at Alligator Alcatraz).

Lastly, on August 16, 2025, the Federal Defendants filed a Notice of Material Development indicating that EOIR has publicly designated Krome as the immigration court with jurisdiction over Alligator Alcatraz. *See* [ECF No. 83] at 1 (citing *Immigration Court List – Administrative Control*, DEP'T OF JUSTICE, https://perma.cc/8XG8-BWZ8 (identifying Krome as the "Administrative Control Court" for Alligator Alcatraz). Given this recent development, the Court begins its analysis as to mootness with Plaintiffs' Fifth Amendment claim before turning to the First Amendment claims.

### a. *Fifth Amendment Claim*

The Fifth Amendment claim is moot and must be dismissed.  In evaluating mootness, "[t]he fundamental question is whether events have occurred that deprive [the Court] of the ability to give the [plaintiff] meaningful relief."  *Djadju v. Vega*, 32 F.4th 1102, 1107 (11th Cir. 2022) (citing *United States v. Al-Arian*, 514 F.3d 1184, 1189 (11th Cir. 2008)).

This is a classic case of mootness.  The Fifth Amendment claim is premised entirely on the contention that "Defendants have failed to identify which immigration court has jurisdiction over Alligator Alcatraz."  Suppl. ¶ 150.  Plaintiffs posit that the alleged Fifth Amendment violation "could readily be cured by publicly identifying which immigration court has jurisdiction over Alligator Alcatraz."  *Id.* ¶ 152.  Indeed, this is the only non-declaratory relief sought in connection with the Fifth Amendment claim.  *See id.* at Prayer for Relief ¶ j (requesting that the Court "[o]rder Defendants to publicly identify a federal immigration court that has jurisdiction over detainees held at Alligator Alcatraz"); Reply at 37 ("All that Plaintiffs request is for EOIR Defendants to identify clearly and publicly *which* immigration court from which they can seek release.").

The EOIR Defendants have now publicly identified that Krome has jurisdiction over Alligator Alcatraz.  *See* [ECF No. 83] at 1.  The Bond Plaintiffs have therefore received all the relief they seek.  The Court can do no more.  At this point, any ruling by the Court on the Fifth Amendment claim would be purely advisory.  *See Knight v. Fla. Dep't of Corr.*, 936 F.3d 1322, 1334 (11th Cir. 2019) ("[I]f 'the court cannot relieve the harm of which a plaintiff complains, the court should not take the case; in the absence of an effective remedy its decision can amount to nothing more than an advisory opinion.'" (quoting *Wymbs v. Republican State Exec. Comm.*, 719 F.2d 1072, 1085 (11th Cir. 1983))).  "'And it is quite clear that the oldest and most consistent

thread in the federal law of justiciability is that the federal courts will not give advisory opinions.'" *Id.* at 1338 (quoting *Flast v. Cohen*, 392 U.S. 83, 96 (1968)).

Two important exceptions to mootness doctrine are relevant here, though neither rescues the Fifth Amendment claim.[11] First, there is a "narrow" exception applicable only in "exceptional situations" when "the action being challenged by the lawsuit is capable of being repeated *and* evading review." *Al Najjar*, 273 F.3d at 1336 (citations omitted). The exception "can be invoked only when '(1) there [is] a reasonable expectation or a demonstrated probability that the *same* controversy will recur involving the same complaining party, and (2) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration.'" *Id.* (quoting *Sierra Club v. Martin*, 110 F.3d 1551, 1554 (11th Cir. 1997) (alterations in original)).

The possibility that the same controversy will recur involving the same complaining party is entirely speculative in this case. Two conditions would need to be met for the complained-of conduct to recur: The Bond Plaintiffs would have to be re-detained at Alligator Alcatraz, *and* the EOIR Defendants would have to reverse course by refusing to name an immigration court that has jurisdiction over Alligator Alcatraz.

Neither condition is likely to occur. There is no evidence that detainees moved from Alligator Alcatraz to other facilities are being returned to Alligator Alcatraz. Indeed, there is no reason why that would be the case given that Alligator Alcatraz is explicitly set up as a temporary detention facility. *See* Reply at 1 (referring to Alligator Alcatraz as a "temporary detention

---

[11] In a putative class action, "an 'inherently transitory' class-action claim is not necessarily moot upon the termination of the named plaintiff's claim," *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75–76 (2013), if it is "'certain that other persons similarly situated' will continue to be subject to the challenged conduct," *id.* (quoting *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991) (citation modified)). This exception is not relevant here because the EOIR Defendants' designation of an immigration court with jurisdiction over Alligator Alcatraz moots this case as to both the Bond Plaintiffs *and* all potential members of the class.

facility"); State Defs.' Resp. at 2 (same); Fed. Defs.' Resp. at 1 (same). Nor is there any obvious reason why the EOIR Defendants would—after already making the determination that Alligator Alcatraz is under Krome's jurisdiction and publicizing that information—backtrack by again failing to publicize which immigration court has jurisdiction over Alligator Alcatraz. "The remote possibility that an event might recur is not enough to overcome mootness, and even a likely recurrence is insufficient if there would be ample opportunity for review at that time." *Al Najjar*, 273 F.3d at 1336. Thus, there is simply no "reasonable expectation or . . . demonstrated probability that the *same* controversy will recur involving the same complaining party." *Id.* Accordingly, the capable-of-repetition-yet-evading-review exception to mootness does not apply here.

Second, Plaintiffs' reliance at the preliminary injunction hearing on the "voluntary cessation" doctrine fails. *See* [ECF No. 84]; *see also* [ECF No. 81] at 1 (noting that Plaintiffs oppose the Federal Defendants' contention that the Fifth Amendment claim is moot because the Federal Defendants' "voluntary decision [to designate an immigration court with jurisdiction over Alligator Alcatraz] provides no guarantee that the challenged practice will not continue if the lawsuit is dismissed").[12] "Ordinarily, a party's 'voluntary cessation' of conduct challenged in a lawsuit does not moot a case" unless "the party responsible for the allegedly illegal conduct" can show "that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Djadju*, 32 F.4th at 1108 (citing *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267 (11th Cir. 2020)).

This burden flips when the defendant is a governmental entity. "Because 'there is a presumption that the government will not later resume the action,' the opposing party must show a reasonable expectation that the government will reverse course." *Id.* (quoting *Walker v. City of*

---

[12] At the preliminary injunction hearing, [ECF No. 84], Plaintiffs confirmed that they believe the Fifth Amendment claim is not moot under the voluntary cessation doctrine.

