UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 25-22896-CV-WILLIAMS

FRIENDS OF THE EVERGLADES, INC., *et al.*,

      Plaintiffs,

v.

KRISTI NOEM, *et al*.,

      Defendants.

_____/

**OMNIBUS ORDER**

**THIS MATTER** is before the Court on Plaintiffs Friends of the Everglades, Inc. ("***Friends***") and Center for Biological Diversity's ("***CBD***") (together, "***Plaintiffs***") Expedited Motion for Preliminary Injunction (DE 5) ("***Motion for Preliminary Injunction***"). The Court will also address Defendant Kevin Guthrie (the "***State***") and Defendants Kristi Noem and Todd Lyons' (together, "***Federal Defendants***") venue challenges. (DE 50; DE 60; DE 65).[1] Both Motions are fully briefed.[2] On July 30, 2025, the Parties presented oral argument on the State and Federal Defendants' improper venue challenge, (DE 72) ("***Hearing on Venue***"), and on August 6, 7, 12, and 13, 2025, the Parties presented evidence and oral argument on the merits of Plaintiffs' request for injunctive relief.

---

[1] Though Defendants' venue challenges were advanced in the form of supplemental briefings to Plaintiffs' Renewed Motion for TRO, the Court "will treat Defendants' response[s] as a 12(b)(3) motion to dismiss based on 'improper venue.'" *Doe 1 v. Bondi*, -- F. Supp. 3d --, 2025 WL 1482733, at *4 (N.D. Ga. May 2, 2025).

[2] All Defendants responded in opposition to Plaintiffs' Motion for Preliminary Injunction, (DE 12; DE 16; DE 21), and Plaintiffs replied (DE 24). Plaintiffs also replied to Defendants' improper venue Motions. (DE 61; DE 66).

(DE 102; DE 103; DE 119; DE 121 (together, the "**_Preliminary Injunction Hearing_**")).
For the reasons set forth below, the Court finds that venue in the Southern District of
Florida ("**_S.D. Fla._**") is proper as to the State and Federal Defendants, and the Motion for
Preliminary Injunction (DE 5) is **GRANTED IN PART AND DENIED IN PART**.

## I.   BACKGROUND

According to the Complaint, on June 23, 2025, the Florida Division of Emergency
Management ("**_FDEM_**") took control of the Dade-Collier Training and Transition Airport
("**_TNT_**"), in order to construct a mass migrant detention and deportation camp. (DE 1 ¶¶
1, 39).[3] Two days later, Florida Governor Ron DeSantis announced that the detention
center was requested and would be fully funded by the federal government. (_Id._ ¶ 35).
Pre-construction and construction activities at TNT began that week, (_Id._ ¶¶ 40–42),
according to Plaintiffs, without any environmental assessment or impact statement having
been prepared. (_Id._ ¶ 43).

The TNT site is located within the Big Cypress National Preserve ("**_BCNP_**") and
the Big Cypress Area, which the Florida legislature has designated as "an area of critical
state concern" with the intention to "conserve and protect the [area's] natural resources
and scenic beauty." Fla. Stat. § 380.055(1)–(2); (DE 1 ¶¶ 21–22). The project site is
"within an environmentally sensitive freshwater wetland ecosystem of ecological
significance for wildlife," such as the "threatened wood stork, and the endangered Florida
bonneted bat and the Florida panther." (DE 1 ¶ 23). The site is also "near Everglades
National Park and part of the historic Everglades," and within the footprint of the Western

---

[3] Throughout this Order, the Court will refer to the detention facility at the TNT site as
"facility" or "camp." The Court declines to use the moniker "Alligator Alcatraz."

Everglades Restoration Plan ("*WERP*"). (*Id.* ¶¶ 29, 32). The WERP is part of a multi-billion dollar joint federal-state effort to "restor[e], preserv[e], and "protect[] the South Florida ecosystem," and uses a complex network of active and passive water management features to "re-establish ecological connectivity, reduce the severity and frequency of wildfires, and restore low nutrient conditions" in the Western Everglades. (*Id.* ¶¶ 29–32). According to Plaintiffs, the detention camp's construction and operation risks harming the wetlands, wildlife, aquifer, and air and water quality in this sensitive area, and degrading the "natural, scenic, hydrologic, floral, and faunal, and recreational values for which the Preserve was created." (*Id.* ¶ 58).

On June 27, 2025, non-profit environmental organizations Friends and CBD filed this suit seeking declaratory and injunctive relief to halt the camp's construction and operation until the project complied with federal, state, and local laws. (*Id.* ¶¶ 1, 8, 13). Most notably, Plaintiffs claim the project is being built and operated in violation of the National Environmental Policy Act ("*NEPA*"), which requires that major federal actions significantly affecting the human environment undergo environmental review processes. (*Id.* ¶¶ 61–74) (Count I). Because no such review had been done, Plaintiffs claim, the approval and use of the camp by the United States Department of Homeland Security ("*DHS*"), including Immigration and Customs Enforcement ("*ICE*"), should be held unlawful under the Administrative Procedure Act ("*APA*"). (*Id.* ¶¶ 75–79) (citing 5 U.S.C. § 701 *et seq.*) (Count II). Plaintiffs further claim the State's participation in the project through FDEM exceeds the department's authority under Florida Statutes Chapters 252 and 944. (*Id.* ¶¶ 80–87) (Count III). Finally, Plaintiffs allege Defendant Miami-Dade County ("*Miami-Dade*") unlawfully acquiesced in allowing its property, TNT, to be used as a

detention camp without the proper permitting and in violation of county code. (*Id.* ¶¶ 88–94) (Count IV). The case was initially assigned to another judge in this district. (DE 2).

On that same day, Plaintiffs filed their Motion for Preliminary Injunction (DE 5), requesting that the Court enjoin the State and the Federal Defendants from developing or using the TNT site as an immigration detention camp "unless and until Defendants comply with NEPA and the APA." (DE 5 at 1–2, 14).[4] Within the following week, all Defendants responded, challenging Plaintiffs' likelihood of success on the merits, (DE 12; DE 16; DE 21), *inter alia*, and Plaintiffs replied. (DE 24). No Defendant raised venue as an issue.

The State's response included an affidavit from Keith Pruett, the FDEM Deputy Executive Director, stating that Florida is funding the project, though it expects to seek reimbursement from the federal government, and that the project's environmental impact is likely to be minimal,[5] as TNT was already an active airfield with two buildings on site lit

---

[4] In their Motion for Preliminary Injunction, Plaintiffs also requested that the Court enjoin the State and Federal Defendants "from authorizing or permitting further development or use of the TNT [s]ite for purposes related to a noncitizen detention center," regardless of what procedures they follow. (DE 5 at 14). That request is apparently tied to Count III, which challenges the FDEM's authority to build and operate a correctional camp. (DE 1 ¶¶ 82–85). However, Plaintiffs did not develop any arguments nor provide any evidence related to Count III in the Motion for Preliminary Injunction, their subsequent briefing, or during the Preliminary Injunction Hearing. Therefore, Plaintiffs have waived this request. *See Fernandez v. Hotwire Commc'ns, Ltd.*, No. 21-cv-60115, 2022 WL 4598638, at *17 (S.D. Fla. Sept. 30, 2022) (holding plaintiffs had waived their disparate impact theory by failing to advance any arguments on the issue at summary judgment (citing *United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) (holding that the "failure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue")). Similarly, Plaintiffs initially sought injunctive relief against Miami-Dade but subsequently withdrew that request. (DE 31 at 3 n.2). Consequently, the Court considers only Plaintiffs' request for an injunction tied to their NEPA allegations.

[5] Director Pruett's declaration provided no background regarding his education, prior work experience, or familiarity with environmental sciences, the Everglades ecosystem, or NEPA. (DE 16-1 at 2–3). It is entirely unclear in what capacity Director Pruett purports to

24-hours a day. (DE 16-1). For their part, the Federal Defendants attached declarations from Thomas Giles, Acting Deputy Executive Associate Director for ICE's Enforcement and Removal Operations ("**ERO**"), (DE 21-1), and David Richardson, acting Administrator of the Federal Emergency Management Agency ("**FEMA**"). (DE 21-2).[6] Giles stated that ICE's role in the development of the detention camp has been "limited to touring the camp to ensure compliance with ICE detention standards, and meeting with officials from the State of Florida to discuss operational matters." (DE 21-1 ¶ 5). He further declared Florida would have final decision-making authority over who to detain at the camp, but that any detentions at the camp would be pursuant to "section 287(g) of the Immigration and Nationality Act [("**INA**")], codified at 8 U.S.C § 1357(g)." (*Id.* ¶¶ 6–7). Even so, Richardson admitted that the facility would be funded by the federal government, stating that "DHS/FEMA announced $600 million in federal funding for the Detention Support Grant Program [("**DSGP**")]" and that "[t]he only eligible applicant under the DSGP is [FDEM]." (DE 21-2 ¶ 3).

Over the next two weeks through July 16, 2025, the Parties filed notices with additional affidavits and other evidence, and they made additional arguments on the merits of Plaintiffs' preliminary injunction request. *See* (DE 14; DE 20; DE 25; DE 26; DE 27; DE 34; DE 35; DE 38; DE 47; DE 48). This included two filings by the State, which, in part, reiterated its merits argument that "NEPA does not apply" to the TNT camp.

---

possess the knowledge required to determine the likely environmental impacts of a detention center on the Everglades.

[6] Throughout this Order, the Court will identify exhibits either through reference to their docket entry numbers or their exhibit numbers on the Parties' Final Lists of Admitted Exhibits (DE 123; DE 124). When doing the latter, Plaintiffs' exhibits will be identified as "Pl. Ex. #", the Tribe's exhibits as "Tribe Ex. #", and Defendants' exhibits as "D. Ex. #".

(DE 28 at 2; DE 35 at 1 ("No matter how many times Plaintiffs poke and prod at the Court, they are unable to show their complaint presents a justiciable controversy under NEPA.")). Still, no Defendant challenged or raised the question of venue.

Also during that period, on July 14, 2025, the Miccosukee Tribe of Indians of Florida ("**Tribe**") moved to intervene as plaintiffs based on its long-standing ties to the lands around TNT and the environmental risks the project poses to the Tribe's food and water supply.[7] (DE 33). Then on July 16, 2026, the presiding judge recused from the case, and it was reassigned to the undersigned. (DE 37).

The next day, Plaintiffs filed a Renewed Motion for TRO, explaining that since they filed suit, the "State and Federal Defendants commenced transporting immigration detainees to the TNT [s]ite," that, according to State officials, "as many as 900 people are now being detained at the [s]ite, and that the State has plans to expand the number of detainees to as many as 4,000." (DE 40 at 2). Given the completion of the detention camp's first phase of construction and its ongoing operations, Plaintiffs modified their request for injunctive relief, now seeking a "halt to any further construction on the TNT [s]ite . . ., [a] pause[ to] the transport of additional detainees to the [s]ite, and [the] ceasing [of] any operations related to detaining or preparing for the detention of anyone not [already] detained at the [s]ite[.]" (*Id.* at 6).

On July 21, 2025, the State filed a Supplemental Response to Plaintiffs' Requests for a Temporary Restraining Order ("**Supplemental Response on Venue**") arguing for

---

[7] Only the State opposed the Tribe's intervention in the suit. *See* (DE 58; DE 59). The Court granted the Tribe's request on July 30, 2025. (DE 73). The Tribe has since filed an Intervenor Complaint, (DE 84), and joined Friends and CBD's Motion for Preliminary Injunction. (DE 85).

the first time that "venue is not proper in this Court." (DE 50 at 1). At a Status Conference that day, the Court set a briefing schedule on the issue and oral arguments for July 30, 2025. (DE 54). "'Where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue,' district courts must hold an evidentiary hearing on the propriety of injunctive relief." *Farmworker Ass'n of Fla. v. Moody*, 734 F. Supp. 3d 1311, 1320–21 (S.D. Fla. 2024) (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1312 (11th Cir. 1998). Therefore, the Court also set an evidentiary hearing on Plaintiffs' Motion for Preliminary Injunction for August 6, 2025. (DE 54).

## A. *Preliminary Injunction Hearing*

Over four days of evidentiary presentation and oral argument between August 6 and August 13, 2025, the Court heard testimony from ten witnesses and viewed over a hundred exhibits. Plaintiffs first called Friends Executive Director Eve Samples, who spoke both of her personal, and the 50,000-member organization's commitment to preserving the Everglades and the procedural harms they have faced due to Defendants' failure to consult with Friends before building the detention camp. State Representative Anna Eskamani recounted a July 12, 2025 tour of the facility led by Director Guthrie. She testified that on the tour, Director Guthrie informed her that the facility was the product of a DHS request, that there would be a federal reimbursement to the state for the facility's costs, that detainees are dropped off at the site by federal agents, and that ICE inspects the facility. CBD member Amber Crooks described hiking, camping, stargazing, and animal-watching in the preserved areas around the TNT site, shared her fears that the light pollution, increased traffic, and wastewater associated with the project will frustrate

her future enjoyment of the area, and stated her readiness to engage with any future NEPA process. Next, 27-year veteran of the Florida Fish and Wildlife Conservation Commission, ecologist, and panther expert Randy Kautz explained how increased light, sound, vehicular traffic, and other human activity from the project risks loss of habitat and increased mortality for the estimated 120 to 230 remaining Florida panthers. The final witness on August 6 was Friends member Jessica Namath, an avid outdoorswoman and animal watcher, who described regularly hiking and driving in the areas surrounding the TNT site before the camp's construction. Since then, Ms. Namath testified to spending nearly every day at the access gate to the TNT site to bear witness to its transformation. She described the site's industrial lighting and her observation of heavy construction materials and machinery coming and going to and from the site, and of federal law enforcement vehicles entering the site daily.

On August 7, Plaintiffs called soil physicist, hydrologist, and wetland ecologist Dr. Christopher McVoy. After touring the project with site Incident Commander Dr. Frank E. Lumm, and reviewing photos and soil reports, Dr. McVoy opined that over 800,000 square feet of new paving had been introduced at the site, which risked disrupting the nutrient balance of the surrounding, connected wetlands by increasing runoff. Next, former Miami-Dade County Department of Environmental Regulatory Management geologist Dillon Reio presented an analysis concluding that the Defendants' 800,000 square feet of new paving could lead to large increases in runoff contaminated with polycyclic aromatic hydrocarbons ("*PAH*") and other carcinogens into the surrounding wetlands. He also testified that the project did not appear to have any meaningful stormwater management system, based on his review of permitting databases and the camp's engineering plans.

On August 12, the Tribe called two members of its environmental team, Director of Water Resources Amy Castaneda and Fish and Wildlife Department Director Dr. Marcel Bozas.[8] Castaneda testified that eighty percent of the Tribe's residences, two schools, and the Tribal governmental building, are all located in the Miccosukee Reserved Area a few miles southeast of the TNT site in Miami-Dade County. She explained that any uncontained wastewater or run-off leaving the TNT site will likely flow into the BCNP, Everglades National Park, and eventually into the Miccosukee Reserved Area. She further testified that the multi-billion-dollar water management projects associated with the recently enacted WERP—which was the culmination of an almost decade-long planning—were based on the TNT site's old usage as a training airport, and that WERP's preservation efforts in the area could be hindered by high-nutrient runoff from the detention camp. Dr. Bozas testified about the site's current and potential harmful impacts on the environment and the Tribe's use of the lands. He testified about the Tribe's traditions of hunting, fishing, and collection of medicinal or other culturally important plants around the site. He pointed out off-road trails with trailheads on the camp's fence line, which had served as the Tribe's access points to BCNP and which are now inaccessible. He also discussed how the increased human activity, traffic, noise, and light from the project is likely to disrupt wildlife in the area, including the endangered panther, bonneted bat, and wood stork.

The only witness called by Defendants was Florida Department of Highway Safety

---

[8] Castaneda earned a bachelor's degree of science in natural resource conservation and has worked in the Tribe's Water Resources Division for nineteen years. (DE 129 at 12). Dr. Bozas holds a Ph.D. in earth system science and natural resources and conducted a study for his dissertation of wildlife movement in the Miccosukee Water Conservation Area and Everglades National Park. (*Id.* at 96–97).

and Motor Vehicles ("*FDHSMV*") Executive Director David Kerner. Director Kerner, who also oversees the Florida Highway Patrol ("*FHP*"), discussed FHP's coordination with ICE under their 287(g) agreement. He explained how FHP troopers contact ICE to make a detention determination after stopping an individual on state law violations and then suspecting that individual of lacking lawful status. He said that it is federal agencies and agents, not FHP troopers, who transport detainees to the TNT site, and federal agencies who carry out deportations using federal aircraft. Director Kerner also discussed the importance of immigration enforcement in Florida generally, referencing an uptick in human and narcotics trafficking across the border, and the importance of increasing detention capacity to those enforcement priorities. Director Kerner testified that his knowledge of who was being detained at the TNT site was limited, though he knew all detainees were there solely on immigration violations, none on state criminal charges. Finally, Director Kerner said he had been on a tour of the facility before it became operational and that he was not aware of any other sites that had been considered for the facility. Defendants also introduced evidence that the TNT site had been in active use as a training airport for decades before the project, and questioned witnesses about how risk of harms from its use as a detention camp compare to those of its prior use facilitating training flights. And throughout the Hearing, Defendants cross-examined witnesses about their failure to collect data proving that the detention camp was having the harmful effects they described in their testimony.

