**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:25-cv-22896-KMW**

FRIENDS OF THE EVERGLADES, INC., a Florida
not-for-profit corporation, and CENTER FOR
BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit
organization,

        Plaintiffs,

vs.

KRISTI NOEM, in her official capacity as Secretary
of the UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; TODD LYONS, in his
official capacity as Acting Director of the UNITED
STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT; KEVIN GUTHRIE, in his official
capacity as Executive Director of the Florida Division
of Emergency Management; and MIAMI-DADE
COUNTY, a political subdivision of the State of
Florida,

        Defendants.

and

THE MICCOSUKEE TRIBE OF INDIANS,

        Intervenor/Plaintiff.

**PLAINTIFFS' AND INTERVENOR/PLAINTIFF'S RESPONSE**
**IN OPPOSITION TO DEFENDANTS'**
**EXPEDITED MOTIONS FOR STAY PENDING APPEAL**

Plaintiffs Friends of the Everglades and the Center for Biological Diversity, and Plaintiff/Intervenor The Miccosukee Tribe of Indians ("Plaintiffs"), hereby submit their Response in Opposition to Defendants' Expedited Motions for Stay Pending Appeal (D.E. 137 & 138).[1]

To the public and to this Court, the State and Federal Defendants repeatedly boasted about their success in transforming a windswept strip of asphalt in the middle of Big Cypress National Preserve into a fully functioning immigration detention center in just eight days. And, from the start, the Defendants have emphasized that the facility was only intended to be temporary. *See* D.E. 16 at 4-5, 14, 19; D.E. 16-1 ¶ 2; D.E. 21. Indeed, the State Defendants argued that preliminary injunctive relief was improper *precisely because* the detention center was temporary, and therefore "there are good reasons to expect a successful return of the status quo." D.E. 16 at 19. Now, in seeking a stay of the Court's preliminary injunction order returning to the pre-suit status quo (D.E. 131), Defendants insist that compliance with the Court's Order over the next 60 days to remove environmentally harmful infrastructure from this temporary facility – a facility that did not exist two months ago, and was not operating as a detention center when Plaintiffs moved for injunctive relief – will somehow cause unmitigated chaos across the state of Florida. Defendants' arguments for a stay are hyperbolic, disingenuous, inconsistent, untimely, unsupported by any competent evidence, and contrary to the facts.

In reality, the State and Federal Defendants had already begun voluntarily *reducing* their reliance on the detention center before the Court entered its preliminary injunction. *See* Decl. of Maxwell Frost, attached as Ex. A (stating that the detention center held **336** detainees, of a capacity

---

[1] In their Motions, filed on Saturday, August 23, 2025, the Defendants demand that the Court enter a ruling by 5:00 on Monday, August 25, based on what they characterize as an "immediate" need for a stay. However, as discussed herein, the Defendants fail to establish any need for an "immediate" stay, nor do they reckon with the fact that the injunction order provides them **60 days** to comply.

of 2,000, as of August 20, 2025).[2]  *See also* D.E. 131 at 4 (noting that the facility previously held **900** detainees).  This fact alone belies Defendants' claims that their enforcement efforts will be significantly impaired by compliance with the injunction. Winding down operations at the detention center pursuant to the injunction order will not cause any measurable harm to the Defendants; it will merely continue what Defendants have already been doing for weeks, and what was planned all along.

As with their presentation at the injunction hearing, Defendants support their bare-bones arguments with conclusory declarations from witnesses spouting generalities about immigration enforcement and the predicted cost of winding down the facility.  *See* D.E. 137-1; 137-2; 138-1. But none of these witnesses provides any competent evidence that this *particular* (and *temporary*) facility, tucked in the heart of the Everglades and completely encompassed by Big Cypress National Preserve – and which, again, did not exist two months ago – is now so uniquely critical to the Defendants' stated interests in immigration enforcement that the Court's injunction order must be stayed pending appeal.  As discussed above, the Defendants have already begun to voluntarily *reduce* their reliance on the detention center – a fact conveniently overlooked by their declarants.  Moreover, the State has publicly stated that it is developing additional immigration detention facilities elsewhere in Florida – one at the Camp Blanding Training Center, the other at Baker Correctional Institution.  *See* D.E. 131 at 76 n.36.[3] (The Baker Correctional plan is

---

[2] *See also* Ben Wieder, Ana Ceballos, Shirsho Dasgupta and Ana Claudia Chacin, *'Psychological warfare': Internal data shows true nature of Alligator Alcatraz*, Miami Herald (August 19, 2025), https://www.miamiherald.com/news/local/immigration/article311718011.html  (showing drop from 1,400 detainees to less than 400 by August 19, 2025).

[3] *See also Executive Office of the Governor, Ron DeSantis, Governor Ron DeSantis Announces Expansion of Florida's Capacity to Detain and Deport Illegal Aliens,* https://www.flgov.com/eog/news/press/2025/governor-ron-desantis-announces-expansion-floridas-capacity-detain-and-deport (last visited Aug. 25, 2025).  The Court may take judicial notice of press releases published by government officials and agencies.  *See* D.E. 131 at 62 n.27

apparently sufficiently advanced to earn a nickname from the Governor and a merchandising campaign.) Thus, by the State Defendant's own admissions, the State presently has the capacity and ability to relieve any detention issues that could arise from enforcement of the Court's injunction.

