UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| FRIENDS OF THE EVERGLADES, INC., et al.,<br><br>Plaintiffs,<br>v.<br><br>MARKWAYNE MULLIN, et al.<br><br>Defendants. | Case No. 1:25-cv-22896-KMW |

**BRIEF OF AMICUS CURIAE SOUTHEASTERN YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS (QUAKERS) IN SUPPORT OF PLAINTIFFS AND INTERVENOR-PLAINTIFF**

**DISCLOSURE STATEMENT**

Amicus curiae Southeastern Yearly Meeting of the Religious Society of Friends ("SEYM") is a religious body. It is a nonprofit organization. It has no parent corporation, and no publicly held corporation owns any interest in it.

Consistent with Federal Rule of Appellate Procedure 29(a)(4)(E), applied here by analogy, amicus states that no counsel for any party wrote this brief in whole or in part; that no party and no counsel for a party contributed money intended to fund the preparation or submission of this brief; and that no person other than amicus, its members and attenders, and its counsel contributed money intended to fund the preparation or submission of this brief.

## TABLE OF CONTENTS

DISCLOSURE STATEMENT ........ 1
TABLE OF AUTHORITIES ........ 3
INTEREST OF AMICUS CURIAE ........ 4
INTRODUCTION ........ 5
ARGUMENT, HISTORY, AND LAW ........ 6
I. THIS GROUND WAS SAVED ONCE BEFORE BECAUSE THE PUBLIC WAS ALLOWED TO STUDY IT AND SPEAK ........ 6
A. The Jetport and the Leopold Report ........ 6
B. Public Process Then Built Lasting Law ........ 7
C. The Lesson for This Case ........ 8
II. QUAKERS, THE TRIBE, AND THE CONSERVATION GROUPS SHARE VALUES THREE CENTURIES DEEP ........ 9
A. Quaker Care for Creation ........ 9
B. The Same Inheritance Runs Through This Case Already ........ 10
C. Quaker Friendship with Native Peoples, Held with Humility ........ 11
D. A Shared Way of Deciding: Listen First, Then Act ........ 12
III. NEPA PUTS THOSE SHARED VALUES INTO LAW, AND THEY CANNOT BE RESTORED AFTER THE FACT ........ 13
IV. THE RECORD SHOWS THE VERY HARMS THAT REVIEW EXISTS TO CATCH BEFORE THEY HAPPEN ........ 14
A. Harms This Court Has Already Found ........ 14
B. Demobilization Without Review Repeats the Same Mistake ........ 15
C. The Endangered Species Act Claims Rest on the Same Principle ........ 16
CONCLUSION ........ 17

# TABLE OF AUTHORITIES

**Cases**

*Dep't of Transportation v. Public Citizen*, 541 U.S. 752 (2004) ..................................... 13

*Hualapai Indian Tribe v. Haaland*, 755 F. Supp. 3d 1165 (D. Ariz. 2024) ..................... 15

*Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989)............................... 13

*Oglala Sioux Tribe v. Nuclear Regulatory Commission*, 896 F.3d 520 (D.C. Cir. 2018) 15

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989).............................. 13

*South Florida Water Management District v. Miccosukee Tribe of Indians*, 541 U.S. 95 (2004)........................................................................................................ 12

*Tennessee Valley Authority v. Hill*, 437 U.S. 153 (1978)............................................... 16

**Statutes**

Administrative Procedure Act, 5 U.S.C. §§ 551 et seq. ................................................. 13

Big Cypress National Preserve Act, Pub. L. No. 93-440, 88 Stat. 1258 (1974)................. 7

Endangered Species Act, 16 U.S.C. §§ 1531 et seq. .................................................. 6, 16

National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq.................................... 5, 6

16 U.S.C. § 698j ........................................................................................... 7, 15

16 U.S.C. § 1536(a)(2) .................................................................................... 16

42 U.S.C. § 4332(2)(C)...................................................................................... 7, 13

**Other Authorities**

Harry S. Truman, Address at the Dedication of Everglades National Park (Dec. 6, 1947) ....................................................................................................... 17

