**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 25-cv-22896-KMW**

FRIENDS OF THE EVERGLADES, INC., a Florida 501(c)(3) not-for-profit corporation, and CENTER FOR BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit organization,

Plaintiffs,

vs.

MARKWAYNE MULLIN, in his official capacity as Secretary of the UNITED STATES DEPARTMENT OF HOMELAND SECURITY; DAVID J. VENTURELLA,, in his official capacity as Acting Director of the UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; CAMERON HAMILTON, in his official capacity as Administrator for the FEDERAL EMERGENCY MANAGEMENT AGENCY; DOUG BURGUM, in his official capacity as Secretary of the Interior; BRIAN NESVIK, in his official capacity as Director of the U.S. Fish and Wildlife Service; JARED W. PERDUE, in his official capacity as Executive Director of the Florida Division of Emergency Management; and MIAMI-DADE COUNTY, a political subdivision of the State of Florida,[1]

Defendants.

**SECOND AMENDED AND SUPPLEMENTAL COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

[1] Pursuant to Federal Rule of Civil Procedure 25(d), David J. Venturella is substituted for Todd Lyons for U.S. Immigration and Customs Enforcement; Cameron Hamilton is substituted for Robert J. Fenton for the Federal Emergency Management Agency; and Jared W. Perdue is substituted for Kevin Guthrie for the Florida Division of Emergency Management,

## INTRODUCTION

1. This is an action for declaratory, injunctive and other relief under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*; the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*; the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.*, and applicable provisions of Florida law, to prevent, mitigate, and remediate environmental harm caused by the Defendants in and around the Dade-Collier Training and Transition Airport ("TNT Site") as a result of their joint project to build and operate a mass immigration detention center there, and for a declaration that Defendants' actions violate federal law.

2. The TNT Site, which previously operated as a limited-use training facility, is owned by defendant Miami-Dade County. It is located within the Greater Everglades, the Big Cypress National Preserve, and the Big Cypress Area, an ecologically sensitive area that serves as habitat for endangered and threatened species like the Florida panther, Florida bonneted bat, Everglade Snail kite, and numerous other species.

3. At the request of Defendant Department of Homeland Security ("DHS"), Defendant Florida Division of Emergency Management (the "Division"), through its Executive Director, entered into an agreement with Defendants DHS, Immigration and Customs Enforcement ("ICE"), and the Federal Emergency Management Agency ("FEMA") to transform the TNT Site into a federally funded and controlled immigration detention and deportation center. On or about June 23, 2025, the Division commandeered the TNT Site from Miami-Dade County for this purpose, relying on a state declaration of an immigration emergency. The State declaration of an immigration emergency was recently renewed on July 20, 2026. State of Florida, Executive Order 26-145.

4. Defendants' agreement, as well as the authorization, construction, operation, demobilization, and federal funding of the mass immigrant detention center at the TNT Site, were undertaken without conducting any environmental reviews required under NEPA, without public notice or comment, without lawfully consulting with the U.S. Fish and Wildlife Service ("FWS") as required under the ESA, and without complying with other federal statutes and state or local land-use laws. Additionally, the Division, which is statutorily charged with preparedness, mitigation, response, and recovery of emergencies and disasters, lacks any lawful authority to construct and operate a detention center to house immigrants.

5. This lawsuit was first filed on June 27, 2025. Along with the Complaint, Plaintiffs filed an expedited motion for a temporary restraining order and preliminary injunctive relief to halt the project until the Defendants complied with state and federal laws, including by considering the environmental impacts of the proposed action and alternatives. DE 1 & 5.

6. On or about July 1, 2025, the detention center, which Defendants dubbed "Alligator Alcatraz," became operational before Plaintiffs' motion for preliminary relief could be heard. It was built to hold up to 3,000 detained persons, with a staff "village" housing up to 1,000 workers around-the-clock. Miles of new fencing, high-intensity industrial lighting, diesel generators, staff housing facilities, large detention tents and cages, and other facilities were quickly positioned on site.

7. On July 11, 2025, Plaintiffs notified Defendants that they were violating additional environmental laws, including the Endangered Species Act.

8. On July 30, 2025, the Court granted a motion by the Miccosukee Tribe of Indians to intervene as a Plaintiff to protect tribal interests. DE 73. The Miccosukee Tribe joined Plaintiffs' NEPA claim and motions for emergency relief.

9. On August 6, 2025, the Court began an evidentiary hearing on Plaintiffs' motions for a temporary restraining order and preliminary injunction. Over the course of the four-day hearing, Plaintiffs and the Miccosukee Tribe presented extensive evidence on the likelihood of success on the merits of their NEPA claim and of irreparable harm to the environment and tribal interests. On August 7, 2025, the Court granted in part a temporary restraining order, prohibiting further construction pending a decision on the preliminary injunction. DE 104. On August 21, 2025, the Court entered a preliminary injunction ordering a wind-down of the facility's environmentally harmful operations over a period of sixty days until Defendants complied with NEPA. DE 131.

10. Defendants filed a notice of interlocutory appeal and sought a stay pending appeal. On September 4, 2025, a divided panel of the Court of Appeals granted a stay. ECF No. 42-1. The panel also granted Florida's request to stay the entirety of this litigation pending the interlocutory appeal. As a result, Plaintiffs could not advance their claims in this case.

11. In granting the stay of the preliminary injunction and the case, the panel majority relied repeatedly on Defendants' representation that Florida had not even applied for federal funding to conclude that there was no proposed federal agency action that would trigger compliance with NEPA. However, unbeknownst to Plaintiffs or the Court, the Division had in fact formally submitted a funding application to FEMA on August 7, 2025. Documents obtained pursuant to Friends' separate and later-filed public records litigation further showed that the Division had prepared an initial application on June 24, 2025, which was sent to FEMA no later than July 4, 2025.

12. Upon opening, the facility operated twenty-four hours a day, seven days a week. In addition to miles of fencing, diesel generators, industrial lighting, and facility structures, more than

20 acres of new pavement were added to the Site without a functional storm water management and treatment system; contractors stored and trucked human waste and wastewater off the Site; water-related infrastructure, including culverts, and at least one well, were added and/or utilized; jet fuel was transported to the Site for out-going passenger flights; pest control treatments were applied; fill material was brought on site, and heavy vehicular traffic entered, parked, and left the Site daily. To Plaintiff's knowledge, although some or all of these activities would have required permits, none were obtained.

13. On April 21, 2026, a divided merits panel of the Court of Appeals vacated the preliminary injunction and remanded the matter for further proceedings. ECF No. 139. The time to seek rehearing expired 45 days later, on June 5, 2026, Fed. R. App. P. 40(d)(1), with the mandate due to issue seven days after that, on June 12, 2026, Fed. R. App. P. 41(b), 39(b).[2]

14. On or about May 15, 2026, the Division reportedly received its first disbursement of federal funds for the facility. This initial disbursement is only a fraction of the grant funding FEMA awarded to the Division, and more disbursements are expected.

15. In May and June 2026, Defendants made several conflicting statements about the status of the facility in response to reports that it would be closing. After initial reporting, then-FDEM Executive Director Kevin Guthrie stated that any decision to close the facility would be made by DHS and that no such decision had been made. Defendant ICE subsequently stated that detainees at the facility were to be relocated due to hurricane season. On June 25, 2026, Florida Governor Ron DeSantis announced that the Site no longer housed any detainees and was being demobilized, but said that if DHS asked Florida to receive another 1,000 detainees, the State could

[2] For unexplained reasons, the Court of Appeals ultimately issued the mandate on July 8, 2026. ECF No. 150.

resume detention operations there. See *6/25/26 Governor's Press Conference*, The Florida Channel (June 25, 2026), https://thefloridachannel.org/videos/6-25-26-governors-press-conference/.

16. As of July 14, 2026, there was evidence of further environmental harm caused by past and ongoing demobilization of the facility and related activities. Large trucks and machinery have been observed moving on and off site. Heavy equipment has been observed on paved areas emitting clouds of particulate matter, with no visible attempt at mitigation or containment, raising urgent concerns about further unpermitted and undocumented physical and chemical alterations of this ecologically sensitive site. Spreading and/or removal of road base and fill material create large clouds of particulate matter into the air and settling of this unknown material in surrounding waters, land and vegetation is unavoidable. As of August 19, 2026, large debris piles remain on site with loose aggregate material appearing to be spread, piled, and moved around the Site. To Plaintiffs' knowledge, these activities and impacts are ongoing as of the date of this Second Amended and Supplemental Complaint and will continue.

17. Heavy machinery, noise, and intense human activity also continue to pose threats to the Florida panther by causing panthers to avoid essential primary zone and breeding habitat that they previously used and that is needed for their survival and recovery. These disruptive activities and ongoing degradation of the Site and surrounding area also negatively impact other federally protected species.

18. Fencing surrounding the Site remains, including razor-wire and barbed-wire fencing, and electrical equipment anchored to cement pads for the operation of automatic gates. Large concrete footers or foundations used as the structural base for signage, housing units, sanitation systems, fencing, and utility equipment also appear to remain. Removing these

structures requires excavation and associated soil disturbance, erosion, and runoff into surrounding wetlands, all of which can cause habitat degradation and/or disturbance if not properly mitigated and contained.

19. On July 20, 2026, the Florida Governor renewed the immigration emergency declaration on which the state Defendants relied to claim legal authority to commandeer the Site for immigration detention.

20. Plaintiffs seek injunctive, declaratory, and other relief to prevent, mitigate, and remediate environmental harms from Defendants' construction, operation, demobilization, and other activities at the TNT Site unless and until Defendants comply with NEPA, the ESA, and related state, federal and local environmental laws and regulations.

## **JURISDICTION AND VENUE**

21. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 701–706 (APA), 42 U.S.C. § 4321 *et seq.* (NEPA), 16 U.S.C. § 1540(g) (ESA), and supplemental jurisdiction under 28 U.S.C. § 1367 over related state-law claims.

22. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. §§ 1391(b) & 1391(e)(1)(b) because Plaintiff Friends of the Everglades resides in this district, a substantial part of the events or omissions giving rise to the claims occurred in this district, immigration detention at the Site is overseen by Defendant ICE's Miami Office, which is in this district, and because the TNT Site is owned by defendant Miami-Dade County, which is located in this district. Venue is also proper in this district pursuant to 16 U.S.C. § 1540(g)(3)(A) because a substantial part of the events or omissions giving rise to the violation occurred in this district and the FWS Ecological Services office responsible for handling ESA compliance in this matter is located in this district.

## PARTIES

23. Plaintiff, Friends of the Everglades, Inc., is a Florida non-profit organization with members and directors in Miami-Dade County, Florida. Its mission includes protecting and restoring the Greater Everglades ecosystem, including the Big Cypress National Preserve and Everglades National Park.

24. Friends' members regularly visit and use the Big Cypress National Preserve for recreational, aesthetic, scientific, and spiritual purposes, and intend to continue using the area in this manner.

25. Friends was founded in 1969 by Marjory Stoneman Douglas, a renowned journalist and environmental activist, to protect the Everglades from development and degradation. In a striking echo, the organization's founding focus was on stopping the construction of the proposed "Everglades Jetport" at the precise spot where the TNT is located. Since that time Friends' mission has expanded to include preserving, protecting, and restoring the entire Everglades ecosystem. Just as Friends did in the 1960s to stop the ill-conceived Jetport, Friends now finds itself in a familiar fight—resisting renewed threats to the Everglades posed by construction, operation, and funding of a mass immigration detention and deportation facility at the TNT Site.

