**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

FRIENDS OF THE EVERGLADES, INC., a Florida not-for-profit corporation, and CENTER FOR BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit organization,

CASE NO. 25-CV-22896-KMW

Plaintiffs,

vs.

MARKWAYNE MULLIN, in his official capacity as Secretary of the UNITED STATES DEPARTMENT OF HOMELAND SECURITY; DAVID VENTURELLA, in his official capacity as Acting Director of the UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; CAMERON HAMILTON, in his official capacity as Administrator for the FEDERAL EMERGENCY MANAGEMENT AGENCY; JARED W. PERDUE, in his official capacity as Executive Director of the FLORIDA DIVISION OF EMERGENCY MANAGEMENT; and MIAMI-DADE COUNTY, a political subdivision of the State of Florida,

Defendants.

and

THE MICCOSUKEE TRIBE OF INDIANS OF FLORIDA,

Intervenor-Plaintiff.
_____________________________________/

**AMENDED INTERVENOR COMPLAINT**

Intervenor-Plaintiff, the Miccosukee Tribe of Indians of Florida (the "Tribe"), submits the following Amended Intervenor Complaint against Defendants Markwayne Mullin, in his official capacity as Secretary of the United States Department of Homeland Security ("DHS"); David Venturella, in his official capacity as Acting Director of the United States Immigration and Customs Enforcement ("ICE"); Cameron Hamilton, in his official capacity as Administrator for the Federal Emergency Management Agency ("FEMA") (together, DHS, ICE, and FEMA are the "Federal Defendants"); Jared W. Perdue, in his official capacity as Executive Director of the Florida Division of Emergency Management ("FDEM"); and Miami-Dade County (the "County").

1. On July 30, 2025, the Court granted the Tribe's Motion to Intervene (D.E. 73).

2. The Miccosukee Tribe of Indians of Florida is a federally recognized Indian Tribe with its headquarters located in the Miccosukee Reserved Area in Miami-Dade County, Florida. The Tribe is a sovereign entity dedicated to promoting the general welfare of its tribal members and conserving and developing its land and resources to secure for its members and their descendants the blessings of liberty and freedom.

3. The Tribe is the owner and real party in interest of several properties adjacent or in close proximity to Big Cypress National Preserve and the TNT Site, including but not limited to Water Conservation Area 3-A, the Miccosukee Reserved Area, and the Miccosukee Reservation.

4. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. §§ 1391(e) because a substantial part of the events occurred in this District, the Tribe's affected landholdings are located in this District, and a substantial number of the affected historic properties are located in this District.

**ADOPTION BY REFERENCE**

5. Pursuant to Federal Rule of Civil Procedure 10(c), the Tribe incorporates and adopts the following allegations from the Second Amended and Supplemental Complaint for Declaratory and Injunctive Relief (D.E. 171) ("SAC") filed by Plaintiffs Friends of the Everglades, Inc. ("Friends") and Center for Biological Diversity (the "Center") (together as "Plaintiffs"):

a. Introduction: Allegation numbers 1-6, 8-20.

b. Jurisdiction and Venue: Allegation numbers 21-22.

c. Parties: Allegation numbers 23-34, 36.

d. Common Allegations: Allegation numbers 37-114.

**COUNT I**
**(VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT and ADA)**
**(Against FDEM, DHS, FEMA, and ICE)**

6. The Tribe realleges paragraphs 1 through 5 above, as well as the adopted allegations in the SAC, as if fully set forth herein.

7. The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, requires federal agencies to prepare an Environmental Impact Statement (EIS) for any major federal action significantly affecting the quality of the human environment, or an Environmental Assessment (EA) if the agency action does not have reasonably foreseeable significant effects on the human environment, or if the significance of such effect is unknown.

8. Major federal actions include any action that is subject to "substantial Federal control and responsibility." 42 U.S.C. § 4336e(10).

