# EXHIBIT A

# APPENDIX G: PROGRAMMATIC AGREEMENT REGARDING IMPLEMENTATION OF BIG CYPRESS NATIONAL PRESERVE BACKCOUNTRY ACCESS PLAN

PROGRAMMATIC AGREEMENT AMONG

THE NATIONAL PARK SERVICE BIG CYPRESS NATIONAL PRESERVE,

THE FLORIDA STATE HISTORIC PRESERVATION OFFICER,

AND THE SEMINOLE TRIBE OF FLORIDA

REGARDING

THE IMPLEMENTATION OF THE *BIG CYPRESS NATIONAL PRESERVE FINAL BACKCOUNTRY ACCESS PLAN/WILDERNESS STUDY/ENVIRONMENTAL IMPACT STATEMENT*, AND THE *BIG CYPRESS NATIONAL PRESERVE – ADDITION FINAL GENERAL MANAGEMENT PLAN/WILDERNESS STUDY/OFF-ROAD VEHICLE MANAGEMENT PLAN/ENVIRONMENTAL IMPACT STATEMENT*, COLLIER, MIAMI-DADE, AND MONROE COUNTIES, FLORIDA

**WHEREAS**, Big Cypress National Preserve (BICY) has developed a “Backcountry Access Plan/Wilderness Study/Environmental Impact Statement” (the BAP) with objectives to reopen select primary and secondary Off-Road Vehicle (ORV) trails in the original Preserve, including airboat trails; expand the hiking trail system; reopen and designate destinations; designate a backcountry campground on a former oil well-pad in the Bear Island Unit of the original Preserve; repair, replace, and install trail markers and trail signs; formally establish the ORV connecting route between Bear Island Grade (in the original preserve) and Bundschu Grade (in the Northeast Addition) to a preexisting trail near the southern end of Bundschu Grade; and reopen an ORV connecting route between the original Preserve and the BICY Addition through Mullet Slough (see Appendix B Maps); and

**WHEREAS**, BICY has developed the “Big Cypress National Preserve – Addition Final General Management Plan/Wilderness Study/Off-Road Vehicle Management Plan/Environmental Impact Statement” (the Addlands GMP) with objectives to reopen primary ORV trails in the Northeast Addition of BICY (see Appendix B Maps); and

**WHEREAS**, the NPS shall undertake a federal rulemaking process for the combined implementation of the BAP and the Addlands GMP, followed by the establishment of the resulting parkwide trail system and reopening of trails (the Undertaking); and

**WHEREAS**, the NPS, of which Big Cypress National Preserve is a part, has determined the Undertaking is subject to review under Section 106 of the National Historic Preservation Act (NHPA), Title 54 USC § 306108, and its implementing regulations, 36 Code of Federal Regulations (CFR) Part 800 (referred collectively to as “Section 106”); and

**WHEREAS**, the NPS, of which Big Cypress National Preserve is a part, has determined this is an Undertaking as defined under 36 CFR 800.16(y) and is a collection of individual undertakings that have the potential to affect historic properties; and

**WHEREAS**, the NPS, in consultation with the Florida State Historic Preservation Office (SHPO), has identified the Area of Potential Effect (APE) for the Undertaking, which includes the entire Big Cypress National Preserve; and

**WHEREAS**, the NPS has prepared Environmental Impact Statements (EIS) to analyze the potential environmental impacts of the Undertaking in accordance with the National Environmental Policy Act (NEPA); and

**WHEREAS**, NPS-administered public lands in the BICY contain numerous historic properties, and these properties are archeological, historical, of traditional and/or cultural importance to Native American Tribes in the region and by their very nature, are non-renewable resources and of great worth to the American public; and

**WHEREAS**, the NPS plans for, operates, manages, and administers the National Park System (the System) and is responsible for identifying, preserving, maintaining, and interpreting the historic properties of the System unimpaired for the enjoyment of future generations in accordance with the 1916 National Park Service Organic Act, the NPS Management Policies (2006), and applicable NPS Directors Orders; and

**WHEREAS**, the NPS has determined that effects cannot be fully determined prior to the approval of the EIS according to 36 CFR 800 Subpart C 800.14(b)(1)(ii) and has developed this Programmatic Agreement (Agreement) pursuant to 36 CFR 800.14(b)(3); and

**WHEREAS**, the NPS will take a phased approach to determining the effects on historic properties of undertakings proposed as a part of the Backcountry Access Plan; and

**WHEREAS**, in accordance with 36 CFR 800.6(a)(1), the NPS has notified the Advisory Council on Historic Preservation (ACHP) of the determination that effects on historic properties cannot be fully determined prior to approval of the Undertaking with specified documentation, and on February 11th, 2021, the ACHP agreed to participate as a Consulting Party to this agreement; and

**WHEREAS**, pursuant to 36 CFR 800.2(c)(1), the Florida State Historic Preservation Officer (SHPO) has responsibilities under the NHPA to advise and assist the NPS in complying with its Section 106 responsibilities for proposed Undertaking and is a Signatory to this Agreement; and

**WHEREAS**, the NPS acknowledges the special expertise of Tribal nations and the value of Indigenous Knowledge (IK) in identifying and evaluating cultural resources and properties of significance.

