IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:25-CV-22896-KMW

FRIENDS OF THE EVERGLADES, INC. et al.,

Plaintiffs,

v.

MARKWAYNE MULLIN et al.,

Defendants.
_______________________________________/

**DEFENDANT MIAMI-DADE COUNTY'S MOTION TO DISMISS SECOND AMENDED AND SUPPLEMENTAL COMPLAINT[1]**

The State of Florida, using extraordinary emergency powers and pursuant to express statutory authority, commandeered Miami-Dade County's Training and Transition Airport to address a declared immigration emergency. Plaintiffs Friends of the Everglades, Inc. and Center for Biological Diversity (hereinafter, "Plaintiffs") claim that the County could have shielded itself from the State's actions by invoking the Miami-Dade County Code and Comprehensive Development Master Plan (CDMP), but there is no legal basis for Plaintiffs' claim—it would be like seeking to constrain the federal government by invoking state law. The argument fails at the initial step, without more. And even if it didn't—if the State's exercise of emergency powers could be subjected to the County Code—private parties like Plaintiffs are

[1] The Notice of Court Practices and Procedures states: "the Parties shall file joint motions and consolidated responses and replies unless there are clear conflicts of position. If conflicts of position exist, the Parties must explain the conflicts in their separate filings." The County's position is in clear conflict with the State and Federal Defendants' positions because (1) it is the State and Federal Defendants' actions with respect to the County's property that have embroiled the County in this dispute and subjected the County to potential liability; and (2) Plaintiffs' theory of the case is that the County should be enforcing its regulations and policies against the State and Federal Defendants.

not entitled to injunctions forcing the County to act on its own ordinances, any challenge under the CDMP is unripe, Plaintiffs' requested injunction against the County is impermissibly indefinite, and Plaintiffs' claim against the County has also been rendered moot. Regardless of what may come to pass between Plaintiffs and the State and Federal Defendants, these and other pleading deficiencies warrant dismissing Miami-Dade County from this lawsuit.

## BACKGROUND

### I. The State's Use of Emergency Powers to Commandeer the County's Airport, and the County's Compliance with State Law

On January 6, 2023, State of Florida Governor Ron DeSantis issued Executive Order 23-03 declaring a state of emergency in Florida upon finding "that the migration of unauthorized aliens to the State of Florida is likely to constitute a major disaster." (DE 12-1 at 3;[2] *see also* Second Amended Complaint (DE 171) ("SAC") ¶ 3). The Governor's order designated the Director of the State's Division of Emergency Management (FDEM) as the State Coordinating Officer for the duration of the emergency, directed him to execute response, recovery, and mitigation plans necessary to cope with the emergency, and authorized him to exercise the State's emergency powers codified in sections 252.36(6)–(12), Florida Statutes. (DE 12-1 at 3). The Governor renewed Executive Order 23-03 multiple times, including recently on July 20, 2026. (SAC ¶ 3; DE 12-2 at 1).

Pursuant to this authority, on or about June 23, 2025, FDEM commandeered from Miami-Dade County the Miami-Dade-County-owned Dade-Collier Training and Transition Airport (the "TNT Airport"), which is located on a parcel of land that straddles the border

[2] The Court may consider this and other extrinsic evidence cited in this Motion in evaluating the County's mootness argument, as mootness is jurisdictional. *See Morrison v. Amway Corp.*, 323 F.3d 920, 924 n.5 (11th Cir. 2003).

between Miami-Dade and Collier Counties. (SAC ¶¶ 2–3, 37, 61). Under section 252.36(6)(b), Florida Statutes, the State is authorized to "utilize all available resources of the state government and of each political subdivision of the state, as reasonably necessary to cope with the emergency." The County is a political subdivision of the State, and the County's property—that is, the TNT Airport—thus became subject to the State's use for emergency purposes at the State's prerogative.[3]

The County also had to comply with the requirement that local officials "use best efforts to support the enforcement of federal immigration law." § 908.104(1), Fla Stat. This requirement, which was signed into law on February 13, 2025, provides severe penalties for noncompliance: in addition to declaratory or injunctive relief that may be sought, as well as potential contempt proceedings, "[a]ny executive or administrative state, county, or municipal officer who violates his or her duties under this chapter may be subject to action by the Governor, including potential suspension from office, in the exercise of his or her authority under the State Constitution and state law." *Id.* § 908.107(1). The County thus complied with this separate requirement of state law by allowing FDEM to use the TNT Airport for FDEM's stated purposes.

