**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**No. 25-cv-22896-KMW**

FRIENDS OF THE EVERGLADES, INC., et al.,

Plaintiffs,

v.

MARKWAYNE MULLIN, et al.,

Defendants.

**<u>FDEM'S REPLY IN SUPPORT OF MOTION TO DISMISS</u>**

FDEM's detention center operated for a year, providing critical immigration-detention bed space. Once the border was more secure, the need for the facility abated, FDEM closed it, demobilized the structures, and returned the land to Miami-Dade County. That should end this case: with no facility, no immigration detention, and no FDEM on the ground, there is nothing left for Plaintiffs to challenge.

In an attempt to keep their suit alive, Plaintiffs mix and match legal theories. Their claims sound in process, and their alleged injuries trace to an operating detention center—yet the remedies they seek center on substantive, retrospective remediation. That mismatch is fatal. Remedies must fit both the theory of liability and the injury alleged. This suit challenged FDEM's detention facility. That facility is gone. This lawsuit should be as well.

## ARGUMENT

### I. THIS CASE IS MOOT

A case is moot "when it no longer presents a live controversy with respect to which the court can give meaningful relief." *Graham v. Att'y Gen.*, 110 F.4th 1239, 1244 (11th Cir. 2024) (citation omitted). The mootness inquiry asks two questions. First, courts ask whether the challenged policy has been rescinded. *See Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs*, 868 F.3d 1248, 1256 (11th Cir. 2017) (en banc). Second, courts ask whether the voluntary-cessation doctrine nonetheless defeats mootness. *Id.* At the first step, the government has the burden to show that the challenged policy has been rescinded. *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 115 F.4th 1266, 1284 (11th Cir. 2024). But "once the repeal of a policy has" suggested mootness, the "burden shifts to the plaintiff to '[show] a reasonable expectation—or ... a substantial likelihood—that the government defendant will reverse course and reenact the repealed'" policy. *Edwards v. Randolph Cnty. Sheriff*, 192 F.4th 1301, 1311 (11th Cir. 2026) (quoting *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1268 (11th Cir. 2020)). Said otherwise, although defendants bear the "heavy" burden of showing that a policy has been repealed, once that burden is met, a plaintiff must show the wrongful behavior could "reasonably be expected to recur." *Flanigan's*, 868 F.3d at 1255-56. *FBI v. Fikre*, 601 U.S. 234 (2024), does not change this burden. The Eleventh Circuit has continued to apply its burden-shifting approach post-*Fikre*. *See Edwards*, 192 F.4th at 1311 (citing *Fikre* before applying the burden-shifting framework). Here, FDEM satisfies both prongs of the test.

**A. The Challenged Policy Has Been Rescinded**

Plaintiffs challenge FDEM's decision to build, operate, and then deconstruct an immigration detention facility. FDEM, "unambiguous[ly]," is no longer doing any of those things. *Doe v. Wooten*, 747 F.3d 1317, 1323 (11th Cir. 2014). Indeed, on July 13, one of the Plaintiffs here acknowledged that the facility was "largely dismantled."[1] And by August 11, FDEM ceased all activity at the site and relinquished control of the land to Miami-Dade. Doc. 188-1 ¶¶ 7-8.

Without ongoing construction, operation, or deconstruction of a detention facility at the TNT site, there is no Article III jurisdiction to entertain Plaintiffs' request to enjoin those non-existent activities. The claim is moot. *See Keohane*, 952 F.3d at 1267; *see also Save the Bay, Inc. v. U.S. Army*, 639 F.2d 1100, 1102 (5th Cir. Feb. 23, 1981) (conclusion of challenged project mooted claims for injunctive relief). Nor is there any future conduct to mitigate with an additional NEPA analysis: FDEM is neither engaging in conduct at the site, nor planning or proposing to engage in conduct at the site.

The Tribe's request for retrospective remediation does not alter this result. The Tribe brings a NEPA claim, so the question is whether additional NEPA process could remedy its alleged injuries. But there is nothing left to study. FDEM is done on that site, so additional NEPA process could change nothing about FDEM's conduct. Nor does the request for declaratory relief overcome mootness. "An otherwise nonjusticiable case cannot be resurrected simply by seeking declaratory relief." *Gagliardi v. TJCV Land Tr.*, 889 F.3d 728, 735 (11th Cir. 2018).

Recognizing these facts, another court dismissed a challenge to FDEM's operation of the TNT site as moot. *See H.C.R. v. Mullin*, 2026 WL 2357889, at *4 (M.D. Fla. Aug. 14, 2026). As the court explained, Governor DeSantis "announced that Alligator Alcatraz had ended operations." *Id.* at *1. And consistent with that announcement, the facility "clos[ed]," the detainees were removed, and the federal government "could no longer transfer detainees to[] the facility." *Id.* Those same facts create the same mootness here.

**B. The Voluntary-Cessation Doctrine Does Not Provide Jurisdiction**

Once a government defendant has ceased the challenged conduct, the case can remain live only if a plaintiff overcomes "the burden of presenting affirmative evidence that its challenge is

[1] Press Release, Ctr. for Biological Diversity, Clean Air Act Lawsuit Concluded After Air Pollution Sources Removed from "Alligator Alcatraz" (July 13, 2026), https://biologicaldiversity.org/w/news/press-releases/clean-air-act-lawsuit-concluded-after-air-pollution-sources-removed-from-alligator-alcatraz-2026-07-13/.

no longer moot" under the narrow voluntary-cessation exception to mootness. *Flanigan's*, 868 F.3d at 1256. That "exception … does not apply where 'subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.* at 1255 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). And "governmental entities" must be "given considerabl[e] … leeway" in "the presumption that they are unlikely to resume" challenged activities once they are declared over. *Id.* at 1256.[2]

*Flanigan's* provides three factors to test the risk of recurrence: (1) whether the change in policy was deliberate or an attempt to manipulate jurisdiction, (2) whether the government's decision to terminate the challenged conduct was unambiguous, and (3) whether the government has consistently maintained its new policy. *See* 868 F.3d at 1257. Here, all three factors confirm mootness, as the *H.C.R.* court already held. *See* 2026 WL 2357889, at *1-4.

**1. *Bona Fide Policy Change.*** FDEM's change in policy was a deliberate operational choice divorced from concerns over jurisdiction. Indeed, when FDEM decided to decommission the detention facility, it had already *won* at the Eleventh Circuit, with a decision that assured the then-existing complaint would have to be dismissed. There was no apparent jurisdiction to manipulate. Plaintiffs' only answer is to contend that FDEM did not explain its policy change. Doc. 195 at 13. But that is plainly wrong. FDEM, from the outset, said the detention facility was a temporary measure to relieve the lack of bed space for immigration detainees. *FOE II*, 174 F.4th at 828 ("temporary immigration detention facility"). Once that capacity crunch was relieved, the facility had completed its mission, and so FDEM publicly explained it would decommission the facility for that reason. Doc. 188-1 ¶ 6; *H.C.R.*, 2026 WL 2357889, at *1, *3. Plaintiffs' allegation of a "backroom action[]," Doc. 195 at 13, is thus fanciful, as it was announced with a formal press conference that explained the exact reasons for the closure. That is precisely the kind of "persuasive explanation[]" that shows the decision was "not dependent upon this litigation." *Flanigan's*, 868 F.3d at 1260. *See also Alford v. Walton County*, 159 F.4th 844, 853 (11th Cir. 2025) (noting that a natural sunsetting because the policy is no longer needed favors mootness).