*Calhoun*, 901 F.3d 1245, 1270 (11th Cir. 2018)); *see also Troiano v. Supervisor of Elections in Palm Beach Cnty., Fla.*, 382 F.3d 1276, 1283 (11th Cir. 2004) ("[W]hen the defendant is not a private citizen but a government actor, there is a rebuttable presumption that the objectionable behavior will *not* recur[.]"); *Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1328–29 (11th Cir. 2004) ("[G]overnmental entities and officials have been given considerably more leeway than private parties in the presumption that they are unlikely to resume illegal activities."). Thus, "[w]hen government laws or policies have been challenged, the Supreme Court has held almost uniformly that cessation of the challenged behavior moots the suit." *Troiano*, 382 F.3d at 1283 (collecting cases).

When the "voluntary-cessation" exception is invoked to challenge government action, courts "examine three factors to determine whether a reasonable expectation that the government will reverse course exists, including whether" (1) "the change in conduct resulted from substantial deliberation or is merely an attempt to manipulate jurisdiction"; (2) "the government's decision to terminate the challenged conduct was unambiguous, i.e., permanent and complete"; and (3) "the government has consistently maintained its commitment to the new policy or legislative scheme." *Djadju*, 32 F.4th at 1109 (citing *Walker*, 901 F.3d at 1270). However, these "considerations are not to 'be viewed as exclusive nor should any single factor be viewed as dispositive,' so a court should find a case moot 'when the totality of the circumstances persuades the court that there is no reasonable expectation that the government entity will reenact the challenged policy.'" *Id.* (quoting *Keohane*, 952 F.3d at 1268). Thus, "[t]he key inquiry is whether the plaintiff has shown a reasonable expectation—or, as we phrased it elsewhere, a substantial likelihood—that the government defendant will reverse course and reenact the repealed rule." *Keohane*, 952 F.3d at 1268 (citations omitted). As with the capable-of-repetition-yet-evading-review exception, "[t]he

remote possibility that an event might recur is not enough to overcome mootness." *Djadju*, 32 F.4th at 1109 (quoting *Al Najjar*, 273 F.3d at 1336).

The Court is unconvinced that there is a substantial likelihood that the EOIR Defendants will reinstate the challenged practice. True, the first factor weighs in Plaintiffs' favor. The timing of the EOIR Defendants' about-face—a month into this litigation and two days before a hearing on Plaintiff's Renewed Motion—is suspicious. At the very least, it raises an inference that the policy shift "was motivated, at least in part, by a desire to rid itself of this litigation." *Keohane*, 952 F.3d at 1269. However, "timing considerations shouldn't be overemphasized in the voluntary-cessation analysis and, in any event, that alleged jurisdiction-manipulation is only one among several non-exhaustive factors that inform the inquiry." *Id.* at 1271. And here, the other factors weigh decidedly in the EOIR Defendants' favor.

With respect to the second factor, the Government's decision to terminate a policy or practice is generally taken as "an unambiguous termination." *See id.* at 1269 (quoting *Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs, Ga.*, 868 F.3d 1248, 1261 (11th Cir. 2017), *abrogated on other grounds by Cambridge Christian Sch. v. Fla. High Sch. Athletic Ass'n, Inc.*, 115 F.4th 1266 (11th Cir. 2024)). Here, the Government has not acted solely with respect to the Bond Plaintiffs, "'it has removed the challenged portion' of the policy 'in its entirety.'" *Id.* (quoting *Flanigan's*, 868 F.3d at 1261). And, as the Federal Defendants indicated on the record at the preliminary injunction hearing, the EOIR Defendants do not intend to reverse their determination that Krome has jurisdiction over Alligator Alcatraz. [ECF No. 84]. This is sufficient to show an unambiguous termination. *Keohane*, 952 F.3d at 1269 (noting that the Eleventh Circuit has "previously relied on . . . representations" made at oral argument to determine whether the

government's decision to terminate the challenged conduct was unambiguous where "there is no evidence or history that would cause" doubt as to the government's representations).

As for the third factor, Plaintiff does not demonstrate that the EOIR Defendants have failed to consistently maintain their commitment to the new policy. The EOIR Defendants have determined that Krome has jurisdiction over *all* Alligator Alcatraz detainees. Nor is there a "'pattern' of broken promises here" that would suggest that the EOIR Defendants lack commitment to the new policy. *Keohane*, 952 F.3d at 1270 (citing *Doe v. Wooten*, 747 F.3d 1317, 1324 (11th Cir. 2014)).

In the end, it is ultimately Plaintiffs' burden to show "a reasonable expectation that the government will reverse course." *Djadju*, 32 F.4th at 1109. Plaintiffs have not shouldered this burden. The Court finds no indication of a reasonable expectation or substantial likelihood that the challenged policy or practice will be reinstated. *Al Najjar*, 273 F.3d at 1336 ("The remote possibility that an event might recur is not enough to overcome mootness."). As the Eleventh Circuit has noted, "[a]t the end of the day," the voluntary-cessation inquiry is "less concerned with the subjective question whether the initial reason for the government's decision was sincere than with the objective question whether there is any 'substantial evidence indicating a reasonable likelihood that the [agency] will reenact the [challenged policy] which it has now repealed' and replaced." *Keohane*, 952 F.3d at 1270 (alterations added) (quoting *Flanigan's*, 868 F.3d at 1260). The mere fact that the EOIR Defendants "realized and corrected [their] mistake a little late in the game in no way suggests that [they] would revert back to [their] old ways absent the injunction." *Id.* For these reasons, the voluntary-cessation exception does not rescue Plaintiffs' Fifth Amendment claim.

In sum, the Fifth Amendment is moot and no exception saves it. The Court must therefore dismiss the Fifth Amendment claim for lack of jurisdiction. *See Al Najjar*, 273 F.3d at 1336.

### b. *First Amendment Claims*

The First Amendment claims are not moot because there is still a live controversy between the parties. The State Defendants note that Alligator Alcatraz detainees have been able to meet with legal counsel since July 15, 2025—before this lawsuit was filed—and held the first in-person meeting between detainees and legal counsel on July 28, 2025. State Defs.' Resp. at 15. The State Defendants further maintain that they "have granted every single request for a detainee to meet with legal counsel." *Id.* at 4. Therefore, "all of the individual Plaintiffs that have requested a meeting, have received at least one, or have one scheduled. Those that have not received a meeting never asked for one." *Id.* at 19 (internal citations omitted). Plaintiffs acknowledge that many of the Detained Plaintiffs have received access to counsel, and all the Attorney Plaintiffs have received access to Alligator Alcatraz detainees. *See* [ECF Nos. 58, 70].