Although the Court heard testimony into the early evening of August 6, the Parties agreed the Preliminary Injunction Hearing would not conclude that day. At that time, counsel for the State and Federal Defendants informed the Court that they had absolute

scheduling conflicts which would preclude resumption of the proceedings until the following Tuesday. After some discussion with the Court, the Parties agreed that the Hearing could proceed the next day for just a half day, to be resumed the following Tuesday.

At the close of the half day of testimony on August 7, Plaintiffs renewed their request for a limited TRO, citing evidence suggesting that Defendants planned to add paving and other infrastructure over the weekend, while the Hearing was in recess. Specifically, Plaintiffs requested that the Court prevent any additional industrial-style lighting, paving, filling, excavating, site preparation, or fencing from being introduced to the site. The Court inquired as to whether Defendants would agree that no such construction would take place over the five-day hiatus. Defendants were unwilling to make this representation. Consequently, after hearing additional argument, the Court granted Plaintiffs' narrow request for a TRO, halting further expansion of the site for fourteen days. (DE 104). The Court then concluded the evidentiary presentation on August 12, 2025, and heard closing remarks the following day.

### B. *287(g) Agreements*

"For nearly 150 years, the Supreme Court has held that the power to control immigration—the entry, admission, and removal of noncitizens—is *exclusively* a federal power." *United States v. Texas*, 97 F.4th 268, 278–79 (5th Cir. 2024). However, "[f]ederal law specifies limited circumstances in which state officers may perform the functions of an immigration officer[,]" such as through a formal agreement under § 1357(g)(1). *Arizona v. United States*, 567 U.S. 387, 408–09 (2012). As mentioned above, the Federal Defendants concede that the camp operates pursuant to such "287(g)" agreements

between DHS (through ICE) and relevant Florida law enforcement agencies, along with the aid of on-site federal agents. (DE 105 at 34). In a separate case raising constitutional challenges to particular practices at the camp, the State and Federal Defendants produced several of the operative 287(g) agreements, including those between ICE and nine Florida agencies: Florida Department of Alcoholic Beverages and Tobacco Bureau of Law Enforcement ("*FDABT*"); Florida Department of Corrections ("*FDOC*"); Florida Department of Law Enforcement ("*FDLE*"); Florida Department of Financial Services Criminal Investigations Division ("*DFS*"); FDHSMV, Division of FHP; Florida Fish & Wildlife Conservation Commission ("*FWC*") (DE 53-1 at 78), Florida Department of Lottery Division of Security ("*FDL*"), the Florida National Guard ("*FNG*"), and Florida Department of Environmental Protection Division of Law Enforcement ("*FDEP"*). *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 53-1 at 2, 17, 32, 47, 62, 78, 93, 108, 123 (collectively, the "*287(g) Agreements*").[9] Each of those agreements contains essentially identical sections, titled "Ice Supervision" and "Liability and Responsibility". *Id.* at 6–9, 19–20, 29, 36–39, 51–54*,* 67–70, 82–85, 97–100, 112–15, 127–30. Those sections include the following language:

**XI. ICE SUPERVISION**

Immigration enforcement activities conducted by participating LEA personnel will be supervised and directed by ICE. Participating LEA personnel are not authorized

---

[9] "A district court may take judicial notice of public records within its files relating to the particular case before it or other related cases." *Cash Inn of Dade, Inc. v. Metro. Dade Cnty.*, 938 F.2d 1239, 1243 (11th Cir. 1991); *see also Lockett v. Experian Info. Sols., Inc.,* 2021 WL 4815898, at *1, *12 n.9 (N.D. Ga. June 30, 2021) ("The Court may take judicial notice of public records, such as court filings on public dockets.") (citing *Universal Express, Inc. v. S.E.C.*, 177 F. App'x 52, 53 (11th Cir. 2006))); *Ohio Cas. Ins. Co. v. Beall*, No. 23-cv-00060, 2024 WL 3993851, at *5 (M.D. Ga. Aug. 29, 2024) (explaining contract was not hearsay because its language was legally operative, not used to prove the truth of another matter).

to perform immigration officer functions except when working under the supervision or direction of ICE.

For the purposes of this MOA, ICE officers will provide supervision of participating LEA personnel only as to immigration enforcement functions. The LEA retains supervision of all other aspects of the employment of and performance of duties by participating LEA personnel.

In the absence of a written agreement to the contrary, the policies and procedures to be utilized by the participating LEA personnel in exercising these authorities shall be DHS and ICE policies and procedures, including the ICE Use of Force Policy.

**XIV. LIABILITY AND RESPONSIBILITY**

Participating LEA personnel will be treated as Federal employees for purposes of the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(I), 2671-2680, and worker's compensation claims, 5 U.S.C. § 8101 et seq., when performing a function on behalf of ICE as authorized by this MOA. See 8 U.S.C. § 1357(g)(7); 28 U.S.C. § 2671. **In addition, it is the understanding of the parties to this MOA that participating LEA personnel performing a function on behalf of ICE authorized by this MOA will be considered acting under color of federal authority for purposes of determining liability and immunity from suit under federal or state law. See 8 U.S.C. § 1357(g)(8).**

These provisions are replete with express references to the statutory framework that governs 287(g) agreements. Section 1357(g) allows states or localities to enter into agreements with the Attorney General to deputize state or local officers to perform functions of federal immigration officers when they are "determined by the Attorney General to be qualified to perform" those functions after receiving training and certification "regarding the enforcement of relevant Federal immigration laws." § 1357(g)(1)–(2). When acting under a 287(g) agreement, the deputized officer "shall be subject to the direction and supervision of the Attorney General." § 1357(g)(3). Further, any 287(g) agreement must specify the deputized officer's powers and duties, the duration of delegated authority, and the federal agency official who is "required to supervise and direct the individual[.]" § 1357(g)(5). Finally, the deputized officer is treated as a federal

employee for purposes of compensation for injury and tort liability, and the officer "shall be considered to be acting under color of Federal authority for purposes of determining the liability, and immunity from suit[.]" § 1357(g)(7)–(8).

## II.   LEGAL STANDARDS

"Under Federal Rule of Civil Procedure 12(b)(3), a party may assert the defense of improper venue." *Hemispherx Biopharma, Inc. v. MidSouth Capital, Inc.*, 669 F. Supp. 2d 1353, 1356 (S.D. Fla. 2009). When a defendant does, "the plaintiff bears the burden of showing that the venue selected is proper." *Id.* (citing *Delong Equip. Co. v. Wash. Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir. 1988)); *Wai v. Rainbow Holdings*, 315 F. Supp. 2d 1261, 1268 (S.D. Fla. 2004) ("On a motion to dismiss based on improper venue, the plaintiff has the burden of showing that venue in the forum is proper."). A court "must accept all allegations of the complaint as true, unless contradicted by the defendants' evidence, and the court "may examine facts outside of the complaint" when factual disputes arise. *Id.* (citations omitted). In reviewing the allegations and evidence, "the court must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff." *Hemispherx*, 669 F. Supp. 2d at 1356; *see also Home Ins. Co. v. Thomas Indus., Inc.*, 896 F.2d 1352, 1355 (11th Cir. 1990) (when reviewing a Rule 12(b)(3) motion and the parties' "affidavits conflict, the court is inclined to give greater weight to the plaintiff's version of the jurisdictional facts and to construe such facts in the light most favorable to the plaintiff."). Finally, "venue must be proper as to each defendant and each claim." *Doe 1 v. Congregation of the Sacred Heart of Jesus and Mary*, No. 23-cv-5294, 2024 WL 4276174, at *2 (E.D.N.Y. Sept. 24, 2024); *see also Williams v. Apple Inc.*, No. 23-3901, 2024 WL 2721630, at *2 (D.D.C. May 27, 2024) ("Where a case involves more than one

cause of action, as is true here, 'venue must be proper as to each claim[.]'") (quoting *Relf v. Gasch*, 511 F.2d 804, 807 n.12 (D.C. Cir. 1975)).

Even if venue is proper, a court may transfer a case to another district in which venue lies "in the interest of justice." 28 U.S.C. § 1404. The court should consider "convenience of parties and witnesses, the 'locus of operative facts,' and other concerns related to 'trial efficiency[.]'" *Bryant v. Sheriff, Saint Lucie Cnty., Fla.*, 2024 WL 4458382, at *8 (11th Cir. Oct. 10, 2024) (quoting *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005)). Additionally, the court should weigh "various public-interest considerations," including "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 571 U.S. 49, 62 n.6 (2013) (internal quotations omitted).

Rule 65 of the Federal Rules of Civil Procedure authorizes courts to grant a preliminary injunction before final judgment in limited circumstances. The purpose of this injunctive relief is to "preserve the status quo until the district court renders a meaningful decision on the merits." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1231 (11th Cir. 2005) (citation omitted). To merit a preliminary injunction, Plaintiffs must show:

> (1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest.

*Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 779 F.3d 1275, 1280 (11th Cir. 2015) (quoting *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1263 (11th Cir. 2014)).

Plaintiffs "bear[] the burden of persuasion to clearly establish all four of these prerequisites." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) (internal quotations omitted).

## III.   DISCUSSION

Defendants levy several objections to the propriety of the Court's adjudication of this matter. First, Defendants argue that 8 U.S.C. 1252(a) and (f) strip the Court of subject-matter jurisdiction over any aspect of Plaintiffs' NEPA claim that relates to federal immigration detention activities. (DE 16 at 12; DE 21 at 5–6). Next, Defendants contest whether the S.D. Fla. is the proper district for Plaintiffs' claims against Defendant Guthrie and the Federal Defendants. The Court will address these threshold issues before discussing the merits of the Motion for Preliminary Injunction.[10]

---

[10] Although Defendants do not contest Plaintiffs' standing, a "district court [is] not empowered to reach any merits question" without first establishing its jurisdiction. *See Wiand v. ATC Brokers Ltd.*, 96 F.4th 1303, 1311 (11th Cir. 2024). So, the Court will briefly address Plaintiffs' standing to seek injunctive relief. Plaintiffs may establish standing through either their own injury in fact or through associational standing by virtue of injuries posed to or suffered by their members. *City of S. Mia. v. Governor*, 65 F.4th 631, 637 (11th Cir. 2023). "To establish associational standing, an organization must prove that its members 'would otherwise have standing to sue in their own right.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1249 (11th Cir. 2020) (citations omitted). To this end, Plaintiffs must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). Here, Plaintiffs allege (and have supported through evidence) that their members' aesthetic, conservational, and recreational interests are adversely impacted by the detention camp's operations. From light pollution affecting members' ability to observe the night skies, to noise pollution impacting members' ability to observe and interact with wildlife, the Court finds that Plaintiffs have sufficiently alleged the injuries to their members and, therefore, have established associational standing. *See Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1170–73 (11th Cir. 2006) (plaintiff environmental groups "easily" had associational standing when alleging that an agency "shirked its duties under NEPA . . ., with the result that already vulnerable species and their habitats are now more vulnerable," and the group's members use the area to recreate and engage with the environment).

### A. Section 1252 does not strip the Court of subject-matter jurisdiction over this NEPA claim.

#### 1. Section 1252(a)(2)(B)(ii)

Section 1252(a)(2)(b)(ii) provides that "[n]o court shall have jurisdiction to review . . . any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subsection to be in the discretion of the Attorney General or the Secretary of Homeland Security[.]" The statute "precludes [the Court's] review of discretionary decisions of the [Secretary] in *only* th[os]e specific circumstances." *Zafar v. United States Attorney General*, 461 F.3d 1357, 1360 (11th Cir. 2006) (emphasis in original); *see also Bakran v. Sec'y United States Dep't of Homeland Sec.*, 894 F.3d 557, 562 (3d Cir. 2018) ("The INA's jurisdiction-stripping language . . . applies not to all decisions the [Secretary] is entitled to make, but to a narrower category of decisions where Congress has taken the additional step to specify that the sole authority for the action is in the [Secretary]'s decision.") (citations and quotations omitted). "The statute requires us to look at the *particular* decision being made and to ascertain whether *that* decision is one that Congress has designated to be discretionary." *Mejia Rodriguez v. United States Dep't of Homeland Sec.*, 562 F.3d 1137, 1143 (11th Cir. 2009) (emphasis in original).

As the Eleventh Circuit has clarified, "[t]he phrase 'specified under this subchapter' refers to subchapter II of Chapter 12, 8 U.S.C. §§ 1151–1378." *Zafar*, 461 F.3d at 1360. "Thus, to avoid judicial review, the [government] must rely on an explicit, Congressionally-defined, discretionary *statutory* power . . . articulated within sections 1151 through 1378[.]" *Belegradek v. Gonzales*, 523 F. Supp. 2d 1364, 1367 (N.D. Ga. 2007) (emphasis in original; citation and quotations omitted).

Defendants rely on §§ 1226 and 1231, which address the Attorney General's authority to detain and remove noncitizens. However, Plaintiffs challenge neither the fact nor the manner of detention or removal. Rather, Plaintiffs seek injunctive relief compelling Defendants to comply with NEPA, which ensures "federal agencies . . . adequately assess the environmental impacts of actions they undertake." *City of Oxford, Ga. v. F.A.A.*, 428 F.3d 1346, 1352 (11th Cir. 2005). This relief does not implicate, much less interfere with, any decision "specified . . . to be in the discretion" of the Secretary or the Attorney General. Because NEPA compliance is not a decision specified to be in the discretion of the Attorney General or Secretary, § 1252(a)(2)(b)(ii) simply does not apply. Defendants conflate two very distinct types of relief. An injunction requiring NEPA compliance would, at most, prevent the use of the facility until a lawful NEPA review is done. This is not the same thing as the Court dictating where or how the government must house immigration detainees, which Congress has specified to be within the Secretary's discretion. Plaintiffs seek only the former type of relief.[11]

Defendants' cited cases—nearly all of which feature individual plaintiffs challenging their own detentions or removals—confirm this distinction. Defendants selectively quote language from these cases to suggest that § 1252(a)(2)(b)(ii) is broader than it is. Plaintiffs do not dispute that the Attorney General and Secretary possess authority over detention and removal as those cases recognize. But those decisions arose in entirely different factual and legal contexts. None address NEPA, none involve the

---

[11] In *C.M. v. Noem*, the court drew a similar conclusion when analyzing whether another jurisdiction-stripping provision of the INA, § 1252(g), precluded review of claims by detainees at the TNT site alleging the manner of their detentions unduly restricted their access to counsel. 25-cv-23182 (S.D. Fla.), ECF 86 at 31–32; *see also infra* n.14.

APA, and none interpret § 1252(a)(2)(B)(ii) in a way that would bar review of Plaintiffs' claims. *See, e.g., Sinclair v. Att'y Gen. of United States*, 198 F. App'x 218, 222 (3d Cir. 2006) (reaffirming attorney general's discretion under § 1231(g)(1) to determine place of detention); *Van Dinh v. Reno*, 197 F.3d 427, 433 (10th Cir. 1999) (holding district court lacked jurisdiction to enjoin attorney general's discretionary transfer of aliens in a Bivens class action); *Comm. of Cent. Am. Refugees v. Immigr. & Naturalization Serv.*, 795 F.2d 1434, 1441 (9th Cir. 1986) (confirming that district court could not supervise attorney general's day-to-day discretion over detention placement); *Jane v. Rodriguez*, No. 20-5922, 2020 WL 10140953, at *2 (D.N.J. May 22, 2020) (recognizing DHS' discretion to detain and set detention locations and transfers during COVID-19); *Lway Mu v. Whitaker*, 18-cv-06924 2019 WL 2373883, at *5 (W.D.N.Y. June 4, 2019) (declining to order DHS to house petitioner in a specific facility, citing § 1231(g)(1)); *Salazar v. Dubois*, 17-cv-2186, 2017 WL 4045304, at *1 (S.D.N.Y. Sept. 11, 2017) (same, absent constitutional violation); *Tercero v. Holder*, No. 12-cv-0246, 2012 WL 8667571, at *3 (D.N.M. Oct. 4, 2012) (court lacked jurisdiction under § 1231(g)(1) over attorney general's decision to detain aliens in New Mexico pending proceedings in Texas); *Kapiamba v. Gonzalez*, No. 07-cv-335, 2007 WL 3346747, at *1 (W.D. Mich. Nov. 7, 2000) (finding that attorney general's decision to detain petitioner in a particular facility unreviewable under § 1231(g)(1)); *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 751 (9th Cir. 2022) (neither discussing § 1252 nor the APA).

At best, Defendants' cases establish that § 1252(a)(2)(b)(ii) bars judicial review over individual detention and removal decisions, issues that are not present here. To expand § 1252(a)(2)(B)(ii) to NEPA-based claims unspecified in the statute would expand

its reach far beyond what Congress explicitly intended and legislated. *Wiersum v. U.S. Bank, N.A.*, 785 F.3d 483, 488 (11th Cir. 2015) ("As the Supreme Court has instructed time again, courts presume Congress says in a statute what it means and means in a statute what it says there.") (citations and quotations omitted); *Harris v. Garner*, 216 F.3d 970, 976 (11th Cir. 2000) ("We will not do to the statutory language what Congress did not do with it, because the role of the judicial branch is to apply statutory language, not to rewrite it.") (citations omitted).

### 2. Section 1252(f)(1)

Defendants also rely on § 1252(f)(1), which provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter." In other words, "[i]t prohibits federal courts from granting classwide injunctive relief" against certain provisions of the INA, specifically §§ 1221–1231. *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999); *see also Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022) ("§ 1252(f)(1) generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions."). "Those provisions charge the Federal Government with the implementation and enforcement of the immigration laws governing the inspection, apprehension, examination, and removal of aliens." *Id.* at 549–50.