It bears noting that none of the Defendants' three declarants in support of their Motions were presented as witnesses at the four-day injunction hearing and subjected to cross-examination on the issues raised in their declarations.  Indeed, two of these declarants (Mr. Harrison (D.E. 137-1) and Mr. Ripa (D.E. 138-1)) were not even identified as potential witnesses prior to the hearing.  The Defendants also failed to argue or assert in their briefs or at the hearing that the potential cost of dismantling the facility's environmentally harmful infrastructure was a factor to be considered in analyzing the balance of harms on Plaintiffs' injunction motion.  Nor did they challenge or address the sufficiency of the nominal bond amount requested by Plaintiffs. For these reasons, Plaintiffs have separately moved to strike these late-filed declarations. Nonetheless, with their untimely submissions, Defendants are nakedly attempting to improperly supplement the record on appeal and tilt the balance of harms in their favor *post hoc* with self-serving declarations that Plaintiffs had no opportunity to test or rebut during the four-day evidentiary hearing on the merits of the injunction motion.  The Court should not allow Defendants to use a motion for stay to exhume issues and arguments they chose to ignore over the course of litigating the underlying injunction motion.  *See Graveline v. Johnson*, No. 18-12354, 2018 WL 4184577, at *3 (E.D. Mich. Aug. 30, 2018) (after appeal is filed, a district court reviewing a motion to stay a preliminary injunction generally is "not permitted to examine new evidence" available to the party at the briefing stage); *Newspaper, Newsprint, Mag. & Film Delivery Drivers, Helpers, & Handlers, Int'l*

---

(internal citations omitted).

*Bhd. of Teamsters, Loc. Union No. 211 v. PG Publ'g Co.*, No. 2:19-CV-1472-NR, 2019 WL 9101872, at *3 (W.D. Pa. Dec. 27, 2019) (court will not consider supplemental evidence that the defendant "simply overlooked or forgot the first time around").

Accordingly, for the reasons stated herein, Defendants' expedited motions for a stay pending appeal should be denied, and their improper and untimely declarations in support of these motions should be stricken from the record, as Plaintiffs request by separate motion.

## **ARGUMENT**

A district court may grant a stay pending appeal only if the moving party establishes four factors: "(1) a substantial likelihood that they will prevail on the merits of the appeal; (2) a substantial risk of irreparable injury…unless the injunction is granted; (3) no substantial harm to other interested persons; and (4) no harm to the public interest." *In re Freedom Unlimited*, 489 F.Supp.3d 1328, 1332 (S.D. Fla. 2020) (emphasis added). The first factor, likelihood of success on the merits, is generally "the most important," however when the balance of equities "weighs heavily in favor of granting the stay," the motion may be granted upon a lesser showing of a "substantial case on the merits." *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986).

"A stay pending appeal is an extraordinary remedy for which the moving party bears a heavy burden." *Matter of O'Keeffe*, 2016 WL 5795121, at *1 (S.D. Fla. June 7, 2016) (internal citations omitted). "Considering that this test is so similar to that applied when considering a preliminary injunction, courts rarely stay a preliminary injunction pending appeal." *Honeyfund.com, Inc. v. DeSantis*, 622 F.Supp.3d 1159, 1186 (N.D. Fla. 2022).

"As with a motion for reconsideration, a motion to stay should not be used to relitigate matters, submit new evidence, or 'raise arguments which could, and should, have been made before the judgment issued.'" *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863–64 (5th Cir. 2003) (quoting

4

*Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990)); *see also* 11 Wright & Miller, Federal Practice & Procedure § 2810.1 at 127–28; *ODonnell v. Harris Cnty.*, 260 F.Supp.3d 810, 815 (S.D. Tex. 2017).

The Defendants cannot meet their heavy burden here. In their motions, they argue in conclusory fashion that a stay is warranted because (1) they have demonstrated a likelihood of success on appeal; (2) there is no "near-term irreparable harm" to Plaintiffs; and (3) the government Defendants will suffer "irreparable injury" to their immigration enforcement efforts if the injunction were enforced. D.E. 137 at 2; D.E. 138 at 2. Each of these arguments fails.

### A. Defendants Have Not Shown a Likelihood of Success on Appeal

While Defendants make a passing suggestion that they are likely to succeed on the merits of their respective appeals of the injunction order, neither Defendant even attempts to identify a single error in the Court's comprehensive, exhaustive 82-page injunction order. In fact, the order thoroughly addresses every single argument or issue raised by the Defendants in their briefs or at the injunction hearing – and Defendants make no attempt to even identify a single ruling that is likely to be overturned on appeal. Nor have the Defendants attempted to show even a "substantial case on the merits" on appeal. *Garcia-Mir*, 781 F.2d at 1453.

Because a preliminary injunction is reviewed on appeal for abuse of discretion, *see Democratic Exec. Comm. of Fla. v. Lee,* 915 F.3d 1312, 1317 (11th Cir. 2019), a party seeking a stay of an injunction must show that the court abused its discretion in entering the preliminary injunction. *George Sink PA Inj. Laws. v. George Sink II L. Firm LLC*, No. 2:19-CV-01206-DCN, 2019 WL 6318778, at *7 (D.S.C. Nov. 26, 2019). Having failed to address or identify any substantive issue on which they are likely to succeed on appeal, Defendants have plainly failed to make such a showing. To the contrary, this factor weighs in favor of *denial* of the motion and

enforcement of the injunction.  *U.S. v. O'Callaghan*, 805 F.Supp.2d 1321, 1327 (M.D. Fla. 2011) (substantial likelihood of success on appeal is generally the "most important" factor when considering a stay).  Defendants' empty argument is without merit.