Jack E. Davis, Green Awakening: Social Activism and the Evolution of Marjory Stoneman Douglas's Environmental Consciousness, 80 Fla. Hist. Q. 43 (2001) ............ 10

John Woolman, Conversations on the True Harmony of Mankind (1772) ........................ 9

John Woolman, The Journal of John Woolman (1774).................................................. 11

Kenneth E. Boulding, The Economics of the Coming Spaceship Earth, in Environmental Quality in a Growing Economy (1966) .................................................... 9

Richard Nixon, Statement About the Construction of Airport Facilities in South Florida (Jan. 15, 1970)........................................................................................ 7

S. Rep. No. 105-361 (1998)........................................................................... 12

U.S. Dep't of the Interior, Environmental Impact of the Big Cypress Swamp Jetport (1969) (the "Leopold Report")...................................................................... 6, 7

William Bartram, Travels Through North and South Carolina, Georgia, East and West Florida (1791) ......................................................................................... 11

William Penn, Conditions or Concessions to the First Purchasers (July 11, 1681) ........... 9
William Penn, Letter to the Kings of the Indians in Pennsylvania (Oct. 18, 1681) ......... 11

## INTEREST OF AMICUS CURIAE

SEYM is the regional body of Quakers whose Monthly Meetings and Worship Groups span Florida and coastal Georgia and South Carolina, with affiliated groups in Managua, Nicaragua, and Havana, Cuba. SEYM held its first sessions as a yearly meeting in 1963, growing out of a Friends conference active in the region since 1950. SEYM gathers Friends for worship and for witness in the world, including advocacy for peace, for social justice, and for the care of the Earth.

Many SEYM members and attenders live in South Florida. They worship in communities near Big Cypress National Preserve, drink water drawn from the Everglades aquifer, and visit the Preserve for recreation, contemplation, and spiritual renewal. Several have joined prayer vigils outside the detention facility at the Dade-Collier Training and Transition Airport (the "TNT Site"), led by Betty Osceola, a member of the Miccosukee Tribe of Florida and the Panther Clan.

SEYM comes to this Court through its own careful process. In October 2025, at a Meeting for Worship with a Concern for Business, SEYM members expressed solidarity with the Miccosukee Tribe in calling for the closure of the facility to protect air and water quality and the ecological balance vital to the Miccosukee way of life. In December 2025, Friends from meetings in Fort Myers, Tampa, DeLand, Tallahassee, and Miami began a group discernment, called a threshing session, to consider how SEYM could support the Plaintiffs and the Tribe. Before going further, SEYM's Field Secretary for Earthcare asked Betty Osceola whether a brief from Friends would be welcome. She answered that it would "help to amplify the voice of the tribe." That months-long process of listening and waiting has led to this brief.

SEYM has long made care for this region a focus of its witness. Its 2014 Minute on Climate Change committed the Yearly Meeting to respond to sea level rise, saltwater intrusion, and pollution of the region's aquifers, rivers, lakes, and springs. Since 2016, SEYM has employed a Field Secretary for Earthcare, to its knowledge the first staff position of its kind at any yearly meeting in North America.

## INTRODUCTION

In the summer of 2025, federal and state officials built a mass immigration detention facility at the TNT Site inside Big Cypress National Preserve. They built it in days, with no environmental review, no public notice, and no chance for anyone to be heard, including the Miccosukee Tribe, whose villages and ceremonial grounds surround the site. After a four-day evidentiary hearing, this Court found that the facility's industrial lighting brightened the night sky twenty to thirty miles away, that roughly 800,000 square feet of land had been newly paved, and that the endangered Florida panther had lost some 2,000 acres of habitat. [DE 131 at pp46, 52]. A divided panel of the court of appeals later vacated this Court's preliminary injunction, relying on the position that Florida had not sought federal funding. The Amended and Supplemental Complaint now alleges that Florida had in fact applied to FEMA for funding as early as June 2025, that federal money began flowing in May 2026, and that the site is now being taken apart the same way it was put up: quickly, and without any environmental review. [DE 162 at ¶¶11, 13-18].