26. Ironically, the 1968 proposal to build the "Everglades Jetport"—now the TNT Site—contributed to the January 1, 1970 adoption of NEPA, and its requirement to evaluate reasonably anticipated environmental impacts that could result from federal action ***before*** acting. After construction on the Everglades Jetport commenced, and the environmental outcry—spearheaded by Friends' founder Marjory Stoneman Douglas—ensued, the Department of Interior commissioned a 1969 report led by ecologist Luna Leopold to assess the ecological impacts of the proposal. The report became one of the first *de facto* environmental impact statements assessing

impacts of federal action, and illustrated the utility of evaluating environmental impacts ***before*** acting. Nathaniel "Nat" Reed, who served as then Florida Governor Claude Kirk's senior advisor, used the Leopold report to persuade the Governor, who had initially supported the Jetport plan, to reverse course and oppose the project—a position later adopted by President Richard Nixon. The Jetport plan was ultimately scuttled, and only the runway—which is expressly limited to use for aviation training—remains. The Nathaniel P. Reed Visitor Center at Big Cypress National Preserve now sits nearby the TNT Site.

27. Friends' member and Executive Director Eve Samples has personally visited the Site and is familiar with the area. Friends' members, including Jessica Namath, enjoy recreating in and around the TNT site, the Everglades, and the Big Cypress area, including in panther habitat. They enjoy hiking, camping, fishing, kayaking, canoeing, birdwatching, and viewing and photographing nature and wildlife. Since the proposal to build a mass detention facility in the Big Cypress National Preserve first surfaced, an astonishing 18,000 supporters of Friends voiced their opposition to the plan. That opposition has grown to more than 43,000 supporters, springing from a desire to preserve and protect the Everglades, and the Big Cypress National Preserve specifically, among Friends' members who use, fish, recreate, observe wildlife or otherwise enjoy the area.

28. Plaintiff Center for Biological Diversity (the "Center") is a national, nonprofit conservation organization that works through science, law, and policy to protect all species—great and small—hovering on the brink of extinction. The Center has offices throughout the United States, including in Florida, and more than 101,611 active members across the country.

29. The Center's members and staff derive ecological, recreational, aesthetic, educational, scientific, professional, and other benefits from visiting Big Cypress National Preserve and observing the ecosystems and species who live there. The Center's members and

staff live near or regularly visit Big Cypress National Preserve and the Greater Everglades Ecosystem.

30. For example, one Center member, Tierra Curry, is a scientist committed to protecting intact ecosystems and preventing biodiversity loss. She plans to visit Big Cypress National Preserve to hike, paddle, and observe wildlife this fall 2026. Another Center member, Amber Crooks, is a conservationist who regularly visits Big Cypress National Preserve to enjoy the quiet peace of nature, to observe wildlife like red-cockaded woodpecker, and to appreciate remarkably dark night skies—among the darkest east of the Mississippi.

31. Friends of the Everglades' and the Center's members are being injured by Defendants' unlawful actions, which threaten the integrity of Big Cypress National Preserve's waters and pristine night skies, the wellbeing of the plants and wildlife living there, including endangered and threatened species, and thus the Plaintiffs' interests in them. Friends and the Center are also injured by being deprived of critical information and a public process under NEPA to analyze and address significant environmental impacts associated with the detention center. Likewise, Friends and the Center are injured by being deprived of a lawful ESA consultation process that would result in measures, terms, and conditions to conserve endangered and threatened species; ensure the survival and recovery of endangered and threatened species is not jeopardized; and ensure designated critical habitat is not destroyed or adversely modified.

32. The injuries described are actual, concrete injuries presently suffered by Plaintiffs and their members, and they will continue to occur unless this Court grants prompt relief. The relief sought herein would redress those harms. Plaintiffs have no other adequate remedy at law.

33. Defendant Jared. W. Perdue is the Executive Director of the Florida Division of Emergency Management and is sued solely in his official capacity.

34. Defendants Secretary Markwayne Mullin, in his official capacity as Secretary of the United States Department of Homeland Security ("USDHS"), Director David J. Venturella, in his official capacity as Acting Director of the United States Immigration and Customs Enforcement ("ICE") agency, are federal officials responsible for immigration enforcement and detention, including over the Miami ICE District Office that oversees and staffs operations related to the detention center at the TNT site. Along with Defendant Mullin/DHS, Defendant Cameron Hamilton, in his official capacity as Administrator for the Federal Emergency Management Agency, is a federal official responsible for federal funding of the immigration detention center at the TNT site.

35. Defendants Doug Burgum, in his official capacity as the Secretary of the Interior, and Brian Nesvik, in his official capacity as Director of the U.S. Fish and Wildlife Service, are responsible for lawfully administering the ESA.

36. Defendant Miami-Dade County (the "County") owns the TNT Site and, on information and belief, has acquiesced in the other Defendants' transformation of the TNT Site into a mass detention center even though County rules do not permit use of the TNT Site for this purpose.

## COMMON ALLEGATIONS

### A. The History and Environmental Significance of the TNT Site.

37. The Dade-Collier Training and Transition Airport is a pilot training facility located within environmentally sensitive land owned by Miami-Dade County that straddles Miami-Dade and Collier counties. The Site is within the footprint of Big Cypress National Preserve, and within the Big Cypress Area as defined in Fla. Stat. § 380.055. At over 23,000 acres, the TNT Site is the

largest parcel of land within the Big Cypress National Preserve not owned by the federal government.

38. The Big Cypress National Preserve was established in 1974 and has been expanded since its creation. *see* Big Cypress National Preserve Act, Pub. L. No. 93-440, as amended by Pub. L. No. 100-301 (the Big Cypress National Preserve Addition Act of 1988); 16 U.S.C. § 698f. The Preserve was created "in order to assure the preservation, conservation and protection of the natural, scenic, hydrologic, floral and faunal and recreational values in the Big Cypress Watershed." Pub. L. No. 93-440(a). The Preserve is managed as a unit of the National Park System "in a manner which will assure their natural and ecological integrity in perpetuity' in accordance with the provisions of this Act and with the provisions of the Act of August 25, 1916 (39 Stat. 535; 16 U.S.C. 1-4), as amended and supplemented." Pub. L. No. 100-301 § 4(a), Big Cypress National Preserve Addition Act of 1988.

39. The Big Cypress National Preserve area where the TNT Site is located is known for its wetlands, critical wildlife habitat, and protected species, including the endangered Everglade snail kite, Florida bonneted bat, and Florida panther. The Site is within an environmentally sensitive freshwater wetland ecosystem of ecological significance for wildlife habitat. The Site is important for drinking water supply and Everglades water quality.

40. The Big Cypress Preserve is home to various listed threatened or endangered species including the Florida bonneted bat, Florida panther, Everglade snail kite, and others, as documented in the Big Cypress National Preserve website. *See*, https://www.nps.gov/bicy/learn/nature/animals.htm, last visited June 1, 2026. According the FWS's Information for Planning and Consultation System, the following species could potentially be affected by activities at the TNT Site:

| **Table 1: Species Identified by the Information for Planning and Consultation System** | | |
|---|---|---|
| **Common Name** | **Scientifi+c Name** | **Status** |
| Florida panther | *Puma concolor coryi* | Endangered |
| Florida bonneted bat | *Eumops floridanus* | Endangered |
| Eastern black rail | *Laterallus jamaicensis jamaicensis* | Threatened |
| Everglade snail kite | *Rostramus sociabilis plumbeus* | Endangered |
| Red-cockaded woodpecker | *Dryobates borealis* | Threatened |
| Eastern indigo snake | *Drymarchon couperi* | Threatened |
| Gulf sturgeon | *Acipenser oxyrinchus desotoi* | Threatened |
| Monarch butterfly | *Danaus plexippus* | Proposed Threatened |
| Beach jacquemontia | *Jacquemontia reclinata* | Endangered |
| Blodgett's Silverbush | *Argythamnia blodgetti* | Threatened |
| Cape Sable thoroughwort | *Chromolaena frustrata* | Endangered |
| Carter's mustard | *Warea carteri* | Endangered |
| Carter's small-flowered flax | *Linum carteri carteri* | Endangered |
| Crenulate lead-plant | *Amorpha crenulate* | Endangered |
| Deltoid spurge | *Chamaesyce deltoidei deltoidei* | Endangered |
| Everglades bully | *Sideroxylon reclinatum austrofloridense* | Threatened |
| Florida brickell-bush | *Brickellia mosieri* | Endangered |
| Florida pineland crabgrass | *Digitaria pauciflorida* | Threatened |
| Florida prairie-clover | *Dalea carthagenensis floridana* | Endangered |
| Florida semaphore cactus | *Consolea coralicola* | Endangered |
| Garber's spurge | *Chamaesyce garberi* | Threatened |
| Pineland sandmat | *Chamaesyce deltoidei pinetorum* | Threatened |
| Sand flax | *Linum Arenicola* | Endangered |
| Small's milkpea | *Galactia smallii* | Endangered |
| Tiny polygala | *Polygala smallii* | Endangered |

41. The TNT Site also overlaps with or is directly adjacent to critical habitat for the federally endangered Florida bonneted bat and endangered Everglade snail kite, and it overlaps with proposed critical habitat for endangered Florida prairie-clover, threatened Florida pineland crabgrass, and threatened Everglades bully, a perennial shrub.




Map credit: Curt Bradley, Center for Biological Diversity
(based on maps of the TNT site from public records and critical habitat shapefiles from FWS's Environmental Conservation Online System)

42. Big Cypress and the TNT site are within the endangered Florida panther's breeding habitat and within an area designed "primary zone" by experts because it is important to the long-term viability and persistence of panthers in the wild and must be maintained functionally and in total areal extent. Florida panthers have been geolocated on the TNT Site on many occasions, including around the runway area. The maps below show Florida panthers geolocated on the TNT Site:




Map Credit: Randy Kautz




Map credit: Jane Cooke, U.S. Fish & Wildlife Service

43. Endangered Florida bonneted bats have also been documented in the Big Cypress National Preserve. *See* 78 Fed. Reg. 61004, 61008, 61011 (Oct. 2, 2013). Their federally designated critical habitat overlaps with the Site, *see* 89 Fed. Reg. 16624, 16675–76 (Mar. 7, 2024); *supra* ¶ 42 (critical habitat map), and acoustic monitoring at locations ranging from 8–20 miles away from the Site has documented Florida bonneted bat presence. The distance from these monitoring locations to the Site is well within the distance that a Florida bonneted bat can fly to forage in a single night.

44. Endangered Everglade snail kites also live in the Big Cypress basin, where they hunt for freshwater apple snails. Their critical habitat is adjacent to the Site. *Supra* ¶ 42 (critical habitat map).

45. Threatened crested caracaras also live within Big Cypress, and the Site is within FWS's consultation area for the species.

46. Big Cypress and the Site are within the occupied range of the threatened red-cockaded woodpecker, which makes its home in mature pine trees. There have been recent observations of the red-cockaded woodpecker 5–10 miles away from the TNT Site.

47. Big Cypress and the Site are also within the occupied range of the threatened eastern indigo snake, which has recorded observations in Big Cypress, despite its elusive nature.

48. Threatened eastern black rails also live within Big Cypress and have been detected around the Site.

49. Proposed-threatened monarch butterflies are also extant in Big Cypress, and larval hostplants like fewflower milkweed are found within the preserve.

50. Imperiled plants are also present within Big Cypress, and the threatened Everglades bully, threatened Florida pineland crabgrass, and endangered Florida prairie clover have proposed critical habitat under the ESA that overlaps with the Site. *Supra* ¶ 42 (critical habitat map).