9. The construction of a detention center is an action that is necessarily subject to federal control and responsibility. The State of Florida has no authority or jurisdiction to enforce federal immigration law.

10. In Fla. Stat. § 908.13, the Florida legislature authorized FDEM to facilitate the transport of detainees on the condition that ICE "specifically request assistance from the division with the transport of unauthorized aliens pursuant to specific federal legal authority." *Id.* § 908.13(2)(a). Additionally, ICE "must reimburse the state for the actual cost of assisting with the transport of unauthorized aliens." *Id.* § 908.13(2)(b). Any such transport "must occur under the ***direct control and supervision*** of" ICE. *Id.* § 908.13(2)(c) (emphasis added). Because state law requires that FDEM's transportation of detainees to and from the detention center occur under the "direct control and supervision" of ICE, the detention center project at the TNT Site is statutorily required to be under "Federal control and responsibility," 42 U.S.C. § 4336e(10), thereby triggering NEPA. In this way, FDEM is acting as agent for the Federal Defendants.

11. NEPA is a procedural statute that requires federal agencies to prepare an EIS, identifying significant environmental effects of the projects, as well as feasible alternatives. The law ensures that the agency and the public are aware of the environmental consequences of proposed projects. Properly applied, NEPA helps agencies to make better decisions and to ensure good project management.

12. Infrastructure projects like this one that are funded and/or approved by the federal government, require federal agencies to prepare an EIS for actions that significantly affect the quality of the human environment. The EIS must identify significant environmental effects of the projects, as well as feasible alternatives.

13. Specifically, an EIS must include a "detailed statement" addressing the following: (i) reasonably foreseeable environmental effects of the proposed agency action; (ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented; (iii) a reasonable range of alternatives to the proposed agency action, including an

analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal; (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (v) any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented. 42 U.S.C. §§ 4332(C)(i)-(v).

14. Moreover, NEPA requires that "[p]rior to making any detailed statement," the head of the lead agency "shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." *Id.* § 4332(C). Because actions associated with the construction and operation of the detention center at the TNT Site are within a national preserve that includes primary habitat for the Florida panther and critical habitat for the Florida bonneted bat, at a bare minimum federal law requires DHS to consult with the National Park Service, and the U.S. Fish and Wildlife Service in assessing the environmental impacts of its proposed project. Additionally, the known presence of Tribal historic and cultural sites, as well as the Tribe's adjacent landholdings that are all ecologically sensitive, requires consultation with the Tribe itself.

15. The arrangements between or among Defendants to transform the TNT Site into a mass detention and deportation facility constitute major federal action due to the use of federal authority, approvals, funding and resources, and will have significant environmental impacts on an ecologically sensitive area. Those impacts, which to date have gone unevaluated, could logically include impacts to listed species, impacts to wetlands and surface waters, impacts due to increased activities at the Site, including traffic to and from the Site, hurricane and flooding preparedness, etc.

16. The Tribe is not aware of any EA or EIS that was or is being prepared by Defendants or any cooperating agency.

17. Defendants' actions and omissions constitute multiple violations of NEPA that are reviewable under the APA. The State and Federal Defendants' actions constituted a partnership or joint venture for purposes of NEPA, including the development, construction, operation and funding of the detention center. The Federal Defendants' actions federalized the project for purposes of NEPA.

18. First, DHS's consideration of entering into a cooperative agreement with FDEM for the construction of a mass immigration detention center at the TNT Site to meet the Federal Defendants' operational needs by agreeing to provide guaranteed bed space for persons detained by DHS/ICE constitutes a proposed major federal action under NEPA. *See* 8 U.S.C. § 1103(a)(11)(B).

19. Second, DHS and/or ICE's consideration of FDEM's request to operate a federal immigration detention center constituted a major federal action subject to NEPA.

20. DHS and/or ICE's authorization of FDEM's operation of a federal immigration detention center constitutes a final agency action under the APA.