**WHEREAS**, pursuant to the special relationship between the federal government and Native American Tribes, and Section 101(d)(6)(B) of the NHPA (54 USC 302706(b)), 36 CFR 800.2(c)(2)(ii), the NPS is responsible for government-to-government consultation with federally recognized Native American Tribes; and

**WHEREAS,** the NPS has invited the Seminole Tribe of Florida, the Miccosukee Tribe of Indians of Florida, and the Seminole Nation of Oklahoma to participate as Consulting Parties. The Seminole Tribe of Florida has agreed to participate as a Signatory to this

agreement. The Miccosukee Tribe of Indians of Florida, and the Seminole Nation of Oklahoma has agreed to participate as Consulting Parties; and

**WHEREAS**, the NPS commits to afford Tribal Officials the appropriate respect and dignity as leaders of sovereign nations and will make every effort to understand and consider Tribal interests in these lands. The NPS has committed to carrying out its responsibilities to consult and coordinate with Native American Tribes with the further understanding that, notwithstanding any decision by these Native American Tribes to decline concurrence with this Agreement, the NPS shall continue to consult and coordinate with these Native American Tribes throughout the implementation of this Agreement; and

**WHEREAS**, unless otherwise indicated, the terms used in this Agreement are defined in Appendix A – Acronyms, Abbreviations, and Definitions and are consistent with the definitions found in 36 CFR 800.16; and

**WHEREAS**, for the purposes of this Agreement, "Consulting Parties" collectively refers to the Signatories, and Concurring Parties regardless of their decision to sign this Agreement; and

**WHEREAS**, the NPS is the federal agency responsible for ensuring that all stipulations of this Agreement are carried out

**NOW, THEREFORE**, the NPS, SHPO and ACHP agree that the Undertaking shall be implemented in accordance with the following stipulations in order to consider the effects of the Undertaking on historic properties.

## STIPULATIONS

The NPS will ensure that the following measures are carried out.

## I. AREA OF POTENTIAL EFFECT

For the purposes of this Agreement, the NPS, in consultation with the Consulting Parties, has defined the Undertaking to encompass the entire Big Cypress Preserve. As defined at 36 CFR 800.16(d), "The area of potential effects is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking."

The individual actions completed under this Agreement for this Undertaking will have specific Areas of Potential Effects due to the nature of their action. These actions include the following: reopen select primary and secondary ORV trails in the original Preserve, including airboat trails; reopen primary trails in the Northeast Addition of the Preserve; reopen and designate destinations for backcountry camping; expand the hiking trail system; create a new backcountry campground on disturbed lands in the Bear Island Unit of the original Preserve; repair, replace, and install trail markers and trail signs; formally establish the ORV connecting route between Bear Island Grade and Bundschu Grade to a preexisting trail near the southern end of Bundschu Grade; and reopen an ORV connecting route between the original Preserve and the BICY Addition through Mullet Slough (see Appendix B: Maps).

NPS, in consultation with the Consulting Parties, will define and document the Area of Potential Effects (APE) (36 CFR 800.16(d)) for the individual actions identified above, based

on their potential to alter directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register of Historic Places (NRHP) in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling or association.

The individual actions done under this Agreement will require refined individual APE's as they are developed.

A. The following shall be used as guidance when defining the APE for actions under this Agreement:

   1. Direct Effects: As per the ACHP's memo "Recent court decision regarding the meaning of "direct" in Sections 106 and 110(f) of the National Historic Preservation Act", the meaning of the term "directly" in Section 110(f) refers to the causality, and not the physicality, of the effect. This means that if the effect comes from the undertaking at the same time and place with no intervening cause, it is considered "direct" regardless of its specific type (e.g., whether it is visual, physical, auditory, etc.). A "direct effect" is an effect that will have a direct impact on any of the aspects of integrity that may a property eligible for the National Register of Historic Places.

   2. Indirect Effects: As per the ACHP's memo "Recent court decision regarding the meaning of "direct" in Sections 106 and 110(f) of the National Historic Preservation Act", "indirect" effects are those caused by the undertaking that are later in time or farther removed in distance but are still reasonably foreseeable.

   3. Cumulative Effects: Cumulative effects are the impact on the historic properties that result from the total impact of the Undertaking. For the purposes of this Agreement, the APE for cumulative effects will be the Preserve.

B. If the APE includes or is located immediately adjacent to Traditional Cultural Places (TCP) or properties of religious or cultural significance; or other classes of historic properties for which setting, feeling and/or association contribute to eligibility, additional analysis of the APE shall be required. This analysis should be conducted on a case-by-case basis in consultation with the Consulting Parties in accordance with the provisions and timelines of Stipulation IX and X.

C. Modifying the APE. The APE shall be modified when additional research, cultural surveys, consultation with the Consulting Parties, or changes to the scope of the Undertaking indicate that historic properties located outside the boundaries of a previously defined APE may be affected directly, indirectly, or cumulatively by the Undertaking. Modifications to the APE shall be allowed only when there is sufficient evidence that the APE is larger than the APE described above; decreases to the APE are not permitted. The APE shall be modified through the following steps:

   1. A proposal for modification of the APE shall be made by the BICY Superintendent or a Consulting Party with written justification for, and a graphic illustration of, the proposed APE modification(s).

2. The BICY Superintendent shall communicate the modification proposal(s) to all Consulting Parties in accordance with the provisions and timelines of Stipulations X.
3. Following consultation, the BICY Superintendent shall decide on the proposed modification(s) and notify the Consulting Parties within seven (7) calendar days. The BICY Superintendent shall proceed with identification and evaluation of historic properties, assessment of effect, and resolution of adverse effects for the modified APE in accordance with the processes outlined in Stipulations II through VII.