The Second Amended Complaint recounts FDEM's subsequent establishment and operation at the TNT Airport of an immigration detention center and alleges various environmental impacts resulting therefrom. (*See, e.g.*, SAC ¶¶ 6, 12, 16). The Second

[3] As noted in the Second Amended Complaint, on June 23, 2025, Miami-Dade County Mayor Daniella Levine Cava wrote to FDEM and stated: "With the federal and state government investing well over $10 billion since 2019 in Everglades restoration and protection, we would appreciate a detailed analysis and report on environmental impacts of this facility to the Everglades. We would also value input from the appropriate federal agencies on their environmental reviews and analyses prior to proceeding." (SAC ¶ 106). Ultimately, however, the TNT Airport was the State's to commandeer.

Amended Complaint further relates the Florida Governor's announcement, on June 25, 2026, "that the Site no longer housed any detainees and was being demobilized." (*Id.* ¶ 15).

And indeed, on August 11, 2026, FDEM returned control of the TNT Airport to the County after the County and FDEM conducted an inspection of the property. (*See* Cty. Ex. 1, filed herewith). The County has remained in control of the TNT Airport ever since, and at no point since then has a detention facility been operated at the TNT Airport. (*See id.*). Instead, the County is in the process of returning the property to aviation use, consistent with its use of the prior decades, and consistent with the County's obligations to the Federal Aviation Administration. (*See id.*). The County Mayor's Administration is also working toward the potential sale or transfer of all or a portion of the TNT Airport property for permanent conservation and ecological restoration. (*See id.*).

## II. Procedural History

Plaintiffs are environmental organizations who claim aesthetic, recreational, and related injuries as a result of the State's use of the TNT Airport and the Federal Defendants' alleged funding of and other involvement in the State's effort. The Second Amended Complaint asserts various counts, but only one is asserted against the County. Count IV, asserted against the County alone, alleges: that "[p]ursuant to the County's Operational Directive No. 15-02, the TNT Site is governed by Chapter 25 of the Miami-Dade County Code, pertaining to aviation operations"; that "[t]he TNT Site is permitted only for aviation uses including pilot flight training, pilot proficiency checks, and aircraft maintenance flight checks"; that "the Site, or a portion of it, is designated Environmentally Protected Parks under Miami-Dade Count[y's] Comprehensive Development Master Plan due to its environmental sensitivity"; that "[t]he Site is not permitted or authorized for use for non-flight purposes;" and

that "[t]he County's agreement or acquiescence in allowing the TNT Site for use as a mas[s] detention center is in violation of the County code and permitting regimes." (SAC ¶¶ 225–29). Plaintiffs thus seek a declaration "that the County may not authorize or allow use of the TNT Site for purposes other than that allowed under the County Code and existing permits and authorizations" (*id.* ¶ 230) and also seek related injunctive relief.

The County now moves to dismiss under Federal Rule of Civil Procedure 12(b)(1) and (6).[4]

## ARGUMENT

### I. Plaintiffs Fail to State a Claim as to the County

Count IV claims that the County's "agreement or acquiescence in allowing the TNT Site for use as a mas[s] detention center" violates chapter 25 of the County Code and the County's CDMP, but Plaintiffs fail to state a claim for four independent reasons.

#### A. Count IV Fails Because the County Code and CDMP Cannot Limit the State's Emergency Powers

Count IV argues that "[t]he TNT Site is permitted only for aviation uses including pilot flight training, pilot proficiency checks, and aircraft maintenance flight checks" and that "[t]he Site is not permitted or authorized for use for non-flight purposes." (SAC ¶¶ 226, 228). Plaintiffs thus claim that the County's "acquiescence in allowing" the State to nevertheless use the site for the detention facility violates chapter 25 of the County Code, which provides the

[4] By way of further pertinent procedural history, the County has been a defendant in this action since the beginning, but Plaintiffs dropped their requests for a temporary restraining order and preliminary injunction against the County before the Court granted injunctive relief. The County has thus not yet been subject to an injunction in this action, nor did the County participate in the appeal before the Eleventh Circuit.