---

[2] Plaintiffs (at 11) again attempt to falsely malign FDEM. The Eleventh Circuit has repeatedly rejected those baseless accusations. *See* Order, No. 25-12873 (Feb. 5, 2026) (denying motion to supplement based on Plaintiffs' allegations); Order, No. 25-12873 (Mar. 31, 2026) (denying motion to reconsider based on these same allegations); *Friends of the Everglades, Inc. v. Sec'y of the U.S. Dep't of Homeland Sec.* (*FOE II*), 174 F.4th 822, 831 (11th Cir. 2026) (reversing the injunction despite these same allegations).

Plaintiffs claim that the timing of FDEM's actions suggests an attempt to manipulate jurisdiction. Doc. 195 at 12. But, again, when FDEM closed the facility, it had already won at the Eleventh Circuit. Those decisions meant FDEM could continue operating the detention facility and held that Plaintiffs would not succeed on the merits of their claims. *FOE II*, 174 F.4th at 830; *see also Friends of the Everglades, Inc. v. DHS* (*FOE I*), 2025 WL 2598567, at *5 (11th Cir. Sept. 4, 2025). FDEM's decision nonetheless to close the facility *despite its victory over Plaintiffs' legal theories* means the cessation could not have been about manipulating jurisdiction, but rather occurred for exactly the reasons FDEM publicly announced. *See Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1285 (11th Cir. 2021) (repeal of policy after a merits win means there was "not … a strategic repeal to avoid adverse litigation developments").

Plaintiffs further argue that "late in the game" changes cannot moot a case. Doc. 195 at 12 (citation omitted). That argument fails factually: the case is still in its infancy, with a motion to dismiss not even decided yet. And it fails legally: mootness is jurisdictional and can arise any time. *See Flanigan's*, 868 F.3d at 1254, 1262 (finding mootness when repeal occurred after "nearly a decade" of litigation but right before en banc review).

**2. *Unambiguous Change.*** FDEM's decommissioning of the detention facility has been unambiguous. Indeed, the clarity of cessation here is far beyond what is found in most cases that are deemed moot. In the typical case, the government moots a policy with the stroke of a pen. And "the Supreme Court has held almost uniformly" that such "cessation of the challenged behavior moots the suit." *Id.* at 1256. But here there is much more: FDEM has physically manifested its decision by depopulating the facility, closing it, deconstructing it, and relinquishing control of the land upon which it sat. Doc. 188-1 ¶¶ 7-11. As *H.C.R.* found, this on-the-ground activity shows FDEM's closure decision is unambiguous. 2026 WL 2357889, at *2.

To claim ambiguity, Plaintiffs cite a passing comment by the Governor, *from last June*, that the facility could reopen if the federal government asked Florida to hold more detainees. But, even at that time, the Governor said the chances of that were negligible, Doc. 188 at 8 n.12, and since then five months have passed and neither the federal nor state governments have even hinted that the facility has any prospect of reopening. Indeed, with the border crisis finally under control, the demand for bed space has lessened; and Florida has also created additional capacity elsewhere.[3]

---

[3] *See* Press Release, Exec. Off. of the Governor, Governor Ron DeSantis Announces Expansion of Florida's Capacity to Detain and Deport Illegal Aliens (Aug. 14, 2025),

Thus, since June, FDEM has completely "decommissioned and deconstructed" the facility, "fully demobilized" its operations, and transferred the land back to Miami-Dade County, which is returning the property to "aviation use." Doc. 188-1 ¶¶ 7, 8; Doc. 187-1 ¶ 8.

Plaintiffs next argue that because the Governor renewed his emergency declaration regarding immigration, FDEM still has the general power to commandeer land and construct detention facilities within Florida. Doc. 195 at 12. But it is true in every government mootness case that, even after the government has changed its policy, it *could* still exercise the power that was originally challenged. Indeed, even if Congress repeals or amends a statute, it could change it back. The inquiry does not turn on plaintiff speculation. Instead, it is rooted in what government officials have said and done. *Keohane*, 952 F.3d at 1269; *Flanigan's*, 868 F.3d at 1261-62; *H.C.R.*, 2026 WL 2357889, at *2. Here, FDEM has said, repeatedly, that it has no intent to again commandeer the TNT site. *See* Doc. 188-1 ¶¶ 10-11; *H.C.R.*, 2026 WL 2357889, at *2.

Plaintiffs claim FDEM has not "promis[ed] not to resume" detention operations at the TNT site. Doc. 195 at 12. It is not clear what kind of "promise" Plaintiffs seek. FDEM has explicitly stated it has no intent to reestablish a detention facility at the TNT site. Doc. 188-1 ¶¶ 10-11. That is more than enough under the law. *Keohane*, 952 F.3d at 1269. And regardless, Plaintiffs confuse the burden: the test is not whether FDEM has "unequivocally assured that it will not re-enact" the challenged policy, but whether Plaintiffs can offer more than "inferences" that the challenged conduct will recur. *Fort Lauderdale*, 11 F.4th at 1285. Plaintiffs do not meet that burden.

Plaintiffs also reference that FDEM has floated the possibility of reimbursing Miami-Dade for limited expenses incurred to return the site to aviation use. *See* Doc. 194 at 8, 16; Doc. 195 at 6. This, they say, "casts doubt on" FDEM's cessation of activities at the TNT site. Doc. 195 at 6. But reimbursing Miami-Dade for those limited costs for *Miami-Dade's activities* is not the same as *FDEM* engaging in the *FDEM* on-site activities Plaintiffs challenge. *See* Doc. 171 ¶¶ 133-67, 210-23; Doc. 178 ¶¶ 6-49. Mootness turns on whether the alleged conduct has ceased, not whether conduct outside the allegations has ceased. *See Covenant Christian Ministries, Inc. v. City of Marietta*, 654 F.3d 1231, 1243 (11th Cir. 2011). Plaintiffs have made no allegation that reimbursing Miami-Dade is unlawful or that Miami-Dade's activities themselves are unlawful.

---

https://www.flgov.com/eog/news/press/2025/governor-ron-desantis-announces-expansion-floridas-capacity-detain-and-deport.