However, Plaintiffs continue to press their First Amendment claims because Defendants "continue to impose significant barriers to attorney access at the facility and have failed to fully implement the measures they have claimed to put in place." Reply at 5. Specifically, Plaintiffs argue that (1) "[a]ttorneys face prolonged delays in scheduling attorney videoconferences and in-person visitation, prejudicing detainees' cases," *id.* at 27; (2) "[r]equests for in-person attorney visitation are extremely delayed, such that some detainees never have the opportunity to meet with their attorneys at all," *id.* at 27; (3) "[d]etainees cannot speak confidentially with counsel in legal videoconferences," *id.* at 29; (4) "[d]etainees cannot speak confidentially with counsel in outgoing phone calls," *id.* at 30; (5) "[d]etainees cannot confidentially exchange legal documents and have no way to receive legal mail," *id.*; (6) "[d]efendants refuse to make basic information regarding

attorney access protocols necessary for communication to detainees and the public," *id.* at 31; and (7) "[a]ttorneys cannot locate detained clients at Alligator Alcatraz" using ICE's detainee locator, *id.* at 32.

Even if Plaintiffs no longer argue that there is a total "ban on attorney-client communication," as they did before, *see* Renewed Mot. at 14, they urge that Defendants' conduct continues to violate the First Amendment. And even though certain detainees have had meetings with attorneys and vice-versa, Plaintiffs maintain that even those meetings violated the First Amendment because they did not include appropriate confidentiality safeguards and did not timely occur, prejudicing detainees' cases. Reply at 26–32. The Federal Defendants and State Defendants, of course, vigorously contest these claims on the merits, as they did at the preliminary injunction hearing. [ECF No. 84]. Indeed, the State Defendants clarified that they do not believe that Plaintiffs' First Amendment claims are moot. *Id.* The First Amendment claims are therefore very much alive, as a "controversy with respect to which the court can give meaningful relief" persists. *Fla. Ass'n of Rehab. Facilities,* 225 F.3d at 1216–17.

Nor does the transfer of certain individual Plaintiffs out of Alligator Alcatraz moot this case as to those who have been transferred—or the putative class. In a putative class action, "an 'inherently transitory' class-action claim is not necessarily moot upon the termination of the named plaintiff's claim." *Genesis Healthcare,* 569 U.S. at 75–76 (2013). This exception to mootness applies when a "named plaintiff's individual claim becomes moot before the district court has an opportunity to rule on the certification motion, and the issue would otherwise evade review." *Id.* (citing *Sosna v. Iowa*, 419 U.S. 393 (1975)). This exception comes into play only when (1) it is "'certain that other persons similarly situated' will continue to be subject to the challenged conduct" and (2) "the claims raised are 'so inherently transitory that the trial court will not have

even enough time to rule on a motion for class certification before the proposed representative's individual interest expires.'" *Id.* at 76 (citations omitted).

Here, Plaintiffs allege that all Detained Plaintiffs at Alligator Alcatraz and all other potential members of the class will continue to be subject to the challenged conduct because the alleged First Amendment violations are occurring facility-wide. Plaintiffs' claims are also fleeting. Alligator Alcatraz is a temporary detention facility, a waystation to federal immigration detention centers or to deportation. Moreover, there is ample evidence in the record that certain Plaintiffs' claims have expired during the pendency of this litigation, well before the Court could address a motion for class certification. For example, Anna Weiser, attorney for Plaintiff Almanza Valdes, waited three weeks to receive a response to her request to meet with her client. The two had a meeting scheduled for August 15, 2025, but Almanza Valdes was transferred out of Alligator Alcatraz on August 11, 2025, before he had a chance to speak with his attorney. Reply at 6. The same goes for Plaintiff Michael Borrego and his legal counsel, Plaintiff Sanctuary of the South: Borrego and Sanctuary of the South had a meeting scheduled for August 4, 2025, but Borrego was transferred from Alligator Alcatraz on August 1, 2025, before he could ever meet with legal counsel. *Id.*

Therefore, to the extent that claims of certain individual named Plaintiffs have become moot, the "inherently transitory" exception preserves their First Amendment claims.

### ii.  8 U.S.C. § 1252(g)

Given that the First Amendment claims have not been rendered moot, the Court turns to the next jurisdictional hurdle: 8 U.S.C. § 1252(g). The Federal Defendants contend that § 1252(g) deprives the Court of subject-matter jurisdiction to review Plaintiffs' claims. *See* Fed. Defs.' Resp. at 5–7. Section 1252(g) provides that "no court shall have jurisdiction to hear any cause or claim

by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders." § 1252(g). As the Supreme Court has explained, § 1252(g) is a "discretion-protecting provision" designed to prevent the "deconstruction, fragmentation, and hence prolongation of removal proceedings." *Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AAADC*"), 525 U.S. 471, 487 (1999).

The Federal Defendants argue that § 1252(g) bars the Detained Plaintiffs' claims because "some detainees [are] . . . in removal proceedings and [have been] issued a notice to appear (NTA) (*commencement of proceedings*); some [are] continuing their removal proceedings and having their claims adjudicated (*adjudication of cases*); and others [are] . . . detained on final orders of removal (*execution of removal*)." Fed. Defs.' Resp. at 6. And because the Detained Plaintiffs are "at Alligator Alley [sic] in connection with categories set out in §[ ]1252(g) . . . their claims arise from those jurisdictionally barred categories." *Id.* The same goes for the Attorney Plaintiffs. "[A]t their core," their claims "necessarily arise from the jurisdictionally barred categories too since they represent their clients in proceedings." *Id.*

The Federal Defendants are mistaken. As "the Supreme Court has explained, § 1252(g) lists just three 'discrete actions': actions to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Camarena v. Dir., Immigr. & Customs Enf't*, 988 F.3d 1268, 1272 (11th Cir. 2021) (quoting *AAADC*, 525 U.S. at 482). The Supreme Court has therefore given § 1252(g) a "narrow reading," emphasizing that it does not cover "all claims arising from deportation proceedings" or impose "a general jurisdictional limitation." *AAADC*, 525 U.S. at 482, 487; *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020).