Here, Plaintiffs' requested relief does not fall within that bar. They do not seek to halt, suspend, or alter the "operation" of any INA provision, nor do they challenge the Defendants' authority to implement or enforce immigration laws. An order compelling NEPA compliance does not "enjoin or restrain" immigration operations; it simply requires

Defendants to follow the environmental procedures that Congress imposed. *See generally Fla. Wildlife Fed'n v. United States Army Corps of Eng'rs*, 401 F. Supp. 3d 1298, 1309 (S.D. Fla. 2005) ("NEPA establishes important action-forcing procedures to ensure that the broad national commitment to protecting and promoting environmental quality is infused into the actions of the federal government.") (citations and quotations omitted). Thus, to the extent Defendants argue otherwise based on detention decisions under § 1226, that reliance is misplaced. Plaintiffs do not challenge any detention decision, and § 1226 contains no language suggesting that NEPA compliance is shielded from judicial review. "Congress legislated which sections are covered by § 1252(f)(1). The Executive Branch does not get to propose additions." *Texas* v. *U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 210 (5th Cir. 2024).

And if NEPA compliance has a "collateral effect" on immigration operations, that is insufficient to trigger § 1252(f)(1). *Id.* at 209 ("[A] court may enjoin the unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision.") (emphasis in original; citation omitted); *see also United Farm Workers v. Noem*, -- F. Supp. 3d -- 2025 WL 1235525, at *22 (E.D. Cal. Apr. 29, 2025) ("Courts maintain authority to enter injunctions addressing other provisions of the INA even if there may be collateral effects upon a provision covered by Section 1252(f)(1) . . . . Thus, even if an injunction could have a collateral effect on the provisions identified by Defendants, the Court has the jurisdiction and the authority to issue an injunction."). Therefore, neither § 1252(a)(2)(B)(ii) nor § 1252(f)(1) deprive the Court of jurisdiction to require Defendants' compliance with NEPA.

B. *The Southern District of Florida is the appropriate venue for this suit.*

Next, the State and Federal Defendants each argue that venue in the S.D. Fla. is improper.[12] (DE 50 at 1; DE 60 at 1). Plaintiffs assert that the State waived its venue challenge. Plaintiffs go on to argue that regardless, venue in the S.D. Fla. is proper as to the Federal Defendants under § 1391(e)(1)(B) and § 1391(e)(1)(C), (DE 66 at 3), and is proper as to the State under 28 U.S.C. § 1391(b)(2). (DE 61 at 8). The Court will address each issue in turn.

1. **Waiver**

Plaintiffs initially argue that the State waived any venue challenge by litigating this case on the merits for almost a month—including filing three merits briefs in opposition to Plaintiffs' requests for injunctive relief—before raising venue. (DE 16; DE 28; DE 35). "A party waives [improper venue] by . . . failing to . . . include it in a responsible pleading or in an amendment allowed by Rule 15(a)(1) as a matter of course." Fed. R. Civ. P. 12(h)(1)(B)(ii). It may also be waived by other "conduct amounting to waiver as a matter of law." *Manley v. Engram*, 755 F.2d 1463, 1468 (11th Cir. 1985). "Because a motion to dismiss for lack of venue . . . can be raised so easily, [courts] strictly apply the waiver rule[.]" *Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment and Allied Indus. Fund*, 967 F.2d 688, 692 (1st Cir. 1992) (describing Rule 12 as requiring venue to be raised in a defendant's "first defensive move" and affirming a finding of waiver when defendant had requested a hearing on plaintiff's TRO motion, moved to appear *pro hac vice*, and stipulated to expedited discovery and preliminary injunction hearing without raising venue). An "opposition to a motion for preliminary injunction can be such a 'first

---

[12] Defendant Miami-Dade County has not challenged venue.

responsive pleading' or defensive move." *Bautista-Perez v. Holder*, 681 F. Supp. 2d 1083, 1091 (N.D. Cal. 2009) (venue was waived when defendants filed two opposition motions to plaintiff's preliminary injunction request, including a declaration on the case's merits).

Here, the State filed notices of appearance on the same day the Complaint was filed. (DE 10; DE 11). Then, over the course of almost a month, the State filed three merits briefs, including a declaration from FDEM Executive Director Guthrie. (DE 16; DE 28; DE 35). The State also filed a motion for extension of time to respond to the Complaint in order to align its deadline with the Federal Defendants', all without mentioning venue. (DE 39). In short, the State failed to raise venue in any of its first *three* defensive moves, despite the opportunity. This is sufficient for a finding of waiver.

The State argues that the above cited cases are distinguishable because in those cases preliminary injunction hearings were held without mention of waiver. (DE 65 at 4–5). But none of those courts discuss that fact as relevant to their decisions. The State then offers a series of inapposite cases where courts rejected waiver in completely different scenarios to the one presented here. See *Lithia Ramsey-T, LLC v. City Line Auto Sales, LLC*, No. 22-03592, 2023 WL 1883355, at *5 (D.N.J. Feb. 9, 2023) (personal jurisdiction was not waived by complying with the court's order to show cause and appear for preliminary injunction hearing a week after complaint filed); *Bartlett v. Bartlett*, No. 16-cv-6595, 2017 WL 106043, at *2 (N.D. Ill. Jan. 11, 2017) (filing motion to disqualify opposing counsel, followed by 12(b)(3) motion before briefing closed on the disqualification motion, did not waive venue defense); *Pickett v. City of Houston*, No. H-08-2734, 2009 WL 1158842, at *2 (S.D. Tex. Apr. 29, 2009) (insufficient service defense not waived by appearing at TRO hearing the morning after complaint filed and

then moving to dismiss in its first filing); *Johnson v. Masselli*, No. 2:07-cv-214, 2008 WL 111057, at *3 (N.D. Ind. 2008) (rejecting waiver argument after defendant appeared at TRO hearing, briefed the non-merits issue of necessity of a security bond for the TRO, and then raised venue in their first merits pleadings—their answer and a motion to dismiss); *Friedberg v. Mut. Holdings, Ltd.*, No. 02-3193, 2005 WL 1213282, at *3 (E.D. Pa. May 19, 2005) (defendants' 12(b)(6) motion based on forum selection clause was not waivable, but even if construed as a 12(b)(3) motion, no waiver when defendants stipulated to TRO as a part of settlement negotiations and did not litigate on the merits).

In sum, for a month, Defendants disregarded an issue they now describe as obviously correct, "an important issue," and a "leading legal argument." DE 89 at 13–14, 16 (arguing "it would be impossible to say" venue is valid under 1391(e)(1)(C) and any arguments for venue under 1391(b)(2) are "easily dispatched"). Though Defendants' waiver of venue is sufficient to foreclose venue as an issue, the Court addresses the merits of all Defendants' venue challenges, as both Parties requested.

## 2. Section 1391(e)(1)(C)

When "a defendant is an officer or employee of the United States or any agency thereof" a civil action may "be brought in any judicial district in which . . . the plaintiff resides if no real property is involved in the action." § 1391(e)(1)(C). For venue purposes, a plaintiff entity resides "only in the judicial district in which it maintains its principal place of business[.]" § 1391(c)(2). Friends has its principal place of business in Stuart, FL, within the S.D. Fla. (DE 61-1). The Federal Defendants do not dispute that this satisfies the first requirement of § 1391(e)(1)(C). They argue that "Plaintiffs' suit centers on the temporary detention center, which is a collection of buildings and pavement on real property[,]" and

"[t]hus, real property is a center component of this action[.]" (DE 60 at 4). But the Federal Defendants' far-reaching interpretation runs counter to decades of authority and the purpose of § 1391(e), which is "to broaden the venue of civil actions" against federal defendants. *Schlanger v. Seamans*, 401 U.S. 487, 490 n.4 (1971). As Judge Constance Baker Motley sagely wrote:

> Gravity being what it is, the vast bulk of human activities take place on the face of the earth. Consequently, almost any dispute over public or private decisions will in some way "involve real property," taken literally. The touchstone for applying § 1391(e)(4) [(the prior, identical version of § 1391(e)(1)(C))] cannot sensibly be whether real property is marginally affected by the case at issue. Rather, the action must center directly on the real property, as with actions concerning the right, title or interest in real property.

*Nat. Res. Def. Council, Inc. v. Tenn. Val. Auth.*, 340 F. Supp. 400, 406 (S.D.N.Y. 1971) (holding NEPA challenge to federally-owned utility's practice of buying strip-mined coal did not involve real property, despite the suit affecting "contracts with third-parties for production of coal," because the plaintiffs did "not seek an adjudication of the validity of defendants' title, leases, or mineral rights"), *rev'd on other grounds*, 459 F.2d 255 (2d Cir. 1972); *see also Env. Defense Fund, Inc. v. Corps of Eng'rs of U.S. Army*, 325 F. Supp. 728, 732 (E.D. Ark. 1971) (NEPA challenge to dam project met prior version of § 1391(e)(1)(C) because "[n]othing need[ed] to be done in [t]he action with respect to the real estate under and adjacent to the [river] or upon which defendants contemplated[] constructing the dam[, and] [t]he action d[id] not put in issue the title to, or possession of, such lands, or any interest therein").

Other courts nationwide have echoed Judge Motley's statutory interpretation and held that NEPA suits similar to Plaintiffs' did not involve real property within the meaning of § 1391(e)(1)(C). For example, in *Earth Island Institute v. Quinn*, the court held real

property was not involved in a NEPA challenge to a federal restoration project to "conduct salvage harvest of fire-killed trees, remove hazardous trees, and engage in tree planting in areas affected by" recent fires. *Earth Island Inst. v. Quinn*, 56 F.Supp.3d 1110, 1112, 1116 (N.D. Cal. 2014). The court began its analysis by pointing out that, "by using the legal term 'real property[]' . . . Congress seems to have indicated that it intended mainly to cover disputes over legal interests in real property." *Id.* at 1115–16. Indeed, the court found, "[m]ost authority appears to have followed [Judge Motley's] logic, generally finding that actions 'involve real property' when they involve disputes over real property interests—and perhaps not even then if the real property dispute is peripheral to the central cause of action." *Id.* at 1116 (first citing Wright & Miller, 14D Fed. Prac. & Proc. Juris. § 3815 n.33 (4th ed.); and then *Animal Legal Def. Fund v. U.S. Dep't of Agric*, No. 12-cv-4407, 2013 WL 120185, at *2 (N.D. Cal. Jan. 8, 2013)). Even though the case related to the use of "a specific area of land," the court concluded this was insufficient to bring the suit within the category of real property disputes triggering the exception, as it was more centrally a suit about "personal property interests in timber and regulatory and environmental policy issues." *Id.* at 1116.

Next, in *Western Watersheds Project v. Schneider*, the court reaffirmed its interpretation of "§ 1391(e)(1)(C) to mean that 'real property' is not 'involved' in a lawsuit challenging an agency's compliance with NEPA[.]" *W. Watersheds Project v. Schneider,* 2019 WL 4863483, at *2–3 (D. Id. Oct. 2, 2019) (citing *WWP v. Salazar*, No. 08-0516, 2009 WL 1299626 (D. Id. May 7, 2009)). Before the court was a challenge to Bureau of Land Management ("**BLM**") land-use plans in several western states, which Plaintiffs say unlawfully "relax[ed] restrictions on oil and gas development in sage grouse habitat." *Id.*

at *1. Though plaintiff's suit implicated third-party property rights as an ancillary matter, plaintiffs were not disputing any party's "right, title or interest in real property." *Id.* at *3. Instead, the court held, like the court in *Earth Island v. Quinn*, that plaintiffs were merely "challeng[ing] an agency's compliance with statutory mandates." *Id.*

Here, Plaintiffs' suit likewise centers on non-compliance with "statutory mandates"—namely the Federal Defendants' approval, construction, funding, and use of the detention camp without conducting environmental analyses required by NEPA—*not* who possesses any given property right to the TNT site. Therefore, even though the suit involves real property in a colloquial sense, it does not fit within the meaning of § 1391(e)(1)(C).

Resisting this conclusion, Defendants point to a single case in which a court held a suit under NEPA involved real property within § 1391(e)(1)(C). (DE 65 at 6 (citing *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. 08-05646, 2009 WL 1025606, (N.D. Cal. Apr. 14, 2009)); DE 89 at 10, 51 (same)). But that single authority relied on another case in which "the plaintiff alleged that [BLM] improperly rejected [its] oil and gas lease applications." *Ctr. for Biological Diversity,* 2009 WL 1025606, at *2 (citing *Ferguson v. Lieurance*, 565 F. Supp. 1013, 1015 (D. Nev. 1983)). In that distinguishable context—where "the obvious and undeniable purpose" of plaintiff's action was to "acquire the real property interest he seeks"—the *Ferguson* court reasoned that the action did involve real property. *Id.* (quoting *Ferguson*, 565 F. Supp. at 1015). The *Center for Biological Diversity* court may have been swayed by the sheer "range of real property issues" at play in the challenged plan before it, "including access to public and private lands, rights of way and easements across these lands, land withdrawals, and land exchanges and acquisitions."

*Id.* at *1. Consequently, several courts have since found the *Center for Biological Diversity* court's decision is confined to its facts and inapplicable in the NEPA context. *See Earth Island Inst. v. Nash*, No. 19-cv-05792, 2019 WL 11023709, at *5 (N.D. Cal. Oct. 7, 2019) (finding *Center for Biological Diversity* "is distinguishable" from the case at hand, where "[p]laintiffs' lawsuit certainly involves public land, [but] the claims focus on compliance with NEPA and other environmental statutes"); *W. Watersheds*, 2019 WL 4863483, at *2 (finding *Earth Island v. Quinn* "more persuasive" than *Center for Biological Diversity*). This Court does as well.[13]

Therefore, the Court finds that this suit does not involve real property within the meaning of § 1391(e)(1)(C), and the S.D. Fla. is a proper venue for this suit with regard to the Federal Defendants under that subsection. The Court will now address whether this district is a proper venue for the State and Federal Defendants as a locus of the substantial part of the events or omissions giving rise to their claims.[14]

---

[13] Finally, Defendants argue that even accepting the stricter interpretation of the phrase, this action *does* involve real property, because Count IV challenges Miami-Dade's acquiescence to the State's use of the TNT site for the project. (DE 89 at 11, 49–52; DE 65 at 6 ("[E]ven under Plaintiffs' test, real property interests are involved: Plaintiffs allege Defendants wrongfully commandeered Miami-Dade's property[.]")). But again, Plaintiffs are not seeking to vindicate any property right of Miami-Dade's or their own—they object to the site's use as a detention camp in violation of certain procedural mandates. *See* (DE 1 ¶ 93 (claiming "[Miami-Dade's] agreement or acquiescence in allowing the TNT [s]ite for use as a mas[s] detention center is in violation of the County code and permitting regimes")).

[14] Defendants filed a Notice of Supplemental Authority (DE 128) citing an order in *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 86. The undersigned is aware that an esteemed colleague recently issued this order in a separate litigation involving detainees housed at the TNT facility. In that case, Plaintiffs raised First and Fifth Amendment constitutional challenges to their conditions of confinement at the facility. As Defendants point out, the order recognizes the "distinct procedural posture" of this case in its discussion of venue, *C.M.*, 25-cv-23182, ECF 86 at 33 n.14, although it should be noted that the Federal Defendants claim that venue was improper pursuant to § 1391(e) was resoundingly rejected in the *C.M.* order. *Id.* at 35–38. In any event, because, as acknowledged in that

### 3. Sections 1391(b)(2) and (e)(1)(B)

"A civil action may [also] be brought in [any] judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated[.]" § 1391(b)(2); *see also* § 1391(e)(1)(B) (providing transactional venue for federal defendants on the same basis). Venue is not confined to one district but may be proper "in two or more districts." *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003). "Only the events that directly give rise to a claim are relevant[,]" and "of the places where the events have taken place, only those locations hosting a 'substantial part' of the events are to be considered." *Id.*

However, the Court "is not required to weigh the events that occurred in" a plaintiff's chosen district "against those that took place in" other districts and "choose which venue is more proper; rather, even though 'a substantial part of the events or omissions giving rise to' the claim" may have occurred in another district, "so long as the same can be said as to" a plaintiff's chosen district, "venue is proper" there. *Goodwyn, Mills & Canood, Inc. v. Black Swamp, Inc.*, 956 F. Supp. 2d 1323, 1326 (M.D. Ala. 2012); *see also Morgan v. N. MS Medical Ctr., Inc.*, 403 F. Supp. 2d 1115, 1123 (S.D. Ala. 2005) ("[A] plaintiff does not have to select the venue with the *most* substantial nexus to the dispute, as long as she chooses a venue where a substantial part of the events giving rise to the claim occurred.").[15] Further, "'[s]ubstantiality' for venue purposes is more a qualitative than a

order, the legal and procedural postures of the two cases are entirely distinct, the determination as to venue in *C.M.* does not control or subvert the analysis here.

[15] Therefore, it is irrelevant to the §1391(b)(2) analysis that the Middle District of Florida, where the majority of the detention camp is located, would also have been a proper venue for Plaintiffs' suit.

quantitative inquiry, determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum, and not by simply adding up the number of contacts." *Russo v. Raimondo*, No. 24-0186, 2024 WL 4571431, *5 (S.D. Ala. Oct. 24, 2024) (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432–33 (2d Cir. 2005)).