### B.  Plaintiffs Clearly Established Immediate Irreparable Harm

Defendants show no more vigor with their argument that Plaintiffs have failed to show "near-term irreparable harm."  To the contrary, the Court made lengthy factual findings of immediate, ongoing irreparable harm that Defendants fail to address, discuss or dispute in their Motions.  *See* D.E. 131 at 67 ("Plaintiffs show ongoing harms to organizational and Tribal members' enjoyment of the preserved areas due to the project's industrial lighting, noise, traffic, and security perimeter"); *id.* at 70 ("[t]hese risks impact the wetlands ecosystem, but they also present direct risks to communities who depend on water from the Everglades for their water supply, including the [Miccosukee] Tribe"); *id.* ("the project creates irreparable harm in the form of habitat loss and increased mortality to endangered species in the area"); *id.* at 71 ("the lighting from the site immediately reduces the panther habitat by 2,000 acres"); *id.* at 72 ("[t]he ongoing light pollution from the project also harms Plaintiff members' enjoyment of the night sky"); *id.* ("Tribal members have lost access to the off-road trails leading into the BCNP lands for hunting and other activities"); *id.* at 73 ("[t]he light pollution is far worse now than before the camp's construction…The addition of 80,000 square feet of asphalt paving (with another 1 million planned) increases harmful water runoff relative to the areas previously paved").

As other courts have recognized, the "grant of a stay of a preliminary injunction pending appeal would almost always be logically inconsistent with a prior finding of irreparable harm."  *ODonnell*, 260 F.Supp.3d at 820 (citing *Rodriguez v. DeBuono*, 175 F.3d 227, 235 (2d Cir.

1999)).  Such is the case here.  Defendants simply ignore the Court's extensive findings of irreparable harm in their bare-bones motions.  These arguments fail on their face.

### C.  Defendants Cannot Show Irreparable Harm from Enforcement of the Injunction

Finally, Defendants argue that the preliminary injunction will cause "irreparable harm" to their respective interests in enforcing immigration law.  D.E. 137 at 2; D.E. 138 at 2.  The State further argues, somewhat nonsensically, that the injunction order will result in "significant financial losses that cannot be recovered" – this after previously asserting that the detention center was "temporary" and the plan all along was to close it.  D.E. 16 at 19 (**"The detention facility will eventually shut down. Governor DeSantis has been clear that the facility is temporary"**) (emphasis added).  The intended temporary nature of the facility means phase out costs must have been part of the calculus from the outset. Defendants have failed to put forward any competent evidence of irreparable harm arising from the preliminary injunction – either at the four-day evidentiary hearing or in the self-serving and conclusory declarations attached to their motions.

As the Court stated in its injunction order, "while the Defendants repeatedly espouse the importance of immigration enforcement, they offer little to no evidence why this detention camp, in this particular location, is uniquely suited and critical to that mission." D.E. 131 at 76. Defendants' untimely supplemental declarations suffer from the same shortcomings:

### 1.  Declaration of Garrett Ripa (D.E. 138-1)

In support of their Motion, the Federal Defendants rely on the declaration of Garrett Ripa, Field Office Director for U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) Miami field office.  Mr. Ripa's declaration is replete with generalized assertions and unsubstantiated hearsay concerning the state of immigration in the United States and Florida at large, but it has no bearing on the purported necessity for a migrant detention facility

in the environmentally sensitive Everglades ecosystem over any other location.  Accordingly, if the Court allows Mr. Ripa's declaration to be considered, it should find that—aside from reinforcing that immigration enforcement is in fact a uniquely federal function—the declaration is comprised of unfounded hearsay and speculation, much like the testimony of David Kerner, the Executive Director of Florida Department of Highway Safety and Motor Vehicles, which the Court found to be irrelevant or inapposite.

Mr. Ripa's declaration puts forward data points that one would expect to (easily) be substantiated with sources such as underlying datasets or reports, yet they are not. For instance, in support of the claimed need for more immigration detention space, Mr. Ripa states that "ERO Miami accounts for 10-15 percent of all ICE arrests nationwide," "ERO Miami [manages] approximately 1.5 million active [immigration] cases," and that "among the millions of aliens who entered United States under the previous administration, one in four provided a release address in [] Florida." D.E. 138-1 ¶¶ 6-7, 17. Without any support for these statistics, the Court is left to take Mr. Ripa's untested word for it, despite the apparent existence of "various records" from which he obtained his information (*see id*. ¶ 3), records that were not put forward with his declaration, nor provided to Plaintiffs, much less this Court. As a result, neither the Court nor Plaintiffs are able to verify the accuracy of these statements or assess factors that could have bearing on how much weight they should be given, such as when, how, and by whom this information was collected. Nothing suggests this information was not available to present ***during*** the hearing; it should not be considered now.