SEYM files this brief because it knows this ground and its story, and because its members have stood beside the Tribe at the facility's gates. The brief offers three things the parties' filings cannot fully supply. First, history. The TNT Site was saved once before, in 1969 and 1970, because scientists were allowed to study it and the public was allowed to speak. That public process helped inspire the National Environmental Policy Act itself and led Congress to create the

nation's first national preserve. Second, values. Quakers, the Miccosukee Tribe, and the conservation groups before this Court share a conviction, each rooted in its own tradition, that a community must listen before it acts, and that the living world is a trust held for those who come after. Third, the present. The harms this Court has already found, and the new harms alleged from the facility's demobilization, are exactly the harms that the National Environmental Policy Act ("NEPA") and the Endangered Species Act ("ESA") exist to catch before they happen, not after.

## ARGUMENT, HISTORY, AND LAW

### I. THIS GROUND WAS SAVED ONCE BEFORE BECAUSE THE PUBLIC WAS ALLOWED TO STUDY IT AND SPEAK.

#### *A. The Jetport and the Leopold Report.*

In September 1968, the Dade County Port Authority broke ground at what is now the TNT Site for what was planned to be the world's largest airport: six runways on a thirty-nine square mile tract of the Big Cypress Swamp. One runway was completed. Before the rest could follow, the Department of the Interior asked a team of scientists led by Luna B. Leopold of the U.S. Geological Survey to study what the project would do to the land and water around it. Their report, released in September 1969, reached a plain conclusion:

> **Development of the proposed jetport** and its attendant facilities will lead to land drainage and development for agriculture, industry, housing, transportation, and services in the Big Cypress Swamp which **will inexorably destroy the south Florida ecosystem and thus the Everglades National Park**.

U.S. Dep't of the Interior, *Environmental Impact of the Big Cypress Swamp Jetport* (1969) (the "Leopold Report") (emphasis supplied).

The Leopold Report changed everything. Marjory Stoneman Douglas, then seventy-nine years old, founded Plaintiff Friends of the Everglades in 1969 to fight the jetport.[1] Miccosukee families whose ceremonial grounds lay on and near the site joined the opposition. Nathaniel Reed, the Governor's environmental advisor, carried the Leopold Report to Governor Claude Kirk, who reversed his support for the project. In January 1970, the federal government, the State of Florida, and the Port Authority signed the Jetport Pact and halted construction. President Nixon called the agreement "an outstanding victory for conservation." *See* R. Nixon, *Statement About the Construction of Airport Facilities in South Florida* (Jan. 15, 1970). The Pact limited the site to "temporary training facilities only." That limit was a promise made to the public, through public process. It held for more than half a century, until the summer of 2025.

***B. Public Process Then Built Lasting Law.***

The jetport fight did more than stop an airport. It helped shape the era's landmark environmental laws. NEPA was signed on January 1, 1970, two weeks before the Jetport Pact, and <u>the Leopold Report is widely regarded as a forerunner of the environmental impact statement NEPA now requires</u>. *See* 42 U.S.C. § 4332(2)(C). The Amended and Supplemental Complaint traces this same history. [DE 162 at ¶26]. And the motley coalition the fight created -- hunters, scientists, conservationists, and tribal members -- pressed Congress until it acted. In 1974, Congress established Big Cypress National Preserve, the nation's first national preserve, "to assure the preservation, conservation, and protection of the natural, scenic, hydrologic, floral and faunal, and recreational values of the Big Cypress Watershed." *Big Cypress National Preserve Act*, Pub. L. No. 93-440, § 1, 88 Stat. 1258 (1974).

---

[1] Douglas's own moral inheritance traced to Friends. Her father was raised in a Quaker family and was among the first editorial voices in Florida against draining the Everglades. *See infra* Section II.B.

Congress also wrote the Tribe's rights into that statute. Members of the Miccosukee and Seminole Tribes "shall be permitted . . . to continue their usual and customary use and occupancy" of the Preserve, "including hunting, fishing, and trapping on a subsistence basis and traditional tribal ceremonials." 16 U.S.C. §698j. The Preserve did not create the Tribe's presence on this land. The Tribe's villages, ceremonial grounds, and burial places were there long before, and Congress promised they could remain.