51. In the Big Cypress Conservation Act of 1973, Fla. Stat. § 380.055, the Florida Legislature determined that "the Big Cypress Area is an area containing and having a significant impact upon environmental and natural resources of regional and statewide importance and that designation of the area as an area of critical state concern is desirable and necessary to accomplish the purposes of 'The Florida Environmental Land and Water Management Act of 1972' and to implement s. 7, Art. II of the State Constitution." Fla. Stat. § 380.055(2).

52. The TNT Site is within the Big Cypress National Preserve as illustrated below:




53. The TNT Site's location within the Big Cypress National Preserve is further illustrated by the below GIS map:




54. The TNT Site is also proximate to Everglades National Park, and part of the historic Everglades. Since the passage of the Comprehensive Everglades Restoration Plan ("CERP") in 2000, the federal government and the State of Florida have jointly committed to one of the most ambitious ecosystem restoration efforts in the world. Authorized by Section 601 of the Water Resources Development Act of 2000 (WRDA 2000), Pub. L. No. 106-541, 114 Stat. 2572, CERP provides a framework for restoring, preserving, and protecting the South Florida ecosystem, including the Everglades, over multiple decades. The Plan encompasses more than 60 projects designed to improve water quality, restore hydrologic flow, and protect critical habitat.

55. Under CERP, the federal government, through the U.S. Army Corps and Engineers ("USACE") and the Department of the Interior ("DOI"), fund half the costs of restoration. The State of Florida contributes the other half, with each partner committing billions of dollars to

implementation. As of 2024, total appropriations for Everglades restoration from both federal and state sources exceed $20 billion—much of which has been allocated since 2019—reflecting a sustained, bipartisan commitment to safeguarding the ecological integrity of the Everglades and adjacent areas like Big Cypress National Preserve.

56. These investments are reinforced by successive authorizations and appropriations through subsequent federal legislation, including the Water Resources Development Acts of 2007, 2014, 2016, 2018, 2020, 2022, and 2024 each of which reauthorized and expanded CERP components. The State of Florida has likewise demonstrated its ongoing commitment to Everglades restoration through substantial state funding, including over $3.5 billion committed between 2019 and 2024 alone under Florida's "Everglades Restoration Strategy." These efforts support not only environmental protection, but also flood control, drinking water supply, and biodiversity, and endangered species habitat preservation and conservation across South Florida.

57. One recent component of CERP is the Western Everglades Restoration Plan ("WERP"), which will use a series of active and passive water management features, water quality features, and alterations to existing canals and levees with a goal of improving the quantity, quality, timing and distribution of water in the Western Everglades in the effort to re-establish ecological connectivity, reduce the severity and frequency of wildfires, and restore low nutrient conditions. The TNT sits within the WERP footprint as illustrated below:


WERP RECOMMENDED PLAN
LEGEND
Seminole Tribe of Florida
Miccosukee Tribe of Indians
South Florida Water Management District Feeder Canal Basin Water Quality Program
Existing Culverts
Existing Structures
Existing Canals
Existing Roads
WERP FEATURES
(not to scale; not representative of final placement)
Water Treatment
Treated Water
Spreader Canal
Embankment
Canal Backfill
Canal Backfill/ Degrade Levee
Canal Modifications
Plug
Plug with Levee Tie-In
Pump
Inline Weir
Gated Culvert
Culvert
Bi-Directional Control Structure
Ditch Backfill
McCormack's Landing Restoration
Vegetation Restoration
LOCATION
~1,200 square mile study area
LAKE OKEECHOBEE
REGION 1
REGION 2
REGION 3
REGION 4
L1
L2W
L2
C-139 Basin
Miami Canal
Deer Fence Canal
State C-139 FEB
STA 5/6
L3
West Feeder Basin
Lard Can Canal
North Feeder Basin
North Feeder STA
PC17A
C-139 Annex
S. Boundary Canal
North Feeder Canal
Sam Jones/ Abiaki Prairie Restoration Project
L3/WCA3A
L28
Wingate Mill Canal
West Weir
Ranch Road
West Boundary Road
West Feeder Canal
S190
L28N
WCA 3A
S140
I-75
The Triangle
L28i
Big Cypress National Preserve
L28i EXT.
L28 Tieback
11-Mile Road
S344
WCA 3A
L28S
US 41
Jetport
S343A
S343B
S12A
Loop Road
NOTE: FEATURES NOT TO SCALE
0 5 10
APPROXIMATE SCALE (MILES)
WESTERN EVERGLADES RESTORATION PROJECT (WERP)
COMPREHENSIVE EVERGLADES RESTORATION PLAN PROJECT | FOR ADDITIONAL INFORMATION: WWW.SAJ.USACE.ARMY.MIL/WERP/
April 2024

58. The TNT site, which is within and/or borders the Big Cypress National Preserve, lies within the broader Everglades ecosystem restoration footprint, and any development at that site that disrupts hydrologic connectivity or degrades environmental conditions threatens to undermine the very objectives that these federal and state investments were intended to achieve.

**B. The Federal Government and State Agree to Open and Operate an Immigration Detention Center at the TNT Site.**

59. In June 2025, DHS and/or ICE entered into an agreement with the Division whereby DHS authorized the Division to operate a mass ICE detention facility at the TNT Site, which the Division dubbed "Alligator Alcatraz."

60. On Friday, June 20, 2025, DHS General Counsel James Percival "confirm[ed] DHS' interest in working with [Florida] to detain aliens under 287g in facilities provided by Florida." DHS committed that if Florida moved forward, DHS would "work out a method of partial reimbursement." David Dewhirst, Chief of Staff for Florida's Attorney General, responded: "Received and confirmed. I've copied [the Division] Director Guthrie here. Thank you. Executive Director Guthrie, please see the email below from DHS leadership. I know you're eager to immediately get to work." Defendants never disclosed this email to Plaintiffs or the district court. It became known to Plaintiffs only after the Division produced it in response to a public records request by a state legislator.

61. With this federal decision, approval, and commitment in hand, on Monday, June 23, 2025, the Division commandeered the Dade-Collier Training and Transition Airport site pursuant to a 2023 state declaration of an immigration emergency directing state agencies to enter into any and all agreements with federal agencies necessary to meet the emergency.

62. At the time, the TNT site was a quiet, limited use pilot-training facility with approximately four employees, primarily devoted to mowing the grass. Other than the runway,

the TNT site was accessible to members of the public who accessed the area for recreational and other purposes.

63. On June 23, 2025, then DHS Secretary Kristi Noem issued a social media post in which she stated: "We are working at turbo speed to . . . to deliver on the American people's mandate for mass deportations . . . We will expand facilities and bed space in just days, thanks to our partnership with Florida. . . . These new facilities will in large part be funded by FEMA's Shelter and Services Program."

64. During a press conference on June 25, 2025, Governor DeSantis noted that federal agencies would fully fund the detention center, stating: "This is fully funded by the federal government"; "This is something that was requested by the federal government, and this is something that the federal government is going to fully fund"; "From a state taxpayer perspective, we are implementing it . . . but that will be fully reimbursed by the federal government." https://www.youtube.com/watch?v=gJfG7L9reHU&ab_channel=FOX35Orlando, at 6:01 (last visited June 27, 2025).

65. In correspondence with Miami-Dade County, Mr. Guthrie stated that the Division intended to use the Site "to assist the federal government with immigration enforcement." Florida Attorney General James Uthemeier stated that the TNT Site, with its runway, is intended to be used to "detain, deport and get people out of this country."

66. Defendants moved swiftly to build, prepare, and inspect the facility for use as a federal detention center that was compliant with federal immigration detention standards.

67. This lawsuit, along with an expedited motion for a temporary restraining order and preliminary injunctive relief, was filed to halt the project while its environmental impacts could be evaluated on June 27, 2025. DE No. 1 & 5.

68. During a July 1, 2025 visit to the Site involving President Trump, Governor DeSantis, and then-DHS Secretary Kirsti Noem, Governor DeSantis told press that, with regard to the facility, the "Feds" are "approving it, supporting it." Then-DHS Secretary Noem stated: "We were looking at different contracts with different vendors and said, why not go straight to our governors?" President Trump stated: "We took the FEMA money . . . hundreds of millions of dollars [a fraction of it] . . . and we used it to build this project." That same day, Noem posted on X that "Alligator Alcatraz will be funded largely by FEMA's Shelter and Services Program."

69. During the July 1, 2025, visit, then-DHS Secretary Noem stated that the project began with "Jimmy Percival" (DHS' General Counsel) reaching out to Florida to ask: "what do you think about partnering with us on a detention facility that we could put in place" and "in 8 days this facility has been stood up." Governor DeSantis stated: "Secretary Noem and her team have said that as soon as president departs we'll be open to start receiving folks."

70. Miles of new fencing, high-intensity industrial lighting, diesel generators, staff housing facilities, large detention tents and cages, and other facilities were quickly positioned on site, and heavy vehicular traffic began to enter and leave the Site. Defendants began detaining individuals there in early July.

71. As construction and eventual operation of the facility proceeded, the Division took steps to receive the funding DHS had committed to providing. Starting in June 2025, the Division and DHS/FEMA began negotiating the terms of a $600 million grant. On June 24, 2025, the Division drafted an initial Application for Federal Assistance Fiscal Year (FY) 2025 97 .XXX-Detention Support Grant Program (DSGP). By July 2, 2025, FEMA had devised a "Detention Support Grant Program" and made the Division the only eligible recipient. *See* July 2, 2025

Declaration of David Richardson ¶ 3, ECF No. 21-2 at 3. On July 4, 2025, the Division emailed its initial application to FEMA, stating it "was not sure if this was sent/received" previously.

72. Between June and August 2025, state and federal agencies exchanged correspondence regarding the request, consideration, and approval of federal funding while finalizing the precise terms. Defendants did not disclose this information to the Plaintiffs or the district court during litigation of Plaintiffs' motion for a preliminary injunction. The Division submitted an application to FEMA for Detention Support Grant Program (DSGP) funds on August 7, 2025, during the preliminary injunction hearing, but did not disclose this information to Plaintiffs or the Court. During an August 15, 2025, meeting, FEMA instructed the Division on its use of the already allocated funds pending a revised budget, but Defendants did not disclose this information either. Plaintiffs only obtained this information after Friends filed a public records act lawsuit against the Division in Circuit Court in Leon County, Florida on October 14, 2025. (Case No. 2025-CA-001972).

73. Instead, during the preliminary injunction hearing on August 6–7, 12–13 on Plaintiffs' motion for a preliminary injunction, Defendants continued to cite and rely on the July 2, 2025 Richardson declaration. That declaration stated that FEMA's Detention Support Grant Program for $600 million had not yet been finalized, that the Division (the only eligible applicant) had not applied for the grant, and that DHS/FEMA had not yet approved the award.

### C. Defendants Represent That No Federal Funding Application Was Submitted to the Federal Government Even Though an Application Was Submitted and Approved.

74. Federal Defendants first deployed the July 2, 2025 Richardson declaration with their July 3, 2025, Opposition to Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction. Doc. 21-2. On August 12, 2025, more than a month after the initial application and five days after FEMA confirmed receipt of Florida's August 7, 2025 application,

the Division moved Richardson's declaration into evidence as State Defendants' Exhibit 44 without update. They did so during the evidentiary hearing on Plaintiffs' preliminary injunction motion after declining to call witnesses they initially said would testify subject to cross-examination at the hearing. Neither the Division nor DHS advised the Court that the statements in the Richardson declaration that the Division "has not yet applied for a DSGP award," was not accurate or at a minimum no longer accurate. *See* Richardson Decl. ¶ 4, ECF No. 21-2.