21. Third, DHS's and FEMA's consideration of Florida's request for federal funding, which pre-dated construction of the facility and continued thereafter, constituted a proposed major federal action subject to NEPA.

22. DHS's and FEMA's commitment to fund the facility prior to its construction constitutes a final agency action under the APA.

23. DHS's and FEMA's approval of funding requests related to the facility constitutes one or more final agency actions.

24. DHS's and FEMA's disbursement of federal funds related to the facility constitutes one or more final agency actions.

25. DHS's and FEMA's creation of the DSGP in order to fund various aspects of the facility's construction and operation, and the decision to name FDEM as the sole eligible applicant for DSGP funds, constitutes one or more final agency actions.

26. The DSGP[1] itself requires compliance with NEPA. Specifically, the DSGP "Application Procedures" section states that "2 C.F.R. 200 Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards applies to this program." Pursuant to 2 C.F.R. 200, Appendix 1 to Part 200, sub(b)(4)(i)(D), the DSGP listing must "identify required content of an application" including, specifically, "information needed to comply with the National Environmental Policy Act (42 U.S.C. 4321 *et seq*.)."

27. The DSGP listing is consistent with the requirements of 2 C.F.R. 200, Appendix 1 to Part 200, sub(b)(4)(i)(D), in that the grant listing provides that "[a]n environmental impact statement is required for this listing" and an "environmental impact assessment is required for this listing."

28. The DSGP "Eligible Award Applicant Types" section states that the "State of Florida Division of Emergency Management is the sole eligible applicant." By applying for the DSGP, FDEM undertook to comply with NEPA and had actual notice that an "environmental impact statement" and "environmental impact assessment" were "required for this listing."

---

[1] The DSGP listing is available here: <https://sam.gov/fal/9ee7147447584efda2d2ed4ac51a92aa/view> (last accessed Aug. 26, 2026).

The DSGP listing was archived and not publicly accessible during the prior proceedings before this Court.

29. The requirement for NEPA compliance in the DSGP listing evidences that the Federal Defendants' actions in developing, creating, and/or publishing the DSGP, including the decision to make FDEM the sole eligible applicant for same, constitute final agency action.

30. Regardless, the Federal Defendants and FDEM undertook to comply with NEPA. The Federal Defendants undertook to comply with NEPA by requiring an "environmental impact statement" and "environmental impact assessment" as part of the DSGP. FDEM undertook to comply with NEPA by applying for the DSGP with actual notice that an "environmental impact statement" and "environmental impact assessment" were required.

31. Fourth, DHS's and ICE's consideration of using the TNT Site for immigration detention (arranging for the TNT facility as a place of immigration detention) was a proposed major federal action.

32. DHS's and ICE's decision to detain people at the TNT Site (arrangement to use the TNT facility as a place of immigration detention), pursuant to which DHS/ICE began to detain people at the facility on or about July 1, 2025, was a final agency action.

33. Fifth, to the extent the construction of the mass detention facility at the TNT Site is deemed a non-Federal action, that action has involved more than minimal federal funding and more than minimal Federal involvement, thereby making it subject to NEPA on this basis as well. 42 U.S.C. § 4336e(10)(B)(i) ("the term 'major Federal action' does not include . . . a non-Federal action . . . with no or minimal Federal funding; or with no or minimal Federal involvement where a Federal agency cannot control the outcome of the project").

34. A condition precedent to the construction of the facility was an agreement between state and federal agencies that (1) the federal government would provide substantial federal funding to support the facility, and (2) the federal government would authorize the state to operate

the detention facility subject to substantial Federal involvement. FDEM acted pursuant to this agreement by commandeering the TNT Site based solely on the declared immigration emergency and employing contractors to build and operate an immigration detention facility subject to federal oversight and control. FDEM asserted no other authority for commandeering the property.

35. Federal approval and authorization were also legal preconditions to the use of the TNT Site for an immigration detention center and construction of the facility as an immigration detention center.