## II. IDENTIFICATION OF HISTORIC PROPERTIES

Inventory is meant to ensure that the nature and distribution of historic properties in areas affected by the NPS undertaking are identified by professional cultural resource staff that meet or exceed the Secretary of Interior Standards as defined by 36 CFR 800.2(a)(1)

The NPS shall make a reasonable and good faith effort to identify historic properties (including those of cultural and religious significance) located within the APE for the Undertaking.

A. In accordance with Executive Orders 13007, 11593, and 13175 and as a part of preliminary planning and identification efforts, the NPS will consult with the Seminole Tribe of Florida, the Miccosukee Tribe of Indians of Florida, and the Seminole Nation of Oklahoma to identify culturally sensitive areas to be avoided by trails.

B. Phased Investigations: The NPS will conduct investigations for identification of historic properties in a phased approach. Consistent with the phased process for Section 106 compliance under this Programmatic Agreement (PA), the NPS shall submit separate Section 106 consultation letters for each Phase. Each Phase will consist of a grouping of individual actions that have been proposed as a part of the Undertaking. Each Phase or piece thereof will be completed as Preserve conditions and resources permit.

   1. Phase 1 – The NPS will evaluate Primary ORV trails that are airboat only, Primary ORV trails that are situated on former tram roads and former roads that have been elevated above the natural surface using fill, hiking trails, and the proposed Backcountry campground on a former well-pad in the Bear Island Unit of the Original Preserve.
   2. Phase 2 – The NPS will evaluate the ORV connecting route between Bear Island Grade and Bundschu Grade and the ORV connecting route between original Preserve and BICY addition through Mullet Slough.
   3. Phase 3 – The NPS will evaluate the remaining Primary ORV trails, Secondary Trails, and Destinations as Preserve conditions and resources permit.

C. Existing Information Inventory: At the beginning of the planning process for each Phase the NPS will conduct a records search and archival/literature review of the

APE, including a 1-mile buffer for information pertaining to the presence of previously recorded sites and the history of conditions within the APEs of the Phase. The NPS will also solicit and take into account information provided by the Consulting Parties.

The NPS will utilize the results of the completed records search and information provided by the Consulting Parties when determining the level of inventory necessary for the Phase.

1. If the NPS cultural resources specialist determines that previous ground disturbance has modified the surface so that the probability of finding intact Historic Properties within the boundaries of the proposed ground disturbance for a Project is negligible, it may be exempt from a full Cultural Resources Assessment Survey (CRAS).
    a. When such a determination is made, the NPS will consult with the Consulting Parties in accordance with Stipulations X and XI of this Agreement.

D. Cultural Resources Assessment Survey: When the results of the completed records search and information provided by the Consulting Parties indicate a CRAS is needed for the Phase, the NPS will adhere to the following guidelines.

1. The NPS will complete the CRAS using a combination of the probability model previously developed by SEAC (Ehrenhard 1980; Schwadron 2002) and the CRAS standards set forth in the Florida Division of Historical Resources Module 3: Guidelines for Use by Historic Preservation Professionals.
    a. The model will not be used to predict historic period sites. The placement of historic sites on the landscape likely corresponds to different variables than those of prehistoric sites, and almost certainly varies between historic site types (e.g., agriculture, ranching, and logging). In addition, archeologists often find historical sites using other archival information, such as General Land Office (GLO) records and land patents.
    b. The completed CRAS will be submitted to the consulting parties for their review and comment consistent with Stipulations X, XI and XII.
2. Culturally sensitive areas
    a. The NPS will identify these areas in consultation with Native American Tribes, applicable local communities, and other Consulting Parties.
    b. The NPS will avoid excavating or shovel testing any areas that are identified by the Native American Tribes as culturally sensitive, including, but not limited to: burial resources, traditional cultural places (TCPs), traditional cultural landscapes, important or religious or sacred sites.
    c. The probability model will not be used to predict culturally sensitive areas; consultation with the Native American Tribes is required to identify these.

E. Fieldwork: Prior to the beginning of fieldwork for a CRAS, the NPS will submit a Research Design for review by the Consulting Parties. The Research Design will become an Appendix to this Agreement.

   1. The Consulting Parties will have 30 calendar days from receipt of the Research Design to forward comments to the NPS. The NPS will revise the Research Design, as necessary, to address these comments. If a Consulting Party fails to submit written comments within 30 calendar days of receipt of the Research Design and does not request a review extension either verbally or in writing within this period, the NPS may assume that Consulting Party has no comments on the Research Design or objections to its adequacy.

F. Timeframe for Completing Identification Efforts: The timeframe will be dependent on resources available to the NPS (e.g., budget and staffing levels) and the fieldwork phases. The NPS will seek additional funding opportunities and partnerships to complete fieldwork, where appropriate, with the goal to complete the investigation of Phases 1 and 2 within 6 months to 1 year and the project in total within 1 to 3 years from the implementation of this Agreement.

## III. EVALUATION OF HISTORIC PROPERTIES

A. National Register Eligibility: In consultation with the SHPO and any Native American Tribe that attaches religious and cultural significance to any prehistoric or historic district, site, building, structure, or object, except those defined in Stipulation II.A.3 and guided by the Secretary's Standards and Guidelines for Evaluation, the NPS shall apply the National Register criteria (36 CFR 63) to cultural resources identified within the APE.