County's Aviation Department rules and regulations.[5] Plaintiffs further claim that such "acquiescence" on the part of the County also violates the County's Comprehensive Development Master Plan ("CDMP"), which is a legislative plan adopted by ordinance that guides the use and development of land in the County.[6]

Count IV rests on the fatally mistaken assumption that the County Code and CDMP constrain the State of Florida's exercise of its emergency powers. Florida law expressly provides that, upon issuance of an Executive Order establishing a State of Emergency, the Florida Governor is expressly authorized to seize and make use of all non-federal lands within Florida. *See* § 252.36(6)(b), (d), Fla. Stat. The State is expressly authorized to "commandeer or utilize any private property if she or he finds this necessary to cope with the emergency." *Id.* § 252.36(6)(d). County property can be seized as well; the Governor is expressly authorized to "utilize all available resources of the state government and of each political subdivision of the state, as reasonably necessary to cope with the emergency." *Id.* § 252.36(6)(b). There are no facial limits on the Governor's exercise of this power other than the general requirement that the use be reasonably necessary to cope with the emergency.[7] And it would obviously be inappropriate to impute limits which the Florida Legislature omitted. *See Hawkins v. Ford*

---

[5] Ordinances are the local government equivalent of statutes. Just as many Congressional statutes are codified in the United States Code, many of Miami-Dade County's ordinances are codified in the County Code, which is available online at: https://library.municode.com/fl/miami_-_dade_county/codes/code_of_ordinances

[6] Comprehensive plans are like land use constitutions, and state law mandates that all local governments have one. *See Machado v. Musgrove*, 519 So. 2d 629, 631–32 (Fla. 3d DCA 1987). As further mandated by state law, local government land development regulations and development orders (such as zoning approvals, building permits, and other decisions having the effect of permitting the development of land) must generally be consistent with the CDMP's policies. §§ 163.3202(1), 163.3215, Fla. Stat. The CDMP is available online at: https://www.miamidade.gov/global/economy/planning/cdmp/adopted-components.page

[7] The State is required to provide compensation for the use of this property. § 252.43, Fla. Stat. But compensation is a remedy; it applies after property has been seized.

*Motor Co.*, 748 So. 2d 993, 1000 (Fla. 1999) ("[T]his Court may not rewrite statutes contrary to their plain language."). Nothing on the face of the statute requires the consent of a property owner before its property is commandeered into the emergency effort, nor does anything in the statute require that the commandeered property be used only as allowed by local ordinances or comprehensive plans.[8]

County ordinances cannot limit the powers granted in section 252.36; the State's authority cannot be cabined by the Miami-Dade County Code or the CDMP. This is not even a close call under Florida law. "Municipal ordinances are inferior to laws of the state and must not conflict with any controlling provision of a statute. When a municipal ordinance flies in the face of state law—that is, cannot be reconciled with state law—the ordinance cannot be sustained." *City of Palm Bay v. Wells Fargo Bank N.A.*, 114 So. 3d 924, 928 (Fla. 2013) (citation omitted). An argument that chapter 25 of the County Code or the CDMP precludes the State's action improperly inverts this precedent—it would privilege the County ordinance over the express provisions of section 252.36. But there is no legal basis for the notion that a County ordinance could limit the State's express statutory ability to commandeer property. Count IV therefore fails as a matter of law.