**3. *Consistency of Policy Change.*** FDEM has consistently maintained its cessation of activities at TNT. From June forward, everything FDEM has done has been consistent with, and advanced, a closure of the facility and a relinquishment of the property. *See* Doc. 188-1 ¶¶ 5, 7-8.

Plaintiffs claim FDEM should have conceded its prior use of the site was unlawful. Doc. 195 at 13. But, of course, the Eleventh Circuit twice held to the contrary, *FOE II*, 174 F.4th at 827; *FOE I*, 2025 WL 2598567, at *5-9, and, regardless, mootness doctrine does not require the government to concede liability. It asks whether the challenged policy is still in place, not whether the defendant "continues to believe [the policy] was" legal. *Flanigan's*, 868 F.3d at 1262. That is because Article III "jurisdiction does not turn on a party's beliefs." *Id.* at 1262 n.8. And so a party's refusal to concede illegality "has little, if anything, to do with … the voluntary-cessation analysis at all." *Keohane*, 952 F.3d at 1269.

* * *

In short, FDEM ceased all activity at the TNT site because the need for the site has evaporated. It has removed its personnel and equipment from the site, dismantled the immigration-detention facility, and returned the land to Miami-Dade, which now unilaterally owns and controls it. Looking at those facts, another district court in Florida has already found mootness regarding claims related to the detention facility. *H.C.R.*, 2026 WL 2357889, at *2. This Court should, too.

**C. Plaintiffs' Cases Confirm That This Dispute Is Moot**

Far from helping Plaintiffs, the cases they cite confirm mootness here. In *Vieux Carre Prop. Owners, Residents & Assocs., Inc. v. Brown*, 948 F.2d 1436 (5th Cir. 1991) (cited at Doc. 194 at 11), the Fifth Circuit concluded that a mootness finding was premature because it was possible that the Army Corps of Engineers had continuing regulatory jurisdiction over a project so that further environmental and historic review might have shaped ongoing project determinations. *See* 948 F.2d at 1443-44. But the Fifth Circuit was clear that if the Corps had no remaining regulatory jurisdiction, then the suit would be moot. *Id.* at 1449 (explaining that the suit would be moot if "the Corps no longer has jurisdiction over the activities and structures constituting the park project"). The Tribe's other cases are in accord. *E.g.*, *McMillan Park Comm. v. Nat'l Cap. Plan. Comm'n*, 968 F.2d 1283, 1289 (D.C. Cir. 1992) (looking to federal "approval authority"). But neither the Tribe nor the Organizational Plaintiffs explain how FDEM has continuing regulatory jurisdiction over the facility. It has none: the facility is gone, and FDEM returned the land—and the regulatory power over it—to Miami-Dade County. There are no permits left for FDEM to

administer or on-the-ground work left for FDEM to oversee. The Tribe's suggestion that federal funding might supply that jurisdiction, Doc. 194 at 12-13, fares no better. At most, funding would give the federal government, not FDEM, regulatory jurisdiction. And after-the-fact funding for a removed facility provides no site-specific regulatory jurisdiction anyway.

The Organizational Plaintiffs' cases are no better. In *Cantrell v. City of Long Beach*, 241 F.3d 674 (9th Cir. 2001), the government razed buildings at a Naval Station allegedly with an insufficient environmental review. *Id.* at 678. But the destruction was part of an *ongoing* plan, not the final step towards abandonment of the site. The Navy had razed the buildings "in preparation for the construction of the marine container terminal." *Id.* Because the Navy's project was ongoing, the Ninth Circuit found that the suit was not moot: additional process might change on-the-ground outcomes because the Navy still controlled the site and could work mitigation into its ongoing construction project. *Id.* at 678-79. This case lacks that critical feature: neither the federal government nor FDEM is engaging in any ongoing work at the facility. Doc. 188-1 ¶¶ 7-11. There is thus no ongoing work to change by doing a NEPA analysis. *E.g.*, *Citizens Alert Regarding the Env't v. Leavitt*, 355 F. Supp. 2d 366, 369-70 (D.D.C. 2005) (distinguishing *Cantrell* when the federal government had no ongoing regulatory jurisdiction over the project); *Willow Creek Ecology v. U.S. Forest Serv.*, 225 F. Supp. 2d 1312, 1317 & n.1 (D. Utah 2002) (distinguishing *Cantrell* when there was no ongoing "use").

*Indian Riverkeeper v. Fed. Highway Admin.*, 2007 WL 9702370 (S.D. Fla. Mar. 23, 2007), and *Sierra Club v. U.S. Fish & Wildlife Serv.*, 2023 WL 2570044 (M.D. Fla. Mar. 20, 2023), each permitted a NEPA claim to proceed even though the construction that the respective plaintiffs challenged had been completed. *See* 2007 WL 9702370, at *5; 2023 WL 2570044, at *2. Even assuming those cases are correct, *but see Save the Bay*, 639 F.2d at 1102 (NEPA claim moot when construction done), they do not help Plaintiffs. In both, the construction was done, but the constructed project remained. And in each case, the court reasoned that it could order some change to the project that might offer relief. But FDEM not only finished construction, it also finished deconstruction. Doc. 188-1 ¶¶ 7-11. There is no project left to change, and thus no live dispute.

## II. Sovereign Immunity Bars Suit Against FDEM

Plaintiffs also cannot avoid FDEM's sovereign immunity. They offer no evidence refuting FDEM's showing that it has yielded control of TNT, demobilized the facility, and ceased all operations at the site. Doc. 188-1 ¶¶ 7-11. Nor do they meaningfully dispute that, as a result,

FDEM no longer has a "connection" to an "ongoing violation of federal law," so any relief at this point—including the Tribe's request for remediation—would be "retrospective." *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1333, 1340-41 (11th Cir. 1999).

Instead, Plaintiffs stress that the complaint "***alleges*** an ongoing violation of federal law" and seeks a "prospective" remedy for that violation. Doc. 195 at 14 (emphasis added). But as their own authorities note, mere allegations can rebut only "***facial*** … jurisdictional attack[s]." *Maron v. Chief Fin. Officer of Fla.*, 136 F.4th 1322, 1331 (11th Cir. 2025) (emphasis added); *see Lavina v. Fla. Prepaid Coll. Bd.*, 174 F.4th 49, 53-54 (11th Cir. 2026) (involving a facial attack). FDEM has raised a "***factual*** attack," Doc. 188 at 9 n.14, so "no presumptive truthfulness attaches" to Plaintiffs' allegations. *Grappell v. Cardona*, 2024 WL 2273366, at *2 (S.D. Fla. May 20, 2024). To defeat that factual attack, Plaintiffs were "required to submit facts through some evidentiary method" and bore "the burden of proving by a preponderance of the evidence that the trial court does have subject matter jurisdiction." *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. May 5, 1981). They cannot "merely reiterate the factual allegations in the complaint," but rather must "substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009). Plaintiffs have not done so and that is fatal. *See id.* at 1280 (dismissing complaint on factual attack where plaintiff "proffered no competent evidence to establish jurisdiction in opposition to" defendant's evidence); *Polski Linie Oceaniczne v. Seasafe Transp. A/S*, 795 F.2d 968, 972 (11th Cir. 1986) (similar).[4]