Yet that is precisely the position the Federal Defendants advance. In their telling, § 1252(g) encompasses every claim made by an alien detained "in connection with categories set out in

§[ ]1252(g)." Fed. Defs.' Resp. at 6. Indeed, the Federal Defendants would have the Court pronounce that § 1252 extends not only to any claim by an alien detained "in connection with categories set out in §[ ]1252(g)," *id.*, but also to claims brought by attorneys who "represent their [alien] clients in proceedings." *Id.*

Section 1252(g) does not permit such a vaporous interpretation. Section 1252(g) requires a specific nexus between the claim and one of the three covered actions: "[A]lthough 'many . . . decisions or actions' may be 'part of the deportation process,' only claims that *arise from* one of the covered actions are excluded from [a court's] review[.]" *Camarena*, 988 F.3d at 1272 (quoting *AAADC*, 525 U.S. at 482) (emphasis added).

The Supreme Court has interpreted § 1252(g)'s "arise from" language narrowly, cautioning that § 1252(g) does not "sweep in any claim that can technically be said to 'arise from' the three listed actions"; instead, the statute "refer[s] to just those three specific actions themselves." *Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018); *id.* (noting that "when confronted with capacious phrases like 'arising from,' we have eschewed uncritical literalism leading to results that no sensible person could have intended." (citation modified)). Thus, to determine whether a claim "arise[s] from" one of the covered actions, "courts must focus on the action being challenged," *Canal A Media Holding, LLC v. U.S. Citizenship & Immigr. Servs.*, 964 F.3d 1250, 1258 (11th Cir. 2020), namely, whether one of the three actions listed in § 1252(g) forms the "basis of the claim," *Gupta v. McGahey*, 709 F.3d 1062, 1065 (11th Cir. 2013).

Here, the basis of the First Amendment claims is that the Federal and State Defendants have unlawfully restricted detainees' access to counsel and counsel's access to detainees. The "action being challenged" is not even remotely related to any action or decision by the Federal or State Defendants to commence proceedings, adjudicate cases, or execute removal.

*Cf. Diaz-Bernal v. Myers*, 758 F. Supp. 2d 106, 125 (D. Conn. 2010) (finding that § 1252(g) does not bar a detained plaintiff's right-to-counsel claim under the Fifth Amendment because "[t]hose claimed violations do not deal with the defendants' commencement of proceedings against the plaintiffs, the adjudication of their cases, or the execution of their removal").

For these reasons, § 1252(g) does not bar Plaintiffs' First Amendment claims.[13]

## B. Venue

Venue concerns "the geographic specification of the proper court or courts for the litigation of a civil action." 28 U.S.C. § 1390. Venue is a distinct inquiry. Jurisdiction, for example, concerns *what* a court can do. *See Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006) (noting that subject matter jurisdiction is "a matter far weightier than venue"). Venue, in contrast, concerns *where* a case should be heard. *See* 14 WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 3801 (4th ed. 2025) [hereinafter WRIGHT & MILLER] (stating that venue "refers to locality" and "the place within the relevant judicial system where a lawsuit should be heard").

Often, parties will diverge on where the most appropriate venue for a civil action may be. In response, the venue rules "generally reflect equity or expediency" in resolving parties' disparate interests. *Burlington N. R.R. Co. v. Ford*, 504 U.S. 648, 651 (1992). Over time, courts have considered venue to concern the forum's "convenience" for the parties. *Wachovia Bank*, 546 U.S. at 316; *see Hess v. Cohen & Slamowitz LLP*, 637 F.3d 117, 124 (2d Cir. 2011) ("[V]enue relates to the convenience of the parties rather than the validity of the claim.").

Atmospherics aside, venue in civil cases—and the determination of a "convenient forum" in turn—are wholly governed by statute. *See Leroy v. Great W. United Corp.*, 443 U.S. 173, 183 n.15 (1979) (noting that determining where a claim "arises" for purposes of federal venue is a

---

[13] The Court need not consider whether § 1252(g) bars the Fifth Amendment claim because the Court dismisses the Fifth Amendment as moot. *See supra* at 21–27.

federal question "whose answer depends on federal law"); *cf. United States v. Bradley*, 644 F.3d 1213, 1251–52 (11th Cir. 2011) (noting that venue in criminal cases is a matter of constitutional concern).  Venue's statutory basis "is specific and unambiguous; it is not one of those vague principles which, in the interest of some overriding policy, is to be given a 'liberal' construction." *Oldberding v. Ill. Cent. R.R. Co.*, 346 U.S. 338, 340 (1953).  A district court therefore cannot supersede Congressionally-enacted venue requirements.  *Bruhl v. Price WaterhouseCoopers Int'l*, No. 03-23044, 2006 WL 8431802, at *3 (S.D. Fla. 2006).  If venue is nonexistent as a statutory matter, it is simply nonexistent.[14]

The general venue provision, which applies to "all civil actions," sets the scene.  28 U.S.C. § 1391(a)(1).  Residential venue may be proper in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." § 1391(b)(1). Transactional venue, in contrast, may be proper in a judicial district "in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." § 1391(b)(2).  If neither residential nor transactional venue exist, venue may be proper in "any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." § 1391(b)(3).

---

[14] Plaintiffs ask the Court to "resolve the motion for preliminary injunction before addressing venue," given "the urgent issues Plaintiffs raise . . . and the work the Court has put into managing this case."  Reply at 10 (citing *S. Visions, LLP v. Red Diamond, Inc.*, No. 18-04566, 2018 WL 8221528, at *5 (N.D. Ga. Dec. 10, 2018); *Arval Serv. Lease S.A. v. Clifton*, No. 14-1047, 2014 WL 12614422, at *1 (M.D. Fla. Nov. 14, 2014)).  The Court will not do so.  True, "venue is not a jurisdictional prerequisite," but it is a statutory requirement. *Id.* (quoting *Harris Corp. v. Nat'l Iranian Radio and Television*, 691 F.2d 1344, 1349 (11th Cir. 1982)).  Plaintiffs' reading would wholly circumvent the federal venue statutes by suggesting that venue is of no issue if a federal court believes that the merits of the underlying case are worth considering.  And "judicial economy" would not be served if the Court were to proceed without addressing venue; if, on appeal, the appellate court were to find venue improper, the parties would be back at square one.  And Plaintiffs' reliance on a parallel proceeding is unavailing given that proceeding's distinct procedural posture.  Reply at 10 (citing *Friends of the Everglades, Inc. v. Noem*, No. 25-22896, ECF No. 104, at 8 (S.D. Fla. Aug. 7, 2025)).