Plaintiffs argue that there are substantial events and omissions which occurred in this district, making venue here a proper choice. Specifically, they point to: (1) TNT's partial location in[16] and ownership by Miami-Dade, (DE 61 at 9–10 (citing DE 12-3; DE 12-4; DE 12-5)); (2) the State and Federal Defendants' failure to conduct environmental assessments and provide opportunity for notice and comment regarding the environmental impacts of the project, which would have taken place, in large part, in Miami-Dade, (*id.* at 10–11); and (3) the current and feared impacts of the project on Miami-Dade, its residents, threatened and endangered species within the county, and Tribal sites and activities within Miami-Dade. (*Id.* at 13–15).

Defendants argue that a substantial part of the events or omissions here could not have taken place in the S.D. Fla. because "all the detention facilities, all the buildings, and all the paving at issue" are located in Collier County, in the Middle District of Florida ("*M.D. Fla.*"), and "all relevant decision[-]making was made or is being made by officials in Washington, DC; in Tallahassee, Florida; or onsite at the camp [.]" (DE 50 at 3–4); *see*

---

[16] Through dueling GIS maps and expert affidavits, the Parties aggressively dispute what percentage of the property is within Miami-Dade, 2% or 28%. (DE 79; DE 80; DE 86). It does appear that around 2% of the jetport is in Miami-Dade, while 28% of the total developed and as yet undeveloped land is within Miami-Dade. The real disagreement is over which areas within the property are relevant to Plaintiffs' claims and to what degree. But, as will be explained, the answer to that question impacts venue little, so the Court will not wade into this contestation.

*also* (DE 60 at 1). Defendants reject the notion that Miami-Dade's ownership of the property has any relevance to the analysis, because, since "FDEM took control of the [s]ite . . . [Miami-Dade's] activities . . . 'do not have a close nexus with the cause of action.'" (DE 50 at 4–5 (quoting *Jenkins Brick*, 321 F.3d at 1373)). Finally, Defendants insist that only Defendants' actions, not Plaintiff's injuries, should be taken into account. (DE 65 at 9–11).

Much of the dispute stems from the Parties' disagreement over how *Jenkins Brick*—the Eleventh Circuit's most detailed discussion of transactional venue—should be understood. The decision in *Jenkins Brick* arose from a dispute involving a breach of a non-compete agreement between an Alabama-based company and a Georgia-based employee. 321 F.3d at 1368. The contract had been executed in Georgia, was intended to be performed in Savannah, Georgia to protect the Alabama-based company's emerging Georgia activities, and was breached when the Georgie employee was hired by a competitor in Savannah. *Id.* at 1372. Arguing that venue was nonetheless proper in Alabama, the plaintiff-employee noted that sales and training meetings had been held in Alabama, his salary and benefits came from Alabama, and the executed non-compete agreement had been sent by the plaintiff back to Alabama. *Id.* at 1372–73. The Eleventh Circuit discounted these connections to Alabama, finding "they did not have a close nexus with the cause of action for breach of contract." *Id.* at 1373. Because "all of the events 'giving rise to'" the claims occurred in Georgia, the court held Alabama was an improper forum. *Id.*

In its analysis, the Eleventh Circuit cited an Eighth Circuit case, *Woodke v. Dahm*, 70 F.3d 983 (8th Cir. 1995), in which a plaintiff who sold and designed semi-trailers

claimed the defendant was passing off trailers under an identical trademark. *Id.* at 1371. The plaintiff filed the case "in the state of his residency, Iowa, even though he had no evidence of wrongdoing in that state." *Id.* (citing *Woodke* 70 F.3d at 985). To support venue in Iowa, the plaintiff argued Iowa is "the location of the ultimate effect of the passing off." *Woodke*, 70 F.3d at 985. He also proffered the fact that the trailers were manufactured in Iowa, before having the trademarks altered elsewhere. *Id.* Assessing the venue claim, the *Woodke* court found the initial manufacturing of the trailers was too causally remote from "the kinds of events that give rise to a claim" to be factored into the analysis. *Id.* Without any other relevant connections to Iowa, the court "reject[ed the plaintiff's] argument that venue lies in [Iowa] simply because that was where he was residing when the passing off occurred." *Id.* As the *Woodke* court explained,

> While the present venue statute was certainly intended to expand the number of venues available to a plaintiff, we are reluctant to impute to Congress an intent to abandon altogether the protection of defendants as a relevant consideration in venue matters. We think it far more likely that . . . Congress meant to require courts to focus on relevant activities of the defendant, not the plaintiff.

*Id.*

Two guiding principles emerge from a more than cursory review of these cases and their reasoning. First, while the Court must "focus" the inquiry on the acts and omissions of the Defendant, these cases do not stand for the drastic proposition that the Court must "ignore the place of injury altogether. They simply hold that the place of . . . injury is not *alone* sufficient to create venue." *Am. Action Network, Inc. v. Cater Am., LLC*, No. 12-cv-1972, 2014 WL 12675253, at *2 (D.D.C. Feb. 12, 2014) (discussing *Jenkins Brick and Woodke*, among other cases). Indeed, courts within the Eleventh Circuit have regularly factored the location of injury into their analyses since *Jenkins Brick* was

decided. *See e.g., Exist Inc. v. Starr Indem. & Liab. Co.*, No. 23-cv-61511, 2023 WL 11969904 at *1, *3 (S.D. Fla. Nov. 2, 2023) (venue for suit challenging New York-based insurer's denial of claim was proper in Florida because "one of the losses giving rise to" the claim occurred there); *AutoNation, Inc. v. Hall*, No. 19-cv-60291, 2019 WL 3712008, at *8 (S.D. Fla. May 29, 2019) (stating that courts have "held that substantial events occurred within a venue when harm or injury was suffered in that venue" (quoting *Mobile Diagnostic Imaging, Inc. v. Gormezano,* No. 12-cv-60888, 2012 WL 3244664, at *2 (S.D. Fla. Aug. 9, 2012))); *United States v. Sec'y, Fla. Dep't of Corr.*, No. 12-cv-22958, 2012 WL 6626818, at *2 (Dec. 19, 2012) (in suit challenging a Florida policy—decided in Tallahassee—to deny kosher meals to prisoners, venue was proper in the Southern District of Florida because "several prisoners in [the district] ha[d] been denied kosher meals[, and] [t]hus, harm ha[d] occurred" there).[17]

Second, for acts or omissions to "give rise to a claim," they must "have a close nexus to the wrong," but they need not be wrongful acts (or omissions) themselves. *Jenkins Brick*, 321 F.3d at 1373. In *Jenkins Brick*, the court found relevant the location where the non-compete agreement was executed and intended to be performed. *Id.* As long as the events are not too causally remote from the wrongful acts, these events are

---

[17] The *Jenkins Brick* court acknowledged that harm may be relevant, when discussing Congress's rationale for amending the venue statute. The court noted that "[t]he old language was problematic because it was oftentimes difficult to pinpoint the single district in which a 'claim arose.'" *Jenkins Brick*, 321 F.3d at 1371. The court gave the example of "a toxic tort case in which the defendant's factories in Colorado and Missouri pollute a river, causing injury to Arkansas and Louisiana citizens who ingest the water." *Id.* Under the old statute allowing venue in only one district, a court would have been forced to "pick a district in an arbitrary fashion," since any of the locations provide a reasonable forum. *Id.* The court's identification of Arkansas and Louisiana—districts where the harm occurred in the hypothetical—as examples of possible venues, indicates the court's understanding that harm is not wholly irrelevant to the analysis.

relevant as "part of the 'historical predicate' of the claim." *MacDermid Printing Sols., LLC v. Clear Stamp, Inc.*, 2013 WL 3176887, at *5 (N.D. Ind. June 21, 2013). For example, in *North MS Medical Center*, the court held venue for an Emergency Medical Treatment and Active Labor Act ("EMTALA") claim was appropriate in Alabama, even though the decedent was injured, hospitalized, treated, and eventually prematurely discharged in Mississippi. 403 F. Supp. 2d at 1123. The court found that the hospital's transportation of the decedent in an ambulance back to his home in Alabama, where he later died of untreated injuries, bore a "close nexus to the wrong," even though "the alleged EMTALA violation may have been satisfied the moment that [the defendant] wheeled [the decedent] out the front door of the [h]ospital[.]" *Id.* In part, this was because the Alabama occurrences would be part of "the proof at trial." *Id.*

Turning back to this case, Plaintiffs' Complaint alleges that Defendants' construction and operation of the TNT site as an immigration detention camp violates various federal, state, and county laws. The NEPA claim asserts that because the project creates major environmental impacts and is subject to significant federal control, Defendants were required to conduct certain environmental reviews beforehand and did not. These claims implicate a broad range of Defendants' conduct, and the scope of relevant acts and omissions is equally broad, and includes: Defendants' efforts to take control of the TNT site and failure to obtain critical information from the site's owner; aspects of Defendants' decision-making process regarding the facilities' construction and operations; and, critically, any of Defendants' detainee transportation, detention, and deportation activities related to the project. A substantial portion of these events took place and are taking place in Miami-Dade, within the S.D. Fla.

First, because Miami-Dade owns the TNT site, Director Guthrie began the project's execution by sending a notice of intent to purchase the TNT site and associated lands to Miami-Dade Mayor Daniella Levine Cava. (DE 12-3). Defendant Miami-Dade, through Mayor Levine Cava, responded by alerting Director Guthrie to Miami-Dade's concerns that Defendants must "understand the scope and scale of the proposed use of the site and what will be developed, as the impacts [on] the Everglades ecosystem could be devastating." (DE 12-4 at 1). The State did not heed Miami-Dade's warnings or ask for any additional information from Miami-Dade to educate itself on scope, scale, and impacts. This interaction was an initial act—or failure to act—in the joint, multi-step decision-making process by Defendants, which is a necessary predicate to NEPA compliance, and which gave rise to Plaintiffs' NEPA claim. *See Russo*, 2024 WL 4571431, at *2–4 (in APA claim challenging a final rule promulgated by a federal agency, an antecedent meeting and vote by a regional council to send a proposed rule to the agency for approval "qualifies as an event that directly g[a]ve[] rise to the plaintiff's claims" even though it was not the actionable event). The State then responded to Miami-Dade's letter, notifying the County of the State's intent to commandeer the property for use as a detention camp. (DE 12-5).

Next, Defendants' use of the site includes actions currently taking place in the S.D. Fla. Most importantly, ICE's Miami field office is responsible for coordinating and supervising immigration enforcement functions conducted by deputized state law enforcement agency officials. (DE 21-1 ¶ 5, 8 (declaration from ICE Interim Assistant Director of Field Operations Thomas Giles confirming that the detention camp operates under Florida agencies' 287(g) agreements with ICE); DE 118-1 ¶ 9 (declaration from ICE

Miami field office director stating that he oversees the relevant 287(g) agreements)). In a different case raising constitutional challenges to detainee treatment on the TNT site, the Federal Defendants filed a declaration by another ICE Miami field office official, Juan Lopez Vega, in which he attested that his responsibilities "include overseeing [Enforcement and Removal Operations], and detention facility operations within the Miami [Area of Responsibility], including those at the South Florida Soft Sided Facility South (SFSSFS). . . . which is also known as Alligator Alcatraz." *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 50-1 ¶¶ 3–4.[18] Given that the sole use of the site is to detain those in federal immigration custody, all activities on the site are supervised and directed by the Miami ICE field office. *See supra* Section I.B. (quoting language from 287(g) agreements stating, "[i]mmigration enforcement activities conducted by participating LEA personnel will be supervised and directed by ICE."). Additionally, the Federal Defendants bring detainees from other Miami-Dade detention facilities to the TNT site. (DE 114 at 312–14). In fact, in another case involving the detention camp, Federal Defendants recently filed a notice that "the Executive Office for Immigration Review (EOIR) has designated Krome North Service Processing Center (Krome) as the immigration court with administrative responsibility over the Alligator Alcatraz detention facility." *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 83. These core actions are alone sufficient to make venue proper in the S.D. Fla. *See Managed Care Sols., Inc. v. Cmty Health Sys., Inc.*, No. 10-cv-60170, 2011 WL 6024572 at *3–4 (S.D. Fla. Dec. 2, 2011) (in a breach of contract case, venue was

---

[18] *See Cash Inn of Dade*, 938 F.2d at 1243 ("A district court may take judicial notice of public records within its files relating to the particular case before it or other related cases); *Lockett*, 2021 WL 4815898, at *1, *12 n.9 ("The Court may take judicial notice of public records, such as court filings on public dockets.") (citing *Universal Express, Inc.*, 177 F. App'x at 53)).

proper in the district where the parties performed the contract, even though the defendant's operations were not based there and that may not be "the venue with the most substantial nexus to the dispute") (internal quotations omitted).

However, Defendants' allegedly wrongful omissions in this case also have close ties to this district. When conducting a NEPA-triggering project in the Everglades area, the federal government is required to coordinate with the Tribe, who has occupancy rights in BCNP, conducts preservation and restoration activities in the area, and historically has aided federal agencies with their environmental reviews. *See* (Tribe Ex. 21 at IV-7; Tribe Ex. 22 at 209, 213, 216; Tribe Ex. 23 at 193; DE 129 at 73, 113 (testifying about the Tribe's occupancy rights in BCNP and the Everglades National Park)). Over the past decade, the Army Corps of Engineers has faithfully followed these protocols during the planning and execution of WERP. When notices of NEPA projects go to the Tribe, they are sent to the Tribe's administration building, located in Miami-Dade County. The Tribe's environmental divisions work out of that building in coordination with federal agencies to create environmental impact statements ("***EIS***"). The same holds true for ICE's consultation of other relevant environmental groups. *See* (Pl. Ex. 154 (describing ICE's consultation with the Everglades National Park regarding its proposed expansion of the ICE Krome SPC detention facility)). In this case, proof of the facts that no EIS was created and the Tribe was never consulted comes from the testimony of Tribal members and employees, whose employment is based in Miami-Dade. (DE 129 at 33–34, 45 (testifying to Defendants' failure to contact the Tribe before moving forward with the project, in contrast to agencies' usual protocol of consultation)). *See Morgan*, 403 F. Supp. 2d at 1123 (recognizing that the source of the proof at trial is an indicator of the location of

substantial events and omissions giving rise to a claim).

Next, though not a dispositive consideration on its own, the locus of possible environmental harms within this district is relevant, particularly where Plaintiffs must show that the project "significantly affect[s] the quality of the human environment" in order to prevail on their NEPA claim. *S. Fla. Water Mgmt. Dist.*, 28 F.3d 1563, 1572 (11th Cir. 1994) (quoting § 4332(a)(C)). To begin with, increased runoff from the 800,000 square feet of new paving and any wastewater from the site is likely to flow southeast, where just a few miles from the site in Miami-Dade, eighty percent of Tribal members reside, Tribal schools are located, and the Tribe's administration building sits. (DE 113 at 24, 79; DE 129 at 16, 34, 45; Tribe Ex. 6 (tribal villages map)). This increased runoff creates risks of carcinogens entering the Tribe's water supply and of sediment and nutrients impacting the plant and wildlife in the areas within Miami-Dade that the Tribe uses for hunting, fishing, and gathering certain plants. (DE 113 at 79; DE 129 at 107–08, 118–19). This change to the quantity and consistency of runoff also risks disrupting the $20 billion WERP, which involves culverts and other infrastructure to manage the flow of water into sensitive wetlands conservation areas in Miami-Dade and Broward Counties. (Pl. Ex. 34; DE 129 at 22–30).

Other harms in Miami-Dade include light pollution from the camp's intense industrial lighting, which obstructs views of the night sky in Miami-Dade. *See* (DE 24-4 (depicting the light emanating from the site from 15 miles away in Miami-Dade); DE 114 at 309 ("it looks like we have a sports stadium in our backyard now"); Tribe Ex. 9 at 8–35 (measuring and documenting the increased sky brightness due to the project)). This light pollution impacts the endangered bonneted bat's critical habitat zone, which is located

partially in Miami-Dade. (DE 129 at 132, 138–41). Further, since Defendants have altered the site's use, Tribal members have also been unable to access the main trails leading into the BCNP lands within Miami-Dade for hunting and cultural and ceremonial activities, as those trailheads are directly adjacent to the site. (*Id.* at 122–27, 133, 164, 175). These harms and others giving rise to Plaintiffs' NEPA claim, are relevant to the request for injunctive relief, and support venue in this district.

Defendants argue that *Friends of Earth v. Haaland*, counsels against this result. (DE 65 at 8 (discussing *Friends of Earth v. Haaland*, 2022 WL 185196, at *2-4 (D.D.C. Jan. 20, 2022))). As that court noted, "[i]n cases brought under the APA, courts generally focus on where the decision[-]making process occurred to determine where claims arose." *Friends of Earth*, 2022 WL 185196, at *3. But in that case, as in most NEPA cases, the court was reviewing a single discrete agency decision—a Record of Decision made in Washington, D.C. rescinding agency approval for new oil and natural gas leases in the Gulf of Mexico—and its relationship to the Western District of Louisiana. *Id.* at *1. Also in that case, as in most NEPA cases, the court was tasked with reviewing a significant record of meetings, studies, and EIS's to decide whether the decision-making process was sufficient under NEPA. *Id.* at *3–4 (discussing the locations of the agency's public comment process, issuances of multiple EISs and a Record of Decision, and of dozens of studies). Under those circumstances, because nearly all of the acts comprising the NEPA process took place outside of the district in question, the court in *Friends of Earth* concluded venue there was improper. *Id.* at *4.