While the Court may consider hearsay at a preliminary injunction hearing, such hearsay must be reliable. *Fla. Atlantic University Board of Trustees v. Parsont*, 465 F.Supp.3d 1279, 1287 n.2 (S.D. Fla. 2020). With Federal Defendants having the burden of proof on their Motion to Stay,

it is not for the Court or Plaintiffs to adduce sources to investigate witnesses' out-of-court statements; that burden lies with Defendants, and they have not met their burden to show the foundation of their declarant's statements. Furthermore, that Plaintiffs are unable to cross-examine this declarant (or any others) put forward by Federal Defendants should cut against the weight this Court gives to this evidence. *See White Cap, L.P. v. Heyden Enterprises*, LLC, 2024 WL 3738925, at *8 (S.D. Fla. July 19, 2024) (declining to consider declarations containing hearsay and speculation by declarants who did not testify at a preliminary injunction hearing); *Flores v. Town of Islip*, No. 218CV3549ADSGRB, 2019 WL 1515291, at *2 (E.D.N.Y. Apr. 8, 2019) ("[T]o the extent the Plaintiffs plan to rely on inadmissible information … the Plaintiffs are cautioned that the Court will apply the Federal Rules of Evidence to determine the weight to be accorded to that evidence and notes that there is a preference for live testimony regarding disputed issues of fact").

In addition to being unsubstantiated hearsay, statements in Mr. Ripa's declaration are also undercut by other evidence admitted timely into the record during the preliminary injunction hearing or evidence in other related proceedings.

For instance, Mr. Ripa vaguely insists that the soft-sided, weeks-old temporary detention center at the TNT site is a "critical component" of ICE's campaign to detain "criminal aliens, gang members, wanted fugitive felons, and individuals with prior criminal removals" and therefore necessary to "potentially avert a national crisis." 138-1 ¶¶ 12-13. *See also id*. ¶ 16 (stating that individuals detained at the TNT site included those with serious criminal records, with examples of the types of crimes).  In addition to being conclusory, attenuated speculation as to the national implications, Mr. Ripa's assertions regarding public safety are belied by the fact that ICE is *choosing* to detain many people who do not have any, or any serious, criminal record. For instance, ICE data obtained by the Deportation Data Project showed that in early June in Florida,

noncriminal arrests surpassed the arrests of people with criminal charges or convictions. D.E. 123, Pl. Ex. 150. Decl. of Miranda McNeill, attached as Ex. B, ¶ 8 (and associated exhibit).  Moreover, not everyone held at the TNT site had a criminal record, or if they did, it might have been for a minor infraction. D.E. 123, Pl. Ex. 129 & 130; Ex. B ¶¶ 9-10 (and associated exhibits).  Mr. Ripa, like the other government witnesses and declarants in this case, surely has access to documents showing exactly how many individuals detained at the TNT site have been convicted of serious or violent offenses – yet the Defendants still refuse to introduce such evidence in their possession, preferring instead to rely on hearsay and the vague, *ipse dixit* opinions of their declarants.

As with Director Kerner's testimony that the Court found unpersuasive, Mr. Ripa has not offered "any statistics or reports specifying how many individuals actually housed at the facility [had a serious] criminal background… necessitating their seclusion from society in the Everglades." *See* D.E. 131 at 76. Although Mr. Ripa describes detainees at the TNT site with serious criminal backgrounds that include "robbery with a deadly weapon, sexual battery, and lewd and lascivious molestation of a child" (D.E. 138-1 ¶ 16), this Court has no way of knowing if it is two or 20 or 200 detainees with these backgrounds, whether these represent only arrests or actual convictions, when these alleged crimes occurred, the circumstances or weight of the evidence surrounding these alleged crimes, and whether these detainees already completed a sentence for these alleged crimes.

What we do know is that, just as an unknown number of detainees at the TNT site had criminal backgrounds, many did not. In *C.M. v. Noem*, pleadings and sworn declarations describe detainees with *no* criminal backgrounds – some married to U.S. citizens, some with children who are U.S. citizens, some working as pool cleaners or landscapers.[4]  One detainee discussed in *C.M.*

---

[4] *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF No. 1 ¶¶ 16-27; ECF No. 5-2 ¶ 4 (describing

*v. Noem* is a young man with no criminal record who received a form of immigration relief known as Special Immigrant Juvenile Status, which is for noncitizens who experienced childhood abuse, abandonment, or neglect.[5] And some of the plaintiffs in *C.M. v. Noem* sought and were granted leave to proceed under pseudonyms because they feared political persecution and torture in their home country and feared "increasingly violent anti-immigrant rhetoric in Florida" and across the United States.[6] In sum, the idea that the TNT site is necessary to ensure public safety is not supported by any competent evidence, and is based on the false premise that it housed or would house *only* dangerous criminals.

More fundamentally, Mr. Ripa's declaration fails to establish why *this* facility—as opposed to any other existing or planned facility[7]—is so necessary and irreplaceable to the federal government's immigration detention and enforcement priorities that it outweighs the established environmental harms resulting from the construction and operation of the TNT site. The Court has already found that the government's stated interest in enforcing immigration law does not outweigh the harms to Plaintiffs' interests in entering a preliminary injunction. D.E. 131 at 76. Significantly,

---

detained client at the TNT site who entered the U.S. without inspection but otherwise has no criminal history, has lived here for 10 years, likely qualifies for relief from removal, is married to a lawful permanent resident, and has a U.S. citizen 5-year-old daughter); ECF No. 5-3 ¶ 4 (none of declarant's three clients detained at the TNT site have criminal convictions and work as pool cleaners or landscapers); ECF No. 5-4 ¶ 5 (declarant's client detained at the TNT site has no criminal history, is married to a U.S. citizen, and has a court date for his pending petition for lawful status via his marriage).

[5] *Id.*, ECF No. 21-3 ¶ 5.

[6] *Id.*, ECF Nos. 11 & 15.