***C. The Lesson for This Case.***

Nothing about the TNT Site has become less sensitive since 1969. Yet this Court has found that no environmental impact statement was prepared for this project and that the Tribe was never consulted before it went forward. [DE 131 at p37]. What changed in 2025 was not the land. It was the willingness of officials to act on the land without asking anyone first.

The same organization that stopped the jetport is before this Court again, for the same ground, joined now by the Tribe whose presence there predates the Preserve by generations. History rarely speaks this clearly. When the public was allowed to study, comment, and be heard, the Everglades were spared, NEPA gained a working model, and the first national preserve was born. When the public was shut out, the panther lost 2,000 acres of habitat, the night sky filled with industrial light, and this Court and the parties were left to sort out the damage after the fact. Public process is not delay. On this ground, it is the reason there is anything left to protect. This Court has already placed this case in that history, observing that the proposal for the world's largest jetport "at the site discussed in this case" was abandoned, and that the Preserve was created to protect this area. [DE 131 at p79].

The public promises about this ground did not end in 1974. The record shows that the Western Everglades Restoration Plan, a roughly twenty-billion-dollar effort that took nearly a

decade of public planning, was designed around the TNT Site's longstanding use as a quiet training airport, and that the facility's runoff now risks disrupting it. [DE 131 at pp38, 67]. This is what happens when a project no one reviewed collides with decades of work reviewed by all.

## II. QUAKERS, THE TRIBE, AND THE CONSERVATION GROUPS SHARE VALUES THREE CENTURIES DEEP.

SEYM offers this history not as decoration but as evidence. The alliance now before this Court, a faith community, a sovereign tribal nation, and citizen conservation groups, did not form by accident. This alliance reflects values each tradition has carried for centuries, and those values converge on the question this case presents: whether the government may act on land held in trust for everyone without first looking, listening, and telling the truth about what it finds.

### *A. Quaker Care for Creation.*

From their beginnings, Friends have understood people as stewards of creation, not its owners. William Penn's first rules for Pennsylvania, the Conditions or Concessions of July 1681, required "that, in clearing the ground, care be taken to leave one acre of trees for every five acres cleared." W. Penn, *Conditions or Concessions to the First Purchasers*, art. XVIII (July 11, 1681). It stands among the earliest forest conservation rules in what became the United States. A century later, the Quaker minister John Woolman warned:

> The produce of the earth is a gift from our gracious creator to the inhabitants, and to impoverish the earth now to support outward greatness appears to be an injury to the succeeding age.

J. Woolman, *Conversations on the True Harmony of Mankind* (1772). In the modern era, Kenneth E. Boulding, a lifelong Friend and a president of the American Economic Association, helped found ecological economics with his 1966 essay, *The Economics of the Coming Spaceship Earth*, which argued that human economies must live within the limits of a finite planet. Friends organized what is now Quaker Earthcare Witness in 1987. SEYM's own Faith and Practice advises

Friends to maintain a sense of responsibility for the environment "both for the present and for future generations." SEYM, *Faith and Practice*, Ch. 5: Queries and Advices, No. 11. *Care of the Natural World* (4th Ed. 2013). These are not slogans. They are the discipline out of which this brief arises.

***B. The Same Inheritance Runs Through This Case Already.***

Quaker Friends did not come to the defense of the Everglades first, or alone. Plaintiff Friends of the Everglades was founded in 1969 by Marjory Stoneman Douglas, and the moral inheritance she carried came, by her own account, from Quaker Friends. Her father, Frank Bryant Stoneman, was raised in a Quaker family in the Midwest. Writing after his death in 1941, Douglas described "that Quaker touch" in him: "the plainness of his speech, his hatred of profanity and gaudy statements, his unpretentiousness, even his grey suits." J. E. Davis, *Green Awakening: Social Activism and the Evolution of Marjory Stoneman Douglas's Environmental Consciousness*, 80 Fla. Hist. Q. 43 (2001). That plainness had consequences for this landscape. As founding editor of the Miami Evening Record, the paper that became the Miami Herald, Stoneman used his editorial page in the years after 1905 to oppose Governor Napoleon Bonaparte Broward's plan to drain the Everglades, at a time when draining them was both popular and profitable.