75. On August 21, 2025, the court granted Plaintiffs' Motion for a Preliminary Injunction, finding Plaintiffs were likely to succeed on the merits of their NEPA claim in part because the facility was subject to sufficient federal authority, control, and/or involvement and to constitute a major federal action and state and federal officials repeatedly admitted that the facility would be federally funded. ECF No. 131 at 55–59, 61–64.

76. On August 26, 2025, the Division filed the Richardson declaration with the United States Court of Appeals for the Eleventh Circuit with its motion to stay the preliminary injunction pending appeal and to stay all further proceedings at the district court. 11th Cir. ECF No. 9-2 at 7, 1475–76. Federal Defendants also represented to the Court of Appeals that no federal funding request had been made. ECF No. 20 at 12 ("Certainly, after Florida seeks federal funding, then a NEPA analysis may inform that decision. But *until that funding request is made* or there is some other need for a federal decision, undertaking a costly and time-consuming NEPA analysis is a wasteful endeavor.") (emphasis added). Federal Appellants further stated that they "fully intend[ed] to comply with NEPA before taking any final agency action to grant federal funding." *Id.* at 14.

77. On September 4, 2025, the Court of Appeals granted the Defendants' motion to stay the preliminary injunction and all further proceedings in the district court pending the

interlocutory appeal. The motions panel majority relied extensively and repeatedly on Defendants' (mis)representations that the Division had not even applied for federal funding to conclude that Plaintiffs were not likely to succeed on the merits of their NEPA claim. 11th Cir. ECF No. 42 at 20 at 6-7 ("However, ***Florida has not filed an application*** for federal funds, and neither DHS nor FEMA has formally 'approved a federal award' providing funds for the construction of the Facility or reimbursing Florida.") (citing Declaration of David Richardson, Doc. 21-2 ¶ 4)); *id.* at 18 ("***DHS has not received ... any applications for funding***, let alone any regarding the Facility."); *id.* at 20 ("***Without an application, there is simply nothing on which a decision can be made***."); *id.* at 23 ("There may come a time when [the Division] applies for FEMA funding.") (emphases added).

78. Defendants did not take any steps to correct these misapprehensions despite their duty of candor to the Court.

79. On September 23, 2025, the Court of Appeals ordered briefing to begin in October 2025 and set the preliminary injunction appeal for oral argument during the week of January 12, 2026. ECF No. 64.

80. On September 30, 2025, FEMA transmitted an "Award Letter" to the Division. The Obligating Document included with the Award Letter confirmed the grant of federal funding to the Division in the full amount of $608,000,000 from the Detention Support Grant Program for a grant period beginning June 1, 2025. The funding was authorized as a lump sum under the category of "other."

81. On October 10, 2025, the Federal Defendants moved to stay the appeal in light of a lapse in federal appropriations, ECF No. 67, which Plaintiffs opposed, ECF No. 68, and the Court of Appeals granted, ECF No. 70.

82. Plaintiffs subsequently received additional documents, pursuant to public records litigation initiated by Friends against the Division in Leon County Circuit Court on October 14, 2025. (Leon County Case No. 2025-CA-001972.) These records suggested that between June and September Defendants removed references to reimbursement for facility's construction, and modified other terms, in an apparent effort to avoid NEPA obligations related to construction activities, which the President previously indicated would be funded.

83. On November 25, 2025, the Court of Appeals lifted the stay and set another briefing scheduled for the appeal. ECF No. 78. On December 8, 2025, the Court of Appeals set the matter for oral argument for the week of April 6, 2026.

84. On or about February 6, 2026, then-FDEM Executive Director Guthrie told reporters that the Department of Justice had put the reimbursement "on hold" though he did not know why. "We actually just got notified . . . days ago or a week ago from an email with FEMA that says [the agreement] is actually held up by the Department of Justice."

85. On March 12, 2026, FEMA notified the Division that the award was "executed as a Grant" and a hold on disbursing the funds lifted.

86. On April 21, 2026, the Court of Appeals vacated this Court's preliminary injunction on the original NEPA claim and remanded the matter for further proceedings. The merits panel majority concluded that Plaintiffs were not likely to succeed on the merits of their NEPA claim based on insufficient evidence of federal control. The merits panel also opined that no action had been taken to fund the project and no decision to disburse funds had been made.

87. On May 15, 2026, the Division received its first installment of the award of federal grant funds.

**D. The TNT Site Immigration Detention Center's Operation and Demobilization <u>in Defiance of Federal Laws</u>.**

88. Throughout this time, the environmental effects of the facility's construction and operation have been and continue to be extensive. An estimated 20 acres of new pavement were added to the Site and remain there. The facility was built to detain up to 3,000 individuals every day and provide housing and facilities for up to 1,000 employees and contractors. To support this extensive facility, surrounded by Big Cypress National Preserve and set up without access to electric, water, or sewer utility services, contractors stored and trucked human waste and wastewater off the Site. A pest control company also entered the Site on more than one occasion, and available records indicate $17,000 per day was spent on pest control treatments.

89. Photographs captured the heavy equipment entering the Site beginning in late June 2025. Below are an image taken by a Friends member and an image published by *WGCU* showing a steady stream of trucks entering and leaving the Site:





90. Below is an image published in the *Miami Herald* and taken on or about June 24, 2025, of industrial, high intensity lighting units being delivered to the TNT site:




91. Below are images, also published in the *Miami Herald*, depicting industrial generators being delivered to the Site:







92. As depicted in the aerial photography below, sensitive wetlands surround the location of all of these structures and equipment. Pollution runoff originating from the Site risks

polluting those surrounding waters, which are used by fish and wildlife including the endangered Everglade snail kite.




©Ralph Arwood
PHOTOGRAPHY




93. Throughout the facility's construction, operation, and demobilization, these activities have continued to draw more traffic onto the portion of Tamiami Trail that runs through Big Cypress National Preserve, a relatively uncongested two-lane road. An increased number of cars on Tamiami Trail also increases the risk of road mortality for wildlife in Big Cypress, including the endangered Florida panther.

94. For nearly a year, industrial lighting staged on the Site 24/7 illuminated the previously dark night sky and could be seen more than 15 miles away, obstructing views of the night sky, pushing endangered Florida panthers out of breeding habitat they previously used, and degrading the darkness endangered Florida bonneted bats need to feed at night.

95. The photograph below, taken on July 7, 2025, approximately 15 miles from the Site near Mile Marker 30.5 on Tamiami Trail, depicts this light pollution.



Photo Credit: Betty Osceola

96. Activities at the TNT site have negatively affected and risk continuing to negatively affecting federally listed species, most notably the Florida panther and Florida bonneted bat.

97. The Florida panther is an endangered species. 32 Fed. Reg. 4001 (Mar. 11, 1967). In 2015, wildlife officials estimated that only 120–230 adult or subadult panthers remain in the wild, and recent population modeling indicates that number peaked in 2016 and has since declined. The Florida panther's primary threat is habitat destruction and degradation associated with human development, along with increased vehicle mortality on associated roads driven by increased traffic. Vehicle collisions are the leading documented cause of direct Florida panther mortalities.

Panthers are also vulnerable to disease and decreased genetic health because of their small population.

98. Increased human activity and lighting at the Site negatively affect the Florida panther by causing panthers to avoid essential primary zone and breeding habitat that they previously used and that is needed for their survival and recovery. This increased disturbance may also result in changes in the size or shape of several panther home ranges as panthers are expected to avoid approaching close to the Site, which in turn increases the risk of intraspecific aggression, when panthers fight or kill one another over territory. Increased vehicle traffic to and from the Site likely increases the danger of road mortality for panthers on a road segment that is already perilous for the species.

99. The Florida bonneted bat is an endangered species. 78 Fed. Reg. 61004 (Oct. 2, 2013). The bats live only in south Florida and have one of the smallest ranges in the United States. The greatest threats to the bat's existence are habitat destruction and degradation from urban and agricultural development and sea level rise. Use of pesticides to control insects can also adversely affect Florida bonneted bats by exposing them to contaminants either directly through spraying or indirectly through their insect prey base.

100. Increased human activity and lighting at the Site negatively affects the Florida bonneted bat by degrading foraging habitat. Florida bonneted bats forage in large, dark, open skies, and there is no evidence that they exploit artificial light sources. Moreover, artificial lighting has broadscale negative effects on insect populations, which can reduce the availability of prey and the overall quality of foraging habitat. Artificial lighting may also impact Florida bonneted bat roosts by disrupting emergence cues. Use of pesticides is likely to affect Florida bonneted bats either directly through spraying or indirectly through consumption of insect prey and can reduce

their overall fitness and reproductive success. Likewise, if pesticides successfully reduce the insect population, it reduces the available food source for bonneted bats, thereby negatively affecting their fitness. These effects are likely to negatively affect the already small and vulnerable Florida bonneted bat population in Big Cypress.

101. Everglade snail kites are endangered species. 32 Fed. Reg. 4001 (Nov. 3, 1967). Snail kites are medium-sized raptors that feed almost exclusively on freshwater Florida apple snails. In Florida, the kite faces threats to its native food source, including changes in water levels, hydroperiods, and vegetation structure; non-native apple snails; and the presence of contaminants. Many of these factors also make snail kite habitat unsuitable. Snail kites are also vulnerable to human disturbance, which can disrupt nesting activities, as well as predation, which can cause nest failure.

102. Eastern indigo snakes are threatened species. 43 Fed. Reg. 4026 (Jan. 31, 1978). Threats include habitat destruction, degradation, and fragmentation; direct killing by people and their domestic pets; pressures from invasive species; and vehicle strikes on roads. Because indigo snakes are apex predators, pesticides that bioaccumulate through the food chain also threaten them.

103. Industrial lighting, increased human presence, pollution, and other activities associated with activities at the Site since about June 2025 may also affect other federally listed species including the Everglade snail kite, crested caracara, red-cockaded woodpecker, eastern black rail, monarch butterfly, Florida prairie-clover, Florida pineland crabgrass, and Everglades bully.

104. On information and belief, no federal agency prepared any environmental assessment or environmental impact statement under the National Environmental Policy Act

(NEPA), 42 U.S.C. §§ 4321, *et seq.*, nor did the Division conduct any environmental review under Florida law, prior to establishing and operating the immigration detention center.

105. Public records disclosed in response to separate litigation by Friends against the Division included a document apparently prepared by a state contractor and titled "Final Draft Environmental Assessment Report." Defendants, however, have not disclosed the process by which that document was developed, its purpose, or how or whether it has been used by Defendants. The document also contains multiple material errors in fact. It does not satisfy Defendants' obligations under NEPA.

106. Defendant Miami-Dade County, while unlawfully allowing its TNT Site to be occupied by agencies seeking to enforce federal immigration laws, questioned the lack of any environmental analyses regarding the project before it began. On June 23, 2025, Miami-Dade County Mayor Daniella Levine Cava wrote to the Division and stated: "With the federal and state government investing well over $10 billion since 2019 in Everglades restoration and protection, we would appreciate a detailed analysis and report on environmental impacts of this facility to the Everglades. We would also value input from the appropriate federal agencies on their environmental reviews and analyses prior to proceeding."