36. Federal involvement includes federal approval of the TNT Site as appropriate for an immigration detention center, authorization for FDEM to operate the detention center, facility inspection for compliance with federal immigration detention standards, the ongoing obligation to ensure compliance with federal immigration detention standards (including facility standards, conditions of confinement, access to counsel, and medical care), imposing an obligation to obtain an environmental impact statement and environmental impact assessment in connection with the DSGP, determinations regarding which individuals will be detained at the facility, exclusive control over when and whether detainees at the facility are released or transferred, and supervision and oversight of staff authorized to participate in immigration functions, which includes immigration detention.

37. Sixth, to the extent the operation of the mass detention facility at the TNT Site is deemed a non-Federal action, that action has involved more than minimal federal funding and more than minimal Federal involvement, thereby making it subject to NEPA on this basis as well.

38. A condition precedent to the operation of the facility was an agreement between state and federal agencies that (1) the federal government would provide more than minimal federal funding to support the facility, and (2) the federal government would authorize the state to operate

the detention facility subject to substantial Federal involvement and/or control. FDEM acted pursuant to this agreement by commandeering the TNT Site based solely on the declared immigration emergency and employing contractors to build and operate an immigration detention facility subject to federal oversight and control.

39. Federal approval and authorization were also legal preconditions to operation and use of the TNT facility as an immigration detention center.

40. Federal involvement includes federal approval of the TNT Site as appropriate for an immigration detention center, authorization for FDEM to operate the detention center, facility inspection for compliance with federal immigration detention standards, the ongoing obligation to ensure compliance with federal immigration detention standards (including facility standards, conditions of confinement, access to counsel, and medical care), imposing an obligation to obtain an environmental impact statement and environmental impact assessment in connection with the DSGP, determinations regarding which individuals will be detained at the facility, exclusive control over when and whether detainees at the facility are released or transferred, and supervision and oversight of staff authorized to participate in immigration functions, which includes immigration detention.

41. FDEM has no authority to construct or operate an immigration detention center absent federal authorization, oversight, and control.

42. The Federal Defendants, individually or collectively, have taken several actions to fund the project, including prior to initial construction. This includes (1) entering into an agreement with FDEM whereby DHS committed to funding the project, a commitment on which FDEM relied to proceed with commandeering the Site and building the facility; (2) developing a FEMA detention support grant program for purposes of funding this project with FDEM as the only

eligible applicant and directing DSGP funds be used "for the costs of sheltering aliens in a detention environment" until they are "transfer[ed] to [ICE]"; (3) coordinating with FDEM to jointly develop and amend parameters for how the funding would be structured, described, and disbursed, in part in an apparent attempt to avoid liability in this suit; (4) formally approving one or more requests for funding; and (5) making disbursements.

43. Defendants violated NEPA by not preparing an EIS because the following actions would have, and have had, significant environmental impacts on an ecologically sensitive area, with significant foreseeable impacts on waters, wetlands, air, traffic, and threatened and endangered species:

a. The Federal Defendants' consideration of and, in fact, entering into a cooperative agreement with FDEM for the construction of a mass immigration detention center at the TNT Site to meet the Federal Defendants' operational needs.

b. The Federal Defendants' request(s) for FDEM to operate, or consideration of FDEM's request to operate, and subsequent authorization of FDEM's operation of, a federal immigration detention center at the TNT Site.

c. The Federal Defendants' consideration of Florida's request for federal funding of the facility at the TNT Site, which began before construction of the facility and continued thereafter, and subsequent decision to fund the facility and subsequent funding of the facility, where Florida relied on the Federal Defendants' commitment of federal funding to proceed with the project and Florida and federal officials assured the public that the facility would be paid for with substantial federal funds.

d. Defendants' failure to uphold their undertaking to prepare a required environmental impact statement and environmental impact assessment in connection with the DSGP.

e. To the extent the construction of the mass detention facility at the TNT Site is deemed a non-Federal action, that action is subject to NEPA because it involves more than minimal federal funding and more than minimal Federal involvement. Construction of the facility was the result of a state-federal partnership or joint venture.

f. To the extent the operation of the mass detention facility at the TNT Site is deemed a non-Federal action, that action is subject to NEPA because it involves more than minimal federal funding and more than minimal Federal involvement. Operation of the facility was also the result of a state-federal partnership or joint venture.