B. The NPS shall ensure that archeological, ethnographic, historic, or other supporting information provided by its Consulting Parties or other knowledgeable sources will be appropriately used to support determinations of eligibility. All previously recorded eligible sites or sites that need additional data to determine NRHP eligibility within the APE must be revisited. Sites that need additional data will be treated as eligible properties for the purposes of inventory and preservation until and/or if determined otherwise. Sites determined not eligible do not require revisits during inventory and evaluation; however, the NPS archeologist may request that ineligible sites be revisited on a case-by-case basis. If the NPS determines that any of the National Register criteria for evaluation (36 CFR 60.4) are met, the resource retains integrity and the SHPO concurs, the cultural resource shall be considered eligible for the National Register (36 CFR 800.4(c)(1) and (2)). All documentation for new and existing sites will be documented on Florida Master Site File forms and adhere to the Florida Division of Historical Resources recording standards.

## IV. AVOIDANCE OF EFFECTS

The following provisions shall be applied to avoid effects to Historic Properties. This Agreement allows for determinations of effect to be made after avoidance through standard

treatment measures and/or best management practices have been integrated into the Undertaking's design.

A. Avoidance of Effects

1. The NPS shall make a reasonable and good faith effort to avoid any potential adverse effects to Historic Properties within the Undertaking's APE, including properties of traditional religious and cultural importance to the Native American Tribes consistent with Executive Order 13007 (Indian Sacred Sites). Avoidance shall be sought through Undertaking design, redesign, relocation of proposed trails, destinations, and campgrounds, or by other means in a manner consistent with this Agreement. Any avoidance measures will be incorporated into the decision or authorization for each undertaking and consulted on with the Consulting Parties consistent with Stipulations X, XI and XII.

## V. MINIMIZATION OF EFFECTS

The following provisions shall be applied to minimize effects to Historic Properties. This Agreement allows for determinations of effect to be made after minimization measures through standard treatment measures and/or best management practices have been integrated into the Undertaking's design.

A. Minimization of Effects

1. In the event avoidance of a Historic Property is not possible, the NPS shall make a reasonable and good faith effort to minimize any potential adverse effects to Historic Properties within the Undertaking's APE. Minimization shall be achieved through Undertaking design, redesign, relocation of proposed trails, destinations, and campgrounds, or by other means in a manner consistent with this Agreement. All minimization measures will be consulted on with the Consulting Parties in accordance with Stipulations X, XI and XII and all consultation will be documented in an Appendix (Appendix D) to this PA that tracks minimization measures.

## VI. ASSESSMENT OF EFFECTS

Following the application of avoidance and minimization measures as described in Stipulations IV and V above, the NPS will recommend a finding of effect for all historic properties identified within the APE as defined in 36 CFR 800.

A. Input from Consulting Parties: After each Cultural Resources Assessment Survey (CRAS) is complete, the NPS will provide the Consulting Parties the opportunity to review and comment on the NPS's findings and preliminary eligibility recommendations found in the CRAS report.

1. In accordance with 36 CFR Section 800.4(c)(1), the NPS acknowledges that Native American Tribes possess special expertise in assessing the eligibility of historic properties that may possess religious and cultural significance to them.

B. SHPO Consultation: After consulting with Native American Tribes the NPS will submit the CRAS report to the SHPO, along with determinations of eligibility, findings of effect, and any comments received from Native American Tribes.

## VII. RESOLUTION OF ADVERSE EFFECTS

In the event avoidance or minimization of adverse effects to a Historic Property is not possible, the NPS shall make a reasonable and good faith effort to mitigate any potential adverse effects to Historic Properties within the Undertaking's APE. All mitigation measures will be consulted on with the Consulting Parties in accordance with Stipulations X, XI and XII, and all consultation will be documented in an Appendix to this PA that tracks mitigation measures.

A. Historic Properties Treatment Plans: If the NPS determines that the Undertaking may have an adverse effect on a historic property or multiple historic properties, the NPS shall consult with the SHPO, Native American Tribes, and other Consulting Parties to develop a Historic Properties Treatment Plan (HPTP) that will detail the measures that the NPS will implement to mitigate adverse effects on historic properties in accordance with 36 CFR 800.6. The HPTP will identify the effects of the undertaking on each historic property and identify the most appropriate treatment strategy(ies).

   1. Potential mitigation measures: Potential mitigation measures to resolve adverse effects from the Undertaking may include, but are not limited to: those that are designed to prevent trail use such as installing closure signs, changing the trail or destination location, installing physical barriers, and conducting site stabilization efforts. Additional measures could include historical research, interpretation, photo documentation, intensive recording, periodic monitoring, and archeological excavation. Trail and destination designation decisions will also be revisited as necessary.

   2. Public education: The NPS will continue to dedicate available staff, funding, and other resources to proactively promote and enforce responsible trail uses and ethics. Such efforts will include continuing to support campaigns to reduce vandalism and unauthorized collection of archeological resources.

B. Input from Native American Tribes and Other Consulting Parties: After the Native American Tribes and other Consulting Parties are provided the HPTP or a summary of treatment recommendations, the NPS will coordinate with the Native American Tribes and other Consulting Parties to discuss the treatment recommendations. The NPS will revise the HPTP, as necessary, to address comments from this consultation process.