Lastly, Plaintiffs offer no basis for either the County or this Court to object to the State's determination that the seizure of TNT was reasonably necessary to respond to the emergency:

---

[8] And this, generally speaking, makes sense. If the State needed to demolish a home to create a firebreak to prevent a wildfire from spreading into a densely populated area, the State's emergency response cannot be held in abeyance pending consent of the property owner. Similarly, it would be deeply strange if staging of hurricane relief on a particular piece of property could be prevented by the local zoning code. A local noise ordinance likewise could not preempt 24-hour use of a piece of seized property to supply generator power to a hospital in an emergency. All of these local rules—applicable in ordinary circumstances—must fall away in the face of the State's emergency response and the authority granted the State in chapter 252 of the Florida Statutes.

under Florida law, courts have little discretion to second-guess state emergency decisions. See *DeSantis v. Florida Educ. Ass'n*, 306 So.3d 1202, 1218 (Fla. 1st DCA 2020) ("Appellees have invited the judiciary to second-guess the executive's discretionary actions exercising emergency powers during a public health emergency to address the health, safety, and welfare of students in Florida's public schools. The courts must decline the invitation."). Indeed, under Florida law, courts don't have the power to weigh competing policy concerns even in normal times. *See Membreno v. City of Hialeah*, 188 So. 3d 13, 22–25 (Fla. 3d DCA 2016) ("The question of the existence of an emergency is not so much an empirical fact as a value judgment… the legislative choices in such matters are not driven by the sort of finding of historical facts regarding past events which occurs in a courtroom…. In our system of government, only democratically elected representative bodies are competent to form the sorts of legislative judgments upon which these legislative choices are based.").

In short, section 252.36 grants the Governor and FDEM broad power to seize and commandeer property to respond to an emergency. These powers supersede any county ordinance, regulation, or policy that might otherwise limit the use of a County-owned property in a non-emergency context. Count IV must therefore be dismissed.

### B. Count IV Fails Because Courts Cannot Mandate How Local Governments Exercise Their Enforcement Discretion

A second, independent reason that Count IV fails is that, even if the County could exercise regulatory authority vis-à-vis the State under these circumstances, courts cannot mandate how local governments exercise their enforcement discretion. Count IV's request for declaratory and injunctive relief effectively asks the Court to order the County to enforce the County Code and the CDMP against the State of Florida, but this the Court cannot do. In *Detournay v. City of Coral Gables*, 127 So. 3d 869 (Fla. 3d DCA 2013), a homeowners

association sought declaratory and injunctive relief against the City of Coral Gables to force it to pursue enforcement action under the building and zoning code against a nearby third-party property owner. The Third District held that dismissal of the lawsuit was required because, under the separation of powers doctrine, "courts cannot generally supervise the executive when it is deciding when and how to enforce specific laws," and such "pure executive function[s] … cannot be supervised by the courts, absent the violation of a specific constitutional provision or law." *Id.* at 872–73.

The Third District's reasoning came from *Trianon Park Condominium Association, Inc. v. City of Hialeah*, 468 So. 2d 912 (Fla. 1985), in which the Florida Supreme Court explained how the separation of powers prevents judicial interference not only in enforcement decisions, but also permitting and other executive officer functions:

> Clearly, the legislature, commissions, boards, city councils, and executive officers, by their enactment of, or failure to enact, laws or regulations, or by their issuance of, or refusal to issue, licenses, permits, variances, or directives, are acting pursuant to basic governmental functions performed by the legislative or executive branches of government. The judicial branch has no authority to interfere with the conduct of those functions unless they violate a constitutional or statutory provision. There has never been a common law duty establishing a duty of care with regard to how these various governmental bodies or officials should carry out these functions. These actions are inherent in the act of governing.

*Id.* at 919. The Court reasoned that "the judicial branch must not interfere with the discretionary functions of the legislative or executive branches of government absent a violation of constitutional or statutory rights"; to hold otherwise "would require the judicial branch to second guess the political and police power decisions of the other branches of government and would violate the separation of powers doctrine." *Id.* at 918. The United States Supreme Court has reached the same result under federal law under its own rationale. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (explaining that, even outside the context of the Administrative

Procedure Act, "[t]his Court has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion").

Plaintiffs ask the Court to order the County to enforce the County Code and CDMP against the State, but a local government's decision as to what kind of enforcement action to take, or whether to take enforcement action at all, is entirely the local government's prerogative and cannot be ordered by a court. Count IV therefore fails as a matter of law.