Nor can Plaintiffs' mootness analysis fill the gaps in their sovereign-immunity argument. Their mootness theory concedes that FDEM has "suspend[ed] [its] challenged conduct." Plaintiffs instead go all in on the voluntary-cessation doctrine. Doc. 195 at 11. But that doctrine does not apply to the Eleventh Amendment. *See Allen v. Cooper*, 895 F.3d 337, 355 (4th Cir. 2018) (rejecting attempt to apply voluntary-cessation analysis to sovereign immunity, as that would "conflate[] the *Ex parte Young* exception with the doctrine of mootness"). So even if "the voluntary-cessation exception [defeats] mootness, it remains [Plaintiffs'] burden in the context of sovereign immunity to establish an *ongoing* violation of federal law to qualify for relief under *Ex*

---

[4] Plaintiffs note in passing that "allegations of threatened future action suffice to establish ongoing violations for *Ex parte Young* purposes." Doc. 195 at 14. But again, Plaintiffs cannot rest on mere allegations to rebut a factual attack; they must meet evidence with evidence. Nor does the record identify any threat from FDEM to restart activities; the record shows the opposite.

*parte Young*." *Id.*; *see, e.g.*, *Watkins v. Blinzinger*, 789 F.2d 474, 484 (7th Cir. 1986) (voluntary cessation does not apply in sovereign immunity analysis); *Green v. Mansour*, 474 U.S. 64, 69-73 (1985) (mid-litigation cessation barred relief under *Young*, without regard for voluntary-cessation analysis). Plaintiffs failed to meet that burden, so sovereign immunity bars their suits.

Lastly, Plaintiffs' request for jurisdictional discovery, Doc. 195 at 6-7, should be denied because there are no genuine factual disputes. Plaintiffs' website says "the facility officially closed its doors in July" after all detainees were removed in "June." *See Friends of the Everglades 2026 Impact Report*, Friends of the Everglades (Nov. 13, 2026), https://www.everglades.org/friends-of-the-everglades-2026-impact-report/. Nor is there a dispute that FDEM left the site and returned the land to the County. Doc. 187-1. Plaintiffs' citations are not to the contrary. *McElmurray v. Consolidated Government of Augusta-Richmond County*, 501 F.3d 1244 (11th Cir. 2007), says that discovery and a hearing should be provided as is "appropriate to the nature of the motion to dismiss." *Id.* at 1251. And their citations make clear that when there are no genuine disputes of fact, no additional discovery is appropriate. *See Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. May 20, 1981). Indeed, the Eleventh Circuit regularly denies jurisdictional discovery when there are no genuine disputes of fact. *E.g.*, *Wolf v. Celebrity Cruises, Inc.*, 683 F. App'x 786, 792 (11th Cir. 2017); *RMS Titanic, Inc. v. Kingsmen Creatives*, 579 F. App'x 779, 790 (11th Cir. 2014).

## III. PLAINTIFFS LACK STANDING

**A.** No Plaintiff is injured by FEMA's remaining funding obligation. The Organizational Plaintiffs identify no such injury. Instead, they incorrectly assert the demand for an injury confuses mootness with standing. Doc. 195 at 9. FDEM's argument is not that deconstruction has mooted the funding claim by eliminating a funding-based injury that once existed; the point is that Plaintiffs were never injured by moving money between FEMA and FDEM. Their purported injuries trace to operating the facility, not the back-end accounting.[5] The Organizational Plaintiffs insist they do not just seek to enjoin funding, "they seek to enjoin the activity." *Id.* But "standing is not dispensed in gross." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). To seek an injunction against funding, Plaintiffs need to point to an injury traceable to funding. They do not.

[5] On November 12, 2026, FDEM asked FEMA for reimbursement for additional costs beyond the per-detainee-per-day burdened rate authorized by the grant. *See* Doc.188-2 ¶ 5. FEMA approved that request. These additional reimbursements (for things like detention operational readiness) all still relate to past spending at the site. So they do not change the injury analysis.

Without an injury tied to funding, the funding challenge here is just like the one in *St. John's United Church of Christ v. FAA*, 520 F.3d 460 (D.C. Cir. 2008). There, the D.C. Circuit dismissed a claim because the plaintiffs could not trace their injuries to the funding grant they challenged. *Id.* at 462-63 ("Because FAA's $29.3 million grant reimburses Chicago for completed work that did not affect the petitioners, how the grant causes their injuries is a mystery."). So too here: Plaintiffs trace their injury to the facility's operation, not the after-the-fact funding. Rather than point to a funding-based injury, the Organizational Plaintiffs say that *St. John's* is not a procedural-injury case. Doc. 195 at 9 n.14. That is simply incorrect: the plaintiffs there alleged a "procedural right," and the court spent a full paragraph rejecting that standing theory. 520 F.3d at 463.

The Tribe takes a different tack. It says that because funding remains undisbursed, its procedural "injury" can still be redressed. Doc. 194 at 9-10. But that confuses injury with redressability. If the Tribe wants to challenge funding, it must explain why it is injured by funding. On that front, however, all the Tribe says is that funding could be leveraged to demand different outcomes on the ground. Doc. 194 at 10. That is the same argument the D.C. Circuit rejected in *St. John's*: once a project is complete, after-the-fact funding causes no injury.

And the Tribe's leverage theory fails on redressability, too. It depends on a chain of "unfettered choices made by independent actors" untargeted by the claim, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)—FEMA deciding to attach new conditions to an award that is no longer tied to the TNT site, Doc. 184-7 at 7, and Miami-Dade, the fee-simple owner that has controlled the site since August 11, 2026, Doc. 188-1 ¶¶ 8-9, deciding to do something different with its land in response. No funding-related claim is asserted against the County, and no funding condition imposed on FDEM would bind it. That means "[i]t is entirely conjectural whether the nonagency activity that affects [the Tribe] will be altered or affected by the agency activity they seek to overturn." *St. John's*, 520 F.3d at 463 (citation modified).

**B.** Nor do Plaintiffs fare any better in pleading standing more broadly. The Organizational Plaintiffs rest most of their defense of standing on new declarations. But Plaintiffs "based on their complaint, must establish that they have standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). To be sure, if a defendant introduces evidence to contest standing, a plaintiff can meet that evidence. *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1233 (11th Cir. 2008). But the plaintiff must, in all events, allege "standing based on the facts alleged in the complaint." *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001).