Slightly different statutory requirements arise when a civil action includes a federal defendant who is "an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States." § 1391(e)(1). An action may be brought against this set of federal defendants "in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action." § 1391(e)(1)(A–C). While this inquiry appears superficially similar to the general-venue inquiry, § 1391(e) makes clear that non-federal defendants that are lumped in to a cause of action with federal defendants "may be joined as parties to any such action in accordance with the Federal Rules of Civil Procedure *and with such venue requirements as would be applicable if the United States or one of its officers, employees, or agencies were not a party*." § 1391(e)(1) (emphasis added).

Plaintiffs contend that venue is proper with reference to two provisions of the venue statute. First, Plaintiffs note that venue is proper for the claims against the Federal Defendants pursuant to § 1391(e)(1). Suppl. ¶ 15; Reply at 12. As for claims solely against the State Defendants, Plaintiffs contend that venue is proper under § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claim occurred in the district," *id.*; Reply at 13–14—in other words, transactional venue, and not residential or fallback venue, applies.[15]

This case involves multiple claims, including claims that are against *both* the Federal and State Defendants. And it is well-established that "venue must be proper for each claim." WRIGHT & MILLER § 3808; *see also, e.g.*, *Lamont v. Haig*, 590 F.2d 1124, 1135 (D.C. Cir. 1978); *Basile v. Walt Disney, Co.*, 717 F. Supp. 2d 381, 386 (S.D.N.Y. 2010); *Williams v. Apple, Inc.*,

---

[15] Transactional venue is the only theory of venue upon which Plaintiffs could rely in this civil action. Residential venue cannot apply, as not all defendants are residents of Florida.

No. 23-3901, 2024 WL 2721630, at *2 (D.D.C. May 27, 2024) (citation omitted).  Accordingly,

the Court first determines whether venue is proper for each claim alleged against the *Federal*

Defendants.  Then, the Court determines whether venue is proper for each claim alleged against

the *State* Defendants.

As a practical matter, this means that Plaintiffs' claims that rely on § 1391(e) that include

*both* federal and state defendants—namely, Counts I and III—will be analyzed in two steps.  First,

the Court will assess whether venue is proper as to the Federal Defendants pursuant to § 1391(e).

Then, the Court will assess whether venue is proper as to the joined State Defendants without

reference to § 1391(e).  *See Little v. King*, 768 F. Supp. 2d 56, 65 n.7 (D.D.C. 2011); *Lamont*, 590

F.2d at 1126 n.26 (D.C. Cir. 1978); *id.* at 1130 n.36 (restating the legislative history of § 1391(e)

and concluding that "a plaintiff distressed by official misconduct who sues both a federal and a

nonfederal defendant who participated in the activity undergirding the lawsuit must press his claim

in a district having venue with respect to the nonfederal defendant by authority other than

§ 1391(e), notwithstanding the procedural burden on vindication of the plaintiff's grievance").

As explained, venue is proper as to the Federal Defendants under § 1391(e)(1).  However,

venue is improper as to the State Defendants, because Plaintiffs have not shown that the State

Defendants engaged in substantial acts or omissions giving rise to Plaintiffs' causes of action in

the Southern District of Florida.

### i. *Venue for the Federal Defendants*

Section 1391(e) instructs plaintiffs where to file civil actions when naming federal officials

as defendants.  Congress enacted this provision "to broaden the venue of civil actions which could

previously have been brought only in the District of Columbia."  *Schlanger v. Seamans*, 401 U.S.

487, 489 (1971).    The statute provides three choices for venue.    § 1391(e)(1).

Section 1391(e)(1)(A) allows plaintiffs to file suit in any district where "a defendant in the action resides." Section 1391(e)(1)(B) allows for plaintiffs to file suit either where transactional venue is proper, or where "a substantial part of the property involved in the action is situated." And § 1391(e)(1)(C) allows a suit to be filed where "the plaintiff resides if no real property is involved in the action."

The Federal Defendants posit that no provision of § 1391(e)(1) applies. For one, they state that no Federal Defendant resides in this District. The inclusion of "ICE-ERO Miami Filed [sic] Director Garret [sic] Ripa" cannot create venue, in their view, because "[m]erely maintaining offices within a district does not mean a federal defendant resides in that district." Fed. Defs.' Resp. at 8 (quoting *Hernandez v. U.S. Citizenship & Immigr. Servs.*, No. 21-20355, 2021 WL 9408841, at *2 (S.D. Fla. Aug 31, 2021)). In addition, the Federal Defendants argue that no substantial part of the "mail and communication issues" that the Federal Defendants allegedly engaged in took place in this District, as Alligator Alcatraz is almost entirely in the Middle District of Florida. *Id.* The Federal Defendants also appear to suggest that venue is improper under § 1391(e)(1)(C) because "the property involved in this case is in the Middle District of Florida," though this argument is rather difficult to parse and fairly cursory. *Id.* In other words, the Federal Defendants concede that venue is proper in the Middle District of Florida. [ECF No. 84].

Plaintiffs do not contest that venue could be proper in the Middle District of Florida for the Federal Defendants—but argue that venue is also proper in the Southern District of Florida under § 1391(e)(1)(A) because Defendant Garrett Ripa "remains a defendant in the action" and "resides in this District." Reply at 11 n.3 (first citing § 1391(e)(1)(A); and then citing Suppl. ¶ 69). Plaintiffs urge the Court to discount the Federal Defendants' caselaw in support of their position, because Federal Defendant Ripa is a "local official." *Id.* In addition, Plaintiffs state that venue is

proper under § 1391(e)(1)(B), because the ICE-ERO Field Office in Miami ensures "'compliance with detention standards,' which include requirements related to access to counsel." *Id.* at 13 (citing Decl. of Juan Lopez Vega ("Vega Declaration"), [ECF No. 50-1] ¶ 5). In addition, Plaintiffs note that the 287(g) Agreements produced in discovery show that "the Miami Field Office Director is responsible for providing authorization to state personnel at Alligator Alcatraz under the agreements, and for reviewing complaints regarding law enforcement activities authorized by the agreements at [Alligator Alcatraz]." *Id.* Finally, Plaintiffs argue that venue is proper against the Federal Defendants "because this action does not involve real property and several plaintiffs reside in this district." *Id.* at 11 n.3 (citations omitted).