But this case is *not* the usual NEPA case. Here, Plaintiffs do not challenge a new rule or Record of Decision, which may be traceable to discrete moments of decision-

making, but a project comprised of many "systematic and connected agency decisions[.]" 40 C.F.R. § 1508.18(3) (describing the adoption of programs as a category of major federal action). Here, there is no record of a NEPA process taking place in other districts because Defendants did not engage with a single step of the environmental review process in any district. Consequently, the Court's review under NEPA necessarily focuses on where studies should have been done and where interested parties should have been consulted but were not.[19]

Defendants say the Court's inquiry should be confined to Defendants' decisions about project construction, which they say took place in either Washington D.C., Tallahassee, Florida, or Collier County. This may be true (though the only supporting evidence Defendants have provided is one conclusory statement from a FDEM employee saying "[a]ll substantial decision-making about the detention facility has occurred at either State offices in Tallahassee, Florida, or on-site in Collier County, Florida"). (DE 50-1 ¶ 4 (declaration of Ian Gadea-Guidicelli)). Yet other decisions relating to the setup of the camp and its ongoing operations likely took place and continue to take place at the Miami field office, which coordinates ICE's oversight of the project's immigration functions and

---

[19] Defendants' reliance on *Rodriguez-Diaz v. Donald* is similarly misplaced. (DE 65 at 6, 8, 9, 11 (citing *Rodriguez-Diaz v. Donald*, No. 14-cv-23055, 2015 WL 11217234 (S.D. Fla. Apr. 1, 2015)). In that copyright infringement case, this Court applied in a straightforward manner the rule from *Jenkins Brick* that the focus of a Court's inquiry under § 1391(b)(2) should be on a defendant's actions with a close nexus to the wrong. *Rodriguez-Diaz*, 2015 WL 11217234, at *2. And because the defendant DJ had performed and sold records in the S.D. Fla. while using an allegedly infringing nickname, venue was proper even though those actions comprised a small share of the DJ's overall sales and performances. *Id.* *1–2. Similarly, here, the Court has identified numerous actions and omissions by Defendants with a close nexus to the alleged NEPA violation, making venue proper even while many other aspects of the claim took place in other districts.

the facilities' compliance with ICE standards. *See infra* pp. 35–36.

Finally, it is noteworthy that the *Friends of Earth* court did credit the location of the impact of the agency's decision as relevant, but said "impacts alone cannot create proper venue. . . .[,] [p]articularly . . . where the impacts of any decision will be felt nationwide." *Id.* at 5. In this case, impacts are localized to Miami-Dade (and some other counties), and these impacts are but one of the many relevant ties to the district. Therefore, the Court finds that Plaintiffs' claims against the State and Federal Defendants are properly in this district.

### 4. Discretionary transfer under section 1404(a)

Federal Defendants alternatively ask the Court to transfer the case to the M.D. Fla., where the majority of the TNT site is located. (DE 60 at 6). They rightly argue that venue is also appropriate there under § 1391(e)(1). (*Id.* at 6–7). But Federal Defendants are wrong in their assertions that the only important factor to weigh is "the local interest in having localized controversies decided at home," (*id.* at 7 n.4), and that this factor cuts in favor of venue in M.D. Fla. (*Id.* at 8).

"[A] plaintiff's choice of forum should be honored so long as venue is proper there, unless substantial countervailing considerations militate to the contrary." *Bartronics, Inc. v. Power-One, Inc.*, 510 F. Supp. 2d 634, 637 (S.D. Ala. 2007) (citing *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 260 (11th Cir. 1996) ("The plaintiff's choice of forum should not be disturbed unless it is clearly outweighed by other considerations.")); *see also Managed Care Sols.*, 2011 WL 6024572 at *4 ("In the Eleventh Circuit, the plaintiff's choice of forum should not be disturbed unless it is clearly outweighed by other considerations.") (citation omitted). When considering transferring a case, the court

should consider "convenience of parties and witnesses, the 'locus of operative facts,' and other concerns related to 'trial efficiency[.]'" *Bryant*, 2024 WL 4458382, at *8 (quoting *Convergys Corp.*, 430 F.3d at 1135 n.1). Additionally, the court should weigh "various public-interest considerations," including "the administrative difficulties flowing from court congestion [and] the local interest in having localized controversies decided at home[.]" *Atl. Marine Constr. Co.*, 571 U.S. at 62 n.6 (2013) (internal quotations omitted).

Federal Defendants argue that NEPA cases "are resolved on an [a]dministrative [r]ecord and therefore" convenience of parties and witnesses and other trial efficiency considerations "do not play a significant role for purposes of the venue analysis." (DE 60 at 7 n.4). That may be true in a typical NEPA case, where the Parties agree that a given agency action was subject to NEPA, and the agency conducted some environmental analysis under NEPA, so there is an administrative record for the Court's review. But again, this is not a typical NEPA case. Here, the Parties dispute whether the project is even a federal action, and no Defendant conducted any environmental analysis prior to building and operating the project; the merits of the NEPA claim will require fact-finding as there is no administrative record to rely upon. Additionally, Plaintiffs request permanent injunctive relief. As the case progress, Plaintiffs will need to marshal testimony from witnesses and other discovery related to irreparable harm and equities, making convenience of witnesses and access to evidence relevant considerations. And both of these considerations—convenience and access—weigh in favor of keeping the case in the S.D. Fla. For one, the S.D. Fla. provides the closest federal courthouse to the TNT

site by 50 miles.[20] Moreover, eighty percent of Tribal members live in Miami-Dade and their environmental resources division and tribal headquarters are based here. (DE 129 at 16, 34, 45; Tribe Ex. 6). Much of the evidence of environmental harms would also be derived from Miami-Dade. Further, Miami-Dade County owns the TNT site; property records, past site plans, ecological studies, and surveys are presumably located in Miami-Dade.

Next, Defendants posit, without any support, that "the resolution of this case . . . will have the *greatest* impact on the people and local governments of the Middle District[.]" (DE 60 at 8). But this is far from clear. Miami-Dade and other adjacent counties in the S.D. Fla. have similar, if not more compelling interests in the resolution of this case. Again, it cannot be overstated that Miami-Dade **owns** the site and certainly has a strong interest in how it is used. Some Miami-Dade residents live relatively close to the site and use the surrounding areas for recreation. Tribal members have perhaps the most compelling interest of any one demographic in how these claims are decided, and they are almost entirely local to Miami-Dade. This is not to say that residents in Collier County may not also have a stake in the proceedings, but this factor does not clearly cut in favor of venue in the M.D. Fla.

Given that the S.D. Fla. is undoubtedly the more convenient forum and public-

---

[20] According to a google maps search, the closest M.D. Fla. courthouse is 103 miles from TNT, while the closest S.D. Fla. courthouse is 54 miles away. Driving Directions from the Ft. Myers Division U.S. Courthouse & Federal Building to the TNT site and from the Wilkie D. Ferguson Jr. U.S. Courthouse to the TNT site, Google Maps, http://maps.google.com. *See Borozny v. Inn*, No. 19-cv-112-J-39PDB, 2019 WL 13272267, at *2 n.2 (M.D. Fla. Feb 25, 2019) ("Courts routinely rely on and take judicial notice of Google Maps." (citing *Perimeter v. Fedex Freight, Inc.,* No. 14-cv-104, 2016 WL 878496, at *2 (M.D. Ga. Mar. 7, 2016)).

interest considerations are in equipoise, the Court will not disturb Plaintiffs' choice of venue in the S.D. Fla. Having established that the case will remain in this district, the Court will proceed to analyze the merits of Plaintiffs' request for a preliminary injunction.

### C. *Plaintiffs have met the criteria for issuance of a preliminary injunction.*

As stated above, to succeed on a motion for preliminary injunction Plaintiffs must show: "(1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest." *Gissendaner*, 779 F.3d at 1280 (citation omitted); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction [in a NEPA case] must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.") (citations omitted). The Court addresses each requirement in turn.

### 1. Likelihood of success on the merits

Plaintiffs base their request for preliminary injunctive relief solely on their NEPA claim,[21] encompassed within Counts I and II.[22] *See supra* n.4. NEPA does not contain a

---

[21] Though the APA provides the cause of action for the relevant claim, for ease and consistency, the Court will refer to the claim as a "NEPA claim," since it hinges on whether Defendants complied with NEPA.

[22] Plaintiffs originally requested injunctive relief against Miami-Dade but withdrew that request. (DE 31 at 3 n.2). Therefore, the Court will not address Miami-Dade's response. (DE 12).

"private right of action." *Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs*, 100 F.4th 1349, 1355 n.2 (11th Cir. 2024). Instead, a plaintiff must sue under the APA provision, "5 U.S.C. § 706(2)(A), which provides a cause of action to challenge final agency action as (among other things) arbitrary and capricious." *Id.* (citing *Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 1130 (2014) (explaining that the APA "permits suit for violations of numerous statutes of varying character that do not themselves include causes of action")); *Lowman v. Fed. Aviation Admin.*, 83 F.4th 1345, 1356 n.12 (11th Cir. 2023) ("NEPA challenges are brought under the [APA]"); *see also* § 706(2)(A) (requiring a "reviewing court [to] . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

NEPA was passed in recognition of "the profound impact of [hu]man[] activity on the interrelations of all components of the natural environment[.]" 42 U.S.C. § 4331(a). It is meant, among other goals, to "fulfill the responsibilities of each generation as trustee of the environment[,]" and "preserve important historic, cultural, and natural aspects of our national heritage[.]" § 4331(b)(1),(4). To those ends, NEPA requires that any "major Federal action significantly affecting the quality of the human environment" be preceded by and EIS, which studies foreseeable environmental impacts of the project, feasible alternatives, and other factors impacting the balance between NEPA's objectives and the benefits of the project. § 4332(C).[23] The EIS process must be done in consultation with

---

[23] The agency may prepare a less intensive "environmental assessment [("***EA***")]" for "proposed agency action that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown[.]" § 4336(b)(2). But even when an EA is appropriate, the decision to prepare an EA along with the reasons for making this decision, must be articulated and published. *Id.* (providing

any Federal agency with expertise relevant to any environmental impact involved in the project, must seek comments from relevant State and local agencies, and must release all these views and comments to the public. *Id.*

Tying together the statutory language, the NEPA claim requires Plaintiffs to show that the construction and/or use of the detention camp involves (1) a final agency action, and (2) a major Federal action, (3) without Defendants conducting a compliant EIS. *See Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (describing a court's "review of agency decisions" under APA and NEPA as "determin[ing] whether the action to be taken constitutes a 'major Federal action'—that is, an action 'significantly affecting the quality of the human environment'"— and reviewing for the presence and sufficiency of an EIS under the APA's arbitrary and capricious standard); *see also Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1511 (2025) (describing a NEPA claim as "argu[ing] that an agency action was arbitrary and capricious due to a deficiency in an EIS").

Defendants do not dispute that the camp and its operations have a sufficient impact on the quality of the human environment to be considered "major," justifying the need for an EIS. Indeed, the Court reviewed plans and photos showing that operation of the camp, to date, has involved paving approximately 800,000 square feet of land, installation of industrial lighting impacting the night sky at least 20 to 30 miles away, and enough residential infrastructure to house thousands of detainees and on-site staff. (Pl. Exs. 22, 90–92 (Dr. McVoy report of new asphalting and TNT site plans); Tribe Ex. 9

___

that an EA "shall be a concise public document prepared by a Federal agency to set forth the basis of such agency's finding of no significant impact or determination that an environmental impact statement is necessary").

(lighting report)). The camp employs as many as 1,000 staff members, many of whom reside on site, and can house multiple thousands of detainees at any given time. (DE 113 at 28, 33–34). Additionally, the project involves the daily movement of human waste, sewage, jet fuel, and significant vehicular traffic. (DE 38-5 (TDF Waste Management Plan)). In fact, several environmental experts opined that they expect the project will have considerable environmental impacts and would have required review by relevant federal agencies, such as the U.S. Fish and Wildlife Service. (DE 113 at 49 (Dr. McVoy opining that he would have expected an EIS to be done before the facility's construction based on his experience with NEPA); DE 114 at 240 (testimony from Kautz that he "would have expected consultation with the U.S. Fish and Wildlife Service for impacts, potential impacts on the Florida panther, as well as other listed species in the area."); DE 129 at 130, 141 (testimony from Dr. Bozas that he expects there to be "effects on wildlife in the area" based "on the current level of human activity at the TNT [s]ite" and that the project's increased lighting would have required review by Fish and Wildlife Service due to its impact on the bonneted bat's critical habitat zone)); *see also Hanly v. Mitchell*, 460 F.2d 640, 647 (2d Cir. 1972) (rejecting GSA's claim that a 450-person jail, even though not constructed in one of the country's most protected environments, would have "no adverse effects on the environment" and requiring it to undergo a proper NEPA evaluation).

Next, Defendants do not purport to have produced an EIS or conducted any environmental assessment prior to constructing or commencing operations of the camp. The fact of this failure to act is supported by testimony from Friends staff and Tribe employees who are routinely notified of new projects in the area, so they can consult and collaborate during the NEPA process. These witnesses unanimously attest to the fact that

they were never notified of the project until news of the site became public. (Tribe Ex. 4 ¶¶ 3–4 (declaration of Jason Daniel) ("I am responsible for receiving, and responding to consultation requests submitted by federal and state agencies with respect to proposed undertakings on or affecting historic properties or lands . . . which are culturally significant to the Miccosukee people. . . . [T]o the best of my knowledge, I have not received a request from any governmental agency . . . with respect to the project or undertaking located at TNT [s]ite."); DE 129 at 169 (Dr. Bozas stating that he "had no notice of the facility" even though "it is generally part of the protocol when there is large State or Federal programs that the Tribe is consulted with"); DE 129 at 33–34 (Tribal Water Resources Director testifying that no governmental entity contacted her before construction of the camp)). Avoiding a discussion of environmental impacts and notice, the Defendants instead say that there has been no <u>final</u> <u>federal</u> agency action. The Court takes up these two issues next.

     *a. Final Agency Action*

Courts employ a two-part test to determine whether an agency action is "final" (and therefore reviewable) under the APA. "First, the action must mark the consummation of the agency's decision[-]making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotations omitted). To be a final agency action, the challenged action must be one that represents "the agency's definitive position, affects the parties' legal rights or obligations, and immediately impacts the regulated parties' daily operations." *RB Jai Alai, LLC v. Sec'y of Fla. Dep't of Transp.*, 47 F. Supp. 3d 1353, 1365

(M.D. Fla. 2014); *see also Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1237 (11th Cir. 2003) ("The finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury." (quoting *Darby v. Cisneros*, 509 U.S. 137, 144 (1993))); *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) ("The core question" in the finality determination is whether the result of the agency's decision[-]making process "will directly affect the parties"); *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 288 (5th Cir. 1999) (characterizing a non-final decision "as one that does not itself adversely affect [a plaintiff] but only affects his rights adversely on the contingency of future administrative action"). A decision with an impact that is "sufficiently direct and immediate" or with a "direct effect on day-to-day business" qualifies as a final agency action. *Franklin*, 505 U.S. at 797 (alterations accepted and internal quotations omitted). The question before the Court is whether the decision-making process, with respect to the detention camp, has advanced to the point where it has had a sufficiently direct and immediate impact on the parties' rights and therefore qualifies as a reviewable final agency action. As discussed below, the Court concludes that it has.

As a threshold matter, the construction of the camp does not represent a preliminary, procedural, or intermediate agency action or ruling. Although it apparently lacks basic forethought in many ways, the facility has undergone substantial construction and is currently operational. Indeed, as Plaintiffs allege, the State and Federal Defendants coordinated to "construct a mass migrant detention and deportation center" and have completed "the installation of housing units, construction of sanitation and food services systems, industrial high-intensity lighting infrastructure, [and] diesel power generators."

(DE 1 at 17).

Prior to such construction, however, the Defendants were required, under NEPA, to issue an EIS or conduct an EA. The Defendants chose not to do so. Under the APA, the "failure to act" qualifies as an "agency action." 5 U.S.C. § 551(13). The Defendants' decision to refrain from issuing an EIS or conducting an EA, and then building a detention camp, represents a determinative position on the matter and has adversely affected Plaintiffs' recreational, conservational, and aesthetic interests. Accordingly, the Defendants' decision to not issue an EIS or conduct an EA and then construct a detention camp qualifies as a final agency action. *See Hall v. Norton*, 266 F.3d 969 (9th Cir. 2001) (explaining that a "decision not to prepare an EIS is a final agency action"); *Hill v. Boy*, 144 F.3d 1446, 1450 (11th Cir. 1998) ("We review an agency's decision not to prepare an EIS under an 'arbitrary and capricious' standard of review."); *Catron Cnty. Bd. of Comm'rs, New Mexico v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1434 (10th Cir. 1996) (alleged failure to comply with NEPA constitutes "final agency action"); *Citizens for Clean Energy v. U.S. Dep't of the Interior*, 384 F. Supp. 3d 1264, 1280–81 (D. Mont. 2019) ("Federal Defendants further initiated a final agency action in their decision not to begin the NEPA process."); *Dine Citizens Against Ruining Our Env't v. Klein*, 676 F. Supp. 2d 1198, 1214 (D. Colo. 2009) (explaining that an agency's failure to prepare an environmental assessment or "failure to otherwise comply with NEPA constitutes final agency action"); *San Juan Citizens' Alliance v. Babbitt*, 228 F.Supp.2d 1224, 1229 (D. Colo. 2002) ("A failure to prepare an EIS is a final agency action within the meaning

of the APA.").[24]

The decision to construct and operate the detention camp, despite Defendants' characterization of the camp as "temporary," cannot be considered "merely tentative or interlocutory" because the EIS or EA must **precede** any "major Federal actions significantly affecting the quality of the human environment." § 4332(C). Under the statutory language, the Defendants cannot put the cart before the horse—they cannot construct a facility and, then only in response to litigation such as the instant case, decide to fulfill their legal obligations.