[7] For example, Governor DeSantis publicly stated at a press conference that Baker Correctional Institution, an existing state prison in North Florida, will take about two weeks to be operational as an immigrant detention facility. Brandon Hogan, *DeSantis says vacant North Florida prison will become 'Deportation Depot,' similar to 'Alligator Alcatraz,'*" WKMG Channel 6 News (Aug. 14, 2025) http://clickorlando.com/news/politics/2025/08/14/florida-gov-ron-desantis-holds-news-conference-at-baker-correctional-institution/. *See also* D.E. 131 at 76 n.36; Ex. B ¶¶ 3-4 (videos of two Gov. DeSantis press conferences describing other locations where Florida is already contemplating establishing immigration detention facilities).

at the preliminary injunction hearing, the Federal Defendants "conceded they had no opinion on the efficacy of the detention camp's location," which was instead a "question for Florida to decide." *Id*. at 77. Federal Defendants also conceded no issue with ICE detention facilities in populated areas like Jacksonville and Boca Raton. *Id*. And neither the State nor the State's only testifying witness, Director Kerner, "could explain why such a place needs to be in the Everglades." *Id*. Mr. Ripa offers no such explanation either.

As to the assertion that the TNT site serves as an overflow facility for the many people ICE is now choosing to detain, this Court already assessed this position and found it unconvincing: specifically, that it "flounders when confronted with the weight of evidence as to irreparable harm posed by Defendants' flouting NEPA protocols." *Id*. at 75-76. Furthermore, Mr. Ripa's claim that the 2,000 detention beds at the TNT site are crucial to United States national security is *contradicted* by another sworn statement by an ICE ERO Miami field office representative that the TNT site provides short-term housing while longer term housing or removal arrangements are secured. *Id*. at 81, n.40. These statements are also belied by the fact that the Defendants have significantly *reduced* the population at the TNT site to just 336 detainees – less than 17 percent of its capacity. *See* Ex. A.

The Federal Defendants' untimely attempt to put forth evidence in the form of a statement by a declarant who works and presumably lives in the Southern District of Florida, who could have come to the evidentiary hearing and testified live, should be rejected for all the reasons stated in this response. Alternatively, if the Court does decide to consider this declaration, it should not be given any weight due to its conclusory, unsubstantiated hearsay statements that provide no answer to the question of why an immigration detention facility must exist in the middle of the Everglades.

### 2.   Declaration of Joseph Harrison (D.E. 137-1)

The State Defendant relies on a declaration of Joseph C. Harrison, Deputy Director of the Office of Executive Officer to the Colonel of the Florida Highway Patrol (FHP) and a "member of FHP's Leadership Team."  Notably, the State never called Mr. Harrison as a witness (or identified him as a potential witness) at the injunction hearing, and therefore the Court should afford this untimely declaration little if any weight.  In any case, Mr. Harrison's declaration suffers from the same defects as Mr. Ripa's, and comes nowhere close to establishing "irreparable harm" to the State or Federal Defendants if the injunction were not stayed.

Mr. Harrison states that FHP has increased the number of individuals it has detained pursuant to its 287(g) agreement with the Federal Defendants, and repeats the Defendants' desire for "maximal detention space" given their alleged increased enforcement efforts. D.E. 137-1 ¶¶ 3 & 5.[8]  Harrison also offers generalized hearsay from unidentified individuals among FHP's "federal immigration partners" about the general lack of detention space at federal immigration facilities.  *Id.* ¶ 5.  But, like Mr. Ripa, this declarant does not state that the injunction preventing detention activities at this one particular temporary facility in the Everglades will result in any specific harm or injury to FHP (which is not a party) or the State Defendants.  Indeed, the fact that the Defendants have voluntarily reduced the population at the 2,000-bed facility to 336 detainees in recent weeks confirms that any purported detention capacity issue is overblown, or at least

---

[8] It is also worth reiterating that detaining individuals pending removal, especially if they do not have criminal records, is a policy choice by DHS and ICE.  The Immigration and Nationality Act at 8 U.S.C. § 1226 outlines that immigration detention is generally discretionary, with provisions for mandatory detention (for example, for underlying crimes or terrorist activity) outlined at subsection (c).  DHS may also parole individuals pending immigration proceedings, pursuant to its regulations at 8 C.F.R. § 212.5.  Lastly, a government filing in *C.M. v. Noem* designated Krome as having administrative control over the TNT detention facility, stating that "all Alligator Alcatraz detainees may file bond petitions with Krome."  *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF No. 83.

remediable, and the Defendants are fully capable of fulfilling its enforcement and detention operations without relying solely on the temporary TNT facility they erected less than two months ago – and which is now apparently 83 percent vacant.

As discussed above, the State has already formulated plans to open new detention centers at Camp Blanding and Baker Correctional Institution.  *See* D.E. 131 at 76 n.36; *supra* nn. 3, 7; Ex. B ¶¶ 3-4.  Florida's governor has expressly stated that the State would open those facilities once there is sufficient "demand" – directly contradicting Mr. Harrison's claim that "maximal detention space" is needed immediately.[9]  *Id.* at ¶ 3.  In addition, Florida law now requires every "sheriff or the chief correctional officer operating a county detention facility" to enter into a 287(g) agreement with ICE to provide additional detention space for immigration detainees.  Fla. Stat. § 908.11(1).  These available alternatives further undermine any suggestion that the Defendants will be irreparably harmed by the enforcement of the preliminary injunction.