Douglas herself was not a Quaker --- she called herself an agnostic --- but she traced the values that drove her to Friends: her Quaker grandparents' stand against slavery, the Society of Friends' early support for women's suffrage, and the Quaker abolitionist Levi Coffin, whom she called the ancestor who influenced her most as a "free thinker and activist." Her biographer concludes that "Douglas's spiritual link to the Society of Friends was a real and conscious one." Davis, *supra*. Her life moved between care for people and care for land without any sense of crossing a boundary: women's suffrage before the Florida Legislature in 1917, relief work among

refugees in Europe after the First World War, running water and sewers for the segregated Black neighborhoods of Coconut Grove in 1948, and, in 1947, *The Everglades: River of Grass*, with its unsparing account of the Seminole Wars and of dispossession.

SEYM does not claim her, and does not need to. It observes only that the organization that stopped the jetport at this site, and that stands before this Court today, was built by someone who understood her own work as an inheritance from Quaker Friends.

***C. Quaker Friendship with Native Peoples, Held with Humility.***

Quaker relationships with Native peoples reach back to the founding era. Before William Penn ever sailed for America, he wrote in 1681 to the Lenape leaders of Pennsylvania, acknowledging "the unkindness and Injustice" other Europeans had shown them and pledging that settlers and Native peoples might "always live together as Neighbors and friends." W. Penn, *Letter to the Kings of the Indians in Pennsylvania* (Oct. 18, 1681). In 1763, in a time of war, John Woolman traveled unarmed to the Native town of Wyalusing on the Susquehanna, writing that "a concern arose to spend some time with the Indians, that I might feel and understand their life and the spirit they live in." *The Journal of John Woolman*, ch. VIII (1774). After hearing Woolman pray, the Munsee leader Papunehang said, "I love to feel where words come from." *Id*.

The oldest of these ties runs through Florida itself. William Bartram, a Philadelphia naturalist raised among Friends, traveled through Florida in the 1760s and 1770s and lived peaceably among the Seminole people, who gave him the name Puc-Puggy, the Flower Hunter. W. Bartram, *Travels* (1791). Friends have tried to carry this friendship forward ever since, and have not always succeeded. Under President Grant's Peace Policy of 1869, Friends administered federal Indian agencies in an era whose record includes grave wrongs, among them boarding schools, that Friends have since publicly acknowledged and worked to repair. Quaker witness

continued in the twentieth century. The American Friends Service Committee, co-recipient of the 1947 Nobel Peace Prize, documented and defended Northwest tribal fishing rights in its 1970 study *Uncommon Controversy*, and the Friends Committee on National Legislation has maintained a standing Native American advocacy program in Washington since 1976.

SEYM stands in that tradition here, in the practice Friends call accompaniment: walking alongside another community in its struggle without taking over or substituting one's own voice. SEYM does not speak for the Miccosukee Tribe. It speaks alongside the Tribe, at the Tribe's welcome, in support of rights the Tribe asserts for itself.

***D. A Shared Way of Deciding: Listen First, Then Act.***

The Miccosukee Tribe governs itself through a General Council of all adult members, a form the Tribe describes as blending traditional government with modern management. The Tribe's constitution, certified by the Secretary of the Interior on January 11, 1962, obligates the Tribe to protect its natural resources, and the United States Senate has recognized that "[t]he Miccosukee tribe has consistently worked to preserve the everglades ecosystem." S. Rep. No. 105-361 (1998). The Tribe has carried that duty into the courts for decades, including to the Supreme Court in its long effort to protect Everglades water quality. *See S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95 (2004).

Friends decide in a kindred spirit. Quaker meetings do not vote. They wait, listen, and labor together until the community finds what Friends call the sense of the meeting. A sense of the meeting emerges during a Meeting for Worship with a Concern for Business. During Meetings for Worship with a Concern for Business, anyone present may speak, without regard to age or rank. And hard questions/decisions go first to a threshing session, where every concern can be

voiced before any decision is attempted. If clarity does not come, the matter is laid over. Decisions are not forced before the community is ready.