107. On information and belief, Defendants did not confer with the U.S. Army Corps of Engineers, Department of the Interior, National Park Service, U.S. Fish and Wildlife Service, or any other federal or local agency regarding potential environmental impacts from the construction and operation of the immigration detention center.

108. On information and belief, no categorical exclusion from NEPA has been invoked by the Defendants, nor does any apply.

109. On information and belief, no exemption or waiver of NEPA requirements has been invoked by Defendants, and none exist.

110. No public notice or hearing was conducted in connection with the use of the TNT Site for migrant detention.

111. The property is subject to intergovernmental agreements and historical land use restrictions related to its location within the footprint of the Big Cypress National Preserve and State Big Cypress Area.

112. The hasty transformation of the Site into a mass detention facility, which includes the installation of extensive fencing, housing units, construction of sanitation and food services systems, industrial high-intensity lighting infrastructure, diesel power generators, substantial fill material altering the natural terrain, and provision of transportation (including use of the runway to receive and transport detainees) poses clear environmental impacts, including to threatened and endangered wildlife. The Defendants' "demobilization" of the facility has caused, and continues to cause, further environmental harm. The Defendants, in their rush to act, unlawfully bypassed required environmental reviews.

113. The operation of the mass detention facility at the TNT site, which has included the 24/7 operation of industrial high-intensity lighting inside and around the perimeter of the facility, diesel power generators to provide electricity around-the-clock, substantial fill material altering the natural terrain, intense human use (including water, food, sanitation, waste) for thousands of detainees and personnel, 24/7 transportation of materials and persons in and out of the facility, poses clear environmental impacts. The Defendants' "demobilization" of the facility (which throughout this complaint is intended also to refer to Defendants' related, on-going activities) has caused, and continues to cause, further environmental harm. These include but are not limited to

more than 20 acres of new pavement over previously permeable land that remain on site, alterations to on-site drainage, large piles of fill and a pile of asphalt that remain on site, the introduction of invasive species, and remaining features that were added for the detention center such as trenches and rebar that also imperil the ecosystem. The photograph below depicts only a portion of the debris and environmental damage left by Defendants' activities that has yet to be remediated:



114. Defendants failed to evaluate the environmental impacts of their planned actions and failed to consider alternatives, including mitigation, remediation, and other less ecologically harmful courses of action. The TNT Site is highly susceptible to flooding and no feasible plan was developed to evacuate center detainees and personnel in the event of a hurricane or major flooding event. No adequate study has been done to determine the added risk of flooding resulting

from the Site's transformation and use as a mass detention facility. The area in which the facility is located is also highly susceptible to wildfires. No feasible plan has been developed to evacuate center detainees and personnel in the event of a wildfire in the area or to mitigate the adverse health effects of nearby wildfires. No adequate study has been done to determine the added risk of wildfires resulting from the Site's transformation and use as a mass detention facility.

115. FEMA also violated the ESA by failing to initiate and complete formal consultation with USFWS prior to approving, committing, awarding, and disbursing DSGP funds for the facility. Plaintiffs provided Defendants with written notice of the ESA violations on July 11, 2025, and the required 60-day pre-suit notice period has expired. *See* 16 U.S.C. § 1540(g)(2)(A)(i).

116. Further, in conjunction with considering Florida's request for federal funding, FWS violated the APA and ESA by issuing arbitrary and unlawful opinion(s) regarding FEMA's impact on endangered and threatened species and their critical habitat.

117. On September 30, 2025, FEMA sent a letter seeking FWS's concurrence that its award of DSGP funds was not likely to adversely affect any species or critical habitat protected under the ESA.

118. In an extraordinary and likely unprecedented move, FWS issued its concurrence letter that same day concluding that FEMA's DSGP award is "not likely to adversely affect any ESA-listed species or designated critical habitats." In reaching this decision FWS applied an unlawful, court-invalidated regulatory definition of "effects of the action" by considering whether "general environmental changes would not occur but for the proposed action" and whether "these changes are reasonably certain to occur." Further, FWS ignored effects of FEMA's action by arbitrarily characterizing FEMA's action as an "initial award and administrative obligation of funds . . . (but not disbursement of funds)" to conclude that FEMA's actions "would not result in

any general environmental changes on the landscape that meet" the unlawful regulatory test. This conclusion ignored that Florida relied on FEMA's commitment of funding (through the "initial award") to proceed with activities that *did affect* endangered and threatened species. Accordingly, FWS arbitrarily and unlawfully found that "no effects have been identified and, by extension, the proposed action is not likely to adversely affect any ESA-listed species or critical habitats."

119. Despite acknowledging that FEMA's decision to award and disburse funds is "subject to ESA compliance before that funding is disbursed," FWS and FEMA neglected to review this full action "at the earliest possible time" as required by the ESA, 50 C.F.R. § 402.14. Rather, FWS perplexingly advised FEMA of its duty to reinitiate a consultation even though FEMA had not yet undertaken the required ESA formal consultation process. On information and belief, FWS subsequently issued another concurrence letter to FEMA in connection with the DSGP funding, which is arbitrary and unlawful where FEMA's award and disbursement of the funds are likely to adversely affect listed species and critical habitat.

120. Additionally, DHS, ICE, and FEMA violated the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq*., because Federal Defendants failed to consider all relevant factors in their decision making, including the funding, siting, construction, operation and demobilization of a mass immigration detention center within the boundaries of a National Preserve, the protections afforded to Big Cypress National Preserve and its natural resources under the National Park Service Organic Act of 1916, (16 U.S.C. § 1, amended and recodified in 54 U.S.C. § 100101(a) (2014)), and the impacts of these final agency actions on Big Cypress National Preserve. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 42 (1983).

121. In 1916 Congress created the National Park Service in the Department of the Interior to promote and regulate the use of national parks, monuments, and reservations. The

National Park Service Organic Act of 1916 states, "The Secretary [of the Interior], acting through the Director of the National Park Service, shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1, amended and recodified in 54 U.S.C. § 100101(a) (2014).

122. Congress later enacted the 1978 amendment to the NPS Organic Act, which reaffirmed the Park Service's mandate to conserve park resources and values and to leave the parks unimpaired for future generations. 54 U.S.C. § 100101(b).

123. The Organic Act's conservation and non-impairment mandate is reflected in the legislation establishing the Preserve. The Preserve is to be managed as a unit of the National Park System "in a manner which will assure their natural and ecological integrity in perpetuity' in accordance with the provisions of this Act and with the provisions of the Act of August 25, 1916 (39 Stat. 535; 16 U.S.C. 1-4), as amended and supplemented." Pub. L. No. 100-301 § 4(a), Big Cypress National Preserve Addition Act of 1988.

124. The TNT Site has used and impaired and is continuing to use and impair the Big Cypress National Preserve by causing direct and indirect harm to its wetlands, wildlife, and air and water quality. These impacts include but are not limited to lighting, noise, vehicle traffic, pollution, fencing, paving, demobilization activities, and other wildlife habitat disturbances. These activities have degraded and are still degrading the natural, scenic, hydrologic, floral, and faunal, and recreational values for which the Preserve was created.

125. The construction, operation, and demobilization activities at the TNT Site have resulted and are resulting in significant environmental harm to the Preserve, do not comport with the conservation and non-impairment mandate of the Organic Act, are in derogation of the values and purposes for which the Preserve was established, and are not otherwise directly and specifically allowed by Congress.

126. Upon information and belief, DHS, ICE, and FEMA, failed to adequately consider how the funding, siting, construction, operation, and demobilization of the TNT Site would impact Big Cypress National Preserve.

127. Upon information and belief, DHS, ICE, and FEMA, also failed to adequately consider how the funding, siting, construction, operation, of the TNT Site, and the current demobilization activities, would conflict with conservation and non-impairment mandates of the National Park Service Organic Act and the prohibitions against the take of wildlife under the Act's implementing regulations prior to the funding.

128. Upon information and belief, DHS, ICE, and FEMA, further failed to adequately consider how the funding, siting, construction, operation of the TNT Site, and the demobilization activities, would be in derogation of the values and purposes for which the Big Cypress National Preserve was established.

129. Upon information and belief, at no time has DHS, ICE, and FEMA consulted with DOI and the National Park Service regarding the funding, siting, construction, operation, of the TNT site within Big Cypress National Preserve.

130. Upon information and belief, at no time has DHS, ICE, and FEMA consulted with DOI and the National Park Service regarding the impacts, siting, constructing, operating and now demobilizing an immigration detention facility would have on Big Cypress National Preserve.

131. Upon information and belief, at no time has DHS, ICE, and FEMA sought a determination from DOI and the National Park Service under the National Park Service Organic Act that the siting, construction, operation, and now demobilization, of an immigration detention facility would not impair Big Cypress National Preserve.

132. DHS, ICE, and FEMA violated the APA when they failed to adequately consider the impacts these final agency actions would have on Big Cypress National Preserve and how these final agency actions would conflict with the National Park Service Organic Act and implementing regulations.

**<u>COUNT I</u>**
**(VIOLATIONS OF NATIONAL ENVIRONMENTAL POLICY ACT AND ADMINISTRATIVE PROCEDURE ACT (NEPA AND APA))**
**(Against the Division, DHS, ICE, and FEMA)**

133. Plaintiffs reallege the Common Allegations as if fully set forth herein.

134. The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, requires federal agencies to prepare an Environmental Impact Statement (EIS) for any major federal action significantly affecting the quality of the human environment, or an Environmental Assessment (EA) if the agency action does not have reasonably foreseeable significant effects on the human environment, or if the significance of such effect is unknown.

135. NEPA applies when a federal agency considers a *proposal* for a major federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332(C); *see also* 42 U.S.C. § 4336(B)(i)-(ii) (describing levels of environmental review for *proposed* federal agency action depending on the reasonably foreseeable significant effects of the action). NEPA also applies to certain non-Federal actions.

136. Final agency actions, including NEPA violations underlying those final agency actions, are reviewable under the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*,

which provides that courts shall set aside agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

137. Defendants' actions and omissions constitute multiple violations of NEPA that are reviewable under the APA. State and Federal Defendants' actions constituted a partnership or joint venture for purposes of NEPA, including the development, construction, operation and funding of the detention center. State and Federal Defendants' actions federalized the project for purposes of NEPA.

138. First, DHS' consideration of entering into a cooperative agreement with the Division for the construction of a mass immigration detention center at the TNT site to meet DHS and ICE's operational needs by agreeing to provide guaranteed bed space for persons detained by DHS/ICE constitutes a proposed major federal action under NEPA. *See* 8 U.S.C. § 1103(a)(11)(B).

139. DHS' decision to enter into, and entrance into, an agreement with the Division to construct a mass immigration detention center at the TNT site to meet DHS and ICE's operational needs by agreeing to provide guaranteed bed space for persons detained by DHS/ICE constitutes a proposed major federal action under NEPA and a final agency action under the APA.

140. Second, DHS and/or ICE's consideration of the Division's request to operate a federal immigration detention center constituted a proposed major federal action subject to NEPA.

141. DHS and/or ICE's authorization of the Division's operation of a federal immigration detention center constitutes a final agency action under the APA.

142. Third, DHS' and FEMA's consideration of Florida's request for federal funding, which pre-dated construction of the facility and continued thereafter, constituted a proposed major federal action subject to NEPA.

143. DHS' and FEMA's commitment to fund the facility prior to its construction constitutes a final agency action under the APA.

144. DHS' and FEMA's approval of funding requests related to the facility constitutes one or more final agency actions.

145. DHS' and FEMA's disbursement of federal funds related to the facility constitutes one or more final agency actions.

146. Fourth, DHS' and ICE's consideration of using the TNT site for immigration detention (arranging for the TNT facility as a place of immigration detention) was a proposed major federal action.