44. Moreover, NEPA requires that "[p]rior to making any detailed statement," the head of the lead agency "shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." 42 § 4332(C)(v). Because actions associated with the authorization, construction, and operation of the detention center at the TNT Site involve a national preserve that includes primary habitat for the Florida panther and critical habitat for the Florida bonneted bat, at a bare minimum federal law required DHS, ICE, and/or FEMA to consult with the National Park Service, and the U.S. Fish and Wildlife Service in assessing the environmental impacts of their proposed actions, something they failed to do.

45. NEPA requires that federal agencies prepare an EA if a proposed agency action does not have reasonably foreseeable significant effects on the human environment or if the significance of such effect is unknown. An EA must examine the reasonably foreseeable effects of the proposed action, consider alternatives, and articulate the bases for a determination that the proposed action will not have a significant effects on the human environment. Federal Defendants did not prepare any or any legally-sufficient EA prior to entering into their agreement with Florida/FDEM, approving the TNT Site as an appropriate place for immigration detention, authorizing Florida/FDEM to operate an immigration detention center, allowing the facility to operate with more than minimal federal involvement and/or control, committing to providing more than minimal federal funding for the facility, approving federal funding, or disbursing those federal funds.

46. The failure to conduct the required environmental review under NEPA violates federal law and deprives the public and affected stakeholders, including the Tribe, of required procedures and environmental protections.

47. Upon information and belief, Defendants' failure to comply with NEPA will cause adverse effects and injuries to the Tribe's adjacent and proximate landholdings. Additionally, Defendants' failures have prevented and will continue to prevent Tribal members from exercising their rights to use and occupy the Big Cypress National Preserve, and substantially impairs their use and enjoyment of adjacent and/or proximate Tribal landholdings.

48. NEPA review is important not only for avoiding environmental harm but also because it discloses environmental impacts and includes the consideration of alternatives, which can include mitigation and remediation. Such a review would also inform Defendants' future

attempts to construct, operate, and/or decommission a detention facility at the site as Florida has indicated it would if DHS requested it.

49. By violating NEPA in the manner set forth above, Defendants' actions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and were taken without compliance with procedure required by law, in contravention of the Administrative Procedure Act. The Tribe is therefore entitled to injunctive, declaratory, and remedial relief.

**COUNT II**
**(VIOLATION OF ADMINISTRATIVE PROCEDURE ACT)**
**(Against Federal Defendants)**

50. The Tribe realleges paragraphs 1 through 5 above, as well as the adopted allegations in the SAC, as if fully set forth herein.

51. The Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, permits judicial review of final agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

52. The Federal Defendants' final decisions and actions to authorize, approve, fund, and carry out a mass immigration detention center, as alleged herein, constitute final agency actions.

53. Federal Defendants undertook these actions in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, because Federal Defendants failed to consider all relevant factors in their decision-making, including the funding, siting, construction, operation and demobilization of a mass immigration detention center within the boundaries of a National Preserve, the protections afforded to Big Cypress National Preserve and its natural resources under the National Park Service Organic Act of 1916, (16 U.S.C. § 1, amended and recodified in 54

U.S.C. § 100101(a) (2014)), and the impacts of these final agency actions on Big Cypress National Preserve.