C. SHPO Consultation: After consulting with Native American Tribes and seeking input from the other Consulting Parties, the NPS will submit the HPTP to the SHPO along with any comments received. The SHPO will have 30 working days from receipt of the report to forward comments to the NPS. The NPS will revise the HPTP, as necessary, to address these comments. If SHPO fails to submit written comments within 30 calendar days of receipt of the report and does not request a review extension either verbally or in writing within this period, the NPS may assume the SHPO has no

comments on the measures identified in the HPTP or objections to the adequacy of the plan.

## VIII. MONITORING AND REPORTING

The NPS will submit copies of its survey reports for each Phase to the Consulting Parties and a final report that details all work completed pursuant to the terms of the Agreement. The sharing of all draft survey reports and final reports shall be consistent with Stipulations IX, X, and XI.

A. The NPS shall provide to the Consulting Parties a draft survey report in electronic or print format as requested describing the findings of the work for a 30-day review and comment period starting upon receipt. Information will be shared with the Consulting Parties, as appropriate and in conformance with ARPA and NHPA Section 304.

B. The draft survey report shall include, as appropriate, recommendations on NRHP eligibility or potential eligibility of all identified archeological sites (and if applicable any newly identified historic properties), recommendations for further archeological investigations, the potential effects of the undertaking on historic properties, and suggested measures to resolve adverse effects through avoidance, minimization, or mitigation. The Consulting Parties shall provide their comments to the NPS within thirty (30) days from the date of receipt of the draft survey report. If no comments are received within the 30-day period, the NPS shall assume that the non-responding party has no comments. If the Consulting Parties, concur with the recommendations for that phase, the NPS may proceed with the next phase. If the Consulting Parties, do not concur with the NPS' recommendations for that phase, the parties shall consult further to resolve the issues following the provisions for dispute resolution in Stipulation IX of this document.

C. The NPS shall ensure that the draft survey reports for all phases of the Project are incorporated into one final report. The Consulting Parties shall provide their comments on the draft final report to the NPS within thirty (30) calendar days from date of receipt of the draft final report. If the NPS does not receive comments within the thirty (30) day comment period, the NPS shall assume that the non-responding party has no comments. The NPS shall ensure that all comments on the draft final report received during the 30-day period are considered in preparation of the final report. The NPS shall submit two (2) archivally bound hardcopies and one electronic copy in Adobe® Portable Document Format (.pdf) of its approved final report to the Consulting Parties, in an agreed upon format.

D. All cultural resource work performed under the terms of this Agreement shall be carried out by or under the direct supervision of a professional who meets the Secretary of the Interior's Professional Qualifications Standards (48 FR 44739) in the appropriate discipline.

E. All archeological studies conducted pursuant to this Agreement shall be consistent with the Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation (48 FR 44716-44742, September 1983), the ACHP's Section 106

Archeology Guidance (June 2007) and the SHPO's Guidelines (Module 3: Guidelines for Use by Historic Preservation Professionals; and Archeological Reports Standards and Guidelines, Chapter 1A-46, Florida Administrative Code).

## IX. PROFESSIONAL QUALIFICATIONS AND STANDARDS

The NPS shall ensure that all work undertaken to satisfy the terms of this Agreement shall conform to the Secretary of Interior's Professional Qualifications and Standards for Archeology and Historic Preservation [48 Fed. Reg.44716, September 29, 1983], the ACHP guidance on archeology, and the appropriate SHPO standards and requirements.

A. Professional Qualifications: The NPS shall ensure that all activities relating to identification, evaluation and resolution of adverse effect undertaken as a part of this Agreement are carried out by or under the direct supervision of a person or persons meeting, at a minimum, the applicable professional qualification standards set forth in the Secretary's Standards [48 Fed. Reg. 44716, September 29, 1983 and 36 CFR 61], the Office of Personnel Management NPS professional qualifications for archeological and historic preservation and any written professional or permitting requirements of the SHPO.

   1. The NPS shall ensure that activities relating to the identification and evaluation of faunal remains when there is doubt as to their origins will be carried out by or under the direct supervision of an expert in bioarcheology, osteology, or zooarchaeology as needed. An expert means a person who possesses a postgraduate degree in the area of expertise needed and who has a minimum of 1 year of laboratory experience in skeletal analysis and reconstruction.

B. Archeological Resource Protection Act (ARPA) Permits: Identification and evaluation activities conducted under this Agreement by non-NPS staff shall be conducted only after qualified cultural resource professionals have obtained ARPA Permits for field work.

## X. CONSULTATION

Throughout the duration of this Agreement, the NPS shall seek consensus with the Consulting Parties through the exchange of information, open discussion, and joint deliberations, and by incorporating Indigenous Knowledge (IK).

A. The NPS shall submit documentation relating to the Undertaking under this Agreement to the ACHP, if required, and to the Consulting Parties following the provisions of this Agreement. Unless otherwise agreed, or specified within a Stipulation to this Agreement, those parties shall have thirty (30) calendar days from receipt of the request to review the submitted documentation and provide response, comment, or request additional time (the NPS will ensure all due dates for input are included on any correspondence).

   1. If a Consulting Party has not responded to the submitted documentation within thirty (30) calendar days of receipt, the NPS shall make at least one attempt to follow-up with them, via electronic mail and telephone, to verify that the

Consulting Party does not have any input about the issue under consideration. If, after this effort to reach an unresponsive Consulting Party, there has still been no response, the NPS shall proceed to the next step in the relevant process under this Agreement.