C. Count IV Fails Because, in the Absence of a Development Order, Plaintiffs Cannot Claim Inconsistency with the CDMP

The third reason Count IV fails is that, under Florida law, a plaintiff cannot simply claim that a project is inconsistent with a local government's comprehensive plan. Instead, such a "consistency challenge" must be asserted under section 163.3215, Florida Statutes, and must allege that a specific "development order" is inconsistent with the comprehensive plan:

> Any aggrieved or adversely affected party may maintain a de novo action for declaratory, injunctive, or other relief against any local government to challenge any decision of such local government granting or denying an application for, or to prevent such local government from taking any action on, a development order, as defined in s. 163.3164, on the basis that the development order materially alters the use or density or intensity of use on a particular piece of property, rendering it not consistent with the comprehensive plan adopted under this part.

§ 163.3215(3), Fla. Stat. (emphasis added). This section provides "the exclusive method[] for an aggrieved or adversely affected party to appeal and challenge the consistency of a development order with a comprehensive plan." *Id.* § 163.3215(1).[9] Accordingly, this statute

[9] The statute provides another method in subsection (4), but that method is inapplicable because it applies only where "a local government elects to adopt or has adopted an ordinance establishing, at a minimum, the requirements listed in [section 163.3215(4)]," which the County has not elected to do.

is the <u>only</u> means by which Plaintiffs could press their consistency challenge—Plaintiffs cannot seek an amorphous declaration of inconsistency divorced from these statutory requirements.

In the absence of a development order, courts dismiss consistency challenges as unripe or for lack of standing. *See MDXQ, LLC v. Miami-Dade County*, 271 So. 3d 68, 69 (Fla. 3d DCA 2019) ("The trial court also properly concluded that, in the absence of a development order, a cause of action under section 163.3215(3) was not yet ripe."); *Manny Seafood Corp. v. City of Miami*, No. 3D23-0357, 2023 WL 8101728, at *1 (Fla. 3d DCA Nov. 22, 2023) (affirming dismissal for lack of standing of a "complaint [that] does not suggest, much less allege, that the City's proposed use of the subject property as a public park constitutes a 'development order' so as to implicate section 163.3215").

Count IV contends that the use of the TNT Airport for the detention facility is inconsistent with the CDMP, but nowhere does the Second Amended Complaint allege that it challenges a "development order." In fact, the Second Amended Complaint does not even cite section 163.3215(3), the statute under which such a claim must be brought. Count IV therefore must be dismissed for failure to state a claim or, in the alternative, as unripe and for lack of standing. *See MDXQ*, 271 So. 3d at 69; *Manny Seafood*, 2023 WL 8101728, at *1.

<u>D.</u> <u>Count IV Fails Because It Is Improperly Pleaded</u>

The fourth reason Count IV fails is that Plaintiffs have not properly pleaded Count IV. Plaintiffs allege the County "agree[d] or acquiesce[d]" in FDEM's use of the TNT Airport for the detention facility, but these conclusory assertions are insufficient because they lack specific factual allegations to support them. Nowhere does the Second Amended Complaint allege any statements by the County agreeing or acquiescing to FDEM's use of the TNT Airport as a

detention facility. *See Ashcroft v. Iqbal*, 556 U.S. 662, 680–81 (2009) (finding that allegations that the petitioners "'knew of, condoned, and willfully and maliciously agreed to subject [him]' to harsh conditions of confinement … [were] conclusory and not entitled to be assumed true").

Similarly, Plaintiffs altogether fail to allege which of the dozens upon dozens of provisions of the County Code or CDMP the County allegedly violated or what specific actions the County Code or CDMP required the County to take. And the reason for this failure is obvious: neither the County Code nor the CDMP impose upon the County any requirement to oppose or attempt to control or condition the exercise of emergency powers by the State. Count IV therefore fails to state a claim for these pleadings deficiencies as well.

## II. The Injunction Requested Against the County Is Unenforceable Because It Is Impermissibly Indefinite and Fails to Specify the Acts the County Would Have to Take to Comply With the Injunction

Rather than seeking to enjoin the County from a defined set of actions, Plaintiffs would have the Court overseeing and enforcing whether the County is "permitting the use of property limited to aviation activities as a mass detainment center or any other unauthorized use" (SAC Prayer for Relief, E). This proposed relief would violate the Federal Rules of Civil Procedure and related precedent requiring that injunctive relief be set forth with requisite specificity.