Neither set of Plaintiffs has done so. The Organizational Plaintiffs do not dispute that, to plead environmental standing, they must show geographic proximity. Doc. 195 at 5. But most of the allegations in the Amended Complaint flunk that test. It is not enough that some of the organizations' members wish to visit the Big Cypress Preserve. *E.g.*, Doc. 171 ¶¶ 24-31. The Preserve is massive, running over 729,000 acres. Wishing to visit the Preserve, somewhere, says nothing about whether a member was injured by the activities *at the TNT site*. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 495-96 (2009). But without the generalized claim that some members might visit the Preserve generally, the closest the complaint gets to pleading proximity is the vague claim that some members recreate "in and around the TNT site." Doc. 171 ¶ 27. That is a near-verbatim recitation of what the Supreme Court held is too generalized. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 887-88 (1990) (rejecting allegation that members recreated "in the vicinity of" an action challenged on environmental grounds).

The Tribe has a different standing problem. It alleges proximity but does not plausibly allege injury. The Tribe points to allegations that it owns lands "adjacent or in close proximity to" the Preserve and the TNT site, that the area holds "historic, cultural and spiritual" significance, and that "Defendants' failure to comply" with NEPA will "cause[] adverse effects and injuries to the Tribe's adjacent and proximate landholdings" and has "prevented and will continue to prevent Tribal members from exercising their rights to use and occupy the Big Cypress National Preserve." Doc. 194 at 6, 8 (citing Doc. 178 ¶¶ 3-4, 47, 66-68, 78, 82). Those allegations fail for four reasons. First, they are conclusory. The Tribe never identifies what adverse effect any FDEM conduct has had or will have on any Tribal parcel, and an "information and belief" prediction of future harm, Doc. 178 ¶ 47, is not a "certainly impending" injury. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Second, the access allegation was not true when pleaded. The Tribe filed its Amended Complaint on August 26, 2026—fifteen days after FDEM returned the site to Miami-Dade County. Doc. 188-1 ¶¶ 8-9. Whatever "prevent[s]" Tribal members from using the Preserve today, it is not FDEM. Third, the Tribe cannot fill the gap with other parties' members. It "incorporates and adopts" the Organizational Plaintiffs' allegations about *their* members, Doc. 178 ¶ 5, but a party cannot borrow another organization's members to establish its own standing. Fourth, the Tribe's invocation of its NHPA consultation rights, Doc. 194 at 6-7, is beside the point as to FDEM: the NHPA imposes duties on federal agencies, not on FDEM. *See* 54 U.S.C. § 306108.

**C.** One final standing problem. Because Plaintiffs seek prospective relief (which they must do to avoid immunity), they must allege imminent injury. Plaintiffs say that is no problem because "standing is determined at the time the complaint is filed." Doc. 195 at 9. But their own authority refutes that proposition: when a plaintiff files an amended complaint, "it is necessary that appellant possessed Article III standing on this later date." *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir. 2003). To be sure, sometimes the amended complaint will relate back to the original, making the two dates the same. But conduct that post-dates a complaint "cannot possibly relate back to the earlier date of filing." *Abramson v. Boedeker*, 379 F.2d 741, 744 (5th Cir. 1967). That is why "a plaintiff's Article III standing is evaluated as of the date of the supplemental pleading." *Lutter v. JNESO*, 86 F.4th 111, 125-26 (3d Cir. 2023).

That rule defeats standing for every theory save a construction claim, which is moot. The original complaint was filed on June 27, 2025, before the facility opened. Doc. 1. Allegations about the finished facility, its operation, its federal funding, and its deconstruction are definitionally supplemental: those events occurred after the filing of the complaint. *See* 6A Wright & Miller, *Fed. Prac. & Proc. Civ.* § 1504 (3d ed.) (a supplemental pleading sets "forth transactions, occurrences, or events that have happened since the filing of the pleading to be supplemented"). But by the time the supplemental complaints were filed—August 12, 2026 (Doc. 162), August 24, 2026 (Doc. 171), and August 26, 2026 (Doc. 178)—every detainee had been gone for two months, the facility had been deconstructed, and the land had been returned to Miami-Dade. Doc. 188-1 ¶¶ 5-9. At that point, no Plaintiff faced an imminent injury from FDEM's construction (it was done), operation (done too), or deconstruction (done as well).

Plaintiffs' responses do not change that. They speculate that FDEM might return to the site because the County hoped FDEM would "address any necessary remediation." Doc. 195 at 6. But FDEM has averred that it has "conducted no activities at the TNT site" since August 11, has "no plans to return," and told the County in writing that it "would not do any work on the site." Doc. 188-1 ¶¶ 9-11; Doc. 188-2 ¶ 8. Considering whether to reimburse the County, from state funds, for work the County may choose to perform, Doc. 188-2 ¶¶ 9-10, cannot create the basis for an environmental injury. And Plaintiffs' supposed fear that the facility might someday be rebuilt, Doc. 195 at 5, rests on a chain of contingencies—a new federal request, a new state decision—that is the opposite of a "certainly impending" injury. *Clapper*, 568 U.S. at 409-10. To seek

prospective relief, Plaintiffs "have to build [their] case from scratch." *Murthy v. Missouri*, 603 U.S. 43, 59 (2024). The supplemental complaints do not.

Of course, Plaintiffs contest that analysis when it comes to mootness. But whether FDEM can satisfy the voluntary-cessation doctrine in the mootness context (it can) is beside the point. Plaintiffs did not add their supplemental claims until FDEM had already ceased its allegedly wrongful conduct. In that context, standing, not mootness, is the proper frame. And when it comes to standing, it is Plaintiffs who bear the burden to prove certainly impending injury, not FDEM's burden to show cessation. *E.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998); *United States v. City of Tampa*, 739 F. Supp. 3d 1055, 1064 n.1 (M.D. Fla. 2024).

## IV. Venue Is Improper in This Court

**A.** Plaintiffs and the Tribe insist this Court already resolved venue when it granted a preliminary injunction, and the Tribe says FDEM must now show that ruling was "an abuse of discretion." Doc. 194 at 26; Doc. 195 at 36 & n.34. But the Eleventh Circuit vacated that order, *see FOE II*, 174 F.4th at 827, and vacated opinions are "officially gone [with] … no legal effect whatever," *United States v. Sigma Int'l, Inc.*, 300 F.3d 1278, 1280 (11th Cir. 2002) (en banc). Plaintiffs' own description of *FOE II*—that the Eleventh Circuit "left the venue issue to the district court," Doc. 195 at 36 n.34 (citation modified)—confirms this Court must write on a clean slate.

Nor would the Court's preliminary ruling warrant deference even if it had somehow survived vacatur. The stay panel was already "skeptical of" the prior venue analysis, explaining that the in-District events on which it relied "do not appear to 'directly give rise' to the Plaintiffs' NEPA claim." *FOE I*, 2025 WL 2598567, at *10 & n.9 (quoting *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003)). And the question now is whether the operative complaints "plead sufficient facts … establish[ing] that venue is appropriate in this district," *ASI Diamonds, Inc. v. Schwardt*, 2019 WL 1960211, at *3 (S.D. Fla. Mar. 1, 2019)—a burden that rests with Plaintiffs and the Tribe, *Delong Equip. Co. v. Wash. Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir. 1988). They have not carried it.