Section 1391(e)(1) allows for the Federal Defendants to be properly sued as to each count in this civil action in the Southern District of Florida. Section 1391(e)(1)(A) neatly applies because a Defendant—Garrett Ripa—resides here. *See* Summons, [ECF No. 1-6] (noting that Federal Defendant Ripa has a residence in the Southern District of Florida). While the Federal Defendants appear to suggest that Federal Defendant Ripa "is not the proper official representative for the agency," they have not contested that he is a proper party in this action. Fed. Defs.' Resp. at 8; [ECF No. 84]. Federal Defendant Ripa thus remains "a defendant in the action," and venue under § 1391(e)(1)(A) is proper.

Plaintiffs have also presented a *prima facie* case that a substantial portion of the Federal Defendants' acts and omissions arose in this District under § 1391(e)(1)(B). True, most of the alleged incidents in this case arise out of actions at Alligator Alcatraz, which is in the Middle District of Florida. Fed. Defs.' Resp. at 8. But Plaintiffs note that the Federal Defendants have admitted through their affidavits that the ICE-ERO Miami Field Office oversees detention facility

operations and is responsible for ensuring compliance with ICE detention standards, including attorney-client access.  Reply at 12.

Section 1391(e)(1)(C) is also easily satisfied, because several plaintiffs live in this District. *E.g.*, Suppl. ¶¶ 16–17, 21–22, 42, 49, 51, 54, 57, 60.  The Federal Defendants' spurious attempt to suggest that venue is improper because "real property" is involved in this action is meritless. "Gravity being what it is, the vast bulk of human activities take place on the face of the earth. Consequently, almost any dispute over public or private decisions will in some way 'involve real property,' taken literally." *Nat'l Res. Def. Council v. Tenn. Valley Auth.*, 340 F. Supp. 400, 406 (S.D.N.Y. 1971), *rev'd on other grounds*, 459 F.2d 255 (2d Cir. 1972).  The mere fact that this action peripherally involves Alligator Alcatraz because it concerns alleged First Amendment violations *at* Alligator Alcatraz does not bar Plaintiffs from relying on § 1391(e)(1)(C).

Ultimately, each provision of § 1391(e)(1) applies here, and venue is thus proper as to the Federal Defendants for Counts I and III.

### ii.   Venue for the State Defendants

Section 1391(b) is the general venue statute.  "Except as otherwise provided by law," it "govern[s] the venue of all civil actions brought in district courts of the United States."  28 U.S.C. § 1391(a).  When an action involves both federal and non-federal defendants, "[a]dditional persons" may be joined as parties "with such other venue requirements as would be applicable if the United States or one of its officers, employees, or agencies were not a party."  § 1391(e)(1). The issue here is twofold: whether venue is proper for the State Defendants in their standalone counts, and whether venue is proper for the State Defendants for those counts where they are joined with the Federal Defendants.  *See Little*, 768 F. Supp. 2d at 65 n.7.  Though the underlying facts

for each claim involving the State Defendants are slightly different, the legal authority Plaintiffs assert for the State Defendants' venue—§ 1391(b)(2)—is the same.

Plaintiffs may lay venue in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." § 1391(b)(2). "Only the events that directly give rise to a claim are relevant. And of the places where the events have taken place, only those locations hosting a 'substantial part' of the events are to be considered." *Jenkins Brick v. Bremer*, 321 F. 3d 1366, 1371 (11th Cir. 2003). The statute limits the relevant set of events "giving rise to the claim" in two ways. First, the statute requires courts to "focus on the relevant activities of the defendant, not the plaintiff." *Id.* at 1371–72. Second, a court should consider only a defendant's "acts and omissions that have a *close nexus*" with the cause of action. *Id.* at 1372 (emphasis added); *Hemispherx Biopharma v. MidSouth Cap., Inc.*, 669 F. Supp. 2d 1353, 1357 (S.D. Fla. 2007). While this interpretation "allows for additional play in the venue joints," the statute still focuses on "the importance of the place where the wrong has been committed." *Jenkins Brick*, 321 F.3d at 1371.

The State Defendants contend that venue is improper in the Southern District of Florida because Plaintiffs plainly allege that all of the State Defendants' actions occurred inside the Alligator Alcatraz facility, which the parties all agree is in the Middle District of Florida. The State Defendants argue that "the alleged denial of access" that motivates the Detained Plaintiffs' claims, "the policy decisions motivating those actions," and "the decisions on how to provide detainees access to counsel while standing up a detention facility" occurred either in the Northern District of Florida or the Middle District of Florida. State Defs.' Resp. at 9 (first citing Suppl. ¶¶ 4, 88, 89; and then citing Decl. of Ian Gadea-Guidicelli, [ECF No. 49-2] ¶ 5). The State

Defendants further note that their "alleged attempts to block access" to the Attorney Plaintiffs occurred outside Alligator Alcatraz, in the Middle District of Florida. *Id.*

Plaintiffs generally suggest that venue is proper in this District as to the State Defendants because "[a] substantial portion of the relevant actions and omissions giving rise to this case took place in this District." Reply at 12. Plaintiffs note that "[t]he Federal and State Defendants represent that the people at Alligator Alcatraz are detained pursuant to agreements under 8 U.S.C. [§] 1357(g)," and these 287(g) Agreements show that "the Miami Field Office Director is responsible for providing authorization to state personnel at Alligator Alcatraz under the agreements, and for reviewing complaints regarding law enforcement activities authorized by the agreement." *Id.* at 13. Plaintiffs also note that "[d]efendants and other authorities have directed attorneys seeking information about communicating with clients at Alligator Alcatraz to ICE's Miami Field Office and the ICE Office of Chief Counsel in Miami." *Id.* (citing Suppl. ¶¶ 27, 28). And finally, Plaintiffs cite to evidence in the record that suggests the State Defendants have directed attorneys to the ICE Miami Field office "with questions about 'decisions to deport, transfer or release detainees,' 'credible fear interviews,' and 'bond/parole/appeal.'" *Id.* (citing Saunders Decl. at 65, 129, 131, 201–02, 257, 265).