Next, the decision not to issue an EIS or conduct an EA has directly impacted the rights of the Parties in this matter. As part of the EIS process, members of the public are afforded opportunities to comment on the proposed environmental action. During the Preliminary Injunction Hearing, Friends members and Tribe employees emphatically stated that they would have provided such comments. Instead, they lost the right to do so when Defendants refused to comply with their statutory obligations. *See* (DE 114 at

---

[24] Under wholly disparate circumstances, some courts have stated that an "agency's decision not to prepare an EIS pursuant to the NEPA does not constitute a final agency action." *Karst*, 403 F. Supp. 2d at 81 n.3 (citing *Pub. Citizen v. Office of U.S. Trade Representatives*, 970 F.2d 916, 918 (D.C. Cir. 1992)); *see also Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 196 n.6 (D.C. Cir. 2003) (when challenged Metrolink project had not yet been built or federally funded, Federal Transit Administration's decision not to conduct an environmental review did not "itself" constitute a final agency action). These cases stand for the unremarkable proposition that an EIS alone is not a final agency action where no "NEPA-triggering" major federal action has already occurred and where administrative processes are ongoing. *Citizens for Clean Energy*, 384 F. Supp. 3d at 1280–81; *see Public Citizen*, 970 F.2d at 918 (Trade Representative's failure to conduct an EIS prior to engaging in trade negotiations was "not itself a final agency action" in the absence of some "specific proposal for legislation or other action at least arguably triggering the agency's obligation to prepare an impact statement") (internal quotation omitted). By contrast, here, the detention camp's construction and existence are undisputed. In this context, the decision not to issue an EIS or conduct an EA is a final agency action.

55–56, 74). Besides this lost engagement opportunity, Plaintiffs' relationship to the Preserve—recreationally, or as conservationists—was also compromised by Defendants' failure to issue an EIS or conduct an EA. For example, Plaintiffs' expert, Randy Kautz testified that the Florida panther has lost 2,000 acres of habitat as a result of the facility's construction and use of intense lights disturbing the habitats of these nocturnal creatures. *See* (DE 114 at 232). Moreover, several witnesses testified about how the facility's light pollution has adversely affected their ability to observe the night sky.[25] (*Id.* at 34). Accordingly, because the decision to construct the detention camp without issuing an EIS or conducting an EA is a definitive position which has caused actual, concrete injury to the Plaintiffs' recreational and conservational interests, the Court finds that the action was a final agency action.

No Defendant has endeavored to explain their decision to abstain from issuing an EIS or conducting an EA. Instead, the Federal Defendants contend that "[n]either ICE nor FEMA has implemented, directed, or controlled the construction work at the temporary detention center." (DE 21 at 3). This contention runs contrary to significant evidence Plaintiffs have adduced that the facility's construction was requested and fully funded by the federal government. *See infra* Section III.C.1.b. Instead of addressing the failure to issue an EIS or conduct an EA as a final agency action, Defendants attempt to reframe the issue as one involving the detention camp's ultimate funding. Defendants point to the fact that the detention camp's construction costs have been initially shouldered by Florida

---

[25] Big Cypress National Preserve is recognized as an International Dark Sky Park and offers visitors a unique opportunity to observe the Milky Way with their naked eyes. *Big Cypress International Dark Sky Place*, FLORIDA NAT'L PARKS ASS'N, https://perma.cc/6CWV-KBC6; *see also* (DE 114 at 34).

to be submitted to the federal government for reimbursement. Accordingly, Defendants argue that the "reimbursement decision . . . has not yet been made . . . [and] there cannot be final agency action." (DE 16 at 11). However, the Court does not, and is not, compelled to focus on the funding decision, since the lack of an EIS and EA qualifies as final agency action given Federal Defendants' intimate involvement in, and control over, the detention facility. *See Sw. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater*, 243 F.3d 270, 279 (6th Cir. 2001) ("major federal actions need not be federally funded to invoke NEPA requirements").

> ### b. *Major Federal Action*

Section 4336e(10) of NEPA defines "major federal action" as an action that "is subject to substantial Federal control and responsibility." It excludes non-federal action "with no or minimal Federal funding" and "no or minimal Federal involvement where a Federal agency cannot control the outcome of the project[.]" 42 U.S.C. § 4336e(10)(B)(i). NEPA implementing regulations promulgated by the Council on Environment Quality reiterate this definition in the affirmative, defining "Major Federal action [as] actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. §1508.18. According to that regulation, federal actions "include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies[.]" § 1508.18(a).

Though "federal courts have not agreed on the amount of federal involvement necessary to trigger the applicability of NEPA," the Eleventh Circuit has had occasion to analyze the issue. *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1572. In that case, the Eleventh Circuit analyzed whether the Federal government negotiating and administering a

settlement agreement with Florida agencies responsible for insuring water quality in the Everglades constituted major federal action. *Id.* at 1568, 1572 ("We must determine whether . . . sufficient federal involvement exists in what is proposed in the Settlement Agreement to constitute major federal action affecting the environment under NEPA."). The focus of the court's analysis was "on the federal agencies' control and responsibility over material aspects of the specific project." *Id.* at 1572. As the court explained, "[t]he touchstone of major federal activity constitutes a federal agency's authority to influence nonfederal activity. 'The federal agency must possess actual power to control the nonfederal activity.'" *Id.* (quoting *Sierra Club v. Hodel*, 848 F.2d 1068, 1089 (10th Cir. 1988)); *see also Goos v. I.C.C.*, 911 F.2d 1283, 1294 (8th Cir. 1990) ("In deciding whether a federal agency exercises legal control, we must therefore consider whether some federal action is a legal condition precedent to accomplishment of an entire nonfederal project.") (internal quotations omitted).

The Eleventh Circuit rejected the notion that the federal government's power to influence state action through "advocacy and negotiation" in litigation or "invok[ing] dispute resolution mechanisms" in resulting settlements is "synonymous with a federal agency's authority to exercise control over a nonfederal project." *Id.* at 1572–73. Instead, what matters is whether the "state agencies retain their state law authority to make the decisions concerning the project," or, in other words, whether project or program in question is implemented "pursuant to existing authority under Florida law[.]" *Id.* at 1573.

Defendants argue that the decision in *S. Fla. Water Mgmt. Dist.* advises against finding major federal action here because the Federal Defendants have not yet reimbursed the State for construction costs of the project and "Plaintiffs offer no evidence

that the federal government is controlling the State's construction on State land." (DE 16 at 8). The Court will discuss the Defendants' untenable claims regarding funding shortly. *See infra* pp. 62–64. But more critically, Defendants ignore the reality that all immigration enforcement activities associated with the camp—key drivers of the project's environmental impact—are entirely under federal control and pursuant to federal law.[26]

Given that the camp acts exclusively as "an immigration detention facility," (DE 105 at 18), any state officials working on site with detainees are doing so as deputized federal immigration officers pursuant to 287(g) agreements. *See* (Pl. Ex. 144 at 5 (official post of *FDHSMV* announcing 287(g) agreement and deputized FHP troopers "ICE Task Force Officers")). Those officers "are not authorized to perform immigration officer functions except when working under the supervision and direction of ICE personnel." *Supra* Section I.B. Under the agreements, the actions of those officials "will be reviewed by the ICE supervisory officers on an ongoing basis to ensure compliance with the requirements of the immigration laws and procedures." *Id.* This alone provides the requisite "federal authority" over the project required under *S. Fla. Water Mgmt. Dist.*

---

[26] To the extent Defendants seek to disaggregate the camp's initial authorization and construction from its ongoing operations and argue that the project is not federal if the initial aspects of the project were state-run, NEPA's pragmatic paradigm does not allow for evasion of responsibility by parsing agency actions in this artificially atomistic way. *See e.g.*, *Okeelanta Corp. v. U.S. Army Corps of Eng'rs*, 132 F.4th 1320, (11th Cir. 2025) ("An agency cannot evade its responsibilities under [NEPA] by artificially dividing a major federal action into smaller components") (internal quotations omitted); *Chilkat v. Indian Vill. of Klukwan v. Bureau of Land Mgmt.*, 825 F. App'x 425,429 (9th Cir. 2020) (considering whether the exploration for and construction of a mine were "connected actions" under NEPA and explaining that "[t]he critical question is whether each of two projects would have taken place with or without the other") (internal quotations omitted); 40 C.F.R. § 1508.18(3) (including "programs, such as a group of concerted actions to implement a specific policy or plan" and "systematic and connected agency decisions" among the types of major federal actions); § 1508.25 (defining "connected actions" and requiring an EIS to discuss all connected actions).

---

Additional facts support this conclusion. The camp operates using "ICE detention standards." (DE 21-1 ¶ 5); *see also supra* Section I.B. (documenting the requirement in the operative 287(g) agreements that "the policies and procedures to be utilized by the participating [state] personnel in exercising [immigration functions] shall be DHS and ICE policies and procedures, including the ICE Use of Force Policy"); *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 57 at 272 (facility's visitation policy stating it adheres to ICE/ERO policy and operates in "in coordinate with ICE/ERO's public affairs objectives). In all of its 287(g) agreements with Florida agencies, ICE is also "responsible for the installation and maintenance of the Information Technology (IT) infrastructure" and requires that any agency with access to its systems follow its "Sensitive System Policy and Rules of Behavior." *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 53-1 at 5, 19, 50, 66, 81, 96, 111, 126. Consequently, the IT systems at the camp were installed by ICE and are under federal control.

Further, ICE directs arresting law enforcement officers whether to take people into custody on suspicion of immigration violations, (DE 129 at 187, 213); ICE "makes decisions regarding transfer into [the facility] based on the posture of aliens' immigration proceedings," *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 50-1 ¶ 6 (declaration of Juan Lopez Vega); ICE "maintains custody" of the detainees, (Pl. Ex. 43 at 4 (SERT South Florida Detention Facility Continuity of Operations Plan)); and it is federal officials who physically transport detainees on and off site and conduct deportations using federally-owned aircraft. *See* (DE 114 at 97 (testimony of Representative Eskamani that she observed ICE vehicles dropping off detainees and that Director Guthrie confirmed this was the standard protocol); *id.* at 312–14 (testimony of Jessica Namath that she observed

ICE-contracted and Customs and Border Protection vehicles transporting between ICE

Krome SPC detention facility and the TNT site); DE 129 at 203, 214–15 (testimony of

Director Kerner that either federal agencies or contractors, not state agencies, transport

detainees to and from the TNT site, and federal agencies are conducting the deportations

using federally-owned airplanes); Pl. Ex. 59 (video of Customs and Border Protection

vans leaving the site); DE 24-2 (photo of DHS transport bus exiting the TNT site)).

That the deputized officers' regular salaries are paid, required uniforms are bought,

and standard work hours are controlled by their state agency supervisors is not germane

to questions involving the TNT facility, because their status there as deputized officers

and their activities at the camp are controlled by ICE. *See e.g.,* (DE 129 at 225–27

(testimony of Director Kerner); DE 118-1 ¶ 13 (describing the ways in which state agency

supervisors retain control for non-immigration aspects of deputized officers' employment);

DE 118-1 ¶ 12 ("DHS provides credentials and guidance to local law enforcement

partners, and signs warrants for service as needed. DHS is required to provide direction

and supervision to local law enforcement officers when taking immigration enforcement

actions")); *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 53-1 at 32–33 ("ICE officers will

provide direction and supervision for participating LEA personnel only as to the

immigration enforcement functions . . . . The LEA retains supervision of all other aspects

of the employment and performance of duties of participating LEA personnel."); *id.* at 33

(providing that deputized officers "performing immigration-related duties pursuant to [the

287(g) agreement] will be assigned to various units, teams, or task forces designated by

ICE"); *id.* at 34 (requiring that all candidates to become deputized immigration officers

"must be approved by ICE"); *id.* at 35 ("The ICE supervisory officer . . . will evaluate the

activities of all personnel certified under [a 287(g)].").

Nationwide, Courts have recognized the legal and practical reality that "'ICE is in complete control of detainees' admission and release,' while the [287(g) agreement] 'places the [deputized state agents] in the role of a mere functionary.'" *Masingene v. Martin*, 424 F. Supp. 3d 1298, 1302–03 (S.D. Fla. 2020) (quoting *Calderon v. Sessions*, 330 F. Supp. 3d 944, 952 (S.N.D.Y. 2018) (holding that the proper respondent to plaintiff's habeas petition is the Director of the Miami Field Office for ICE, who is responsible for supervising federal immigrant detainees at a county detention center); *see also Roman v. Ashcroft*, 340 F.3d 314, 320 (6th Cir. 2003); *Khody v.* Adduci, 697 F. Supp. 3d 774, 776 (E.D. Mich. 2010); Abner *v. Sec'y of Dep't of Homeland Sec.*, No. 06CV308, 2006 WL 1699607 at *3–4 (D. Conn. June 19, 2006); *Zabadi v. Chertoff*, No. 05-01796, 2005 WL 1514122, at *3 (N.D. Cal. June 17, 2005).

Defendants next claim that "the ultimate decision of who to detain at the" camp "belongs to Florida," and this precludes the project from being a federal action. (DE 21-1 ¶ 6); DE 105 at 18 (positing that the State can "turn down anyone they want")). For one, to be a major federal action, a project need not be under complete control by federal authorities in all respects, but merely "subject to substantial Federal control and responsibility." 42 U.S.C. § 4336e(10(B)(i). In fact, NEPA's statutory language contemplates projects that are led in large part by state entities but still trigger NEPA. § 4332 (G)(i) (allowing an EIS for certain "major Federal action[s]" to be prepared by a state agency official if "the State agency or official has statewide jurisdiction and has the responsibility for such action[.]"). Second, it is ICE that decides whether and where an apprehended person will be detained for not having legal status. (DE 129 at 187). And if

Florida began unilaterally rejecting large swaths of detainees, ICE is contractually authorized to terminate the 287(g) agreement, which would lead to the shuttering of the facility. *See e.g.*, (DE 24-3 at 8–9 (287(g) agreement with FHP detailing the process for ICE to terminate the agreement)). Even if Florida has some authority to reject a prospective detainee, the fact that the federal government is responsible for selecting the pool of prospective detainees and transporting them to the camp gives the federal government significant control over who is housed there.

Defendants make a few additional arguments in their ill-considered attempt to avoid the implications of the project's federal activities, but each fails. First, Defendants say the detention activities are not reviewable under the APA, § 702(a)(2), because DHS secretary has discretion over detainees' detention locations under 8 U.S.C. § 1231(g)(1). (DE 16 at 12). But "[t]he question for §701(a)(2) purposes is whether there is 'no law to apply' *for the exercise of discretion being challenged*." *Mass. Coal. for Immgr. Reform v. U.S. Dep't of Homeland Sec.*, 698 F. Supp. 3d 10, 37 (D.D.C. 2023). It "does not matter whether the Government has discretion [over detention locations] or not. That question is not before the Court" in a NEPA claim. *Id.* "What is before the Court is the decision *not to comply with NEPA*" . . . . [a]nd on that, the Government has no discretion." *Id.* (citing *Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971)).

Next, Defendants argue the operations of the site fall into a NEPA exemption for "bringing judicial or administrative civil or criminal enforcement actions[.]" § 4336e(10)(B)(v); *see also* (DE 105 at 21). The construction and operation of an immigration detention facility is plainly not an enforcement action. *Compare Mass. Coal.*

*for Immgr. Reform v. U.S. Dep't of Homeland Sec.*, 698 F. Supp. 3d 10, 20 (D.D.C. 2023) (DHS's "return to Mexico" immigration policy did not meet the NEPA "enforcement action[]" exemption because it "goes well beyond the decision whether to enforce the law in individual cases"), *with Sierra Club v. Penfold*, 857 F.2d 1037, 1313 (9th Cir. 1988) (describing the agency's right to "issue notices of noncompliance" and then "commence enforcement proceedings" as coming within the enforcement action exemption), Civil Action, Black's Law Dictionary (10th ed. 2014) (a legal action "brought to enforce, redress, or protect a private or civil right"). In recognition of this, in 2024 DHS performed a NEPA evaluation before ICE's expansion of the Krome detention facility. *See* (Pl. Ex. 154).

Finally, Defendants argue that "even if Florida is exercising federal power when it decides where to detain, the APA turns on whether a federal agency is making the decision not whether federal power is being exercised." (DE 130 at 108). But Defendants' premise fails. The evidence and legal framework governing deputized state law enforcement agents' immigration activities make clear that they are not only exercising federal authority; their conduct is controlled by ICE. Consequently, the cases Defendants cite have no bearing on the issue. Neither applies NEPA's major federal action standard nor discusses the state-federal relationship in immigration enforcement. *See Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397, 399 (1995) (holding Amtrak was "part of the Government for purposes of the First Amendment"); *Ritter v. Cecil Cnty. Off. of Hous. and Comm. Dev.*, 33 F.3d 323, 327–28 (4th Cir. 1994) (interpretation of HUD regulation by local housing board is reviewed under something like *Skidmore* deference, not the APA's arbitrary and capricious standard). Defendants attempt to seize on dicta, in which Justice Scalia mentioned that an entity's status as a federal agency *can* be defined by

statute "for purposes of . . . whether it is subject to statutes that impose obligations or confer powers upon Government entities, such as the [APA][.]" *Id.* at 392. The closest analog to this situation is § 1357(g)(7)–(8), where Congress specified that deputized officers *are* "acting under color of Federal authority" when performing immigration functions under a 278(g) agreement. But it is worth noting Justice Scalia's pronouncement in *Lebron* that "[i]t surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form." *Lebron*, 513 U.S. at 397.