Like Mr. Ripa, Mr. Harrison also gratuitously states that "some" of those apprehended by FHP for immigration violations (notably, he does not say how many) also have pending criminal cases or past criminal convictions and suggests that public safety would be at risk if the injunction were not stayed.  But, like his supervisor, Mr. Kerner, at the injunction hearing, Mr. Harrison once again provides no data or records on criminal apprehensions with his declaration – though the State and Federal Defendants surely have this information at their fingertips.  In fact, records show that many of those detained at the facility have no criminal record at all.  *See* D.E. 123, Pl. Exs. 129, 130 & 150; *supra* nn. 4-6; Ex. B ¶¶ 8-11 and associated exhibits.

---

[9]   *See*   https://thefloridachannel.org/videos/7-16-25-governors-press-conference-on-floridas-economy/; Ex. B ¶ 3.

To the extent that FHP has apprehended individuals also "accused of" crimes, as Mr. Harrison states, the Court's injunction should have no effect on these individuals *at all*, as they should be detained at a county jail or other correctional facility, not at this or any other immigration detention center.  Indeed, FHP's 287(g) agreement specifically requires local law enforcement to "pursue to completion prosecution" of local criminal charges before transferring these detainees to ICE.  *See* D.E. 124, State Def. Ex. 28.

Mr. Harrison's declaration fails to address the crucial question – "why this detention camp, in this particular location, is uniquely suited and critical" to the State Defendants' interests.  It is essentially duplicative of Director Kerner's testimony and is of equally scant evidentiary value.

### 3.  Declaration of Ian Gadea-Guidicelli (D.E. 137-2)

Finally, Defendant Guthrie also filed yet another Declaration of Ian Gadea-Guidicelli, the *fifth* declaration from Mr. Gadea-Guidicelli filed in this case. *See* D.E. 50-1, 86-1, 116-1, 120-1, 137-2; *see* D.E. 124. In addition to submitting the previous four declarations, Defendant Guthrie also listed Mr. Gadea-Guidicelli on Defendant FDEM's Preliminary Witness and Exhibit List for August 6, 2025, Hearing, D.E. 90, but ultimately never called him to testify in court. D.E. 129, Tr. of Aug. 12, 2025, Hr'g, at 92–95, 176, 180.

As a preliminary matter, given the "preference for live testimony regarding disputed issues of fact"—and that Defendant Guthrie had the opportunity to call Mr. Gadea-Guidicelli to testify the matters in this most recent declaration and failed to do so—the Court should afford this declaration little to no weight. *Flores*, 2019 WL 1515291 at *2 (explaining that although declarations may be considered at the preliminary injunction stage, courts "will apply the Federal Rules of Evidence to determine the weight to be accorded to that evidence"); *Ramsey v. Fox News Network, LLC*, 323 F.Supp.2d 1352, 1356 (N.D. Ga. 2004) ("when possible, live testimony is

preferred over other means of presenting evidence"). Presumably, Mr. Gadea-Guidicelli could have testified to the contents of his most recent declaration if Defendant Guthrie had called him to testify, which would have offered Plaintiffs the opportunity to cross-examine him and the Court the opportunity to assess any basis for and credibility of his assertions.

Substantively, Mr. Gadea-Guidicelli's declaration once again contains only "conclusory statement[s] from a FDEM employee" (D.E. 131 at 40) that amount to speculation unsupported by foundational data or documents.

First, Mr. Gadea-Guidicelli baldly states that he anticipates compliance with the Court's order to remove fencing, lighting, generators, gas, sewage, and other waste and waste receptacles from the site would cost "roughly $15–20 million," and if the site were to re-open, it would cost "about $15–20 million to reinstall the structures." D.E. 137-2 at 1–2. Rather than providing any documented costs, invoices, vendor quotes or the like, Mr. Gadea-Guidicelli bases this estimate solely on his unspecified "experience with FDEM's financing of the facility and conversations with FDEM's vendors." *Id.* Given Mr. Gadea-Guidicelli's experience, he should have access to documentary evidence to support his bare claims, yet he fails to provide it. Further, to the extent Mr. Gadea-Guidicelli is relying on out-of-court statements from vendors, this is hearsay from unidentified third parties that the Court is unable to assess or verify and should thus disregard.

Mr. Gadea-Guidicelli's other statements are likewise vague and unsubstantiated. For instance, he states that the court's preliminary injunction order "will eventually cause all detention operations at the site to cease" and "FDEM will lose most of the value of the $218 million it invested to make TNT suitable for detention operations."[10] D.E. 137-2 at 2. Yet this claim assumes

---

[10] As the Court has noted, both State and Federal officials have stated that the costs of construction and operation will be reimbursed by DHS, so this is no injury to the State. *See* D.E. 131 at 2, 62-63. *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) (financial losses do not constitute

the facility to be *permanent*, which contradicts Mr. Guidicelli's prior sworn statements and other record evidence that the facility is temporary, and that a winding down was not only foreseeable but already anticipated.[11] D.E. 116-1 at ¶ 17 ("Importantly, all infrastructure at the facility is temporary and can be removed once FDEM's operations cease at the airport"); D.E. 116-1 at Exhibit 8 (describing the "temporary detention facility"); Pl. Ex. 43 at 4 (South Florida Detention Facility Continuity of Operations Plan describing the facility as "a temporary detention facility"); *see also* D.E. 16 at 19 ("[t]he detention facility will eventually shut down"); D.E. 21 (Federal Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction describing the "temporary detention center" throughout); D.E. 60 (same).