The parallel between these traditions is not exact, and each speaks for itself. But both rest on the same convictions: that no single person or office holds all the relevant knowledge; that those who must live with a decision deserve a voice in making it; and that a community that listens before it acts makes better decisions and fewer irreversible mistakes. Those are also the convictions Congress wrote into NEPA. The public comment period is, in a real sense, the nation's threshing session. What happened at the TNT Site in 2025 was its opposite.

## III. NEPA PUTS THOSE SHARED VALUES INTO LAW, AND THEY CANNOT BE RESTORED AFTER THE FACT.

NEPA requires federal agencies to take a hard look at the environmental consequences of major federal actions before taking them, and to do so in public. 42 U.S.C. § 4332(2)(C). The Supreme Court has explained that this process "ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Review must come at the front end, because an agency's duty is to take the hard look "before" it acts, while its choices remain open. *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1989). And the duty runs with federal involvement in a project, including federal funding and approval. *See Dep't of Transportation v. Public Citizen*, 541 U.S. 752, 763 (2004); 5 U.S.C. §§ 551 et seq.

The parties will brief the relevant law, and SEYM will not repeat their arguments. Amicus adds one point from its own experience. Friends have learned, over three and a half centuries of communal practice, what happens when process is sacrificed to speed: decisions made in haste must be revisited later at greater cost, and the harm done in the meantime often cannot be undone.

That is not obstruction. It is wisdom earned the hard way, and it is the same wisdom Congress placed in NEPA. Here, the Amended and Supplemental Complaint alleges that there was no assessment, no impact statement, no comment period, and no consultation, and that while the court of appeals was told no federal funding was in play, a funding application had in fact been submitted. [DE 162 at ¶¶11,14]. If those allegations are borne out, the public was not merely bypassed; it was misinformed. The procedural rights NEPA guarantees were lost at the only moment they could have mattered, before the land was paved.

## IV. THE RECORD SHOWS THE VERY HARMS THAT REVIEW EXISTS TO CATCH BEFORE THEY HAPPEN.

### *A. Harms This Court Has Already Found.*

This is not a case about speculative injury. After hearing four days of evidence, this Court found that the facility's industrial lighting brightened the night sky at least twenty to thirty miles away. [DE 131 at 46]. One witness put it plainly: "it looks like we have a sports stadium in our backyard now." *Id*. at 38. This is a Preserve that in 2016 became the first United States national preserve accredited as an International Dark Sky Place. The stars matter here. The orientation of the stars is an element of Miccosukee religious practice, and the Preserve's dark skies are part of why people travel from across the country to be in it. The Court's findings rest on the record's own words and numbers: empirical data showing that the project "meaningfully increases the brightness for miles around the site," and testimony describing the "pitch black darkness with beautiful [views of the] Milky Way" that the certification protects. [DE 131 at p72 & n.25].

This Court further found that roughly 800,000 square feet of land had been paved, with runoff likely to flow toward tribal lands and the waters that feed South Florida's drinking supply, including the Miccosukee Reserved Area, where eighty percent of the Tribe's members live a few miles downstream, and that the Florida panther, of which an estimated 120 to 230 adults remain

in the wild, lost some 2,000 acres of habitat to the facility's construction and lighting, because panthers will not come near a large artificial light source. [DE 131 at pp46, 52, 67]; *see also id*. at 71. The Court rejected the suggestion that panthers no longer use this area, noting that panthers were detected within four miles of the TNT Site 1,164 times between 1982 and 2014, and that witnesses captured recent panther presence on trail cameras. [DE 131 at p72 n.34]. The Tribe's villages sit close by; the record reflects traditional villages within a few miles of the site, the nearest within about 1,000 feet, along with ceremonial grounds used for the Green Corn Dance and the Miccosukee Indian School downstream. These are the homes, waters, sacred places, and subsistence rights that Congress promised to protect in 1974. 16 U.S.C. § 698j. Every one of these harms is the kind of consequence a NEPA process is designed to surface, weigh, and avoid before construction begins.