147. DHS' and ICE's decision to detain people at the TNT site (arrangement to use the TNT facility as a place of immigration detention), pursuant to which DHS/ICE began to detain people at the facility on or about July 1, 2025, was a final agency action.

148. Fifth, to the extent the *construction* of the mass detention facility at the TNT site is deemed a non-Federal action, that action has involved more than minimal federal funding and more than minimal Federal involvement, thereby making it subject to NEPA on this basis as well. 42 U.S.C. § 4336e(10)(B)(i) ("the term 'major Federal action' does not include . . . a non-Federal action . . . with no or minimal Federal funding; or with no or minimal Federal involvement where a Federal agency cannot control the outcome of the project").

149. A condition precedent to the *construction* of the facility was an agreement between state and federal agencies that (1) the federal government would provide substantial federal funding to support the facility, and (2) the federal government would authorize the state to operate the detention facility subject to substantial Federal involvement. The Division acted pursuant to this agreement by commandeering the TNT site based solely on the declared immigration

emergency and employing contractors to build and operate an immigration detention facility subject to federal oversight and control. The Division asserted no other authority for commandeering the property.

150. Federal approval and authorization were also legal preconditions to the use of the TNT site for an immigration detention center and construction of the facility as an immigration detention center.

151. Federal involvement includes federal approval of the TNT site as appropriate for an immigration detention center, authorization for the Division to operate the detention center, facility inspection for compliance with federal immigration detention standards, the on-going obligation to ensure compliance with federal immigration detention standards (including facility standards, conditions of confinement, access to counsel, and medical care), determinations regarding which individuals will be detained at the facility, exclusive control over when and whether detainees at the facility are released or transferred, and supervision and oversight of staff authorized to participate in immigration functions, which includes immigration detention.

152. Sixth, to the extent the *operation* of the mass detention facility at the TNT site is deemed a non-Federal action, that action has involved more than minimal federal funding and more than minimal Federal involvement, thereby making it subject to NEPA on this basis as well.

153. A condition precedent to the *operation* of the facility was an agreement between state and federal agencies that (1) the federal government would provide more than minimal federal funding to support the facility, and (2) the federal government would authorize the state to operate the detention facility subject to substantial Federal involvement and/or control. The Division acted pursuant to this agreement by commandeering the TNT site based solely on the declared

immigration emergency and employing contractors to build and operate an immigration detention facility subject to federal oversight and control.

154. Federal approval and authorization were also legal preconditions to operation and use of the TNT facility as an immigration detention center.

155. Federal involvement includes federal approval of the TNT site as appropriate for an immigration detention center, authorization for the Division to operate the detention center, facility inspection for compliance with federal immigration detention standards, the on-going obligation to ensure compliance with federal immigration detention standards (including facility standards, conditions of confinement, access to counsel, and medical care), determinations regarding which individuals will be detained at the facility, exclusive control over when and whether detainees at the facility are released or transferred, and supervision and oversight of staff authorized to participate in immigration functions, which includes immigration detention.

156. The Division has no authority to construct or operate an immigration detention center absent federal authorization, oversight, and control.

157. DHS, ICE, and/or FEMA have taken several actions to fund the project, including prior to initial construction. This includes (1) entering into an agreement with the Division whereby DHS committed to funding the project, a commitment on which the Division relied to proceed with commandeering the Site and building the facility; (2) developing a FEMA detention support grant program for purposes of funding this project with the Division as the only eligible applicant; (3) coordinating with the Division to jointly develop and amend parameters for how the funding would be structured, described, and disbursed, in part in an apparent attempt to avoid liability in this suit; (4) formally approving one or more requests for funding; and (5) making disbursements.

158. In Fla. Stat. § 908.13, the Florida legislature authorized the Division to facilitate the transport of detainees on the condition that ICE "specifically request assistance from the division with the transport of unauthorized aliens pursuant to specific federal legal authority." *Id.* § 908.13(2)(a). Additionally, ICE "must reimburse the state for the actual cost of assisting with the transport of unauthorized aliens." *Id.* § 908.13(2)(b). Any such transport "must occur under the ***direct control and supervision*** of" ICE. *Id.* § 908.13(2)(c) (emphasis added). Because state law requires that the Division's transportation of detainees to and from the detention center occur under the "direct control and supervision" of ICE, the TNT detention center project is statutorily required to be under "Federal control and responsibility," 42 U.S.C. § 4336e(10), thereby triggering NEPA. In this way, the Division is acting as agent for DHS and ICE.

159. Florida Attorney General Uthmeier announced that the TNT Site would be used "in support of the Trump administration" in federal immigration law enforcement. The Attorney General posted on social media that "Alligator Alcatraz [is] the one-stop shop to carry out President Trump's mass deportation agenda." He accompanied the post with a video of the TNT Site runway. Governor DeSantis has been quoted as stating the TNT Site is to "facilitate the federal government in immigration enforcement."

160. Infrastructure projects like this one that are funded and/or approved by the Federal government, require federal agencies to prepare an EIS for actions that significantly affect the quality of the human environment. The EIS must identify significant environmental effects of the projects, as well as feasible alternatives. The law ensures that the agency and the public are aware of the environmental consequences of proposed projects. Properly applied, NEPA helps agencies to make better decisions and to ensure good project management.

161. Specifically, an EIS must include a "detailed statement" addressing the following: (i) reasonably foreseeable environmental effects of the proposed agency action; (ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented; (iii) a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal; (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (v) any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented. 42 U.S.C. §§ 4332(C)((i)-(v).

162. Federal Defendants violated NEPA by not preparing an EIS because the following actions would have, and have had, significant environmental impacts on an ecologically sensitive area, with significant foreseeable impacts on waters, wetlands, air, traffic, and threatened and endangered species:

a. DHS' and/or ICE's consideration of entering into, and entering into, a cooperative agreement with the Division for the construction of a mass immigration detention center at the TNT site to meet DHS and ICE's operational needs.

b. DHS and/or ICE's request for the Division to operate, or consideration of the Division's request to operate, and subsequent authorization of the Division's operation of, a federal immigration detention center at the TNT site.

c. DHS' and/or FEMA's consideration of Florida's request for federal funding of the facility at the TNT site, which began before construction of the facility and continued thereafter, and subsequent decision to fund the facility and subsequent funding of the facility,

where Florida relied on DHS' and/or FEMA's commitment of federal funding to proceed with the project and Florida and federal officials assured the public that the facility would be paid for with substantial federal funds.

d. To the extent the construction of the mass detention facility at the TNT site is deemed a non-Federal action, that action is subject to NEPA because it involves more than minimal federal funding and more than minimal Federal involvement. Construction of the facility was the result of a state-federal partnership or joint venture.

e. To the extent the operation of the mass detention facility at the TNT site is deemed a non-Federal action, that action is subject to NEPA because it involves more than minimal federal funding and more than minimal Federal involvement. Operation of the facility was also the result of a state-federal partnership or joint venture.

163. Moreover, NEPA requires that "[p]rior to making any detailed statement," the head of the lead agency "shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." *Id.* § 4332(C). Because actions associated with the authorization, construction, and operation of the detention center at the TNT Site involve a national preserve that includes primary habitat for the Florida panther and critical habitat for the Florida bonneted bat, at a bare minimum federal law required DHS, ICE, and/or FEMA to consult with the National Park Service, and the U.S. Fish and Wildlife Service in assessing the environmental impacts of their proposed actions, something they failed to do.

164. NEPA requires that federal agencies prepare an EA if a proposed agency action does not have reasonably foreseeable significant effect on the human environment or if the significance of such effect is unknown. An EA must examine the reasonably foreseeable effects

of the proposed action, consider alternatives, and articulate the bases for determination that the proposed action will not have a significant effect on the human environment. Federal Defendants did not prepare any or any legally-sufficient EA prior to entering into their agreement with Florida/the Division, approving the TNT site as an appropriate place for immigration detention, authorizing Florida/the Division to operate an immigration detention center, allowing the facility to operate with more than minimal federal involvement and/or control, committing to providing more than minimal federal funding for the facility, approving federal funding, or disbursing those federal funds.

165. The failure to conduct the required environmental review under NEPA violates federal law and deprives the public and affected stakeholders, including Plaintiffs, of required procedures and environmental protections.

166. NEPA review is important not only for avoiding environmental harm but also because it discloses environmental impacts and includes the consideration of alternatives, which can include mitigation and remediation. Such a review would also inform Defendants' future attempts to construct, operate, and/or decommission a detention facility at the site as Florida has indicated it would should DHS request it.

167. By violating NEPA in the manner set forth above, Defendants' actions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and were taken without compliance with procedure required by law, in contravention of the Administrative Procedure Act. Plaintiffs are therefore entitled to injunctive, declaratory, and remedial relief.

## COUNT II
## (VIOLATION OF ADMINISTRATIVE PROCEDURE ACT (APA)
## (Against DHS, ICE, and FEMA))

168. Plaintiffs reallege the Common Allegations as if fully set forth herein.

169. The Federal Defendants' final decisions and actions to authorize, approve, fund, and carry out a mass immigration detention center, as alleged herein, constitute final agency actions.

170. Federal Defendants undertook these actions in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq*., because Federal Defendants failed to consider all relevant factors in their decision making, including the funding, siting, construction, operation and demobilization of a mass immigration detention center within the boundaries of a National Preserve, the protections afforded to Big Cypress National Preserve and its natural resources under the National Park Service Organic Act of 1916, (16 U.S.C. § 1, amended and recodified in 54 U.S.C. § 100101(a) (2014)), and the impacts of these final agency actions on Big Cypress National Preserve. *See State* Farm, 463 U.S. at 42.

171. In 1916 Congress created the National Park Service in the Department of the Interior to promote and regulate the use of national parks, monuments, and reservations. The National Park Service Organic Act of 1916 states, "The Secretary, acting through the Director of the National Park Service, shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1, amended and recodified in 54 U.S.C. § 100101(a) (2014).

172. With the enactment of the General Authorities Act in 1970, Congress declared that "the National Park System, which began with establishment of Yellowstone National Park in 1872, has since grown to include superlative natural, historic, and recreation areas in every major region

of the United States and its territories and possessions; these areas, though distinct in character, are united through their interrelated purposes and resources into one National Park System as cumulative expressions of a single national heritage; individually and collectively, these areas derive increased national dignity and recognition of their superb environmental quality through their inclusion jointly with each other in one System preserved and managed for the benefit and inspiration of all the people of the United States." 54 U.S.C. § 100101(b)(1)(A)-(C).

173. Congress later enacted the 1978 amendment to the NPS Organic Act, which reaffirmed the Park Service's mandate to conserve park resources and values and to leave the parks unimpaired for future generations. The 1978 Amendment to the NPS Organic Act states: "Congress reaffirms, declares, and directs that the promotion and regulation of the various System units shall be consistent with and founded in the purpose by subsection (a), to the common benefit of all the people of the United States. The authorization of activities shall be construed and the protection, management, and administration of the System units shall be conducted in light of the high public value and integrity of the System and shall not be exercised in derogation of the values and purposes for which the System units have been established, except as directly and specifically provided by Congress." 54 U.S.C. § 100101(b).

174. This duty to conserve the park system and protect it against impairment, extends to actions occurring on non-federally owned land encompassed within national park boundaries.

175. The National Park Service has promulgated regulations to implement the National Park Service Organic Act. 36 C.F.R. pt. 1 (2026).