54. The Federal Defendants approved the use of the TNT Site without providing the Tribe and the public with an opportunity for notice and comment, and without adhering to required environmental review procedures under NEPA and other federal laws, including NHPA, the Endangered Species Act, and the National Park Service Organic Act of 1916, (16 U.S.C. § 1, amended and recodified in 54 U.S.C. § 100101(a) (2014)).

55. The decision to proceed without notice and comment, and without an EA or EIS, constitutes final agency action and is subject to judicial review.

56. The Tribe is entitled to a declaration that the Federal Defendants' conduct is unlawful, on order vacating their the unlawful agency actions, as well as an injunction preventing further activity until NEPA compliance is achieved.

**<u>COUNT III</u>**
**(VIOLATION OF NATIONAL HISTORIC PRESERVATION ACT and APA)**
**(Against the Federal Defendants)**

57. The Tribe realleges paragraphs 1 through 5 above, as well as the adopted allegations in the SAC, as if fully set forth herein.

58. Pursuant to 5 U.S.C. § 706(1), this Court has authority to compel agency action unlawfully withheld or unreasonably delayed.

59. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. §§ 1391(e) because a substantial part of the events occurred in this District and a substantial number of the affected historic properties are located in this District.

60. NHPA obligates federal agencies to "assume responsibility for the preservation of historic properties" and requires that federal agencies having authority to license any undertaking,

prior to the issuance of any federal funds or license, shall take into account the effect of the undertaking on historic properties. 54 U.S.C. § 306108; 36 C.F.R. § 800.1.

61. Pursuant to 36 C.F.R. § 800.3, the NHPA Section 106 process begins when a federal agency determines that a proposed federal action is an "undertaking" as defined by 36 C.F.R. § 800.16(y). An undertaking includes "a project . . . under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license or approval." 36 C.F.R. § 800.16(y).

62. The timing requirement for consultation ensures the agency considers a broad range of alternatives, including no action, and to avoid, minimize or mitigate the undertaking's adverse effects to historic properties. *See* 36 C.F.R. § 800.1(c). *See also Pueblo of Sandia v. United States*, 50 F.3d 856, 859-62 (10th Cir. 1995) (discussing the timing requirements in connection with tribal consultation regarding sufficiency of proposed alternatives).

63. NHPA regulations carve out a detailed consultation process for Native American Tribes. 36 C.F.R. § 800.2(c)(2)(ii).

64. This requirement applies, even if the location of the historic property is off tribal lands. 36 C.F.R. § 800.2(c)(2)(ii)(D).

65. Agencies, like the Federal Defendants, are required to ensure the consultation process provides a tribe with a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, articulate its views on the undertaking's effects on such properties and participate in the resolution of adverse effects. *See* 36 C.F.R. § 800.2(c)(2)(ii)(A).

66. The Tribe attaches historic, cultural and spiritual significance to the areas affected by the construction and operation of the TNT Site.

67. The Miccosukee people have lived in and cared for the land now known as the Big Cypress National Preserve (the "Preserve") since time immemorial. The Tribe and its ancestors occupied, traveled, and utilized resources within its ancestral lands, including what is now the Preserve.

68. The Tribe's cultural resources and sites are historically and culturally interrelated and interconnected throughout its ancestral lands generally, including the Preserve, Everglades National Park, Water Conservation Area 3-South, the Miccosukee Reserved Area, and the Miccosukee Reservation.

69. Both the state and federal governments are well aware of the number and significance of Tribal historic and cultural sites throughout Big Cypress. Attached hereto as Exhibit A is a true and correct copy of that certain "PROGRAMMATIC AGREEMENT AMONG THE NATIONAL PARK SERVICE BIG CYPRESS NATIONAL PRESERVE, THE FLORIDA STATE HISTORIC PRESERVATION OFFICER, AND THE SEMINOLE TRIBE OF FLORIDA REGARDING THE IMPLEMENTATION OF THE BIG CYPRESS NATIONAL PRESERVE FINAL BACKCOUNTRY ACCESS PLAN/WILDERNESS STUDY/ENVIRONMENTAL IMPACT STATEMENT, AND THE BIG CYPRESS NATIONAL PRESERVE – ADDITION FINAL GENERAL MANAGEMENT PLAN/WILDERNESS STUDY/OFF-ROAD VEHICLE MANAGEMENT PLAN/ENVIRONMENTAL IMPACT STATEMENT, COLLIER, MIAMI-DADE, AND MONROE COUNTIES, FLORIDA" (the "NPS Agreement").