2. If a Consulting Party requires additional time for consultation, they may request an extension in writing. The NPS shall attempt to accommodate such requests if they do not negatively affect other scheduled planning efforts.
3. If comments received from a Consulting Party require only minor editorial corrections, such as spelling, grammatical, formatting and punctuation errors, the NPS shall execute the changes and shall consider the consultation completed.
4. If substantive changes, meaning changes other than spelling, typographical and grammatical corrections are required, the NPS shall execute and provide draft copies of the revised documents to the Consulting Parties with a request for second review and comment. The Consulting Parties shall have 30 calendar days to provide comments on the revised draft. The NPS may, in consultation with the Consulting Parties and the SHPO, modify the duration of further review periods depending on the nature and complexity of the documentation in question.
5. The NPS shall consider all comments submitted during the review period and shall consult with the Consulting Parties to resolve differences or disagreements. If differences or disagreements cannot be resolved, the NPS shall elevate the matter to the ACHP in accordance with 36 CFR 800.5(c)(3)(i) and (ii).

B. Communications among Consulting Parties: Official correspondence from the BICY Superintendent to Consulting Parties regarding the Agreement and the undertakings covered by this Agreement will be conducted primarily through electronic mail. If a Consulting Party desires hard copy communication for all or portions of the correspondence and documentation regarding the Agreement and the undertakings covered in this Agreement, they must submit notification of their desires to the BICY Superintendent. The BICY Superintendent shall then identify alternative arrangements with the Consulting Party, which will allow the Consulting Party the opportunity to consult by other than electronic means within the timeframes specified in this Agreement. Consulting Parties may, at any time, notify the BICY Superintendent of their desires to change the format that consultation is conducted in. The BICY Superintendent is required to identify alternative arrangements within thirty (30) calendar days of receipt of notification by a Consulting Party (the NPS will ensure all due dates for input are included on any correspondence).

C. Final Agreement: The final Agreement, any amendments to the Agreement, any agreements that flow from the Stipulations of this Agreement and all reports associated with this Agreement shall be posted on the NPS webpage and/or made otherwise accessible to the public, subject to the confidentiality considerations defined in Stipulation XI.

## XI. TRIBAL CONSULTATION

The NPS is the federal agency responsible for notification, coordination, and consultation with the federally recognized Native American Tribes under this Agreement. The NPS shall coordinate and consult on a government-to-government basis with the Native American Tribes in the identification, evaluation, and treatment of resources to which the Native American Tribes may attach religious and cultural significance and in the determination of whether they are historic properties. Government-to-government consultation with Native American Tribes shall continue through the life of this Agreement.

A. The NPS shall seek Tribal participation in association with Section 106 identification, evaluation and treatment efforts associated with individual undertakings throughout the life of this Agreement. When identifying Consulting Parties, the BICY Superintendent shall review and familiarize themselves with previous consultations to identify Tribal Consulting Parties. Government-to-government consultation and coordination shall be consistent with NPS standards and guidelines.

B. Throughout the life of this Agreement, Native American Tribes may identify specific resources that: (1) meet the definitions of historic properties [36 CFR 800.16(l) and 36 CFR 60.3], defined as districts, sites, buildings, structures and objects and properties of traditional religious and cultural importance [36 CFR 800.16 (I)(l)] or (2) meet the definitions of TCPs or Native American sacred sites (see National Register Bulletin 38 and Executive Order 13007).

C. Communication between the NPS and the Native American Tribes shall follow the standards and timelines identified in Stipulation IX (the NPS will ensure all due dates for input are included on any correspondence).

D. Points of Contact.

   1. The BICY Superintendent, or their designee, shall be the NPS point of contact for government-to-government communication correspondence relating to this Agreement.

   2. The elected Tribal official of federally recognized Native American Tribes shall be the official point of contact for government-to-government communication. A representative(s), in addition to the elected Tribal official, may be designated by the Tribal Government to represent the Tribe for purposes of coordination. Representatives appointed by Native American Tribes could include but are not limited to; Cultural Preservation Departments, Cultural Representatives, and/or Tribal Historic Preservation Officers (THPOs).

## XII. CONFIDENTIALITY AND SENSITIVE INFORMATION

Information concerning the nature and location of all historic properties, archeological resources (historic or prehistoric) or other confidential cultural resources shall be considered sensitive and protected from release under the provisions of the Freedom of Information Act (5 USC § 552, as amended by Public Law No. 104-231, 110 Stat. 3048), Section 9 of the Archeological Resources Protection Act (ARPA), as amended (16 USC § 470hh), Section 304 of the NHPA (54 USC § 307103), and Executive Order 13007.

Consideration may result in the sharing of summary reports that do not contain sensitive location information. Other than the FL SHPO, the Tribal Consulting Parties, and ACHP, the NPS will only consider the release of complete reports or other information concerning the nature and location of all historic properties, archeological resource, or other confidential cultural resource to a Consulting Party with a demonstrated interest in the information requested. All Consulting Parties will ensure that all sensitive information, as defined in Section 9 of ARPA, as amended (16 USC § 470hh) and Section 304 of the NHPA (54 USC § 307103) and excluded under the Freedom of Information Act (5 USC § 552, as amended by Public Law No. 104-231, 110 Stat. 3048) is protected from release.