An injunction must, among other things, "state its terms specifically; and [] describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(B)–(C). In effect, "[t]he drafting standard established by Rule 65(d) is that an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed." *Hughey v. JMS Dev.*

*Corp.*, 78 F.3d 1523, 1531 (11th Cir. 1996) (quoting 11A Wright, Miller & Mary Kay Kane, Fed. Prac. & Proced.: Civil 2D § 2955 (1995) (footnotes omitted)).[10]

Given these requirements, "courts will not countenance injunctions that merely require someone to 'obey the law.'" *Hughey*, 78 F.3d at 1531; *see S.E.C. v. Goble*, 682 F.3d 934, 949 (11th Cir. 2012) (noting, "[w]e have repeatedly questioned the enforceability of obey-the-law injunctions not only in the context of securities cases but other cases as well" and collecting cases). This is so because "[b]road, non-specific language that merely enjoins a party to obey the law or comply with an agreement . . . does not give the restrained party fair notice of what conduct will risk contempt." *Id.* (citations omitted). Stated differently, an injunction "must be tailored to remedy the specific harms shown rather than to enjoin all possible breaches of the law." *Id.* (citations omitted). In effect, "[a] person enjoined by court order should only be required to look within the four corners of the injunction to determine what he must do or refrain from doing." *Id.* at n.12.

Like an "obey the law" injunction, the injunction Plaintiffs seek would have the Court impose a broad, unspecific mandate on the County that would be as unenforceable as the cease-and-desist order vacated in *LabMD, Inc. v. Federal Trade Commission*, 894 F.3d 1221 (11th Cir. 2018). In that case, the Eleventh Circuit considered whether "a cease and desist order directing LabMD to create and implement a variety of protective measures" was

[10] The clarity required by Rule 65 serves two fundamental purposes. First, that persons subject to an injunction have sufficient notice of the prescribed or proscribed conduct to satisfy due process considerations. *See LabMD, Inc. v. Fed. Trade Comm'n*, 894 F.3d 1221, 1235–36 (11th Cir. 2018) (noting that "[t]he most fundamental postulates of our legal order forbid the imposition of a penalty for disobeying a command that defies comprehension" and that "[b]eing held in contempt and sanctioned pursuant to an insufficiently specific injunction is therefore a denial of due process"). And second, to facilitate effective appellate review. *See Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) ("In the absence of specific injunctive relief, informed and intelligent appellate review is greatly complicated, if not made impossible").

unenforceable. *Id.* at 1224. The subject order, the court noted, "identifies no specific unfair acts or practices from which LabMD must abstain and instead requires LabMD to implement and maintain a data-security program 'reasonably designed' to the Commission's satisfaction." *Id.* at 1230. The court highlighted the problem with setting forth such an "indeterminable standard of reasonableness" by explaining what would likely occur at a hypothetical show-cause hearing to enforce the cease-and-desist order. *See id.* at 1236. Each side would have a respective expert to testify that a particular act was or was not "a necessary component of a reasonably designed data-security program," and the court would be tasked with determining which expert correctly read an injunctive provision, with nothing in the provision indicating which expert would be correct. *Id.* at 1237.

To comply with Rule 56(d) and related precedent, Plaintiffs' requested injunction would have to set forth with specificity the list of actions the County would have to take to not violate the injunction's prohibition against "permitting" the State to use the TNT Airport as a detention facility. Without such specificity, the universe of potential actions is impermissibly indefinite. How exactly would the County have to not "permit" the State's actions? Would the County have to take enforcement action? If so, what laws would the County have to enforce, and what remedies pursue, and what opportunities to cure provide? Would the County have to file a lawsuit or instead pursue administrative remedies? Or, instead of taking enforcement action, would the County have to require the State to submit to a regulatory approval process? If so, which permits or other regulatory approvals would the State have to get, and under what conditions would the County have to grant or instead deny those approvals, and what should the County do if the State does not strictly comply with the requirements of those approvals?