**B.** Both Plaintiffs and the Tribe invoke 28 U.S.C. § 1391(b)(2), which places venue where "a substantial part of the events or omissions giving rise to the claim occurred." That inquiry "focus[es] on relevant activities of the defendant," and only acts with "a close nexus to the wrong"—those that "directly give rise" to the claim—count. *Jenkins Brick*, 321 F.3d at 1371-72 (quoting *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995)). Even then, "only those locations

hosting a 'substantial part' of the events are to be considered." *Id.* at 1371. The wrongs alleged against FDEM are that it built, ran, and dismantled a detention facility without environmental review (Counts I and II) and, in doing so, exercised authority it lacked by "convert[ing] county-owned property into a federal detention center" (Count III). Doc. 171 ¶ 212. The relevant acts for every count are thus the facility's construction, operation, and demobilization, and the decisions behind them—including the decision to commandeer the site. And for NEPA, the relevant omission is "the lack of a decision to conduct" environmental review. *Friends of the Earth v. Haaland*, 2022 WL 185196, at *3-4 (D.D.C. Jan. 20, 2022); *see Harvard v. Inch*, 408 F. Supp. 3d 1255, 1262-63 (N.D. Fla. 2019) (venue for challenge to State policy lay where State officials set it). None of that happened here. The facility sat in Collier County, in the Middle District, and the decisions to commandeer the site and to build without an EIS were made in Tallahassee—facts neither complaint disputes. That is why two other judges of this Court have held that this district is the wrong venue for facility-related challenges, *C.M. v. Noem*, 796 F. Supp. 3d 1198, 1225-33 (S.D. Fla. 2025); *Garcia v. Guthrie*, No. 25-cv-23136, Doc. 5 at 1-2 (S.D. Fla. July 16, 2025), and why the Eleventh Circuit doubted a contrary result, *FOE I*, 2025 WL 2598567, at *10 & n.9.

Unable to place any core event in this district, Plaintiffs and the Tribe instead offer a list of peripheral ones. Doc. 194 at 24-25; Doc. 195 at 37. None "directly give[s] rise" to the claims, *Jenkins Brick*, 321 F.3d at 1371, and each is "insubstantial" next to the acts that do. *Lamont v. Haig*, 590 F.2d 1124, 1134 n.62 (D.C. Cir. 1978).

First, Plaintiffs say FDEM's "notice to the County commandeering the site," and the County's "acquiescence" in that commandeering, were "necessary step[s]" toward the facility's construction, operation, and demobilization—and, as to the notice, that it "directly give[s] rise" to FDEM's allegedly ultra vires "conversion of county-owned property." Doc. 195 at 37-38 (citation modified). But venue does not lie wherever a "necessary event" in a "causal" chain occurred. *Jenkins Brick*, 321 F.3d at 1372 (quoting *Woodke*, 70 F.3d at 985); *see Steen v. Murray*, 770 F.3d 698, 704 (8th Cir. 2014) (acts are not relevant "simply because the alleged wrongful conduct would have been impossible without [them]"). The relevant acts—for the NEPA claims and the ultra-vires claim alike—are FDEM's decision to commandeer the site and its conversion of that site into a detention facility. The decision was made in Tallahassee; the conversion occurred in Collier County. A letter telling the landowner what FDEM had decided is not the decision, any more than a notice of injury is the injury. *See Frank v. Univ. of Toledo*, 2006 WL 1555986, at *3 (E.D. Mich.

June 2, 2006); *(888) Just., Inc. v. Just Enters., Inc.*, 2007 WL 2398504, at *6 (S.D.N.Y. Aug. 22, 2007). That is why Judge Ruiz rejected this very theory: "[r]elying on" state communications sent into this District "to manufacture venue would not only redefine the 'close nexus' standard but also introduce a 'minimum contacts' personal jurisdiction analysis to venue that this circuit has expressly disclaimed." *C.M.*, 796 F. Supp. 3d at 1233.[6]

Second, Plaintiffs and the Tribe cite FDEM's supposed "failure to obtain information" from the County about environmental impacts, along with the Federal Defendants' failures to consult the Tribe, Everglades National Park, and the Fish and Wildlife Service. Doc. 194 at 24-25; Doc. 195 at 37. First off, the Federal Defendants' omissions are not FDEM's, and "venue must be proper for each party." 14D Wright & Miller, *Fed. Prac. & Proc. Juris.* § 3807 (4th ed.). As for FDEM, the argument that it "could not lawfully complete the legally required environmental reviews" without consulting the County, Doc. 195 at 38, conflates the merits with venue. The omission that gives rise to a NEPA claim is "the lack of a decision to conduct" review—not every study or conversation that review might have entailed. *Friends of the Earth*, 2022 WL 185196, at *4 (failure to conduct "additional [NEPA] research" is not a "relevant omission"). A failure to consult is at most a "tangential" consequence of that decision, *Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 294 (3d Cir. 1994), and treating it as a venue-creating event would "subject … officials to suit in almost every district in the country" where someone with relevant knowledge resides, *Leroy v. Great W. United Corp.*, 443 U.S. 173, 186-87 (1979).

Third, Plaintiffs contend that the "Federal Defendants' coordination and supervision of immigration enforcement" from ICE's Miami Field Office, and their "transportation of immigrants" to the facility, establish venue for claims "regarding unlawful operation of the facility." Doc. 195 at 39. Again, those are the Federal Defendants' activities, not FDEM's. And venue does not lie wherever a supervisor sits. *See C.M.*, 796 F. Supp. 3d at 1231-33 (venue in this District improper for TNT-facility challenge despite federal policies emanating from Miami, because on-site actors were not acting "pursuant to the Federal Defendants' instructions"); *Kolev v. Sessions*, 2019 WL 1748436, at *1-2 & n.1 (S.D.N.Y. Apr. 16, 2019) (ICE's § 287(g) supervisory authority did not establish venue in New York where ICE lacked "day-to-day control" over New Jersey facility); *Salcedo v. Decker*, 2019 WL 339642, at *2 (S.D.N.Y. Jan. 28, 2019) (similar);

[6] The County's "acquiescence" adds nothing. It is the defendant's activities that count, *Jenkins Brick*, 321 F.3d at 1371-72, and the County is not a defendant to claims against FDEM.

*Pillsbury v. PBF Energy, Inc.*, 2021 WL 12319890, at *2 (D.N.J. Mar. 24, 2021) (similar). The claims against FDEM are that *FDEM* operated a facility in Collier County without environmental review and without authority. Plaintiffs allege nothing suggesting ICE controlled that facility. Their complaint alleges the opposite—*Florida* took over the site, ran the program, and decided to end it. Doc. 171 ¶¶ 61, 64-65; *see FOE II*, 174 F.4th at 830, 833. That is doubly true of the ultra-vires claim, which on Plaintiffs' telling turns on FDEM acting "independently" of federal control. Doc. 195 at 25. Plaintiffs cannot ground venue in federal supervision they say did not exist.