### a. *Detained Plaintiffs' First Amendment Claims*

Plaintiffs have not met their *prima facie* burden to show that the State Defendants engaged in any acts or omissions in this District giving rise to the Detained Plaintiffs' First Amendment claims (Counts I and III). Plaintiffs consistently plead that the State Defendants' First Amendment violations against the Detained Plaintiffs occurred "at the facility," which is in the Middle District of Florida. *See, e.g.*, Suppl. ¶ 4 ("Defendants in this case have blocked detainees held *at the facility* from access to legal counsel. No protocols exist *at this facility* for providing standard means of

confidential attorney-client communication." (emphasis added)); *id.* ¶ 89 ("Florida Defendants have unreasonably restricted immigrant detainees' access to counsel *at Alligator Alcatraz*. . . . Their intrusion on detainees' confidential communication with counsel undermine[s] the attorney-client privilege." (emphasis added)); Reply at 5 (noting that "Defendants [ ] continue to impose significant barriers to attorney access *at the facility*," and that "[i]mmigrant detainees and their attorneys thus remain unable to meaningfully engage in confidential attorney-client communication *at Alligator Alcatraz*" (emphasis added)); *id.* at 6–7 ("All *outgoing* phone calls by detainees to their attorneys are monitored and recorded." (emphasis added)); *id.* at 7 ("Legal conferences do not take place in an enclosed space; instead, detainees are held in a cage, with officers in close, auditory proximity."). Plaintiffs have made it quite clear that "the place where the wrong has been committed" is—at least substantially—in the Middle District. *Jenkins Brick*, 321 F.3d at 1371.

While Plaintiffs note that federal and state officials have signed intergovernmental agreements, the existence of legally enforceable agreements between state and federal officials cannot support venue on its own. *See id.* at 1372 (holding venue was not established because a legally enforceable contract was sent to a particular place, as the contract's transmittal did not have a close nexus to the place where the cause of action (breach of contract) occurred). Plaintiffs appear to suggest that the State Defendants' failure to act in accordance with these agreements gave rise to the Detained Plaintiffs' First Amendment causes of action. This argument—to the extent Plaintiffs even make it—is inherently flawed. For one, Plaintiffs' cause of action is *constitutional*, not *regulatory* or *contractual*. Plaintiffs do not—and have never, through the twists and turns of this litigation—claimed that the State Defendants' failure to act in accordance with intergovernmental agreements creates a First Amendment issue. The existence of an

intergovernmental agreement on detention standards is not a "necessary precondition" for the First Amendment claims and cannot, standing alone, be the "close nexus" between the Detained Plaintiffs' allegations and the State Defendants' actions. *Robey v. Chase Bank, N.A.*, 343 F. Supp. 3d 1304, 1316 (S.D. Fla. 2018).

Plaintiffs have presented no facts to show that the State Defendants have failed to act in accordance with the agreements they cite. Plaintiffs note that "the Miami Field Office Director is responsible for providing authorization to state personnel *at Alligator Alcatraz* under the agreements, and for reviewing complaints regarding law enforcement activities authorized by the agreements *at the facility*." Reply at 13 (emphasis added). Plaintiffs then cite to a single Memorandum of Agreement between ICE, DHS, and the Florida Department of Highway Safety and Motor Vehicles, Division of Highway Patrol. *Id.* (citing [ECF No. 52] at 70, 78).

It is unclear why Plaintiffs cite to *this* Memorandum of Agreement, when the Division of Highway Patrol is not in this action. Superfluous citation aside,[16] Plaintiffs do not point to any part of the record that suggests that any State Defendant signed a Memorandum of Agreement that vested them with particular responsibilities relating to the Detained Plaintiffs at Alligator Alcatraz. Indeed, the State Defendants have provided policy documents from Defendant FDEM that show that "[t]he *facility* is responsible for facilitating detainees' private access to their legal representatives and assistants." South Detention Facility Visitation Policy, Saunders Decl. at 272 (emphasis added).

Plaintiffs' assertion at the hearing that venue derives from 287(g) Agreements between the Federal and State Defendants requires impermissible inferential leaps. First, the Court would have

---

[16] This does not appear to be an uncommon litigation strategy for Plaintiffs. They sued Sherea Green, Director of the Corrections and Rehabilitation Department of Miami-Dade County, without alleging any facts against her in their initial Complaint. *See* [ECF No. 47] at 4. Plaintiffs later agreed to voluntarily dismiss her from this suit. *See* [ECF No. 66].

to find it has proper venue over the State Defendants based on Agreements that none of them signed.  Second, the Court would have to find that the State Defendants violated those Agreements.  And third, the Court would have to find that the breach of those Agreements proximately caused the Detained Plaintiffs' constitutional injuries.  *See Robey*, 343 F. Supp. 3d at 1316; *see also Wai*, 315 F. Supp. at 1268 (noting that a court will draw reasonable inferences and resolve factual conflicts in favor of the plaintiffs, supposing a factual conflict exists).  But this is not a case about the breach of any 287(g) Agreements, nor is this a case about whether the State Defendants have violated a practice or policy.

At the preliminary injunction hearing, Plaintiffs suggested that venue is proper here because the State Defendants in the Middle District of Florida have acted pursuant to federal policies that emanate from the Southern District of Florida.  [ECF No. 84].  But the district court case they cite in support—*Harvard v. Inch*, 408 F. Supp. 3d 1255 (N.D. Fla. 2019)—undercuts their claim in two respects.  The court in *Harvard* certainly concluded that conditions of confinement in a Middle District of Florida jail could be traced back to state policy decisions from Tallahassee.  *Id.* at 1262.  But the court did so because the plaintiffs specifically "alleged that a statewide policy and practice of isolation [ ] was promulgated and enforced in Tallahassee by Defendants."  *Id.*  Here, Plaintiffs advance no specific allegation that the State Defendants have engaged in acts or omissions pursuant to the Federal Defendants' instructions.  Even if Plaintiffs did so, *Harvard* would hurt their claims, by suggesting that the State Defendants' policies stem from the Northern District of Florida, *not* the Southern District of Florida.

Plaintiffs' arguments, at their core, have the "flavor" of personal jurisdiction.  *Jenkins*, 321 F.3d at 1272.  But whether the State Defendants purposefully availed themselves of or "hailed" themselves into this District is irrelevant.  A sound venue analysis depends on whether this District

is the proper place for this civil action.  Here, the Detained Plaintiffs do not present a *prima facie* case that the State Defendants committed substantial acts or omissions in this District giving rise to their First Amendment claims.  Venue is therefore improper as to Count II, and the State Defendants cannot be joined as to Count I.