The Federal Defendants' control over operations at the camp should suffice to end the analysis. However, evidence that the project was built at the Federal Defendants' request and that federal funding has been committed to the State for the entire cost of the project both support the conclusion that the Federal Defendants were "so intimately involved in the discussion and planning" of the project that they "cannot now claim to have no responsibility under NEPA[.]" *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 13 (D.D.C. 1998).

FDEM has acknowledged in its own written materials about the camp that it was built after "DHS and [FEMA] request[ed] the State of Florida to supplement [its immigration enforcement] capacity with a temporary detention facility." (Pl. Ex. 43 at 4). According to Representative Eskamani, Director Guthrie confirmed to her directly while leading a tour of the camp that the project was the result of DHS's written request. (DE 114 at 96). These statements align with those of other high level public officials. ICE Field Officer Director Garrett Rippa described the project as "state, local, and federal partners working in unison, working as one" and promised that ICE "will continue to utilize

th[e] facility." (Pl. Ex. 61 at 0:25–1:01). DHS Secretary Noem explained that the project was conceived when her general counsel "called up Florida's Attorney General and Governor" and requested they partner with DHS to build the detention center. (Pl. Ex. 63 at 0:05–0:32). Governor DeSantis said the same: the project was "requested by the federal government."[27] Defendants argue that "a local plan does not become a major federal action subject to NEPA regulations merely upon its approval by a federal agency." *Rattlesnake*, 509 F.3d at 1102. But Defendants fail to recognize that the situation in *Rattlesnake*—"[t]he development and improvement of sewage treatment by a municipality[—]is intrinsically a local matter under the responsibility of local government." *Id.* Here, it is beyond peradventure that the detention of undocumented persons and decision as to their ongoing status is a uniquely federal question under the authority, control, and supervision of the federal government.

Additionally, the Federal Defendants acknowledge that DHS "announced $600 million in federal funding for the Detention Support Grant Program" and the "**only eligible applicant** . . . is the Florida Division of Emergency Management." (DE 21-2 at 2) (declaration of David Richardson) (emphasis added). Governor DeSantis confirmed that the federal government will "fully fund" the facility.[28] And Secretary Noem posted on social media that "Alligator Alcatraz will be funded largely by FEMA's Shelter and Services

---

[27] Fox 35 Orlando, 'Alligator Alcatraz': Florida Gov. DeSantis speaks on immigration project, YOUTUBE (June 25, 2025), https://www.youtube.com/watch?v=gJfG7L9reHU. *See Santa Clara v. Trump*, 250 F. Supp. 3d 497, 520 nn.4, 6–7 (N.D. Cal. 2017) (taking notice of government officials' statements during press conferences and interviews); *McLoughlin v. People's United Bank, Inc.*, 586 F. Supp. 2d 70, 73 (D. Conn. 2008) ("The Court may take judicial notice of the press releases of government agencies.").

[28] *See supra* n.27.

Program." (Pl. Ex. 144 ¶ 5). Furthermore, Assistant United States Attorneys made representations in court that "[t]he Everglade[s] detention facility is being funded from a continuing resolution for [fiscal year] 2025" of the Shelter and Services Program. *See City of Chicago v. DHS*, 25-cv-05463 (N.D. Ill.), ECF 35 at 1–2.

Despite these clear and unequivocal public assertions of federal funding, Defendants would have this Court find that a "reimbursement decision . . . has not yet been made." To reach this conclusion, however, would require the Court to disregard these unambiguous statements from government representatives. Instead, taking all of this context into consideration, it is apparent that the reimbursement funding decision has in fact been made.

In *Scottsdale Mall v. State of Indiana*, the court had no difficulty in concluding the highway project at issue was a major federal action when "the record indicate[d] federal participation in the programming, location, design, preliminary engineering, and right of way acquisition stages." *Scottsdale Mall v. Indiana*, 549 F.2d 484, 489 (7th Cir. 1977). In that case, the state claimed it would "refund" monies to the federal government that had been committed to a segment of the project. *Id.* at 487. This, the state argued, gave it the "prerogative to avoid compliance with NEPA." *Id.* at 488. The court rejected this argument, noting that "[s]uch accounting transfer of federal funds from one state project to another under the guise of 'refund' have been viewed with disfavor[.]" *Id.* at 487 n.5. The court found that where a state takes "substantial steps" to program a project for federal assistance, it cannot "withdraw the program from federal funding consideration with a resulting avoidance of complying with federal environmental statutes." *Id.* at 488. Similarly, the Defendants' legal legerdemain regarding funding does not convince the

Court. As the Tribe's counsel argued: "If this is allowed, effectively, the [f]ederal [g]overnment is laundering federal control or federal approval through a grant program with only one applicant who's eligible to receive the money. And if that's allowed, then [NEPA] is effectively useless[.]" (DE 130 at 131).

In light of the conclusion that the funding decision has been made, the Defendants' cases are unpersuasive. In *S. Fla. Water Mgmt. Dist.*, for example, the Eleventh Circuit stated, "[t]he possibility that federal funding will be provided in the future is not sufficient to federalize a state project, even when such funding is likely." 28 F.3d at 1573. Thus, Defendants argued at the Preliminary Injunction Hearing that the *possibility* of federal funding for the detention camp precludes any finding of a reviewable, final federal agency action. As the Court explained *supra*, however, the instant matter goes well beyond a possibility. Unlike *S. Fla. Water Mgmt. Dist.*, this case does not involve hypothetical proposals that may never materialize. Instead, the evidence demonstrates that the detention camp was constructed at the request of the federal government, with its cooperation and counsel, and with specifically earmarked funds to reimburse any state expenditures. The instant matter is not a situation where the State is applying to a general program from which it may or may not receive reimbursement since, as the "only eligible applicant," the only "competition" they face in receiving the award is the State's decision on when it will be conferred.[29]

---

[29] Defendants point the Court to cases involving grant programs that were generally open to applicants and instances where the grantors had not made final decisions as to the grants. *See, e.g.*, *Karst Envtl. Educ. & Prot., Inc. v. EPA,* 403 F. Supp. 2d 74, 81 (D.D.C. 2005) (concluding that there was no final agency action where HUD had yet to consider and approve a grant application for disbursal of appropriated funds because "the federal money is but an expectancy that has not yet materialized") (citation and internal quotation marks omitted); *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103 (9th Cir. 2007)

Defendants essentially tell the Court that the project is purely state action because its employees (presumably) wear uniforms bearing state agency logos, and because the federal government seems to have held back on sending its reimbursement until some unidentified impediment (perhaps, this litigation) has abated. Meanwhile, the project was requested by the federal government; built with a promise of full federal funding; constructed in compliance with ICE standards; staffed by deputized ICE Task Force Officers acting under color of federal authority and at the direction and supervision of ICE officials; and exists for the sole purpose of detaining and deporting those subject to federal immigration enforcement. Detainees are brought onto the site by federal agents and deported from the site by federal agents on federally owned aircraft. In concluding the camp is a major federal action, the Court will "adhere to the time-tested adage: if it walks like a duck, quacks like a duck, and looks like a duck, then it's a duck." *Van Antwerp*, 526 F.3d at 1359.

Defendants make a final argument that, even if the Court finds Defendants have violated NEPA, Plaintiffs should not receive the injunction they request because the Court may "call for a remand without vacatur." (DE 16 at 13–14). "[V]acatur is the ordinary APA

---

(explaining that "[t]he congressional appropriation to the EPA of funds for a particular project does not constitute a final agency action by the EPA until the EPA has reviewed a grant application and decided to disburse the funds.") The Court finds that these cases are factually inapposite. *Karst*, for instance, involved the award of a federal grant to a state agency for the purpose of developing an industrial complex. In *Karst*, HUD representatives explained that "it had taken some action with respect to the grant application, but that it ha[d] not yet 'obligated' the money." *Karst*, 403 F. Supp.2d at 81. Accordingly, the federal funding was "but an expectancy that [had] not yet materialized." *Id.* Unlike the instant case, however, that grant program did not appear to be designed specifically for the grantee but was a general program from which the grantee sought disbursement. In the instant case, there is not just an "expectancy" of federal funding— elected officials stated in unambiguous terms that the reimbursement *would* happen.

remedy," but the Court has discretion to remand an agency action without vacatur, leaving the agency's action in place while it completes a satisfactory NEPA evaluation. *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015) (alterations accepted) (quoting *Antwerp*, 526 F.3d at 1369). The considerations courts weigh in this decision make clear why a vacatur without remand is inappropriate here. Those are "the seriousness of the [agency] order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Id.*

Here, there weren't "deficiencies" in the agency's process. There was no process. The Defendants consulted with no stakeholders or experts and did no evaluation of the environmental risks and alternatives from which the Court may glean the likelihood that the agency would choose the same course if it had done a NEPA-compliant evaluation. It will come as no surprise that every case Defendants cite where the court remanded without vacatur involved a meaningful evaluative process by the agency before their final action. *See e.g.*, *Port Isabel v. Fed. Energy Regul. Comm'n*, 130 F.4th 1034, 1037 (D.C. Cir. 2025) ("The Commission has already issued extensive final environmental impact statements reflecting more than three years of review and public comment."); *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 1012, 1015 (9th Cir. 2025) ("BLM conducted a biological assessment of several listed species" and "only failed to explain whether or why its adopted alternative complied with the full field development standard at the ROD stage"); *Cal. Cmtys. Against Toxics v. E.P.A.*, 688 F.3d 989, 993–94 (9th Cir. 2012) (EPA conducted a rulemaking process but had "flaws in its reasoning"). Further, given Defendants' commitments to protecting the Everglades,

backed by tens of billions of dollars in funding for preservation and restoration projects near the TNT site, the Court assumes a thorough review of environmental impacts and alternatives could yield meaningful insights.

### 2. Irreparable injury

Even when Plaintiffs show they likely suffered the procedural harm of a NEPA violation, they must also "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis omitted). "An injury is irreparable only if it cannot be undone through monetary remedies." *Ferrero v. Assoc. Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (internal quotation omitted). And "[o]ngoing harm to the environment[,]" including "when a project may significantly degrade some human environmental factor," "constitutes irreparable harm warranting an injunction." *Env. Prot. Inf. Ctr. v. Carlson*, 968 F.3d 985, 991 (9th Cir. 2020) (internal quotation omitted); *see also Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable.").

Plaintiffs identify a myriad of risks from the project to the wetlands and endangered species whose habitats include the area around the site. Plaintiffs also proved that runoff and wastewater discharge from the camp risks polluting the water supply in the Miccosukee Reserved Area—where eighty percent of Tribe members reside—just a few miles downstream from the TNT site, and beyond. Finally, Plaintiffs show ongoing harms to organizational and Tribal members' enjoyment of the preserved areas due to the project's industrial lighting, noise, traffic, and security perimeter.

First, the creation of 800,000 square feet of new impervious surface will increase

runoff into the surrounding, interconnected wetlands, which threatens the "extremely sensitive . . .[,] low nutrient" hydrology of the Everglades. (DE 113 at 46–47). Dr. McVoy testified that the Everglades and BCNP are peculiar and particularly sensitive in at least two ways: first they are interconnected wetlands that require "sheet flow," meaning water flows with little obstruction across large areas, impacting the entire ecosystem;[30] and second, they are "naturally very low nutrient level, and when you introduce nutrients, particularly . . . phosphorous, nitrogen, potassium, it disturbs the ecosystem drastically." (*Id.*). According to Dr. McVoy, the legal requirement for water introduced into the wetlands is quite low and that requirement is the result of "a lot of science that clearly demonstrated the link that anything higher than that disturbs the system." (*Id.* at 47). With the newly paved surface, "anything that falls in th[ose] 20 acres will go directly into the wetlands." (*Id.* at 49). The possible contaminants in any runoff come "from a number of different sources" on the site. (DE 129 at 41). It could come from the paved material itself, from petroleum products on-site to fuel generators, from the vehicles and from thousands of detainees and staff doing laundry, cooking, cleaning, using restrooms. (*Id.* at 41–42). Beyond contaminants entering the water, "increased sediment . . . in the wetlands oftentimes leads to increased turbidity . . . [and] decrease[d] dissolved oxygen," which can kill aquatic animals. (DE 129 at 42, 136); *see also* (DE 5-2 ¶ 18 (declaring that the endangered Everglade snail kite relies on the "preserve's aquatic ecosystem for survival" and would be harmed by the project's wastewater and runoff)).

Defendants argue that they have mitigated these risks by installing silt fencing.

---

[30] Plaintiffs introduced aerial footage of the natural wetlands surrounding the TNT site, which followed the unbreaking sheen of contiguous water below the thin layer of swamp vegetation, until the natural landscape was interrupted by TNT site. (Pl. Ex. 145).

But multiple Plaintiffs' experts provided unrebutted testimony that that silt fencing "is not suitable in the long-term to be able to reduce any storm water runoff that could potentially affect neighboring areas." (DE 113 at 108). Especially in a large storm event, those "temporary structures . . . could be easily . . . toppled and allow for sediment and storm water to pass through." (*Id.* at 118). Given Defendants' complete lack of other stormwater management features, silt fencing is not "an appropriate substitute for a soil geologist designed storm water management system." (*Id.*). Defendants also quibble with geologist Dillon Reio's calculation that the 800,000 square feet of new pavement would increase runoff by almost "10 million gallons over a 72-hour, 100-year storm event[,]" attacking his assumptions regarding how permeable the now-paved area had originally been, given that some of that area was compacted when the jetport was originally built. (*Id.* at 80, 95–104). But even if Defendants are correct that the true increase in peak discharge could be some unknown lesser amount, there is sufficient likelihood that the increased runoff will harm the surrounding wetlands given the ecosystem's interconnectedness and sensitivity to warrant preliminary injunctive relief. Plaintiffs are not required to prove harms of a particular probability or quantity, as "[p]art of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be little if any information about prospective environmental harms and potential mitigating measures." *Winter*, 555 U.S. at 23; *see also Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 404 F. Supp. 2d 1352, 1362 (S.D. Fla. 2005) ("A fundamental purpose of NEPA is to ensure that important effects will not be overlooked or underestimated only to be discovered after resources have been

committed or the die otherwise cast.") (internal quotations omitted).[31] To make matters worse, it appears Defendants have imminent plans to expand this paving significantly, as they have already contracted to purchase 1.8 million square feet of asphalt. (Pl. Ex. 126 at 1 (purchase order for 200,000 square yards of asphalt)).[32]

These risks impact the wetlands ecosystem, but they also present direct risks to communities who depend on water from the Everglades for their water supply, including the Tribe. As the Court has discussed, the overwhelming majority of Tribal life is enjoyed and experienced just a few miles southeast of the TNT site. Based on the general direction of water flow in the area around the project, water from TNT site is likely to flow into the Tribe's water supply, risking contaminating the water of Tribal residences, schools, the Tribe's government building, and businesses. Water also "flows from the jetport into Monroe County" and "Dade County" due to the connective features of the L28 Canal that were built under WERP. (DE 129 at 24–25).

Next, the project creates irreparable harm in the form of habitat loss and increased mortality to endangered species in the area. For example, Dr. Bozas testified that the

---

[31] Defendants repeat this same argument with regard to nearly every harm Plaintiffs identify. Defendants cross-examined Plaintiffs' witnesses on the fact that few had data showing baselines from before the site was constructed or data showing developments since the project came online. Of course, because Defendants did not consult with Plaintiffs or any other research group before constructing the project in eight days, there was no opportunity to collect baseline data. And since Defendants have refused access to nearly everyone seeking to visit the site, Plaintiffs' experts have been unable to take any samples or collect other data useful for empirical study. Further, the harms Plaintiffs fear take time to accrue; and time and access for study is precisely what NEPA procedures are meant to afford. *See Fund for Animals v. Rice*, 85 F.3d 535, 546 (11th Cir. 1996) ("NEPA 'works' by requiring that the environmental consequences of an action be studied before the proposed action is taken.").