Mr. Gadea-Guidicelli's declaration also overlooks the fact that Defendants already reduced the population of the TNT detention center to less than 17 percent of its purported capacity of 2,000 before the Court entered the preliminary injunction.[12] Ex. A. Given that the Court has found Plaintiffs are likely to succeed on the merits of their case, the Court's preliminary injunction serves only to facilitate the winding down of the facility—as foreseen and apparently undertaken by Defendants—at an earlier date. This presents no additional cost above what Defendants must have, or at least should have, already anticipated when devising plans for the Everglades detention center.

Mr. Gadea-Guidicelli's declaration is of little legal significance in any case. Given Defendants' repeated assertions that the facility is temporary, the cost of winding down the facility was already baked into the anticipated costs to be borne by the State, this cannot possibly support

---

irreparable harm if they can be recouped).

[11] Any consideration of purported costs to the State must necessarily be measured against the costs of operation, which Defendants themselves have estimated at $450 million a year – more than $1.2 million *per day*. *See* Ex. B ¶ 5 and Exhibit 2.

[12] Notably, the Court's Temporary Restraining Order did not prevent Defendants from continuing to bring detained people to the site or require them to reduce the number housed there. D.E. 104 at 12–13 (prohibiting new construction at the site for 14 days).

a finding of "irreparable injury" necessary to support a stay of the injunction. *See League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1370 (11th Cir. 2022). Moreover, these purported harms are entirely self-inflicted – the result of Defendants' abject failure to comply with the National Environmental Policy Act *before* constructing a mass immigration detention center in the middle of a national preserve in the Everglades. Such self-inflicted harms "do not count" in the balance of interests. *State v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (citing 11A Charles Alan Wright, Et Al., Federal Practice and Procedure § 2948.1 (2021) ("[A] party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted")) (finding that "DHS could have avoided this problem by waiting . . . until this litigation was resolved" where the case was filed well in advance of the action sought to be enjoined, and DHS took the action anyway); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) (holding "the injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself"); *see also Grace, Inc. v. City of Miami*, No. 23-12472, 2023 U.S. App. LEXIS 20292, at *17 (11th Cir. Aug. 4, 2023) (explaining that "a stay applicant may not delay, and self-inflict the imminent harm it seeks relief from").

For all of these reasons, Mr. Gadea-Guidicelli's declaration should be disregarded.

**D.  Defendants Waived Any Objections to the Amount of the Injunction Bond**

In its Motion, the State – for the first time – challenges the sufficiency of the $100 bond ordered by the Court, in reliance on Mr. Gadea-Guidicelli's unsupported assertions above. This untimely argument is waived and should be rejected.

From the outset, Plaintiffs requested that the Court require a nominal bond of $100 in their original Expedited Motion for Temporary Restraining Order and Preliminary Injunction dated June

27, 2025.  D.E. 5 at 13.  Yet in the more than fifty days between that request and the Court's injunction order on August 21, Defendants never objected to the sufficiency of the proposed bond—not in any of their multiple written filings opposing Plaintiffs' request for injunctive relief (D.E. 16, 21, 28, 50, 65), including a multitude of declarations, and not over the course of four days of evidentiary hearings on Plaintiffs' motion, which concluded with fulsome oral argument by all parties.  "As with a motion for reconsideration, a motion to stay should not be used to . . . raise arguments which could, and should, have been made before the judgment issued." *Rosenzweig*, 332 F.3d at 863–64 (citation omitted).  Defendants have plainly waived any objection to the bond, and they cannot raise it now in a motion for stay.

Even if this issue had not been waived, the Court's imposition of a nominal bond was well within its discretion.  *See BellSouth Telecomm., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (internal citations omitted) ("the amount of security required by the rule is a matter within the discretion of the trial court…and the court may elect to require no security at all"); *Naples Pride, Inc. v. City of Naples*, No. 2:25-CV-291-JES-KCD, 2025 WL 1370174, at *18 (M.D. Fla. May 12, 2025) (imposing $100 bond in public interest case where city asserted it would incur financial costs it would not be able to recover from the plaintiff).

It was the Defendants' burden to establish "a rational basis for the amount of a proposed bond."  *Cont'l Grp., Inc. v. KW Prop. Mgmt., LLC*, 09-60202-CV, 2009 WL 3644475, *6 (S.D. Fla. Oct. 30, 2009).  But having failed to propose a bond amount, Defendants failed to meet this burden.  *Williamson v. City of Foley, Alabama*, 146 F.Supp.3d 1247, 1253 n.4 (S.D. Ala. 2015) (imposing no bond requirement where "[t]he defendants, despite full opportunity to do, did not request imposition of a security requirement, and the Court will not intercede on their behalf").  Moreover, nominal bonds are typically imposed in environmental cases because these cases

19

vindicate important public interests.  *See Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016) (decision to waive bond requirement was not abuse of discretion in environmental case in light of "the important public interest in the enforcement of [federal environmental law]"); *See also Davis v. Mineta*, 302 F.3d 1104, 1126 (10th Cir. 2002) ("Ordinarily, where a party is seeking to vindicate the public interest served by NEPA, a minimal bond amount should be considered").  The Court thus acted well within its discretion by setting a nominal bond.  The State's untimely argument fails.

WHEREFORE, for the reasons stated above, Defendants' Expedited Motions for a Stay Pending Appeal should be denied.

Dated:   August 25, 2025

Respectfully submitted,

| EARTHJUSTICE | COFFEY BURLINGTON, P.L. |
|---|---|
| 4500 Biscayne Boulevard, Suite 201 | 2601 South Bayshore Drive, Penthouse One |
| Miami, Florida  33137 | Miami, Florida  33133 |
| Telephone:  (305) 440-5432 | Telephone:  (305) 858-2900 |

By:____s/   Tania Galloni_____     By:____s/   Paul J. Schwiep_____

Tania Galloni, Fla. Bar No. 619221 — Paul J. Schwiep, Fla. Bar No. 823244
tgalloni@earthjustice.org — PSchwiep@CoffeyBurlington.com
Dominique Burkhardt, Fla. Bar No. 100309 — Scott Hiaasen, Fla. Bar No. 103318
dburkhardt@earthjustice.org — SHiaasen@CoffeyBurlington.com
Alisa Coe, Fla. Bar No. 10187 — YVB@CoffeyBurlington.com
acoe@earthjustice.org — LPerez@CoffeyBurlington.com
— service@CoffeyBurlington.com

*Counsel for Friends of the Everglades*     *Counsel for Plaintiffs*

CENTER FOR BIOLOGICAL DIVERSITY     TODD R. FRIEDMAN, P.A.
Elise Pautler Bennett, Fla. Bar No. 106573 — Todd R. Friedman, Fla. Bar No. 97919
ebennett@biologicaldiversity.org — todd@toddfriedmanpa.com
Jason Alexander Totoiu, Fla. Bar No. 871931 — 1101 Brickell Avenue, Suite S-700
jtotoiu@biologicaldiversity.org — Miami, Florida 33131
Post Office Box 2155 — Telephone:  (786) 536-7190
St. Petersburg, FL 33731
Telephone:  (727) 755-6950 — CHRISTOPHER AJIZIAN, P.A.

|  |  |
|---|---|
| *Counsel for Center for Biological Diversity* | Christopher Ajizian, Fla. Bar No. 1010170<br>chris@ajizianlaw.com<br>1101 Brickell Avenue, Suite S-700<br>Miami, Florida  33131<br>Telephone:  (305) 699-5001<br><br>*Counsel for The Miccosukee Tribe of Indians* |

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 25, 2025, I electronically filed the foregoing with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record on the Service List below via transmission of Notice of Electronic Filing generated by CM/ECF.

      s/  Paul J. Schwiep

| Service List | |
|---|---|
| **Nathan A. Forrester**<br>   Chief Deputy Solicitor General<br>nathan.forrester@myfloridalegal.com<br>**Robert S. Schenck**<br>   Assistant Solicitor General<br>robert.schenck@myfloridalegal.com<br>Office of the Attorney General<br>The Capitol, PL-01<br>Tallahassee, Florida  32399-1050<br>Telephone:  (850) 414-3300<br>jenna.hodges@myfloridalegal.com<br><br>————————<br><br>Boies Schiller Flexner LLP<br>**Jesse Panuccio, Esq.**<br>jpanuccio@bsfllp.com<br>**Evan Ezray, Esq.**<br>eezray@bsfllp.com<br>**David Costello, Esq.**<br>dcostello@bsfllp.com<br>**Dante C. Ficarelli, Esq.** *(pro hac vice* pending)<br>dficarelli@bsfllp.com | HAYDEN P. O'BYRNE<br>United States Attorney<br>**Carlos J. Raurell**<br>   Assistant U.S. Attorney<br>carlos.raurell@usdoj.gov<br>99 Northeast 4th Street<br>Miami, Florida  33132<br>Telephone:  (305) 961-9243<br>melissa.Jiminson@usdoj.gov<br><br>————————<br><br>ADAM R.F. GUSTAFSON<br>Acting Assistant Attorney General<br>Environment and Natural Resources Division<br>   United States Department of Justice<br>**Peter M. Torstensen, Jr.**<br>   Deputy Assistant Attorney General<br>Environment and Natural Resources Division<br>   United States Department of Justice<br>**Hayley A. Carpenter**<br>   Trial Attorney<br>hayley.carpenter@usdoj.gov<br>**Marissa Piropato** |

| | |
|---|---|
| 401 East Las Olas Boulevard, Suite 1200<br>Fort Lauderdale, Florida  33301<br>Telephone:  (954) 356-0011<br>jpanuccio@BSFLLP.com<br>ftleserve@bsfllp.com<br><br>*Counsel for Defendant Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management* | Deputy Chief<br>Marissa.Piropato@usdoj.gov<br>Natural Resources Section<br>Ben Franklin Station<br>P.O. Box 7611<br>Washington, D.C. 20044-7611<br>Telephone:  (202) 305-0242<br><br>*Counsel for Kristi Noem, in her official capacity as Secretary, United States Department of Homeland Security, and Todd Lyons, in his official capacity as Acting Director, United States Immigration and Customs Enforcement* |
| GERALDINE BONZON-KEENAN<br>Miami-Dade County Attorney<br>**Christopher J. Wahl**<br>   Assistant County Attorney<br>wahl@miamidade.gov<br>**Monica Rizo Perez**<br>   Assistant County Attorney<br>rizo@miamidade.gov<br>**David M. Murry**<br>   Assistant County Attorney<br>DMMurray@FlyMIA.com<br>Stephen P. Clark County<br>111 Northwest 1st Street, Suite 2810<br>Miami, Florida  33128<br>Telephone:  (305) 375-5151<br>Victor.Rodriguez3@miamidade.gov<br>Madalis.Gonzalez@miamidade.gov<br>KGriffin@FlyMIA.com<br><br>*Counsel for Miami-Dade County* | |