The Court also heard that Tribal members lost access to the trails they use to enter the Preserve for hunting, and that members had long gathered plants beside the TNT Site for ceremonial and medicinal purposes, a practice the camp's activity now erodes. [DE 131 at pp72-73]. Courts have recognized that this kind of harm to a people's sacred and cultural life is irreparable. See *Oglala Sioux Tribe v. Nuclear Regulatory Commission*, 896 F.3d 520, 536 (D.C. Cir. 2018); *Hualapai Indian Tribe v. Haaland*, 755 F. Supp. 3d 1165, 1197 (D. Ariz. 2024); [DE 131 at p73]. A church would not accept losing the ground where it worships, and neither should the Tribe.

***B. Demobilization Without Review Repeats the Same Mistake.***

The complaint alleges that the facility has now been emptied and is being dismantled in the same manner it was built: fast, unpermitted, and unexamined. Heavy equipment kicks up clouds of dust with no visible containment. Debris piles sit on the site while fill is spread and

moved. Razor wire, concrete footings, and some twenty acres of pavement remain, and removing them will mean excavation, erosion, and runoff into surrounding wetlands. [DE 162 at ¶¶ 16-18]. Meanwhile, the state emergency declaration was renewed in July 2026, and officials have said detention operations could resume on request. [DE 162 at ¶¶15, 19].

A site inside a national preserve should not swing between a detention camp and a demolition field without anyone once asking, in public, what the land can bear. Whether the machines are building or tearing down, the dust settles on the same wetlands, the lights and noise reach the same panthers and the same villages, and the runoff flows toward the same drinking water. Review is not less necessary at the end of this project than it was at the beginning.

***C. The Endangered Species Act Claims Rest on the Same Principle.***

The Amended and Supplemental Complaint adds claims under the ESA, which requires federal agencies to consult with the U.S. Fish and Wildlife Service before taking actions that may affect endangered species. 16 U.S.C. § 1536(a)(2); [DE 162, Counts V-VI]. The Supreme Court has described the ESA as a policy of "institutionalized caution." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 194 (1978). That is the same principle that runs through this whole case, and through the traditions described above: look before you act, ask before you build, and treat what cannot be replaced with care. The Florida panther and the Florida bonneted bat cannot file comments. Consultation is how the law listens on their behalf. SEYM respectfully urges the Court to give the ESA claims the same careful attention as the NEPA claims; they protect the same living world through the same discipline of caution.

## CONCLUSION

SEYM respectfully urges this Court to sustain the Plaintiffs' and the Tribe's claims and to hold that the law required environmental review, public participation, and consultation before the TNT Site was transformed, and requires them still as the site is unmade.

SEYM writes not only as an advocate for a legal conclusion but as a community of faith bearing witness to what was lost when process was cast aside. The Miccosukee Tribe, whose villages and sacred places are woven into this Preserve, was given no voice. The people of South Florida, who drink from the aquifer beneath the Preserve and find solace within it, were given no voice. The students of the Miccosukee Indian School, downstream of the site, were never the subject of any study. The panther in the cypress, the wading bird in the marsh, and the fish and game on which the Tribe depends had no advocate in a process that never occurred. NEPA and the ESA exist so that all of them are heard before the die is cast. This Court has the power to enforce that promise, and history, on this very ground, shows what that promise can save.

In 1947, dedicating Everglades National Park, President Truman spoke of laying aside the problems of the time for "a project whose great value lies in the enrichment of the human spirit," and said: "We have permanently safeguarded an irreplaceable primitive area. We have assembled to dedicate to the use of all people for all time, the Everglades National Park." This Court closed its preliminary injunction order with those words. [DE 131 at p79]. Friends, the Tribe, and the conservation groups before this Court ask only that the promise be kept.

Respectfully submitted,

Dated: August 19, 2026
Miami, Florida

**DUNTON GALLAGHER LEGAL PLLC**

*/s/ Clyde Dunton-Gallagher*

**CLYDE S. DUNTON-GALLAGHER, ESQ.**
Florida Bar No. 122012
3390 Mary Street, Suite 116

Coconut Grove, Florida 33133
Tel: +1 424 259 3334
csdg@pm.me
csdg_service@pm.me
clyde@tutanota.com
*Counsel for Amicus Curiae and Member of the Miami Friends Meeting of the Religious Society of Friends*