176. 36 C.F.R. § 1.1(b) states that "these regulations will be utilized to fulfill the statutory purposes of units of the National Park System: to conserve scenery, natural and historic

objects, and wildlife, and to provide for the enjoyment of those resources in a manner that will leave them unimpaired for the enjoyment of future generations."

177. In 2006, the National Park Service issued Management Policies for the National Park System. Nat'l Park Serv., Management Policies (2006).

178. The Big Cypress National Preserve is a unit of the National Park System and was established in 1974. It was established to "assure the preservation, conservation, and protection of the natural, scenic, hydrologic, floral, and faunal, and recreational values of the Big Cypress Watershed in the State of Florida and to provide for the enhancement and public enjoyment thereof." Big Cypress National Preserve Act, Pub. L. No. 93-440(a), as amended by Pub. L. No. 100-301 (the Big Cypress National Preserve Addition Act of 1988); 16 U.S.C. § 698f.

179. The Organic Act's conservation and non-impairment mandate is reflected in the legislation establishing the Preserve. The Preserve is to be managed as a unit of the National Park System "in a manner which will assure their natural and ecological integrity in perpetuity' in accordance with the provisions of this Act and with the provisions of the Act of August 25, 1916 (39 Stat. 535; 16 U.S.C. 1-4), as amended and supplemented." Pub. L. No. 100-301 § 4(a), Big Cypress National Preserve Addition Act of 1988.

180. The Preserve's General Management Plan "envisions Big Cypress National Preserve as a nationally significant ecological resource-a primitive area where ecological processes are restored and maintained and where cultural sites are protected from unlawful disturbance. Visitors would have the opportunity to appreciate and learn about the preserve's resources in a natural setting." Big Cypress National Preserve General Management Plan iii (1991).

181. The General Management Plan identifies two "fundamental" resources in the preserve, according to a review of the House and Senate reports leading to the passage of PL 93-440, which established the park:

> "Water-The natural flow of freshwater (that is, the watershed) is key to the survival of Everglades National Park as well as the integrity of the entire south Florida ecosystem.
>
> Natural values- As important as the watershed, the natural, scenic, floral, and faunal values are cited as being worthy of national recognition and protection on their own merit. Recreation is discussed along with the natural values because the natural resources provide opportunities for recreational pursuits." General Management Plan at 7.

182. The General Management Plan notes that the Preserve's enabling Act "states that the preserve, as a unit of the national park system, is to be administered in a manner that will ensure its 'natural and ecological integrity in perpetuity.'" General Management Plan at 7.

183. The General Management Plan further states that "the legislative history acknowledges the state's cooperation in preserving the Big Cypress Area." General Management Plan at 8.

184. One of the many wildlife species that the General Management Plan seeks to protect is the Florida panther. In 1991, the National Park Service established a "Florida Panther Special Concern Subzone" adjacent to the TNT site, which calls for special management actions to be taken to increase the panther prey-base and to reduce and control potential human disturbance to panthers. General Management Plan, at 26-27.

185. The TNT Site has used and impaired, and is continuing to use and impair, the Big Cypress National Preserve by causing direct and indirect harm to its wetlands, wildlife, and air and water quality. These impacts include but are not limited to increased lighting, noise, vehicle traffic,

pollution, and disturbance. These activities have degraded and are still degrading the natural, scenic, hydrologic, floral, and faunal, and recreational values for which the Preserve was created.

186. The facility has cast and threatens to cast, light pollution over the Preserve's night skies, has projected and threatens to project disruptive soundwaves across the Preserve, and has caused and threatens to cause stormwater runoff to flow from more than 20 acres of paved surfaces into the Preserve's wetlands. These uses and impacts have harmed and threaten to harm wildlife within the Preserve and plaintiffs' enjoyment of these lands.

187. The National Park Service highlights the naturally dark skies of the Big Cypress National Preserve on the Preserve's website. "Big Cypress National Preserve has a resource that many take for granted or may not even be aware of-our natural darkness. Even with widespread development on the east and west coasts of Florida, the Preserve remains one of the darkest areas east of the Mississippi River. In the heart of the swamp it's still possible to view the Milky Way, something that many who have only been in urban or suburban settings have never seen." https://www.nps.gov/bicy/learn/nature/lightscape.htm

188. The National Park Service further states that '[t]he quality (relative darkness) of the night sky has come under siege throughout the United States and the world. The widespread and rapid rate of development and the associated installation of lights without thought to the impact those lights have on the night sky is illuminating the darkness worldwide. Lighting associated with advertising, grounds, security, and building and street illumination all contribute to what is referred to as 'light pollution.'" https://www.nps.gov/bicy/learn/nature/lightscape.htm

189. The National Park Service adds that "in addition to interfering with our ability to see celestial bodies and astronomical events, light pollution has a detrimental environmental impact." https://www.nps.gov/bicy/learn/nature/lightscape.htm

190. The National Park Service's Management Policies recognize the need to preserve the natural lightscapes of parks, "which are natural resources and values that exist in the absence of human-caused light." The National Park Service explains "improper outdoor lighting can impede the view and visitor enjoyment of a natural dark night sky." Nat'l Park Serv., Management Policies 4.10 (2006).

191. The use of artificial lighting on the TNT site has caused and is threatening to cause light pollution and the "take" of Florida panthers in violation of the Organic Act's implementing regulations.

192. The Organic Act's implementing regulations specifically prohibit the "taking" of wildlife on National Park Service units, except by authorized hunting and trapping activities. 36 C.F.R. § 2.2 (a). "Take" or "Taking" "means to pursue, hunt, harass, harm, shoot, trap, net, capture, collect, kill, wound, or attempt to do any of the above." 36 C.F.R. § 1.4 (a). These regulations apply, regardless of land ownership, on all lands and waters within a park area that are under the legislative jurisdiction of the United States. 36 C.F.R. § 2.2(g).

193. The use of artificial lighting on the TNT site has harassed and threatens to harass endangered Florida panthers on federally owned lands within Big Cypress National Preserve through the loss of 2,000 acres of panther habitat. These actions have thereby caused and are threatening to cause the "take" of panthers in violation of 36 C.F.R. § 2.2(g).

194. DHS, ICE, and FEMA violated the APA when they failed to consider how their final agency actions would violate the Organic Act and its implementing regulations and cause the "take" of Florida panthers within the National Park System. *State Farm*, 463 U.S. at 42.

195. In addition to the artificial lighting on the TNT site harassing, and therefore "taking" endangered Florida panthers, the light pollution caused by the TNT operations has

adversely affected and threatens to continue to adversely affect the ability of Plaintiffs to observe the night sky within Big Cypress National Preserve, which is recognized as an International Dark Sky Park.

196. DHS, ICE, and FEMA further violated the APA when they failed to consider how their final agency actions would adversely impact the night sky within Big Cypress National Preserve and diminish the experiences of visitors to the Preserve, including those of the Plaintiffs. *State Farm*, 463 U.S. at 42.

197. The National Park Management Policies recognize the need to protect the natural soundscapes of parks. Nat'l Park Serv., Management Policies 4.9 (2006).

198. The policies explain that some natural sounds in the natural soundscape are also part of the biological or other physical resource components of the park and include such natural sounds produced by bats to locate prey or navigate. *Id.*

199. Increased noise from additional construction and ongoing human activity at the TNT site disrupts and threatens to continue to disrupt wildlife within the Preserve, including the endangered Florida panther, and the endangered Florida bonneted bats' ability to echolocate prey.

200. Increased noise from the facility has also adversely affected and threatens to continue to adversely affect Plaintiff's ability to quietly enjoy Big Cypress National Preserve, thereby deteriorating the user experience.

201. DHS, ICE, and FEMA violated the APA when they failed to consider how their final agency actions would adversely impact the soundscape of Big Cypress National Preserve, disrupt wildlife within the Preserve, and diminish the experiences of visitors to the Preserve, including those of the Plaintiffs. *State Farm*, 463 U.S. at 42.

202. Big Cypress National Preserve's General Management Plan states: "The quality, quantity, seasonality, and distribution of surface water affect all biological communities in the Big Cypress swamp and in downstream Everglades estuaries. Since development in similar south Florida environments has repeatedly illustrated the sensitivity of these communities to hydrologic perturbations, comparable developments within Big Cypress are important natural resource issues." General Management Plan, at 10.

203. "The pollution of surface waters and groundwaters by both point and nonpoint sources can impair the natural functioning of aquatic and terrestrial ecosystems and diminish the utility of park waters for visitor use and enjoyment." Nat'l Park Serv., Management Policies 4.6.3 (2006).

204. The creation of 800,000 square feet of new impervious surface at the TNT facility, will increase runoff into the surrounding, interconnected wetlands, which threatens the sensitive, low nutrient hydrology of the Everglades. This runoff contains possible contaminants from a number of different sources on site, including from the paved material itself, from petroleum products used to fuel generators, from vehicles and from the activities of thousands of detainees and staff. DE 131 at 68. Additionally, increased sediment in the wetlands often leads to increased turbidity and decreased dissolved oxygen, which can kill aquatic animals. *Id.*

205. DHS, ICE, and FEMA violated the APA when they failed to consider how their final agency actions would adversely impact the waters of Big Cypress National Preserve and downstream estuarine waters of the Everglades. *State Farm*, 463 U.S. at 42.

206. The construction and operation of the TNT Site have resulted in and threaten to continue to result in significant environmental harm to the Preserve, do not comport with the

conservation and non-impairment mandate of the Organic Act, and are in derogation of the values and purposes for which the Preserve was established.

207. DHS, ICE, and FEMA violated the APA when they failed to adequately consider the impacts these final agency actions would have on Big Cypress National Preserve and how these final agency actions would conflict with the National Park Service Organic Act and implementing regulations. *State Farm*, 463 U.S. at 42.

208. The final agency actions taken by DHS, ICE, and FEMA are "arbitrary and capricious," an "abuse of discretion" or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A). *See also Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971).

209. Plaintiffs are entitled to a declaration that the agencies' conduct is unlawful, an order vacating the agency actions, and injunctive relief.

**COUNT III**
**(ULTRA VIRES ACTION**
**(Against the Division))**

210. Plaintiffs reallege the Common Allegations as if fully set forth herein.

211. The Division of Emergency Management is governed by Chapter 252, Florida Statutes.

212. Nothing in Chapter 252 authorizes the Division to convert county-owned property into a federal detention center without legislative authority, environmental review, or compliance with local land use requirements.

213. Moreover, Florida law requires that, before the State of Florida may construct a correctional facility, it must consult with local governments with jurisdiction over the proposed site to determine if the proposed facility would comply with applicable local land use laws. Fla. Stat. § 944.095(2). Florida law further provides that local governments have 90 days to review any

proposed correctional facility to determine if it complies with the applicable land use laws. The Division has not complied with these legal requirements.

214. The Division has no independent legislative authority to construct and manage a correctional facility. Under Florida law, a correctional facility means any "prison, road camp … prison forestry camp … prison farm [whether] temporary or permanent." Section 944.02(8), Fla. Stat. "Prisoner" includes any person "under civil or criminal arrest [and committed] to the custody of the department pursuant to lawful authority." *Id.* § 944.02(6). These provisions apply to the Florida Department of Corrections, however, not the Division which has no authority to detain persons under Florida law.

215. The Division has no authority under state or federal law to build or operate an immigration detention center, including by and through contractors.

216. The Division has no authority under state or federal law to detain individuals for immigration purposes, including those subject to detention on the basis of federal immigration charges, pending a federal removal process, or for purposes of removal from the United States pursuant to federal immigration law.

217. The Division is not a law enforcement agency and is therefore not eligible to enter into 287(g) agreements with federal immigration agencies.

218. In any event, 287(g) agreements do not authorize the construction and operation of immigration detention centers.

219. The Division lacks any and all authority over the TNT site that does not relate to the state immigration emergency declaration on which the Division relied to commandeer the property in June 2025. The Division's actions exceed the scope of authority granted by Florida or federal law.

220. The Division's unlawful actions harm Plaintiffs' interests by transforming the TNT site's previous use in such a manner so as to preclude previously enjoyed access, and cause significant environmental impacts, to the ecologically sensitive areas in and around the TNT site, including the waters, wetlands, air, and threatened and endangered species.

221. Plaintiffs are entitled to declaratory relief under 28 U.S.C. § 2201 that the Division's (1) agreement with DHS to build and operate a mass immigration detention center, (2) construction and operation of a mass immigration detention center, including by and through contractors, and (3) detention of individuals solely on the basis of federal immigration charges, all at the TNT site, are are *ultra vires* and void.

222. Plaintiffs are further entitled to declaratory relief under 28 U.S.C. § 2201 that the Division's use of the TNT site for any purpose other than those authorized under the state's emergency immigration declaration are *ultra vires* and void.

223. Plaintiffs are further entitled to injunctive relief preventing the Division from constructing or operating a mass immigration detention center at the TNT site or otherwise using the site for any other unauthorized use.

**COUNT IV**
**(VIOLATION OF MIAMI-DADE COUNTY CODE AND CDMP**
**(against Miami-Dade County))**

224. Plaintiffs reallege the Common Allegations as if fully set forth herein.

225. Pursuant to the County's Operational Directive No. 15-02, the TNT Site is governed by Chapter 25 of the Miami-Dade County Code, pertaining to aviation operations.

226. The TNT Site is permitted only for aviation uses including pilot flight training, pilot proficiency checks, and aircraft maintenance flight checks.

227. In addition, the Site, or a portion of it, is designated Environmentally Protected Parks under Miami-Dade Counties Comprehensive Development Master Plan due to its environmental sensitivity.

228. The Site is not permitted or authorized for use for non-flight purposes.

229. The County's agreement or acquiescence in allowing the TNT Site for use as a mas detention center is in violation of the County code and permitting regimes.

230. Plaintiffs are entitled to a declaration under 28 U.S.C. § 2201 that the County may not authorize or allow use of the TNT Site for purposes other than that allowed under the County Code and existing permits and authorizations.

**COUNT V**
**(VIOLATIONS OF THE ENDANGERED SPECIES ACT (ESA)**
**(against FEMA))**

231. Plaintiffs reallege the Common Allegations as if fully set forth herein.

232. ESA Section 7 mandates that each federal agency must consult with the expert wildlife agency—in this case, FWS—to ensure that "any action authorized, funded, or carried out by the agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2).

233. The ESA's implementing regulations broadly define the scope of "agency actions" subject to consultation to include "all activities or programs *of any kind* authorized, funded, or carried out, in whole or in part, by [f]ederal agencies," including but not limited to "the granting of licenses, contracts, [or] leases" and "actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02 (emphasis added).

234. Under the ESA's implementing regulations, the action agency must initiate the consultation process whenever a proposed action "may affect" listed species. *Id.* § 402.14(a). Effects of the action include "direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action," which is then added to the baseline environmental conditions. *Id.* § 402.02. "Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur." *Id.* "Interrelated actions are those that are part of a larger action and depend on the larger action for their justification," and "[i]nterdependent actions are those that have no independent utility apart from the action under consideration." *Id.*

235. If an agency determines that its action "may affect" but is "not likely to adversely affect" a listed species or its critical habitat, and FWS concurs in writing, ESA regulations permit a less comprehensive "informal consultation." *Id*. § 402.13. But where, as here, the action is likely to adversely affect listed species, a formal consultation process must be undertaken, which concludes with a biological opinion that evaluates the impacts of the action on protected species, including the incidental take of species that is expected to occur and the steps that must be taken to minimize and mitigate adverse impacts. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14(g).

236. ESA Section 7(d) provides that "after initiation of consultation . . . the Federal agency . . . shall not make any irreversible or irretrievable commitment of resources . . . which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures." 16 U.S.C. § 1536(d).

237. FEMA's commitment to fund, approval of funding requests, and disbursement of funds related to the facility, constitute one or more federal agency actions.

238. FEMA's approval, award, and disbursement of DSGP funding for the mass immigration detention center at the Site makes construction, operation and demobilization of the facility an action "authorized" and "funded," by FEMA within the meaning of the ESA. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02. It is also an action that "directly or indirectly causes modifications to the land, water, or air." 50 C.F.R. § 402.02.

239. The construction, operation, and demobilization of the facility, funded by FEMA, has affected, may affect—and indeed is likely to adversely affect—endangered and threatened species and critical habitat through both direct and indirect effects of the agencies' funding, and through interrelated and interdependent actions undertaken to carry out DHS's and FEMA's immigration purpose at the site.

240. FEMA violated ESA Section 7's procedural requirements by failing to initiate and complete lawful consultation before approving and committing to funding requests, authorizing and entering into one or more agreements to fund, and dispersing funds for the construction, operation, and demobilization of the facility.

241. FEMA violated ESA Section 7's procedural requirements by failing to undertake formal consultation regarding its actions that may affect and are likely to adversely affect endangered and threatened species and to destroy or adversely modify critical habitat.

242. By failing to comply with the ESA's mandatory consultation requirements, FEMA also violated ESA Section 7's substantive requirement to ensure they do not jeopardize the continued existence of a threatened or endangered species or destroy or adversely modify an endangered or threatened species' critical habitat.

243. Further, by entering into an agreement, authorizing, and/or funding the construction, operation, and demobilization of the facility before satisfying ESA Section 7(a)(2)'s

consultation requirements, FEMA foreclosed themselves from formulating or implementing reasonable and prudent alternative measures to avoid jeopardizing listed species and destroying or adversely modifying critical habitat.

244. Therefore, FEMA irreversibly or irretrievably committed resources in a manner that foreclosed the formulation or implementation of reasonable and prudent alternative measures to protect listed species and critical habitat, in violation of ESA Section 7(d).

245. FEMA's violations harmed Plaintiffs' interests in conserving federally protected endangered and threatened species.

246. Plaintiffs are entitled to an order declaring that the agencies' conduct is unlawful, directing vacatur of the agency actions, and enjoining any further activity affecting endangered and threatened species until ESA compliance is achieved.

**COUNT VI**
**(VIOLATIONS OF THE ADMINISTRATIVE PROCEDURE ACT (APA) and ENDANGERED SPECIES ACT (ESA)**
**(against FWS))**

247. Plaintiffs reallege the Common Allegations as if fully set forth herein.

248. The APA requires that reviewing courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

249. ESA Section 7 mandates that "[e]ach Federal agency shall, in consultation with [FWS], insure that any action authorized, funded, or carried out by the agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2). The consultation must be based on "the best scientific and commercial data available." *Id.*

250. Consultation is required where an agency action "may affect" endangered or threatened species or their critical habitat. 50 C.F.R. § 402.14(a).

251. Where an agency action is likely to adversely affect endangered or threatened species or their critical habitat, formal consultation that results in a detailed biological opinion is required. *Id.* § 402.14(a)–(b). During formal consultation, FWS's responsibility is to, among other things, review all relevant information, evaluate the effects of the action, and prepare a "biological opinion" that details the effects of the action on listed species or critical habitat and determines whether the action is likely to jeopardize ESA-listed species or destroy or adversely modify their critical habitat. *Id.* § 402.14(g), (h). Additionally, FWS must specify any incidental "take" (which includes harming, harassing, killing or wounding an ESA-listed species) that will occur as a result of the agency action, along with reasonable and prudent measures that are necessary and appropriate to minimize the take, and terms and conditions to implement the measures. *Id.* § 402.14 (i).

252. Under the ESA's implementing regulations, "effects of the action" include "direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action," which is then added to the baseline environmental conditions. 50 C.F.R. § 402.02. "Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur." *Id.* "Interrelated actions are those that are part of a larger action and depend on the larger action for their justification," and "[i]nterdependent actions are those that have no independent utility apart from the action under consideration." *Id.*

253. If an agency determines that its action "may affect" but is "not likely to adversely affect" a listed species or its critical habitat, and FWS concurs in writing, ESA regulations permit

a less comprehensive "informal consultation." *Id*. § 402.13. But where, as here, the action is likely to adversely affect listed species, a formal consultation process must be undertaken, which concludes with a biological opinion that evaluates the impacts of the action on protected species, including the incidental take of species that is expected to occur and the steps that must be taken to minimize and mitigate adverse impacts. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14(g).

254. Through a mix of arbitrary decision making that departed from the best available science and ignored important aspects of the problem, and the application of a now-invalidated regulatory definition of "effects of the action," among other errors, FWS violated the APA by making findings and conclusions in its concurrences that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the ESA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Declare that Defendants' actions violate NEPA, the ESA, and the APA;

B. Enjoin any construction, conversion, demobilization, and any other environmentally harmful activity on or use of the TNT Site for purposes other than its longstanding prior use as a limited pilot training facility, including use for federal immigration detention and removal, and federal funding (including reimbursement) thereof, unless and until Defendants comply with NEPA, the ESA, the APA, and state and local laws;

C. Declare that Defendant Perdue's actions exceed lawful authority under state and federal law;

D. Declare that Defendant Perdue's actions violate state environmental and land use laws;

E. Enjoin Defendants from authorizing, permitting, contracting, funding, or undertaking the continued, further, or renewed development or use of the TNT Site for purposes related to a mass detention center or any other unauthorized use;

F. Enjoin the County from permitting the use of property limited to aviation activities as a mass detainment center or any other unauthorized use;

G. Award Plaintiffs their attorneys' fees and costs as allowed by law;

H. Grant such other relief as the Court deems just and proper.

Dated: August 21, 2026

Respectfully submitted,

EARTHJUSTICE
4500 Biscayne Boulevard, Suite 201
Miami, Florida 33137
Telephone: (305) 440-5432

By: s/ Tania Galloni
Tania Galloni, Fla. Bar No. 619221
tgalloni@earthjustice.org
Dominique Burkhardt, Fla. Bar No. 100309
dburkhardt@earthjustice.org
Alisa Coe, Fla. Bar No. 10187eli
acoe@earthjustice.org

*Counsel for Friends of the Everglades*

COFFEY BURLINGTON, P.L.
2601 South Bayshore Drive, Penthouse One
Miami, Florida 33133
Telephone: (305) 858-2900

By: s/ Paul J. Schwiep
Paul J. Schwiep, Fla. Bar No. 823244
PSchwiep@CoffeyBurlington.com
Scott Hiaasen, Fla. Bar No. 103318
SHiaasen@CoffeyBurlington.com
YVB@CoffeyBurlington.com
LPerez@CoffeyBurlington.com
service@CoffeyBurlington.com

*Counsel for Plaintiffs*

CENTER FOR BIOLOGICAL DIVERSITY
Elise Pautler Bennett, Fla. Bar No. 106573
ebennett@biologicaldiversity.org
Jason Alexander Totoiu, Fla. Bar No. 871931
jtotoiu@biologicaldiversity.org
Post Office Box 2155
St. Petersburg, FL 33731
Telephone: (727) 755-6950

*Counsel for Center for Biological Diversity*