70. The NPS Agreement arose in connection with NPS's preparation of a "Backcountry Access Plan/Wilderness Study/Final Environmental Impact Statement" ("NPS Final Plan") with

respect to the environmental impact of proposed re-opening of off-road-vehicle trails within the Preserve, among other things. (*See* Ex. A, at ix.) Notably, NPS's decision on whether to allow off-road-vehicles on certain trails within the Preserve was sufficient to trigger an almost four-hundred-page environmental impact study and consultation process with the Tribe and other Tribes in the area, all of which is discussed in the larger NPS Final Plan. (*See* Ex. A, at 1/G-2 (defining the reopening of off-road-vehicle trails as a federal undertaking under 36 C.F.R. § 800.16(y)).)

71. Considering that the Tribe's ancestral homelands include the Preserve, the NPS Final Plan found that *the entire Preserve* was an Area of Potential Effects. (Ex. A, at 2/G-3.) Indeed, the NPS Agreement provides: "NPS-administered lands in the [Preserve] **contain numerous historic properties**, and these **properties are archeological, historical, of traditional and/or cultural importance to Native American Tribes in the region** and by their very nature, **are non-renewable resources and of great worth to the American public**." (*Id.*) To that end, NPS acknowledged and reaffirmed its obligation to consult with the Tribe and other Tribes during its decision-making process. (*See, e.g.,* Ex. A, §§ II.A ("[T]he NPS will consult with . . . the Miccosukee Tribe . . . to identify culturally sensitive areas to be avoided by trails.").)

72. The NPS Final Plan also includes findings that there are approximately "500 known archeological sites within the Preserve" and notes that NPS estimates there are "several hundred unrecorded sites" in the Preserve as well. (*See* NPS Final Plan at 79.) These include "historic Seminole or Miccosukee camps and sacred areas . . . ." (*Id.*) Further, the NPS Final Plan confirms that "[m]any resources within the original [P]reserve and the Addition have traditional associations with the Seminole and Miccosukee Tribes," "Native American ceremonial sites exist in the [P]reserve," and NPS's consultation with the Tribe and Tribal Members "to protect the privacy and

sanctity of their ceremonial and burial sites" pursuant to the American Indian Religious Freedom Act of 1978. (*Id*. at 80.)

73. The Tribe is a non-signatory, Consulting Party to the NPS Agreement. (*See* Ex. A, at 21/G-22.)

74. As a whole, the NPS Agreement and the NPS Final Plan reflect the level of respect and government-to-government discussions required under law when implementing agency action in areas with known cultural significance, such as the Big Cypress National Preserve.

75. No such efforts to consult with the Tribe were made here.

76. Instead, the Federal Defendants, directly or indirectly, authorized or approved the construction and operation of a detention center at the TNT Site that is surrounded on all sides by Big Cypress National Preserve. This constitutes a federal undertaking because the project was under the direct or indirect jurisdiction of the Federal Defendants, carried out with Federal financial assistance, and/or required the Federal Defendants' approval.

77. This undertaking remains active due to the ongoing demobilization efforts at the TNT Site. Upon information and belief, the Federal Defendants intend to re-open the detention facility or otherwise resume operations at the TNT Site. This is supported by the continued presence of construction and other improvements or modifications at the TNT Site that were ostensibly built for purposes of operating the detention center and would, in turn, be used to enable continued operations at a later date. Finally, the undertaking remains active because the Federal Defendants have not disbursed the balance of DSGP funds to FDEM.

78. To date, the Federal Defendants have not consulted with the Tribe regarding this federal undertaking, including but not limited to the facility's construction and/or operation, its demobilization, or the potential adverse effects to historic and cultural sites in the surrounding

area. The TNT Site is located in the heart of the Tribe's ancestral homelands where hundreds, if not thousands, of protected ceremonial and religious sites are located.

79. In addition to their obligations under the plain language of the NHPA, the Federal Defendants have promulgated policies and procedures that specifically require consultation with the Tribe and general compliance with NHPA, including but not limited to DHS Directive 017-01 and Instruction 017-01-001, both of which were issued in or about October 2020 and were updated or reaffirmed on or about March 28, 2025.

80. The Federal Defendants' undertaking to fund, authorize, and/or approve the construction and operation of a detention center at the TNT Site has had an adverse effect on historic and culturally significant sites in the surrounding area, including Tribal sites, and has prevented the Tribe and Tribal Members from exercising their rights to use and access these sites. Additionally, the intensive use of the TNT Site has had an adverse effect on the historic and cultural Tribal sites and resources in the area.

81. At all times material, the Federal Defendants had actual or constructive notice of the existence of protected historical and cultural sites within Big Cypress National Preserve, including Tribal sites, by virtue of the NPS Final Plan generally and the NPS Agreement specifically. The Federal Defendants knew or should have known that their undertaking(s) had the potential to cause adverse effects on the historic and cultural sites, including Tribal sites.

82. Upon information and belief, the adverse effects caused by the Federal Defendants' undertaking(s) will worsen and/or spread over time, causing additional adverse effects to a greater number of protected historical and cultural sites.

83. By violating the NHPA in the manner set forth above, the Federal Defendants' actions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,

and were taken without compliance with procedures required by law, all in contravention of the Administrative Procedure Act. The Tribe is therefore entitled to injunctive, declaratory, and remedial relief.

84. Furthermore, the Federal Defendants' failure to consult with the Tribe is a violation of the express provisions of the NHPA and their own policies requiring same, such that the Tribe is entitled to an order compelling the Federal Defendants to engage in agency action that, to date, has been unlawfully withheld or unreasonably delayed.

**PRAYER FOR RELIEF**

WHEREFORE, the Miccosukee Tribe of Indians of Florida respectfully requests that the Court:

A. Declare that Defendants' actions violate NEPA, NHPA, and the APA;

B. Enjoin any construction, conversion, demobilization, and any other activity on or use of the TNT Site, unless and until Defendants comply with NEPA, NHPA, and the APA;

C. Require the remediation of any damage caused by the construction, conversion, demobilization, and other activity on the TNT Site, and setting benchmarks to restore the site to its status quo ante;

D. Compel Tribal consultation required by the NHPA;

E. Award the Tribe its attorneys' fees and costs as allowed by law;

F. Grant such other relief as the Court deems just and proper.

Dated: August 26, 2026

Respectfully submitted,

**CHRISTOPHER AJIZIAN, P.A.**

By: */s/ Christopher Ajizian*
Christopher Ajizian, Esq.
Florida Bar No. 1010170
chris@ajizianlaw.com
1101 Brickell Avenue
Suite S-700
Miami, FL 33131
Tel: (305) 699-5001

-and-

**TODD R. FRIEDMAN, P.A.**
Todd R. Friedman, Esq.
Fla. Bar No. 97919
1101 Brickell Avenue
Suite S-700
Miami, Florida 33131
786-536-7190
todd@toddfriedmanpa.com

*Counsel for The Miccosukee Tribe of Indians of Florida*

**CERTIFICATE OF SERVICE**

I certify that on August 26, 2026 a true and correct copy of the foregoing was filed via the Court's CM/ECF filing system and thereby served on counsel of record.

By: */s/ Christopher Ajizian*
Christopher Ajizian