## XIII. CURATION

A. The NPS will have a limited collection policy for all cultural resources investigations associated with these undertakings.

   1. Only diagnostic materials not associated with Native American Graves Protection and Repatriation Act (NAGPRA) materials will be collected.

   2. The Native American Tribes will be consulted prior to any collection of materials from the field.

B. The NPS shall curate any archeological materials and records which result from activities undertaken as part of this Agreement or the associated Undertaking(s) in accordance with federal laws and regulations, including 36 CFR 79. These materials and records shall be curated in repositories that meet these federal standards and do not violate federal laws or regulations. Big Cypress National Preserve archeological materials and records are curated at two NPS facilities in Florida: The Southeast Archeological Center in Tallahassee and the South Florida Collections Management Center in Everglades National Park. Both facilities follow the NPS Museum Handbook, NPS Director's Orders, and Department of the Interior regulations applicable to archeological materials and records.

## XIV. UNANTICIPATED DISCOVERIES

There is the potential for encountering previously unrecorded cultural resources or for affecting such resources in an unanticipated manner during the course of these undertakings. According to the 2008 National Park Service Programmatic Agreement Section VI, if previously unidentified cultural resources are discovered during the implementation of the undertakings, all work in that area will stop, and the Superintendent, the Preserve Archeologist, the South Florida Chief of Cultural Resources, and the Consulting Parties will be notified immediately.

## XV. NATIVE AMERICAN GRAVES PROTECTION AND REPATRIATION ACT

There is the potential for encountering previously unrecorded burials and associated items or for affecting them in an unanticipated manner during the course of the undertakings. If burials and associated items protected by the NAGPRA are discovered during the implementation of the undertakings or cultural resources investigations, all activity will cease in the area of discovery, and immediate notice will be made to the Superintendent, the

Preserve Archeologist, the South Florida Chief of Cultural Resources, and the appropriate federally recognized Native American Tribes.

A. Prior to the start of cultural resources investigations and implementation of the undertakings, Big Cypress National Preserve will develop a NAGPRA Plan of Action in consultation with the appropriate federally recognized Native American Tribes. The Plan will be attached to this agreement as an Appendix.

## XVI. RECOGNIZING OTHER FEDERAL LAW REQUIREMENTS

Anti-Deficiency Act: The NPS's obligations under this Agreement are subject to the availability of appropriated funds, and the stipulations of this Agreement are subject to the provisions of the Anti-Deficiency Act. The NPS shall make reasonable and good faith efforts to secure the necessary funds to implement this Agreement in its entirety. If compliance with the Anti-Deficiency Act alters or impairs the NPS's ability to implement the stipulations of this Agreement, the NPS shall consult in accordance with the amendment and termination procedures found at Stipulation XIV (C) and (E) of this Agreement.

## XVII. ANNUAL REPORT

A. On or before January 31 of each year, the NPS shall prepare and provide to all Consulting Parties of this Agreement an annual report addressing, at a minimum, the following topics:

    1. a general summary of how this Agreement has been implemented during the preceding year;
    2. a listing of Phases completed in accordance with Stipulations II and III, including a listing of all historic properties affected by the Undertaking's actions;
    3. NPS' assessment of the effectiveness of this Agreement; and
    4. any recommendations NPS may have for improving the Agreement.

B. The Consulting Parties shall have the opportunity to review the annual report and within thirty (30) days of its receipt and to provide comments to the NPS. Any objections to the handling of specific undertakings or way the Agreement is implemented may be assessed using the process outlined in Stipulation IX. The NPS shall make the annual report available to the public on its Planning, Environment and Public Comment website.

## XVIII. ADMINISTRATIVE PROVISIONS

A. Dispute Resolution Procedures: Should any Signatory (sole authority to execute, amend or terminate the Agreement), Invited Signatory (authority to amend and terminate the Agreement), or Concurring Party object to implementation of this Agreement, they shall provide written notice to the NPS of their objection with supporting justification. The NPS will consult with the objecting party(ies) to resolve the objection. If the NPS Superintendent determines that the objection cannot be resolved within 30-calendar days, the Superintendent shall forward all documentation relevant to the dispute to the other Signatories and Invited Signatories in this

Agreement. If the dispute cannot be resolved between the NPS and the other Signatories and Invited Signatories, the NPS shall forward all documentation relevant to the dispute to the ACHP. Within 30 days after receipt of all pertinent documentation, the ACHP shall either provide the NPS with recommendations, which the NPS shall take into account in reaching a final decision regarding the dispute, or notify the NPS that it will comment within an additional 30 days. The NPS will take into account any ACHP comment provided in response to such a request in accordance with 36 CFR 800.7(c)(4) with reference to the subject of the dispute.

B. Amendments to the Agreement: Any Signatory or Invited Signatory may request that the Agreement (including appendices) be amended by informing the Superintendent in writing of the reason for the request and the proposed amendment language. The NPS may also request an amendment to the Agreement. The Superintendent shall notify all Signatories and Invited Signatories and interested Native American Tribes and Concurring Parties of the proposed amendment. The Signatories and Invited Signatories will consult to reach agreement in 30 days, unless the Signatories and Invited Signatories agree to a longer period of consultation, or the party of the proposed amendment retracts its proposal. During this time, the Superintendent will determine if a meeting with the Signatories and Invited Signatories, and potentially interested Native American Tribes and Concurring Parties is needed. The amendment will be effective on the signature date of the last Signatory to sign the amended Agreement. The Superintendent will notify all interested Native American Tribes and Concurring Parties of the amendment and provide them and opportunity to sign the amended Agreement. Amendments to the appendices attached to this Agreement may be made without the formal amendment process outlined above.

C. Termination of the Agreement: Any Signatory or Invited Signatory may terminate this Agreement by providing a concurrent 90-calendar day notice to the other Signatories and Invited Signatories, provided that during this period the Signatories and Invited Signatories attempt in good faith to find a collaborative resolution that would avoid terminating this Agreement. The Superintendent will determine if a meeting with Signatories, Invited Signatories, interested Native American Tribes and other Concurring Parties is needed to discuss potential termination of this Agreement. If the Agreement is terminated, the NPS will comply with Section 106 of the NHPA by following the implementing regulations at 36 CFR 800. The NPS will notify all interested Native American Tribes and other Concurring Parties that this Agreement has been terminated.

D. Agreement Duration: This Agreement shall be in place until the implementation of the Back Country Access Plan (BAP) and the Addlands GMP are complete, or for a period of 5 years, whichever comes first.

EXECUTION of this Agreement by the NPS, Florida SHPO, and the ACHP and subsequent implementation of its terms shall evidence that the NPS has taken into account the effects of each Undertaking on historic properties and that the NPS has afforded the ACHP an opportunity to comment.

PROGRAMMATIC AGREEMENT AMONG

THE NATIONAL PARK SERVICE BIG CYPRESS NATIONAL PRESERVE,

THE FLORIDA STATE HISTORIC PRESERVATION OFFICE,

AND THE SEMINOLE TRIBE OF FLORIDA

REGARDING

THE IMPLEMENTATION OF THE BACKCOUNTRY ACCESS PLAN AND ADDLANDS GMP

COLLIER, MIAMI-DADE, AND MONROE COUNTIES, FLORIDA

Signatories:

National Park Service, Big Cypress National Preserve

THOMAS FORSYTH

Digitally signed by THOMAS FORSYTH
Date: 2024.01.03 13:10:09 -05'00'

_______________________________________________

Thomas Forsyth, Superintendent, Big Cypress National Preserve

PROGRAMMATIC AGREEMENT AMONG

THE NATIONAL PARK SERVICE BIG CYPRESS NATIONAL PRESERVE,

THE FLORIDA STATE HISTORIC PRESERVATION OFFICE,

AND THE SEMINOLE TRIBE OF FLORIDA

REGARDING

THE IMPLEMENTATION OF THE BACKCOUNTRY ACCESS PLAN AND ADDLANDS GMP

COLLIER, MIAMI-DADE, AND MONROE COUNTIES, FLORIDA

Signatories:

Florida State Historic Preservation Office

Alissa Slade Lotane 1/30/24

Alissa Slade Lotane, Florida State Historic Preservation Officer

PROGRAMMATIC AGREEMENT AMONG

THE NATIONAL PARK SERVICE BIG CYPRESS NATIONAL PRESERVE,

THE FLORIDA STATE HISTORIC PRESERVATION OFFICE,

AND THE SEMINOLE TRIBE OF FLORIDA

REGARDING

THE IMPLEMENTATION OF THE BACKCOUNTRY ACCESS PLAN AND ADDLANDS GMP

COLLIER, MIAMI-DADE, AND MONROE COUNTIES, FLORIDA

Signatories:

Seminole Tribe of Florida

Tina M. Osceola

____________________________________________

Tina M. Osceola, Tribal Historic Preservation Officer

PROGRAMMATIC AGREEMENT AMONG

THE NATIONAL PARK SERVICE BIG CYPRESS NATIONAL PRESERVE,

THE FLORIDA STATE HISTORIC PRESERVATION OFFICE,

AND THE SEMINOLE TRIBE OF FLORIDA

REGARDING

THE IMPLEMENTATION OF THE BACKCOUNTRY ACCESS PLAN AND ADDLANDS GMP

COLLIER, MIAMI-DADE, AND MONROE COUNTIES, FLORIDA

Concurring Party:

Miccosukee Tribe of Indians of Florida

__________________________________________________

Talbert Cypress, Chairman

PROGRAMMATIC AGREEMENT AMONG

THE NATIONAL PARK SERVICE BIG CYPRESS NATIONAL PRESERVE,

THE FLORIDA STATE HISTORIC PRESERVATION OFFICE,

AND THE SEMINOLE TRIBE OF FLORIDA

REGARDING

THE IMPLEMENTATION OF THE BACKCOUNTRY ACCESS PLAN AND ADDLANDS GMP

COLLIER, MIAMI-DADE, AND MONROE COUNTIES, FLORIDA

Concurring Party:

Seminole Nation of Oklahoma

________________________________________________

Lewis Johnson, Principal Chief

PROGRAMMATIC AGREEMENT AMONG

THE NATIONAL PARK SERVICE BIG CYPRESS NATIONAL PRESERVE,

THE FLORIDA STATE HISTORIC PRESERVATION OFFICE,

AND THE SEMINOLE TRIBE OF FLORIDA

REGARDING

THE IMPLEMENTATION OF THE BACKCOUNTRY ACCESS PLAN AND ADDLANDS GMP

COLLIER, MIAMI-DADE, AND MONROE COUNTIES, FLORIDA

Concurring Party:

The Advisory Council on Historic Preservation

________________________________________________