Such a dizzying list of questions and counterfactuals throws into stark relief the utter failure of Plaintiffs' requested injunction to comply with Rule 65(d)'s specificity requirements. *See Wynn Oil Co. v. Purolator Chem. Corp.*, 536 F.2d 84, 86 (5th Cir. 1976) (holding that an injunction restraining defendants from "slandering and disparaging the Wynn Oil Co. and its products" was "impermissively vague" and "lack of specific findings in this regard ma[de] it impossible to relate the broad language to specific acts"); *see also Elend v. Sun Dome, Inc.*, 370 F. Supp. 2d 1206, 1211 (M.D. Fla. 2005), *aff'd sub nom. Elend v. Basham*, 471 F.3d 1199 (11th Cir. 2006) (noting the proffered injunction "was something along the lines of a prohibition against violating the First Amendment rights" which was an improper "type of 'obey the law' injunction"). Thus, for yet another reason, Count IV must be dismissed.

**III. In the Alternative, Count IV Should Be Dismissed as Moot**

Separate and apart from its various pleading deficiencies, Count IV should be dismissed as moot because the State no longer controls the TNT Airport, and no detention facility has been operated on the TNT Airport since FDEM returned control of the airport to the County. "A case is moot when later events deprive the court of the power to grant meaningful relief." *Purpose Built Families Foundation, Inc. v. United States*, 95 F.4th 1346, 1352 (11th Cir. 2024) (citations omitted). "Because mootness is jurisdictional, a moot case must be dismissed." *Id.* And while "[a] defendant's voluntary cessation of challenged conduct ordinarily does not render a complaint moot," it does when "it is absolutely clear that the challenged conduct could not reasonably be expected to recur." *Id.* at 1353 (citations omitted). In the context of government conduct, such an inquiry turns on three factors: (1) "whether the agency's change in conduct resulted from substantial deliberation or was instead merely an attempt to manipulate jurisdiction"; (2) "whether the decision to terminate the challenged conduct is

permanent and complete"; and (3) "whether the agency has consistently maintained its commitment to the new policy." *Id.* (citations omitted).

Count IV seeks declaratory and injunctive relief to force the County to not allow the State to operate a detention facility at the TNT Airport. The State, however, returned control of the TNT Airport to the County on August 11, 2026. (*See* Cty. Ex. 1). Since then, no detention facility has been operated on the property. Instead, the County has been returning the property to aviation use, consistent with its use of the prior decades, and consistent with the County's obligations to the Federal Aviation Administration. (*See id.*). The County Mayor's Administration has also been working toward the potential sale or transfer of all or a portion of the TNT Airport property for permanent conservation and ecological restoration. This is no attempt to manipulate the Court's jurisdiction, and Plaintiffs cannot in good faith deny that the County intends to return the property to aviation use and to continue exploring options for conservation and ecological restoration at the property.

Any declaration or injunction Plaintiffs seek under Count IV would address a factual scenario that has ceased to exist and as to which there is no allegation reasonably suggesting such a scenario would return. Such an order would, in other words, be advisory, but "Article III grants federal courts no authority to issue advisory decisions." *Purpose Built Families*, 95 F.4th at 1352.

**CONCLUSION**

For the multitude of reasons set forth above, Count IV should be dismissed for failure to state a claim or, in the alternative, as moot, and the County should be dismissed from this action.

Dated October 2, 2026

Respectfully submitted,

GERALDINE BONZON-KEENAN
Miami-Dade County Attorney
Stephen P. Clark Center
111 NW 1st Street, Suite 2810
Miami, Florida 33128

By: /s/ Christopher J. Wahl
David M. Murray (FBN 291330)
Christopher J. Wahl (FBN 122453)
Monica Rizo Perez (FBN 28319)
Assistant County Attorneys
dmmurray@FlyMIA.com
wahl@miamidade.gov
monica.rizo@miamidade.gov
kgriffin@FlyMIA.com
victor.rodriguez3@miamidade.gov
madalis.gonzalez@miamidade.gov
(305) 375-5151
Attorneys for Miami-Dade County