<u>Fourth</u>, Plaintiffs concede that environmental impacts in this district cannot establish venue alone but say they count when combined with the events above. Doc. 195 at 39-40. That turns *Jenkins Brick* on its head. Venue "focus[es] on relevant activities of the defendant," 321 F.3d at 1371-72 (quoting *Woodke*, 70 F.3d at 985), not on where a plaintiff "feels the effects of a defendant's conduct," *Bigham v. Envirocare of Utah, Inc.*, 123 F. Supp. 2d 1046, 1048 (S.D. Tex. 2000). Harms flowing from an alleged violation are its result, not its cause. They are not "relevant" events, and adding an irrelevant event to a list of tangential ones does not yield a "substantial part" of anything. *See Friends of the Earth*, 2022 WL 185196, at *5.

**C.** Plaintiffs' and the Tribe's fallback theories fail, too. Plaintiffs invoke 28 U.S.C. § 1391(e)(1), the venue provision for suits against federal officers. Doc. 195 at 35. But that provision allows "[a]dditional persons" to be joined only "in accordance with … such other venue requirements as would be applicable if the United States or one of its officers, employees, or agencies were not a party." 28 U.S.C. § 1391(e)(1). Venue must therefore be independently proper "as to each" non-federal defendant. *Little v. King*, 768 F. Supp. 2d 56, 65 n.7 (D.D.C. 2011) (citation omitted). As shown above, it is not proper as to FDEM.

The Tribe argues that venue is proper because part of the TNT property is "situated" in this district. Doc. 194 at 24. But two judges of this Court have already concluded the facility sat in Collier County, in the Middle District, for venue purposes. *C.M.*, 796 F. Supp. 3d at 1208, 1232-33; *Garcia*, No. 25-cv-23136, Doc. 5 at 1-2. Rightly so. The statute asks whether "a *substantial* part of property that is the subject of the action" lies here. 28 U.S.C. § 1391(b)(2) (emphasis added). The "subject of the action" is the detention facility, not every acre of airport land the County owns. No part of that facility sat in this district. The only portion of the prior *airport* parcel in Miami-Dade was an unused strip of runway overflow that formed no part of the claims,

"much less a substantial part of them." *Sterling Wholesale, LLC v. Travelers Indem. Co. of Conn.*, 2012 WL 1991456, at *2 (S.D. Fla. May 29, 2012).

The Tribe also oddly contends that FDEM has not "refute[d]" that venue lies under the ESA's venue provision, 16 U.S.C. § 1540(g)(3)(A). Doc. 194 at 23. But the Tribe does not assert an ESA claim against FDEM, so there is nothing to refute. *See* Doc. 178 ¶¶ 6-49.

Venue is improper in this District. Thus, if the Court does not dismiss the claims against FDEM for lack of jurisdiction, it should dismiss them under Rule 12(b)(3) or transfer them to the Middle District of Florida, where the facility sat and where two judges of this Court previously sent facility-related challenges based on lack of venue. *See* 28 U.S.C. § 1406(a).

## V. PLAINTIFFS' CLAIMS FAIL ON THE MERITS

### A. NEPA/APA

**1.** No one disputes that NEPA claims must be channeled through the APA. *See* Doc. 195 at 20 n.19. And, as the Organizational Plaintiffs themselves concede, "the APA is not applicable to state agencies." Doc. 195 at 27 (quoting *Doe, 1-13 ex rel. Doe Sr. 1-13 v. Bush*, 261 F.3d 1037, 1055 (11th Cir. 2001)). So then, what is the basis for bringing this APA claim against a state agency? Only one Eleventh Circuit case permits that kind of claim: *Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203, 1210 (11th Cir. 2012). And it only does so when the targeted final agency action requires a state agency to work "in tandem with federal agencies." *Id.* But the Organizational Plaintiffs disclaim *Citizens for Smart Growth*. Doc. 195 at 20. And they cannot satisfy its stringent test: the "discrete final agency actions" they point to target DHS, ICE, and FEMA, not FDEM. *See* Doc. 195 at 15. Indeed, when the Organizational Plaintiffs get around to arguing that FDEM formed a partnership with the federal government, they must point to separate conduct—not their "six final agency actions." *Compare* Doc. 195 at 15, *with* Doc. 195 at 20. They say FDEM formed "a partnership or joint venture for purposes of NEPA, including the development, construction, operation and funding of the detention center." Doc. 195 at 20. But the Organizational Plaintiffs admit they have no direct allegations supporting that partnership theory—they concede that FDEM has neither an intergovernmental services agreement nor a § 287(g) agreement with the federal government. Doc. 195 at 27. And without that kind of direct evidence, Plaintiffs would be left to "infer an abstract decision apart from specific agency action." *FOE II*, 174 F.4th at 830 (citation modified). That is the precise analysis the Eleventh Circuit rejected. A party cannot "assemble a constellation of agency choices and transform them into final

agency action." *Id.* at 831. Nor can the Organizational Plaintiffs' theory be squared with the Eleventh Circuit's holding on its own terms. As the Eleventh Circuit explained: "Florida, not federal, officials constructed the facility." *Id.* at 830. The Organizational Plaintiffs cannot invert that holding into the "in tandem" conduct they need to plead an APA claim against FDEM.

The Tribe, for its part, avoids the aggregation problem by challenging only the federal government's funding decision. Doc. 194 at 17-18. But that runs right into the APA problem. A challenge to the federal government's funding decision cannot be brought against a state agency. *E.g.*, *Griffith v. Bell-Whitley Cmty. Action Agency*, 614 F.2d 1102, 1103, 1106 (6th Cir. 1980) (no APA claim against community action agency even though its "programs are funded by the federal government"). And indeed, every single case the Tribe cites was brought against the federal government, not the funding recipient.[7] The Tribe, in short, offers no basis to hold FDEM liable for the federal government's funding decision.

**2.** Nor would Plaintiffs show major federal action attributable to FDEM even if they pointed to final agency action. On that front, the Organizational Plaintiffs considerably understate *FOE II*. Yes, the decision was interlocutory. But it is still a published opinion from the Eleventh Circuit that binds this Court on the law. *See Roe v. Alabama*, 68 F.3d 404, 408 (11th Cir. 1995) (preliminary-injunction decisions "establish law which is binding"). And *FOE II* unambiguously held that the federal control needed for "major federal action" does not exist when Florida retained the authority "to stop building or to dedicate the land to addressing a new emergency." *FOE II*, 174 F.4th at 833. Nothing in the Amended Complaint suggests that Florida gave up that authority. Quite the opposite, the Amended Complaint makes clear that Florida took over the site, Doc. 171 ¶ 61, Florida implemented the detention program, *id.* ¶ 64, and Florida used the site, *id.* ¶ 65.

In response, the Organizational Plaintiffs argue that they can show "a pattern of involvement and influence from before construction to present day." Doc. 195 at 21. They add that in another case, ICE agents directed Florida officials about detainee phone calls. *Id.* But that is disconnected from the governing legal standard. Again, the Eleventh Circuit has made clear that there is insufficient federal control when a state "control[s] the outcome of the project." *FOE II*,

[7] *Cal. Ins. Guarantee Ass'n v. Burwell*, 227 F. Supp. 3d 1101 (C.D. Cal. 2017) (Secretary of Health and Human Services, the Department, and the Centers for Medicare and Medicaid Services); *City of Chicago v. DHS*, 815 F. Supp. 3d 727 (N.D. Ill. 2025) (DHS, FEMA, and their heads); *U.S. Ct. Sec. Officers v. U.S. Marshals Serv.*, 2023 WL 2758354 (S.D.N.Y. Apr. 3, 2023) (U.S. Marshals Service).

174 F.4th at 833. A state controls the outcome of a project when it can either change or end the project over the federal government's objection. *Id.* Federal influence, when ultimately subject to state approval, is not enough. *Id.* Because Plaintiffs allege—at most—such federal influence, they do not adequately allege control. *See FOE I*, 2025 WL 2598567, at *9 n.7.

The Tribe, again, says nothing about FDEM. It argues only that funding is a major federal action. Doc. 194 at 18. But the Tribe never explains why FDEM should be liable for the federal government's own funding decision. And funding is not a major federal action because, again, the federal government lacks control. As the funding documents themselves make clear, the federal government is providing after-the-fact payment to Florida for already-incurred costs like laundry, meals, and office supplies. Doc. 184-5 at 1. Under that program, the federal government had no control over Florida's program—Florida acted first and the federal government paid later. In the words of the statute, the federal government provided "financial assistance" but "does not exercise sufficient control and responsibility over the subsequent use of such financial assistance or the effect of the action." 42 U.S.C. § 4336e(10)(B)(iii). And for that reason, courts have refuted—especially after the 2023 NEPA amendments—that after-the-fact reimbursements are subject to NEPA. *E.g.*, *Hoffman v. U.S. Dep't of Treasury*, 2025 WL 1809994, at *7 (D. Kan. July 1, 2025) (tax credits not subject to NEPA); *see NAACP v. Med. Ctr., Inc.*, 584 F.2d 619, 631 (3d Cir. 1978).

**B. Ultra Vires**

**1.** Plaintiffs assert that *NRC v. Texas* does not govern their ultra-vires claim. Doc. 195 at 25. But they never provide an alternative standard because none exists: *NRC* provides the only standard for "nonstatutory ultra vires review" and it requires more than a disagreement about statutory authority; it demands an "action entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute." 605 U.S. 665, 680-81 (2025) (citation modified). Plaintiffs do not come close to that standard because their central syllogism fundamentally misunderstands federal law. On Plaintiffs' telling, either the federal government had control over construction, operation, and deconstruction (requiring NEPA compliance) or Florida acted entirely unilaterally (making its actions ultra vires). Doc. 195 at 24-25. But there is a third, lawful explanation: Florida kept control but cooperated with the federal government. As the Eleventh Circuit explained, "states have sovereign power to choose to assist federal law enforcement." *FOE II*, 174 F.4th at 833. Indeed, Congress contemplated precisely that kind of cooperation, permitting states to "cooperate with the Attorney General in the identification, apprehension, detention, or removal of

aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(B). And the Eleventh Circuit has recognized that Florida can "apply its own laws to respond to an immigration crisis." *FOE I*, 2025 WL 2598567, at *10 (citation modified). Plaintiffs acknowledge that some of that kind of cooperation is permissible, Doc. 195 at 27 n.26, but insist that such cooperation cannot extend to Florida's efforts here under *Arizona v. United States*. That is an impossible argument because the Eleventh Circuit cited *Arizona* to explain why Florida could cooperate with the federal government in this circumstance. *FOE II*, 174 F.4th at 833. And it cannot be squared with *Arizona*, which gave "examples," not an exhaustive list of valid cooperation. 567 U.S. 387, 410 (2012).

Section 1231(g) does not negate the possibility of cooperation. Yes, the federal government must designate places of detention. But Florida was not abducting federal detainees and sneaking them into its facility. The state and federal governments were cooperating. As the Eleventh Circuit explained, "[a]fter federal authorities inspected the facility for compliance with federal standards, they started using it as a detention facility." *FOE II*, 174 F.4th at 827; *see also* Doc. 171 ¶ 155.

**2.** Plaintiffs' state-law ultra-vires claim fares no better. They do not dispute that under *Pennhurst*, the claim requires them to establish that FDEM acted "without any authority whatever." Doc. 195 at 28. Nor do they dispute that under that test, they must establish more than "erroneous use of authority that exists." *Warren v. DeSantis*, 631 F. Supp. 3d 1188, 1194 (N.D. Fla. 2022). But they simply ignore FDEM's significant state-law authority: under its governing statutes, FDEM coordinates all state power in an emergency. *E.g.*, Fla. Stat. §§ 252.35, 252.36. So in an emergency like this one, FDEM brings forward the full weight of state power.

Plaintiffs have no statutory answer to that argument. They cite no Florida cases or statutes that show that FDEM has no "authority whatever" in this area. Instead, they nitpick, arguing that under FDEM's borrowed authority, it should have consulted with local governments on site selection. Doc. 195 at 28. That at most is the "erroneous use of authority that exists." *Warren*, 631 F. Supp. 3d at 1194. It is not the stuff of an ultra-vires claim. That leaves Plaintiffs' fallback theory that federal law precludes FDEM's actions. But that theory just collapses into the federal ultra-vires theory and fails because FDEM's cooperation is authorized under § 1357(g).

## CONCLUSION

The Court should dismiss all claims against FDEM for lack of subject matter jurisdiction. If it does not, the Court should dismiss or transfer to the Middle District because this Court lacks venue. If it does neither, it should dismiss with prejudice because Plaintiffs cannot state a claim.

Dated: November 20, 2026

Respectfully submitted,

s/ *Jesse Panuccio*
Jesse Panuccio (FBN 31401)
Evan Ezray (FBN 1008228)
David Costello (FBN 1004952)
**BOIES SCHILLER FLEXNER LLP**
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
jpanuccio@bsfllp.com

*Counsel for Jared Perdue, in his official capacity as Executive Director of the Florida Division of Emergency Management*

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2026, the foregoing was filed with the Clerk of Court using CM/ECF, which will serve a Notice of Electronic Filing on all counsel of record.

s/ *Jesse Panuccio*
Jesse Panuccio