### b.   *Attorney Plaintiffs' First Amendment Claims*

The Attorney Plaintiffs do not present a *prima facie* case as to their First Amendment claims against the State Defendants either.  Plaintiffs have consistently maintained that the alleged barriers to counsel and inability to engage in confidential communications have taken place at Alligator Alcatraz, which is not in this District.  If Attorney Plaintiffs would like to speak with their clients, they must schedule conferences with other detainees at the facility "in close, auditory proximity."  Reply at 7 (first citing Suppl. Decl. of Johan Gutierrez, [ECF No. 67-5] ¶ 6; then citing Suppl. Decl. of Katherine Blankenship ("Blankenship Supplemental Declaration"), [ECF No. 67-7] ¶¶ 6, 15).  If Attorney Plaintiffs would like to collect signatures on time-sensitive documents, they must travel to Alligator Alcatraz and leave those documents at the facility.  Blankenship Suppl. Decl. ¶ 6.  And if Attorney Plaintiffs would like to schedule an in-person visit, they must "[a]ttach copies of legal documents" for approval at the facility.  Reply at 7 (citing Saunders Decl. ¶ 12).  The State Defendants' alleged First Amendment violations thus clearly stem from actions that take place in the Middle District of Florida.

No close nexus exists between the Southern District of Florida and the Attorney Plaintiffs' First Amendment causes of action.  As established, the mere existence of some intergovernmental agreements between state actors and the Federal Defendants cannot support a reasonable inference that the State Defendants engaged in actions against the Attorney Plaintiffs in this District.  *See supra* at 42–43.  Plaintiffs argue that the "Defendants have directed attorneys seeking information

about communicating with clients at Alligator Alcatraz" to federal offices in Miami.  Reply at 13

(citing Suppl. ¶¶ 27–28).  But these citations to the record simply undercut their argument, for they

show only that the *Federal* Defendants could not assist Attorney Plaintiffs, and that decisions

regarding attorney access were being made by State officials at Alligator Alcatraz.  *See* Suppl. ¶ 27

(noting that the court clerk at Krome stated that "the immigration court no longer had jurisdiction

over cases of detainees held at Alligator Alcatraz"); *id.* ¶ 28 (noting that the Attorney Plaintiff "sent

emails" to a host of Federal, but not State, Defendants).

Plaintiffs' contention that the State Defendants "have directed attorneys to the ICE 'Miami

Field Office'" is also beside the point.  Reply at 12 (citing Saunders Decl. at 65, 129, 131,

201–02, 257, 265).  None of these citations to the record relate to the First Amendment violation

at issue, because none indicate that any State Defendant has failed to provide Attorney Plaintiffs

access to present and prospective clients detained at Alligator Alcatraz.   Instead, Plaintiffs'

citations indicate that officials based at Alligator Alcatraz have directed certain "questions about

'decisions to deport, transfer, or release detainees,' 'credible fear interviews,' and

'bond/parole/appeal'" to Federal, instead of State, officials.  Reply at 13 (citing Saunders Decl. at

65, 129, 131, 201–02, 257, 265).  These issues have nothing to do with the Attorney Plaintiffs'

First Amendment claims.  If anything, the record indicates that officials at Alligator Alcatraz—and

not federal officials in Miami—are responsible for scheduling legal calls and visits.  *See, e.g.*,

Saunders Decl. at 98, 101, 105, 110–11, 119, 121; *see also* FDEM South Detention Facility

Visitation Policy, *id.* at 272 (noting that "[t]he facility is responsible for facilitating detainees'

private access to their legal representatives and assistants").  While the State Defendants' First

Amendment violations may have arisen at Alligator Alcatraz, there is no close nexus between their

purported violations at Alligator Alcatraz and the Southern District of Florida.

The existence of email communications from the State Defendants to Attorney Plaintiffs cannot create venue simply because Attorney Plaintiffs received those communications in this District.  The heart of the Attorney Plaintiffs' cause of action concerns barriers to attorney-client access *at Alligator Alcatraz*.  Again, all of the State Defendants' alleged actions took place in the Middle District of Florida, *at Alligator Alcatraz*.  While email communications could provide some evidence of a First Amendment violation, they do not—standing alone—give rise to the First Amendment violations at issue.  Relying on the State Defendants' emails sent to Attorney Plaintiffs in this District to manufacture venue would not only redefine the "close nexus" standard but also introduce a "minimum contacts" personal jurisdiction analysis to venue that this circuit has expressly disclaimed.  *See Jenkins Brick*, 321 F.3d at 1372.

In sum, the Attorney Plaintiffs do not present a *prima facie* case that the State Defendants engaged in substantial acts or omissions in this District giving rise to their First Amendment claims.  Venue is therefore improper as to Count IV, and the State Defendants cannot be joined as to Count III.

### iii.   *Transfer is Appropriate Under 28 U.S.C. § 1404(a)*

Section 1404(a) allows for a district court to "transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  At the preliminary injunction hearing, the parties consented to transfer of this case to the Middle District of Florida in the event the Court found venue improper in the Southern District for the State Defendants.  *See also* August 14, 2025 Status Conference Tr. at 6:7–10 (consent from the Federal Defendants); *id.* at 6:18–21 (consent from the State Defendants).  Given the parties' consent—and the fact that venue would be proper for the State Defendants and the Federal

Defendants in the Middle District of Florida—the Court finds it "in the interest of justice" to transfer this civil action to the Middle District of Florida.

## CONCLUSION

When faced with an extraordinary request for preliminary injunctive relief—especially in the context of immigration policy and detention facility management—the job of the District Court is not to rule first and ask questions later. Instead, it must ensure that it is imbued with the ability to decide such a case in the first instance, pursuant to the limits on judicial power imposed by Article III and Congress's statutory limitations on venue. Prudence in this matter has revealed changed circumstances, a moot claim, and improper venue warranting transfer. The Court has thus sifted through critical preliminary issues to advance the case and position a sister court in the Middle District of Florida to reach the merits of Plaintiffs' remaining claims under the First Amendment. Accordingly, for the reasons stated above, it is hereby

**ORDERED AND ADJUDGED** as follows:

1. Count V of Plaintiffs' Complaint is **DISMISSED**.

2. The State Defendants' Venue Motion is **GRANTED**.

3. This action is hereby **TRANSFERRED** to the United States District Court for the Middle District of Florida. All pending deadlines are hereby **TERMINATED**. Upon transfer, the Clerk is directed to **CLOSE** this case.

**DONE AND ORDERED** in Miami, Florida, this 18th day of August, 2025.

_____

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**