[32] This and other evidence of Defendants' expansion plans undermines Defendants' argument that "Plaintiffs point to harm that is too late to prevent[.]" (DE 16 at 16).

endangered eastern black rail has been detected in the area around the site and that the TNT site is within the bonneted bat's critical habitat zone.[33] (DE 129 at 142). Both of these species are nocturnal, and the increased lighting from the project "will push" those animals "out of the area. They do not use illuminated habitats." (*Id.* at 132). Moreover, the increased noise from additional construction and ongoing human activity on the site also disrupts the bats' "ability to [echolocate] prey." (*Id.*)

Additionally, the lighting from the site immediately reduces the panther habitat by 2,000 acres, as studies suggest panthers are unlikely to come within 500 meters of a large artificial light source. (DE 114 at 232). Defendants dismiss this habitat loss as merely a minuscule share of the total few 3.11 million acres of significant panther habitat. (*Id.* at 262). But 2,000 acres is "hardly a de minimus injury" from one project to those hoping to see panthers in the area and to preserve and maintain panthers' habitats. *Alliance for the Wild Rockeies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (loss of 1,652 acres of forest caused sufficient irreparable harm to plaintiffs' ability to enjoy the area undisturbed to warrant injunction, despite representing only 6% of the relevant area); *see* (DE 114 at 158–60 (Amber Crooks testimony about her efforts to track panthers in the area); *id.* at 229–34 (Kautz testifying that a 2,000-acre loss may well reduce the panther population due to, among other impacts, inter-species aggression)). Further, vehicular strikes are the number one cause of panther mortality, and stretches of the highway close to the TNT site are known "hot spots" for panther strikes. (DE 114 at 161, 194; DE 38-6 at 24–25 (showing that 20 to 35 Florida panthers die per year from roadkills and documenting the

---

[33] Critical habit zones are a "formal designation that the U.S. Fish and Wildlife makes for some listed species." (DE 114 at 243).

mortality records near the site)).[34]

The ongoing light pollution from the project also harms Plaintiff members' enjoyment of the night sky—for which BCNP has received certification as an International Dark Sky Park. *See supra* n.25; (DE 113 at 20–21 (describing what is required to maintain a dark sky designation); DE 114 at 34 (discussing the impact the site will have on area's dark sky designation); *id.* at 303 (describing the "pitch black darkness with beautiful [views of the] Milky Way and sky where you can see all of the stars")). As the Court has discussed, Plaintiffs provide empirical data proving that the project meaningfully increases the brightness for miles around the site. *See e.g.,* (Tribe Ex. 9 at 8–35). This data factors in the prior existence of a few small, lit buildings on the jetport site.

Finally, the Tribe provided testimony that Tribal members have lost access to the off-road trails leading into the BCNP lands for hunting and other activities due to the camp's operations. (DE 129 at 122–27, 133 164, 175). Furthermore, Tribal members had previously harvested plants from the areas directly adjacent to the TNT site for ceremonial and medicinal purposes, but the camp's new human activity erodes the cultural

---

[34] Defendants also maintain that telemetry data acquired by tracking a sample of panthers' movements over time, suggest that panthers have not been seen within a few miles of the site for many years. (Pl. Ex. 25 at 19, 26). In Defendants' view, this proves that no panther-related harm will be caused by the project, as the area was not in use by the panther population even before the project's construction. Defendants distort the significance of this data. Only some unknown fraction of the panther population was affixed with tracking collars, as researchers' goal was "not to monitor every place within the range of panthers that panthers occur." (DE 114 at 279). Collection of data from the radio collars also ceased in 2014 due to budget cuts. (*Id.* at 275). And several of Plaintiffs' witnesses had either seen panthers in the area or knew others who had. *See e.g.,* (DE 129 at 143 (testifying to having captured recent panther presence in the area of the site on trail cameras)). The fact that the data shows that panthers were detected within a four-mile radius of the TNT site 1,164 times in the few decades between 1982 and 2014 proves that the area was a functioning panther habitat despite airport activity at the TNT site. (Pl. Ex. 25 at 19).

significance of the plant life. (*Id.* at 120, 134, 155–56); *see also Oglala Sioux Tribe v. Nuclear Regul. Comm'n*, 896 F.3d 520, 524, 536 (D.C. Cir. 2018) (reversing agency finding of no irreparable harm where tribe challenged uranium mining project that risked destruction of cultural, historical, and religious sites in the project area); *Hualapai Indian Tribe v. Haaland*, 755 F. Supp. 3d 1165, 1197 (D. Az. 2024) (holding that plaintiff Indian tribe met the irreparable harm requirement "because it has shown that damage to . . . a culturally significant site for the [t]ribe[] is likely").[35]

Defendants' rejoinder to all this is that the TNT site was already in use as a training airport, and Plaintiffs have not proven that the detention camp creates harms above and beyond those already wrought by the site's prior use. Specifically, Defendants point to flight logs showing that over the seven months starting in January 2025, there were about 28,000 "flight operations" from the site, or 137 per day. (DE 116-1 ¶ 11). In other words, over that period there were approximately 14,000 takeoffs and landings each. (*Id.* at 34).

---

[35] The *Hualapai* case is particularly instructive. The Hualapai tribe filed for a preliminary injunction to enjoin drilling for lithium on property adjacent to a sacred hot spring, "Ha'Kamwe'." *Hualapai*, 755 F. Supp. 3d at 1173. The tribe alleged that BLM failed to consider any reasonable alternative before approving the project; prematurely terminated its consultation process with the tribe; and failed to take a hard look at impacts in its EA by not analyzing geologic faults that could pollute the aquifers feeding Ha'Kamwe'. *Id.* at 1186. The court decided an injunction was appropriate, finding that under NEPA "[c]onsideration of reasonable alternatives is necessary to ensure that the agency has before it and takes into account *all* possible approaches to, and potential environmental impacts of, a particular project." *Id.* at 1192 (internal quotation omitted). As the court explained, the defendants had failed to consider alternatives, such as approving fewer drilling sites located farther away from Ha'Kamwe'. *Id.* at 1193. Finally, the court found the tribe was likely to suffer irreparable harm if the drilling project went forward "through its impact to Ha'Kamwe's character." *Id.* at 1198–99 (citing *Winter*, 555 U.S. at 22). The decision in *Hualapai* supports the entry of a preliminary injunction in this case where no reasonable alternatives were considered, no environmental assessment of any kind was conducted and no consideration of any type of impact was undertaken. In sum, not only did Defendants fail to take a "hard look" as required by NEPA, they failed to take any look.

Almost 80% of these were by single engine aircraft. (*Id.*) Defendants say these aircrafts surely would have been sufficiently noisy to scare off animals and impede any recreation in the nearby areas. (DE 16 at 5–6). Plaintiffs present their own flight data from 2020-2024, documenting around 11,600 flights total, or about 6 per day (not double-counting takeoffs and landings). (Pl. Ex. 33).

The Court need not parse which Party's interpretation of the flight data presents a more accurate picture of the site's prior activity, because even Defendants' version of the data does not support the notion that the airport use caused similar harms as those posed by the detention camp. For one, several witnesses testified under oath that they worked or recreated in that area for years leading up to the camp's construction and noticed little or no noise from the airport. *E.g.*, (DE 114 at 176–77; DE 129 at 32, 87, 130). Defendants discount these individual experiences as less accurate than flight data, but this misconstrues the import of these eyewitnesses' testimony. An irreparable harm inquiry is focused on how an event, in this case noise, impacts the effected individuals. Beyond this, many harms separate from noise undisputably were created or are exacerbated by the detention camp. The light pollution is far worse now than before the camp's construction. (Tribe Ex. 9). The addition of 800,000 square feet of asphalt paving (with another 1 million planned) increases harmful water runoff relative to the areas previously paved. (Pl. Exs. 22, 90–92, 126 at 1). The frenetic human activity, including vehicular traffic and wastewater from thousands of people daily, was essentially absent prior to the detention camp's construction. *See* (DE 113 at 27 (Dr. McVoy recounting a statement by the TNT site's Incident Commander Dr. Frank E. Lumm that prior to the detention center the airport had "four employees, most of whom were involved in mowing the grass")). In

short, Plaintiffs have provided substantial evidence to prove that irreparable harm from the detention camp is ongoing and likely to worsen absent injunctive relief. The Court will next consider the balance between these harms and the Government's interest in continuing detention operations at this site before conducting the required NEPA analysis.

### 3.  Balance of equities and public interest

For similar reasons, the balance of equities and the public interest favor granting a preliminary injunction. "These two factors merge when, as here, the government is the opposing party." *Farmworker Ass'n of Fla. v. Moody,* 734 F. Supp. 3d 1311, 1342 (S.D. Fla. 2024) (internal quotations omitted). The Court has discussed the ongoing and possible future irreparable harms caused by Defendants' NEPA violation. When irreparable environmental harms are sufficiently likely, "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Vill. of Gambell,* 480 U.S. at 545. The Court acknowledges Defendants' unchallenged position that the government's interest in immigration enforcement is significant. Immigration is at the forefront of national and state politics: as the swell of people seeking refuge and opportunities in our nation steadily increases, the government is under a corresponding pressure to respond and regulate.

The Federal Defendants argue that "the significant national interest in combatting unlawful immigration favors allowing Florida to continue the development and use of [the detention camp]." (DE 21 at 7). To this end, the Federal Defendants rely on Thomas Giles' declaration that the detention camp's function in detaining aliens "operationally benefits ICE and furthers its immigration enforcement mission." *Id.* Giles goes on to state that the detention camp serves to "decompress other detention facilities used to house aliens

throughout the United States." (DE 21-1 at 5).

This position, however, flounders when confronted with the weight of evidence as to the irreparable harm posed by Defendants' flouting NEPA protocols. Plaintiffs have provided extensive evidence supporting their claims of significant ongoing and likely future environmental harms from the project. *See supra* Section III.C.2. By contrast, while the Defendants repeatedly espouse the importance of immigration enforcement, they offered little to no evidence why this detention camp, in this particular location, is uniquely suited and critical to that mission. Director Kerner did state that his troopers "have encountered and apprehended people that have active warrants for murder in other countries" and offered his belief that some of those individuals might be detained at the detention camp. (DE 129 at 202). Director Kerner could not, however, offer any statistics or reports specifying how many individuals actually housed at the facility had such a criminal background. (*Id.* at 206). He could not directly testify that even one of the detainees had a criminal record, much less a record of violent crimes necessitating their seclusion from society in the Everglades. (*Id.* at 206, 219).

Director Kerner further asserted that the detention camp is necessary because other immigration facilities are at capacity. (*Id.* at 205). This need, however, again fails to explicate the decision to place the detention camp in the Everglades.[36] Counsel for the

---

[36] Any detention capacity issue also appears will be mitigated by the State's recent announcement of a second temporary immigration detention facility with "the same services as Alligator Alcatraz" also with costs to be "reimbursed by federal partners." Press Release, Executive Office of the Governor, Governor Ron Desantis Announces Expansion of Florida's Capacity to Detain and Deport Illegal Aliens (Aug. 14, 2025), https://perma.cc/3HXE-73VY. *See Santa Clara*, 250 F. Supp. 3d at 520 nn.4, 6–7 (taking notice of government officials' statements during press conferences and interviews); *McLoughlin*, 586 F. Supp. 2d at 73 ("The Court may take judicial notice of the press releases of government agencies."); *Coastal Wellness Ctrs., Inc. v. Progressive Am. Ins.*

Federal Defendants opined that the detention camp housed "all sorts of people from all walks of life" and claimed that the camp's remoteness is "relevant to the national security and public safety interest at play here." (DE 130 at 68, 77-78). When pressed by this Court, however, the Federal Defendants conceded that they actually had no opinion on the efficacy of the detention camp's location, saying that the location "is a question for Florida to decide." (*Id.* at 69). The Federal Defendants further conceded that there was no issue with the operation of other ICE detention facilities in populated areas like Jacksonville and Boca Raton. (*Id.* at 78). Thus, at least for the Federal Defendants, the remoteness of the detention camp seems to be an inconsequential consideration.

The State Defendants also insisted that the detention camp's remoteness was an important consideration. The State presented testimony from Director Kerner that the detention camp's site was "ideal" because "first and foremost," it is "far removed." (DE 129 at 225). Director Kerner also pointed to the site's "very long runway[,] which is a very critical piece of the deportation process." (*Id.*) But aside from their use of adjectives, neither the State nor Director Kerner could explain why such a place needs to be in the Everglades. What is apparent, however, is that in their haste to construct the detention camp, the State did not consider alternative locations. Indeed, Director Kerner testified that the current detention camp is the "only site that [he] looked at." (*Id.* at 223).

Allowing the detention camp to continue expanding its infrastructure and operations poses an even more formidable challenge than maintaining the status quo because "it is difficult to change that course" if the Court eventually decides that NEPA

---

*Co.*, 309 F. Supp. 3d 1216, 1220 n.4 (S.D. Fla. 2018). ("The Court may take judicial notice of government publications and website materials.").

assessments are required. *Sierra Club v. Marsh*, 872 F.2d 497, 500, 505 (1st Cir. 1989) (vacating district court's denial of preliminary injunction related to NEPA claim and remanding). Defendants brush aside this concern by pointing to Justice Kavanaugh's remark in *Seven County* that "NEPA has transformed from a modest procedural requirement into a blunt and haphazard tool employed by project opponents." 145 S. Ct. at 1513. But while the *Seven County* case cited by counsel for the State is instructive, it is not for the phrases parsed by counsel. While the Court did discuss how NEPA requisites could sometimes be an impediment to critical projects, the comment was made in the context of that particular case: a 3,600-page EIS generated over a year-long period with the input of six public meetings and more than 1,900 public comments. *Id.* at 1508. This is hardly a meaningful guide in a matter where there was no consultation with the public and no reports of any page length regarding a project that was erected in eight days. Instead, this case exemplifies why NEPA's modest mandate that an "agency [take] a 'hard look' at the environmental consequences of [a] proposed action" before saddling communities and future generations with unknown environmental risks is still an important procedural check. *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) ("Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast."). In light of the foregoing, the Court finds that the equities weigh in favor of granting a preliminary injunction.

Nonetheless, the Court recognizes the unique and unprecedented situation

presented by this case. The Court fully understands the interests of the Defendants and the importance of a well-ordered transition while Defendants modify the facility to perform the necessary environmental assessments. The construction of the facility may have taken only eight days, but the capacity of the Defendants to remedy the NEPA violations outlined will involve a longer period of time. The Court has endeavored to provide that temporal accommodation in its Order.

## IV.   CONCLUSION

In 1947, President Harry Truman dedicated Everglades National Park observing:

> Not often in these demanding days are we able to lay aside the problems of the time, and turn to a project whose great value lies in the enrichment of the human spirit. Today we make the achievement of another great conservation victory. We have permanently safeguarded an irreplaceable primitive area. We have assembled to dedicate to the use of all people for all time, the Everglades National Park.[37]

Twenty years later, a proposal for construction of the world's largest jetport—at the site discussed in this case—was abandoned, and the Big Cypress National Preserve was created to protect this area.[38] Since that time, every Florida governor, every Florida senator, and countless local and national political figures, including presidents, have publicly pledged their unequivocal support for the restoration, conservation, and protection of the Everglades. This Order does nothing more than uphold the basic requirements of legislation designed to fulfill those promises.

---

[37] Harry S. Truman, Address on Conservation at the Dedication of Everglades National Park (Dec. 6, 1947), https://perma.cc/C392-4LE4.

[38] *Worlds Largest Jetport*, Big Cypress, NAT'L PARK SERV. (last visited Aug. 21, 2025), https://perma.cc/6BHR-X25W.

For the reasons set forth above, it is **ORDERED AND ADJUDGED** as follows:

1. For the purposes of Defendants becoming compliant with their obligations under NEPA, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion for a Preliminary Injunction (DE 5), as follows:

2. The Court **ENTERS** a Preliminary Injunction prohibiting the State and Federal Defendants[39] and their officers, agents, employees, attorneys, and any person who is in active concert or participation with them from **(1)** installing any additional industrial-style lighting (described by witnesses as "Sunbelt" lighting); or doing any paving, filling, excavating, or fencing; or doing any other site expansion, including placing or erecting any additional buildings, tents, dormitories, or other residential or administrative facilities on the TNT site; and **(2)** bringing any additional persons onto the TNT site who were not already being detained at the site at the time of this Order going into effect. The Preliminary Injunction does not prohibit modification or repairs to existing facilities, which are solely for the purpose of increasing safety or mitigating environmental or other risks at the site.

3. The Preliminary Injunction shall include among those "who are in active concert or participation with" the State or Federal Defendants or their officers, agents, employees, or attorneys, and thus prohibited from conducting the activities specified above, any contractors, subcontractors, or any other individuals or

---

[39] Though state agencies are not subject to the APA, when "state and federal [actions] are sufficiently interrelated," the Court may enjoin state entities from acting in violation of NEPA. *Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203, 1210 (11th Cir. 2012) (citation omitted) (exercising jurisdiction over the Florida Department of Transportation Secretary in a NEPA case because the project in question featured FDOT "working in tandem with federal agencies").

entities authorized to conduct work on the TNT site or provide detainee transportation or detention services. *See* Fed. R. Civ. P. 65(d)(2)(C) (including "other persons who are in active concert or participation with" the parties or the parties' officers, agents, servants, employees, and attorneys among those bound by any injunction).

4. No later than **sixty (60)** days from the date of this order, and once the population attrition allows for safe implementation of this Order,[40] the Defendants shall remove 1) the temporary fencing installed by Defendants to allow Tribe members access to the site consistent with the access they enjoyed before the erection of the detention camp; 2) the Sunbelt lighting fixtures and any additional lighting installed for the use of the property as a detention facility; and 3) all generators, gas, sewage, and other waste and waste receptacles that were installed to support this project.

5. Finally, Plaintiffs shall post a bond of $100. See *BellSouth Telecomm., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (internal citations omitted) ("the amount of security required by the rule is a matter within the discretion of the trial court").

---

[40] Based on Defendants' representation that the site is currently being used as a transportation spoke to other facilities, the Court is relying on programmatic attrition of the camp's population within the next sixty days. *See C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 50-1 ¶¶ 10 (stating that the detention facility on the TNT site "provides short-term housing while longer term housing or removal arrangements are secured for aliens"). This attrition will allow Defendants time to remove the newly installed fencing, lighting, and other fixtures and utilities apparatus in a safe, humane, and responsible manner. The housing and detention dormitory facilities may remain and be maintained to prevent deterioration or damage.

**DONE AND ORDERED** in Chambers in Miami, Florida, on this <u>21st</u> day of August, 2025.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE